## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

| | |
|---|---|
| TRANSGENDER AMERICAN VETERANS ASSOCIATION, | ) ) ) |
| Petitioner, | ) |
| v. | ) ) |
| DENIS R. MCDONOUGH, Secretary of Veterans Affairs, | ) ) ) |
| Respondent. | ) ) ) ) |

**PETITION FOR REVIEW PURSUANT TO 38 U.S.C. § 502**

Pursuant to 38 U.S.C. § 502 and Federal Circuit Rule 15(f), the Transgender American Veterans Association ("TAVA") hereby petitions for review of the denial of its petition for rulemaking by the U.S. Department of Veterans Affairs ("VA"). The petition for rulemaking requested that VA amend its regulations, including 38 C.F.R. § 17.38(c)(4) and implementing directives, to include medically necessary gender-confirmation surgery for transgender veterans in the medical benefits package. *See* Ex. 1. On February 22, 2024, VA denied the petition. *See* Ex. 2.

## INTRODUCTION

Gender-confirmation surgery is medically necessary care, but VA has declined to provide it to transgender veterans, who comprise a disproportionally high percentage of the transgender population. This is especially damaging because transgender veterans are more likely than cisgender veterans to rely on VA health care, more likely to be uninsured, and more likely to face cost barriers to care. VA's refusal to provide transgender veterans with care commensurate with that it provides to non-transgender veterans contravenes its duty to provide medically necessary care to all veterans and violates VA's mandate, mission, and legal obligations.

As TAVA explained in its petition for rulemaking, VA's failure to provide gender-confirmation surgery defies clear medical consensus. Major medical associations have long recognized that gender-confirmation surgery is effective and often essential treatment for gender dysphoria. Gender-confirmation surgery lowers rates of psychological distress and suicidal ideation. By denying transgender veterans access to gender-confirmation surgery through VA, the agency thus consigns transgender veterans to increased risk of physical harm, psychological distress, and suicide. These risks are particularly pronounced for the veteran population, which already exhibits significantly higher suicide and depression rates than civilians.

VA's exclusion of gender-confirmation surgery from the medical benefits package is discordant with its approaches to both gender dysphoria and conditions other than gender dysphoria. First, VA admits that gender dysphoria requires medical attention, as it provides other forms of gender-affirming care, but arbitrarily draws the line at surgery. Second, VA provides the *same medical procedures* that constitute gender-confirmation surgery to treat non-transgender veterans for conditions *other than* gender dysphoria. VA has recognized the importance of the condition this care treats and developed the capacity to provide it—yet refuses to do so.

VA's categorical exclusion of gender-confirmation surgery means that transgender veterans must pay out-of-pocket at non-VA facilities to access this care, which is often prohibitively expensive. Even when a veteran can afford this care, seeking medical treatment outside the VA disrupts their continuity of care to the detriment of their health and well-being. Some transgender veterans who require gender-confirmation surgery but cannot afford it attempt to take matters into their own hands without medical training or supervision, with life-threatening consequences.

TAVA has long been concerned about the myriad problems with VA's categorical exclusion of gender-confirmation surgery. On May 9, 2016, TAVA and two individual veterans filed a

rulemaking petition asking VA to include gender-confirmation surgery for transgender veterans in its medical benefits package. Ex. 1. VA ignored TAVA's rulemaking petition for nearly eight years, leading the organization to file suit to compel the agency to act. *See In re Transgender Am. Veterans Ass'n*, No. 24-108 (Fed. Cir. filed Jan. 25, 2024). By letter dated February 22, 2024, VA denied TAVA's petition. Ex. 2. This denial followed nearly three years of public promises by Secretary McDonough to provide this care and five submissions by VA of proposed rules to that effect to the Office of Information & Regulatory Affairs.

TAVA now seeks judicial review of VA's denial because it was arbitrary and capricious in violation of the Administrative Procedure Act ("APA"). VA's denial of TAVA's petition also violates the equal protection component of the Fifth Amendment, as it amounts to unconstitutional discrimination on the basis of sex and transgender status. This violation of the Constitution constitutes another independent violation of the APA. Finally, VA's denial violates Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116(a), which prohibits discrimination on the basis of sex in federal healthcare programs, including the Veterans Health Administration. This violation of Section 1557 also constitutes a third violation of the APA.

VA's rejection of TAVA's petition for rulemaking after nearly eight years of letting the petition languish—and nearly three years of promises to provide the coverage it requested—demonstrates the agency's failure to take seriously the needs of transgender veterans, the inadequacy of the care it currently provides, and the urgent need for reform.

## JURISDICTION

The U.S. Court of Appeals for the Federal Circuit has exclusive jurisdiction to review the VA Secretary's denial of rulemaking petitions. 38 U.S.C. § 502.

## STANDING

TAVA is a membership-based organization whose members include transgender veterans who are eligible for VA health care and who have been denied gender-confirmation surgery by VA or whose requests would be futile in light of the agency's categorical exclusion. TAVA submitted a petition for rulemaking on May 9, 2016 on behalf of itself and its members, *see* Ex. 1, which VA denied on February 22, 2024. *See* Ex. 2. TAVA has associational standing on behalf of its members because TAVA has members who have standing to sue in their own right, the interests TAVA seeks to protect are germane to its purpose, and neither the claims asserted nor relief requested requires participation of individual TAVA members in this suit. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *Inst. Nat'l Des Appellations D'Origine v. Vintners Int'l Co., Inc.*, 958 F.2d 1574, 1579 (Fed. Cir. 1992); *E. Paralyzed Veterans Ass'n, Inc. v. Sec'y of Veterans Affs.*, 257 F.3d 1352, 1356 (Fed. Cir. 2001).

TAVA also has organizational standing because VA's denial of TAVA's petition is germane to TAVA's purpose, which is to ensure that transgender veterans receive full services and dignified treatment from VA. VA's denial of its rulemaking petition has forced TAVA to divert scarce resources to address the VA failings detailed in the petition and to seek judicial review of VA's denial of the petition. This diversion of resources is an injury-in-fact. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982); *see also Warth v. Seldin*, 422 U.S. 490, 511 (1975).

## SUMMARY OF ARGUMENT

1.      VA's denial of TAVA's petition for rulemaking is arbitrary and capricious in violation of the APA. 5 U.S.C. § 706(2)(A). First, VA's continued exclusion of gender-confirmation surgery from the medical benefits package contradicts VA's position that this care is medically

necessary and thus contravenes the statute requiring VA to provide veterans with care it recognizes as medically necessary. 38 U.S.C. § 1710.

Second, VA's denial of TAVA's petition is discordant with its provision of other gender-affirming care to transgender veterans, as well as its provision of the same or substantively similar surgeries to intersex and other veterans for conditions other than gender dysphoria.

Third, by restricting access to these surgeries to exclusively non-transgender veterans to treat conditions other than gender dysphoria, VA's actions contradict established medical evidence.

Fourth, VA failed to offer reasoned explanation and adequate justification for the denial of TAVA's rulemaking petition. VA's only proffered reason—that the eligibility expansion caused by the Sergeant First Class Heath Robinson Honoring our Promise to Address Comprehensive Toxics Act of 2022 ("PACT Act") "may affect" the decision to provide gender-confirmation surgery, *see* Ex. 2—is insufficient.

2.     VA's denial is "contrary to constitutional right" in violation of the APA. 5 U.S.C. § 706(2)(B). VA's denial of TAVA's rulemaking petition violates the equal protection component of the Fifth Amendment Due Process Clause by impermissibly discriminating on the basis of sex and transgender status. U.S. Const. amend. V. Discrimination on the basis of sex gives rise to heightened scrutiny and necessarily includes discrimination on the basis of transgender status, *cf. Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731 (2020), and discrimination on the basis of transgender status itself gives rise to heightened scrutiny as well. VA impermissibly discriminates on the basis of sex and transgender status by (1) providing the same or substantively identical surgeries to non-transgender veterans to treat conditions other than gender dysphoria and (2) refusing to update its regulations to provide the same type of care to transgender veterans. This discriminatory treatment against transgender people, which lacks a basis in medical consensus, is

not grounded by an exceedingly persuasive justification that furthers an important governmental interest by means substantially related to that interest.

3.      VA's denial is not in accordance with Section 1557 of the ACA or is in excess of statutory authority. 5 U.S.C. § 706(2)(A); *id.* § 706(2)(C). VA's denial runs afoul of Section 1557 of the ACA by impermissibly discriminating on the basis of sex in the provision of a federally administered healthcare program. 42 U.S.C. § 18116(a). By excluding transgender veterans from coverage, VA's denial of TAVA's rulemaking petition contravenes the statutory command that persons may not "be denied the benefits of . . . any program or activity that is administered by an Executive Agency" on the basis of sex, *id.*, which includes discrimination on the basis of transgender status. *Bostock*, 140 S. Ct. at 1731. VA's denial should be set aside as in violation of the APA for it is not in accordance with law or is in excess of statutory authority.

4.      VA's denial directly violates the equal protection component of the Fifth Amendment Due Process Clause by impermissibly discriminating on the basis of sex and transgender status. U.S. Const. amend. V.

5.      VA's denial directly violates Section 1557 of the ACA by denying transgender veterans the medical care it provides to non-transgender veterans. 42 U.S.C. § 18116(a).

As set forth above, VA's denial of the rulemaking petition violates the APA, Section 1557 of the ACA, and the Fifth Amendment.

### RELIEF SOUGHT

For the foregoing reasons, TAVA requests that this Court review VA's denial of its petition for rulemaking and direct VA to undertake rulemaking to amend or repeal its regulations, including 38 C.F.R. § 17.38(c)(4) and implementing directives, that exclude medically necessary gender-confirmation surgery from the medical benefits package.

April 15, 2024

Respectfully submitted,

/s/ Michael J. Wishnie
John Baisley, Law Student Intern*
Alexandra Johnson, Law Student Intern*
K.N. McCleary, Law Student Intern*
Sophie Park, Law Student Intern*
Sonora Taffa, Law Student Intern*
Michael Wishnie, Supervising Attorney
Veterans Legal Services Clinic
Jerome N. Frank Legal Services Organization
Yale Law School**
P.O. Box 209090
New Haven, CT 06520-9090
(203) 432-4800
michael.wishnie@ylsclinics.org

*Motion for law student appearance forthcoming.
**This petition for review does not purport to state the views of Yale Law School, if any.

PETITION FOR RULEMAKING TO

PROMULGATE REGULATIONS GOVERNING PROVISION OF SEX REASSIGNMENT

SURGERY TO TRANSGENDER VETERANS

SUBMITTED TO

THE UNITED STATES DEPARTMENT OF VETERANS AFFAIRS

MAY 9, 2016

Dee Fulcher, Giuliano Silva, and Transgender American Veterans Association

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................1

II.   LEGAL AUTHORITY ..............................................................................4

III.  PETITIONERS .........................................................................................4

IV.   BACKGROUND:  THE CURRENT REGULATORY FRAMEWORK, GENDER
      DYSPHORIA, AND SEX REASSIGNMENT SURGERY .................................7

      A.    The VA's Provision of Medical Care ....................................................7

      B.    Gender Dysphoria and Sex Reassignment Surgery ................................8

      C.    The VA's Current Provision of Surgeries Constituting Sex Reassignment Surgery
            To Treat Other Conditions ..................................................................13

      D.    The Critical Need for Sex Reassignment Surgery in the Transgender Veteran
            Population ........................................................................................16

      E.    Developments in Health Care Coverage for Transgender Individuals .................17

V.    THE VA SHOULD AMEND THE REGULATION TO COVER SEX
      REASSIGNMENT SURGERY ..................................................................20

VI.   THE EXISTING REGULATION IS ARBITRARY AND CAPRICIOUS .....................23

VII.  THE EXISTING REGULATION VIOLATES THE EQUAL PROTECTION
      COMPONENT OF THE FIFTH AMENDMENT..............................................28

      A.    Discrimination Against Transgender People Receives Heightened Scrutiny........28

            1.    Discrimination Against Transgender People Is Sex Discrimination .........28

            2.    Discrimination Based on Transgender Status Also Receives Heightened
                  Scrutiny ...................................................................................31

      B.    The Regulation Cannot Survive Any Level of Review .........................................33

VIII. CONCLUSION.........................................................................................35

Dee Fulcher, Giuliano Silva, and the Transgender American Veterans Association ("TAVA") (together, "Petitioners") hereby petition the Secretary of Veterans Affairs (the "Secretary") to amend or repeal the rules and regulations, including 38 C.F.R. § 17.38(c)(4) and any implementing directives, that exclude medically necessary sex reassignment surgery for transgender veterans from the medical benefits package provided to veterans under the health care system of the Department of Veterans Affairs ("Department" or "VA"), and to promulgate regulations expressly including medically necessary sex reassignment surgery for transgender veterans in that medical benefits package.

## I.    INTRODUCTION

When Congress enacted the Veterans Health Care Eligibility Reform Act of 1996 (Pub. L. 104-262), establishing the current framework for veteran eligibility for medical benefits under the VA health care system, the United States sought to ensure that the medical needs of all American veterans would be met through the provision of quality health care.  To implement that directive, the Department has promulgated a series of regulations establishing robust coverage for the panoply of medical needs that veterans of our armed services might confront.  But in contravention of that directive, the Department also has promulgated a discriminatory regulation that singles out transgender veterans and bars the provision of medically necessary sex reassignment surgery to treat gender dysphoria.  *See* 38 C.F.R. § 17.38(c)(4) (prohibiting coverage for "gender alterations") (the "Regulation").

That bar has remained in place notwithstanding the existence of a broad medical consensus about the need for sex reassignment surgery for many transgender people, and notwithstanding the United States' own evolving policies on the ability of transgender people to serve openly in the military.  The Department's exclusion for sex reassignment surgery was not supported by medical evidence when it was implemented in 1999, and it is even more

- 1 -

indefensible today.  The Department should eliminate the categorical exclusion of sex reassignment surgery as a treatment for gender dysphoria, and expressly include sex reassignment surgery in the medical benefits package available to veterans, either as an exercise of the Secretary's discretion or in recognition of the fact that the exclusion is both arbitrary and capricious and unconstitutional.

Providing sex reassignment surgery to transgender veterans for whom it is medically indicated is required by the Department's stated policy of providing medically necessary care to all veterans.  That sex reassignment surgery is a medically necessary treatment for gender dysphoria is not in dispute within the medical community; all major medical associations recognize this treatment as such.  Providing sex reassignment surgery to transgender veterans is essential to relieving the serious distress caused by gender dysphoria.  Our Nation owes transgender veterans this treatment in the same way it owes all other veterans medically necessary care for their serious medical conditions.  Finally, although the Department has never justified the exclusion for sex reassignment surgery on cost grounds, it bears emphasis here that any marginal increase in the Department's total expenditures on medical care—which should be negligible—should be offset in whole or in part by the reduced costs of long-term health care that would otherwise be necessary for some transgender veterans denied surgical treatment.

Including sex reassignment surgery in the medical benefits package is legally required, and the refusal to do so would constitute arbitrary and capricious agency action, subject to reversal by the federal courts.  The established medical consensus plainly requires the inclusion of sex reassignment surgery in the medical benefits package, on equal footing with medical treatments that address other similarly serious and treatable medical conditions.  Indeed, the Department recognizes the seriousness of gender dysphoria as a medical condition:  It offers

other treatments that may be necessary (but not sufficient) to ameliorate that condition, such as hormone therapy, and it offers ancillary treatments supporting sex reassignment surgery, such as pre- and post-surgical care, for the few who can pay for the surgery on their own.  Nor does the Department appear to have any rational objection to the forms of surgery involved in sex reassignment surgery:  The Department's regulations and directives offer surgeries identical or substantially similar to those constituting sex reassignment surgery to veterans with other medical conditions.  And, finally, the VA excluded sex reassignment surgery without examining any relevant data and without giving any public explanation for the exclusion.  All of this lays bare the arbitrariness of the exclusion at issue here.

The Fifth Amendment to the Constitution likewise bars the exclusion.  To offer certain medically necessary surgeries to veterans for some conditions, yet to deny the same or substantially similar surgeries to transgender veterans to treat gender dysphoria, constitutes unconstitutional discrimination on the basis of sex and transgender status, and the regulations implementing this discrimination fail to survive any level of scrutiny that may be applied.  These regulations—lacking any connection to medical consensus or any other rational justification—are also unconstitutional under a long line of Supreme Court cases forbidding discriminatory treatment that appears to be based on "'a bare … desire to harm a politically unpopular group'[.]"  *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013) (quoting *Department of Agriculture v. Moreno*, 413 U.S. 528, 534-35 (1973)).

The amendments this petition seeks are not only good policy and legally required—they also are urgent.  The suicide rate for individuals with untreated gender dysphoria is significantly higher than that of the general population, as is the prevalence of depression, self-harm, and drug and alcohol addiction.  Appropriate treatment is necessary to prevent such suffering and long-

term harm.  Petitioners respectfully request that the Secretary attend to the urgency of the need of some transgender veterans for sex reassignment surgery in his consideration of this petition.

## II.     LEGAL AUTHORITY

Congress granted the Secretary of Veterans Affairs the "authority to prescribe all rules and regulations which are necessary or appropriate to carry out the laws administered by the Department," which include laws governing veterans' benefits.  38 U.S.C. § 501(a).  The Secretary thus has the authority to amend or repeal the rules and regulations that are the focus of this petition, including 38 C.F.R. § 17.38(c)(4), and to issue appropriate rules and regulations in their place.

## III.    PETITIONERS

Petitioners each have the statutory right to petition the Department for rulemaking pursuant to 5 U.S.C. § 553(e), which requires "[e]ach agency [to] give an interested person the right to petition for the issuance, amendment, or repeal of a rule."  Petitioners also satisfy the standing requirements of Article III of the United States Constitution.

TAVA is a 501(c)(3) organization dedicated to ensuring that transgender veterans receive appropriate and necessary medical care.  TAVA was founded in 2003 to advocate on behalf of transgender veterans within the VA health care system.  Its mission is to work with the VA, Congress, veterans, active-duty military personnel, and LGBT groups to influence the VA and military policy, regulations, and procedures regarding the provision of medical and psychological care to veterans with gender dysphoria.  While TAVA primarily focuses on ensuring the fair and equal treatment of transgender individuals, it is committed to improving the health care of all American veterans.

TAVA is a membership organization, and many of its members are transgender veterans currently enrolled in the VA health care system.  Affidavit of Evan Young ("Young Aff.") ¶ 11.

Some of those individuals have been diagnosed with gender dysphoria by the VA and have been provided some medical care related to their diagnosis. *Id.* However, members who have sought sex reassignment surgery through the VA, or coverage of such surgery by the VA, have been denied such surgery or coverage because of the existing regulatory exclusion of "gender alterations" from covered benefits. *Id.* Many of those veterans rely on the VA for provision of their mental and physical health care, and they satisfy all the medical prerequisites for sex reassignment surgery: They have been diagnosed with gender dysphoria (often by VA clinicians), they have spent multiple years living in a gender role consistent with their gender identity and are currently undergoing hormone therapy to assist in their transition, and they have been prescribed sex reassignment surgery by qualified mental health providers as medically necessary treatment for their condition. *Id.* Nevertheless, these veterans have been unable to obtain medically necessary sex reassignment surgery due to the VA's categorical bar on "gender alterations." *Id.* These veterans are currently, concretely, and directly harmed by the VA's bar on sex reassignment surgery; granting the petition and repealing or amending the Regulation as requested herein would provide them with redress.

TAVA's purpose in submitting this petition is to advocate on behalf of its members who have been denied medically necessary treatment as a result of the VA's regulations. Young Aff. ¶ 12. This petition directly advances one of TAVA's central organizational goals—to achieve reform of the VA's policies regarding coverage of sex reassignment surgery and other medical procedures related to gender dysphoria. *Id.* If the VA were to amend its regulations to include coverage of sex reassignment surgery, such an amendment would significantly improve the physical and mental health of TAVA members and of other transgender veterans with gender dysphoria. *Id.*

Although the relief requested by TAVA in this petition does not require the participation of TAVA's individual members, *see, e.g.*, *Biotechnology Industry Organization v. District of Columbia*, 496 F.3d 1362, 1369 (Fed. Cir. 2007), TAVA is joined in this petition by Dee Fulcher and Giuliano Silva, individual transgender veterans whose interests are directly affected by the VA's exclusion of sex reassignment surgery.

Dee Fulcher is a veteran of the U.S. Marine Corps and a member of TAVA. Affidavit of Dee Fulcher ("Fulcher Aff.") ¶ 2. Dee is a transgender woman. *Id*. She was first diagnosed with gender dysphoria by a physician outside of the VA health care system. *Id*. ¶ 6. Ms. Fulcher's diagnosis of gender dysphoria has been confirmed by a clinical mental health social worker and a board certified physician in internal medicine, both at the Southeast Louisiana Veterans Healthcare System (part of the VA health care network). *Id*. ¶¶ 6-7. Ms. Fulcher's VA clinicians have both recommended that she receive sex reassignment surgery as the next step in her treatment for gender dysphoria. *Id*. If that were covered by the VA, Ms. Fulcher would pursue such surgery, including penectomy, vaginoplasty, facial feminization, breast augmentation, and electrolysis. *Id*. ¶ 8. Yet due to the VA's exclusion of sex reassignment surgery, Ms. Fulcher cannot receive this medically necessary treatment that her physician and mental health provider have prescribed for her.

Giuliano Silva is a veteran of the U.S. Army and a member of TAVA. Affidavit of Giuliano Silva ("Silva Aff.") ¶ 2. Mr. Silva is a transgender man and has been diagnosed with gender dysphoria by medical providers at the Miami VA Healthcare System. *Id*. ¶ 10. While Mr. Silva would seek sex reassignment surgery (in particular, a mastectomy) if that surgery were covered, Mr. Silva also has suffered, and continues to suffer, from additional effects of the VA's exclusion of sex reassignment surgery on the medical practices of VA healthcare providers.

*Id.* ¶ 15.  The VA's exclusion of sex reassignment surgery has had the effect of preventing Mr.

Silva from receiving a mastectomy, which a VA physician has recommended to Mr. Silva to

treat his severe back pain and related problems.  *Id.* ¶ 11.  The surgeon to whom this physician

referred Mr. Silva appears to have determined that Mr. Silva is seeking the mastectomy primarily

as transition-related surgery, rather than as a surgery to address his severe back problems, and

has consequently determined that the surgery is not covered.  *Id.*  In Mr. Silva's experience, the

VA's exclusion of sex reassignment surgery has left VA doctors skeptical of the medical needs

of transgender veterans and outwardly hostile to treating them.  *Id.* ¶ 12.

## IV.    BACKGROUND:  THE CURRENT REGULATORY FRAMEWORK, GENDER DYSPHORIA, AND SEX REASSIGNMENT SURGERY

### A.    The VA's Provision of Medical Care

Under 38 U.S.C. § 1710, the Secretary "shall furnish" "medical services" that the

Secretary determines to be "needed" by several classes of veterans, including those with a

service-connected disability, former prisoners of war, veterans of World War I, and all veterans

who are unable "to defray the expenses of necessary care," which include all veterans who

qualify for Medicaid, receive a qualifying pension, or meet specified income thresholds.

38 U.S.C. §§ 1710(a)(1)-(2), 1722 (a)(1)-(3).  In addition, under § 1710, the Secretary is

authorized to provide "needed" "medical services" to all veterans "to the extent resources and

facilities are available."  38 U.S.C. § 1710(a)(3).  Thus, all veterans are eligible to receive

medically necessary health care, as determined by the Secretary, as long as the VA has the

resources to provide or pay for such care.  As President Clinton explained in signing the current

enabling statute into law, it "authorizes the Department of Veterans Affairs to furnish

comprehensive medical services to all veterans."  Presidential Statement on Signing Veterans

Legislation, 32 Weekly Comp. Pres. Doc. 2018 (Oct. 9, 1996).

- 7 -

Veterans who enroll in the VA health care system (as well as certain other veterans meeting other criteria[1]) are entitled to a "medical benefits package" as defined by regulation (the "Medical Benefits Package").  38 C.F.R. § 17.36.  The regulation sets forth a broad and overarching directive for the provision of veterans' health care:  Veterans are meant to receive a given medical treatment "if it is determined by appropriate healthcare professionals that the care is needed to promote, preserve, or restore the health of the individual and is in accord with generally accepted standards of medical practice."  38 C.F.R. § 17.38(b).  Care is deemed "to promote health" if "the care will enhance the quality of life or daily functional level of the veteran."  *Id.* at 17.38(b)(1).  To that end, the regulation broadly covers inpatient and outpatient medical, surgical, and mental health care.  *See* 38 C.F.R. § 17.38(a).

## B.      Gender Dysphoria and Sex Reassignment Surgery

At issue in this petition is the VA's coverage of medically necessary health care for veterans with gender dysphoria.  By way of background, "gender identity" is an established medical concept, referring to one's intrinsic understanding of oneself as being a particular gender.  Declaration of Dr. Randi C. Ettner ("Ettner Decl.") ¶ 11.  Gender identity is an innate aspect of personality that is firmly established, generally by the age of four, although individuals vary in the age at which they come to understand and express that identity.  *Id.*  Typically, people who are designated female at birth based on the appearance of their genitalia identify as girls or women, and people who are designated male at birth identify as boys or men.  *Id.* ¶ 12.  For transgender individuals, however, the person's gender identity differs from the sex assigned to

---

[1]      Under 38 C.F.R. § 17.37, even veterans who are not enrolled in the VA health care system may receive the care in the Medical Benefits Package, or some subset thereof, if they fall within one of certain specified classes.  For example, veterans with service-connected disabilities that meet specified severity criteria are entitled to all the care in the Medical Benefits Package (§ 17.37(a)), and a veteran with a compelling medical need to complete a course of VA treatment started when the veteran was enrolled in the VA health care system may continue to receive that treatment regardless of the veteran's continuing enrollment status (§ 17.37(d)).

that person at birth.[2]  The medical diagnosis for that feeling of incongruence is gender dysphoria,

which can cause severe distress if untreated.  *Id.* ¶ 13.

The major medical associations and diagnostic manuals uniformly recognize gender

dysphoria as a serious medical condition.  For example, the *Diagnostic and Statistical Manual of*

*Mental Disorders*, Fifth Edition—on which the VA regulations governing ratings for disability

relating to mental disorder rely, *see* 38 C.F.R. § 4.130—dedicates an entire chapter to the

diagnosis of gender dysphoria.[3]  Other manuals too, such as the *International Classification of*

*Diseases*, provide for a diagnosis of gender dysphoria (albeit using different terminology).[4]

Major medical organizations—including the American Psychiatric Association, the American

Medical Association, the Endocrine Society, and the American Psychological Association—

likewise recognize gender dysphoria, and provide for its diagnosis and full treatment, including

through sex reassignment surgery where necessary.  Declaration of Dr. Marci L. Bowers

("Bowers Decl.") ¶ 36; Ettner Decl. ¶¶ 11, 13-14, 18, 24, 35.

In May 2012, the American Psychiatric Association ("APA") issued an official Position

Statement on Access to Care for Transgender and Gender Variant Individuals, which:

(1) recognizes that appropriately evaluated transgender and gender variant individuals can

benefit greatly from medical and surgical gender transition treatments; (2) advocates for removal

---

[2]       A transgender man is a person who was assigned the sex of female at birth but whose gender identity is male.  A transgender woman is a person who was assigned the sex of male at birth but whose gender identity is female.

[3]       The *Diagnostic and Statistical Manual of Mental Disorders*, Fifth Edition ("DSM" or "DSM-5"), is used throughout the world as the authoritative guide to the diagnosis of mental disorders and includes gender dysphoria. The DSM "provides a common language for clinicians to communicate about their patients and establishes consistent and reliable diagnoses that can be used in the research of mental disorders."  American Psychiatric Association, DSM Development, *available at* http://www.dsm5.org/about/Pages/faq.aspx.

[4]       World Health Organization, "Gender Identity Disorders," International Statistical Classification of Diseases and Related Health Problems, 10th Revision (2016), at F64, *available at* http://apps.who.int/classifications/icd10/browse/2016/en#/F64.0.

of barriers to care and supports both public and private health insurance coverage for gender transition treatment; and (3) opposes categorical exclusions of coverage for such medically necessary treatment when prescribed by a physician.[5]

The protocol for diagnosing and treating gender dysphoria is well established and generally accepted by the medical community. The Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People promulgated by the World Professional Association for Transgender Health ("WPATH Standards" or "Standards of Care") set forth the accepted protocol for the diagnosis and treatment of gender dysphoria, and are recognized as authoritative standards of care by the American Psychiatric Association, the Endocrine Society, and the American Psychological Association. Ettner Decl. ¶ 18.

The Standards of Care identify the following treatment protocols for treating individuals with gender dysphoria:

- Changes in gender expression and role (which may involve living part-time or full-time in another gender role, consistent with one's gender identity);

- Psychotherapy (individual, couple, family, or group) for purposes such as exploring gender identity, role, and expression; addressing the negative impact of gender dysphoria and stigma on mental health; alleviating internalized transphobia; enhancing social and peer support; improving body image; or promoting resilience;

- Hormone therapy to feminize or masculinize the body; and

---

[5] American Psychiatric Association, Position Statement on Access to Care for Transgender and Gender Variant Individuals (2012), *available at* http://www.psychiatry.org/File%20Library/Learn/Archives/Position-2012-Transgender-Gender-Variant-Access-Care.pdf.

- Surgery to change primary and/or secondary sex characteristics (*e.g.*, breasts/chest, external and/or internal genitalia, facial features, body contouring).

Sex reassignment surgery is a well-established, effective, and often critical treatment for gender dysphoria. Bowers Decl. ¶¶ 31-38; Ettner Decl. ¶¶ 15, 19-34. While not all individuals with gender dysphoria require sex reassignment surgery, the WPATH Standards recognize that hormone therapy and psychotherapy may be inadequate to treat severe cases of gender dysphoria, and in those cases, failure fully to treat gender dysphoria through sex reassignment surgery may cause serious mental and physical health issues for the patient. Bowers Decl. ¶¶ 34, 37; Ettner Decl. ¶¶ 19-20. Without treatment, individuals with severe gender dysphoria experience anxiety, depression, suicidality, and other attendant mental health issues. Bowers Decl. ¶ 37; Ettner Decl. ¶ 15. Many such individuals carry a burden of shame and low self-esteem, attributable to a feeling of being inherently "defective," and as a result become socially isolated. Ettner Decl. ¶ 15. This isolation in turn leads to the stigmatization of such individuals, which over time proves ravaging to healthy personality development and interpersonal relationships. *Id.* As a result, without treatment, many such individuals are unable to function effectively in occupational, social, or other important areas of daily living. *Id.* A recent survey shows a 41% rate of suicide attempts among transgender people, far above the baseline rates for North America. *Id.* As with the diagnosis of gender dysphoria, there is a consensus within the medical community that sex reassignment surgery may be the only adequate treatment for some cases of gender dysphoria. *Id.* ¶¶ 21, 23; Bowers Decl. ¶ 34.

Courts too have recognized that gender dysphoria is a serious medical condition and that sex reassignment surgery may be medically necessary to treat certain individuals with gender

dysphoria.  In *Soneeya v. Spencer*, for example, the court held that a prisoner's gender dysphoria constituted a "serious medical need" that the Massachusetts Department of Correction ("MDOC") was required under the Eighth Amendment to address adequately.[6]  Moreover, although the MDOC had provided the prisoner with psychotherapy and hormone treatment, offering such treatment alone was inadequate, as the MDOC also was required to "consider whether sex reassignment surgery … [was] medically indicated."[7]  Likewise, in *Fields v. Smith*, the court found that gender dysphoria was a "serious medical need" within the meaning of the Eighth Amendment, and held that a statutory prohibition on hormone therapy and sex reassignment surgery for inmates was unconstitutional on its face because it deprived inmates of access to "medically necessary" treatment.[8]

In a recent Tax Court case, *O'Donnabhain v. Commissioner*, the court conducted a trial and an in-depth review of the medical evidence regarding treatment of gender dysphoria.[9]  The court noted the broad acceptance of the WPATH Standards throughout the psychiatric profession, as evidenced by multiple psychiatric and medical reference texts and court opinions, all concluding that sex reassignment surgery is medically necessary to ensure the health of some patients suffering from gender dysphoria.[10]  Other courts to consider the necessity of surgery to treat gender dysphoria have reached similar conclusions.[11]

---

[6]        851 F. Supp. 2d 228, 231-232, 252 (D. Mass. 2012).

[7]        *Id*. at 252.

[8]        712 F. Supp. 2d 830, 844 (E.D. Wis. 2010).

[9]        *See O'Donnabhain v. Commissioner*, 134 T.C. 34, 65-70 (2010).

[10]        *Id*.

[11]        *See, e.g*., *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) (noting that sex reassignment surgery is an "accepted, effective, medically indicated treatment for GID").

Sex reassignment surgery often may be the only adequate treatment for gender dysphoria. In certain cases, sex reassignment surgery—which can include, depending upon the circumstances, removal or construction of the breasts, penectomy, vaginoplasty, phalloplasty, and penile and testicular implants—is medically necessary to treat the symptoms of gender dysphoria, and indeed may be the only medically adequate treatment.[12]

The VA's categorical ban on sex reassignment surgery in all instances, no matter how necessary it may be for an individual, flies in the face of the medical consensus on this subject. This categorical exclusion is all the more irrational because the VA recognizes that gender dysphoria is a serious medical condition that requires treatment. For example, the VA will provide, where medically necessary, hormone treatment to address gender dysphoria. The VA also will provide pre- and post-operative care for veterans who have undergone sex reassignment surgery outside the VA system. Thus, the VA appears to have no *medical* objection to sex reassignment surgery. Yet the VA irrationally continues to exclude coverage for sex reassignment surgery—no matter how medically necessary.

### C. The VA's Current Provision of Surgeries Constituting Sex Reassignment Surgery To Treat Other Conditions

The VA already provides each of the surgeries that constitute sex reassignment surgery. The VA provides these surgeries for a variety of reasons, including to address certain intersex conditions, to repair traumatic injuries, and to treat cancer, but the VA denies those same procedures to transgender veterans for the treatment of gender dysphoria. For example, VA policy covers surgery for intersex veterans "in need of surgery to correct inborn conditions related to reproductive or sexual anatomy." VHA Directive 2013-003 (Feb. 8, 2013) ("VHA

---

[12]    *See id.* (noting, in the Eighth Amendment context, that providing some treatment consistent with the WPATH Standards does not mean that constitutionally adequate treatment has been provided); *see also Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1188 (N.D. Cal. 2015) (granting preliminary injunction where plaintiff was likely to succeed in establishing that surgery was "the only way to treat her persistent symptoms of gender dysphoria").

Directive 2013-003" or "Directive 2013-003"), at 2.  Under 38 C.F.R. § 17.38(a)(1)(x), the VA

offers veterans "[r]econstructive (plastic) surgery required as a result of disease or trauma,"

which under VHA Directive 1091 (Feb. 21, 2014) ("Directive 1091") includes "those surgical

procedures performed for the revision of external bodily structures which deviate from normal

either from congenital or acquired causes."

Under 38 C.F.R. § 17.38(a)(1)(x) and Directive 1091, the VA offers breast reconstruction

to cisgender[13] women who have had a mastectomy, and penile and testicular implants to

cisgender males whose penises or testes have been damaged.[14]  Hysterectomy and mastectomy

are offered to cisgender females for, among other reasons, reduction of cancer risk.[15]  The VA

also offers cisgender males orchiectomies, scrotectomies, and penectomies for various medical

reasons.[16]  Moreover, under the clear language of Directive 2013-003, the VA offers various

procedures, including vaginoplasty and phalloplasty, for certain intersex individuals born with

ambiguous genitalia.

---

[13]     "Cisgender" is a term used to describe a person whose self-identity conforms to the sex he or she was assigned at birth—*i.e.*, someone who is not transgender.  *See Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1120 n.9 (N.D. Cal. 2015).

[14]     *See* Leong *et al.*, *Effective Breast Reconstruction in Female Veterans*, 198(5) Am. J. Surg. 658-63 (Nov. 2009) (addressing outcomes of breast reconstruction performed at VA hospitals); *Shimansky v. West*, 17 Vet. App. 90, 90 (1999) (patient received a penile prosthesis at the Wilmington, Delaware VA Medical Center); *Brewer v. Nicholson*, 21 Vet. App. 420, 420 (2006) (patient received a penile prosthesis at the Jackson, Mississippi VA Medical Center); Board of Veteran's Appeals, Docket No. 96-07-121 (Sept. 26, 1997) (stating patient received a "testicular prosthetic implantation" at a VA hospital).

[15]     *See* Gardella *et al.*, *Prevalence of Hysterectomy and Associated Factors in Women Veterans Affairs Patients*, 50(3) J. Reprod. Med. 166, 166-72 (Mar. 2005) (estimating the prevalence of hysterectomies provided by the VA Puget Sound Health Care System); Hynes *et al.*, *Breast Cancer Surgery Trends and Outcomes:  Results from a National Department of Veterans Affairs Study*, 198(5) J. of the Am. College of Surgeons 707-16 (Mar. 2004) (examining trends in breast cancer surgery performed at VA hospitals).

[16]     *See Norvell v. Peake*, 22 Vet. App. 194, 195 (2008) (noting that the patient underwent a bilateral orchiectomy at Lexington, Kentucky, VA Medical Center), *aff'd sub nom. Norvell v. Shinseki*, 333 F. App'x 571 (Fed. Cir. 2009); Corman *et al.*, *Fournier's Gangrene in a Modern Surgical Setting:  Improved Survival with Aggressive Management*, BJU International, 84: 85-88 (July 1999) (noting that all patients covered in the survey had received scrotectomies for Fournier's Gangrene and that some of the patients had been treated at West Los Angeles Veterans Administration Hospital); Board of Veterans Appeals, Docket No. 05-31 519 (Oct. 25, 2007) (noting that the patient had undergone a total penectomy at a VA hospital due to cancer).

These procedures are excluded from coverage, however, if they are necessary to treat a transgender veteran's gender dysphoria. The regulation at issue here, *i.e.*, 38 C.F.R. § 17.38(c)(4), expressly excludes "[g]ender alterations" from the Medical Benefits Package. VHA Directive 2013-003 clarifies that this exclusion constitutes an absolute bar to coverage for "sex reassignment surgery," which the Directive defines to include "any of a variety of surgical procedures (including vaginoplasty and breast augmentation in MtF transsexuals and mastectomy and phalloplasty in FtM transsexuals) done simultaneously or sequentially with the explicit goal of transitioning from one sex to another." VHA Directive 2013-003 at 2. Heedless of the current medical consensus regarding the medical necessity of sex reassignment surgery for some individuals suffering from gender dysphoria, the Directive puts such surgery on equal footing with "plastic reconstructive surgery for strictly cosmetic purposes." It does this even though, as noted above, substantively identical procedures are available to intersex veterans under the clear language of the Directive, and to other veterans for various reasons, including to repair traumatic injuries and to treat cancer.

The illogic of the exclusion on sex reassignment surgery is underscored not only by the fact that the VA provides its constituent procedures to other veterans to treat other conditions, but also by the fact that the VA covers *other* aspects of transgender health, including hormone therapy and post-sex-reassignment-surgery health care. Specifically, the VA provides mental health care, hormone therapy, and preoperative evaluation for transgender veterans, as well as continuing hormone replacement therapy and post-operative care to veterans who have received sex reassignment surgery outside the VA health care system. VHA Directive 2013-003 at 2. The VA clearly views those treatments as medically necessary, but irrationally excludes only surgical treatments needed to treat gender dysphoria.

**D.    The Critical Need for Sex Reassignment Surgery in the Transgender Veteran Population**

Recent empirical studies show that the estimated prevalence of transgender individuals in the Nation's military is five times greater than the estimated prevalence in the civilian population.[17]    As of May 2014, there are an estimated 129,700 transgender veterans of the U.S. Military, as well 4,600 retired transgender members of the U.S. Reserves and National Guard. Approximately 15,500 transgender individuals currently serve as members of the U.S. Armed Forces, Reserves, and Guard.[18]    The population of transgender veterans is so significant that since 2015, clinics have opened in Cleveland, Ohio and Tucson, Arizona to specialize in providing medical care to these veterans.[19]    Similarly, the VA Boston Healthcare System has formed the Interdisciplinary Transgender Treatment Team, which provides medical care tailored to the needs of transgender veterans.[20]

Moreover, recent progress in policies affecting transgender military personnel suggests that the population of transgender active-duty military and veterans is likely only to increase.  In July 2015, United States Secretary of Defense Ashton B. Carter issued a directive to devise new rules to allow transgender individuals to serve openly in the military.[21]    These rules are expected to reverse the military's longstanding policy of preventing transgender individuals from serving

---

[17]    Blosnich *et al.*, *Prevalence of Gender Identity Disorder and Suicide Risk Among Transgender Veterans Utilizing Veterans Health Administration Care*, 103(10) Am. J. of Public Health e27 (2001).

[18]    Gates & Herman, *Transgender Military Service*, Williams Institute (May 2014).

[19]    Albrecht, *VA's First Transgender Clinic Opens in Cleveland*, Cleveland.com (Nov. 2015); Jenkins, *New VA Clinic Opens for Transgender Vets*, National Public Radio (Dec. 29, 2015).

[20]    Dep't of Veterans Affairs, VA Boston Healthcare Sys. (Mar. 3, 2016).

[21]    Somashekhar & Whitlock, *Military To Allow Transgender Members To Serve Openly*, Wash. Post, July 13, 2015.

and reflect a growing recognition on the part of the federal government as a whole that transgender individuals deserve fair and equal treatment under the law.[22]

While the percentage of veterans who are transgender is very significant compared to the percentage of transgender individuals in the general population, the transgender veteran population nevertheless constitutes only a small percentage of the total veteran population. Based on the best available data, only 0.6% of the national population of veterans and retirees of the U.S. Armed Forces, Army Reserves, and National Guard is transgender.[23]

### E.    Developments in Health Care Coverage for Transgender Individuals

The VA's categorical exclusion of sex reassignment surgery from the package of medical benefits available to transgender veterans has become increasingly divorced from the practices of other federal agencies and States, which have recognized that sex reassignment surgery may be a medical necessity to treat gender dysphoria. Several federal agencies and state governments have adopted laws and policies to prohibit discrimination against transgender individuals in access to health care. In particular, these agencies and governments have prohibited categorical bars on sex reassignment surgery in coverage determinations made by insurers and health care programs receiving federal and state financial assistance.

At the federal level, the Department of Health and Human Services ("HHS") recently issued a proposed rule under Section 1557 of the Affordable Care Act ("ACA") that would prohibit sex discrimination (including on the basis of gender identity) in any health program or activity receiving federal financial assistance. 42 U.S.C. § 18116; *see* Nondiscrimination in

---

[22]    On January 14, 2016, Matthew Allen, a Pentagon spokesperson, stated that he anticipates that the Secretary's final approval of the rules will be issued in spring 2016. Johnson, *Pentagon Expects Decision on Trans Military Ban in Spring*, Wash. Blade, January 14, 2016, *available at* http://www.washingtonblade.com/2016/01/14/pentagon-expects-determination-on-trans-military-ban-in-spring.

[23]    Gates & Herman, *supra* note 18 at 4.

Health Programs and Activities, 80 Fed. Reg. 54,172 (Sept. 8, 2015).  That prohibition applies to all covered entities under the ACA that provide or administer health-related insurance or other health-related coverage.  Although the prohibition does not apply to the VA, it is nonetheless instructive for the VA as it formulates its own nondiscriminatory practices.  The proposed rule clarifies that the statutory bar on sex discrimination includes discrimination on the basis of gender identity, and voids any explicit categorical exclusion for coverage of health services related to gender transition, such as the one at issue here.  The rule also would prohibit denial of any specific health services related to gender transition "where such a denial or limitation results in discrimination against a transgender individual."  80 Fed. Reg. at 54,190.  For example, a health care plan may be discriminatory if it generally provides coverage of hysterectomies but denies coverage of a hysterectomy needed to treat gender dysphoria.  *See id.*

Additionally, the HHS Departmental Appeals Board recently overturned a thirty-year-old National Coverage Determination ("NCD") denying Medicare coverage of all sex reassignment surgery as a treatment for gender dysphoria.[24]  An NCD is "a determination by the Secretary [of Health and Human Services] with respect to whether or not a particular item or service is covered nationally under [title XVIII (Medicare)]."  Social Security Act §§ 1862(l)(6)(A), 1869(f)(1)(B); *see also* 42 C.F.R. § 400.202 (NCD "means a decision that [the Centers for Medicare & Medicaid Services] makes regarding whether to cover a particular service nationally under title XVIII of the Social Security Act.").  NCDs "describe the clinical circumstances and settings under which particular [Medicare items and] services are reasonable and necessary (or are not reasonable and necessary)."  67 Fed. Reg. 54,534, 54,535 (Aug. 22, 2002).  The Appeals Board found that the exclusion of coverage of sex reassignment surgery was unreasonable in

---

[24]     *See* Decision No. 2576, Department of Health and Human Services, Departmental Appeals Board (May 30, 2014), *available at* http://www.hhs.gov/dab/decisions/dabdecisions/dab2576.pdf.

light of significant and unchallenged empirical evidence supporting the safety, effectiveness, and necessity of that treatment for certain individuals with severe gender dysphoria.[25]

Other federal agencies and multiple States have acknowledged the need to establish clear policies that recognize the medical consensus that sex reassignment surgery may be medically necessary for a number of transgender individuals. For example, the Office of Personnel Management ("OPM") recently issued a letter to health insurance carriers participating in the Federal Employees Health Benefits Program stating that no carrier "may have a general exclusion of services, drugs or supplies related to gender transition or 'sex transformations.'"[26] The guidance from OPM recognizes "the evolving professional consensus that treatment may be medically necessary to address a diagnosis of gender dysphoria."[27] And an increasing number of States, including California, Colorado, Connecticut, Illinois, Maryland, Massachusetts, Minnesota, Nevada, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington, as well as the District of Columbia, have adopted laws and policies that recognize the discriminatory nature of health care programs that deny necessary coverage for the treatment of gender dysphoria.[28] These recent policy revisions and clarifications focus on the inappropriateness of blanket exclusions of sex reassignment surgery and other treatments for

---

[25]    *Id.*

[26]    U.S. Office of Personnel Management, FEHB Program Carrier Letter, Letter No. 2015-12 (June 23, 2015), *available at* https://www.opm.gov/healthcare-insurance/healthcare/carriers/2015/2015-12.pdf.

[27]    *Id.*

[28]    *See* Pennsylvania Ins. Dep't, Notice Regarding Nondiscrimination, Pa.B. Doc. No. 16-762, 46 Pa.B. 2251 (Apr. 30, 2016), *available at* http://www.pabulletin.com/secure/data/vol46/46-18/762.html; 80 Fed. Reg. at 54,189; Rhode Island Office of the Health Ins. Comm'r, Bulletin No. 2015-3 (Nov. 23, 2015), *available at* http://www.ohic.ri.gov/documents/Bulletin-2015-3-Guidance-Regarding-Prohibited-Discrimination.pdf; Minnesota Dep't of Commerce, Administrative Bulletin 2015-5 (Nov. 24, 2015), *available at* http://mn.gov/commerce-stat/pdfs/bulletin-insurance-2015-5.pdf; Maryland Ins. Admin., Bulletin 14-02 (Jan. 27, 2014), *available at* http://insurance.maryland.gov/Insurer/Documents/bulletins/bulletin-1402-transgender.pdf.

gender dysphoria while still preserving providers' ability to make medical necessity determinations on an individual basis.

The VA is quickly becoming an outlier among health care providers in its failure to provide full coverage of the treatment necessary for patients with gender dysphoria.

## V.    THE VA SHOULD AMEND THE REGULATION TO COVER SEX REASSIGNMENT SURGERY

The VA should offer sex reassignment surgery to transgender veterans, first and foremost, because doing so is good policy.  The VA may adopt a new policy if it "is permissible under the statute, [] there are good reasons for it, and [] the agency *believes* it to be better, which the conscious change adequately indicates."  *F.C.C. v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009).  Offering sex reassignment surgery is clearly permissible under 38 U.S.C. § 1710, which broadly authorizes the Secretary to provide "needed" medical care to veterans, and there are good reasons for this policy change:  providing this surgery is consistent with, and mandated by, the VA's mission, would impose at most only a relatively minor burden on the VA health care system, and would provide medically necessary care to alleviate the physical suffering, depression, and suicidal ideation of transgender veterans who, in the absence of such care, are likely to be gravely afflicted with such conditions.

Providing sex reassignment surgery is required by the VA's mission to promote the health of veterans through coverage of medically accepted treatments that enhance the quality of life or daily functional level of veterans.  The Secretary is charged with providing hospital care and medical services to veterans.  *See* 38 U.S.C. § 1710.  The VA has determined that this mandate includes care that is "needed to promote, preserve, or restore the health of the individual and is consistent with generally accepted standards of medical practice."  38 C.F.R. § 17.38(b). Care is deemed "to promote health" if "the care will enhance the quality of life or daily

functional level of the veteran," *id*. § 17.38(b)(1), and care is deemed to "preserve health" if the

care will maintain the current quality of life or daily functional level of the veteran," including

by "extend[ing] lifespan," *id*. § 17.38(b)(2). Notwithstanding its categorical exclusion for some

of the most essential medical care for transgender veterans, VHA Directive 2013-003 states that

"[i]t is the VHA policy that medically necessary care is provided to enrolled or otherwise eligible

intersex and transgender veterans." VHA Directive 2013-003 at 2.[29]

As discussed above, there is no genuine dispute within the medical community that sex

reassignment surgery is a medically necessary component of treatment for some individuals with

gender dysphoria. Indeed, the VA implicitly acknowledges the necessity of sex reassignment

surgery by providing preoperative assessment and post-operative care to veterans who may

undergo, or who have already undergone, such surgery. Not all individuals suffering from

gender dysphoria require surgery, yet those who do may be some of the most vulnerable to

related complications from lack of access to care—namely, depression and suicide. Transgender

individuals who need but do not receive sex reassignment surgery are significantly more

susceptible than the general population to depression and suicide.[30]

Relative to the extraordinarily salubrious effect of providing medically necessary sex

reassignment surgery to those in need of it, a change in VA policy would impose an immaterial

cost burden on the VA health care system. Only a small absolute number of veterans are

---

[29]    Notably, in addition to preventing transgender veterans from receiving medically necessary care, the VA's exclusion of sex reassignment surgery from coverage appears to be having other unfortunate effects, evidently causing some providers to be skeptical of the medical needs of transgender veterans that are unrelated to gender transition, and outwardly hostile to treating them. *See* Silva Aff. ¶¶ 11-12.

[30]    *See* Ettner Decl. ¶ 15 ("A recent survey shows a 41% rate of suicide attempts among transgender people, far above the baseline rates for North America. (Haas et al., 2014)."); Blosnich *et al*., Prevalence of Gender Identity Disorder and Suicide Risk Among Transgender Veterans Utilizing Veterans Health Administration Care," 103 Am. J. Pub. Health e27 (Oct. 2013), *available at* http://ajph.aphapublications.org/doi/abs/10.2105/AJPH.2013.301507 (the "rate of suicide-related events among GID-diagnosed VHA veterans was more than 20 times higher than were rates for the general VHA population.").

transgender, and likely only a fraction of them will require sex reassignment surgery.[31]  And sex

reassignment surgery is no more expensive than substantially identical surgeries included in the

Medical Benefits Package for cisgender veterans.  *See, e.g.*, Bowers Decl. ¶ 20.  Moreover, the

VA's failure to treat gender dysphoria fully in a given patient leads to collateral consequences,

both for the individual veteran who experiences continued mental and physical impairment from

his or her partially treated condition, and for the VA health care system itself, which must

continue to pay for such veterans' mental health care, sometimes indefinitely.  In fact, a recent

study shows that the upfront costs of sex reassignment surgery are negligible when compared

with the ongoing costs associated with treatment of long-term depression in individuals with

cases of gender dysphoria for which surgery is appropriate.[32]

    The California Department of Insurance likewise recently conducted an assessment of the

economic impact of covering transition-related health care and determined that "transgender

insureds who have access to treatment see rates of depression drop and anxiety decrease," and

that "[t]his overall improvement in mental health and reduction in utilization of mental health

---

[31]      *See supra* note 18 and accompanying text.  The WPATH Standards of Care reference available studies of individuals who "present for gender-transition-related care at specialist gender clinics," and notes that these studies estimate the prevalence of such individuals in the general population at between "1:11,900 to 1:45,000 for male-to-female individuals … and 1:30,400 to 1:200,000 for female-to-male … individuals."  Some researchers have suggested that, given the sources of the study participants, the figures in these studies approximate the prevalence of individuals who undergo sex reassignment surgery.  *See* Olyslager & Conway, "On the Calculation of the Prevalence of Transsexualism" (Sept. 2007), at 1 (paper presented at the WPATH 20th International Symposium), *available at* http://www.changelingaspects.com/ PDF/2007-09-06-Prevalence of Transsexualism.pdf.

    The New York Times has reported that a recent yet currently unreleased study commissioned by the Department of Defense and conducted by the RAND Corporation predicted that between only 29 and 129 active service members would seek transition-related medical care annually.  The study also found that given these low numbers, the cost of providing transition-related care to active duty service members would be negligible.  Editorial Board, *The Military's Transgender Policy, Stalled*, N.Y. Times, Apr. 6, 2016.

[32]      Padula *et al.*, *Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population:  A Cost-Effectiveness Analysis*, J. of General Internal Medicine (Oct. 19, 2015).

services could be a source of cost savings for employers, insurers, and insureds."[33]  Citing the California assessment, HHS agreed in its proposed rule on Section 1557 of the Affordable Care Act that "providing transgender individuals non-discriminatory insurance coverage and treatment … will have minimal impact on the overall cost of care and on health insurance premiums."[34]

Finally, offering sex reassignment surgery to transgender veterans is the right thing to do. Offering sex reassignment surgery to transgender veterans can be a life-saving treatment to treat the serious distress associated with gender dysphoria.  Bowers Decl. ¶¶ 34-35, 37; Ettner Decl. ¶¶ 15-16, 21.  The VA implicitly acknowledges what the broader medical community does not question—that sex reassignment surgery is medically necessary for some patients—yet the VA refuses to provide this medically necessary care to those patients.  Our Nation owes transgender veterans this life-changing treatment in the same way it owes all other veterans medically necessary care for their most significant medical conditions.  It is time for the VA to take the next step and provide complete treatment to transgender veterans.

## VI.     THE EXISTING REGULATION IS ARBITRARY AND CAPRICIOUS

Under the Administrative Procedure Act, a court may hold unlawful and set aside final agency action, such as a regulation or a denial of a petition for rulemaking or to amend existing rules, that it finds to be, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.  To comply with the requirements of the Act, the agency "must examine the relevant data and articulate a satisfactory explanation for its action." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 552, (2009) (quoting *Motor Vehicles Mfrs.*

---

[33]     California Department of Insurance, "Economic Impact Assessment of Gender Nondiscrimination in Health Insurance," Reg. File No. REG-2011-00023 (Apr. 13, 2012), *available at* http://transgenderlawcenter.org/wp-content/uploads/2013/04/Economic-Impact-Assessment-Gender-Nondiscrimination-In-Health-Insurance.pdf.

[34]     Notice of Proposed Rulemaking Nondiscrimination in Health Programs and Activities, Medicare & Medicaid Guide 220954, 80 Fed. Reg. 54,171, 54,206 (Sept. 8, 2015).

*Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983)).  That explanation must

"includ[e] a rational connection between the facts found and the choice made."  *State Farm*, 463

U.S. at 42-43.  "Normally, an agency rule would be arbitrary and capricious if the agency has

relied on factors which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the

evidence before the agency, or is so implausible that it could not be ascribed to a difference in

view or the product of agency expertise[.]"  *Fox Television*, 556 U.S. at 552 (quoting *State Farm*,

463 U.S. at 42-43).  Moreover, "it is well-established that 'an agency action is arbitrary when the

agency offer[s] insufficient reasons for treating similar situations differently.'"  *SKF USA Inc. v.*

*United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (quoting *Transactive Corp. v. United States*,

91 F.3d 232, 237 (D.C. Cir. 1996)).

A denial of this petition would be arbitrary and capricious for three reasons:  (1) the VA

already recognizes that gender dysphoria is a treatable medical condition and currently provides

some treatments for it, yet arbitrarily excludes sex reassignment surgery from the covered

treatments; (2) the VA covers certain treatments for cisgender and intersex veterans yet

arbitrarily denies the same or analogous treatments for transgender veterans; and (3) the VA

excluded sex reassignment surgery without examining any relevant data and without giving any

public explanation for the exclusion, while the overwhelming medical consensus supports the

inclusion of sex reassignment surgery.

It is the height of arbitrary and capricious action to recognize gender dysphoria as a

treatable medical condition and provide some treatments for it, while denying other equally

necessary medical treatments.  The VA's current policy with respect to the provision of medical

care to transgender veterans states:

> VHA policy [requires] that medically necessary care [be] provided to enrolled or otherwise eligible intersex and transgender Veterans, including hormonal therapy, mental health care, preoperative evaluation, and medically necessary post-operative and long-term care following sex reassignment surgery.  Sex reassignment surgery cannot be performed or funded by VA.

VHA Directive 2013-003 at 2.[35]  Thus, VA policy clearly recognizes that medically necessary care must be provided to transgender veterans, and also recognizes that some level of care related to sex reassignment surgery is medically necessary.  For example, the VA currently provides mental health care coverage and hormonal therapy—which, like surgery, is specifically designed to assist transgender individuals in treating their dysphoria by making their bodies congruent with their gender.  VA policy likewise provides transgender individuals with therapies, namely "preoperative evaluation, and medically necessary post-operative and long-term care following sex-reassignment surgery," that are specifically tailored to assist individuals seeking sex reassignment surgery with the pre- and post-surgical aspects of such surgery.  And VA policy recognizes as medically necessary evaluations of transgender individuals performed prior to their obtaining sex reassignment surgery (namely, preoperative evaluation).  Thus, the VA recognizes the medical necessity of *every aspect of care* for transgender veterans undergoing sex reassignment surgery, except surgery itself.  That policy is incoherent because it is internally inconsistent, and therefore arbitrary and capricious.

The arbitrary and capricious nature of the VA's policy is underscored by the fact that the VA offers the same or substantially similar surgeries to cisgender and intersex veterans for other medically necessary conditions.  As explained above, sex reassignment surgery is an umbrella term referring to a compliment of surgeries that may include, penectomy, vaginoplasty, chest reconstruction, phalloplasty, hysterectomy, and/or mastectomy.

---

[35]    *See also*, Dep't of Veterans Affairs, Patient Care Services, (Mar. 3, 2016), *available at* http://www.patientcare.va.gov/Lesbian_Gay_Bisexual_and_Transgender_LGBT_Veteran_Care.asp.

Under the clear language of the VA regulations and directives, each of these surgeries is provided as a matter of VA policy to cisgender and intersex veterans for other conditions that the VA recognizes to be medically necessary. VA policy grants surgery to intersex individuals "to correct inborn conditions related to reproductive or sexual anatomy," and so provides penectomy and vaginoplasty to certain intersex individuals born with ambiguous genitalia. VHA Directive 2013-003 at 2. Hysterectomy and mastectomy are offered to cisgender females for, among other reasons, reduction of cancer risk, but the same surgeries are denied to transgender males. *See supra*, note 15. The VA offers, and so deems medically necessary, breast reconstruction to cisgender women who have had a mastectomy, but denies a substantially identical surgery, breast augmentation, to transgender women. *See supra*, note 14. The VA offers penile and testicular implants to cisgender males whose penises or testes have been damaged, but refuses very similar treatment to transgender men. *See id*.

In each of these comparisons, the VA offers certain surgeries to cisgender or intersex individuals for their conditions, but refuses to cover the same or substantially similar surgeries to transgender individuals for their conditions. The VA cannot justify this inconsistent treatment by claiming that these surgeries are medically necessary for treatment of some conditions, but not medically necessary for the treatment of gender dysphoria—as explained above, *see supra* Section IV.B, there is no genuine dispute within the medical community that sex reassignment surgery is medically necessary for certain patients. Accordingly, the VA's current policy amounts to offering certain surgeries when they are medically necessary, only not when those surgeries are medically necessary to treat gender dysphoria. This policy is incoherent and unjustifiable, and the VA's action in continuing it would be arbitrary and capricious. *See SKF USA Inc.*, 263 F.3d at 1382.

- 26 -

Finally, the VA has given no public explanation for excluding from coverage sex reassignment surgery for transgender veterans.  Neither the proposed nor the final Regulation explained the exclusion or offered any evidence that the VA had "examine[d] the relevant data" in arriving at its decision to exclude this surgery from coverage.  *State Farm*, 463 U.S. at 42-43; *see* 63 Fed. Reg. 37,299 (July 10, 1998) (proposed rule); 64 Fed. Reg. 54,207 (Oct. 6, 1999) (final regulation).  The subsequent VHA directives that implemented the exclusion of sex reassignment surgery from the Medical Benefits Package likewise contained no explanation.  *See* VHA Directive 2011-024 (June 9, 2011); VHA Directive 2013-003 (Feb. 8, 2013).  The VA has therefore failed thus far even to attempt to "articulate a satisfactory explanation for its action" in excluding sex reassignment surgery from the Medical Benefits Package, or to offer a "rational connection between [] facts found and the choice made."  *State Farm*, 463 U.S. at 42-43; *see also Michigan v. E.P.A.*, 135 S. Ct. 2699, 2706 (2015) ("Federal administrative agencies are required to engage in 'reasoned decisionmaking.'") (citation omitted).

As explained above, if the VA were to examine data relevant to its policy of excluding sex reassignment surgery from the Medical Benefits Package, the VA would find that such data clearly support reversing this exclusion.  The medical community has reached consensus that sex reassignment surgery is a medically necessary treatment for a significant number of individuals with gender dysphoria—medically necessary in the same way as any other medical treatment that is required "to promote, preserve, or restore" the well-being of the patient.  VHA Directive 1091 (Feb. 21, 2014), at 1; *see also* Bowers Decl. ¶¶ 34-37; Ettner Decl. ¶¶ 21, 23.  No major medical association considers sex reassignment surgery to be a form of cosmetic surgery.  Bowers Decl. ¶ 35; Ettner Decl. ¶ 23.  As discussed above, the costs of providing sex reassignment surgery are negligible in context.  *See supra* Section V at 21-22.

- 27 -

For these reasons, a denial of this petition to amend the Regulation to include sex reassignment surgery in the Medical Benefits Package would constitute unlawful, arbitrary and capricious agency action.

## VII.   THE EXISTING REGULATION VIOLATES THE EQUAL PROTECTION COMPONENT OF THE FIFTH AMENDMENT

A denial of this petition to amend the Regulation to include sex reassignment surgery in the Medical Benefits Package would also violate the Equal Protection component of the Fifth Amendment.  The Federal Circuit is required to "hold unlawful and set aside" any VA regulation "contrary to constitutional right, power, privilege, or immunity."  38 U.S.C. § 7292(d)(1)(B).  The Regulation violates those guarantees by discriminating against transgender veterans on the basis of their sex and their transgender status, without any compelling, or even arguably permissible, government interest.

### A.   Discrimination Against Transgender People Receives Heightened Scrutiny

#### 1.   Discrimination Against Transgender People Is Sex Discrimination

It is "firmly established" that laws or policies that discriminate based on sex are evaluated under close scrutiny.  *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 723 (1982).  Discrimination against transgender people receives the same scrutiny.  In fact, since *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), every court of appeals to consider the question has concluded that prohibitions against sex discrimination protect transgender people.

In *Price Waterhouse*, the Supreme Court held that discrimination on the basis of gender stereotypes is sex-based discrimination.  In that case, a female employee with the Price Waterhouse firm had been denied partnership in the firm because she was considered too "macho" and was told she needed to "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry."  490 U.S. at 235.  Six

members of the Supreme Court agreed that that kind of discrimination due to failure to conform to sex stereotypes constituted sex discrimination. *Id.* at 250-251 (plurality opinion); *id.* at 258-261 (White, J., concurring); *id.* at 272-273 (O'Connor, J., concurring).

Since that decision, federal courts have been nearly unanimous in holding that discrimination against transgender people is also a form of sex discrimination under *Price Waterhouse. See, e.g., G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, No. 15-2056, __ F.3d __, 2016 WL 1567467, at *4-8 (4th Cir. Apr. 19, 2016); *Glenn v. Brumby*, 663 F.3d 1312, 1316-1320 (11th Cir. 2011); *Smith v. City of Salem*, 378 F.3d 566, 571-575 (6th Cir. 2004); *Rosa v. Park West Bank & Trust Co.*, 214 F.3d 213, 215-216 (1st Cir. 2000); *Schwenk v. Hartford*, 204 F.3d 1187, 1201-1202 (9th Cir. 2000); *see also Schroer v. Billington*, 577 F. Supp. 2d 293, 303-306 (D.D.C. 2008).

As the Eleventh Circuit observed in *Glenn*, "[a] person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes" and there is therefore "a congruence between discriminating against transgender and transsexual individuals and discrimination on the basis of gender-based behavioral norms." 663 F.3d at 1316.

*Schroer* offered another formulation of why discrimination against transgender people must be understood as sex discrimination, posing a helpful analogy:

> Imagine that an employee is fired because she converts from Christianity to Judaism. Imagine too that her employer testifies that he harbors no bias toward either Christians or Jews but only "converts." That would be a clear case of discrimination "because of religion." No court would take seriously the notion that "converts" are not covered by the statute. Discrimination "because of religion" easily encompasses discrimination because of a *change* of religion.

577 F. Supp. 2d at 306. Applying that logic, the court held that the discrimination against a transgender job applicant because she disclosed her intent to transition from male to female "was *literally* discrimination 'because of … sex.'" *Id.* at 308; *see also Fabian v. Hosp. of Cent.*

- 29 -

*Conn.*, No. 3:12-cv-1154, 2016 WL 1089178, at *28 (D. Conn. Mar. 18, 2016)

("[D]iscrimination on the basis of gender stereotypes, or on the basis of being transgender, or

intersex, or sexually indeterminate … is literally discrimination 'because of sex.'").

Recognizing that no responsible argument to the contrary remains, the federal

government has adopted the position that discrimination against transgender people is sex

discrimination.  In *Macy v. Holder*, the Equal Employment Opportunity Commission ("EEOC")

held unanimously that discrimination against a transgender person is, "by definition," a form of

sex discrimination.[36]  E.E.O.C. Appeal No. 0120120821, 2012 WL 1435995, at *11 (Feb. 24,

2012); *see also* Memorandum from the Attorney General, Treatment of Transgender

Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964 (Dec. 15,

2014) (announcing that the Department of Justice will take the position that discrimination

against transgender people violates Title VII); U.S. Department of Labor, Office of Federal

Contract Compliance Programs, Directive 2014-02 (Aug. 19, 2014) (clarifying that sex

discrimination "under Executive Order 11246 … includes discrimination on the bas[is] of …

transgender status").[37]

---

[36]     *Macy* was decided under Title VII, but "the showing a plaintiff must make to recover on a disparate treatment claim under Title VII mirrors that which must be made to recover on an equal protection claim."  *Smith*, 378 F.3d at 577; *see also Glenn*, 663 F.3d at 1316-1318 (reviewing Title VII precedent to conclude that the Fourteenth Amendment prohibits discrimination against transgender employees).

[37]     The U.S. Department of Education also has made clear that "Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity."  Dep't of Educ., Office of Civil Rights, *Questions and Answers on Title IX and Sexual Violence* (Apr. 29, 2014), at 5, *available at* http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf. Numerous federal courts have agreed.  *See, e.g., G.G.*, 2016 WL 1567467, at *7; *Pratt v. Indian River Cent. Sch. Dist.*, 803 F. Supp. 2d 135, 151-152 (N.D.N.Y. 2011); *Doe v. Brimfield Grade Sch.*, 552 F. Supp. 2d 816, 823 (C.D. Ill. 2008); *Montgomery v. Independent Sch. Dist. No. 709*, 109 F. Supp. 2d 1081, 1090 (D. Minn. 2000); *see also Rumble v. Fairview Health Servs.*, No. 14-cv-2037, 2015 WL 1197415, at *10 (D. Minn. Mar. 16, 2015) (holding that Section 1557 of the Affordable Care Act, which incorporates Title IX's prohibition on sex-based discrimination, "protects plaintiffs … who allege discrimination based on 'gender identity'").

### 2.     Discrimination Based on Transgender Status Also Receives Heightened Scrutiny

Even aside from its inextricable connection to sex discrimination, discrimination based on transgender status is separately entitled to heightened scrutiny.  If a classification disadvantages certain groups, it may be considered "suspect" or "quasi-suspect," and therefore scrutinized with extra care.  The Supreme Court consistently has applied heightened scrutiny where the classified group has suffered a history of discrimination, and the classification has no bearing on a person's ability to perform in society.  *See*, *e.g.*, *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (heightened scrutiny is warranted where a classified group has "experienced a 'history of purposeful unequal treatment' or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities").  In addition, the Supreme Court has sometimes considered whether the group is a minority or relatively politically powerless, and whether the characteristic is defining or "immutable" in the sense of being beyond the group member's control or not one the government has a right to insist an individual try to change.  *See*, *e.g.*, *Lyng v. Castillo*, 477 U.S. 635, 638 (1986); *see also Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407, 425-28 (Conn. 2008) (analyzing federal equal protection law to conclude that history of discrimination and ability to contribute to society are the two central considerations, and collecting authorities).  While not all considerations need point toward heightened scrutiny, *Plyler v. Doe*, 457 U.S. 202, 216 n.14, (1982); *Golinski v. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 983 (N.D. Cal. 2012), here all demonstrate that laws that discriminate based on transgender status should be subjected to heightened review.

Under any faithful application of that standard, discrimination against transgender people must receive heightened review.  In recent decisions, federal courts have recognized that discrimination against transgender people—beyond its connection to discrimination based on

sex—must be evaluated under heightened scrutiny. *See, e.g.*, *Adkins v. City of New York*, __ F. Supp. 3d __, No. 14 Civ. 7519, 2015 WL 7076956, at *3-4 (S.D.N.Y. Nov. 16, 2015); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015). In *Adkins*, the court found that all four of the hallmarks of heightened scrutiny were present with respect to the transgender community. It found that "transgender people have [inarguably] suffered a history of persecution and discrimination," 2015 WL 7076956, at *3;[38] that "transgender status bears no relation to ability to contribute to society," *id.*; that "transgender status is a sufficiently discernible characteristic to define a discrete minority class," *id.*; and that "transgender people are a politically powerless minority," noting that "there have [n]ever been any transgender members of the United States Congress or the federal judiciary," *id.* at *4. The court therefore concluded that transgender people constituted a "quasi-suspect class" entitled to intermediate scrutiny. *Id.* at *4.

Another federal court examined the same question in a case challenging a health care policy—like the VA's here—that denied transgender people access to sex reassignment surgery. *Norsworthy*, 87 F. Supp. 3d at 1119. That court noted the recent federal decisions indicating that discrimination based on sexual orientation must be evaluated with heightened scrutiny, holding that such conclusion "applies with at least equal force to discrimination against transgender people, whose identity is equally immutable and irrelevant to their ability to contribute to society, and who have experienced even greater levels of societal discrimination and marginalization." *Id.* at 1119 n.8. As a result, the court held squarely that "discrimination based

---

[38]    *See also* Sears *et al.*, *Documenting Discrimination on the Basis of Sexual Orientation and Gender Identity in State Employment*, Williams Institute (2009), *available at* http://williamsinstitute.law.ucla.edu/research/workplace/documenting-discrimination-on-the-basis-of-sexual-orientation-and-gender-identity-in-state-employment; Grant *et al.*, *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey* (2011), *available at* http://www.thetaskforce.org/downloads/reports/reports/ntds_full.pdf.

on transgender status … qualifies as a suspect classification under the Equal Protection Clause."
*Id*. at 1119.

### B.    The Regulation Cannot Survive Any Level of Review

The Regulation is plainly discriminatory:  It denies transgender veterans treatments critical for their health, while providing the same treatments for other veterans.  To state the obvious, an exclusion of coverage for surgeries related to "gender alteration," which the VA applies *only* to transgender veterans, targets transgender veterans for differential treatment.
38 C.F.R. § 17.38(c)(4); VHA Directive 2013-003 at 2 (defining the prohibited surgery to apply to transgender, but not intersex, veterans).  That is facial discrimination based on sex and transgender status.  Because there is no permissible justification for that exclusion, the Regulation is unconstitutional.

Under the heightened scrutiny standard applicable to claims of discrimination based on sex or transgender status, the challenged action must "serve important governmental objectives" and be "substantially related to the achievement of those objectives."  *Craig v. Boren*, 429 U.S. 190, 197 (1976); *see also United States v. Virginia*, 518 U.S. 515, 531, 533 (1996) (under intermediate scrutiny, government "must demonstrate an exceedingly persuasive justification for that action," the burden for which "is demanding and … rests entirely on the state") (internal quotation marks and citations omitted).

No such "important" objective can be advanced by denying transgender veterans the same medically necessary treatments that are provided to other veterans.  For example, the facts of this case are nearly identical to those in *Norsworthy*.  That case challenged the policy of a state prison that sex reassignment surgery could never be provided to transgender people in prison, although the prison did provide the same treatments for non-transgender individuals, and it did provide mental health and hormone treatments to transgender individuals.  The state was

unable to identify any "important governmental interest, much less describe how their gender classification—which makes it more difficult for a transgender person to receive vaginoplasty than it is for a cisgender woman—[could be] substantially related to that interest." 87 F. Supp. 3d at 1120. The court therefore concluded that a state policy of "treat[ing a transgender woman] differently from a similarly situated non-transgender woman in need of [the same] medically necessary surgery" would violate her right to equal protection. *Id.*

Even under the most deferential standard of review, however, the policy cannot stand. Governmental action that "neither burdens a fundamental right nor targets a suspect class" will be upheld only "so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996). That test is not "toothless." *Mathews v. Lucas*, 427 U.S. 495, 510 (1976). In particular, the review must be meaningful when the policy at issue targets a vulnerable group. *See Romer*, 517 U.S. at 634-635 (invalidating law that burdened the "politically unpopular group" of lesbian, gay, and bisexual people); *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring) ("When a law exhibits such a desire to harm a politically unpopular group, we have applied a more searching form of rational basis review to strike down such laws under the Equal Protection Clause."); *Kelo v. City of New London*, 545 U.S. 469, 490-491 (2005) (Kennedy, J., concurring) (distinguishing between the rational basis test applied to "economic regulation" versus classifications discriminating against a particular group of people).

As discussed above, because the VA already provides the same or similar treatments to non-transgender and intersex veterans, there is no conceivable non-discriminatory basis for excluding coverage for transgender veterans alone. The Regulation and its implementing directives do not deny transgender veterans surgical treatments for gender dysphoria because of

concerns about medical necessity, or because it is expensive (which it is not),[39] or because it is impractical or difficult to provide—if any of those were the case, the VA would bar provision of those treatments for *any* veteran, not just transgender veterans. And the reason cannot be that the VA disagrees with the necessity of medical treatments for gender dysphoria generally—because if that were the case, the VA would not provide the many other medical treatments it *does* provide for transgender veterans, such as hormone therapy and pre- and post-operative care.

Accordingly, the only conceivable explanation for the transgender-specific surgery exclusion appears to be the fear of potential political controversy that could result from extending care to this vulnerable minority, which is not a permissible consideration under any standard of review. *See U.S. Dep't of Ag. v. Moreno*, 413 U.S. 528, 534 (1973) (intention to exclude a "politically unpopular group" from receiving benefits "cannot constitute a legitimate governmental interest"); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) ("mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable … are not permissible bases" for differential treatment of a vulnerable group).

## VIII.  CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Secretary of Veterans Affairs amend or repeal the rules and regulations, including 38 C.F.R. § 17.38(c)(4), that exclude sex reassignment surgery for transgender veterans from the Medical Benefits Package provided to veterans under the Veterans Affairs health system, and promulgate regulations expressly

---

[39]   Because the population of transgender veterans affected by the Regulation is small compared to the overall population, cost concerns have no basis in reality. But regardless, the Fifth Amendment does not safeguard equality only when it is costless. Seeking to justify the Regulation as a budgetary matter would do what the Supreme Court has condemned: attempt to "protect the public fisc by drawing an invidious distinction between classes of its citizens." *Memorial Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 263 (1974); *see also Graham v. Richardson*, 403 U.S. 365, 374-375 (1971).

including sex reassignment surgery for transgender veterans within that Medical Benefits

Package.

Dated: May 9, 2016                          Respectfully submitted,

By: _Alan Schoenfeld / APV_                  By: _[signature]_

Alan Schoenfeld                              M. Dru Levasseur
Austin Van                                   LAMBDA LEGAL DEFENSE AND
WILMER CUTLER PICKERING                       EDUCATION FUND, INC.
    HALE AND DORR LLP                        120 Wall Street, 19th Floor
7 World Trade Center                         New York, NY 1005
250 Greenwich Street                         Telephone: (212) 809-8585
New York, NY 10007                           Facsimile: (212) 809-0055
Telephone: (212) 937-7294
Facsimile: (212) 230-8888                    Tara L. Borelli
                                             LAMBDA LEGAL DEFENSE AND
                                              EDUCATION FUND, INC.
Paul R.Q. Wolfson                            730 Peachtree Street NE, Suite 1070
Andrew Jaco                                  Atlanta, GA 30308-1210
WILMER CUTLER PICKERING                      Telephone: (404) 897-1880
    HALE AND DORR LLP                        Facsimile: (404) 897-1884
1875 Pennsylvania Avenue
Washington, DC 20006
Telephone: (202) 663-6390                    By: _[signature]_
Facsimile: (202) 663-6363                    Ilona Turner
                                             Sasha Buchert
                                             TRANSGENDER LAW CENTER
                                             1629 Telegraph Avenue, Suite 400
                                             Oakland, CA 94612
                                             Telephone: (415) 865-0176
                                             Facsimile: (877) 847-1278

*Attorneys for Petitioners*



February 22, 2024

Ilona Turner
Sasha Buchert
Transgender Law Center
1629 Telegraph Avenue, Suite 400
Oakland, CA 94612

Dear Counsellor,

It is our mission at VA to provide transgender Veterans – and all Veterans – with the world-class care and benefits they deserve. Gender Affirming Care should be available to any Veteran who needs it. Under its medical benefits package, VA presently provides Gender Affirming Care to Veterans – including hormone therapy, gender affirming therapy, pre- and post-operative care, voice and communication coaching, prosthetic support, and psychosocial support groups. VA also provides pre-operative evaluations for surgical procedures and surgical revisions associated with post-surgery complications.

The petition for rulemaking to repeal or amend 38 C.F.R. § 17.38(c)(4) filed by Dee Fulcher, Giuliano Silva, and the Transgender American Veterans Association (TAVA) requests that VA amend the medical benefits package to provide gender affirming surgery, in addition to the Gender Affirming Care VA presently provides. VA has moved methodically in its consideration of this important potential change in coverage because it must be implemented in a manner that has been thoroughly considered and ensures that the services made available to Veterans meet VA's rigorous standards for consistent and quality health care nationwide. VA remains committed to providing care to transgender Veterans and will continue to take steps to consider any potential changes to the provision of medical care to that important population.

Among other considerations and analyses, in the months to come VA will produce estimates and collect data concerning the population of Veterans who will become newly eligible for hospital care (including mental health services and counseling), medical services, and nursing home care for any illness under Section 103 of the Sergeant First Class Heath Robinson Honoring our Promise to Address Comprehensive Toxics Act of 2022 (PACT Act), one of the most significant laws ever to help millions of veterans who were exposed to toxins and burn pits during their military service. These estimates and data will inform further analyses, including whether the Notice of Proposed Rulemaking or the Regulatory Impact Analysis VA previously produced must be updated and submitted to the Office of Management and Budget.

Because VA is not ready at this time to initiate a rulemaking addressing the specific regulatory changes proposed in the petition, VA hereby denies the petition for rulemaking to repeal or amend 38 C.F.R. § 17.38(c)(4). While VA will continue to

Case: 24-1714     Document: 1-2     Page: 46     Filed: 04/19/2024

Ilona Turner

consider how and when it might ultimately provide gender affirming surgery, this letter is the VA's final action on the petition for rulemaking.

Thank you for your attention to this matter and your advocacy on behalf of our Nation's transgender Veterans.

Sincerely yours,

Denis McDonough