No. 24-1714

# In the United States Court of Appeals for the Federal Circuit

————

TRANSGENDER AMERICAN VETERANS
ASSOCIATION,

*Petitioner*,

v.

SECRETARY OF VETERANS AFFAIRS,

*Respondent.*

————

## BRIEF FOR PETITIONER

————

Michael J. Wishnie
VETERANS LEGAL SERVICES
  CLINIC
JEROME N. FRANK LEGAL
  SERVICES ORGANIZATION
YALE LAW SCHOOL
P.O. Box 209090
New Haven, CT 06520-9090
(203) 436-4780
michael.wishnie@ylsclinics.org
*Counsel for Petitioner*

## CERTIFICATE OF INTEREST

Counsel for Petitioners, the Transgender American Veterans Association, certified the following:

1.      The full name of every party or amicus represented in this appeal is:

The Transgender American Veterans Association.

2.      The names of the real parties in interest represented in this appeal are:

Not applicable.

3.      The names of all parent corporations and any publicly held companies that own 10 percent of the party represented are:

None.

4.      The names of all law firms and the partners or associates that are expected to appear in this appeal for Petitioners are:

The Jerome N. Frank Legal Services Organization; Michael J. Wishnie, John Baisley, Alexandra Johnson, K.N. McCleary, Sophie Park.

5.      The following law firms and counsel formerly appeared in the district court in prior phases of the case:

None.

/s/ Michael J. Wishnie

Michael J. Wishnie

July 29, 2024

# TABLE OF CONTENTS

**CERTIFICATE OF INTEREST** ii

**TABLE OF AUTHORITIES** v

**RELATED CASES** 1

**JURISDICTION** 1

**ISSUE PRESENTED** 1

**STATEMENT** 2

    A.   The VA's Medical Benefits Package 2

    B.   VA's Exclusion of 'Gender Alterations' from the Medical Benefits Package 3

    C.   Treatment of Gender-Confirmation Surgery by Other Agencies, Insurers, and Employers 4

    D.   Impact on Transgender Veterans 6

    E.   Previous Proceedings 9

**SUMMARY OF ARGUMENT** 11

**STANDARD OF REVIEW** 14

**ARGUMENT** 14

    I.   VA's Denial of TAVA's Petition for Rulemaking is Arbitrary and Capricious 14

        A.   VA's Denial Is Not in Accordance with 38 U.S.C. § 1710. 15

        B.   VA's Denial Is Inconsistent with Its Provision of Gender-Affirming Care and Surgeries to Treat Other Conditions. 18

        C.   VA's Denial Contradicts Established Medical Evidence. 23

        D.   VA's Reliance on the PACT Act Is Not a Reasoned Explanation. 27

    II.   VA's Denial Is Contrary to Constitutional Right. 34

        A.   VA's Denial Classifies on the Basis of Sex and Transgender Status. 35

        B.   VA's Denial Fails Intermediate Scrutiny. 41

    III.   VA's Denial is Not in Accordance with Section 1557 of the Affordable Care Act 45

    IV.   VA's Denial Is Unconstitutional. 50

V.   VA's Denial Violates Section 1557 of the Affordable Care Act.          50

**CONCLUSION**                                                              **51**

**ADDENDUM**

**CERTIFICATE OF SERVICE**

**CERTIFICATE OF COMPLIANCE**

# TABLE OF AUTHORITIES

## CASES

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023) .. 38, 48

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022) ................................................................................................................... 38

*Am. Fed'n of Gov't Emps. v. FLRA,* 470 F.3d 375 (D.C. Cir. 2006)..................... 21

*ANR Storage Co. v. F.E.R.C.*, 904 F.3d 1020 (D.C. Cir. 2018) ............................ 32

*B.P.J. by Jackson v. W. Virginia State Bd. of Educ.*, 98 F.4th 542 (4th Cir. 2024) 40

*Berkley v. United States*, 287 F.3d 1076 (Fed. Cir. 2002)..................................... 41

*Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644 (2020)...................................... passim

*Bowen v. Gilliard*, 483 U.S. 587 (1987) ................................................................ 40

*Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022)..................... 36, 37

*City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432 (1985).................. 40

*Craig v. Boren*, 429 U.S. 190 (1976).......................................................... 35, 41, 44

*De'Lonta v. Johnson*, 708 F.3d 520 (4th Cir. 2013).............................................. 26

*Dekker v. Weida*, 679 F. Supp. 3d 1271 (N.D. Fla. 2023)..................................... 38

*Dep't of Com. v. New York*, 588 U.S. 752 (2019) ................................................. 28

*Diaz-Rivas v. U.S. Att'y Gen.*, 769 F. App'x 748 (11th Cir. 2019) ...................... 34

*Doe v. Am. Univ.*, No. 19-cv-03097, 2020 WL 5593909 (D.D.C. Sept. 18, 2020) 46

*Doe v. Snyder*, 28 F.4th 103 (9th Cir. 2022) .................................................... 47, 48

*Edelman v. Jordan*, 415 U.S. 651 (1974) .............................................................. 43

*Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019) ........................................... 25

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016)........................ 19, 29, 33

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ............................... 28

*Fain v. Crouch*, 618 F. Supp. 3d 313 (S.D. W. Va. 2022) .................................... 49

*Fields v. Smith*, 653 F.3d 550 (7th Cir. 2011) ...................................................... 25

*Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931 (W.D. Wis. 2018). 48, 49

*Fletcher v. Alaska,* 443 F. Supp. 3d 1024 (D. Alaska 2020)................................. 25

*Frontiero v. Richardson*, 411 U.S. 677 (1973)...................................................... 44

*GameFly, Inc. v. Postal Regul. Comm'n*, 704 F.3d 145 (D.C. Cir. 2013)............. 21

*Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011)................................................ 37

*Good v. Iowa Dep't of Hum. Servs.*, 924 N.W.2d 853 (Iowa 2019)...................... 26

*Graham v. Richardson*, 403 U.S. 365 (1971) ........................................ 43

*Griffin v. Sec'y of Veterans Affs.*, 288 F.3d 1309 (Fed. Cir. 2002). ..................... 14

*Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020) ..... 36, 37, 40, 47

*Hammons v. Univ. of Md. Med. Sys. Corp.*, 649 F. Supp. 3d 104 (D. Md. 2023). 25, 49

*Hecox v. Little*, No. 20-35813, 2023 WL 11804896 (9th Cir. Aug. 17, 2023) ....... 39

*Ill. Pub. Telecommc'ns Ass'n v. F.C.C.*, 117 F.3d 555 (D.C. Cir. 1977) .............. 16

*In re Transgender Am. Veterans Ass'n*, No. 24-108 (Fed. Cir. filed Jan. 25, 2024). .................................................................................... 1, 6, 10

*J.E.B. v. Alabama*, 511 U.S. 127 (1994) ............................................. 37

*Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) ............................... passim

*Kaiser Found. Hosps. v. Sebelius*, 708 F.3d 226 (D.C. Cir. 2013) ................. 20, 32

*Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019) .............................. 40

*Kort v. Burwell*, 209 F. Supp. 3d 98 (D.D.C. 2016) .............................. 19

*Kreis v. Sec'y of the Air Force,* 406 F.3d 684 (D.C. Cir. 2005) ................. 21, 32

*Lakoski v. James*, 66 F.3d 751 (5th Cir. 1995) .................................. 47

*Lange v. Hous. Cnty., Ga.*, 101 F.4th 793 (11th Cir. 2024) ..................... 44, 49

*Latta v. Otter*, 771 F.3d 456 (9th Cir. 2014) ................................... 39

*Lawrence v. Off. of Personnel Mgmt.*, EEOC Appeal No. 0120162065, 2024 WL 3040129 (May 30, 2024). ........................................................ 5

*Lawrence v. Texas*, 539 U.S. 558 (2003) ......................................... 39

*Level the Playing Field v. Fed. Election Comm'n*, 232 F. Supp. 3d 130 (D.D.C. 2017) .................................................................... 29

*Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881 (1st Cir. 1988) .................. 47

*Mabry v. State Bd. of Cmty. Colls. & Occupational Educ.*, 813 F.2d 311 (10th Cir. 1987) .................................................................... 47

*Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307 (1976) .............................. 40

*Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250 (1974) ........................... 42

*Metro. Sch. Dist. of Martinsville v. A. C.*, 144 S. Ct. 683 (2024) ............. 38

*MH v. Jeppesen*, No.: 1:22-cv-00409-REP, 2024 WL 1012986 (D. Idaho Mar. 8, 2024) .................................................................... 39

*Military-Veterans Advocacy Inc. v. Sec'y of Veterans Affairs*, 38 F.4th 154 (Fed. Cir. 2022) ........................................................... 14

*Miss. Univ. for Women v. Hogan*, 458 U.S. 718 (1982) .......................... 35

*Monroe v. Meeks*, 584 F. Supp. 3d 643 (S.D. Ill. 2022) ......................................... 25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .......................................................................................................... 27

*Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209 (D.C. Cir. 2013) ..................... 32

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ................................................................................................................................. 29

*New York v. Nuclear Regul. Comm'n*, 681 F.3d 471 (D.C. Cir. 2012) ................. 50

*Norsworthy v. Beard*, 87 F. Supp. 3d 1164 (N.D. Cal. 2015) ............................... 26

*O'Connor v. Peru State Coll.,* 781 F.2d 632 (8th Cir. 1986) ................................ 47

*O'Donnabhain v. Commn'r*, 134 T.C. 34 (2010) .................................................. 26

*Plyler v. Doe,* 457 U.S. 202 (1982) ...................................................................... 44

*Preminger v. Sec'y of Veterans Affs.*, 632 F.3d 1345 (Fed. Cir. 2011) .. 1, 14, 27, 28

*Reed v. Reed*, 404 U.S. 71 (1971) ....................................................................... 44

*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020) ............................................. 24

*Rosati v. Igbinoso*, 791 F.3d 1037 (9th Cir. 2015) .............................................. 26

*Schlesinger v. Ballard*, 419 U.S. 498 (1975) ....................................................... 44

*Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940 (9th Cir. 2020) .......................... 46

*Serv. Women's Action Network v. Sec'y of Veterans Affs.*, 815 F.3d 1369 (Fed. Cir. 2016) ............................................................................................................ 14, 29

*Shapiro v. Thompson*, 394 U.S. 618 (1969) .................................................... 43, 44

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001) .................... 20, 32

*Skubel v. Fuoroli*, 113 F.3d 330 (2d Cir. 1997) .................................................. 24

*Sneed v. Shinseki*, 737 F.3d 719 (Fed. Cir. 2013) ................................................. 2

*Soneeya v. Spencer*, 851 F. Supp. 2d 228 (D. Mass. 2012) ................................. 26

*Stanley v. Ill.*, 405 U.S. 645 (1972) .................................................................... 44

*United States v. Skrmetti*, No. 23-477, 2024 WL 3089532 (U.S. June 24, 2024) .. 38

*United States v. Virginia*, 518 U.S. 515 (1996) .............................................. 35, 41

*W. Deptford Energy, LLC v. F.E.R.C.*, 766 F.3d 10 (D.C. Cir. 2014) .................. 32

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health and Hum. Servs.*, 485 F. Supp. 3d 1 (D.D.C. 2020) .................................................................................. 47

*Williams v. Kincaid*, 45 F.4th 759 (4th Cir. 2022) ............................................. 40

## STATUTES

38 U.S.C. § 1710. ........................................................................................... passim

38 U.S.C. § 502. ...................................................................................... 1

42 U.S.C. § 18116 ........................................................................... passim

5 U.S.C. § 706(2)(A) ...................................................................... passim

5 U.S.C. § 706(2)(B) ....................................................................... 11, 14, 34

5 U.S.C. § 706(2)(C) ....................................................................... 11, 13, 45

Pub. L. 117–168 (Aug. 10, 2022) ............................................................ 30

## OTHER AUTHORITIES

63 Fed. Reg. 37299 (July 10, 1998) .......................................................... 3

64 Fed. Reg. 54207 (Oct. 6, 1999) ........................................................... 16

83 Fed. Reg. 31711 (July 9, 2018) ........................................................... 10

Brief of Amici Curiae Cities and Counties, et al. as Amici Curiae Supporting
Petitioner at 9-11, *In re TAVA*, No. 24-00108 (Fed. Cir. Jan. 29, 2024) ............. 6

Brief of Amici States of Washington, et al. as Amici Curiae Supporting Petitioner
at 14-16, *In re TAVA*, No. 24-00108 (Fed. Cir. Jan. 31, 2024) ........................... 6

Brief for Petitioners, *Fulcher*, No. 2017-1460 (Fed. Cir. June 21, 2017) ............... 9

Petition for a Writ of Certiorari, *Skrmetti*, 2023 WL 7327440 (U.S. Nov. 6, 2023).
.................................................................................................. 38

## RULES

38 C.F.R. § 17.38(b) ........................................................................... 3, 16

38 C.F.R. § 17.38(c)(4) ......................................................................... 1, 3, 9

38 C.F.R. § 4.130 ............................................................................... 22

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. V. ......................................................................... 13, 50

## RELATED CASES

No appeal in this case was previously before this Court or any other court. The Petitioner previously filed a petition for writ of mandamus to compel action on the underlying rulemaking petition. *In re Transgender Am. Veterans Ass'n*, No. 24-108 (Fed. Cir. filed Jan. 25, 2024). The mandamus petition was voluntarily dismissed as moot upon the agency's decision to deny the rulemaking petition. *Id.*, ECF No. 55 (Mar. 5, 2024).

## JURISDICTION

The U.S. Court of Appeals for the Federal Circuit has exclusive jurisdiction to review the Secretary's denial of rulemaking petitions. 38 U.S.C. § 502.

## ISSUE PRESENTED

On May 9, 2016, the Transgender American Veterans Association ("TAVA") and two individual veterans filed a rulemaking petition asking the U.S. Department of Veterans Affairs ("VA") to repeal its ban on gender-confirmation surgery in its medical benefits package. *See* App'x 003-040. The petition for rulemaking further requested that VA amend its regulations, including 38 C.F.R. § 17.38(c)(4) and implementing directives, to include medically necessary gender-confirmation surgery for transgender veterans in the medical benefits package. App'x 005. VA ignored TAVA's rulemaking petition for nearly eight years, leading the organization to file suit to compel the agency to act. *See In re TAVA*, No. 24-108 (Fed. Cir. filed

Jan. 25, 2024), ECF No. 1. On February 22, 2024, VA denied the rulemaking petition, App'x 001-002, mooting the mandamus petition. VA's denial followed nearly three years of public promises by VA Secretary Denis McDonough to provide this care.

On April 15, 2024, TAVA filed the instant petition for this Court to review VA's denial of its rulemaking petition. The questions presented are:

1. Whether VA's denial of TAVA's petition for rulemaking was arbitrary and capricious, contrary to constitutional right, or not in accordance with law, in violation of the Administrative Procedure Act ("APA").

2. Whether VA's denial of TAVA's petition violates the equal protection component of the Fifth Amendment, amounting to unconstitutional discrimination on the basis of sex and transgender status.

3. Whether VA's denial violates Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116(a), which prohibits discrimination on the basis of sex in federally funded or administered healthcare programs.

## STATEMENT

### A. VA's Medical Benefits Package

In recognition of the risks veterans take for this country, VA provides a comprehensive suite of benefits intended to be "imbued with special beneficence from a grateful sovereign." *Sneed v. Shinseki*, 737 F.3d 719, 728 (Fed. Cir. 2013)

(internal quotation marks omitted). As part of the benefits scheme, Congress has directed the Secretary of VA to "furnish hospital care and medical services which the Secretary determines to be needed." 38 U.S.C. § 1710. The Secretary implements that directive by establishing the veterans' medical benefits package, which "explain[s] what care would and would not be provided to veterans enrolled in the VA healthcare system." 63 Fed. Reg. 37299, 37300 (July 10, 1998). The benchmark for inclusion in the package is whether the Secretary has determined that the care is "medically needed"—that is, "care that is determined by appropriate healthcare professionals to be needed to promote, preserve, or restore the health of the individual and to be in accord with generally accepted standards of medical practice." *Id.* (codified at 38 C.F.R. § 17.38(b)).

## B. VA's Exclusion of 'Gender Alterations' from the Medical Benefits Package

VA categorically excludes gender-confirmation surgery from its medical benefits package, 38 C.F.R. § 17.38(c)(4), even though this treatment is essential, often lifesaving care and even though VA already provides the same procedures (such as vaginoplasties, phalloplasties, hysterectomies, mastectomies, orchiectomies, scrotectomies, penectomies, and reconstructive surgery) to treat conditions other than gender dysphoria. Gender-confirmation surgery, which includes the surgeries

listed above, is not a unique type of medical procedure; rather, it is defined by the purpose for which these medical procedures are administered.

Major medical associations have long recognized that gender-confirmation surgery is an effective and often essential treatment for gender dysphoria. App'x 003-040; App'x 302-309 (finding lower risk of suicidal ideation and attempt after transgender patients receive gender-confirmation surgery); App'x 417-428 (Fifth Edition of *Diagnostic and Statistical Manual of Mental Disorders* spending an entire chapter discussing diagnosis of gender dysphoria). By denying transgender veterans access to gender-confirmation surgery through VA healthcare services, the agency subjects transgender veterans to increased risk of physical harm, psychological distress, and suicide. This is especially damaging because transgender veterans are more likely than cisgender veterans to rely on VA healthcare, to be uninsured, and/or to experience cost barriers to care. VA's refusal to provide transgender veterans with care that it provides non-transgender veterans facially contradicts its duty to provide medically necessary care to all veterans.

### C. Treatment of Gender-Confirmation Surgery by Other Agencies, Insurers, and Employers

VA's position is contrary to a large and growing consensus among federal and state agencies, insurance carriers, and private businesses that gender-confirmation surgery is essential. Most relevant here, the Department of Defense ("DOD") provides gender-confirmation surgery (among other transition-related care) to

transgender active-duty servicemembers. *See* App'x 444-465; *see also* App'x 466-469; App'x 470-483; App'x 484-486 (reporting DOD spent around $15 million providing gender-affirming care, including surgical care, between January 2016 and May 2021).

Other federal agencies do likewise. For example, in 2014, the Department of Health and Human Services ("HHS") Departmental Appeals Board overturned a thirty-year-old policy denying Medicare coverage for gender-confirmation surgery, deeming the exclusion unreasonable due to unchallenged evidence supporting the safety, effectiveness, and necessity of that treatment for individuals with severe gender dysphoria. *See* Decision No. 2576, HHS Departmental Appeals Board (May 30, 2014). More recently, in early June 2024, the Equal Employment Opportunity Commission ruled that "denying a retired federal employee coverage for the same medical care others receive simply because he was receiving it for gender dysphoria" violated Title VII of the Civil Rights Act of 1964. *Lawrence v. Off. of Pers. Mgmt.*, EEOC Appeal No. 0120162065, 2024 WL 3040129 (May 30, 2024).

Finally, private businesses increasingly cover gender-confirmation surgery as part of the benefits provided to employees, and numerous states and municipalities recognize the medical necessity and low cost of providing such services to public servants. According to one 2023 study, nearly a quarter of all large employers (with 200 or more employees) nationwide include gender-confirmation surgery as part of

their employee health benefits package. Around 60 percent of firms with more than 5,000 employees cover gender-confirmation surgery. App'x 519-554.

Many states and municipalities also recognize that the limited marginal cost of providing gender-confirmation surgery is greatly outweighed by the benefits, including future cost savings, of providing such care. *See* Brief of Amici States of Washington, et al. as Amici Curiae Supporting Petitioner at 14-16, *In re TAVA*, No. 24-00108 (Fed. Cir. Jan. 31, 2024), ECF No. 48 (additional cost of gender-confirmation surgery is low in states that currently cover such care, and benefits to public health greatly outweigh cost of extending coverage); Brief of Amici Curiae Cities and Counties, et al. as Amici Curiae Supporting Petitioner at 9-11, *In re TAVA*, No. 24-00108 (Fed. Cir. Jan. 29, 2024), ECF No. 28 (estimating cost of gender-confirmation surgery as between .001 and .03 percent of VA's annual budget in 2021 and stating that many public and private employers report very low costs, if any, from providing similar coverage).

### D. Impact on Transgender Veterans

VA's failure to provide gender-confirmation surgery comes with immediate consequences to the health and lives of transgender veterans. In 2023, 157 advocacy organizations, including the Minority Veterans of America, Student Veterans of America, and Iraq and Afghanistan Veterans of America, wrote to Secretary McDonough emphasizing the human cost of VA's refusal to provide gender-

confirmation surgery. App'x 334-342 (characterizing delay as "not just an equity issue, but also a safety issue," given that without access to this care, transgender veterans continue to face higher rates of depression and suicide). Transgender veterans are at higher risk of suicide than the transgender or the veteran community, two communities which already have a significantly elevated risk of suicide. App'x 487-491. Veterans have a suicide rate more than fifty-seven percent higher than civilians; transgender veterans are more than twenty times more likely than other veterans to experience "suicide-related events." *Id.* Forty percent of transgender people in the United States will attempt to take their own life at least once. *Id.* Given these risks, gender-confirmation surgery is critical to protecting transgender veterans' lives.

Access to gender-confirmation surgery can be the difference between life and death. Suicide-related events are over twenty times more common for veterans with gender dysphoria who rely on VA care than for veterans who rely on VA care generally. App'x 310-315. VA's categorical exclusion of gender-confirmation surgery forces transgender veterans to forgo necessary care, increasing the risk to their mental health. To obtain this care, they must pay out-of-pocket at a non-VA facility. Making transgender veterans to seek gender-affirming care at multiple facilities and from different providers disrupts continuity of care to the detriment of their health and well-being. *See, e.g.*, App'x 437-438 (describing how VA denied

former TAVA President Rebekka Eshler a referral letter to receive gender-confirmation surgery elsewhere.)

The critical importance of timely gender-confirmation surgery is reflected in the lived experiences of transgender veterans. Natalie Kastner, a TAVA member diagnosed with gender dysphoria, was aware that gender-confirmation surgery was not a viable choice at VA. App'x 429-430 ¶¶ 3, 5, 6. Unable to access gender-confirmation surgery via VA or alternative means, she removed her right testicle at home on March 5, 2022, without anesthesia or formal medical training. App'x 429-430 ¶ 6. In doing so, she accidentally severed an artery. *Id.* Ms. Kastner managed to drive herself to the local emergency room, where she received life-saving care. App'x 430 ¶ 7. VA's denial of the petition means that Ms. Kastner will continue suffering from this dangerous condition without proper medical treatment.

Another TAVA member, Ray Gibson, is a Black transgender male veteran of the U.S. Air Force. App'x 433 ¶¶ 2-3. In his late sixties, Mr. Gibson fears that he is too old to safely access phalloplasty. *Id.* ¶ 4; App'x 436 ¶ 19. As he has aged, recovery from surgeries has become harder. VA is his only healthcare provider, and he lives on a fixed income. App'x 434 ¶¶ 13, 10. He is unable to pay out-of-pocket for gender-confirmation surgery. *Id.* ¶ 11; App'x 435 ¶ 17. VA's denial of the petition means that Mr. Gibson will have to struggle with gender dysphoria for the rest of his life.

### E. Previous Proceedings

On May 9, 2016, pursuant to 5 U.S.C. § 553(e), TAVA and two individual veterans filed a rulemaking petition requesting that VA amend or repeal the rules and regulations—including 38 C.F.R. § 17.38(c)(4) and any implementing directives—that exclude medically necessary "sex reassignment surgery" from the medical benefits package. *See* App'x 003-040. In response, VA stated it would explore regulatory changes to allow VA to provide gender-confirmation surgery in its medical benefits package. *See* Brief for Petitioners at 1, *Fulcher*, No. 2017-1460 (Fed. Cir. June 21, 2017), ECF No. 28.

In 2016, VA drafted a proposed rule, entitled "Removing Exclusion of Gender Alterations from the Medical Benefits Package," performed an impact analysis for the draft proposed rule, and issued a memorandum from the Veterans Health Administration's Chief Financial Officer regarding the impact analysis. App'x 078-088; App'x 089-098.

VA changed direction under the next administration. In 2017, it re-issued VHA directive 2013-003, declaring that "sex reassignment surgery" cannot be performed or funded by VA. App'x 289-301. This remains VA's position. As a result, TAVA and two individual veterans filed suit requesting that this Court set aside VA's constructive denial of the rulemaking petition or, in the alternative, compel VA to act on the grounds of unreasonable delay. *See* App'x 316-320. In July 2018,

VA sought comment on the rulemaking petition in the Federal Register, without publishing a Notice of Proposed Rulemaking ("NPRM") or proposed rule. 83 Fed. Reg. 31711 (July 9, 2018). TAVA and the other petitioners voluntarily dismissed the case. App'x 321-322.

Since 2021, VA has returned to promising it will provide gender-confirmation surgery. Secretary McDonough first made public assurances in June 2021 that VA will provide gender-confirmation surgery; however, VA has not honored those promises. App'x 323-326; App'x 327-328. As recently as June 2023, VA Press Secretary Terrence Hayes said that VA is "moving ahead methodically" to provide gender-confirmation surgery. App'x 329-333.

On November 20, 2023, International Transgender Day of Remembrance, TAVA wrote to VA's Acting General Counsel advising that if VA failed to grant its 2016 rulemaking petition and initiate the rulemaking process within 30 days, the organization would file suit. VA did not initiate rulemaking. On January 25, 2024, TAVA filed a mandamus petition. *In re TAVA*, No. 24-00108 (Fed. Cir. Jan. 25, 2024), ECF No. 1. In response, on February 22, 2024, VA breached its repeated public promises to make gender-confirmation surgery available by denying TAVA's rulemaking petition, citing the difficulties posed by implementation of the Sergeant First Class Heath Robinson Honoring our Promise to Address Comprehensive Toxics Act of 2022 ("PACT Act"). App'x 001-002. VA's denial came nearly eight

years after receiving the petition and nearly three years after promising to provide the care the petition requested, supported by rationale inconsistent with its previous and concurrent actions. Left with no other options, TAVA filed a petition for review in this matter on April 15, 2024. *See* No. 24-1724 (Fed Cir. filed Apr. 15, 2024), ECF No. 1-2.

## SUMMARY OF ARGUMENT

The Court should set aside Secretary McDonough's denial of TAVA's rulemaking petition. Firstly, denial of the rulemaking petition violates the APA. *See* 5 U.S.C. § 706(2)(A)-(C). The refusal to provide gender-confirmation surgery contradicts VA's long-held position that gender-confirmation surgery is medically necessary care, directly contravening the statutory command of 38 U.S.C. § 1710 that the Secretary shall include all such care in the medical benefits package. Further, Secretary McDonough's denial of the petition is inconsistent with VA's provision of gender-affirming care and the same or substantively similar surgeries for conditions other than gender dysphoria. The denial was arbitrary and capricious. It contradicts established medical consensus, including all medical evidence in the administrative record before the agency, and is unsupported by the record.

VA's sole justification for denying the petition was that the agency is busy with implementation of a new statute, the PACT Act. This is rank pretext at best, and potentially an outright falsehood. An agency can walk and chew gum at the same

time, and nothing about VA's obligation to implement one statute can justify its derogation of its duty under another—and under the Constitution—to provide medically necessary healthcare to eligible veterans. Tellingly, VA has moved ahead with other care expansions, including removing different exceptions to the medical benefits package, despite its simultaneous duty to carry out the PACT Act. Moreover, even well after passage of the PACT Act, VA repeatedly vowed to provide gender-confirmation surgery, revealing that it did not view the PACT Act as a barrier to this provision. App'x 329-333; App'x 338. VA appears to have invoked the PACT Act only when casting about for an excuse to delay access to this vital care for transgender veterans.

Secondly, Secretary McDonough's denial of the rulemaking petition unconstitutionally discriminates against transgender veterans, in violation of the Constitution and the APA. VA provides the same or substantively similar procedures to gender-confirmation surgery to non-transgender veterans to treat conditions other than gender dysphoria. By denying transgender veterans access to this care, VA classified its veterans on the basis of sex and transgender status, which gives rise to intermediate scrutiny. The rationale contained in VA's denial fails to meet that high standard. Its insistence on the demands of PACT Act implementation is nothing more than an argument based on cost and administrative convenience—neither of which constitute sufficiently important governmental interests to justify such

classifications. This unlawful discrimination is contrary to constitutional right and violates the equal protection component of the Fifth Amendment to the U.S. Constitution. *See* 5 U.S.C. § 706(2)(C); U.S. Const. amend. V.

Third, Secretary McDonough's denial violates Section 1557 of the Affordable Care Act and, by extension, the APA. By providing the same or substantively similar surgical procedures to treat conditions other than gender dysphoria in non-transgender veterans, but denying those procedures to transgender veterans, VA's denial inescapably relied on sex. *See Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644 (2020) (holding that discrimination on the basis of transgender status is sex discrimination). Such reliance is expressly forbidden by Section 1557, which prohibits sex discrimination in the provision of federally funded or administered healthcare programs. VA's discrimination violates the letter of Section 1557, *see* 42 U.S.C. § 18116 ("[A]n individual shall not, on the ground prohibited by . . . title IX of the Education Amendments of 1972 [i.e., sex], be excluded from participation in, be denied the benefits of, or be subjected to discrimination . . . under any program or activity that is administered by an Executive Agency . . . ."), and thus also the APA. *See* 5 U.S.C. § 706(2)(A).

This Court should set aside VA's denial of TAVA's rulemaking petition.

## STANDARD OF REVIEW

The Court must set aside an administrative agency's denial of a petition for rulemaking if the denial was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Military-Veterans Advoc. Inc. v. Sec'y of Veterans Affairs*, 38 F.4th 154, 160 (Fed. Cir. 2022); *see also Serv. Women's Action Network v. Sec'y of Veterans Affs.*, 815 F.3d 1369, 1374 (Fed. Cir. 2016); 38 U.S.C. § 502; 5 U.S.C. § 706(2)(A). A reviewing court must require that "'the [agency] has adequately explained the facts and policy concerns it relied on and . . . satisfy [itself] that those facts have some basis in the record.'" *Preminger v. Sec'y of Veterans Affs.*, 632 F.3d 1345, 1353 (Fed. Cir. 2011) (citation omitted). In addition, this Court must "hold unlawful and set aside" any VA action "contrary to constitutional right." 5 U.S.C. §706(2)(B); *see also Griffin v. Sec'y of Veterans Affs.*, 288 F.3d 1309, 1317 (Fed. Cir. 2002).

## ARGUMENT

## I.   VA's Denial of TAVA's Petition for Rulemaking is Arbitrary and Capricious

Secretary McDonough's denial of TAVA's rulemaking petition violates the APA's prohibition of arbitrary and capricious agency action in numerous ways. First, the denial is not in accordance with the Secretary's statutory duty under 38 U.S.C. § 1710 to provide medically necessary care. Second, the denial is inconsistent with the

other actions VA has taken to provide gender-affirming care and the same or substantively similar procedures to treat conditions other than gender dysphoria—and does not explain this inconsistency. Third, the denial is unsupported by the record and contravenes medical consensus, as all the medical evidence before the agency correctly reflects the consensus view that gender-confirmation surgery is lifesaving, essential care. Fourth, the denial's rationale is unreasoned and inconsistent with other actions taken by the agency; implementation of the PACT Act does not excuse the Secretary of his other statutory obligations, including to offer medically necessary care under 38 U.S.C. § 1710. Nor has it stood in the way of other VA care expansions or VA's representations prior to the denial that it would provide the care requested by the petition.

### A. VA's Denial Is Not in Accordance with 38 U.S.C. § 1710.

Secretary McDonough is required by statute to provide veterans with all medical services that he determines are needed. Yet although he has determined that gender-confirmation surgery is necessary medical care, he has declined to provide it. This failure is not in accordance with 38 U.S.C. § 1710(a)(1)(B) and thus violates the APA. *See* 5 U.S.C. § 706(2)(A).

Per 38 U.S.C. § 1710(a)(1)(B), the Secretary "*shall* furnish hospital care and medical services *which the Secretary determines to be needed* . . . to any veteran who has a service-connected disability rated at 50 percent or more." *Id.* (emphasis

added). Pursuant to this statue, VA promulgated 38 C.F.R. § 17.38 in 1999, which establishes the medical benefits package available to these veterans. 64 Fed. Reg. 54207 (Oct. 6, 1999). The medical benefits package includes only care "determined by appropriate healthcare professionals that the care is needed to promote, preserve, or restore the health of the individual and is in accord with generally accepted standards of medical practice." 38 C.F.R. § 17.38(b). "Although not specifically explained in the preambles to the original proposed and final rules, the rationale for all exclusions in § 17.38(c)," including the gender alterations exception, "was generally that such services were not considered medically needed." App'x 080. As a wealth of modern medical evidence has shown, however, *see infra* Section I.C, App'x 014-017, App'x 081-083, App'x 130-137, the current consensus among medical professionals is that gender-confirmation surgery is often medically necessary to treat gender dysphoria.

Secretary McDonough has commendably recognized this medical consensus—but, in violation of his statutory duties, has failed to provide care commensurate with that recognition. His denial of TAVA's rulemaking petition must be set aside: it is not in accordance with 38 U.S.C. § 1710, *see* 5 U.S.C. § 706(2)(A), and thus arbitrary and capricious, *see id.* An agency's failure to adhere to its statutorily required substantive duties necessarily renders agency action arbitrary and capricious. *See, e.g., Ill. Pub. Telecommc'ns Ass'n v. F.C.C.*, 117 F.3d

555, 556 (D.C. Cir. 1977), *decision clarified on reh'g*, 123 F.3d 693 (D.C. Cir. 1997) (finding agency's failure to provide compensation for all calls "inconsistent with [statute's] command that fair compensation be provided for 'each and every completed call'" and thus "arbitrary and capricious").

Publicly and privately, Secretary McDonough has repeatedly emphasized that gender-confirmation surgery is needed to treat gender dysphoria. Even in his initial explorations of what it would take to provide this care, he instructed his staff to determine what was required "to provide *all medically necessary services*" in the medical benefits package so as to end the ban on gender alterations. *See* App'x 155; *see also* App'x 156. Then, when he first announced that VA would provide gender-confirmation surgery in June 2021, he emphasized "the surgical *needs* that transgender Veterans have called for and deserved for a long time." *See* App'x 161 (emphasis added). Even when speaking directly to TAVA, VA made clear that gender-confirmation surgery is essential: in his December 22, 2023 response to a demand letter sent by TAVA, VA Acting General Counsel Richard J. Hipolit emphasized that Secretary McDonough's 2021 announcement was "based on . . . the recognized *need* for this care." *See* App'x 244 (emphasis added).

The draft proposed rules that VA prepared for review by the Office of Information & Regulatory Affairs ("OIRA") further reflect the Secretary's consistent understanding that gender-confirmation surgery is necessary care. In its

spring 2016 OIRA submission of a proposed rule removing the gender alterations exception from the medical benefits package, VA wrote that "surgical procedures are now widely accepted in the medical community as *medically necessary* treatment for gender dysphoria." *See* App'x 078 (emphasis added). In OIRA submissions on four more occasions, including as recently as Fall 2023, Secretary McDonough explained each time that VA was "proposing these changes so that transgender and gender diverse veterans may receive *medically necessary* health care, including surgical interventions for gender transition . . . *consistent with medical industry standards*." *See* App'x 164; App'x 195; App'x 238; *see also* App'x 163 (reflecting conclusion of the full OIRA review process for the Fall 2022 submission). Despite these repeated concessions that gender-confirmation surgery is medically necessary, the Secretary has failed to furnish this care, in breach of his duties under 38 U.S.C. § 1710.

### B. VA's Denial Is Inconsistent with Its Provision of Gender-Affirming Care and Surgeries to Treat Other Conditions.

The Secretary's denial of TAVA's petition is discordant with VA's provision of gender-affirming care *other than surgery* to transgender veterans, giving rise to an inconsistency that makes the denial arbitrary and capricious. He has failed to rationalize this inconsistent provision of care to transgender veterans, further demonstrating that his denial of TAVA's rulemaking petition is arbitrary and capricious.

VA recognizes that gender dysphoria is a medical condition that often requires medical treatment. *See* App'x 078. It even recognizes the medical necessity of care for transgender veterans preparing for and undergoing gender-confirmation surgery. "VHA policy [requires] that medically necessary care [be] provided to enrolled or otherwise eligible intersex and transgender Veterans, including . . . medically necessary postoperative and long-term care following sex reassignment surgery." App'x 028-029; *see also* App'x 290 at ¶3. Despite offering to transgender veterans every form of gender-affirming care that comes before and after gender-confirmation surgery, VA has arbitrarily decided to exclude the surgery itself.

VA's inconsistent policy renders its denial of the rulemaking petition arbitrary and capricious. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 212 (2016) ("An unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice . . . .") (internal quotation marks and citation omitted)); *see also Kort v. Burwell*, 209 F. Supp. 3d 98 (D.D.C. 2016) (holding that the failure of an agency to adequately explain why it denied coverage for scans while it approved coverage for other diagnostic tests was arbitrary and capricious). VA otherwise provides the full slate of treatments to address gender dysphoria—from voice coaching to hormone therapy, among other treatments—but it inexplicably stops short of critical gender-

confirmation surgery. *See, e.g.*, App'x 029; App'x 001-002. This inconsistent provision of medically necessary care to transgender veterans is unreasoned.

Moreover, the Secretary's denial of TAVA's petition is also discordant with its provision of the same or substantively similar surgeries to intersex and other veterans for conditions other than gender dysphoria. VA provides vaginoplasties, phalloplasties, hysterectomies, mastectomies, orchiectomies, scrotectomies, penectomies, and reconstructive surgery to veterans for diagnoses other than gender dysphoria. *See* App'x 017-019 ((citing VHA Directive 2013-003 (Feb. 8, 2013) (clarifying that VA provides to "intersex Veterans… surgery to correct inborn conditions related to reproductive or sexual autonomy); 38 C.F.R. § 17.38(a)(1)(x) (providing plastic surgery to veterans "required as a result of disease or trauma"); App'x 559-563; App'x 030-031; *see also* App'x 289-291; App'x 263-288. Yet VA refuses to provide identical procedures to transgender veterans to address gender dysphoria. VA's inconsistent deployment of care—to save some lives, but not others—confirms that the agency's denial of the petition is arbitrary and capricious.

Multiple courts, including the Federal Circuit, have recognized that an agency action treating "like cases differently" is arbitrary and capricious. *See Kaiser Found. Hosps. v. Sebelius*, 708 F.3d 226, 233 (D.C. Cir. 2013); *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("[A]gency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently.")

(internal quotation marks omitted); *Kreis v. Sec'y of the Air Force,* 406 F.3d 684, 687 (D.C. Cir. 2005) ("[A]n agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so.") (internal quotation marks omitted). VA's differential treatment of conditions based on whether a veteran is seeking care for gender dysphoria versus other conditions is inconsistent, illogical, and irrational. And "[c]ertainly, if the result reached is illogical on its own terms, the" agency's decision " order is arbitrary and capricious." *GameFly, Inc. v. Postal Regul. Comm'n*, 704 F.3d 145, 148 (D.C. Cir. 2013) (quoting *Am. Fed'n of Gov't Emps. v. FLRA,* 470 F.3d 375, 380 (D.C. Cir. 2006)).

Gender-confirmation surgery treats gender dysphoria in the same way that VA's provision of the same and similar procedures treats certain intersex conditions, traumatic injuries, and disease. For example, VA provides mastectomies for veterans with cancer and veterans who are at high risk for cancer but have not been diagnosed. App'x 018. Just like a mastectomy to treat cancer or the threat of cancer, a mastectomy to address gender dysphoria can be lifesaving. In its petition for rulemaking, TAVA explained that "major medical associations and diagnostic manuals uniformly recognize gender dysphoria as a serious medical condition." App'x 013. Medical research and guidance from major medical organizations further confirms the importance of gender-confirmation surgery as effective treatment for gender dysphoria, including in the years since TAVA submitted its petition as

reflected in its 2024 supplemental submissions. *See, e.g.*, App'x 013; App'x 082; App'x 152-154; App'x 159; App'x 302-309.

Gender dysphoria is a serious medical condition. Treating it through surgery can be critical for a transgender veteran. Without gender-confirmation surgery, transgender veterans are at increased risk of physical harm, psychological distress, and suicide. *See* App'x 009-012; *see also* App'x 343-346 (Resolution 122 of the American Medical Association), App'x 347-381 (Report of the APA Task Force), App'x 406-416 (guidelines from the Endocrine Society). Among transgender veterans, undergoing gender-confirmation surgery is associated with significantly lowered levels of psychological distress and suicidal ideation. *See* App'x 007-008; App'x 302-309 (2021 study finding lower risk of suicidal ideation and attempt after transgender patients receive gender-confirmation surgery), App'x 041-045 (declaration of Dr. Marci Bowers), App'x 052-064 (declaration of Dr. Randi Ettner), App'x 099 (letter from Congress citing medical evidence); App'x 183 (same); App'x 196 (same). The *Diagnostic and Statistical Manual of Mental Disorders*—on which VA ratings for disability relating to mental disorder rely, *see* 38 C.F.R. § 4.130— explains that many transgender people "are distressed if the desired physical interventions using hormones and/or surgery are not available." *See* App'x 417-428. Gender-confirmation surgery is often critical to treating gender dysphoria, just as the

same or substantively similar surgery is often critical to treating intersex conditions, traumatic injuries, and disease. Yet VA provides the latter, but not the former.

Despite recognizing that gender dysphoria is a serious medical condition and that gender confirmation surgery is a necessary and effective treatment for it, VA declines to provide these surgeries—even though it provides the same surgeries to treat other conditions it recognizes as serious and for which it recognizes these surgeries as necessary and effective. This irrational and inconsistent treatment of life-threatening conditions that can be treated with the same procedures typifies the kind of government action that must be set aside as arbitrary and capricious.

### C. VA's Denial Contradicts Established Medical Evidence.

The Secretary's denial of TAVA's rulemaking petition, and its stubborn refusal to provide gender-confirmation surgery, also contradicts medical consensus on the effectiveness of surgical care in treating gender dysphoria, which was reflected in the medical evidence submitted to the agency. *See, e.g.*, App'x 417-428; App'x 343-346 (Resolution 122 of the American Medical Association), App'x 347-381 (Report of the APA Task Force), App'x 406-416 (guidelines from the Endocrine Society); App'x 007-008; App'x 302-309 (2021 study finding lower risk of suicidal ideation and attempt after transgender patients receive gender-confirmation surgery), App'x 041-046 (declaration of Dr. Marci Bowers), App'x 052-064 (declaration of Dr. Randi Ettner). VA's failure to give reasoned

explanation for this contradiction further confirms that VA's denial is arbitrary and capricious because it is unsupported by the record.

In denying TAVA's rulemaking petition, VA endorses outdated assumptions about what is medically necessary to treat gender dysphoria. It advances the view that gender-confirmation surgery is not critically necessary treatment. VA also assumes that it is, nevertheless, providing transgender veterans suffering from gender dysphoria with the care they need. VA's adherence to these outdated assumptions is "unsupported by the record" and "contradicted by scientific evidence." *Roe v. Dep't of Def.*, 947 F.3d 207, 225 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (holding that Department's functionally categorical prohibition on HIV positive servicemembers deploying was arbitrary and capricious); *cf. Skubel v. Fuoroli*, 113 F.3d 330, 337 (2d Cir. 1997) (holding regulation limiting Medicaid-funded home healthcare services to those provided at recipient's residence was arbitrary and capricious because decision relied on "obsolete medical assumptions").

The medical evidence in the record and otherwise available has long established that gender-confirmation surgery is medically necessary treatment for gender dysphoria. *See supra* Section I.B. Every document from a medical organization, *see* App'x 152-154, or medical researcher, *see* App'x 256-262, that informed VA's denial states that gender-confirmation surgery is a medically necessary treatment for gender dysphoria. This medical evidence is even affirmed in

documents by VA itself, *see* App'x 077-088; App'x 089-098; App'x 158-159. Directly contradicting this medical evidence, however, VA's denial of TAVA's rulemaking petition endorses the view that gender-confirmation surgery is not medically necessary.

Courts have time and time again affirmed that gender-confirmation surgery is medically necessary care. *See, e.g.*, *Edmo v. Corizon, Inc.*, 935 F.3d 757, 803 (9th Cir. 2019) (holding that gender-confirmation surgery was medically necessary for transgender prisoner with gender dysphoria); *Kadel v. Folwell*, 100 F.4th 122, 157 (4th Cir. 2024) (holding that state healthcare plans exclusion of gender confirmation surgery for state employees and dependents violated Equal Protection Clause, Medicaid Act, and the Affordable Care Act); *Fields v. Smith*, 653 F.3d 550, 554 (7th Cir. 2011) (holding that correction facility ban on gender-confirmation surgery for inmates violated Eighth Amendment). VA denies gender-confirmation surgery to transgender veterans "irrespective of medical necessity," *Kadel*, 100 F.4th at 157, although "[t]here is no dispute that gender transition-related surgery can be" and, as recognized by courts across the country, often is "medically necessary surgery." *Fletcher v. Alaska,* 443 F. Supp. 3d 1024, 1026 (D. Alaska 2020); *see also Hammons v. Univ. of Md. Med. Sys. Corp.*, 649 F. Supp. 3d 104 (D. Md. 2023) (recognizing gender-confirmation surgery as medically necessary to alleviate gender dysphoria); *Monroe v. Meeks*, 584 F. Supp. 3d 643 (S.D. Ill. 2022) (similar); *Good v. Iowa Dep't*

*of Hum. Servs.*, 924 N.W.2d 853 (Iowa 2019) (similar); *Rosati v. Igbinoso*, 791 F.3d 1037 (9th Cir. 2015) (similar); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164 (N.D. Cal. 2015) (similar); *De'Lonta v. Johnson*, 708 F.3d 520, 523, 526 (4th Cir. 2013) (similar); *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 2487 (D. Mass. 2012) (similar); *O'Donnabhain v. Commn'r*, 134 T.C. 34, 65-70 (2010) (similar).

VA's denial also departs from the practices of other federal agencies and states that follow well-established medical evidence. DOD, for example, provides gender-confirmation surgery to service members. App'x 444-465. VA's denial creates an illogical situation where an individual who would have been eligible for gender-confirmation surgery as a service member is refused access to the same medically necessary care as a veteran. *See* App'x 020. Indeed, some TAVA members have considered re-enlisting in order to receive this lifesaving care. VA staff have even observed this disparity as "a very big problem" that could call VA's "credibility…into question." App'x 492-504. While serving the country's national security interests, a transgender individual's need for gender-confirmation surgery is considered medically necessary, but when they are no longer serving this country, a transgender individual's need for gender-confirmation surgery is not. That is the very definition of arbitrary.

In addition to DOD, multiple other federal agencies, *see* App'x 102, and an increasing number of states recognize the discriminatory nature of healthcare

programs that deny coverage for treatment of gender dysphoria. *See id*.; App'x 023; *see also* Brief of Amici States of Washington, et al. as Amici Curiae Supporting Petitioner at 14-16, TAVA, No. 24-00108 (Fed. Cir. Jan. 31 2024), ECF No. 48. VA is an outlier among federal and state healthcare providers in its failure to follow the medical evidence that gender-confirmation surgery is critical to treating gender dysphoria—the same medical evidence that VA admits to be true. *See* App'x 078-088; App'x 089-098; App'x 158-159.

VA fails to provide any reason for defying the medical consensus reflected in the administrative record. The evidence cited in its own documents and recognized by medical organizations, researchers, other federal agencies, states, and courts across the country directly contradicts its arbitrary decision to deny TAVA's rulemaking petition.

### D. VA's Reliance on the PACT Act Is Not a Reasoned Explanation.

Secretary McDonough's invocation of the PACT Act does not constitute a reasoned justification sufficient to survive arbitrary-and-capricious review. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Preminger v. Sec'y of Veterans Affs.*, 632 F.3d 1345, 1353 (Fed. Cir. 2011). The rationale stated in his denial of TAVA's rulemaking petition, *see* App'x 001-002, and his same-day memorandum to his staff, *see* App'x 442-443, is patently inconsistent with VA's previous and concurrent actions. Secretary McDonough has

repeatedly demonstrated that VA's obligations under the PACT Act do not prevent it from expanding healthcare in other areas. Certainly, VA's denial cites no authority for the proposition that congressional enactment of one statute, even one as significant as the PACT Act, excuses an agency from its concurrent duties under other statutes, such as 38 U.S.C. § 1710. Claiming that VA is too busy implementing the PACT Act to honor the Secretary's promise to provide gender-confirmation surgery is disingenuous and reeks of pretext. *See* App'x 175 (Secretary statement insisting VA "will be taking the next steps to make sure we are providing the full spectrum of care to transgender Vets," but disclaiming he is "not naïve about the environment we're operating in, and the pressure we can all feel around politics"); *Dep't of Com. v. New York*, 588 U.S. 752, 784 (2019) (finding pretext where "[a]ltogether, the evidence tells a story that does not match the explanation the Secretary gave for his decision").

While an agency is of course free to change positions without being subjected to more searching review, *see F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009), it still "must show that there are good reasons for the new" decision. *Id.* at 515. "In other words," the Court here must "look to see whether the agency employed reasoned decisionmaking in rejecting the petition" for rulemaking, in contravention of its longstanding stated public position. *See Preminger*, 632 F.3d at 1353; *see also id.* (judicial review must ensure that agency "has adequately

explained the facts and policy concerns it relied on and . . . that those facts have some basis in the record"); *Serv. Women's Action Network*, 815 F.3d at 1374. If the agency's explanation is unreasonable, "an appropriate remedy may be a remand to the agency for reconsideration and publication of a new decision or the commencement of rulemaking if the agency so decides." *Level the Playing Field v. Fed. Election Comm'n*, 232 F. Supp. 3d 130, 146 (D.D.C. 2017); *see also id.* at 148 (remanding for reconsideration of rulemaking petition because agency failed to provide reasoned explanation).

VA's position since June 2021 has been that it intends to provide gender-confirmation surgery to transgender veterans who need this care, as requested by TAVA's rulemaking petition. Its abrupt course reversal in February 2024, based ostensibly on the PACT Act's effect on the provision of this care, is not grounded in sound reasoning. VA's 2024 reversal contradicts not only VA's previous position, but also other actions it has taken to expand healthcare since the PACT Act went into effect on August 10, 2022. Such "[u]nexplained inconsistenc[ies]" constitute "a reason for holding" agency action to be "an arbitrary and capricious change from agency practice." *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005); *see also Encino Motorcars*, 579 U.S. at 222 (citing *Brand X*, 545 U.S. at 981). Secretary McDonough's purported rationale for denying

TAVA's rulemaking petition cannot be squared with his other actions taken, both on this issue and others, rendering this denial arbitrary and capricious.

First, Secretary McDonough has expanded other VA healthcare services unrelated to the PACT Act since that law's enactment. On September 9, 2022, for instance, VA published an interim final rule removing the medical benefits package's exclusion of abortion counseling and providing abortion care for veterans and CHAMPVA beneficiaries when necessary to preserve the life and health of the pregnant veteran. 87 Fed. Reg. 55287 (Sept. 9, 2022). On March 4, 2024, VA published a final rule to this effect, making no substantive changes from the interim final rule. 89 Fed. Reg. 15451 (Mar. 4, 2024).

Between publication of this interim final rule and final rule, the nature of PACT Act's implementation changed dramatically. Specifically, although the original text of the PACT Act called for an eight-year schedule staggering the enrollment of veterans based on period and location served, *see* Pub. L. 117–168 (Aug. 10, 2022), on November 11, 2023, President Biden announced that all veterans covered by the PACT Act would be eligible for care in March 2024. App'x 505-511.[1] Yet VA made no mention of the PACT Act, let alone this change to its implementation schedule, in the interim final rule, March 2024 final rule, or

_____

[1] VA effectuated President Biden's announcement on March 5, 2024. App'x 555-558.

accompanying Regulatory Impact Analyses ("RIAs"). VA staff are plainly capable of implementing the PACT Act while simultaneously updating the medical benefits package in other ways. That VA is commendably providing care for many new veterans as a result of the PACT Act is no excuse for leaving so many of its existing patients behind.

President Biden's announcement of accelerated PACT Act implementation also had implications for the extension of abortion services to eligible veterans under the interim final rule. But VA did not amend its post-announcement final rule to reflect the new PACT Act workload. Instead, the RIA accompanying the March 2024 final rule was based solely on a 2020-21 healthcare projection model that entirely predates the PACT Act, as well as data from DOD which provides abortions in similar circumstances. *See* App'x 512-518. Like the final rule itself, the accompanying RIA included no discussion of the PACT Act.[2] VA's ability to proceed with revisions to the medical benefits package so as to provide abortion services, notwithstanding its implementation of the PACT Act, undermines the Secretary's claim that it cannot do the same for gender-confirmation surgery.

---

[2] The RIA accompanying the interim final rule from September 2022 similarly included no discussion of the PACT Act and was solely based on the same 2020-21 model and DOD data, even though the Act went into effect before completion of the analysis and publication of the interim final rule. App'x 564-569.

VA has failed to provide a reasoned explanation for its denial of TAVA's petition, as required by law. Where an agency decision does not give "a 'reasoned analysis' to justify the disparate treatment of regulated parties that seem similarly situated," it must be set aside as arbitrary and capricious. *ANR Storage Co. v. F.E.R.C.*, 904 F.3d 1020, 1024 (D.C. Cir. 2018) (quoting *W. Deptford Energy, LLC v. F.E.R.C.*, 766 F.3d 10, 21 (D.C. Cir. 2014)); *see also SKF USA Inc.*, 263 F.3d at 1382 (if "agency offer[s] insufficient reasons for treating similar situations differently," "agency action is arbitrary") (internal quotation marks omitted); *Sebelius*, 708 F.3d at 233; *Kreis,* 406 F.3d at 687; *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 216 (D.C. Cir. 2013) ("Agency action is arbitrary and capricious if the agency offers insufficient reasons for treating similar situations differently.") (internal quotation omitted).

Second, although the PACT Act went into effect on August 10, 2022, VA continued to declare its intent to provide gender-confirmation surgery for sixteen more months, indicating it did not view the PACT Act as a barrier to providing this care. *See, e.g.*, App'x 175 (Secretary promise to provide "the full spectrum of care to transgender Vets" in February 26, 2023 speech also discussing implementation of the PACT Act); App'x 181 (VA statement to TAVA that "[w]e are close to finalizing the review and publishing the proposed rule in the Federal Register" on March 6, 2023); App'x 202 (VA representation that it "is actively working on the gender

affirming surgery regulatory action" on May 2, 2023); App'x 203-237 (Secretary McDonough statement that "[t]his proposed rule is continuing through VA's concurrence process" on May 9, 2023); App'x 334-342 ("VA is actively working on a gender affirming surgery regulatory action."); App'x 244 (December 22, 2023 letter from Secretary McDonough to TAVA counsel stating "As VA has already decided it should offer these services, VA has reviewed the 2016 petition and believes action is appropriate.").

Additionally, VA continued to publish its intent to provide gender-confirmation surgery via rulemaking in the OIRA Unified Agenda, including in the Fall 2022, Spring 2023, and Fall 2023 Unified Agendas. *See* App'x 164; App'x 195; App'x 238. These publications evidence that VA had time and opportunity to assess and incorporate the impact of the PACT Act into plans to provide gender-confirmation surgery and concluded that it still intended to move forward. In fact, OIRA's conclusion of EO 12866 Regulatory Review was also published after the PACT Act's effective date, on September 7, 2022. App'x 163.

Inconsistency like that demonstrated here is arbitrary and capricious agency action that must be set aside. Such "lack of reasoned explication for" agency action "that is inconsistent with the Department's longstanding earlier position . . . cannot carry the force of law . . . ." *Encino Motorcars*, 579 U.S. at 213. The Secretary repeatedly declared that he would initiate rulemaking to provide the gender-

confirmation surgery requested by TAVA, including after the PACT Act went into effect. But he failed to honor his word. When pressed to act by TAVA's mandamus petition, he for the first time invoked VA's duties under the PACT Act as grounds to deny the rulemaking petition.

## II.    VA's Denial Is Contrary to Constitutional Right.

Secretary McDonough's denial of TAVA's rulemaking petition unconstitutionally discriminates on the basis of sex and transgender status and is thus contrary to constitutional right in violation of the APA. *See* 5 U.S.C. § 706(2)(B); *see also Diaz-Rivas v. U.S. Att'y Gen.*, 769 F. App'x 748, 766 n.2 (11th Cir. 2019) (Jordan, C.J., concurring in part) (collecting cases where courts "considered [discrimination-based] constitutional claims as violations of" § 706(2)(B)). By denying TAVA's rulemaking petition, Secretary McDonough maintained VA's exclusion of "gender alterations" from the medical benefits package, in a denial letter that made specific reference to "gender affirming surgery" and "transgender veterans." *See* App'x 001-002. This letter, like the exclusion itself, classifies on the basis of sex and transgender status and fails intermediate scrutiny. VA's claim that its duties under the PACT Act compel denial of the petition are, at best, concerns about cost and administrative convenience, neither of which constitute a sufficiently important governmental objective for the quasi-suspect classifications used. The denial must be set aside as contrary to constitutional right.

**1. VA's Denial Classifies on the Basis of Sex and Transgender Status.**

A veteran's sex assigned at birth determines whether VA will provide them with certain medical services that are considered gender-confirmation surgeries. In denying transgender veterans these medical services while granting them for non-transgender veterans, VA classifies on the basis of sex. Like all sex classifications, VA's classification here is subject to intermediate scrutiny. *See United States v. Virginia*, 518 U.S. 515, 532-33 (1996); *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982); *Craig v. Boren*, 429 U.S. 190, 197-98 (1976). Denial of TAVA's rulemaking petition classifies on the basis of sex because it restricts access to care based on biological sex. Surgeries related to "gender alterations" are exclusively sought by transgender veterans, as Secretary McDonough acknowledged. *See* App'x 442-443 (referring only to "gender affirming surgery," not to the specific procedures themselves, and only to the needs of "transgender Veterans"). However, VA provides these same surgeries to treat conditions other than gender dysphoria—i.e., when sought by non-transgender veterans. *See supra* Section I.B.

For instance, if a woman veteran seeks a reduction mammoplasty on the basis of medical necessity, VA will provide it to her *unless* her medical necessity is due to gender dysphoria—a condition that cannot be diagnosed without reference to sex. "Determining whether a treatment like reduction mammoplasty constitutes" gender

alterations surgery "is impossible—literally cannot be done—without inquiring into a patient's sex assigned at birth and comparing it to their gender identity." *Kadel*, 100 F.4th at 147 (observing that "those procedures are routinely covered by the" government healthcare program in question "in situations where the only material difference is the patient's sex"). In other words, "[t]he biological sex of the . . . patient is the basis on which the" government action in question "distinguishes between those who may receive certain types of medical care and those who may not," such that Secretary McDonough's denial should "therefore [be] subject to heightened scrutiny." *Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661, 670 (8th Cir. 2022); *cf. Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 660 (2020) (holding that discrimination against transgender people necessarily constitutes sex discrimination because "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex").

Secretary McDonough's denial of TAVA's rulemaking petition also amounts to sex discrimination *qua* sex stereotyping. Several courts have held that "discrimination against transgender people constitute[s] sex-based discrimination for purposes of the Equal Protection Clause because such policies punish transgender persons for gender non-conformity, thereby relying on sex stereotypes." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (collecting cases); *see also Glenn v. Brumby*, 663 F.3d 1312, 1320

(11th Cir. 2011) (state action that "presume[s] that men and women's appearance and behavior will be determined by their sex[] must be subjected to heightened scrutiny because they embody 'the very stereotype the law condemns'") (quoting *J.E.B. v. Alabama*, 511 U.S. 127, 138 (1994)). "[A] policy that conditions access to gender-affirming surgery on whether the surgery will better align the patient's gender presentation with their sex assigned at birth is a policy based on gender stereotypes." *Kadel*, 100 F.4th at 154.

For example, VA's policy restricting breast augmentations only to veterans assigned female at birth on the basis of non-gender-dysphoria (e.g., reconstructive surgery) "is rooted in a gender stereotype: the assumption that people who have been assigned female at birth are supposed to have breasts, and that people assigned male at birth are not." *Id.* (analyzing state health plan that provides mastectomies to those assigned male or female at birth, but to the former only when "conducted for gender-affirming purposes"). The denial of TAVA's rulemaking petition thus constitutes a sex classification in multiple ways: by inescapably relying on sex and by trafficking in impermissible sex stereotypes.

Multiple circuits have recognized that government actions that restrict transgender people's access to healthcare or sex-specific facilities are subject to intermediate scrutiny because they constitute discrimination based on sex. *See Brandt*, 47 F.4th at 670; *Grimm*, 972 F.3d at 608 (applying intermediate scrutiny in

constitutional challenge to policy preventing transgender public school students using bathrooms concordant with their gender identities); *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 803 (11th Cir. 2022) (same); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 772 (7th Cir. 2023), *cert. denied sub nom. Metro. Sch. Dist. of Martinsville v. A. C.*, 144 S. Ct. 683 (2024) (same); *see also Dekker v. Weida*, 679 F. Supp. 3d 1271, 1292-93 (N.D. Fla. 2023) (holding state Medicaid plan's exclusion of gender-affirming care, including surgery, violated Constitution). [3] The Federal Circuit should join its peers in applying intermediate scrutiny to government action, like Secretary McDonough's denial of TAVA's rulemaking petition, that restricts access to essential medical care only to those whose biological sex accords with their gender identity.

Second, Secretary McDonough's denial classifies on the basis of transgender status by specifically declining to provide care exclusively required by transgender people and by making direct reference to the medical needs of "transgender

---

[3] This case presents distinct questions from that which the Supreme Court will address in *United States v. Skrmetti*, No. 23-477, 2024 WL 3089532 (U.S. June 24, 2024), where it will consider a Tennessee law prohibiting gender-affirming care for adolescents. VA's categorical exclusion from the medical benefits package affects only adults. *See* Petition for a Writ of Certiorari, *Skrmetti*, 2023 WL 7327440 (U.S. Nov. 6, 2023). VA regards  veterans, who are mature enough to fight and die for the nation, as adults, and there is no medical debate concerning the necessity of gender-affirming surgery for many transgender adults. *See supra* Section I.C. Moreover, the sole question presented in *Skrmetti* does not reach statutory claims under Section 1557 of the ACA nor any claims under the APA.

Veterans."[4] *See* App'x 442-443. Government actions that classify on the basis of

transgender status, like classifications on the basis of sex, independently trigger

intermediate scrutiny because transgender people constitute a quasi-suspect class.

To determine whether a group constitutes a suspect class warranting heightened

scrutiny, courts balance an array of factors including: (1) relevance of the

classification to a person's ability to contribute to society; (2) history of

discrimination against people who identify with the classification; (3) distinguishing

---

[4] The omission of the term "transgender" from the gender alterations exception does
not save it from intermediate scrutiny, since regulations may discriminate on the
basis of a protected class even if they avoid naming the class outright. *See Kadel*,
100 F.4th at 146 ("[G]ender dysphoria is so intimately related to transgender status
as to be virtually indistinguishable from it. The excluded treatments aim at
addressing incongruity between sex assigned at birth and gender identity, the very
heart of transgender status.")*; Hecox v. Little*, No. 20-35813, 2023 WL 11804896,
at *9 (9th Cir. Aug. 17, 2023) (rejecting argument that because regulation "uses
'biological sex' in place of the word 'transgender,' it is not targeted at excluding
transgender" individuals since regulation's "specific classification of 'biological sex'
has . . . been carefully drawn to target transgender women and girls, even if it does
not use the word "transgender" in the definition"); *MH v. Jeppesen*, No.: 1:22-cv-
00409-REP, 2024 WL 1012986, at *5 (D. Idaho Mar. 8, 2024) (defendant's policy
amounted to proxy discrimination because it is *"*discrimination against genital
reconstruction surgery to treat gender dysphoria operates to discriminate only
against transgender individuals because a person cannot suffer
from gender dysphoria without identifying as transgender").
    This understanding is well established in the context of sexual orientation
discrimination as well. *See Latta v. Otter*, 771 F.3d 456, 467-68 (9th Cir. 2014)
(holding that state laws banning same-sex marriage facially discriminate based on
sexual orientation even though they did so by classifying couples based on
"procreative capacity"); *Lawrence v. Texas*, 539 U.S. 558, 575 (2003) ("When
homosexual conduct is made criminal by the law of the State, that declaration in and
of itself is an invitation to subject homosexual persons to discrimination . . . .").

characteristics of the classification; and (4) minority status or lack of political power of those who identify with the classification. *See Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312-13 (1976); *see Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); *see also City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 441-43 (1985).

In applying these factors to the transgender population, several circuits have correctly concluded that transgender people are a quasi-suspect class. *See Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019) (holding military policy excluding transgender people experiencing gender dysphoria from service is subject to "something more than rational basis but less than strict scrutiny" because policy "on its face treats transgender persons differently than other persons"); *Williams v. Kincaid*, 45 F.4th 759, 772 (4th Cir. 2022) ("In part because of the long history of discrimination against transgender people, . . . intermediate scrutiny applies to laws that discriminate against them."); *accord. Kadel*, 100 F.4th at 143 ("[D]iscrimination on the basis of gender identity is subject to heightened scrutiny. If the coverage exclusions here discriminate against transgender people, they must withstand that scrutiny to stay in place.") (internal citation omitted); *B.P.J. by Jackson v. W. Virginia State Bd. of Educ.*, 98 F.4th 542, 556 (4th Cir. 2024) ("facial classification based on gender identity" necessarily "trigger[s] intermediate scrutiny"); *Grimm*, 972 F.3d at 610 ("[H]eightened scrutiny applies because transgender people constitute at least a quasi-suspect class."); *see also id.* (collecting district court cases

from Second, Third, Fourth, Sixth, Seventh, and Ninth Circuits reaching same conclusion). Secretary McDonough's denial of TAVA's rulemaking petition thus merits intermediate scrutiny as both sex and transgender status discrimination, not just the former.

### 2. VA's Denial Fails Intermediate Scrutiny.

To survive intermediate scrutiny, the challenged government action must have an "exceedingly persuasive justification" "that serves important governmental objectives" where "the discriminatory means employed are substantially related to the achievement of those objectives." *Virginia*, 518 U.S. at 524 (quoting *Hogan*, 458 U.S. at 724) (internal quotation marks omitted); *see also Boren*, 429 U.S. at 197-98; *Berkley v. United States*, 287 F.3d 1076, 1082 n.1 (Fed. Cir. 2002) (quoting *Virginia*, 518 U.S. at 533). The burden to survive heightened scrutiny "is demanding and . . . rests entirely on the State." *Virginia*, 518 U.S. at 531. The VA's justifications "must be genuine, not hypothesized or invented *post hoc* in response to litigation" and "must not rely on overbroad generalizations about the different talents, capacities, or preferences of" different sexes. *Id.* at 533. The Secretary is thus limited to the explanations contained in the administrative record: specifically, his denial letter to TAVA and same-day memorandum to staff. App'x 442-443. These explanations do not survive intermediate scrutiny.

The sole justification proffered by VA is the potential cost increases and administrative problems posed by the agency's obligations under the PACT Act. The Secretary's denial letter to TAVA disclaimed that "VA is not ready at this time to initiate a rulemaking addressing the specific regulatory changes proposed in the petition," as it needed to produce new PACT-Act-based "estimates and data" to "inform further analyses" of the rule. App'x 001-002. Based on the administrative record, the "estimates and data" to which he is referring are exclusively ones motivated by fear of cost and administrative burden. In his memorandum, Secretary McDonough requested analysis of how "utilization" of VA's Beneficiary Travel Self Service System ("BT") would be affected by provision of this care, whether there needs to be "a unique clinical appeals process" based on "[t]he complex and specialized determination" of eligibility "for gender affirming surgery," and whether the NPRM and RIA previously submitted to OIRA "must be updated in light of these estimates, data, and analyses." *See* App'x 442-443.

These justifications fail as a matter of law. First, the Supreme Court has long made clear that cost concerns are insufficient to justify classifications that trigger heightened scrutiny. The "State may not protect the public fisc by drawing an invidious distinction between classes of its citizens . . . ." *Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 263 (1974); *see also id.* (explaining "conservation of the taxpayers' purse is simply not a sufficient state interest to sustain a . . . requirement

which, in effect, severely penalizes exercise of" crucial rights). But Secretary McDonough's concern about BT utilization and need to update the RIA are directly motivated by concerns about the "public fisc."[5] Reference to uncertain BT utilization as a rationale for denying TAVA's rulemaking petition is thus, in fact, an impermissible cost rationale.

The same goes for the Secretary's insistence on needing to understand whether the NPRM and RIA submitted to OIRA must be updated. OIRA reviews NPRMs under EO 12866 primarily for their potential economic effects, and an RIA is but an estimate of costs. *See, e.g.*, App'x 163 (listing primarily economic conclusions of EO 12866 regulatory review of proposed rule); App'x 089-098 (2016 RIA conducted for this rule making exclusively cost-based conclusions).

Cost uncertainty cannot, as a matter of law, justify the decision to deny essential medical care to veterans on the basis of their sex and transgender status. *See Shapiro v. Thompson*, 394 U.S. 618, 633 (1969) ("The saving of welfare costs cannot justify an otherwise invidious classification."), *overruled in part on other grounds*, *Edelman v. Jordan*, 415 U.S. 651 (1974); *see also Graham v. Richardson*, 403 U.S. 365, 374-75 (1971) (citing *Shapiro*, 394 U.S. at 633); *Plyler v. Doe,* 457

---

[5] Under the BT system, VA "pays eligible Veterans back for mileage and other authorized travel expenses to and from approved health care appointments." *See Beneficiary Travel Self Service System BTSSS*, U.S. DEP'T VETERANS AFFS. (March 29, 2024), https://www.va.gov/new-york-harbor-health-care/programs/beneficiary-travel-self-service-system-btsss.

U.S. 202, 227 (1982) ("[C]oncern for the preservation of resources standing alone can hardly justify the classification used in allocating . . . resources."). Instead, it is imperative that healthcare "providers . . . consider discriminatory impacts when designing plan coverage." *Lange v. Hous. Cnty., Ga.*, 101 F.4th 793, 800 (11th Cir. 2024) (citing *Shapiro*, 394 U.S. at 633). Cost concerns are no excuse for denying transgender veterans the care they need because of their biological sex and transgender status.

Second, the Supreme Court has repeatedly "rejected administrative ease and convenience as sufficiently important objectives to justify" classifications based on sex. *Boren*, 429 U.S. at 198 (collecting cases); *see also Reed v. Reed*, 404 U.S. 71, 76 (1971); *Stanley v. Ill.*, 405 U.S. 645, 656 (1972); *Frontiero v. Richardson*, 411 U.S. 677, 690 (1973); *cf. Schlesinger v. Ballard*, 419 U.S. 498, 506-507 (1975). Yet Secretary McDonough's justifications do exactly this. VA cannot deny and further delay provision of this care because it is uncertain about prospective BT utilization, a review process for disputes about the need for care, and further OIRA submissions. By relying on these impermissible rationales, Secretary McDonough "draws a sharp line" based on sex and transgender status "solely for the purpose of achieving administrative convenience . . . and therefore involves the 'very kind of arbitrary legislative choice forbidden by the Constitution.'" *Frontiero*, 411 U.S. at 690 (quoting *Reed*, 404 U.S. at 77, 76, 92) (alterations omitted). The concurrent

obligation to implement the PACT Act falls well short of the important governmental objectives required to justify sex- and transgender-status-based classifications such as the one at issue here. VA's denial epitomizes the kind of efficiency-based rationale that fails under intermediate scrutiny.

### III.    VA's Denial Is Not In Accord With and Exceeds the Statutory Authority of Section 1557 of the Affordable Care Act.

VA's denial of TAVA's rulemaking petition is not in accordance with and exceeds the statutory authority provided by Section 1557 of the ACA. 5 U.S.C. § 706(2)(A); *id.* § 706(2)(C). In denying the petition, VA runs afoul of Section 1557 of the ACA by impermissibly discriminating on the basis of sex in the provision of a federally administered healthcare program. 42 U.S.C. § 18116(a). It contravenes the statutory command that persons may not "be denied the benefits of . . . any program or activity that is administered by an Executive Agency" on the basis of sex, *id.*, which includes discrimination on the basis of transgender status. *See Bostock*, 590 U.S. 644 (recognizing that Title VII's prohibition of sex discrimination includes prohibition of discrimination based on transgender status). For this reason, VA's denial violates Section 1557, exceeds VA's statutory authority, and thus should be set aside under the APA.

VA's denial of TAVA's rulemaking petition amounts to sex discrimination directly prohibited by Section 1557 of the ACA. To establish one has been subject to sex discrimination prohibited by Section 1557, a person must prove they were (1)

excluded from participation in, denied the benefits of, or subjected to discrimination (2) by a federally funded healthcare service or healthcare service administered by an Executive Agency (3) on the basis of sex. *See* 42 U.S.C. § 18116 (incorporating standards under Title IX of the Education Amendments of 1972); *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 946 (9th Cir. 2020) (laying out standards under Title IX); *Doe v. Am. Univ.*, No. 19-cv-03097, 2020 WL 5593909, at *6 (D.D.C. Sept. 18, 2020) (same). By denying TAVA's rulemaking petition, VA subjected TAVA members to this impermissible sex discrimination. VA's denial (1) excludes TAVA members from accessing gender-confirmation surgery (2) at VA—a federally funded healthcare service operated by a federal agency (3) on the basis of their sex. Accordingly, the denial must be set aside.

As the Supreme Court established in 2020, discrimination on the basis of transgender status is necessarily discrimination on the basis of sex as a matter of logic. Put simply, "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Bostock*, 590 U.S. at 660; *see also id.* at 661 ("Just as sex is necessarily a but-for *cause* when an employer discriminates against homosexual or transgender employees, an employer who discriminates on these grounds inescapably *intends* to rely on sex in its decisionmaking.") (emphasis in original).

The Court's conclusion in *Bostock* regarding Title VII is equally applicable to the parallel prohibitions in Title IX and, by extension, Section 1557 of the ACA, which incorporates Title IX's protections by reference. 42 U.S.C. § 18116(a); *see, e.g.*, *Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022) ("We construe Title IX's protections consistently with those of Title VII . . . ."); *Mabry v. State Bd. of Cmty Colls. & Occupational Educ.*, 813 F.2d 311, 316 n.6 (10th Cir. 1987) ("Because Title VII prohibits the identical conduct prohibited by Title IX, i.e., sex discrimination, we regard it as the most appropriate analogue when defining Title IX's substantive standards . . . ."); *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 897 (1st Cir. 1988) (concurring with *Mabry*); *Lakoski v. James*, 66 F.3d 751, 757 (5th Cir. 1995) (same); *O'Connor v. Peru State Coll.,* 781 F.2d 632, 642 n.8 (8th Cir. 1986); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health and Hum. Servs.*, 485 F. Supp. 3d 1, 40 (D.D.C. 2020) (acknowledging argument that "application of *Bostock*'s textual analysis to Title IX (by way of Section 1557's incorporation of that statute) would yield the conclusion that the statute forbids discrimination based on gender identity…").

In the wake of *Bostock*, a multitude of circuits have applied its holding to Title IX and Section 1557 cases. *See, e.g.*, *Grimm*, 972 F.3d at 608 (relying on *Bostock* in holding that school district's, under Title IX, "necessarily rests on a sex classification" because it cannot be stated or effectuated "without referencing sex"); *A.C.*, 75 F.4th

at 769; *Snyder*, 28 F.4th at 114 (reasoning that *Bostock*'s interchangeable use of phrases "on the basis of sex" and "because of sex" suggests decision's equal applicability to Title IX). *Bostock* therefore should govern the analysis of VA's denial under Section 1557.

VA's denial of TAVA's rulemaking petition plainly discriminates on the basis of transgender status and, per *Bostock*, thus constitutes impermissible sex discrimination in violation of Section 1557. VA provides the same or substantively similar surgeries to treat conditions other than gender dysphoria—i.e., for conditions sought by non-transgender veterans. *See supra* Section I.B. Because non-transgender veterans can access the very same care for non-gender dysphoria diagnoses, VA's denial maintains a healthcare framework that discriminates on the basis of sex. *See supra* Section II.A.

Much like employers' decisions to discipline or fire employees on the basis of their transgender status in *Bostock*, VA could not have made its decision to deny TAVA's rulemaking petition without reference to its members' sex. For example, "if a natal male" veteran "were in a car accident and required a phalloplasty, that surgery would be covered" by VA "if deemed medically necessary. However, a natal female" veteran "seeking that same medically necessary procedure for gender dysphoria would be denied because of his sex." *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 948 (W.D. Wis. 2018). VA's denial is thus "a straightforward

case of sex discrimination." *Id.*; *see also Lange*, 101 F.4th at 799 ("Because transgender persons are the only plan participants who qualify for gender-affirming surgery, the plan denies health care coverage based on transgender status.").

Because sex is "necessarily a but-for *cause*" of the decision to deprive transgender veterans of essential healthcare, *Bostock*, 590 U.S. at 661 (emphasis in original), this Court must set aside VA's denial as a violation of Section 1557. It would not be the first to do so. Indeed, courts across the country have held that denials of gender-affirming care, including gender-confirmation surgery, by a federally funded healthcare program or program operated by a federal agency impermissibly discriminate on the basis of sex and so violate Section 1557. *See, e.g.*, *Kadel*, 100 F.4th at 133; *Hammons v. Univ. of Md. Med. Sys. Corp.*, 649 F. Supp. 3d 104, 117 (D. Md. 2023) (holding that decision to cancel hysterectomy that patient sought as treatment for gender dysphoria violated ACA); *Fain v. Crouch*, 618 F. Supp. 3d 313, 331 (S.D. W. Va. 2022) (holding state Medicaid plan's exclusion of gender-affirming care violated the ACA); *Flack*, 395 F. Supp. 3d at 1014-15 (same). Here too, the Federal Circuit should join these courts in setting aside VA's denial of gender-affirming care—specifically, gender-confirmation surgery—as impermissible sex discrimination that is not in accordance with Section 1557.

VA's absolute bar on its provision of surgery to transgender veterans confronting gender dysphoria impermissibly discriminates on the basis of sex. As

VA is a federally funded healthcare service and operated by a federal agency, VA's denial of this medically necessary care to transgender veterans with gender dysphoria violates Section 1557 of the ACA. Denial of TAVA's rulemaking petition is not in accordance with law and exceeds its statutory authority. Under the APA, the denial must thus be set aside. *See, e.g.*, *New York v. Nuclear Regul. Comm'n*, 681 F.3d 471, 476, 481-482 (D.C. Cir. 2012) (setting aside agency action under Nuclear Waste Policy Act for failure to comply with National Environmental Policy Act).

## IV.    VA's Denial Is Unconstitutional.

For the same reasons described *supra* in Section II, Secretary McDonough's denial of TAVA's rulemaking petition directly violates the equal protection component of the Fifth Amendment Due Process Clause by impermissibly discriminating on the basis of sex and transgender status. U.S. Const. amend. V.

## V.    VA's Denial Violates Section 1557 of the Affordable Care Act.

For the same reasons described *supra* in Section III, VA's denial of TAVA's rulemaking petition directly violates Section 1557 of the ACA by discriminating on the basis of sex. 42 U.S.C. § 18116(a).

## CONCLUSION

For the foregoing reasons, TAVA respectfully requests that the Court hold VA's denial unlawful and reverse the agency's decision. In the alternative, TAVA requests that the Court vacate and remand the decision to VA to provide reasoned explanation or to initiate rulemaking proceedings.

July 29, 2024

Respectfully submitted,

/s/ Michael J. Wishnie
John Baisley, Law Student Intern
Alexandra Johnson, Law Graduate
K.N. McCleary, Law Graduate
Sophie Park, Law Student Intern
Michael J. Wishnie, Supervising Attorney
Veterans Legal Services Clinic
Jerome N. Frank Legal Services Organization
Yale Law School[*]
P.O. Box 209090
New Haven, CT 06520-9090
(203) 432-4800
michael.wishnie@ylsclinics.org

---

[*] This brief does not purport to state the views of Yale Law School, if any.

# ADDENDUM

# TABLE OF CONTENTS

1.  Letter from the Honorable Denis McDonough, Secretary, U.S. Department of Veterans Affairs, to Counsel, Transgender American Veterans Association (February 22, 2024) ..........................................................Appx 1



February 22, 2024

Ilona Turner
Sasha Buchert
Transgender Law Center
1629 Telegraph Avenue, Suite 400
Oakland, CA 94612

Dear Counsellor,

It is our mission at VA to provide transgender Veterans – and all Veterans – with the world-class care and benefits they deserve. Gender Affirming Care should be available to any Veteran who needs it. Under its medical benefits package, VA presently provides Gender Affirming Care to Veterans – including hormone therapy, gender affirming therapy, pre- and post-operative care, voice and communication coaching, prosthetic support, and psychosocial support groups. VA also provides pre-operative evaluations for surgical procedures and surgical revisions associated with post-surgery complications.

The petition for rulemaking to repeal or amend 38 C.F.R. § 17.38(c)(4) filed by Dee Fulcher, Giuliano Silva, and the Transgender American Veterans Association (TAVA) requests that VA amend the medical benefits package to provide gender affirming surgery, in addition to the Gender Affirming Care VA presently provides. VA has moved methodically in its consideration of this important potential change in coverage because it must be implemented in a manner that has been thoroughly considered and ensures that the services made available to Veterans meet VA's rigorous standards for consistent and quality health care nationwide. VA remains committed to providing care to transgender Veterans and will continue to take steps to consider any potential changes to the provision of medical care to that important population.

Among other considerations and analyses, in the months to come VA will produce estimates and collect data concerning the population of Veterans who will become newly eligible for hospital care (including mental health services and counseling), medical services, and nursing home care for any illness under Section 103 of the Sergeant First Class Heath Robinson Honoring our Promise to Address Comprehensive Toxics Act of 2022 (PACT Act), one of the most significant laws ever to help millions of veterans who were exposed to toxins and burn pits during their military service. These estimates and data will inform further analyses, including whether the Notice of Proposed Rulemaking or the Regulatory Impact Analysis VA previously produced must be updated and submitted to the Office of Management and Budget.

Because VA is not ready at this time to initiate a rulemaking addressing the specific regulatory changes proposed in the petition, VA hereby denies the petition for rulemaking to repeal or amend 38 C.F.R. § 17.38(c)(4). While VA will continue to

Case: 24-1714    Document: 16    Page: 62    Filed: 07/29/2024

consider how and when it might ultimately provide gender affirming surgery, this letter is the VA's final action on the petition for rulemaking.

Thank you for your attention to this matter and your advocacy on behalf of our Nation's transgender Veterans.

Sincerely yours,

Denis McDonough

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 29th day of July, 2024, I filed the foregoing Brief

for Petitioners with the Clerk of the United States Court of Appeals for the Federal

Circuit via the CM/ECF system, which will send notice of such filing to all registered

CM/ECF users.

/s/ Michael J. Wishnie
Michael J. Wishnie
Veterans Legal Services Clinic
Jerome N. Frank Legal Services Organization
Yale Law School
P.O. Box 209090
New Haven, CT 06520-9090
(203) 432-4800

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Circuit Rule 32(a).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 11,620 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font. As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

<u>/s/ Michael J. Wishnie</u>
Michael J. Wishnie
Veterans Legal Services Clinic
Jerome N. Frank Legal Services Organization
Yale Law School
P.O. Box 209090
New Haven, CT 06520-9090
(203) 432-4800

July 29, 2024