[24-01714]

IN THE

# United States Court of Appeals
# for the Federal Circuit

TRANSGENDER AMERICAN VETERANS ASSOCIATION,

Petitioner,

v.

SECRETARY OF VETERANS AFFAIRS

Respondent.

## BRIEF OF *AMICI CURIAE* CITIES AND COUNTIES
## IN SUPPORT OF PETITIONER

RYAN WONG
KRISTEN E. LOVIN
RYAN HAYWARD
COURTNEY LISS
SARA FITZPATRICK
   *Principal Attorneys of Record*
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111
(415) 391-5400

*Attorneys for Amici Curiae*
[Complete List of *Amici Curiae* on
Signature Page and in Addendum]

August 2, 2024

# CERTIFICATE OF INTEREST

I, Ryan Wong, counsel for *amici curiae*, certify the following:

1.    The full names of the *amici curiae* entities represented by me are:

>    Ann Arbor, Michigan
>
>    Alexandria, Virginia
>
>    Berkeley, California
>
>    Borough of Carlisle, Pennsylvania
>
>    Cincinnati, Ohio
>
>    Cleveland, Ohio
>
>    Lowell, Massachusetts
>
>    Miami Beach, Florida
>
>    New York, New York
>
>    Olympia, Washington
>
>    Pittsburgh, Pennsylvania
>
>    Portland, Oregon
>
>    Santa Clara County, California
>
>    West Hollywood, California
>
>    Yonkers, New York

2.    The names of the real parties in interest represented by me are: Not applicable.

3.    The names of any parent corporations or publicly held companies that own 10% or more of the stock of an *amicus* represented by me are: None.

i

4.     The names of all law firms and the partners or associates that appeared for the *amici* now represented by me in the trial court or agency or are expected to appear in this court are:

KEKER, VAN NEST & PETERS LLP: Kristen E. Lovin, Ryan Hayward, Courtney Liss, Sara Fitzpatrick

5.     Other than the originating case(s) for this case, there are no related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a).

6.     No information is required to be provided under Fed. R. App. 26.1(b).


Dated:  August 2, 2024                              Respectfully submitted,

                                                    *s/ Ryan Wong*
                                                    RYAN WONG

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ....................................................................i

INTEREST OF *AMICI CURIAE* ...............................................................1

SUMMARY OF ARGUMENT .....................................................................1

ARGUMENT .................................................................................................2

I.     *AMICI*'S COLLECTIVE EXPERIENCE PROVES THAT PROVIDING TRANSITION-RELATED HEALTH CARE, INCLUDING GENDER-CONFIRMATION SURGERY, PROMOTES IMPORTANT INTERESTS WITHOUT IMPOSING SIGNIFICANT COSTS.........................................2

    A.    Transgender people, including veterans, are an integral part of *amici's* communities. .........................................2

    B.    *Amici* provide transition-related health care, including gender-confirmation surgery, to their employees and dependents, and have found that doing so promotes important societal interests. ...........................................3

        1.    Healthcare policies that cover comprehensive transition-related care, including gender-confirmation surgery, promote wellbeing in *amici*'s communities. ...........................................5

        2.    Providing transgender-inclusive healthcare, including gender-confirmation surgery, benefits *amici*'s employees and their families. .................................7

        3.    Providing transgender-inclusive medical benefits, including gender-confirmation surgery, bolsters *amici's* ability to recruit and retain employees. ...................8

    C.    Covering transgender-inclusive medical benefits, including gender confirmation surgery, does not impose significant costs or administrative burdens. ...................9

iii

II.    VA'S REFUSAL TO END ITS EXCLUSION OF GENDER-
       CONFIRMATION SURGERY FROM VETERANS'
       HEALTH BENEFITS VIOLATES THE FIFTH
       AMENDMENT'S DUE PROCESS CLAUSE........................................12

       A.    VA's regulation worsens the already pervasive
             discrimination against transgender people, undermining
             amici's core values and harming public health. ...........................13

       B.    VA's continued exclusion of gender-confirmation
             surgery from veterans' health benefits fails both
             heightened-scrutiny and rational-basis review. ...........................16

CONCLUSION .................................................................................................19

ADDENDUM ....................................................................................................21

       List of *Amici Curiae*.................................................................................21

CERTIFICATE OF SERVICE ........................................................................22

CERTIFICATE OF COMPLIANCE................................................................23

iv

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bostock v. Clayton Cnty., Georgia,*
    140 S. Ct. 1731 (2020) .................................................................. 16, 17

*Brandt by & through Brandt v. Rutledge,*
    47 F.4th 661 (8th Cir. 2022) ..................................................16

*Cleburne v. Cleburne Living Ctr.,*
    473 U.S. 432 (1985) .................................................................19

*Glenn v. Brumby,*
    663 F.3d 1312 (11th Cir. 2011) ...........................................16

*Grimm v. Gloucester Cnty. Sch. Bd.,*
    972 F.3d 586 (4th Cir. 2020) ................................................16

*Kadel v. Folwell,*
    100 F.4th 122 (4th Cir. 2024) ...................................... 17, 18

*Karnoski v. Trump,*
    926 F.3d 1180 (9th Cir. 2019) .............................................16

*Norsworthy v. Beard,*
    87 F. Supp. 3d 1104 (N.D. Cal. 2015) ...............................17

*Romer v. Evans,*
    517 U.S. 620 (1996).................................................................18

*Sessions v. Morales-Santana,*
    582 U.S. 47 (2017)...................................................................17

*U.S. Dep't of Agric. v. Moreno,*
    413 U.S. 528 (1973).................................................................19

*United States v. Virginia,*
    518 U.S. 515 (1996).................................................................17

2547798

**Statutes**

38 C.F.R. § 17.38(a)(1)(x) ................................................................. 14, 18

38 C.F.R. § 17.38(c)(4) .................................................................. 1, 14, 18

Fed. R. App. P. 29(a)(2) ...........................................................................1

Fed. R. App. P. 29(a)(4)(E) ......................................................................1

**Other Authorities**

Aaron Belkin, *Cost to VHA of Providing Transition-Related Surgery*,
    Palm Center (Nov. 2016) .....................................................................12

Anthony Almazan & Alex Keuroghlian, *Association Between Gender-*
    *Affirming Surgeries and Mental Health Outcomes*, 156 JAMA
    SURGERY 611 (2021) ..........................................................................3, 7

Ashley Kirzinger, Audrey Kearney, et al., *KFF/The Washington Post*
    *Trans Survey*, KFF (March 2022) .................................................... 9, 13

Blosnich et al., *Mental Health of Transgender Veterans in US States*
    *With and Without Discrimination and Hate Crime Legal*
    *Protection*, 106 AM. J. PUB. H. 534 (2016) .......................................14

Cal. Dep't of Ins., *Economic Impact Assessment: Gender*
    *Nondiscrimination in Health Insurance* (Apr. 13, 2012) ....................7

Center for American Progress, *Protecting and Advancing Health Care*
    *for Transgender Adult Communities* (Aug. 18, 2021) ..........................6

Cleveland Clinic, *Gender Affirmation Surgery* (accessed Jan. 2024) ......3

Def. Civilian Personnel Adv., Federal Employees Health Benefits
    (accessed Jan. 2024) .............................................................................5

Denis R. McDonough, Remarks at Orlando VA Healthcare System's
    11th Annual Pride Month Celebration (June 19, 2021).......................18

HRC Municipal Equality Index 2023, Executive Summary, HRC
    Foundation (Nov. 2023)........................................................................9

vi

Human Rights Campaign Foundation, *Corporate Equality Index 2023-2024* (Nov. 2023)..............................................................4

Interview with Santa Clara Official, May 23, 2017...............................7, 8

Jody Herman, *Costs and Benefits of Providing Transition-Related Health Care Coverage in Employee Health Benefits Plans*, Williams Inst. 1 (Sept. 2013) .............................................................11

Kayla Williams, *Bill would ban care for transgender veterans; the scientific and medical consensus tell us that's a mistake,* RAND Corporation (Jul. 5, 2023)...................................................................12

Kellan Baker and Arjee Restar, *Utilization and Costs of Gender-Affirming Care in a Commercially Insured Transgender Population,* 50 J. LAW. MED. ETHICS 456 (Fall 2022).........................10

Kerry O'Leary and Marco Marcelli, *Mental Health Outcomes Among Transgender Veterans and Active-Duty Service Members in the United States: A Systematic Review*, 2021 FED. PRACTITIONER 418.................15

Lindsay Dhanani & Rebecca Totton, *Have You Heard the News? The Effects of Exposure to News About Recent Transgender Legislation on Transgender Youth and Young Adults*, 20 SEX RES SOC POLICY 1345 (2023).....................................................................................4

Madeleine B. Deutsch, *Overview of Gender-Affirming Treatments and Procedures*, UCSF Transgender Care (accessed Jan. 2024) ...............11

*OIRA Conclusion of EO 12866 Regulatory Review – RIN: 2900-AR34,* OFF. INFO. & REGUL. AFFS. (Sept. 7, 2022) ........................................10

Raymond Tucker, Rylan Testa, et al., *Hormone therapy, gender affirmation surgery, and their association with recent suicidal ideation and depression symptoms in transgender veterans*, 48 PSYCH. MED. 2329–36 (2018)..............................................................15

Rebecca Kheel, *The VA said it would cover gender affirmation surgeries. Trans vets are still waiting.,* MILITARY.COM (Dec. 20, 2021) ........................................................................................................9

Sandy James, Jody Herman, et al., *The Report of the 2015 U.S. Transgender Survey,* Nat'l Ctr. For Transgender Equality (Dec. 2016) ...................................................................................... 13, 14

The Trevor Project, *Data on Transgender Youth* (Feb. 22, 2019) ............................6

U.S. Dep't. of Vet. Aff., *Community Provider Toolkit: Veterans with Transgender and Gender Diverse Identities* (accessed Jan. 2024) .................2, 3

U.S. Dep't. of Vet. Aff., *VHA LGBTQ+ Health Program* (accessed Jan. 23, 2023) ...........................................................................................12

U.S. Off. of Pers. Mgmt., Benefits for Transgender Federal Employees and Annuitants (accessed Jan. 2024) ................................................5

UCLA Williams Institute, *How Many Adults and Youth Identify as Transgender in the United States* (June 2022) .....................................................2

William Padula, Shiona Heru, et. al, *Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis,* 31 J. GEN. INTERN. MED. 394 (Oct. 19, 2015)......................................................................11

World Prof'l Ass'n for Transgender Health, *Position Statement on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the USA* (Dec. 21, 2016) .................................................................7

**Constitutional Provisions**

U.S. Const. Amend. V......................................................................... 12, 13

## INTEREST OF *AMICI CURIAE*

*Amici* are American cities and counties that offer transgender-inclusive medical benefits—including coverage for gender-confirmation surgery—for employees and their dependents.[1] *Amici* are home to, and/or employ, many of our country's estimated 1.6 million transgender people, including numerous transgender veterans who have served our country. *Amici* have a strong interest in protecting transgender members of their communities from discriminatory and marginalizing policies, including the Department of Veterans Affairs ("VA") regulation, 38 C.F.R. § 17.38(c)(4), which excludes gender-confirmation surgery from the medical benefits VA makes available to our veterans.[2]

## SUMMARY OF ARGUMENT

*Amici* submit this brief to share their collective experience as cities and counties offering transgender-inclusive medical benefits.[3] *Amici*'s collective experience demonstrates the significant benefits and insubstantial costs of providing comprehensive care for transgender individuals and confirms that there is no legitimate purpose for VA's continued exclusion of coverage for gender-

---

[1] All *amici* are listed on the signature page and in the Addendum to this brief.

[2] Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici* affirm that that no counsel for a party authored this brief in whole or in part, and that no person other than *amici* and their counsel contributed money to fund its preparation or submission.

[3] *Amici* submit this brief pursuant to Fed. R. App. P. 29(a)(2) as all parties have consented to the brief's filing.

1

confirmation surgery. Moreover, VA's regulation further stigmatizes individuals who already face severe discrimination and, in so doing, violates the equal protection component of the Fifth Amendment's due process clause.

## ARGUMENT

I.  ***Amici*'s collective experience proves that providing transition-related health care, including gender-confirmation surgery, promotes important interests without imposing significant costs.**

   A.  **Transgender people, including veterans, are an integral part of *amici's* communities.**

Transgender people are an integral part of our communities—they are neighbors, coworkers, family members, and friends. An estimated 1.3 million adults and 300,000 youth in the United States identify as transgender. UCLA Williams Institute, *How Many Adults and Youth Identify as Transgender in the United States* (June 2022), https://perma.cc/4HSA-C4XA. Transgender residents pay taxes; rely on public services; and work for a living, with many transgender people employed by *amici*.

In addition to being valued members of *amici*'s communities, transgender people are an integral part of the United States armed forces. Compared to the general population, transgender people are two-to-three times more likely to serve in the United States military. U.S. Dep't. of Vet. Aff., *Community Provider Toolkit: Veterans with Transgender and Gender Diverse Identities* (accessed Jan. 2024), https://perma.cc/YAA6-9G2W. A 2014 study estimated that over 15,000

2

transgender people were serving in our armed forces, and approximately 134,000 veterans identified as transgender. *Id. Amici* have a strong interest in ensuring that transgender veterans in their communities are provided with medically necessary healthcare.

**B.    *Amici* provide transition-related health care, including gender-confirmation surgery, to their employees and dependents, and have found that doing so promotes important societal interests.**

In *amici*'s experience, providing coverage for transgender healthcare, and more specifically, gender-confirmation surgery, increases wellness in *amici*'s communities at minimal cost. Not all transgender individuals desire or seek gender-confirmation surgery. But for those who do, successfully undergoing gender-confirmation surgery significantly reduces gender dysphoria, anxiety, and depression. Cleveland Clinic, *Gender Affirmation Surgery* (accessed Jan. 2024), https://perma.cc/ZTD4-A5CQ. In fact, a Harvard T.H. Chan School of Public Health study found that among transgender people who underwent gender-confirmation surgery, the incidence of psychological distress was 42% lower, and the incidence of suicidal ideation 44% lower, than among transgender people who sought, but could not obtain, gender-confirmation surgery. Anthony Almazan & Alex Keuroghlian, *Association Between Gender-Affirming Surgeries and Mental Health Outcomes*, 156 JAMA SURGERY 611, 613–17 (2021), https://perma.cc/6CN4-7EZF.

3

Unsurprisingly, legislative bans on gender-confirmation surgery have a detrimental effect on *amici*'s communities. Nearly 80% of LGBTQ+ adults report that bans on gender-affirming care make them feel less safe. Human Rights Campaign Foundation ("HRC"), *Corporate Equality Index 2023-2024* (Nov. 2023) https://perma.cc/27US-B7TP. And a recent study found that transgender people are at risk of experiencing negative outcomes, including increased risk of suicide, because of the legislative bans on gender-affirming care proliferating across the country. Lindsay Dhanani & Rebecca Totton, *Have You Heard the News? The Effects of Exposure to News About Recent Transgender Legislation on Transgender Youth and Young Adults*, 20 SEX RES SOC POLICY 1345–1359 (2023), https://perma.cc/B2R8-X5PX.

All *amici* have direct experience providing health plans to their employees that cover gender-confirmation surgery. For example, *amicus* County of Santa Clara offers three health plans to its employees, and all three plans cover transition-related healthcare generally and gender-confirmation surgery in particular.[4, 5]

---

[4] Unless otherwise specified, information about the County of Santa Clara's provision of healthcare services dates to between November 2023 and January 2024.

[5] Cities and counties are not the only public employers providing inclusive healthcare to their employees: Many federal government agencies have also taken steps to cover transgender-inclusive healthcare. Since 2016, the federal

In addition to providing medical benefits to their employees, some *amici* operate health plans or other programs that provide medical care, including gender-confirmation surgery, to their residents. For example, one of the health plans available to the County of Santa Clara's estimated 10,000 to 20,000 transgender residents[6] is the Valley Health Plan, a County-owned-and-operated plan that offers a broad range of transgender-inclusive health services.[7]

Covering transgender-inclusive health services furthers several important societal interests.

### 1. Healthcare policies that cover comprehensive transition-related care, including gender-confirmation surgery, promote wellbeing in *amici*'s communities.

Transgender-inclusive health policies that cover gender-confirmation surgery promote *amici*'s interest in the long-term health and wellbeing of their

---

government has required that each Federal Employees Health Benefits (FEHB) Program carrier offer at least one plan that covers gender-confirmation surgery. U.S. Off. of Pers. Mgmt., Benefits for Transgender Federal Employees and Annuitants (accessed Jan. 2024), https://perma.cc/2DX4-N5FX. FEHB plans cover the vast majority of federal civil servants—with the notable exclusion of veterans who utilize VA's healthcare plans. Def. Civilian Personnel Adv., Federal Employees Health Benefits (accessed Jan. 2024), https://perma.cc/S2VQ-TCTE.

[6] This approximation is based on data from the California Health Interview Survey tool AskCHIS. *See* California Health Interview Survey (CHIS), *Access CHIS Data,* https://perma.cc/R4TB-EZZR.

[7] The County covers many individuals through the county-run Valley Health Plan: 25,837 commercial Valley Health Plan members, 20,620 Valley Health Plan members through Covered California, and 161,635 Medi-Cal beneficiaries.

employees and residents. Transgender adults and youth are particularly vulnerable, at-risk populations in the United States. Center for American Progress, *Protecting and Advancing Health Care for Transgender Adult Communities* ("Center for American Progress Report") at 1 (Aug. 18, 2021), https://perma.cc/U6XB-5NPK; The Trevor Project, *Data on Transgender Youth,* (Feb. 22, 2019), https://perma.cc/U6WS-XN9K. Due to discrimination, stigma, violence, and other social, political, and economic factors, transgender adults suffer from worse health outcomes—including higher rates of chronic health conditions, HIV/AIDS, substance use, mental illness, and sexual and physical violence—than the general population. Center for American Progress Report, *supra*, at 1. Transgender adults are more than two times as likely as cisgender adults to have a depressive disorder and report twice as many days with poor mental health as cisgender, heterosexual adults. *Id.* at 3. Many of these issues are exacerbated by hostility in the medical system, including refusal to cover healthcare costs. *Id.* at 15.

In *amici's* view, by providing coverage for transition-related healthcare, *amici* can help mitigate broader health risks for transgender employees. Studies show that gender-confirmation surgery "plays an undisputed role in contributing toward favorable outcomes" for transgender people. World Prof'l Ass'n for Transgender Health ("WPATH"), *Position Statement on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the USA* at 2 (Dec. 21,

6

2016), https://perma.cc/7P79-M4JP. A study found that those who underwent gender-confirmation surgery had a 35% lower incidence of tobacco smoking than those who sought but could not receive gender-affirming care. Almazan & Keuroghlian, *Gender-Affirming Surgeries*, *supra*, at 5. In another study, transgender women who had undergone gender-confirmation surgeries had mental health scores comparable to other women, while those who could not access needed surgical care scored much lower. Cal. Dep't of Ins., *Economic Impact Assessment: Gender Nondiscrimination in Health Insurance* at 11 (Apr. 13, 2012), https://perma.cc/XBU7-CXG7. In *amici*'s experience, supporting transgender-inclusive healthcare promotes the broader public health within their communities.

> ## 2. Providing transgender-inclusive healthcare, including gender-confirmation surgery, benefits *amici*'s employees and their families.

For *amici*'s employees who are transgender or have transgender family members, the value of transgender-inclusive health care cannot be overstated. One County of Santa Clara official spoke about how having "access to the healthcare [his] daughter needs is everything" to his family. Interview with Santa Clara Official, May 23, 2017.[8] The official's insurance, provided through his employment by the County, offered a wide range of transition-related care,

---

[8] Certain identifying characteristics have been changed or omitted to protect the privacy of the employee's child.

including extensive counseling for the official's family members, provision to his daughter of a "puberty blocker" through a surgical procedure, and hormone therapy. *Id*. As the official explained,

> Having a teen is hard enough, it's so emotional, and the suicide rates of transgender kids are so high, that we need to make sure our child is getting appropriate medical care ….We are lucky to have a team of well-trained, culturally competent doctors delivering services in a way that's allowed my daughter to flourish—she gets straight As, is a double black belt in martial arts, and is a musician. She's an amazing child. And she has been able to do all these things because we haven't had to spend our time and energy fighting the health plan to get medical care…. I can't imagine what it would be like if we didn't have this health coverage.

*Id.* The official spoke about how critical the plan's coverage of gender-confirmation surgery was:

> [My daughter] has always wanted to have surgery once she is 18, right before her transition to college. This is a medical decision she will make for herself when she is 18, but we all feel relieved knowing that that can be her choice, rather than something determined by our family finances.

*Id.* By providing healthcare benefits that allow employees to access gender-confirmation surgery for themselves and their families, *amici* help their employees and citizens thrive and focus on their futures.

### 3. Providing transgender-inclusive medical benefits, including gender-confirmation surgery, bolsters *amici's* ability to recruit and retain employees.

Providing transgender-inclusive health benefits bolsters *amici*'s ability to recruit and retain employees. Over 40% of the municipalities surveyed by HRC

offer transgender-inclusive health benefits to municipal employees, and that number is steadily increasing. *See* HRC Municipal Equality Index 2023, Executive Summary, HRC Foundation (Nov. 2023), https://perma.cc/JJ75-S5WE. Indeed, the County of Santa Clara Official stated that the provision of these benefits was so critical that he would have left his job without them. He explained, "It's that important." The availability of gender-affirming health care is so important that one in seven transgender adults has changed jobs in order to get health insurance that covers such care. Ashley Kirzinger, Audrey Kearney, et al., *KFF/The Washington Post Trans Survey*, KFF at 20 (March 2022), https://perma.cc/JMH7-F8J6. Therefore, for *amici*, providing transgender-inclusive health benefits helps to attract and retain talent.

### C. Covering transgender-inclusive medical benefits, including gender confirmation surgery, does not impose significant costs or administrative burdens.

Contrary to VA's suggestion in the past that providing transgender-inclusive medical benefits would be financially burdensome, in *amici*'s experience, providing comprehensive transition-related care does not result in significantly higher costs. VA's own 2016 analysis estimated that the cost of providing gender-confirmation surgery to servicemembers would range from "$3.5 million to $78 million annually." Rebecca Kheel, *The VA said it would cover gender affirmation surgeries. Trans vets are still waiting.*, Military.com (Dec. 20, 2021),

https://perma.cc/LK2U-QS8Z. This is a small amount for VA; it would amount to only .001 to .03 percent of VA's $243 billion 2021 budget. *Id.* Indeed, the Office of Information & Regulatory Affairs has done a full cost-benefit analysis of the proposed end of VA's discriminatory rule against providing gender-confirmation surgery and has found that it would *not* be financially significant. *OIRA Conclusion of EO 12866 Regulatory Review – RIN: 2900-AR34*, OFF. INFO. & REGUL. AFFS. (Sept. 7, 2022), https://perma.cc/4FPS-XUGQ.

Other studies have analyzed the costs of covering gender-confirmation surgery in a variety of healthcare systems and found them to be insubstantial. One study, surveying nearly three decades of commercial insurance claims, found that the cost of providing gender-affirming care, including surgery, for the transgender population in 2019 was about $.06 per member per month. Kellan Baker and Arjee Restar, *Utilization and Costs of Gender-Affirming Care in a Commercially Insured Transgender Population,* 50 J. LAW. MED. ETHICS 456–70 (Fall 2022), https://perma.cc/8UUY-YBGG. The Massachusetts Group Insurance Commission, which administers that state's employment-based health benefits to 420,000 subscribers, found in a similar study that providing transgender-inclusive healthcare benefits leads to significant quality-of-life gains while costing only about $.016 per member per month. William Padula, Shiona Heru, et. al, *Societal Implications of Health Insurance Coverage for Medically Necessary Services in*

*the U.S. Transgender Population: A Cost-Effectiveness Analysis,* 31 J. GEN. INTERN. MED. 394–401 (Oct. 19, 2015), https://perma.cc/9JQA-4WCB. A 2013 study of thirty-four public and private employers found that employers reported very low actual costs, if any, from providing transition-related coverage in their health benefits plans. Jody Herman, *Costs and Benefits of Providing Transition-Related Health Care Coverage in Employee Health Benefits Plans*, Williams Inst. 1–23, 1 (Sept. 2013), https://perma.cc/B6WN-U8XZ.

These studies attribute the minimal costs associated with transgender-inclusive benefits to several factors. One factor is low utilization. Transgender people are a small portion of the population, and not all transgender people undergo medical treatment or seek the same treatment. Madeleine B. Deutsch, *Overview of Gender-Affirming Treatments and Procedures*, UCSF Transgender Care (accessed Jan. 2024), https://perma.cc/WCE2-53GR. A study of thirty-four public and private employers found the following utilization rates for transition-related health care benefits: 1 out of 10,000 employees for employers with 1,000–10,000 employees, and 1 out of 20,000 employees for employers with 10,000–50,000 employees. Herman, *supra*, at 2.

Moreover, the provision of gender-confirmation surgery can result in overall cost savings due to improved continuity of care. Notably, VA is *already* responsible for covering the "increased costs for treating mental health conditions

that are exacerbated by the failure to provide medically recommended care." Kayla Williams, *Bill would ban care for transgender veterans; the scientific and medical consensus tell us that's a mistake,* RAND Corporation, (Jul. 5, 2023), https://perma.cc/3BJD-RPVD; U.S. Dep't. of Vet. Aff., *VHA LGBTQ+ Health Program* (accessed Jan. 23, 2023), https://perma.cc/B55P-239K ("VA currently provides all medically necessary gender-affirming care to transgender Veterans with the exception of gender-affirming surgical interventions, due to an exclusion in the VA medical benefits package."). Because VA already covers most transition-related care, but excludes gender-confirmation surgery, it must cover post-operative complications and other medical issues arising from surgeries performed outside of the designated medical care system. Aaron Belkin, *Cost to VHA of Providing Transition-Related Surgery*, Palm Center at 3 (Nov. 2016), https://perma.cc/4AZZ D8F4. Providing coverage for gender-confirmation surgery would ensure that all medical care is efficiently handled within one system and increase financial savings from enhanced continuity of care. *Id.*

## II.    VA's refusal to end its exclusion of gender-confirmation surgery from veterans' health benefits violates the Fifth Amendment's Due Process clause.

VA's regulation excluding gender-confirmation surgery from veterans' health benefits is a violation of the equal protection component of the Fifth

Amendment's Due Process Clause. The regulation perpetuates discrimination and fails even rational-basis review.

###### A.    VA's regulation worsens the already pervasive discrimination against transgender people, undermining amici's core values and harming public health.

Despite protective laws and policies like those *amici* have in place, transgender people continue to face severe hardships and discrimination in many aspects of their daily existence. *See generally* Sandy James, Jody Herman, et al., *The Report of the 2015 U.S. Transgender Survey,* Nat'l Ctr. For Transgender Equality at 4 (Dec. 2016), https://perma.cc/S5BT-F87S; Kirzinger et al., *supra*, at 15–18. Over two-thirds of transgender adults have been verbally attacked because of their gender identity, gender expression, or sexual identity, and one in four has been physically attacked. Kirzinger et al., *supra*, at 16. Moreover, twenty-three percent of transgender adults have experienced housing discrimination in the past year, James et al., *Transgender Survey*, *supra*, at 176–80, and nearly half have been sexually assaulted, *id.* at 205.

The discrimination transgender people face extends into healthcare. In a recent survey, 24% of transgender adults reported that they had been refused health care due to their gender identity. Kirzinger et al., *supra*, at 17. For transgender veterans, VA's refusal to cover gender-confirmation surgery is an especially harmful form of discrimination. Excluding gender-confirmation surgery from

veterans' health coverage—while providing identical or substantially similar procedures to veterans who are cisgender[9]—cruelly singles out an already marginalized population by denying them medically necessary care. The resulting stigmatization contributes to the well-documented link between discrimination and adverse health effects in the transgender population. Transgender people who experience discrimination are more likely to experience severe psychological distress and other health issues. *See, e.g.*, *supra* Section I.B.; *see also* James et al., *Transgender Survey*, *supra*, at 107 (finding that 51% of transgender people who had faced workplace discrimination in the past year were currently experiencing serious psychological distress, compared with 36% of those who did not have such experience); *see also* Blosnich et al., *Mental Health of Transgender Veterans in US States With and Without Discrimination and Hate Crime Legal Protection*, 106 AM. J. PUB. H. 534–540 (2016) (finding that nondiscrimination protection was associated with a 26% decrease of mood disorders and 43% decrease of self-directed violence among transgender veterans). Stigmatization actively harms transgender veterans' mental and physical health.

---

[9] VA health coverage includes reconstructive surgery when medically necessary "as a result of disease or trauma," 38 C.F.R. § 17.38(a)(1)(x), but excludes "[g]ender alterations," 38 C.F.R. § 17.38(c)(4).

VA's exclusionary policies are especially disturbing given the mental health crisis among transgender veterans. Transgender veterans have worse mental health outcomes than their cisgender counterparts. Kerry O'Leary and Marco Marcelli, *Mental Health Outcomes Among Transgender Veterans and Active-Duty Service Members in the United States: A Systematic Review*, 2021 FED. PRACTITIONER 418–425, 419–22, https://perma.cc/7ZDB-9LQF (collecting studies and reporting that transgender veterans experience higher rates of suicidal thoughts and self-harm, military sexual trauma, substance abuse disorders, depression, and anxiety). One study found that transgender veterans who undergo both hormone therapy and gender-confirmation surgery have lower rates of suicidal ideation and symptoms of depression compared to those who undergo hormone therapy without surgical intervention. Raymond Tucker, Rylan Testa, et al., *Hormone therapy, gender affirmation surgery, and their association with recent suicidal ideation and depression symptoms in transgender veterans*, 48 PSYCH. MED. 2329–36, 2333–35 (2018), https://perma.cc/TMG3-P4YH. Given the importance of gender-confirmation surgery to transgender veterans' health, VA's refusal to cover such surgery puts veterans' wellbeing at risk.

2547798

**B.    VA's continued exclusion of gender-confirmation surgery from veterans' health benefits fails both heightened-scrutiny and rational-basis review.**

Turning to the equal-protection analysis, several federal courts of appeal have held that the heightened-scrutiny standard applies to policies that treat transgender people differently from other people. *E.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610 (4th Cir. 2020) (holding school bathroom policy was discriminatory and that "heightened scrutiny applies because transgender people constitute at least a quasi-suspect class"); *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019) (concluding that a policy banning openly transgender individuals from military service "on its face treats transgender persons differently than other persons, and consequently something more than rational basis but less than strict scrutiny applies"); *Glenn v. Brumby*, 663 F.3d 1312, 1319 (11th Cir. 2011) (concluding that discrimination against transgender people for gender-nonconformity is a form of sex stereotyping); *Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022) (applying heightened scrutiny to law prohibiting "gender transition procedures" for minors).[10]

---

[10] The Supreme Court's decision in *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1743 (2020), likewise supports applying heightened scrutiny. Although *Bostock* concerned the interpretation of Title VII of the Civil Rights Act of 1964, the Court's reasoning that "homosexuality and transgender status are inextricably bound up with sex" holds true in the Equal Protection context. *Id.* at 1742. In *Bostock*, the Court explained that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual

Because heightened scrutiny applies, VA must "demonstrate an 'exceedingly persuasive justification'" for its refusal to end its discriminatory regulation. *United States v. Virginia*, 518 U.S. 515, 531 (1996). Under this analysis, the regulation cannot stand unless it "serve[s] an important governmental interest *today*, for 'new insights and societal understandings can reveal unjustified inequality . . . that once passed unnoticed and unchallenged.'" *Sessions v. Morales-Santana*, 582 U.S. 47, 48 (2017) (quoting *Obergefell v. Hodges*, 576 U.S. 644, 673 (2015)).

Here, VA's refusal to cover transition-related surgical care for transgender veterans cannot stand because it serves no important governmental objectives. *See, e.g.*, *Kadel v. Folwell*, 100 F.4th 122, 133 (4th Cir. 2024) (holding that "healthcare plans that cover medically necessary treatments for certain diagnoses but bar coverage of those same medically necessary treatments for a diagnosis unique to transgender patients violate [ ] the Equal Protection Clause"); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1120 (N.D. Cal. 2015) (finding that a ban on surgical care for transgender inmates served no important governmental interest when the same treatment was provided for cisgender inmates). *Kadel* is illustrative. There, plaintiffs in two states challenged healthcare plans that excluded gender-affirming care.  There, as here, surgeries were available to cisgender individuals but not to

_____

based on sex." *Id.* at 1741. It follows that heightened scrutiny should apply.

transgender individuals seeking gender affirming care. *Compare id.* at 148 *with* 38 C.F.R. § 17.38(a)(1)(x), (c)(4) (VA policy permitting reconstructive surgeries when medically indicated for cisgender people but categorically prohibits the same surgeries for the purpose of "[g]ender alteration[]."). The Fourth Circuit found that this exclusion of treatments for gender confirmation constituted discrimination on the basis of gender identity as well as on the basis of sex and served no important governmental interest. *Kadel*, 100 F.4th at 153, 156-57. This is unjustifiable under heightened-scrutiny review.

But even if the Court were to review VA's refusal to cover transition-related surgical care under the rational-basis standard, the policy would still fail. Under rational-basis review, governmental action must "bear[] a rational relation to some legitimate end," and the Court's review must be more searching where the action targets a vulnerable group, as it does here. *Romer v. Evans*, 517 U.S. 620, 631, 634–35 (1996); *see supra,* Section II.A (discussing vulnerability of transgender veterans). But no such rational basis exists. Indeed, Secretary of Veterans Affairs McDonough has acknowledged that allowing transgender veterans "to go through the full gender confirmation process with VA by their side" is "the right thing to do" and "can save lives." Denis R. McDonough, Remarks at Orlando VA Healthcare System's 11th Annual Pride Month Celebration (June 19, 2021), https://perma.cc/KWR4-TLHA.

Given the relatively small number of transgender veterans, the low utilization rate for gender-confirmation surgery, and the health benefits provided by de-stigmatizing transgender veterans and providing gender-confirmation surgery to those who need it, there is no legitimate reason to deny transgender veterans such medically necessary care. *See U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) ("desire to harm a politically unpopular group" by excluding the group from receiving public benefits "cannot constitute a legitimate governmental interest"); *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) ("[M]ere negative attitudes, or fear . . . are not permissible bases" for disadvantaging a group of people). VA has provided no justification for its exclusionary policy, and for years has signaled intent to change the policy, but it has not done so. VA's discriminatory policy is harmful to veterans who require gender-confirming medical care.

## CONCLUSION

VA's continued discriminatory exclusion of gender-confirmation surgery from veterans' health benefits is unjustifiable. As *amici*'s collective experience shows, there is no legitimate, nondiscriminatory reason for denying medically necessary care to our nation's veterans. The Court should grant the Petition and order VA to proceed with amending or repealing its discriminatory rule.

19

Respectfully submitted,

Dated:  August 2, 2024

*s/ Ryan Wong*
RYAN WONG
KRISTEN E. LOVIN
RYAN HAYWARD
COURTNEY LISS
SARA FITZPATRICK

*Principal Attorneys of Record*
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111
Telephone:     (415) 391-5400
Facsimile:     (415) 397-7188

*Counsel for Amici Curiae*
Ann Arbor, Michigan; Alexandria, Virginia;
Berkeley, California; Borough of Carlisle,
Pennsylvania; Cincinnati, Ohio; Cleveland,
Ohio; Lowell, Massachusetts; Miami Beach,
Florida; New York, New York; Olympia,
Washington; Pittsburgh, Pennsylvania;
Portland, Oregon; Santa Clara County,
California; West Hollywood, California;
Yonkers, New York

2547798

# ADDENDUM

## List of *Amici Curiae*

1.  Ann Arbor, Michigan

2.  Alexandria, Virginia

3.  Berkeley, California

4.  Borough of Carlisle, Pennsylvania

5.  Cincinnati, Ohio

6.  Cleveland, Ohio

7.  Lowell, Massachusetts

8.  Miami Beach, Florida

9.  New York, New York

10. Olympia, Washington

11. Pittsburgh, Pennsylvania

12. Portland, Oregon

13. Santa Clara County, California

14. West Hollywood, California

15. Yonkers, New York

2547798

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2024, I electronically filed the foregoing

**BRIEF OF *AMICI CURIAE* CITIES AND COUNTIES IN SUPPORT OF**

**PETITIONER** with the Clerk of the Court using the appellate CM/ECF system,

which will serve, via email, notice of such filing on all counsel registered as

CM/ECF users:

I certify that all participants in the case are registered CM/ECF users and

that service will be accomplished by the appellate CM/ECF system.


Dated:   August 2, 2024                    *s/ Ryan Wong*
                                           RYAN WONG

2547798

**CERTIFICATE OF COMPLIANCE**

I hereby certify as follows:

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) and Federal Circuit Rule 29(b). The brief contains 4,015 words according to the word count of the word-processing system used to prepare the brief, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a 14-point, proportionally spaced Times New Roman font.


Dated:    August 2, 2024                    *s/ Ryan Wong*
                                            RYAN WONG