No. 24-1714

---

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

———————————

TRANSGENDER AMERICAN VETERANS ASSOCIATION,

*Petitioner*,

v.

SECRETARY OF VETERANS AFFAIRS,

*Respondent*.

———————————

ON PETITION FOR REVIEW
PURSUANT TO 38 U.S.C. § 502

———————————

---

**CORRECTED BRIEF OF FORMER GENERALS, ADMIRALS, AND SURGEONS GENERAL AS *AMICI CURIAE* IN SUPPORT OF PETITIONER AND GRANT OF THE PETITION FOR REVIEW**

---

Jeffrey S. Trachtman
KRAMER LEVIN NAFTALIS &
FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

Roy T. Englert, Jr.
Shikha Garg
KRAMER LEVIN NAFTALIS &
FRANKEL LLP
2000 K Street NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
renglert@kramerlevin.com

*Counsel for* Amici Curiae

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 24-1714

**Short Case Caption** Transgender American Veterans Association v. Secretary of Veterans Affairs

**Filing Party/Entity** Donald Arthur, Kristine Campbell, Rose Loper, Stanley McChrystal, Gale Pollock, Patricia Rose, Tammy Smith, Alan Steinman, and Loree Sutton

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 08/05/2024

Signature: /s/ Roy T. Englert, Jr.

Name: Roy T. Englert, Jr.

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Donald Arthur | n/a | n/a |
| Kristine Campbell | n/a | n/a |
| Rose Loper | n/a | n/a |
| Stanley McChrystal | n/a | n/a |
| Gale Pollock | n/a | n/a |
| Patricia Rose | n/a | n/a |
| Tammy Smith | n/a | n/a |
| Alan Steinman | n/a | n/a |
| Loree Sutton | n/a | n/a |
|  |  |  |
|  |  |  |

☐     Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑     None/Not Applicable            ☐     Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)     ☐   No     ☑   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable            ☐     Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ...................................................................... ii

INTERESTS OF *AMICI CURIAE* ...........................................................1

INTRODUCTION .....................................................................................5

ARGUMENT ............................................................................................7

I.   Providing All Medically Necessary Healthcare To Transgender Veterans Is Essential To The Effectiveness Of The Military...........................7

    A.   Military Recruiting Has Long Depended On The Commitment To Provide Benefits To Veterans....................................................8

    B.   As The Military's Diversity Increases, The Benefits Provided To Veterans Must Also Change To Reflect The Needs Of Recruits............12

    C.   Providing Gender-Confirmation Surgery To Transgender Veterans Does Not Undermine The VA's Ability To Provide Other Healthcare ...............................................................................17

II.   Discriminating Against Transgender Veterans Is Antithetical To The Military's Core Values ...................................................................20

CONCLUSION ......................................................................................24

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aptheker v. Sec'y of State*,
    378 U.S. 500 (1964)....................................................................7

*Bostock v. Clayton Cnty.*,
    140 S. Ct. 1731 (2020)..............................................................21

*Haig v. Agee*,
    453 U.S. 280 (1981)....................................................................7

*McCarty v. McCarty*,
    453 U.S. 210 (1981)....................................................................7

**Statutes and Regulations**

38 U.S.C. § 1705(a) ........................................................................11

38 U.S.C. § 1710........................................................................8, 11

Act of Sept. 29, 1789, 1 Stat. 95 .....................................................9

Act of Mar. 18, 1818, 3 Stat. 410....................................................9

Act to Authorize the President to Consolidate and Coordinate
    Governmental Activities Affecting War Veterans,
    Pub. L. No. 71-536, 46 Stat. 1016 (1930) .........................10

Sergeant First Class Heath Robinson Honoring our Promise to
    Address Comprehensive Toxics Act of 2022 .....................19

Veterans' Health Care Eligibility Reform Act of 1996,
    Pub. L. No. 104-262, 110 Stat. 3177 (Oct. 9, 1996)....................11, 12

38 C.F.R. § 0.601(d) .....................................................................20

38 C.F.R. § 17.36 ............................................................................8

38 C.F.R. § 17.38(a)......................................................................12

Page(s)

38 C.F.R. § 17.38(b) .................................................................8, 11

38 C.F.R. § 17.38(c).................................................................5, 8

**Legislative History**

142 Cong. Rec. E1441-01, 1996 WL 434824 ...........................12

H.R. Rep. No. 104-690 (1996)...................................................11

**Other Authorities**

Anthony N. Almazan & Alex S. Keuroghlian, *Association Between Gender-Affirming Surgeries and Mental Health Outcomes*, 156 JAMA 611 (Apr. 28, 2021) ............................................18

Elisabeth Bumiller, *Top Defense Officials Seek to End "Don't Ask, Don't Tell,"* N.Y. Times (Feb. 2, 2010) .............................23

Jay Caputo, *Should Transgender Persons Serve?*, U.S. Naval Inst. (Dec. 2017), https://www.usni.org/magazines/proceedings/ 2017/december/should-transgender-persons-serve .....................13, 16

Congressional Budget Office, *Trends in DoD's and VA's Budgets for Military Compensation* (Mar. 22, 2023), https://www.cbo.gov/system/files/2023-03/59013-Manpower.pdf...................17

Exec. Order No. 6232 (1933)......................................................11

Exec. Order No. 14004 On Enabling All Qualified Americans To Serve Their Country In Uniform (Jan. 25, 2021), https://www.whitehouse.gov/briefing-room/presidential- actions/2021/01/25/executive-order-on-enabling-all-qualified- americans-to-serve-their-country-in-uniform ..............................5, 14

Gary J. Gates & Jody L. Herman, *Transgender Military Service in the United States*, Williams Inst. (May 2014), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans- Military-Service-US-May-2014.pdf ............................................14

**Page(s)**

Michael P. Hughes, *Factors Influencing Recruitment into the U.S.
  Armed Services: Could Health Insurance be a Motivator?*,
  25 State Univ. of N.Y. Coll. at Buffalo - Buffalo State Coll.
  Master's Projects 1 (2017) ...................................................................12

IAVA, *Fulfill the Promise to Today's Veterans* (2017),
  http://iava.org/wp-content/uploads/2017/03/
  IAVA_Policy_2017_v8_125bleed.pdf ............................................16

*Is Military Enlistment Down?*, USAFacts (Nov. 24, 2023),
  https://usafacts.org/articles/is-military-enlistment-down ..................13

Jodie G. Katon, et al., *Trends in Hysterectomy Rates Among Women
  Veterans in the US Department of Veterans Affairs*,
  217 Am. J. Obstetrics & Gynecology 428.e1 (Oct. 2017) ................21

Rebecca Kheel, *The VA Said It Would Cover Gender Affirmation
  Surgeries. Trans Vets Are Still Waiting*, Military Daily News
  (Dec. 20, 2021) ...................................................................................17

Letter from George Washington to John Banister (Apr. 21, 1778),
  https://founders.archives.gov/documents/Washington/03-14-02-
  0525...................................................................................................8, 9

James D. Ridgway, *The Splendid Isolation Revisited: Lessons from
  the History of Veterans' Benefits Before Judicial Review*,
  3 Veterans L. Rev. 135 (2011).........................................................9, 11

Second Inaugural Address of Abraham Lincoln (Mar. 4, 1865),
  http://avalon.law.yale.edu /19th_century/lincoln2.asp .......................10

Secretary of Defense Ash Carter, *Remarks on Ending the Ban on
  Transgender Service in the U.S. Military* (June 30, 2016),
  https://www.defense.gov/News/Speeches/Speech/Article/821833/
  remarks-on-ending-the-ban-on-transgender-service-in-the-us-
  military...............................................................................................22

**Page(s)**

Lara Seligman, *DoD's Highest-Ranking Trans Official: 'Ostracizing Anybody' Will Hurt Military Readiness*, Politico (Apr. 9, 2023), https://www.politico.com/news/2023/04/09/shawn-skelly-gop-trans-00090488 .................................................................................15

Secretary of Defense Lloyd J. Austin III, *Statement on Transgender Service in the Military* (Jan. 25, 2021), https://www.defense.gov/News/Releases/Release/Article/2481568/statement-by-secretary-of-defense-lloyd-j-austin-iii-on-transgender-service-in...............................................................15

*Trump Approves New Limits on Transgender Troops in the Military*, N.Y. Times (Mar. 24, 2018) ...............................................................14

U.S. Dep't of Defense, *Directive-type Memorandum (DTM) 16-005 - Military Service of Transgender Service Members* (June 30, 2016) .................21

U.S. Dep't of Defense, *Directive-type Memorandum (DTM) 19-004 - Military Service by Transgender Persons and Persons with Gender Dysphoria* (Mar. 17, 2020) ...............................................................21

U.S. Dep't of Veterans Affairs, Claims for VA Benefits and Character of Discharge, https://www.benefits.va.gov/BENEFITS/docs/COD_Factsheet.pdf ...............................................................11

U.S. Dep't of Veterans Affairs, *History Overview*, https://department.va.gov/history/history-overview...........................................10

U.S. Dep't of Veterans Affairs, *The Origin of the VA Motto*, https://www.mirecc.va.gov/visn20/Newsflash/Origin-of-the-VA-Motto.asp ...............................................................10

U.S. Dep't of Veterans Affairs, *US Department of Veterans Affairs FY 2025 Budget Submission* (March 2024)............................................19

U.S. Dep't of Veterans Affairs, Veterans Health Admin., *Roots of VA Health Care Started 150 Years Ago* (Mar. 2, 2015), https://www.va.gov/health/newsfeatures/2015/march/roots-of-va-health-care-started-150-years-ago.asp .........................................9, 10

**Page(s)**

U.S. Dep't of Veterans Affairs, VHA Directive 1341(3) (May 23, 2018), https://www.patientcare.va.gov/LGBT/ docs/directives/VHA_DIRECTIVE_1341.pdf ....................................................20

U.S. Dep't of Veterans Affairs Women Veterans Task Force, *Strategies for Serving Our Women Veterans 2012 Report* (2012), https://www.va.gov/opa/publications/Draft_2012_Women-Veterans_StrategicPlan.pdf..............................................................16

U.S. Marines, *Marine Corps Values*, https://www.marines.com/life-as-a-marine/standards/values.html .................20

U.S. Navy, *Our Core Values*, https://www.navy.mil/About/Our-Core-Values ...............................................20

*VA Provides Free Emergency Suicide Prevention Care to Nearly 50,000 Veterans and Former Service Members in First Year of New Policy*, U.S. Dep't of Veterans Affairs (Jan. 17, 2024), https://news.va.gov/press-room/va-provides-free-emergency-suicide-prevention-care-to-nearly-50000 ............................................................18

David Vergun, U.S. Dep't of Defense, *DOD Addresses Recruiting Shortfall Challenges* (Dec. 13, 2023), https://www.defense.gov/News/News-Stories/Article/article/3616 786/dod-addresses-recruiting-shortfall-challenges.............................................13

Veterans Health Admin., *Economic Impact Analysis for RIN 2900-AP69, Removing Gender Alternations Restrictions from the Medical Benefits Package* (July 29, 2016) ...................................................18, 22

White House, *Fact Sheet: President Biden Signs Executive Order Enabling All Qualified Americans to Serve Their Country in Uniform* (Jan. 25, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/25/ fact-sheet-president-biden-signs-executive-order-enabling-all-qualified-americans-to-serve-their-country-in-uniform...................................................15

**Page(s)**

White House, *Statement from President Joe Biden on the Pardon of LGBTQI+ Service Members Wrongly Convicted* (June 26, 2024), www.whitehouse.gov/briefing-room/statements-releases/2024/06/26/statement-from-president-joe-biden-on-the-pardon-of-lgbtqi-service-members-wrongly-convicted ......................................6

## INTERESTS OF *AMICI CURIAE*

*Amici* are retired high-ranking officers.[1] They have a significant interest in this case because they understand that the continued refusal to provide transgender veterans necessary medical care undermines the military's core values and its recruitment and retention efforts. *Amici* urge this Court to review the VA's denial of Petitioner's 2016 rulemaking petition and direct the VA to amend or repeal its regulations that exclude medically necessary gender-confirmation surgery from the medical benefits package.

*Amici*'s views are based on decades of experience and accomplishments at the highest positions in our country's military and medical leadership, and decades advocating for the equal treatment of servicemembers and veterans:

- Vice Admiral Donald C. Arthur, M.D., J.D., USN, Ret., served in the Navy for 33 years. He was the Navy's 35th Surgeon General and Chief of the Navy Bureau of Medicine and Surgery.

- Brigadier General Kristine K. Campbell, PhD, RN, USAR, Ret., served in the Army Reserve, retiring as Assistant Surgeon General for Force Management,

---

[1] No party's counsel authored this brief either in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person—other than *amici curiae* and their counsel—contributed money that was intended to fund preparing or submitting the brief. Pursuant to Federal Rule of Appellate Procedure 29(a), all parties have consented to the filing of this *amicus* brief.

1

Mobilization and Reserve Affairs. She also commanded a Combat Support Hospital in Bosnia, the first nurse and the first woman to do so in a hazardous duty area.

- Brigadier General Rose Loper, USAR, Ret., served 33 years, retiring as the Deputy Commanding General of 70th Regional Support Command. Her commands included E Company 709th Maintenance Battalion supporting the 9th Infantry Division; 92nd Transportation Company providing CH-47 Helicopter Support for the National Park Service at Mt. Rainier National Park; 6th Battalion 158th Aviation Regiment (selected as Army Reserve Aviation Unit of the Year); and 1395 Transportation Terminal Battalion. BG Loper is a Master Army Aviator and retired as a Test Pilot from the Boeing Company.

- General Stanley A. McChrystal, USA, Ret., served in the Army for more than 34 years, retiring as a four-star general. Among his many leadership roles, he was Commander of U.S. and International Security Assistance Forces (ISAF) Afghanistan and of the Nation's premier military counter-terrorism force, Joint Special Operations Command. In 2009, he was appointed Commander of U.S. Forces Afghanistan and NATO ISAF, which included more than 150,000 troops from 45 allied countries.

- Major General Gale S. Pollock, CRNA, FACHE, FAAN, Ret., spent more than 30 years treating servicemembers and veterans. She was the first woman

and the first non-physician to serve as the Army's Acting Surgeon General, responsible for the healthcare of more than 3.5 million servicemembers worldwide. She also served as Chief of the Army Nurse Corps, as Commander at several Army hospitals, and as a nurse at other Army community hospitals and medical centers.

- Major General Patricia A. Rose, USAF, Ret., served for 33 years in a variety of leadership roles focused on Air Force readiness. In 2013, she became the first openly LGBT service member in the U.S. military to achieve the rank of two-star General.

- Major General Tammy Smith, USA, Ret., served for 35 years, retiring as Special Assistant to the Assistant Secretary of the Army (Manpower and Reserve Affairs). In 2012, she became the military's first openly gay flag officer and has used her visibility to champion inclusion and diversity in the Army and Department of Defense.

- Rear Admiral Alan Steinman, M.D., USCG, USPHS, Ret., is an expert on occupational and preventive medicine with more than 25 years of service in the Coast Guard and the Public Health Service. He served as the Coast Guard's Director of Health and Safety (equivalent to the Surgeon General), as medical advisor to the Coast Guard's Chief of Operations, and as rescue physician on numerous Coast Guard search-and-rescue missions.

- Brigadier General Loree Sutton, USA, Ret., served as the Army's highest-ranking psychiatrist and the founding commissioner of NYC's Department of Veterans' Services. She earned a Bronze Star for her actions in combat during Operation Desert Storm and, among several other leadership roles, commanded a medical center at Fort Hood, Texas during Operation Iraqi Freedom. Over a 40-year public service career, Dr. Sutton has led, designed, and pioneered integrative approaches for building resilience, enhancing recovery, and fostering community reintegration.

## **INTRODUCTION**

Since the Nation's earliest days, our military leadership has recognized that recruiting and retaining a volunteer force to protect national security requires a firm commitment to providing essential benefits to veterans after they serve. Chief among those benefits are the healthcare services that the Department of Veterans Affairs (VA) provides veterans.

But those services are not provided equally to all qualifying veterans. For years, the VA has refused to provide gender-confirmation surgery to transgender veterans even when their VA doctors deem that surgery medically necessary. 38 C.F.R. § 17.38(c)(4). That refusal undermines military readiness, hampers recruitment efforts, and violates the military's core values of equality and respect for human dignity.

Three years ago, President Biden, as Commander-in-Chief, issued an Executive Order allowing transgender persons to serve, recognizing that the military "thrives when it is composed of diverse Americans . . . and an inclusive military strengthens our national security." Exec. Order No. 14004 On Enabling All Qualified Americans To Serve Their Country In Uniform (Jan. 25, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/25/exec utive-order-on-enabling-all-qualified-americans-to-serve-their-country-in-uniform. As recently as a few weeks ago, President Biden reiterated that the Nation has "a

sacred obligation to all of our service members—including our brave LGBTQI+ service members . . . to care for them and their families when they return home." White House, *Statement from President Joe Biden on the Pardon of LGBTQI+ Service Members Wrongly Convicted* (June 26, 2024), www.whitehouse.gov/ briefing-room/statements-releases/2024/06/26/statement-from-president-joe-biden-on-the-pardon-of-lgbtqi-service-members-wrongly-convicted.

The VA's discriminatory policy denying transgender veterans gender-confirmation surgery nevertheless remains unchanged. Though the VA has promised to provide gender-affirming care, it denied Petitioner's 2016 rulemaking petition after eight years of delay and continues to refuse to alter its policies. Meanwhile, tens of thousands of transgender veterans remain ineligible for care that, their VA physicians agree, is medically necessary—a constant reminder that, although the military depends on the service of thousands of transgender soldiers, it does not consider them equal members of the Nation's military.

It is past time for the VA to fulfill its promise to provide essential benefits to transgender veterans on the same basis as all other veterans. Continuing the VA's discriminatory policy harms thousands of veterans who served their country, and further alienates transgender servicemembers and veterans, compromising the effectiveness of our armed forces. *Amici* urge this Court to review the VA's denial of Petitioner's rulemaking petition and rule that such denial violates the

Administrative Procedure Act, the Patient Protection and Affordable Care Act, and the Fifth Amendment of the U.S. Constitution. The Court should compel the VA to amend or repeal its regulations excluding medically necessary gender-confirmation surgery so that the VA brings its policies in line not just with governing law, but also with core military values and the recruitment and retention needs of our fighting forces.

## ARGUMENT

### I.    PROVIDING ALL MEDICALLY NECESSARY HEALTHCARE TO TRANSGENDER VETERANS IS ESSENTIAL TO THE EFFECTIVENESS OF THE MILITARY

"[N]o governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (quoting *Aptheker v. Sec'y of State*, 378 U.S. 500, 509 (1964)). Today, that security is entrusted to an all-volunteer military. To recruit the Nation's best and brightest, the military promises that veterans will receive an array of benefits following their service as "inducement for enlistment and re-enlistment." *McCarty v. McCarty*, 453 U.S. 210, 234 (1981).

Congress, the military, and the VA offer these benefits to veterans out of rational self-interest and moral obligation: Taking care of veterans is both an essential part of the military's recruitment efforts and the right thing to do. Thus, the recruitment offer to prospective servicemembers has always included a promise that

recruits would receive benefits intended to ease their return to civilian life and help them flourish long after their active service.

Healthcare is one of the most important benefits the military promises. Once determined to be eligible for VA healthcare, a veteran is entitled to the care "needed to promote, preserve, or restore the health of the individual" as determined by VA doctors. 38 C.F.R. § 17.38(b)(1); *see also id.* § 17.36; 38 U.S.C. § 1710. That care goes beyond treating injuries veterans sustain during service and is intended to cover a broad spectrum of care that veterans may need over the course of their lives. Flouting that commitment, the VA carves out "[g]ender alterations," even when a VA doctor has determined that such care is medically necessary. 38 C.F.R. § 17.38(c)(4). Doing so breaks the government's core promise to care for transgender veterans after they have served and undermines the effectiveness of our volunteer military.

## A. Military Recruiting Has Long Depended On The Commitment To Provide Benefits To Veterans

Promises to care for veterans have always been an essential part of the military's recruitment efforts. During the Revolutionary War, General Washington worried that potential volunteer soldiers would be unwilling "to sacrifice all views of present interest, and encounter the numerous vicissitudes of War," unless the Continental Congress pledged "to make a decent provision for their future support." Letter from George Washington to John Banister (Apr. 21, 1778),

https://founders.archives.gov/documents/Washington/03-14-02-0525. Without that commitment, Washington feared that his fledgling army would be "without discipline, without energy, incapable of acting with vigor, and destitute of those cements necessary to promise success on the one hand, or to withstand the shocks of adversity on the other." *Id.*

Over the following two centuries, veterans' benefits have taken many forms, but the basic commitment that General Washington advocated has remained. In 1789, the First Congress provided disability compensation for wounded veterans. Act of Sept. 29, 1789, ch. 24, 1 Stat. 95. In 1818, the Service Pension Law gave every veteran who had served in the Revolutionary War and needed assistance a fixed pension for life. Act of Mar. 18, 1818, ch. 19, 3 Stat. 410. And, before the Civil War, Congress provided veterans with land in exchange for service. James D. Ridgway, *The Splendid Isolation Revisited: Lessons from the History of Veterans' Benefits Before Judicial Review*, 3 Veterans L. Rev. 135, 149-50 (2011).

The current system of veterans' healthcare benefits can be traced to the Civil War. The day before his second inauguration, President Lincoln signed a law establishing a national asylum for soldiers—the first government institution created specifically for honorably discharged volunteer soldiers. *See* U.S. Dep't of Veterans Affairs, Veterans Health Admin., *Roots of VA Health Care Started 150 Years Ago* (Mar. 2, 2015), https://www.va.gov/health/newsfeatures/2015/march/roots-of-va-

health-care-started-150-years-ago.asp. During his second inaugural address, President Lincoln called on Congress "to care for him who shall have borne the battle and for his widow and his orphan"—which inspired the VA's motto. Second Inaugural Address of Abraham Lincoln (Mar. 4, 1865), http://avalon.law.yale.edu/19th_century/lincoln2.asp.[2]

When the United States entered World War I in 1917, Congress established new benefits, including "life insurance, disability compensation, prosthetics, vocational rehabilitation, and hospitalization." U.S. Dep't of Veterans Affairs, *Roots of VA Health Care*, *supra*. In the aftermath of the war, Congress consolidated veterans' programs (including medical centers) managed by several overburdened agencies into a single Veterans Bureau. U.S. Dep't of Veterans Affairs, *History Overview*, https://department.va.gov/history/history-overview. That bureau was elevated to a federal administration in 1930. *Id.*; Act to Authorize the President to Consolidate and Coordinate Governmental Activities Affecting War Veterans, Pub. L. No. 71-536, 46 Stat. 1016 (1930).

---

[2] For decades, the VA's motto directly quoted President Lincoln. It was updated in 2023 to a modest paraphrase: "To fulfill President Lincoln's promise to care for those who have served in our nation's military and for their families, caregivers, and survivors." The update acknowledges that President Lincoln's words no longer fully capture the diversity of our Nation's servicemembers and their families. U.S. Dep't of Veterans Affairs, *The Origin of the VA Motto*, https://www.mirecc.va.gov/visn20/Newsflash/Origin-of-the-VA-Motto.asp.

Significantly, Congress and the President then expanded medical coverage to *all* conditions, whether service-connected or not, and to *all* honorably discharged veterans, whether they served in wartime or peacetime. Exec. Order No. 6232 (1933); *see also* Ridgway, *supra*, at 187.[3] Congress expanded veterans' benefits again after the Korean War and transformed the VA health system "from an acute disability treatment service to a general health care system for veterans." Ridgway, *supra*, at 188. Congress further expanded veterans' benefits in 1996, focusing on healthcare coverage. Veterans' Health Care Eligibility Reform Act of 1996, Pub. L. No. 104-262, 110 Stat. 3177, § 101 (Oct. 9, 1996) (codified at 38 U.S.C. § 1710) (the 1996 Act). This legislation set a new "simple" standard for eligibility—a "clinically appropriate 'need for care' test," under which "medical judgment rather than legal criteria will determine when care will be provided and the level at which that care will be furnished." H.R. Rep. No. 104-690, at 4 (1996).

The 1996 Act reaffirms that care is not limited to service-connected injuries, but includes any care "needed to promote, preserve, or restore the health" of veterans. 38 C.F.R. § 17.38(b); *see also* 38 U.S.C. § 1705(a)(5) (including veterans "unable to defray the expenses of necessary care" as eligible for VA healthcare

---

[3] Since then, some veterans who were not honorably discharged have become eligible for VA benefits. U.S. Dep't of Veterans Affairs, Claims for VA Benefits and Character of Discharge, https://www.benefits.va.gov/BENEFITS/docs/COD_Factsheet.pdf.

regardless of service-connected disability status). All veterans in the VA healthcare system are therefore eligible to receive the care that their VA doctors determine they need, including treatment for service-related conditions and all other medical needs, whether or not service-related. 38 C.F.R. § 17.38(a).

This expanded coverage and eligibility reflected Congress's commitment to fulfill existing promises to servicemembers and an enhanced promise to future recruits—strengthening the core bargain necessary to recruit an effective volunteer military. As Congressman J.D. Hayworth explained during debate on the 1996 Act, "[v]eterans have kept their promises to the Government. We must honor our commitment to them by providing veterans with the necessary tools for survival." 142 Cong. Rec. E1441-01, 1996 WL 434824. The VA cannot fully honor that commitment unless it provides medically necessary care to all veterans, including transgender veterans who—according to their VA physicians—require gender-confirmation surgery for their health.

### B. As The Military's Diversity Increases, The Benefits Provided To Veterans Must Also Change To Reflect The Needs Of Recruits

The government's commitments to veterans have furthered the military's interest in recruiting from the broadest possible pool of potential volunteers. Sustaining those efforts requires keeping promises. In particular, studies have shown that access to free lifetime healthcare is an influential motivator for those considering service, and so serves as a critical tool in recruitment. Michael P. Hughes, *Factors*

*Influencing Recruitment into the U.S. Armed Services: Could Health Insurance be a Motivator?*, 25 State Univ. of N.Y. Coll. at Buffalo - Buffalo State Coll. Master's Projects 1, 1–39 (2017). Denying transgender veterans access to medically necessary care undercuts the government's commitments and undermines continued recruiting efforts, thus impairing the military's ability to keep this country safe.

Upholding that commitment is particularly critical today because enrollment in the all-volunteer armed forces has been declining steadily for the past several decades. *Is Military Enlistment Down?*, USAFacts (Nov. 24, 2023), https://usafacts.org/articles/is-military-enlistment-down. Data from the U.S. Naval Institute, for example, show that "[m]ore than 70 percent of the population between 17 and 24 years of age is unable to meet eligibility requirements," and, of those who are eligible, fewer and fewer wish to serve. Jay Caputo, *Should Transgender Persons Serve?*, U.S. Naval Inst. (Dec. 2017), https://www.usni.org/magazines/proceedings/2017/december/should-transgender-persons-serve. As a result of these trends, in 2023, the Armed Forces missed recruiting goals by more than 40,000 recruits. David Vergun, U.S. Dep't of Defense, *DOD Addresses Recruiting Shortfall Challenges* (Dec. 13, 2023), https://www.defense.gov/News/News-Stories/Article/article/3616786/dod-addresses-recruiting-shortfall-challenges.

Recruiting transgender individuals is of paramount importance given overall difficulties in recruiting. Despite contrary stereotypes, transgender individuals make

up a disproportionate percentage of the military and are *twice* as likely as all U.S. adults to have served. Gary J. Gates & Jody L. Herman, *Transgender Military Service in the United States*, Williams Inst. 3 (May 2014), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Military-Service-US-May-2014.pdf (estimating that 21.4% of transgender adults have served). According to the most recent National Transgender Discrimination Survey, in 2014—a time when transgender individuals could not serve openly—there were approximately 15,500 transgender individuals actively serving and 134,300 transgender veterans. *Id.* at 1. In the three years that transgender individuals have again been able to serve openly,[4] those numbers have likely increased substantially.

The country's military leaders have recognized the need to welcome transgender individuals into the military. When issuing the executive order allowing transgender individuals to serve openly, President Biden stressed that the military "thrives when it is composed of diverse Americans who can meet the rigorous standards for military service, and an inclusive military strengthens our national

---

[4] Approximately one year after President Obama ended the ban on transgender individuals serving openly in 2016, President Trump, by tweet on July 26, 2017, declared that "the United States Government will not accept or allow Transgender individuals to serve in any capacity in the U.S. Military." *Trump Approves New Limits on Transgender Troops in the Military*, N.Y. Times (Mar. 24, 2018). Whatever legal effect the tweet had—along with its undeniable practical chilling effect on recruitment of transgender individuals—remained in force until President Biden's 2021 Executive Order.

security." White House, *Fact Sheet: President Biden Signs Executive Order Enabling All Qualified Americans to Serve Their Country in Uniform* (Jan. 25, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/25/fact-sheet-president-biden-signs-executive-order-enabling-all-qualified-americans-to-serve-their-country-in-uniform.

Secretary of Defense Lloyd Austin (a retired four-star general in the U.S. Army) seconded that view, emphasizing that the military accomplishes its mission of defending the country "more effectively when we represent all our fellow citizens. I also believe we should avail ourselves of the best possible talent in our population, regardless of gender identity." Secretary of Defense Lloyd J. Austin III, *Statement on Transgender Service in the Military* (Jan. 25, 2021), https://www.defense.gov/News/Releases/Release/Article/2481568/statement-by-secretary-of-defense-lloyd-j-austin-iii-on-transgender-service-in-.

Shawn Skelly, a former Navy commander who is now the highest ranking openly transgender official at the Department of Defense, further echoed that sentiment, stating, "If people understand that they're not going to get a fair shake, because they come from a specific ethnic origin, or based on their identity, or based on who they love, we are going to be worse off because not enough Americans are going to want to be a part of the U.S. military." Lara Seligman, *DoD's Highest-Ranking Trans Official: 'Ostracizing Anybody' Will Hurt Military Readiness*,

Politico (Apr. 9, 2023), https://www.politico.com/news/2023/04/09/shawn-skelly-gop-trans-00090488.

As the number of transgender servicemembers and veterans increases, the VA must expand the benefits it provides transgender veterans, just as it has done for the increasing number of female veterans. In 2011, then-Secretary of Veterans Affairs Eric Shinseki stated that the VA "must be visionary and agile enough to anticipate and adjust not only to the coming increase in women Veterans, but also to the accompanying complexity and longevity of treatment needs they will bring with them." U.S. Dep't of Veterans Affairs Women Veterans Task Force, *Strategies for Serving Our Women Veterans 2012 Report* (2012), https://www.va.gov/opa/publications/Draft_2012_Women-Veterans_StrategicPlan.pdf (emphasis omitted). Accordingly, the VA established Women's Health Centers in 80 VA Medical Centers, and a women's healthcare provider in every VA health system with primary care services. IAVA, *Fulfill the Promise to Today's Veterans* 11 (2017), http://iava.org/wp-content/uploads/2017/03/IAVA_Policy_2017_v8_125bleed.pdf.

Providing transgender veterans all necessary healthcare is similarly crucial to sustaining and enhancing recruitment efforts. Excluding gender-confirmation surgery from the benefits offered to veterans, particularly when so many transgender individuals are "ready, willing, and able" to serve, makes it all the more difficult for the armed forces to reinvigorate its recruitment numbers. Caputo, *supra*.

16

The VA has recognized in the context of women veterans that it is not enough simply to allow a class of individuals to serve in the military; it must also provide the full panoply of benefits to those individuals, including necessary healthcare, whether or not related to service-connected conditions. By the same token, it is insufficient to open the military to transgender individuals without fully meeting their healthcare needs. Denying medically necessary coverage for transgender veterans not only calls into question the military's commitment to transgender recruits, but also undermines the military's promises to *all* recruits. A VA that denies medically necessary healthcare to some veterans is a VA that cannot be counted on to stand by its commitment to provide medically necessary healthcare to all.

## C. Providing Gender-Confirmation Surgery To Transgender Veterans Does Not Undermine The VA's Ability To Provide Other Healthcare

Providing gender-confirmation surgery will not adversely affect the VA's ability to provide other care to veterans. According to the VA's estimates, covering gender-confirmation surgeries could cost the VA between $3.5 million to $78 million annually, depending on the number and type of surgeries. Rebecca Kheel, *The VA Said It Would Cover Gender Affirmation Surgeries. Trans Vets Are Still Waiting*, Military Daily News (Dec. 20, 2021). Even the upper range of that estimate represents a negligible percentage of the VA's total requested $325 billion budget for fiscal year 2024. Congressional Budget Office, *Trends in DoD's and VA's*

*Budgets for Military Compensation*, at 1 (Mar. 22, 2023), https://www.cbo.gov/system/files/2023-03/59013-Manpower.pdf.

Providing this essential care to transgender veterans will also offset other medical expenses and potentially save money overall in the long run. As the VA itself recognized, "transition-related surgery has been proven effective at mitigating serious health conditions including suicidality, substance abuse and dysphoria that, left untreated, impose treatment costs on the VHA." Veterans Health Admin., *Economic Impact Analysis for RIN 2900-AP69, Removing Gender Alternations Restrictions from the Medical Benefits Package*, attachment 1 (July 29, 2016); *see also* Anthony N. Almazan & Alex S. Keuroghlian, *Association Between Gender-Affirming Surgeries and Mental Health Outcomes*, 156 JAMA 611 (Apr. 28, 2021) (gender-affirming surgery improves mental health outcomes). And treating suicidality in turn offers additional cost savings. *See VA Provides Free Emergency Suicide Prevention Care to Nearly 50,000 Veterans and Former Service Members in First Year of New Policy*, U.S. Dep't of Veterans Affairs (Jan. 17, 2024), https://news.va.gov/press-room/va-provides-free-emergency-suicide-prevention-care-to-nearly-50000 (noting that lifesaving emergency care related to suicide prevention as part of the 2020 Veterans Comprehensive Prevention, Access to Care, and Treatment (COMPACT) Act has already saved the VA $64 million in healthcare costs).

Given the low estimated cost of providing gender-confirmation surgery for transgender veterans and the potential long-term cost savings, it is baffling that the VA referenced costs associated with the PACT Act—formally, the Sergeant First Class Heath Robinson Honoring our Promise to Address Comprehensive Toxics Act of 2022—as one of its reasons for denying Petitioner's rulemaking petition. Dkt. 1-2, Ex. 2, at 1. Providing gender-confirmation surgery to transgender veterans has little to no effect on the VA's costs when compared with the magnitude of benefits authorized by the PACT Act. For instance, the Act allocates $20.3 billion to the Cost of War Toxic Exposures Fund for 2024. *See* U.S. Dep't of Veterans Affairs, *US Department of Veterans Affairs FY 2025 Budget Submission* (March 2024), at 7. Compared to this sum, the $3.5 million to $78 million annual estimate for covering gender-confirmation surgery would, again, be negligible.

Denying transgender veterans medically essential care denigrates them and deters other transgender individuals from serving at a time when their enlistment is sorely needed. Despite the VA's invocation of the PACT Act in its denial of the rulemaking petition, providing gender-confirmation surgery would have negligible, if any, impact on the funds available for other critical VA healthcare needs.

## II.   DISCRIMINATING AGAINST TRANSGENDER VETERANS IS ANTITHETICAL TO THE MILITARY'S CORE VALUES

Discriminating against transgender veterans by denying them necessary healthcare contravenes the core values of the service branches, the Department of Defense, and the VA.

Core values guide and define the service of the Department of Defense, each service branch, and the VA. For example, the Navy's Core Values are honor, courage, and commitment. Commitment includes "[s]how[ing] respect toward all people without regard to race, religion, or gender"; and "[t]reat[ing] each individual with human dignity." U.S. Navy, *Our Core Values*, https://www.navy.mil/About/Our-Core-Values. Likewise, the Marine Corps understands its core value of Honor—the "bedrock" of Marines' "character"—to include a commitment to "respect human dignity and respect others." U.S. Marines, *Marine Corps Values*, https://www.marines.com/life-as-a-marine/standards/values.html.

The VA's long-established values follow suit: VA employees must "treat all those they serve and with whom they work with dignity and respect." 38 C.F.R. § 0.601(d). Indeed, the VA's Directive on Providing Health Care for Transgender and Intersex Veterans expressly commits to the "respectful delivery of health care to transgender and intersex Veterans" enrolled in the VA health system. U.S. Dep't of Veterans Affairs, VHA Directive 1341(3), at 1 (May 23, 2018), https://www.patientcare.va.gov/LGBT/docs/directives/VHA_DIRECTIVE_1341.

pdf. The VA's decision not to cover medically necessary gender-confirmation surgery reneges on that commitment and violates the military's core values in four ways.

*First*, as the Defense Department itself has recognized, discrimination on the basis of transgender status is sex discrimination. U.S. Dep't of Defense, *Directive-type Memorandum (DTM) 19-004 – Military Service by Transgender Persons and Persons with Gender Dysphoria*, at 11 (Mar. 17, 2020); U.S. Dep't of Defense, *Directive-type Memorandum (DTM) 16-005 – Military Service of Transgender Service Members*, attachment at 2 (June 30, 2016) ("It is the Department's position, consistent with the U.S. Attorney General's opinion, that discrimination based on gender identity is a form of sex discrimination."); *see also Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741 (2020) (holding that discrimination based on transgender status constitutes sex discrimination).

The VA's policy clearly discriminates on the basis of transgender status. Many of the same procedures that are part of gender-confirmation surgery— mastectomies, hysterectomies, penectomies, etc.—are covered when medically necessary for all veterans *except* when used to treat gender dysphoria in transgender veterans. *See, e.g.*, Jodie G. Katon, et al., *Trends in Hysterectomy Rates Among Women Veterans in the US Department of Veterans Affairs*, 217 Am. J. Obstetrics & Gynecology 428.e1 (Oct. 2017) (noting VA provides approximately 1,000

hysterectomies annually). There is no explanation other than arbitrary discrimination for refusing to provide the same types of surgeries to transgender veterans.

*Second*, denying medically necessary healthcare to transgender veterans violates the military's specific promise, in welcoming those servicemembers to serve openly, that it would meet their healthcare needs. As then-Secretary of Defense Ash Carter explained in 2016 when he announced the decision to allow transgender servicemembers to serve openly, "most of our transgender servicemembers must go outside the military medical system in order to obtain medical care that is judged by doctors to be necessary, and they have to pay for it out of their own pockets." Secretary of Defense Ash Carter, *Remarks on Ending the Ban on Transgender Service in the U.S. Military* (June 30, 2016), https://www.defense.gov/News/Speeches/Speech/Article/821833/remarks-on-ending-the-ban-on-transgender-service-in-the-us-military. Forcing servicemembers to bear those costs "is inconsistent with our promise to all our troops that we will take care of them and pay for necessary medical treatment." *Id.*

*Third*, denying transgender veterans necessary healthcare fails to respect their fundamental human dignity. For the transgender veteran for whom gender-confirmation surgery is medically necessary, that surgery is essential to living a life of dignity and fulfillment. Indeed, for many transgender veterans, that surgery literally may be a matter of life or death. *See* Veterans Health Admin., *Economic*

*Impact Analysis for RIN 2900-AP69*, *supra*, attachment 1 (explaining that gender-confirmation surgery reduces suicidality).

*Finally*, denying transgender veterans medically necessary care further insults individuals against whom the military has discriminated for generations. Thousands of transgender veterans served their country honorably but were forced to serve in silence—or were separated from the military if found out—for no reason other than ignorance and prejudice. Just as repealing the "Don't Ask, Don't Tell" policy freed gay and lesbian servicemembers from the burden of having to "lie about who they are in order to defend their fellow citizens," so too has the reversal of the military's transgender service ban freed transgender servicemembers of that burden. Elisabeth Bumiller, *Top Defense Officials Seek to End "Don't Ask, Don't Tell*," N.Y. Times (Feb. 2, 2010) (statement of Admiral Mike Mullen).

Continuing to deny medically necessary healthcare to transgender veterans perpetuates this history of discrimination—sending the harmful message that transgender soldiers, sailors, airmen, and marines are still less than equal, which will impede their progress towards full acceptance in military culture. What's more, it may impede their progress towards full acceptance in civilian life as well. Civilian medical providers might see the VA's denial of gender-confirmation surgery and as a result become more skeptical of the needs of transgender veterans and less likely to treat them with the dignity and respect that they deserve.

The strength of our all-volunteer military is its people. For more than two centuries, the military has promised recruits that they would be taken care of as veterans. No benefit the VA provides is more important to veterans than healthcare. To discriminate in the provision of that essential benefit on the basis of transgender status undermines the military's recruitment efforts, corrodes military cohesion and morale, and flies in the face of its core values.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should review the VA's denial of Petitioner's 2016 rulemaking petition and direct the VA to amend or repeal its regulations that exclude medically necessary gender-confirmation surgery from the medical benefits package.

Dated:   August 5, 2024                    Respectfully submitted,

                                           */s/ Roy T. Englert, Jr.*
                                           Roy T. Englert, Jr.
                                           Shikha Garg
                                           KRAMER LEVIN NAFTALIS &
                                           FRANKEL LLP
                                           2000 K Street NW, 4th Floor
                                           Washington, DC 20006
                                           Telephone: (202) 775-4500
                                           Facsimile: (202) 775-4510
                                           renglert@kramerlevin.com

                                           Jeffrey S. Trachtman
                                           KRAMER LEVIN NAFTALIS &
                                           FRANKEL LLP
                                           1177 Avenue of the Americas
                                           New York, NY 10036
                                           Telephone: (212) 715-9100
                                           Facsimile: (212) 715-8000

                                           *Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Federal Circuit Rule 32(b)(2), this document contains 4,912 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word, typeface Times New Roman, 14-point type. I have relied on the word count feature in preparing this certificate.

*/s/ Roy T. Englert, Jr.*
Attorney for *Amici Curiae*
Dated: August 5, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2024, I electronically filed the foregoing document with the United States Court of Appeals for the Federal Circuit by using the CM/ECF system, which will send a notice of filing to all registered users.

*/s/ Roy T. Englert, Jr.*
Attorney for *Amici Curiae*