No. 24-1714

# In the United States Court of Appeals for the Federal Circuit

————

TRANSGENDER AMERICAN VETERANS ASSOCIATION,

*Petitioner,*

v.

SECRETARY OF VETERANS AFFAIRS,

*Respondent.*

————

## BRIEF OF *AMICI CURIAE* MEDICAL AND MENTAL HEALTH PROFESSIONALS IN SUPPORT OF PETITIONER

————

Jonathan K. Youngwood
*Counsel of Record*
SIMPSON THACHER &
BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Tel.: (212) 455-2000
jyoungwood@stblaw.com

*Counsel for Amici Curiae
American Academy of Family Physicians,
American College Health Association,
American College of Physicians, LGBTQ
Health Caucus within the American Public
Health Association, North American Society
for Pediatric and Adolescent Gynecology,
and the World Professional Association for
Transgender Health*

## <u>CERTIFICATE OF INTEREST</u>

Pursuant to Federal Circuit Rule 47.4, Jonathan Youngwood, counsel for *amici curiae* the American Academy of Family Physicians, American College Health Association, American College of Physicians, the Lesbian, Gay, Bisexual, and Transgender Health Caucus within the American Public Health Association (the "LGBTQ Health Caucus"), North American Society for Pediatric and Adolescent Gynecology, and the World Professional Association for Transgender Health, certifies the following:

1.    The full names of the *amici curiae* represented by me are the American Academy of Family Physicians, American College Health Association, American College of Physicians, the Lesbian, Gay, Bisexual, and Transgender Health Caucus within the American Public Health Association (the "LGBTQ Health Caucus"), North American Society for Pediatric and Adolescent Gynecology, and the World Professional Association for Transgender Health.

2.    The names of the real parties in interest represented by me is not applicable ("N/A") because this is an amicus brief.

3.    No publicly held corporation owns 10% or more of the stock of American Academy of Family Physicians, American College Health Association, American College of Physicians, the LGBTQ Health Caucus, North American

Society for Pediatric and Adolescent Gynecology, and the World Professional Association for Transgender Health.

4.     The names of all law firms and the partners and associates that appeared for the *amici curiae* now represented by me in this proceeding are: Simpson Thacher & Bartlett LLP and Jonathan Youngwood.

5.     The related cases tag is not applicable ("N/A") because this is an amicus brief.

6.     The organizational victims and bankruptcy cases tag is N/A.

Dated: August 5, 2024                    Respectfully submitted,

                                        By:  */s/* Jonathan K. Youngwood
                                        Jonathan K. Youngwood
                                        SIMPSON THACHER &
                                        BARTLETT LLP
                                        425 Lexington Avenue
                                        New York, NY 10017
                                        Tel.: (212) 455-2000
                                        Fax: (212) 455-2502
                                        jyoungwood@stblaw.com

                                        *Counsel for Amici Curiae*

2

# TABLE OF CONTENTS

Page

INTERESTS OF *AMICI CURIAE* ..............................................................8

SUMMARY OF ARGUMENT .................................................................11

ARGUMENT .............................................................................................12

I.    Gender Affirming Surgery Is a Medically Necessary Treatment for Certain Patients with Gender Dysphoria ........................................12

    A.    Gender Dysphoria Is a Serious Medical Condition ............12

    B.    Gender Affirming Surgery Is Medically Necessary for Some Individuals ..............................................................................15

II.    Case-By-Case Assessment and Treatment of Veterans with Gender Dysphoria Is Necessary .........................................................19

    A.    Medical and Mental Health Associations Oppose Categorical Exclusion of Gender Affirming Surgery ..............................20

    B.    Courts Emphasize Individualized Treatment for Gender Dysphoria ..21

    C.    The Federal Government Provides Non-Veterans with Coverage for Gender Affirming Surgery After Individualized Assessments ...........23

    D.    The VA's Blanket Ban On Gender Affirming Surgery Disrupts Continuity of Care ................................................................27

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*De'Lonta v. Johnson*,
    708 F.3d 520 (4th Cir. 2013) ........................................................ 10, 17

*Edmo v. Corizon, Inc.*,
    935 F.3d 757 (9th Cir. 2019) ............................................. 9, 10, 15, 16

*Fields v. Smith*,
    653 F.3d 554 (7th Cir. 2011) ................................................................17

*Gibson v. Collier*,
    920 F.3d 212 (5th Cir. 2019) ...............................................................10

*Hundley v. Aranas*,
    No. 21-15757, 2023 U.S. App. LEXIS 731
    (9th Cir. Jan. 12, 2023) ........................................................................15

*Lange v. Hous. Cnty.*,
    101 F.4th 793 (11th Cir. 2024) ..............................................................8

*Soneeya v. Spencer*,
    851 F. Supp. 2d 228 (D. Mass. 2012)....................................................10

**Other Authorities**

89 Fed. Reg. 37522 (May 6, 2024) .............................................................25

Am. Med. Ass'n, Policy H-185.950, *Removing Financial Barriers to Care*
    *for Transgender Patients* (modified 2022), https://policysearch.ama-
    assn.org/policyfinder/detail/Removing%20Financial%20Barriers%20to%
    20Care%20for%20Transgender%20Patients%20H-
    185.950?uri=%2FAMADoc%2FHOD.xml-0-1128.xml...................................16

Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental*
    *Disorders* 512-13 (5th ed., Text Revision 2022)......................................... 13, 14

Am. Psychiatric Ass'n, Position Statement on Access to Care for
    Transgender and Gender Diverse Individuals, at 1 (May 2018) ........................20

Am. Psychiatric Ass'n, *Position Statement on Discrimination Against Transgender and Gender Diverse Individuals* (2018), https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Discrimination-Against-Transgender-and-Gender-Diverse-Individuals.pdf............................................12

Am. Psychiatric Ass'n, *Veterans are at Higher Risk for Suicide. Psychologists are Helping Them Tackle Their Unique Struggles* (2022), https://www.apa.org/monitor/2022/11/preventing-veteran-suicide ..................15

Am. Psychol. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Psych. 832 (2015)............................................................................................................12

Am. Psychol. Ass'n, *Report of the APA Task Force on Gender Identity and Gender Variance* (2008) at 32, https://www.apa.org/pi/lgbt/resources/policy/ genderidentityreport.pdf ...............................16

Am. Psychol. Ass'n, Resolution on Transgender, Gender Identity, & Gender Expression Non-Discrimination (Aug. 2008), http://www.apa.org/about/policy/transgender.pdf...............................................21

AMA Policy H-185.950 (2022), https://policysearch.ama-assn.org/policyfinder/detail/H-185.950?uri=%2FAMADoc%2FHOD.xml-0-1128.xml....................................20

Anthony N. Almazan and Alex S. Keuroghlian, *Association Between Gender-Affirming Surgeries and Mental Health Outcomes*, 156(7) JAMA Surg. 611 (2021) ...........................................................................18

Comm. On Adolescence, *Office-Based Care for Lesbian, Gay, Bisexual, Transgender, and Questioning Youth*, 132(1) Pediatrics e297, 307–08 (2013)............................................................................................................16

CTR. FOR MEDICARE & MEDICAID SERV., FINAL DECISION MEMORANDUM ON GENDER REASSIGNMENT SURGERY FOR MEDICARE BENEFICIARIES WITH GENDER DYSPHORIA (2016) ................................................................25

DEP'T OF VETERANS AFF., 2022 NATIONAL VETERAN SUICIDE PREVENTION ANNUAL REPORT at 29 (2022), https://www.mentalhealth.va.gov/docs/data-sheets/2022/2022-National-Veteran-Suicide-Prevention-Annual-Report-FINAL-508.pdf ...........................15

DEPT. OF VETERANS AFF., VHA DIRECTIVE 1341(3) at 3 (2018).
https://www.patientcare.va.gov/LGBT/docs/directives/VHA_DIRECTIV
E_1341.pdf ........................................................................................................28

Endocrine Society, *Transgender Health: An Endocrine Society Position
Statement* (Dec. 16, 2020),
https://www.endocrine.org/advocacy/position-statements/transgender-
health ...............................................................................................................21

George R. Brown, *Autocastration and Autopenectomy as Surgical Self-
Treatment in Incarcerated Persons with Gender Identity Disorder*, 12
Int'l J. Transgenderism 31, 31-39 (2020) ............................................14

Lauren Bruce et al., *Long-Term Regret and Satisfaction With Decision
Following Gender-Affirming Mastectomy*, 158(10) JAMA Surg. 1070
(2023) ..............................................................................................................19

Madeline B. Deutsch, *Overview of Gender-affirming Treatments and
Procedures*, USCF Transgender Care (June 17, 2016),
https://transcare.ucsf.edu/guidelines/overview ...................................17

*Merck Manual of Diagnosis and Therapy* 1797 (Robert S. Porter et al. eds.,
20th ed. 2018), at 1797. ......................................................................14

Myriam Vigny-Pau et al., *Suicidality and Non-Suicidal Self-Injury Among
Transgender Populations: A Systematic Review*, 25(4) J. Gay & Lesbian
Mental Health 358,359 (2021) (finding a lifetime average rate of 46% for
suicidal ideation and 27% for suicidal attempts in the transgender
population) ....................................................................................................14

Nat'l Ass'n of Soc. Workers, *Social Work Speaks: National Association of
Social Workers Policy Statements 2018–2020* (11th ed. 2018) ........................21

OFF. OF POPULATION AFF. GENDER-AFFIRMING CARE AND YOUNG
PEOPLE(2022). https://opa.hhs.gov/sites/default/files/2022-03/gender-
affirming-care-young-people-march-2022.pdf ....................................17

Raymond P. Tucker, *Hormone Therapy, Gender Affirmation Surgery, and
Their Association with Recent Suicidal Ideation and Depression
Symptoms in Transgender Veterans*, 48 PSYCH. MED 2329-2336 (2018). .........15

*Standards of Care for the Health of Transgender and Gender Diverse People* developed by the World Professional Association for Transgender Health ................................................................................................ 15, 17, 19

Suma Vupputuri et al.,
*The Quality of Care of Transgender and Gender Nonconforming Patients: The Provider Perspective*, 25 Perm. J. 1(2020) ..................................27

U.S. DEPT. OF JUST., FED. BUREAU OF PRISONS, TRANSGENDER OFFENDER MANUAL (2022), https://www.bop.gov/policy/progstat/5200-08-cn-1.pdf........26

U.S. OFF. OF PERS. MGMT. HEALTHCARE AND INS., FEBH PROGRAM CARRIER LETTER 2022-03 (2022) at 6, https://www.opm.gov/healthcare-insurance/carriers/fehb/2022/2022-03.pdf. (emphasis added) ...........................24

U.S. OFF. OF PERS. MGMT. HEALTHCARE AND INS., FEBH PROGRAM CARRIER LETTER 2023-12 (2023) https://www.opm.gov/healthcare-insurance/carriers/fehb/2023/2023-12.pdf...........................................................24

U.S. OFF. OF PERS. MGMT. HEALTHCARE AND INS., TECHNICAL GUIDANCE AND INSTRUCTIONS FOR 2025 BENEFIT PROPOSALS LETTER 2024-06 (2024) at 40, https://www.opm.gov/healthcare-insurance/carriers/fehb/2024/2024-06.pdf...................................................................25

Valeria P. Bustos et al., *Regret After Gender-affirmation Surgery: a Systematic Review and Meta-analysis of Prevalence.* 9(3) Plast. Reconstr. Surg. Glob. Open. 3477 (2022) .........................................................................19

World Medical Association, Statement on Transgender People (Oct. 2015)..........21

World Prof'l Ass'n for Transgender Health, *WPATH Policy Statements: Position Statement on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the U.S.A.* (Dec. 21, 2016), https://www.wpath.org/media/cms/Documents/Insurance%20Training/WPATH%20Position%20on%20Medical%20Necessity%2012-2016.pdf ...........18

Wylie C. Hembree et al., *Endocrine Treatment of Gender Dysphoric/Gender-Incongruent Persons*, 102(11) J. Clinical Endocrinology & Metabolism 3869, 3876 (Nov. 2017) ("Endocrine Soc'y Guidelines"), https://academic.oup.com/jcem/article/102/11/3869/4157558...........................17

## INTERESTS OF *AMICI CURIAE*[1]

*Amici Curiae* represent well-recognized organizations that promulgate the leading standards of care in the field, individual medical professionals charged with ensuring proper treatment for their patients, and organizations that advocate for the interests of its LGBTQ+ and gender diverse veteran members. *Amici* offer this brief to explain that the VA's categorical exclusion of medically necessary gender-affirming surgeries from its medical benefits package impinges upon medical and mental health professionals' ability to provide medically necessary care to each veteran patient with gender dysphoria.

*Amicus* the American Academy of Family Physicians ("AAFP") is one of the largest national medical organizations, representing 130,000 family physicians and medical students nationwide. Founded in 1947, AAFP seeks to improve the health of patients, families, and communities by advocating for the health of the public and by supporting its members in providing continuous comprehensive health care to all.

*Amicus* the American College Health Association ("ACHA") represents over 700 institutions of higher education and the collective health and wellness needs of 20 million college students. ACHA serves over 8,500 individual college health and

---

[1] All parties consented to the filing of this brief. Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici curiae* state that no party's counsel authored this brief in whole or in part, and no person other than *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

wellness professionals and leaders of all disciplines united together to advance the health and wellness of college students.

*Amicus* the American College of Physicians ("ACP") is the largest medical specialty organization and the second largest physician membership society in the United States. ACP members include 161,000 internal medicine physicians, related subspecialists, and medical students. Internal medicine physicians are specialists who apply scientific knowledge, clinical expertise, and compassion to the preventive, diagnostic, and therapeutic care of adults across the spectrum from health to complex illness.

*Amicus* the Lesbian, Gay, Bisexual, and Transgender Health Caucus within the American Public Health Association (the "LGBTQ Health Caucus") has been an active group of interdisciplinary public health professionals committed to furthering LGBTQ+ issues within the American Public Health Association, and the field of public health at large since it was established in 1975.

*Amicus* the North American Society for Pediatric and Adolescent Gynecology ("NASPAG") is a voluntary, non-profit organization devoted to conducting, encouraging, and supporting programs of medical education and professional training in the field of pediatric and adolescent gynecology.  It provides leadership while serving as a forum for research and promoting communication and collaboration among health care professionals on issues related to pediatric and

adolescent gynecology.  NASPAG members reside in all 50 states and in countries abroad.

*Amicus* the World Professional Association for Transgender Health ("WPATH") is an interdisciplinary professional association committed to developing the best practices and supportive policies to promote health, research, education, respect, dignity, and equality for transgender people in all settings.  WPATH was founded in 1979 and based on the principles of Dr. Harry Benjamin, one of the first physicians to work with transgender individuals.  It is the only medical association devoted solely to the study and treatment of gender dysphoria, and maintains a leading role in setting medically-accepted standards for treatment.  WPATH publishes *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* that articulate a professional consensus about the medical, psychiatric, psychological, and surgical management of gender dysphoria.  The *Standards of Care* recognize the role of surgery to change sex characteristics in treating gender dysphoria.

## SUMMARY OF ARGUMENT

Many transgender people experience gender dysphoria, a serious condition characterized by significant distress. The internationally-recognized standards of care for gender dysphoria provide that transition-related care, including gender affirming surgery, is clinically effective and medically necessary. These standards—which the federal government, in other contexts, looks to as "evidence based clinical guidance" for treating transgender patients—recognize that there is no "one size fits all treatment plan" for gender dysphoria. Instead, health professionals must make a case-by-case assessment and treatment plan for each patient. For that reason, nearly every major medical organization (and multiple courts) oppose the categorical exclusion of, or bans on, gender affirming surgery. And the federal government itself, when it provides health coverage to non-veterans, routinely recognizes that gender affirming surgery may be necessary for individual patients. The VA's categorical refusal to cover gender affirming surgery—irrespective of the veteran's medical needs or the professional judgment of the veteran's medical care team—is inconsistent with the weight of this authority and places transgender veterans at a heightened risk of physical and emotional trauma.

## ARGUMENT

## I.    Gender Affirming Surgery Is a Medically Necessary Treatment for Certain Patients with Gender Dysphoria

It is well-established that gender dysphoria can be a serious medical condition that, if left untreated, elevates risk of depression, thoughts of suicide, and suicide attempts—risks which are already elevated in veterans compared to the general population.  And it is similarly well-established that, for some patients, gender affirming surgery is medically necessary to treat gender dysphoria.

### A.    Gender Dysphoria Is a Serious Medical Condition

Transgender individuals have a "gender identity"—a "deeply felt, inherent sense" of their gender[2]—that does not align with their sex assigned at birth. Although being transgender "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities,[3] many transgender individuals experience gender dysphoria, a condition characterized by clinically

---

[2]    Am. Psychol. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 AM. PSYCH. 832,  834 (2015).

[3]    Am. Psychiatric Ass'n, *Position Statement on Discrimination Against Transgender and Gender Diverse Individuals* (2018), https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Discrimination-Against-Transgender-and-Gender-Diverse-Individuals.pdf

significant distress resulting from the incongruence between an individual's gender and assigned sex at birth.[4]

The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders sets forth two conditions for a gender dysphoria diagnosis. First, there must be a "marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:" (1) "a marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics"; (2) "a strong desire to be rid of one's primary and/or secondary sex characteristics"; (3) "a strong desire for the primary and/or secondary sex characteristics of the other gender"; (4) "a strong desire to be of the other gender (or some alternative gender . . . )"; (5) "a strong desire to be treated as the other gender (or some alternative gender . . .)"; or (6) "a strong conviction that one has the typical feelings and reactions of the other gender."[5] Second, the person's condition must be "associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning."[6]

---

[4]     *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 512–13 (5th ed., Text Revision 2022) [hereinafter DSM-5].

[5]     *Id.*

[6]     *Id.* at 514.

If left untreated, gender dysphoria may cause "significant distress or disability" with "severe, disturbing, and long-lasting symptoms."[7] *See also Lange v. Hous. Cnty.*, 101 F.4th 793, 796 (11th Cir. 2024) ("[I]f left untreated, people with gender dysphoria are more vulnerable to developing other health concerns including, but not limited to, anxiety, depression, and suicidality."). Similarly, if gender dysphoria is left inadequately treated—*i.e.*, "if the desired physical interventions using hormones and/or surgery are not available"—the distress may be exacerbated[8] As a result of gender dysphoria, individuals can suffer from depression, anxiety, self-harm, and suicidality.[9] Further, when treatment for gender dysphoria is inaccessible, some transgender women resort to self-treatment and, in some cases, attempt their own castration.[10]

The risks of gender dysphoria can be particularly pronounced in veterans. Veterans, as a whole, are already "1.5 times more likely to die by suicide than

---

[7]    *Merck Manual of Diagnosis and Therapy* 1797 (Robert S. Porter et al. eds., 20th ed. 2018), at 1797.

[8]    See DSM-5, at 513.

[9]    *See, e.g.*, Myriam Vigny-Pau et al., *Suicidality and Non-Suicidal Self-Injury Among Transgender Populations: A Systematic Review*, 25(4) J. GAY & LESBIAN MENTAL HEALTH 358,359 (2021) (finding a lifetime average rate of 46% for suicidal ideation and 27% for suicidal attempts in the transgender population).

[10]    DSM-5, at 516; George R. Brown, *Autocastration and Autopenectomy as Surgical Self-Treatment in Incarcerated Persons with Gender Identity Disorder*, 12 INT'L J. TRANSGENDERISM 31, 31–39 (2020).

nonveteran adults,"[11] and transgender veterans are more than 20 times more likely to attempt suicide than non-transgender veterans.[12] In fact, a national sample of transgender veterans found that 66 percent of participants developed a suicide plan within their lifetimes and 32 percent of transgender veterans had attempted suicide.[13] The VA itself has recognized transgender veterans "are at increased risk for suicidal ideation and non-fatal suicide attempts."[14]

### B. Gender Affirming Surgery Is Medically Necessary for Some Individuals

"Gender dysphoria is a serious but treatable medical condition." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019). For over 30 years, medical professionals have treated gender dysphoria following the protocols laid out in the *Standards of Care for the Health of Transgender and Gender Diverse People* developed by the World Professional Association for Transgender Health

---

[11] Am. Psychiatric Ass'n, *Veterans are at Higher Risk for Suicide. Psychologists are Helping Them Tackle Their Unique Struggles* (2022), https://www.apa.org/monitor/2022/11/preventing-veteran-suicide.

[12] *Id.*

[13] Raymond P. Tucker, *Hormone Therapy, Gender Affirmation Surgery, and Their Association with Recent Suicidal Ideation and Depression Symptoms in Transgender Veterans*, 48 PSYCH. MED 2329-2336 (2018).

[14] DEP'T OF VETERANS AFF., 2022 NATIONAL VETERAN SUICIDE PREVENTION ANNUAL REPORT at 29 (2022), https://www.mentalhealth.va.gov/docs/data-sheets/2022/2022-National-Veteran-Suicide-Prevention-Annual-Report-FINAL-508.pdf.

("WPATH") [hereinafter, the "WPATH Standards of Care."], which were most recently updated in 2022. Major medical and mental health groups in the United States expressly recognize the WPATH Standards of Care as representing the consensus of the medical and mental health community regarding the appropriate treatment for gender dysphoria.[15] And "[m]ost courts agree" that the WPATH Standards "are the internationally recognized guidelines for the treatment of individuals with gender dysphoria." *Edmo*, 935 F.3d at 769 (citation omitted) (collecting cases).[16]

Gender dysphoria can be treated with gender-affirming health care. Gender-affirming care "consists of an array of services that may include medical, surgical,

---

[15] *See, e.g.*, Am. Med. Ass'n, Policy H-185.950, *Removing Financial Barriers to Care for Transgender Patients* (modified 2022), https://policysearch.ama-assn.org/policyfinder/detail/Removing%20Financial%20Barriers%20to%20Care%20for%20Transgender%20Patients%20H-185.950?uri=%2FAMADoc%2FHOD.xml-0-1128.xml; American Psychological Association, *Report of the APA Task Force on Gender Identity and Gender Variance* (2008) at 32, https://www. apa.org/pi/lgbt/resources/policy/ genderidentityreport.pdf; Comm. On Adolescence, *Office-Based Care for Lesbian, Gay, Bisexual, Transgender, and Questioning Youth*, 132(1) Pediatrics e297, 307–08 (2013)

[16] *See also De'Lonta v. Johnson*, 708 F.3d 520, 522-23 (4th Cir. 2013) ("[WPATH] Standards of Care" are the generally accepted protocols for the treatment of [gender dysphoria]."); *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 231 (D. Mass. 2012) (similar). *But see Gibson v. Collier*, 920 F.3d 212, 223 (5th Cir. 2019) (finding that WPATH's "standards of care are a matter of contention in the medical community").

mental health, and non-medical services."[17]    These care options fall along a

continuum.  Transgender "people may need to undergo all, some, or none of [the

medical] interventions to support their gender affirmation."[18]    Although a

psychosocial assessment is part of any evaluation prior to treatment[19] and mental

health providers play an important role in the care of people transitioning,[20] some

people "will not require therapy or other forms of mental health care as part of their

transition."[21]    Gender affirming hormone therapy is "the primary medical

intervention sought by transgender people," though "the current standard of care is

to allow each transgender person to seek only those interventions which they desire

to affirm their own gender identity."[22]

---

[17]    OFF. OF POPULATION AFF., GENDER-AFFIRMING CARE AND YOUNG PEOPLE 1 (2022),    https://opa.hhs.gov/sites/default/files/2022-03/gender-affirming-care-young-people-march-2022.pdf.

[18]    WPATH Standards of Care, at S7.

[19]    Wylie C. Hembree et al., *Endocrine Treatment of Gender Dysphoric/Gender-Incongruent Persons*, 102(11) J. Clinical Endocrinology & Metabolism 3869, 3876 (Nov.     2017)     ("Endocrine     Soc'y     Guidelines"), https://academic.oup.com/jcem/article/102/11/3869/4157558; WPATH Standards of Care, at S31, S37, S49.

[20]    Endocrine Soc'y Guidelines, at 3877; WPATH Standards of Care, at S34.

[21]    WPATH Standards of Care, at S12, S173.

[22]    Madeline B. Deutsch, *Overview of Gender-affirming Treatments and Procedures*,     USCF     Transgender     Care     (June     17,     2016), https://transcare.ucsf.edu/guidelines/overview.

For some transgender individuals, psychotherapy and hormone therapy are insufficient to manage their gender dysphoria. "In some cases, [gender affirming] surgery is the **only** effective treatment for the condition," and for some individuals, it "is essential and life-saving."[23] It is widely recognized that "[t]he medical procedures attendant to gender affirming/confirming surgeries are not 'cosmetic' or 'elective' or 'for the mere convenience of the patient.' These reconstructive procedures are not optional in any meaningful sense, but are understood to be medically necessary for the treatment of the diagnosed condition."[24]

Medical research continues to show gender affirming surgery provides tangible, potentially life-saving, benefits. A 2021 landmark study of 27,715 transgender individuals demonstrated that gender affirming surgery is associated with decreased severe psychological distress and past-year suicidal ideation.[25] Other studies link gender affirming surgery to "a consistent and direct increase in health-

---

[23]    World Prof'l Ass'n for Transgender Health, *WPATH Policy Statements: Position Statement on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the U.S.A.* (Dec. 21, 2016), https://www.wpath.org/media/cms/Documents/Insurance%20Training/WPATH%20Position%20on%20Medical%20Necessity%2012-2016.pdf.

[24]    *Id.*

[25]    Anthony N. Almazan and Alex S. Keuroghlian, *Association Between Gender-Affirming Surgeries and Mental Health Outcomes*, 156(7) JAMA SURG. 611 (2021).

related quality of life" and "a significant decrease in gender dysphoria."[26] Studies similarly confirm that transgender individuals who have received gender affirming surgery have very "low levels of decisional regret."[27]

In all, medical and mental health organizations agree that gender dysphoria often requires medical treatment. And, consistent with the well-established WPATH Standards of Care, gender affirming surgery is medically necessary for some patients.

## II. Case-By-Case Assessment and Treatment of Veterans with Gender Dysphoria Is Necessary

"[T]here is no 'one-size-fits-all approach" to treating gender dysphoria.[28] Transgender people "represent a diverse array of gender identifies and have differing needs for [gender affirming care]," and they "may need to undergo all, some, or none of [the medical] interventions to support their gender affirmation."[29] Empirical studies demonstrate that gender dysphoria "is not a homogenous phenomenon," and

---

[26]  WPATH Standards of Care, at S130 (summarizing research regarding GAS and individual wellbeing).

[27]  Lauren Bruce et al., *Long-Term Regret and Satisfaction With Decision Following Gender-Affirming Mastectomy*, 158(10) JAMA Surg. 1070 (2023); Valeria P. Bustos et al., *Regret After Gender-affirmation Surgery: a Systematic Review and Meta-analysis of Prevalence.* 9(3) Plast. Reconstr. Surg. Glob. Open. 3477 (2022).

[28]  WPATH Standards of Care, at S7.

[29]  *Id* at S7, S31.

that it requires "a more varied treatment approach."[30]  Accordingly, the WPATH guidelines recommend individualized assessment and treatment.[31]

For that reason, major medical associations, courts, and the federal government eschew categorical bans of gender affirming surgery, in favor of an individualized assessment of the patient's specific needs.  The VA's categorical ban here conflicts with this weight of authority.

### A. Medical and Mental Health Associations Oppose Categorical Exclusion of Gender Affirming Surgery

Recognizing the importance of individualized care for transgender patients, major medical and mental health organizations have called for an end to blanket exclusions in health insurance coverage for treatment of gender dysphoria:

- The American Medical Association "supports public and private health insurance coverage for treatment of gender dysphoria as recommended by the patient's physician."  AMA Policy H-185.950 (2022), https://policysearch.ama-assn.org/policyfinder/detail/H-185.950?uri=%2FAMADoc%2FHOD.xml-0-1128.xml.

- The American Psychiatric Association "[o]pposes categorical exclusions of coverage for such medically necessary treatment when prescribed by a physician." Am. Psychiatric Ass'n, Position Statement on Access to Care for Transgender and Gender Diverse Individuals, at 1 (May 2018).

---

[30]    P.T. Cohen-Kettenis & L.J.G. Gooren, *Transsexualism: A Review of Etiology, Diagnosis and Treatment*, 46 J. Psychosomatic Res. 315, 328 (1999) (reviewing empirical studies on those with gender dysphoria).

[31]    *See, e.g., id.* at S31 ("no single assessment process will fit every person"); S132 ("These recommendations are designed to facilitate an individualized approach").

- The American Psychological Association "recognizes the efficacy, benefit, and necessity of gender transition treatments for appropriately evaluated individuals and calls upon public and private insurers to cover these medically necessary treatments." Am. Psychol. Ass'n, Resolution on Transgender, Gender Identity, & Gender Expression Non-Discrimination (Aug. 2008), http://www.apa.org/about/policy/transgender.pdf.

- The Endocrine Society recognizes that "[m]edical intervention for transgender youth and adults (including puberty suppression, hormone therapy and medically indicated surgery) is effective, relatively safe (when appropriately monitored)," and that "[f]ederal and private insurers should cover such interventions as prescribed by a physician." Transgender Health: An Endocrine Society Position Statement (Dec. 16, 2020) https://www.endocrine.org/advocacy/position-statements/transgender-health.

- The World Medical Association "urges that every effort be made to make individualised, multi-professional, interdisciplinary and affordable transgender healthcare (including speech therapy, hormonal treatment, surgical interventions and mental healthcare) available to all people who experience gender incongruence." World Medical Association, Statement on Transgender People (Oct. 2015).

- The National Association of Social Workers "supports the rights of all individuals to receive health insurance and other health coverage . . . specifically without exclusion of services related to transgender or transsexual transition (or sex change) . . . which may include hormone replacement therapy [and] surgical interventions." National Association of Social Workers Policy Statements 2018–2020 (11th ed. 2018).

### B. Courts Emphasize Individualized Treatment for Gender Dysphoria

Courts similarly recognize that "the broad medical consensus in the area of transgender health care requires providers to *individually diagnose, assess, and treat individuals' gender dysphoria*" and that "[t]reatment can and should include [gender affirming surgery] when medically necessary." *Edmo*, 935 F.3d at 771 (emphasis added); *Hundley v. Aranas*, No. 21-15757, 2023 U.S. App. LEXIS 731, at *2–3 (9th

Cir. Jan. 12, 2023) ("[T]he prison must make an individualized decision about whether Hundley should have her gender dysphoria treated by [gender affirming surgery]."). For that reason, in the Eighth Amendment context, courts have held that denial of gender affirming surgery must be based on individualized assessments, not categorical bans.

For example, in *Edmo*, the Ninth Circuit affirmed a district court order requiring the Idaho Department of Corrections to provide gender affirming surgery to Edmo, a transgender prisoner. 935 F.3d at 771. After Edmo was diagnosed with gender dysphoria while in the care of the department of corrections, she received hormone therapy. *Id.* at 772. But the hormone therapy did not "completely alleviate [her] gender dysphoria," and she twice attempted self-castration. *Id.* After an extensive evidentiary hearing, the district court—crediting the testimony of two expert witnesses who examined Edmo—held that gender affirming surgery was "medically necessary" to treat her gender dysphoria. *Id.* at 776. It concluded that gender affirming surgery was only denied due to the "practice of refusing this treatment for gender dysphoria." *Id.* In affirming the order, the Ninth Circuit held that the "record in the case" established that Edmo had a "serious medical need" for which "the appropriate medical treatment is [gender affirming surgery]." *Id.* at 767 ("the analysis here is individual to [plaintiff]").

Other courts have reached the same conclusion. *See Fields v. Smith*, 653 F.3d 554 (7th Cir. 2011) (holding that a categorical exclusion of gender affirming surgery for transgender inmates violated the Eighth Amendment because, in some cases, "a doctor can prescribe hormones, which have the effect of relieving the psychological distress" but "[i]n the most severe cases, [gender affirming] surgery may be appropriate."); *De'lonta v. Johnson*, 708 F.3d 520 (4th Cir. 2013) (reversing dismissal of Eighth Amendment claim based on refusal to refer prisoner for gender affirming surgery because "the [WPATH] Standards of Care . . . indicate that [GCS] may be necessary for individuals who continue to present with severe [gender dysphoria]").

### C. The Federal Government Provides Non-Veterans with Coverage for Gender Affirming Surgery After Individualized Assessments

Outside of the benefits administered by the VA, many other federal programs provide coverage for gender affirming surgery when medically necessary for that individual. The Office of Personnel Management ("OPM"), which administers the Federal Employee Health Benefits program, instructs federal health insurance carriers ("Carriers") to "be sensitive to the fact that [transgender] individuals have unique needs and the types of medically necessary services required will be specific

to each individual."[32] OPM requires Carriers to adopt "an acceptable standard of care"—like the WPATH Standards of Care, which OPM expressly recognizes as "evidence-based clinical guidance"—to inform the Carriers' "benefits coverage [policies] to assist transgender and gender diverse people with safe and effective pathways that maximize their overall health, including physical and psychological well-being."[33] Indeed, OPM announced that in the 2024 plan year, "no [Federal Employee Health Benefits] Carrier may categorically exclude from coverage services related to gender affirming care," including "genital surgeries, breast surgeries, and facial gender affirming surgeries."[34] In the 2025 plan year, OPM reaffirmed that it "has *consistently* strongly encouraged Carriers to cover comprehensive gender affirming care and services," and that Carriers should "cover procedures or treatments for gender dysphoria when plans cover the same procedures or treatments for other diagnoses."[35]

---

[32]    U.S. Off. Of Pers. Mgmt. Healthcare and Ins., FEBH Program Carrier Letter 2022-03 (2022) at 6, https://www.opm.gov/healthcare-insurance/carriers/fehb/2022/2022-03.pdf.

[33]    *Id.*

[34]    U.S. Off. Of Pers. Mgmt. Healthcare and Ins., FEBH Program Carrier Letter 2023-12 (2023) https://www.opm.gov/healthcare-insurance/carriers/fehb/2023/2023-12.pdf

[35]    U.S. Off. Of Pers. Mgmt. Healthcare and Ins., Technical Guidance and Instructions for 2025 Benefit Proposals Letter 2024-06 (2024) at 40,

Similarly, gender affirming surgery is not categorically excluded from Medicare or Medicaid coverage. To the contrary, as of July 2024, Medicare and various Medicaid entities are prohibited from "[d]eny[ing] or limit[ing] health services sought for purpose of gender transition or other gender-affirming care that the covered entity would provide to an individual for other purposes if the denial or limitation is based on an individual's sex assigned at birth, gender identity, or gender otherwise recorded." 45 C.F.R. § 92.206. Gender affirming care includes "counseling, hormone therapy, *surgery*, and other related services." 89 Fed. Reg. 37522, 37596 (May 6, 2024) (emphasis added).

Medicare contractors have "ma[d]e the determination of whether or not to cover gender [affirming] surgery based on whether gender [affirming] surgery is reasonable and necessary for the individual beneficiary *after considering the individual's specific circumstances*."[36] In May 2024, the Center for Medicare and Medicaid Services reaffirmed that "coverage decisions for gender-affirming surgery will continue to be made by local Medicare Administrative Contractors ("MACs") and Medicare Advantage ("MA") plans on a *case-by-case basis* based on whether

---

https://www.opm.gov/healthcare-insurance/carriers/fehb/2024/2024-06.pdf (emphasis added).

[36] *See* CTR. FOR MEDICARE & MEDICAID SERV., FINAL DECISION MEMORANDUM ON GENDER REASSIGNMENT SURGERY FOR MEDICARE BENEFICIARIES WITH GENDER DYSPHORIA (2016).

gender-affirming surgery is reasonable and necessary for the individual beneficiary after *considering the individual's specific circumstances*." 89 Fed. Reg. 37522, 37672 (May 6, 2024) (emphasis added).

Further, under certain circumstances, active service members can request coverage for gender affirming surgery. [37] Defense Health Agency guidance recognizes that transition is "variable and individualized," [38] and that "[f]or some, this may involve surgical procedures." And the Federal Bureau of Prisons has recognized that, for certain transgender prisoners, "surgery may be the final stage in the transition process." [39] Accordingly, transgender prisoners are permitted to submit a request for "surgical consideration" after certain conditions are satisfied. [40] The relevant medical director then conducts an "*individualized assessment*" to "determine if the surgery is medically appropriate for referral to a gender affirming surgeon." [41]

---

[37]     *See* DEFENSE HEALTH AGENCY, PROCEDURAL INSTRUCTIONS GUIDANCE FOR GENDER-AFFIRMING HEALTH CARE OF TRANSGENDER AND GENDER-DIVERSE ACTIVE AND RESERVE COMPONENT SERVICE MEMBERS (May 12, 2023).

[38]     *Id.* at 44.

[39]     U.S. DEPT. OF JUST., FED. BUREAU OF PRISONS, TRANSGENDER OFFENDER MANUAL (2022), https://www.bop.gov/policy/progstat/5200-08-cn-1.pdf.

[40]     *Id.*

[41]     *Id.*

In all, the federal government recognizes that coverage for gender affirming surgery depends on a case-by-case assessment. And it recognizes, at least for its own employees, that these determinations should be "consistent with" recognized standards of care, including the WPATH standards. But the VA denies transgender veterans access to individualized treatment and medically necessary care.

### D.    The VA's Blanket Ban On Gender Affirming Surgery Disrupts Continuity of Care

The VA's categorical ban also disrupts continuity of patient care for transgender veterans. The WPATH Standards of Care emphasize "[i]mprov[ing] experiences of health services including those related to administrative systems and continuity of care."[42] For gender affirming surgery specifically, "[i]t is important the surgeon is available to provide and facilitate postoperative care," including facilitating "ongoing support" from the patient's primary care provider.[43] A 2021 pilot study similarly noted that referring transgender patients to "external surgeons"—*i.e.*, surgeons outside the patient's healthcare system—"creates a break in the continuity of care because providers are not updated about the status of surgeries."[44]

---

[42]    *See* WPATH Standards of Care, at S17.

[43]    *Id.* at S130.

[44]    Suma Vupputuri et al., *The Quality of Care of Transgender and Gender Nonconforming Patients: The Provider Perspective*, 25 PERM. J. 1(2020).

In conflict with this standard, the VA provides for all medically necessary care for transgender veterans *except* for gender affirming surgery. This includes "hormonal therapy, mental health care, preoperative evaluation, and medically necessary post-operative and long-term care following sex confirming/reassignment surgery."[45] Transgender veterans may receive a bundle of pre- and post-operative care from their VA providers but must obtain the critical operative care on their own. Notably, the VA's refusal to provide such care does not arise from lack of capability. The VA covers the same procedures for non-transgender veterans with other medical needs, whether because of cancer or a genital injury during service. Under the federal policies governing FEHB Carriers, this alone would require coverage of the same procedures for transgender veterans. But the VA requires transgender veterans—and only transgender veterans—to look outside the VA system for medically necessary procedures and disrupts the continuity of their care.

\* \* \*

In all, treatment for gender dysphoria is individualized. Medical professionals must evaluate each patient on a case-by-case basis to prescribe the proper treatment. Sometimes, the proper treatment is gender affirming surgery, as medical

---

[45] DEPT. OF VETERANS AFF., VHA DIRECTIVE 1341(3) at 3 (2018). https://www.patientcare.va.gov/LGBT/docs/directives/VHA_DIRECTIVE_1341.pdf

organizations and courts across the country have repeatedly recognized. Indeed, the federal government itself recognizes that transgender employees, active service members, and prisoners should have a right to individualized treatment plans and insurance. But the VA's blanket ban forces transgender veterans to find—and pay for—medically necessary procedures on their own. As a result, the ban places transgender veterans at substantially greater risk of physical and emotional harm.

Respectfully Submitted,

By:  */s/* Jonathan K. Youngwood
Jonathan K. Youngwood
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Tel.: (212) 455-2000
Fax: (212) 455-2502
jyoungwood@stblaw.com

*Counsel for Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limitation of Federal Circuit Rule 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Federal Circuit Rule 32(b)(2), this document contains 4,303 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Microsoft Word, typeface Times New Roman, 14-point type. I relied on Microsoft Word's word count feature in preparing this certificate.

Dated: August 5, 2024

Respectfully submitted,

By: /s/ Jonathan K. Youngwood
Jonathan K. Youngwood
SIMPSON THACHER &
BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Tel.: (212) 455-2000
Fax: (212) 455-2502
jyoungwood@stblaw.com

*Counsel for Amici Curiae*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on the 5th day of August, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

Dated: August 5, 2024

Respectfully submitted,

By:  /s/ Jonathan K. Youngwood
Jonathan K. Youngwood
SIMPSON THACHER &
BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Tel.: (212) 455-2000
Fax: (212) 455-2502
jyoungwood@stblaw.com


*Counsel for Amici Curiae*
