# No. 24-1714

IN THE

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

═══════════════════════

### TRANSGENDER AMERICAN VETERANS ASSOCIATION,

*Petitioner,*

**v.**

### SECRETARY OF VETERANS AFFAIRS,

*Respondent.*

═══════════════════════

### CORRECTED BRIEF OF SCHOLARS WHO STUDY THE TRANSGENDER POPULATION AS *AMICI CURIAE* IN SUPPORT OF PETITIONER AND REVERSAL

═══════════════════════

William Tentindo
THE WILLIAMS INSTITUTE
UCLA SCHOOL OF LAW
1060 Veteran Avenue
Los Angeles, CA 90095

James E. Tysse
AKIN GUMP STRAUSS HAUER &
FELD LLP
2001 K Street NW
Washington, DC 20006
(202) 887 4571
jtysse@akingump.com

Zach ZhenHe Tan
AKIN GUMP STRAUSS HAUER &
FELD LLP
100 Pine Street, Suite 3200
San Francisco, CA 94111

*Attorneys for Amici Curiae Scholars*

# CERTIFICATE OF INTEREST

Case Number:  <u>24-1714</u>

Short Case Caption:  <u>Transgender American Veterans Association v. Secretary of</u>
<u>Veterans Affairs</u>

Filing Party/Entity:  <u>Scholars Who Study the Transgender Population</u>

---

Instructions:
1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information is accurate and complete to the best of my knowledge.

August 8, 2024                    /s/ *James E. Tysse*
                                 James E. Tysse

1.    **Represented Entities**.  The full name of all entities represented by undersigned counsel in this case are:

Scholars Who Study the Transgender Population

2.    **Real Party in Interest**.  The full name and affiliation of every scholar comprising the Scholars Who Study the Transgender Population are:

Christopher S. Carpenter, Ph.D.
Professor
Department of Economics
Vanderbilt University

Andrew R. Flores, Ph.D.
Assistant Professor
American University
Affiliated Scholar
The Williams Institute
UCLA School of Law

Nanette Gartrell, M.D.
Visiting Distinguished Scholar
The Williams Institute
UCLA School of Law

Jody L. Herman, Ph.D.
Reid Rasmussen Senior Scholar of Public Policy
The Williams Institute
UCLA School of Law

Christy Mallory, J.D.
Legal Director
The Williams Institute
UCLA School of Law

Elana Redfield, J.D.
Federal Policy Director
The Williams Institute
UCLA School of Law

Brad Sears, J.D.
Founding Executive Director
The Williams Institute
UCLA School of Law

William Tentindo, J.D.
Staff Attorney
The Williams Institute
UCLA School of Law

3.    The names of all parent corporations and any publicly held companies that own 10 percent of the party represented are:

None.

4.    The names of all law firms and the partners or associates who are expected to appear in this court for *amici* are:

James E. Tysse
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006

Zach ZhenHe Tan
AKIN GUMP STRAUSS HAUER & FELD LLP
100 Pine Street, Suite 3200
San Francisco, CA 94111

William Tentindo
THE WILLIAMS INSTITUTE
UCLA SCHOOL OF LAW
1060 Veteran Avenue
Los Angeles, CA 90095

5.    Related Cases:

N/A (amicus).

6.   Organizational Victims and Bankruptcy Cases:

None/Not Applicable.

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICI CURIAE.............................................................1

INTRODUCTION ..............................................................................2

SUMMARY OF ARGUMENT ...............................................................4

ARGUMENT .....................................................................................6

    I.       Laws That Discriminate Against Transgender People Trigger Heightened Scrutiny .........................................6

        A.    Transgender People Have Experienced A Long History Of Discrimination. ...................................10

            1.    *Discrimination By Federal, State, And Local Governments.* ................................ 10

            2.    *Discrimination In Healthcare* ..................... 15

            3.    *Discrimination In The Legal System.* .......... 17

            4.    *Discrimination In The Workplace.* ............. 20

            5.    *Discrimination In Other Essential Services.* ............... 21

            6.    *Experiences of Violence And Victimization.* ................ 23

            7.    *Discrimination Against Transgender People Is Linked To Adverse Health And Well-Being Outcomes.* ................................... 24

        B.    Being Transgender Bears No Relationship To A Person's Ability To Contribute To Society. .........................27

        C.    Transgender People Lack Political Power. .............................28

        D.    Transgender People Are A Discrete Minority Group.............30

CONCLUSION .................................................................................31

CERTIFICATE OF COMPLIANCE......................................................32

APPENDIX:  AMICI CURIAE SCHOLARS ........................................33

i

CERTIFICATE OF SERVICE ................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*303 Creative v. Elenis*,
   600 U.S. 570 (2023)........................................................................1

*Adkins v. City of New York*,
   143 F. Supp. 3d 134 (S.D.N.Y. 2015) ...................................8, 9, 28, 30

*Anonymous v. Anonymous*,
   325 N.Y.S.2d 499 (N.Y. Sup. Ct. 1971)...........................................19

*Ashlie v. Chester-Upland Sch. Dist.*,
   No. 78-4037, 1979 U.S. Dist. LEXIS 12516 (E.D. Pa. May 9,
   1979) ...........................................................................................20

*Bostock v. Clayton County*,
   590 U.S. 644 (2020)..................................................................1, 14

*Bowen v. Gilliard*,
   483 U.S. 587 (1987)........................................................................7

*Brandt v. Rutledge*,
   47 F.4th 661 (8th Cir. 2022) ...........................................................9

*Brandt v. Rutledge*,
   551 F. Supp. 3d 882 (E.D. Ark 2021),
   *aff'd*, 47 F.4th 661 (8th Cir. 2022)....................................................8

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985)..........................................................6, 7, 8, 27

*Crowder v. Diaz*,
   No. 2:17-CV-1657-TLN-DMC, 2019 U.S. Dist. LEXIS 140306
   (E.D. Cal. Aug. 16, 2019) ..............................................................29

*Daly v. Daly*,
   715 P.2d 56 (Nev. 1986).................................................................19

*Doe v. Boyertown Area Sch. Dist.*,
   897 F.3d 518 (3d Cir. 2018) .............................................................2

*In re Estate of Gardiner*,
   42 P.3d 120 (Kan. 2002) ...................................................................19

*Etsitty v. Utah Transit Auth.*,
   502 F.3d 1215 (10th Cir. 2007) ........................................................20

*Evancho v. Pine-Richland Sch. Dist.*,
   237 F. Supp. 3d 267 (W.D. Pa. 2017)............................................8, 28

*F.V. v. Barron*,
   286 F. Supp. 3d 1131 (D. Idaho 2018) ..............................................28

*Flack v. Wis. Dept. of Health Servs.*,
   328 F. Supp. 3d 931 (W.D. Wis. 2018) ..........................................9, 28

*Grimm v. Gloucester Cnty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020) ....................................2, 8, 9, 27, 28, 29

*Hecox v. Little*,
   104 F.4th 1061 (9th Cir. 2024) ............................................................2

*Hernandez-Montiel v. INS*,
   225 F.3d 1084 (9th Cir. 2000) ...........................................................30

*B.P.J. ex. rel. Jackson v. W. Va. State Bd. of Educ.*,
   98 F.4th 542 (4th Cir. 2024) ................................................................9

*Kantaras v. Kantaras*,
   884 So.2d 155 (Fla. App. 2004) ........................................................19

*Karnoski v. Trump*,
   926 F.3d 1180 (9th Cir. 2019) ......................................................8, 13

*Karnoski v. Trump*,
   No. C17-1297, 2018 U.S. Dist. LEXIS 63563 (W.D. Wash. Apr.
   13, 2018) .......................................................................................28, 30

*Littleton v. Prange*,
   9 S.W.3d 223 (Tex. App. 1999)..........................................................19

*Lyng v. Castillo*,
   477 U.S. 635 (1986).......................................................................7, 30

*M.A.B. v. Bd. of Educ. of Talbot Cnty*,
   286 F. Supp. 3d 704 (D. Md. 2018).....................................................9

*Massachusetts Bd. of Ret. v. Murgia*,
  427 U.S. 307 (1976) (per curiam)........................................................7

*Norsworthy v. Beard*,
  87 F. Supp. 3d 1104 (N.D. Cal. 2015)................................................28

*Obergefell v. Hodges*,
  576 U.S. 644 (2015)............................................................................2

*Obergefell v. Wymyslo*,
  962 F. Supp. 2d 968 (S.D. Ohio 2013)..............................................28

*Oiler v. Winn-Dixie Louisiana, Inc.*,
  No. 00-3114, 2002 U.S. Dist. LEXIS 17417 (E.D. La. Sept. 16,
  2002) ..................................................................................................19

*Tingley v. Ferguson*,
  57 F.4th 1072 (9th Cir. 2023) .............................................................2

*Trump v. Karnoski*,
  139 S. Ct. 950 (2019).........................................................................13

*Weinberger v. Wiesenfeld*,
  420 U.S. 636 (1975)............................................................................7

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of*
  *Educ.*,
  858 F.3d 1034 (7th Cir. 2017) ............................................................9

*Windsor v. United States*,
  699 F.3d 169 (2d Cir. 2012), *aff'd,* 570 U.S. 744 (2013)...............4, 7

**Statutes**

29 U.S.C. § 705 ...................................................................................14

42 U.S.C. § 12211 ...............................................................................14

Pub. L. No. 102-569, 106 Stat. 4344 (1992).......................................14

**Executive Orders**

Exec. Order No. 10450, 18 Fed. Reg. 2489 (Apr. 27, 1953)................11

Exec. Order No. 13764, 82 Fed. Reg. 8115 (Jan. 17, 2017)................11

Exec. Order No. 14004, 86 Fed. Reg. 7471 (Jan. 25, 2021)....................................13

**Rules and Regulations**

38 C.F.R. § 17.38(c)(4) .........................................................................................3

Fed. R. App. P. 29(d) ..........................................................................................32

Fed. R. App. P. 32(a)(5).......................................................................................32

Fed. R. App. P. 32(a)(6).......................................................................................32

Fed. R. App. P. 32(a)(7).......................................................................................32

**Other Authorities**

ACLU, *Mapping Attacks on LGBTQ Rights in U.S. State Legislatures* .................15

Judith Adkins, Nat'l Archives, *"These People Are Frightened to Death"*, 48 Prologue Mag. (Summer 2016) ......................................................11

Christine J. Back & Jared P. Cole, Congressional Rev. Serv., *Potential Application of* Bostock v. Clayton County *to Other Civil Rights Statutes* (July 2, 2021) ......................................................................................14

Kevin M. Barry et al., *A Bare Desire to Harm: Transgender People and the Equal Protection Clause*, 57 B.C.L. REV. 507 (2016).....................13, 14

Aaron Belin & Diane Mazur, Palm Ctr., *Department of Defense Issues First Ever Official Count of Active Duty Transgender Service Members* (Feb. 13, 2018).......................................................................................2

John R. Blosnich et al., *Mortality among veterans with transgender related diagnoses in the Veterans Health Administration, FY2000-2009*, 1 LGBT HEALTH 269 (2014) ..................................................................26

John R. Blosnich et al., *Prevalence of Gender Identity Disorder and Suicide Risk Among Transgender Veterans Utilizing Veterans Health Administration Care*, 103 AM. J. PUB. HEALTH e27-e32 (2013) .............................................................................................................3, 26

Walter Bockting et al., *Adult development and quality of life of transgender and gender nonconforming people*, CURRENT OPINION IN ENDOCRINOLOGY, DIABETES AND OBESITY 23(2) (2016) ..............................24

Walter Bockting et al., *Stigma, Mental Health, and Resilience in an Online Sample of the US Transgender Population*, 103 AM. J. OF PUB. HEALTH 943 (2013) ...................................................................24

Richard Bränström & John E. Pachankis, *Reduction in Mental Health Treatment Utilization Among Transgender Individuals After Gender-Affirming Surgeries: A Total Population Study*, AM. J. OF PSYCHIATRY 727 (2019) ..............................................................17

George R. Brown & Kenneth T. Jones, *Mental Health and Medical Health Disparities in 5135 Transgender Veterans Receiving Healthcare in the Veterans Health Administration: A Case-Control Study*, LGBT HEALTH (2015) ....................................................26, 27

Elisabeth Bumiller, *Obama Ends 'Don't Ask, Don't Tell' Policy*, N.Y. TIMES (July 22, 2011) ........................................................12

Kerith J. Conron et al., The Williams Inst., *Educational Experiences of Transgender People* (Apr. 2022) ......................................23

Janelle Downing et al., *Transgender and Cisgender US Veterans Have Few Health Differences*, 37 HEALTH AFFAIRS 1160 (2018) .....................26

Andrew R. Flores et al., *Gender Identity Disparities in Criminal Victimization: National Crime Victimization Survey, 2017–2018*, 111 AM. J. PUB. HEALTH 726 (2021)...................................................23

Andrew R. Flores et al., *Hate crimes against LGBT people: National Crime Victimization Survey, 2017-2019*, 17 PLoS One e0279363 (Dec. 2022) .................................................................23, 24

Gary J. Gates & Jody L. Herman, The Williams Inst., *Transgender Military Service in the United States* (2014) ..........................................3

Michael L. Hendricks & Rylan J. Testa, *A conceptual framework for clinical work with transgender and gender nonconforming clients: An adaptation of the minority stress model*, PROFESSIONAL PSYCHOLOGY RESEARCH AND PRACTICE 43(5) (2012) .....................................24

Jody L. Herman et al., The Williams Inst., *How Many Adults and Youth Identify as Transgender in the United States?* (June 2022) .................2, 17

Jody L. Herman & Kathryn K. O'Neill, The Williams Inst., *Suicide Risk and Prevention for Transgender People: Summary of Research Findings* (Sept. 2001) .................................................17, 25

Sandy E. James et al., *Early Insights: A Report of the 2022 U.S. Transgender Survey* (Feb. 2024) ...........................................21, 22, 23

Sandy E. James et al., Nat'l Ctr. For Transgender Equality, *Report of the 2015 U.S. Transgender Survey* (2016)....................................*passim*

Keren Lehovet et al, *Factors Associated with Suicidality Among a National Sample of Transgender Vets, Suicide and Life-Threatening Behavior* 46(5) (2016).................................................25

LGBTQ+ Victory Inst., Out for America 2024 (June 2024) ..................................29

Christy Mallory et al., The Williams Inst., *Discrimination and Harassment by Law Enforcement Officers in the LGBT Community* (March 2015) ......................................................18, 19

Memorandum For The President From James Mattis, Sec'y Of Def. (Feb. 22, 2018)............................................................13

Ilan H. Meyer et al., The Williams Inst., *LGBTQ People in the US* (June 2021)................................................................22

Shabab Ahmed Mirza & Caitlin Rooney, Ctr. for Am. Progress, *Discrimination Prevents LGBTQ People from Accessing Healthcare* (Jan. 18, 2018) ......................................................16

Kathryn O'Neill et al., The Williams Inst., *Homeless Shelter Access Among Transgender Adults* (Nov. 2020)...........................................22

Kathryn O'Neill, The Williams Inst., *The Potential Impact of Voter Identification Laws on Transgender Voters in the 2022 General Election* (Sept. 2022) ..........................................................30

Presidential Memorandum, Military Service by Transgender Individuals, 82 Fed. Reg. 41319 (Aug. 25, 2017) .............................12

Presidential Memorandum, Military Service by Transgender Individuals, 83 Fed. Reg. 13367 (Mar. 23, 2018) .............................13

Public Comment from Williams Institute Scholars to Dep't of Health
    & Human Servs. Re: Grant Regulation; Proposed Rule, 88 Fed.
    Reg. 44750 (Sept. 6, 2023) ...............................................................27

Kate Redburn, *Before Equal Protections: The Fall of Cross-Dressing
    Bans and he Transgender Legal Movement, 1963-86*, 40 L. &
    HIST. REV. 679 (2022)........................................................................14

Alex Redcay et al., *Changing Social Policy and the Transgender
    United States Soldier*, 5 J. HUM. RIGHTS & SOC. WORK 191 (2020) .................11

Elana Redfield et al., The Williams Inst., *The Impact of 2024 Anti-
    Transgender Legislation on Youth* (Apr. 2024)...........................................16, 17

Brad Sears et al., The Williams Inst., *Banning the Use of the Gay and
    Trans Panic Defenses* (April 2021) ......................................................18

Brad Sears et al., The Williams Inst., *LGBT People's Experience of
    Workplace Discrimination and Harassment* (Sept. 2021) ...........................20, 21

Mark Stein, ed., *Encyclopedia of Lesbian, Gay, Bisexual and
    Transgender History in America* (2004)...............................................11

Sheryl Gay Stolberg, *Loophole in Rules on Transgender Troops
    Denies 2 Their Commissions*, N.Y. TIMES (May 26, 2017)..............................12

Susan Stryker, *Transgender History* (2008) ........................................14, 18

U.S. DEP'T OF DEFENSE, *Transgender Service in the U.S. Military: An
    Implementation Handbook* (2016)......................................................12

U.S. DEP'T OF VETERANS AFFAIRS, *Patient Care Services: VHA
    LGBTQ+ Health Program*..................................................................3

Williams Institute (@WilliamsInstitute), INSTAGRAM ............................................17

# INTEREST OF AMICI CURIAE[1]

*Amici curiae* are eight scholars of demographics, economics, law, psychology, political science, public health, public policy, and other disciplines. Many *amici* are affiliated with the Williams Institute, an academic research center at UCLA School of Law focused on sexual orientation and gender identity law and public policy. *Amici* have conducted extensive research and authored numerous studies regarding the transgender population in the United States, and have expertise in law and policy issues affecting transgender people. The appended list of scholars identifies the individual *amici*.

*Amici* have submitted *amicus curiae* briefs in various courts, including the U.S. Supreme Court. *See, e.g.*, *303 Creative v. Elenis*, No. 21-476 (2022); *Fulton v. Philadelphia*, No. 19-123 (2021); *Bostock v. Clayton County*, No. 17-1618 (2020); *Obergefell v. Hodges*, No. 14-556 (U.S. 2015); *United States v. Windsor*, No. 12-307 (U.S. 2013). Supreme Court justices have expressly relied on Williams Institute research in several cases. *303 Creative v. Elenis*, 600 U.S. 570, 616 (2023) (Sotomayor, J., dissenting) (citing research on public accommodations discrimination); *Bostock v. Clayton County*, 590 U.S. 644, 678-

---

[1] In accordance with Federal Rule of Appellate Procedure 29(c)(5), *amici* certify that no counsel for either party authored this brief in whole or in part, and that no party or other person other than *amici* or their counsel made a monetary contribution to the brief's preparation or submission. All parties consent to the filing of this brief. FED. R. APP. P. 29(a).

679 (2020) (citing scholarship by Williams Institute Faculty Chair, Cary Franklin);

*Obergefell v. Hodges*, 576 U.S. 644, 668 (2015) (citing Brief of Gary J. Gates as

*Amicus Curiae*).   So have numerous other federal courts.   *See, e.g.*, *Tingley v.*

*Ferguson*, 57 F.4th 1072, 1083 (9th Cir. 2023); *Hecox v. Little*, 104 F.4th 1061, 1069

n.2 (9th Cir. 2024); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 597, 612 (4th

Cir. 2020); *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 523 n.22 (3d Cir. 2018).

As scholars who specialize in issues related to transgender people, *amici* have a

substantial interest in this matter and believe that their expertise will assist the Court.

## INTRODUCTION

According to *amici*'s recent analyses, 0.5% of the U.S. adult population, or

approximately 1.3 million adults, identify as transgender.[2]  Defense Department data

shows that, at least as of 2016, approximately 14,700 service members identify as

transgender.[3]   An estimated 134,300 veterans and retired National Guard or

---

[2] Jody L. Herman et al., The Williams Inst., *How Many Adults and Youth Identify as Transgender in the United States?* (June 2022), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Jun-2022.pdf.

[3] Aaron Belin & Diane Mazur, Palm Ctr., *Department of Defense Issues First Ever Official Count of Active Duty Transgender Service Members* (Feb. 13, 2018), https://palmcenterlegacy.org/wp-content/uploads/2019/06/14700-Transgender-Troops-.pdf.

reservists identified as transgender as of 2014.[4] Data indicate that transgender men and women serve in the military in proportionally higher rates (21.4%) than the general population (10.4%).[5]

The Department of Veterans Affairs ("VA") specifically excludes "gender alterations" from health care coverage under 38 C.F.R. § 17.38(c)(4). This regulation prevents veterans from accessing coverage for gender-affirming surgery.[6] On February 22, 2024, the VA denied Petitioner's petition for rulemaking requesting that the VA amend its regulations excluding gender-affirming surgery from the VA medical benefits package.

*Amici* agree with Petitioner that the VA's denial of the petition for rulemaking warrants relief from this Court in the form of an order directing the VA to amend the regulations to include gender-affirming surgery. *Amici* submit this brief to provide support for Petitioner's arguments that the exclusion violates the Equal Protection

---

[4] Gary J. Gates & Jody L. Herman, The Williams Inst., *Transgender Military Service in the United States* 1, 4 (2014), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Military-Service-US-May-2014.pdf.

[5] *Id.* at 3; *see also* John R. Blosnich et al., *Prevalence of Gender Identity Disorder and Suicide Risk Among Transgender Veterans Utilizing Veterans Health Administration Care*, 103 AM. J. PUB. HEALTH e27-e32 (2013).

[6] U.S. DEP'T OF VETERANS AFFAIRS, *Patient Care Services: VHA LGBTQ+ Health Program*, https://www.patientcare.va.gov/lgbt/#:~:text=VA%20currently%20provides%20all%20medically,the%20VA%20medical%20benefits%20package (last accessed July 31, 2024).

3

Clause. In particular, as experts on the transgender population, *amici* provide demographic data, social science research, and additional information to demonstrate that heightened scrutiny is the proper standard of review.

## SUMMARY OF ARGUMENT

The Constitution guarantees all people equal protection of the laws. Because the law must treat similarly situated people alike, laws that divide people along "suspect" (or "quasi-suspect") lines warrant heightened judicial scrutiny. To determine whether a law targeting a group triggers heightened scrutiny, the Supreme Court has considered various factors. The first two are the most important: whether the group (1) has experienced a history of discrimination and (2) faces discrimination based on stereotyped characteristics not truly indicative of the abilities of the group's members to contribute to society. *See Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012), *aff'd,* 570 U.S. 744 (2013). In some cases, the Court has additionally considered whether the group (3) lacks the capacity adequately to protect itself within the political process and (4) shares definite characteristics that distinguish it as a discrete minority group. *Id.*

*Amici* agree with Petitioner that the VA's policy excluding gender-affirming surgery from its medical benefits package discriminates on the basis of sex *and* on the basis of transgender status. This brief focuses on the second of these grounds for applying heightened scrutiny. It offers the court relevant research and legal

authority showing why laws targeting transgender people, independent of discriminating on the basis of sex, creates a suspect classification. As scholars who specialize in studying the transgender population, *amici* are uniquely suited to offer such data and research to this Court.

In *amici*'s view, all the factors courts traditionally apply demonstrate that laws and government policies that discriminate against transgender people or classify on the basis of transgender status trigger heightened scrutiny.

*First*, overwhelming evidence shows that transgender people have long been the victims of public- and private-sector discrimination. For decades, federal, state, and local government policies have discriminated against transgender people, including in the U.S. military (and often in the context of access to healthcare specifically). Transgender people also have been mistreated by the justice system— as civil litigants, as criminal defendants, as prisoners, and as victims of crimes that transgender people suffer at disproportionately high rates. Studies show that discrimination also permeates many other aspects of transgender peoples' lives, including at work, in school, and in housing and public accommodations. And this discrimination has costs: Transgender people suffer high rates of poverty, unemployment, criminal victimization, and a range of physical and mental health conditions.

*Second*, courts and scholars agree that being transgender bears no relation to a person's ability to contribute to society.

*Third*, the transgender population—a small minority group in our society—lacks political power to protect itself within the political process. Legislatures continue to enact discriminatory laws and a number of states refuse to extend anti-discrimination protections to transgender people—and these trends are exacerbated by the lack of any openly transgender officials elected to federal office.

*Fourth*, the approximately 1.3 million transgender adults in the United States who identify as transgender (~0.5% of the adult population) share definite characteristics that distinguish them as an identifiable, discrete minority group.

Because all four considerations support the same conclusion, this Court should recognize that laws and policies that discriminate against transgender people, including the Department of Veterans Affairs' refusal to provide medically indicated gender-affirming surgery, trigger heightened scrutiny.

## ARGUMENT

### I. LAWS THAT DISCRIMINATE AGAINST TRANSGENDER PEOPLE TRIGGER HEIGHTENED SCRUTINY

The constitutional guarantee of equal protection "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting

6

*Plyler v. Doe*, 457 U.S. 202, 216 (1982)).[7]  Although courts presume the validity of classifications that are "rationally related to a legitimate state interest," that "general rule gives way . . . when a statute classifies" groups that have historically been subject to discrimination.  *Id.* at 440.  Thus, laws that discriminate based on a "suspect" classification (such as race) or a "quasi-suspect" classification (such as gender) receive heightened judicial scrutiny.  *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987).

The Supreme Court has historically looked to two primary considerations to determine whether certain classifications are suspect:  (1) whether the group has experienced a history of discrimination, *City of Cleburne*, 473 U.S. at 440-441, and (2) whether the discrimination is based on "stereotyped characteristics not truly indicative" of the group's abilities, *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (per curiam).  The Supreme Court has also occasionally looked to (3) whether the group lacks the capacity adequately to protect itself within the political process, *Bowen*, 483 U.S. at 602, and (4) whether members of the classified group have "obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Lyng v. Castillo*, 477 U.S. 635, 638 (1986).  Those latter two factors, however, are not necessary to establish a suspect class.  *See Windsor*, 699

---

[7]  Although *Cleburne* analyzed the Equal Protection Clause of the Fourteenth Amendment, federal courts apply the same standard to Fifth Amendment equal-protection claims.  *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975).

F.3d at 181; *see also City of Cleburne*, 473 U.S. at 472 n.24 (Marshall, J., concurring in part and dissenting in part) ("The 'political powerlessness' of a group may be relevant . . . , but that factor is neither necessary, as the gender cases demonstrate, nor sufficient, as the example of minors illustrates.").

Here, because all relevant factors are satisfied, this Court should apply heightened scrutiny when evaluating whether the VA's policy regarding transgender medical care is consistent with the U.S. Constitution. That approach would be consistent with the one taken by the Fourth and Ninth Circuits and several federal district courts. *Grimm v. Glouster Cnty. Sch. Bd.*, 972 F.3d 586, 611, 613 (4th Cir. 2020) (applying heightened scrutiny and noting that "there is no doubt that transgender individuals historically have been subjected to discrimination on the basis of their gender identity, including high rates of violates and discrimination in education, employment, housing, and healthcare access"); *Karnoski v. Trump*, 926 F.3d 1180, 1200-1201 (9th Cir. 2019) (endorsing lower court's application of factors, but finding that lower court should have applied heightened, rather than strict, scrutiny); *see, e.g., Brandt v. Rutledge*, 551 F. Supp. 3d 882, 889 (E.D. Ark 2021), *aff'd*, 47 F.4th 661 (8th Cir. 2022); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288-289 (W.D. Pa. 2017); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 140 (S.D.N.Y. 2015). These and other courts have recognized that transgender people have faced a history of discrimination across various settings

8

including employment, education, housing, and other settings. As a district court in Wisconsin observed, "one would be hard pressed to identify a class of people more discriminated against historically or otherwise more deserving of the application of heightened scrutiny when singled out for adverse treatment[] than transgender people." *Flack v. Wis. Dept. of Health Servs.*, 328 F. Supp. 3d 931, 953 (W.D. Wis. 2018); *see also Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017) ("There is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity."); *Adkins*, 143 F. Supp. 3d at 139 (that "transgender people have suffered a history of persecution and discrimination . . . is not much in debate") (internal quotation marks omitted); *M.A.B. v. Bd. of Educ. of Talbot Cnty*, 286 F. Supp. 3d 704, 720 (D. Md. 2018).[8]

---

[8] While this brief focuses on the applicability of heightened scrutiny as applied to transgender status, heightened scrutiny is also appropriate because the regulation creates a sex-based classification. *See, e.g.*, *Whitaker*, 858 F. 3d at 1051 (holding that a school district policy which mandated that students use the bathroom according to their sex assigned at birth and not their gender identity was "inherently based upon a sex-classification and heightened review applies"); *Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022) (finding that ban on "gender transition procedures" discriminated on the basis of sex). Indeed, heightened scrutiny should apply to laws that discriminate against transgender people under *both* rationales. *See, e.g., B.P.J. ex. rel. Jackson v. West Va. State Bd. of Educ.*, 98 F.4th 542, 556-557 (4th Cir. 2024) (holding that heightened scrutiny applies to a transgender sports ban because the law discriminates based on sex and because, citing to *Grimm*'s suspect class analysis, classifications based on gender identity trigger heightened scrutiny).

### A.    Transgender People Have Experienced A Long History Of Discrimination.

Transgender people have faced a history of widespread and pervasive discrimination in the United States, which has been documented in a variety of sources including government and private surveys, scientific field studies, controlled experiments, court cases, administrative complaints, complaints to community-based organizations, and in newspapers, books, and other media.[9] Researchers have relied on these sources to study the existence and impact of discrimination against transgender people (and LGBTQ people more broadly) in public and private sector employment, housing, education, public accommodations, and other settings. This section presents some findings from a large and growing body of research to illustrate the historical and continuing pattern of discrimination against transgender people in the United States.

#### 1.    Discrimination By Federal, State, And Local Governments.

A substantial portion of historical discrimination against transgender people has been perpetuated by the government itself. Beginning in the mid-twentieth century, the federal government began a concerted effort to target LGBTQ people in

---

[9] For all Williams Institute research on discrimination against transgender people, and LGBTQ people more broadly, *see* https://williamsinstitute.law.ucla.edu/publications/?issues=discrimination-violence.

what is known as the "Lavender Scare."[10]  During this time, the government began to purge LGBTQ employees from employment on the grounds that they were thought to pose security risks.[11]  In 1953, President Eisenhower formalized this practice through Executive Order 10450, which barred federal government employment for anyone who was determined to have a record of "criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct … [or] sexual perversion."[12]  An estimated 5,000 to 10,000 people were fired under suspicions of homosexuality.[13]

As directly relevant to transgender servicemembers and veterans, Executive Order 10450 was used to prohibit transgender people from serving in the armed forces.[14]  While this bar on military service by openly transgender people was recently repealed, this result came only after a series of repeated policy reversals that highlight the lack of structural protections for transgender servicemembers and

---

[10] Mark Stein, ed., *Encyclopedia of Lesbian, Gay, Bisexual and Transgender History in America* at 342 (2004); Judith Adkins, Nat'l Archives, *"These People Are Frightened to Death"*, 48 Prologue Mag. (Summer 2016), https://www.archives.gov/publications/prologue/2016/summer/lavender.html.

[11] Stein, *supra*, at 342; Adkins, *supra*.

[12] Exec. Order No. 10450, Security Requirements for Government Employment, 18 Fed. Reg. 2489 (Apr. 27, 1953), *revoked by* Exec. Order No. 13764, 82 Fed. Reg. 8115 (Jan. 17, 2017).

[13] Adkins, *supra*.

[14] Alex Redcay et al., *Changing Social Policy and the Transgender United States Soldier*, 5 J. HUM. RIGHTS & SOC. WORK 191, 192 (2020).

veterans.  Specifically, while the military's "Don't Ask, Don't Tell" policy was repealed in 2011,[15] the military did not lift its ban on service by transgender soldiers until 2016.[16]  Even then, the policy change covered only transgender soldiers who were already serving in the military.[17]

Moreover, after a change in presidential administrations, transgender people were yet again targeted for exclusion from the armed forces.  In particular, a 2017 Presidential Memorandum directed the Departments of Defense and Homeland Security to adopt the policy "that was in place prior to June 2016," thus excluding transgender people from openly serving.[18]  While a second Presidential Memorandum was issued in March 2018 purportedly revoking the 2017 Memorandum and permitting the Secretaries of Defense and Homeland Security to

---

[15] Elisabeth Bumiller, *Obama Ends 'Don't Ask, Don't Tell' Policy*, N.Y. TIMES (July 22, 2011), http://www.nytimes.com/2011/07/23/us/23military.html.

[16] U.S. DEP'T OF DEFENSE, *Transgender Service in the U.S. Military: An Implementation Handbook* 10 (2016), http://www.defense.gov/Portals/1/features/2016/0616_policy/DoDTGHandbook_093016.pdf?ver=2016-09-30-160933-837.

[17] Sheryl Gay Stolberg, *Loophole in Rules on Transgender Troops Denies 2 Their Commissions*, N.Y. TIMES (May 26, 2017), https://www.nytimes.com/2017/05/26/us/loophole-in-rules-on-transgender-troops-denies-2-their-commissions.html?_r=0.

[18] Presidential Memorandum, Military Service by Transgender Individuals, 82 Fed. Reg. 41319 (Aug. 25, 2017), https://www.govinfo.gov/content/pkg/FR-2017-08-30/pdf/2017-18544.pdf.

implement policies addressing service by transgender people,[19] that 2018 Memorandum adopted a separate policy from the Secretary of Defense concluding that transgender people should be banned from military service except in very limited circumstances.[20] Thus, the 2018 Memorandum was effectively yet another ban on transgender people serving openly. Preliminary injunctions against the 2017 and the 2018 memoranda were stayed by appellate courts, thereby allowing this exclusionary policy to go into effect. *E.g., Trump v. Karnoski*, 139 S. Ct. 950 (2019); *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019). Litigation proceeded until a 2021 Executive Order, following another change in presidential administrations, finally allowed transgender people to enlist and serve openly.[21]

Transgender people have also faced exclusion under a number of other federal laws and policies. For example, in 1988, Congress excluded "transvestites" from the Fair Housing Act.[22] Both the Americans with Disabilities Act and the

---

[19] Presidential Memorandum, Military Service by Transgender Individuals, 83 Fed. Reg. 13367 (Mar. 23, 2018), https://www.federalregister.gov/documents/2018/03/28/2018-06426/military-service-by-transgender-individuals.

[20] Memorandum For The President From James Mattis, Sec'y Of Def. (Feb. 22, 2018), https://media.defense.gov/2018/Mar/23/2001894037/-1/-1/0/MILITARY-SERVICE-BY-TRANSGENDER-INDIVIDUALS.PDF.

[21] Exec. Order No. 14004, Enabling All Qualified Americans to Serve Their Country in Uniform, 86 Fed. Reg. 7471 (Jan. 25, 2021).

[22] Kevin M. Barry et al., *A Bare Desire to Harm: Transgender People and the Equal Protection Clause*, 57 B.C.L. Rev. 507, 527-29 (2016), http://lawdigitalcommons.bc.edu/bclr/vol57/iss2/4.

Rehabilitation Act expressly exempt "transvestism," "transsexualism," and "gender identity disorders not resulting from physical impairments" as protected conditions.[23] Moreover, despite efforts to add gender identity as a protected characteristic to federal non-discrimination laws, Congress has refused to do so for decades. Although the Supreme Court has now interpreted Title VII to protect transgender people from employment discrimination on the logic that discriminating against someone because of their transgender status necessarily entails discrimination because of that person's sex, *Bostock v. Clayton County*, 590 U.S. 644 (2022), it is unclear whether the Court's holding extends to other settings such as education and healthcare.[24]

State laws also provide ample evidence of discrimination against transgender people. States began targeting transgender people through the enactment of anti-cross-dressing laws as early as 1848.[25] In the decades that followed, cities and states passed other laws, including criminal vagrancy laws, that criminalized being transgender and undermined protections for transgender people.[26] These efforts

---

[23] 42 U.S.C. § 12211(b); 29 U.S.C. § 705(20)(F); *see also* Pub. L. No. 102-569, 106 Stat. 4344 (1992); Barry et al., *supra*, at 529-40.

[24] Christine J. Back & Jared P. Cole, Congressional Rev. Serv., *Potential Application of* Bostock v. Clayton County *to Other Civil Rights Statutes* (July 2, 2021), https://crsreports.congress.gov/product/pdf/R/R46832.

[25] Susan Stryker, *Transgender History* at 31 (2008).

[26] Kate Redburn, *Before Equal Protections: The Fall of Cross-Dressing Bans and he Transgender Legal Movement, 1963-86*, 40 L. & Hist. Rev. 679, 681 (2022).

continue today.  Many states lack laws expressly prohibiting discrimination on the basis of gender identity.[27]  And of the 46 states that have passed hate crimes legislation, only 22 (and the District of Columbia) explicitly extend those protections to transgender victims.[28]  According to the ACLU, over 500 anti-LGBTQ bills were filed in state legislatures during the 2024 legislative session as of June.[29]  Most of them were specifically focused on removing or undermining transgender rights.[30]

### 2.   *Discrimination In Healthcare*

As relevant to this pending challenge to the VA's regulations over healthcare coverage, it bears emphasis that transgender people have historically suffered—and continue to suffer—particularly acute forms of discrimination with regard to healthcare access.

---

[27] As of July 2024, 31 states and D.C. prohibit gender identity discrimination in housing, and 28 states and D.C. prohibit such discrimination in public accommodations.  Thus, 19 states do not prohibit gender identity discrimination in housing, and 22 states do not prohibit gender identity discrimination in public accommodations.  Movement Advancement Project, Non-Discrimination Laws, https://www.lgbtmap.org/equality-maps/non_discrimination_laws/housing  (toggle between housing and public accommodations tabs).

[28] One additional state interprets its hate crime law to include gender identity as a protected characteristic. Movement Advancement Project, Hate Crime Laws, https://www.lgbtmap.org/equality-maps/hate_crime_laws.

[29] ACLU, *Mapping Attacks on LGBTQ Rights in U.S. State Legislatures*, https://www.aclu.org/legislative-attacks-on-lgbtq-rights-2024 (last updated June 28, 2024).

[30] *Id.*

Among respondents to a large national study of transgender people, the 2015 U.S. Transgender Survey ("USTS"), one third (33%) of respondents who had seen a healthcare provider in the previous year reported having a negative experience related to their transgender status.[31]   Nearly one quarter (23%) of respondents reported that they did not see a doctor when they needed to in the past year due to fear of discrimination.[32]  Similarly, a nationally representative survey by the Center for American Progress found that 29% of transgender people reported being refused care entirely in the preceding twelve months because of their gender identity; 12% were specifically refused care related to gender transition.[33]

States have also passed a raft of laws denying transgender people access to healthcare specifically.  A Williams Institute analysis found that, as of May 2024, 25 states banned gender-affirming care for transgender youth and an additional 15 states considered these bans in the 2024 legislative session.[34] Additional research

---

[31] Sandy E. James et al., Nat'l Ctr. For Transgender Equality, *Report of the 2015 U.S. Transgender Survey* 93 (2016) [hereinafter "USTS"], https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf.

[32] *Id.* at 93.

[33] Shabab Ahmed Mirza & Caitlin Rooney, Ctr. for Am. Progress, *Discrimination Prevents LGBTQ People from Accessing Healthcare* (Jan. 18, 2018), https://www.americanprogress.org/article/discrimination-prevents-lgbtq-people-accessing-health-care/.

[34] Elana Redfield et al., The Williams Inst., *The Impact of 2024 Anti-Transgender Legislation on Youth* (Apr. 2024), https://williamsinstitute.law.ucla.edu/wp-content/uploads/2024-Anti-Trans-

16

concluded that gender-affirming care bans impacted an estimated 117,600 transgender young people aged 13-17,[35] or about one third of the total population of transgender youth in the United States.[36] As explained further below, access to gender-affirming care is directly correlated to a transgender person's overall health and well-being, with studies showing that access to gender-affirming care, including surgery, reduces depression and suicidality among transgender people.[37]

### 3. Discrimination In The Legal System.

Transgender people have also experienced discrimination and harassment while interacting with the legal system. These experiences include mistreatment by

---

Legislation-Apr-2024.pdf. South Carolina enacted a ban after release of this report. *See* Williams Institute (@WilliamsInstitute), INSTAGRAM [hereinafter "Williams Institute, South Carolina Update"], https://www.instagram.com/p/C7cPm3murtQ/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA== (last visited July 31, 2024).

[35] In addition to the 113,900 transgender young people estimated in the report, subsequent developments have added approximately 3,700 young people to the total impacted. *See* Redfield, *supra*; Williams Institute, South Carolina Update.

[36] *See* Herman et al., *supra*.

[37] *E.g.*, Richard Bränström & John E. Pachankis, *Reduction in Mental Health Treatment Utilization Among Transgender Individuals After Gender-Affirming Surgeries: A Total Population Study*, 177 AM. J. OF PSYCHIATRY 727 (2019), https://ajp.psychiatryonline.org/doi/10.1176/appi.ajp.2019.19010080; Jody L. Herman & Kathryn K. O'Neill, The Williams Inst., *Suicide Risk and Prevention for Transgender People: Summary of Research Findings* (Sept. 2001), https://williamsinstitute.law.ucla.edu/publications/trans-suicide-risk-prevent-summary/.

courts and judges, lawyers, law enforcement, and corrections officers. Negative interactions can create barriers to seeking services or help from these sources.[38]

Such discriminatory legal targeting has deep roots. The 1950s and 60s were marked by police raids and targeting of LGBTQ people, as law enforcement relied on nuisance laws to harass and criminalize LGBTQ people.[39] The most famous of these raids took place at the Stonewall Inn in 1969.[40]

Research indicates that the overcriminalization of LGBTQ people continues to the present day.[41] When surveyed, transgender people have reported recent experiences of mistreatment when interacting with the legal system. Among respondents to the 2015 USTS who had interacted with a courthouse in the prior year, 13% said they experienced discrimination because of being transgender.[42] Of those who interacted with an attorney or legal clinic, 6% said they experienced discrimination because of being transgender.[43] The majority (58%) of respondents

---

[38] *See* Brad Sears et al., The Williams Inst., *Banning the Use of the Gay and Trans Panic Defenses* at 16-17 (April 2021), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Gay-Trans-Panic-Apr-2021.pdf.

[39] Stryker, *supra*, at 50-89.

[40] *Id.* at 75.

[41] Christy Mallory et al., The Williams Inst., *Discrimination and Harassment by Law Enforcement Officers in the LGBT Community* (March 2015), https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBT-Discrimination-by-Law-Enforcement-Mar-2015.pdf.

[42] USTS at 214.

[43] *Id.*

who had interacted with police reported experiencing mistreatment during the interaction.[44] Transgender respondents who had been incarcerated or detained in the past year also reported experiencing sexual assault by facility staff at five to six times the rate of that among the general incarcerated population.[45]

Instances of discrimination and harassment against transgender people within the legal system have also been documented in court cases. Courts have refused to recognize transgender people's marriages, *see, e.g.*, *Kantaras v. Kantaras,* 884 So.2d 155 (Fla. App. 2004); *Littleton v. Prange*, 9 S.W.3d 223 (Tex. App. 1999); *Anonymous v. Anonymous*, 325 N.Y.S.2d 499 (N.Y. Sup. Ct. 1971); denied their inheritance from deceased spouses, *see, e.g.*, *In re Estate of Gardiner*, 42 P.3d 120 (Kan. 2002); and revoked parental rights, *see, e.g.*, *Daly v. Daly*, 715 P.2d 56, 59 (Nev. 1986) (stripping parental rights from transgender woman that court called "a selfish person whose own needs, desires and wishes were paramount and were indulged without regard to their impact on the life and psyche of the daughter").

One federal court justified discriminating against a transgender woman by stating she was "impersonating" a woman and "pretend[ing]" in order to "disguise himself." *Oiler v. Winn-Dixie Louisiana, Inc.*, No. 00-3114, 2002 U.S. Dist. LEXIS 17417, at *17, *28 (E.D. La. Sept. 16, 2002). Another court likened a transgender

---

[44] *Id.* at 185.
[45] *Id.* at 192.

litigant to a man trying to change himself "into a donkey." *Ashlie v. Chester-Upland Sch. Dist.*, No. 78-4037, 1979 U.S. Dist. LEXIS 12516, at *14 (E.D. Pa. May 9, 1979). And another found no cognizable discrimination even though an employer fired a transgender woman after asking "where she was in the sex change process" and "whether she still had male genitalia." *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1218-1219 (10th Cir. 2007).

### 4.    *Discrimination In The Workplace.*

Research has documented persistent and pervasive discrimination against transgender people in the workplace. For example, a 2021 study by the Williams Institute found that two thirds (66%) of transgender employees had experienced employment discrimination because of their gender identity at some point in their lives.[46] About half (49%) of transgender survey respondents said they had not been hired or had been fired because of their gender identity, slightly less than half (46%) had experienced verbal, sexual, or physical harassment at work, and many transgender people had experienced multiple forms of discrimination and harassment.[47] Many transgender employees reported recent experiences of employment discrimination—61% of transgender respondents said they had

---

[46] Brad Sears et al., The Williams Inst., *LGBT People's Experience of Workplace Discrimination and Harassment* at 2 (Sept. 2021), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Workplace-Discrimination-Sep-2021.pdf.

[47] *Id.* at 12.

experienced discrimination or harassment in the workplace within the five years prior to the survey.[48]

Similarly, 27% of 2015 USTS respondents reported that they had experienced employment discrimination based on their gender identity in previous year;[49] 15% reported experiencing verbal harassment, physical attack, or sexual assault in the workplace in the past year; and 23% reported other negative actions at work such as being told to present as the wrong gender in order to keep their jobs.[50] An update to the USTS was conducted in 2022, and select findings that have been released thus far show that 11% of respondents who have ever held a job said they were fired, forced to resign, lost a job, or been laid off because of their gender identity of expression.[51]

### 5.    *Discrimination In Other Essential Services.*

Discrimination against transgender people has also been documented in other settings, such as housing and education.[52] Williams Institute research based on data collected through the TransPop Study found that 17% of transgender people had

---

[48] Analysis on file with authors.

[49] USTS at 150-51.

[50] *Id.* at 153-54.

[51] Sandy E. James et al., *Early Insights: A Report of the 2022 U.S. Transgender Survey* 21 (Feb. 2024), https://transequality.org/sites/default/files/2024-02/2022%20USTS%20Early%20Insights%20Report_FINAL.pdf.

[52] USTS at 178.

been prevented from moving into or buying a home or apartment by a landlord or realtor at some point in their lives.[53]  Another Williams Institute analysis found that 30% of transgender respondents to the 2015 USTS reported having experienced homelessness due to their transgender status at some point in their lives.[54]  Early insights to the 2022 USTS found the same.[55]  Among those who had experienced homelessness within the prior year (13% of respondents), almost 30% were denied access to a shelter due to their gender identity.[56]

Discrimination against transgender people in educational settings is widespread as well.  2015 USTS respondents who were open about their transgender status at school (or those perceived to be transgender by others at school) reported high rates of verbal harassment (54%), physical attack (24%), and sexual assault (13%) in grades K-12.[57]  Williams Institute research has found that transgender people encounter similar challenges in higher education.  In response to a 2021 national survey, nearly one third (32%) of transgender adults reported experiencing

---

[53] Ilan H. Meyer et al., The Williams Inst., *LGBTQ People in the US* 19 (June 2021), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Generations-TransPop-Toplines-Jun-2021.pdf.

[54] Kathryn O'Neill et al., The Williams Inst., *Homeless Shelter Access Among Transgender Adults* 2 (Nov. 2020), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Homeless-Shelter-Nov-2011.pdf.

[55] James, *supra*, at 21.

[56] O'Neill, *Shelter Access, supra*, at 2.

[57] USTS at 132-34.

unfair treatment by teachers, staff, or school administrators in colleges and universities.[58] The 2022 USTS found that 80% of adult respondents and 60% of 16- and 17-year-old respondents who were out or perceived as transgender at school experienced mistreatment or negative experiences.[59]

### 6.    *Experiences of Violence and Victimization.*

Transgender people also experience disproportionately high rates of violence and victimization.  A Williams Institute analysis of 2017-2019 National Crime Victimization Survey (NVCS) data found that "[t]ransgender people experienced violence at a rate of 86.2 victimizations per 1000 persons compared with 21.7 per 1000 persons among cisgender people."[60]  A separate Williams Institute analysis of 2017-2019 NCVS data found that about one in ten LGBT victims of violence described the incident as a hate crime compared to 4% of non-LGBT victims.[61]  The vast majority (85%) of LGBT hate crimes victims identified sexual orientation,

---

[58] Kerith J. Conron et al., The Williams Inst., *Educational Experiences of Transgender People* 9 (Apr. 2022), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Higher-Ed-Apr-2022.pdf.

[59] James, *supra*, at 22.

[60] Andrew R. Flores et al., *Gender Identity Disparities in Criminal Victimization: National Crime Victimization Survey, 2017–2018*, 111 AM. J. PUB. HEALTH 726 (2021),  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7958056/.

[61] Andrew R. Flores et al., *Hate crimes against LGBT people: National Crime Victimization Survey, 2017-2019*, 17 PLoS One e0279363 (Dec. 2022), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0279363.

gender, or gender identity as the bias motivation.[62]  Transgender respondents to the 2015 USTS reported similar rates of violence: 13% of respondents reported they had been physically attacked in the prior year, and 66% of them identified their gender identity or expression as the motivation for the attack.[63]

7.    *Discrimination Against Transgender People is Linked to Adverse Health and Well-Being Outcomes.*

Transgender people face adverse health consequences related to stigma and discrimination.  One explanation is that prejudice and stigma against transgender people leads to various stressors referred to as "minority stress,"[64] which causes a variety of negative effects on well-being and which ultimately becomes reflected in disparities in health outcomes and other well-being indicators.[65]

An analysis of TransPop data found that an alarming 42% of transgender people have reported a suicide attempt—a rate vastly higher than the approximately

---

[62] *Id.*

[63] USTS at 12-13.

[64] *See, e.g.*, Michael L. Hendricks & Rylan J. Testa, *A conceptual framework for clinical work with transgender and gender nonconforming clients: An adaptation of the minority stress model*, PROFESSIONAL PSYCHOLOGY RESEARCH AND PRACTICE 43(5), 460 (2012); Walter Bockting et al., *Adult development and quality of life of transgender and gender nonconforming people*, CURRENT OPINION IN ENDOCRINOLOGY, DIABETES AND OBESITY 23(2), 188-97 (2016).

[65] *See* Walter Bockting et al., *Stigma, Mental Health, and Resilience in an Online Sample of the US Transgender Population*, 103 AM. J. OF PUB. HEALTH 943, 943-51 (2013).

10% of cisgender adults who have reported the same.[66]  Moreover, 82% of 2015 USTS respondents reported having seriously considered suicide at some point in their lives, including 48% in the prior year alone.[67]  The high prevalence of suicide attempts is linked to discrimination:  Experiences of discrimination, mistreatment, or violence were associated with a higher risk of suicide thoughts and attempts amongst 2015 USTS respondents.[68]

Unsurprisingly, members of the military and veterans are not immune from these effects.  In an online survey of transgender veterans, participants reported "a variety of life challenges, including high rates of a history of homelessness (34%), employment and housing discrimination (34% and 12%, respectively), and military enacted stigma [i.e., investigation or punishment of transgender status by the military] due to gender identity (29%)."[69]  Studies have reflected that transgender

---

[66] *See* Jeremy D. Kidd et al., *Prevalence of substance use and mental health problems among transgender and cisgender U.S. adults: Results from a national probability sample*, 326 PSYCHIATRY RESEARCH 115339 at 1 (Aug. 2023), https://doi.org/10.1016/j.psychres.2023.115339.

[67] USTS at 112-14.

[68] Herman & O'Neill, *supra*.

[69] Keren Lehovet et al, *Factors Associated with Suicidality Among a National Sample of Transgender Vets, Suicide and Life-Threatening Behavior* 46(5) 507, 509-10, 518-19 (2016). "Enacted stigma" consists of "[e]xternal factors such as experiences of discrimination and rejection." *Id.* at 508.

veterans experience high rates of suicide.[70]   Research examining the health and wellbeing of transgender veterans, specifically, has shown that they are more likely to experience poor mental health outcomes than their cisgender counterparts.  For example, one representative study found that transgender veterans were significantly more likely to experience mental distress and depression than cisgender veterans.[71] Another study calculated a suicide rate of 82/100,000 for transgender veterans— substantially higher than the rate among all veterans (37/100,000) and the general population.[72]  Similarly, a study of veterans seeking care from the VA between 1995 and 2013 calculated that nearly 20% of transgender veterans had suicidal ideation or attempts, compared to less than 5% of cisgender veterans.[73]   Other studies have also found that transgender veterans also suffer from alcohol abuse, panic disorders, PTSD, and serious mental illness at rates significantly higher than cisgender

---

[70] John R. Blosnich et al., *Mortality among veterans with transgender related diagnoses in the Veterans Health Administration, FY2000-2009*, 1 LGBT HEALTH 269, 269-276 (2014); Blosnich, *Prevalence*, *supra*, at e27–e32; Lehovet, *supra*, at 508.

[71] Janelle Downing et al., *Transgender and Cisgender US Veterans Have Few Health Differences*, 37 HEALTH AFFAIRS 1160 (2018), https://www.healthaffairs.org/doi/10.1377/hlthaff.2018.0027.

[72] Blosnich et al., *Mortality, supra*, at 273.

[73] George R. Brown & Kenneth T. Jones, *Mental Health and Medical Health Disparities in 5135 Transgender Veterans Receiving Healthcare in the Veterans Health Administration: A Case-Control Study*, LGBT HEALTH 6 (2015).

veterans.[74]  Additional research has documented similar disparities for transgender people compared to cisgender people more broadly.[75]

### B.    Being Transgender Bears No Relationship To A Person's Ability To Contribute To Society.

The second traditional factor in the Court's heightened scrutiny analysis is whether the group in question is distinctively different from other groups in a way that "'frequently bears [a] relation to ability to perform or contribute to society.'" *City of Cleburne*, 473 U.S. at 440-441 (quoting *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality op.)). Unlike non-suspect classes like intelligence or physical disability, *see id.*, a number of courts, including the Fourth and Ninth Circuits, have held that "being transgender bears no such relation," *Grimm*, 972 F.3d at 612.  Indeed, in discussing transgender people's contributions to society, one district court made particular note of the contributions of transgender veterans:

> [T]he Individual Plaintiffs in this case contribute not only to society as a whole, but to the military specifically. For years, they have risked their lives serving in combat and non-combat roles, fighting terrorism around the world, and working to secure the safety and security of our forces overseas.

---

[74] *Id.*

[75] For a summary of this literature, see Public Comment from Williams Institute Scholars to Dep't of Health & Human Servs. Re: Grant Regulation; Proposed Rule, 88 Fed. Reg. 44750 (Sept. 6, 2023), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Comment-HHS-Grants-Sep-2023.pdf.

*Karnoski v. Trump*, No. C17-1297, 2018 U.S. Dist. LEXIS 63563, at *33 (W.D. Wash. Apr. 13, 2018), *aff'd in relevant part*, 926 F.3d 1180 (9th Cir. 2019); *see also Evancho*, 237 F. Supp. 3d at 288; *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 n.8 (N.D. Cal. 2015)*; F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018); *Flack*, 328 F. Supp. 3d at 953 n.29.  Like the court in *Adkins*, *amici* are "not aware of any data or argument suggesting that a transgender person, simply by virtue of transgender status, is any less productive than any other member of society." *Adkins*, 143 F. Supp. 3d at 139.

### C.    Transgender People Lack Political Power.

Comprising just 0.5% of the total adult population, transgender people lack the power to fully protect themselves in the political process.  *Grimm*, 972 F.3d at 613 (finding that "transgender people constitute a minority that has not yet been able to meaningfully vindicate their rights through the political process"); *see also Obergefell v. Wymyslo*, 962 F. Supp. 2d 968, 989-990 (S.D. Ohio 2013) (citing "small population size" as factor establishing powerlessness of LGBT community), *rev'd sub nom., DeBoer v. Snyder*, 772 F.3d 388 (6th Cir. 2014), *rev'd sub nom., Obergefell v. Hodges*, 135 S. Ct. 2584 (2015).

One significant indication that the transgender community lacks political power is the small number of openly transgender elected or appointed political officials.  As explained by the Fourth Circuit in *Grimm*, "[e]ven considering the low

percentage of the population that is transgender, transgender persons are underrepresented in every branch of government. It was not until 2010 that the first openly transgender judges took their place on their states' benches, . . . and we know of no openly transgender federal judges." *Grimm*, 972 F. 3d at 613. While representation has increased somewhat at the state level over the past few years, there are only 109 transgender, non-binary or gender diverse people who hold elected offices across the US, according to the 2024 Out for America Report from the LGBTQ+ Victory Institute.[76] Given the many thousands of federal, state, and local officeholders, these statistics demonstrate how few openly transgender individuals hold positions of political power.

Moreover, the recent proliferation of state-level laws and policies that target transgender people indicates a lack of political power. As described above, these laws and policies undermine non-discrimination protections, block access to healthcare, interfere with educational opportunities, and harm transgender people in other ways. *See Crowder v. Diaz*, No. 2:17-CV-1657-TLN-DMC, 2019 U.S. Dist. LEXIS 140306, at *36-37 (E.D. Cal. Aug. 16, 2019) ("Federal courts have had to block the federal government and state legislatures from enforcing laws that violated

---

[76] LGBTQ+ Victory Inst., Out for America 2024 at "Gender Identity" (June 2024), https://victoryinstitute.org/out-for-america-2024/. The 109 elected officials are 39 transgender women, 39 non-binary people, 15 gender non-conforming people, 8 transgender men, 3 two-spirit people, and five people with other non-cisgender gender identities.

the rights of transgender individuals.").  Other policies that are facially neutral towards transgender people, such as voter identification laws, may directly inhibit their ability to engage in the political process.[77]

### D.    Transgender People Are a Discrete Minority Group.

Courts and scholars agree that the transgender population is a "discrete" minority group that self-identifies according to a distinguishing characteristic:  a lack of congruence between their gender identity and their assigned sex at birth.  *Lyng*, 477 U.S. at 638; *see Adkins*, 143 F. Supp. 3d at 139 ("transgender status is a sufficiently discernible characteristic to define a discrete minority class"); *Karnoski*, 2018 U.S. Dist. LEXIS 63563, at *33 ("transgender people clearly have immutable and distinguishing characteristics that define them as a discrete group") (internal quotations omitted); *see also Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000) (gender identity is "so fundamental" to identity that individuals "should not be required to abandon" it), *overruled on other grounds*, *Thomas v. Gonzales*, 409 F.3d 1177 (9th Cir. 2005).  Indeed, as already discussed, the group's distinguishing characteristic "calls down discrimination when it is manifest." *Adkins*, 143 F. Supp. 3d at 139-140 (finding this factor relevant because transgender people "face backlash in everyday life when their status is discovered") (citing

---

[77]  Kathryn O'Neill, The Williams Inst., *The Potential Impact of Voter Identification Laws on Transgender Voters in the 2022 General Election* (Sept. 2022), https://williamsinstitute.law.ucla.edu/publications/trans-voter-id-impact/.

*Windsor*, 699 F.3d at 183).  This factor, too, thus weighs in favor of finding that transgender status is a suspect classification.

## CONCLUSION

In accordance with the foregoing, *amici* respectfully request that this Court apply heightened scrutiny to the VA's policy of refusing to provide medically indicated gender reassignment surgery in its benefits package.

August 8, 2024                        Respectfully submitted,

*/s/ James E. Tysse*
James E. Tysse
Zach ZhenHe Tan
AKIN GUMP STRAUSS HAUER & FELD LLP

William Tentindo
THE WILLIAMS INSTITUTE
UCLA SCHOOL OF LAW

*Attorneys for Amici Curiae Scholars*

31

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(d) and 32(a)(7)(B) because this brief contains 6,716 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word 365 in 14-point Times New Roman.

August 8, 2024                          _/s/ *James E. Tysse*_____
                                                        James E. Tysse

# APPENDIX: AMICI CURIAE SCHOLARS WHO STUDY THE TRANSGENDER POPULATION

*Institutions for identification purposes only*

Christopher S. Carpenter, Ph.D.
Professor
Department of Economics
Vanderbilt University

Andrew R. Flores, Ph.D.
Assistant Professor
American University
Affiliated Scholar
The Williams Institute
UCLA School of Law

Nanette Gartrell, M.D.
Visiting Distinguished Scholar
The Williams Institute
UCLA School of Law

Jody L. Herman, Ph.D.
Reid Rasmussen Senior Scholar of Public Policy
The Williams Institute
UCLA School of Law

Christy Mallory, J.D.
Legal Director
The Williams Institute
UCLA School of Law

Elana Redfield, J.D.
Federal Policy Director
The Williams Institute
UCLA School of Law

Brad Sears, J.D.
Founding Executive Director
The Williams Institute

UCLA School of Law

William Tentindo, J.D.
Staff Attorney
The Williams Institute
UCLA School of Law

**CERTIFICATE OF SERVICE**

I hereby certify that on August 8, 2024, I electronically filed the foregoing *amici curiae* brief using the court's CM/ECF system. All of the participants are registered CM/ECF users and will be served copies of the foregoing Brief via the CM/ECF system.


Dated: August 8, 2024      **AKIN GUMP STRAUSS HAUER & FELD LLP**

By   /s/ *James E. Tysse*

James E. Tysse