***CORRECTED* JOINT APPENDIX**
**VOLUME I (1-381)**

**No. 24-1714**

# In the United States Court of Appeals for the Federal Circuit

---

TRANSGENDER AMERICAN VETERANS
ASSOCIATION,
*Petitioner.*

v.

SECRETARY OF VETERANS AFFAIRS,
*Respondent.*

---

Appeal of denial of petition for rulemaking
by the Department of Veterans Affairs

---

Michael J. Wishnie
*Counsel of Record*
VETERANS LEGAL SERVICES
  CLINIC
JEROME N. FRANK LEGAL
  SERVICES ORGANIZATION
YALE LAW SCHOOL
P.O. Box 209090
New Haven, CT 06520-9090
(203) 432-4800
michael.wishnie@ylsclinics.org

*Counsel for Petitioner*

# TABLE OF CONTENTS

1.  Letter from the Honorable Denis McDonough, Secretary, U.S. Department of Veterans Affairs, to Counsel, Transgender American Veterans Association (February 22, 2024)......................................................Appx001

2.  Petition for Rulemaking to Promulgate Regulations Governing Provision of Sex Reassignment Surgery to Transgender Veterans, with attachments (May 9, 2016) ...................................................................................Appx003

3.  U.S. Department of Veterans Affairs, RIN 2900-AP69, "Removing Exclusion of Gender Alterations from the Medical Benefits Package" (Spring 2016) ...................................................................................Appx078

4.  U.S. Department of Veterans Affairs, "Economic Impact Analysis for RIN 2900-AP69, Removing Gender Alterations Restriction from the Medical Benefits Package" (July 29, 2016)....................................................Appx089

5.  Letter from Members of the House of Representatives to the Honorable Robert McDonald, Secretary, U.S. Department of Veterans Affairs, (September 12, 2016) .......................................................................Appx099

6.  Letter from Members of the Senate to the Honorable Robert McDonald, Secretary, U.S. Department of Veterans Affairs (September 12, 2016) ..................................................................................................Appx102

7.  Letters from the Honorable Robert McDonald, Secretary, U.S. Department of Veterans Affairs, to Members of Congress (November 10, 2016) ..................................................................................................Appx105

8.  The American College of Obstetrician and Gynecologists, "America's Frontline Physicians Urge Trump Administration to Protect Transgender Patients and Women's Reproductive Health" (May 28, 2019) ........Appx152

9.  Message from the Honorable Denis McDonough, Secretary, U.S. Department of Veterans Affairs, to Employees, U.S. Department of Veterans Affairs (February 23, 2021)................................................Appx155

10. Memo from the Honorable Denis McDonough, Secretary, U.S. Department of Veterans Affairs, "Services for LGBT Beneficiaries and Employees" (February 23, 2021) ........................................................................ Appx156

11. The Honorable Denis McDonough, Secretary, U.S. Department of Veterans Affairs, "Decision Memorandum: Removal of Gender Alterations Exclusion from VA Medical Benefits Package" (June 11, 2021) ..... Appx158

12. Remarks by the Honorable Denis McDonough, Secretary, U.S. Department of Veterans Affairs, Orlando Veterans Affairs Healthcare System's 11th Annual Pride Month Celebration (June 19, 2021) ............................ Appx160

13. Conclusion of EO 12866 Regulatory Review, RIN 2900-AR34, Unified Agenda, Office of Information and Regulatory Affairs (September 7, 2022) ..................................................................................................... Appx163

14. Entry RIN 2900-AR34, Unified Agenda, Office of Information and Regulatory Affairs (Fall 2022) ............................................................ Appx164

15. Remarks by the Honorable Denis McDonough, Secretary, U.S. Department of Veterans Affairs, to Disabled American Veterans (February 26, 2023) ...... ..................................................................................................... Appx165

16. Letter from Kimberly M. Mitchell, Director, Veteran Service Organization Liaison, U.S. Department of Veterans Affairs, to Transgender American Veterans Association (March 6, 2023) ............................................. Appx181

17. Letter to the Honorable Denis McDonough, Secretary, U.S. Department of Veterans Affairs (March 31, 2023) .................................................. Appx182

18. Entry RIN 2900-AR34, Unified Agenda, Office of Information and Regulatory Affairs (Spring 2023) ....................................................... Appx195

19. Letter from Members of the House of Representatives to the Honorable Denis McDonough, Secretary, U.S. Department of Veterans Affairs (March 31, 2023) ........................................................................................... Appx196

20. Letter from Kimberly M. Mitchell, Director, Veteran Service Organization Liaison, U.S. Department of Veterans Affairs, to Minority Veterans of America (May 2, 2023) ..................................................................... Appx202

21. Letters from Honorable Denis McDonough, Secretary, U.S. Department of Veterans Affairs, to Members of Congress (May 9, 2023) ............... Appx203

22. Entry RIN 2900-AR34, Unified Agenda, Office of Information and Regulatory Affairs (Fall 2023) ........................................................... Appx238

23. Letter from Michael Wishnie, Counsel, Transgender American Veterans Association, to Richard J. Hipolit, Acting General Counsel, U.S. Department of Veterans Affairs (November 20, 2023) ..................... Appx239

24. Letter from Richard J. Hipolit, Acting General Counsel, U.S. Department of Veterans Affairs, to Counsel, Transgender American Veterans Association (December 22, 2023) ..................................................... Appx244

25. Letter from Michael Wishnie, Counsel, Transgender American Veterans Association, to Richard J. Hipolit Acting General Counsel, U.S. Department of Veterans Affairs, with attachments (January 16, 2024) ................................................................................................... Appx254

26. VHA Directive 1341(3) (May 23, 2018) .......................................... Appx263

27. VHA Directive 2013-003 (January 2017 reissue) ........................... Appx289

28. Anthony N. Almazan & Alex S. Keuroghlian, "Association Between Gender-Affirming Surgeries and Mental Health Outcomes," 156 J. Am. Med. Ass'n 611 (2021) ..................................................................... Appx302

29. John R. Blosnich et al., "Prevalence of Gender Identity Disorder and Suicide Risk Among Transgender Veterans Utilizing Veterans Health Administration Care," 103 Am. J. Pub. Health e27 (Oct. 2013) ...... Appx310

30. Petition for Review, Fulcher v. Sec'y of Veterans Affs. (No. 2017-1460) (Fed. Cir. June 21, 2017) ................................................................. Appx316

31. Dismissal Order, Fulcher v. Sec'y of Veterans Affs. (No. 2017-1460) (Fed. Cir. Aug. 1, 2018) ................................................................. Appx321

32. Leo Shane III, "VA to Offer Gender Surgery to Transgender Veterans for the First Time," Mil. Times (June 19, 2021) .................................... Appx323

33. "External FAQs: Removing 'Gender Alterations' Exclusion from the Medical Benefits Package," U.S. Department of Veterans Affairs (June 18, 2021 ...............................................................................Appx327

34. Leo Shane III, "After Two Years, Still No Timeline for Transgender Surgeries at VA," Mil. Times (June 20, 2023)................................Appx329

35. "Town Hall with VA Secretary Denis McDonough," VA News (Nov. 8, 2023) ..............................................................................Appx334

36. Am. Med. Ass' H.D., Resolution 122 (A-08) ..................................Appx343

37. William Byne et al., "Report of the APA Task Force on Treatment of Gender Identity Disorder," 169 Am. J. Psychiatry 1 (2012) ............Appx347

38. Wylie C. Hembree et al., "Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline," 102 J. Clinical Endocrinology & Metabolism 3869 (2017) ..............................................................................Appx382

39. Am. Psychiatric Ass'n, "Gender Dysphoria," in Diagnostic and Statistical Manual of Mental Disorders, Text Revisions 164.0 (5th ed. 2022) . Appx417

40. Declaration of Natalie Rose Kastner. .................................................Appx429

41. Declaration of Ray Gibson. .............................................................Appx433

42. Declaration of Rebekka Eshler. .......................................................Appx437

43. Memorandum from the Honorable Denis McDonough, Secretary, U.S. Department of Veterans Affairs, to Under Secretary for Health, U.S. Department of Veterans Affairs, "Analysis of Amendment to 38 C.F.R. § 17.38(c)(4) and PACT Act Eligibility" (February 22, 2024)............Appx442

44. DoD Instruction 1300.28 (April 30, 2021) .......................................Appx444

45. Terri Moon Cronk, "DOD Revises Transgender Policies to Align With White House," U.S. Department of Defense (Mar. 31, 2021)..........Appx466

46. Steve Beynon, "Army to Provide Gender Transition Care, Surgeries for Transgender Soldiers," Military.com (June 28, 2021)......................Appx470

47. Cong. Research Serv., "TRICARE Coverage of Gender-Affirming Care," FY2024 NDAA (Jan. 4, 2024) ..........................................................Appx484

48. Mariel Padilla, "Trans Veterans Were Promised Access to Gender-Affirming Surgeries—But It Never Happened," The 19th (January 25, 2024). ........................................................................................Appx487

49. Richard Brookshire, "Black Veterans Project Supports Gender-Affirming Care," Black Veterans Project (July 22, 2024) .................................Appx492

50. "Remarks by President Biden at a Veterans Day Wreath Laying Ceremony | Arlington, VA," White House (Nov. 11, 2023, 12:00 PM EST) ......Appx505

51. U.S. Department of Veterans Affairs, Office of General Counsel, "Regulatory Impact Analysis for RIN 2900-AR57(F), Reproductive Health Services" at 4-5 (Feb. 13, 2024)........................................................Appx512

52. "2023 Employer Health Benefits Survey: Section 13: Employer Practices, Telehealth, Provider Networks, Coverage Limits and Coverage for Abortion – Coverage for Gender-Affirming Surgeries," KFF (Oct. 18, 2023). ..........................................................................................Appx519

53. Press Release, "PACT Act Health Care Expanded Eligibility," U.S. Department of Veterans Affairs (Mar. 6, 2024) ................................Appx555

54. VHA Directive 1091 (February 18, 2020) ........................................Appx559

55. U.S. Department of Veterans Affairs, Office of General Counsel, "Regulatory Impact Analysis for RIN 2900-AR57(IF), Reproductive Health Services," (Sept. 1, 2022)..................................................................Appx564

56. Second Amended Index of Record of Department of Veterans Affairs', February 22, 2024 Denial of Petitioner's Rulemaking Petition ......Appx570



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

February 22, 2024

Ilona Turner
Sasha Buchert
Transgender Law Center
1629 Telegraph Avenue, Suite 400
Oakland, CA 94612

Dear Counsellor,

It is our mission at VA to provide transgender Veterans – and all Veterans – with the world-class care and benefits they deserve. Gender Affirming Care should be available to any Veteran who needs it. Under its medical benefits package, VA presently provides Gender Affirming Care to Veterans – including hormone therapy, gender affirming therapy, pre- and post-operative care, voice and communication coaching, prosthetic support, and psychosocial support groups. VA also provides pre-operative evaluations for surgical procedures and surgical revisions associated with post-surgery complications.

The petition for rulemaking to repeal or amend 38 C.F.R. § 17.38(c)(4) filed by Dee Fulcher, Giuliano Silva, and the Transgender American Veterans Association (TAVA) requests that VA amend the medical benefits package to provide gender affirming surgery, in addition to the Gender Affirming Care VA presently provides. VA has moved methodically in its consideration of this important potential change in coverage because it must be implemented in a manner that has been thoroughly considered and ensures that the services made available to Veterans meet VA's rigorous standards for consistent and quality health care nationwide. VA remains committed to providing care to transgender Veterans and will continue to take steps to consider any potential changes to the provision of medical care to that important population.

Among other considerations and analyses, in the months to come VA will produce estimates and collect data concerning the population of Veterans who will become newly eligible for hospital care (including mental health services and counseling), medical services, and nursing home care for any illness under Section 103 of the Sergeant First Class Heath Robinson Honoring our Promise to Address Comprehensive Toxics Act of 2022 (PACT Act), one of the most significant laws ever to help millions of veterans who were exposed to toxins and burn pits during their military service. These estimates and data will inform further analyses, including whether the Notice of Proposed Rulemaking or the Regulatory Impact Analysis VA previously produced must be updated and submitted to the Office of Management and Budget.

Because VA is not ready at this time to initiate a rulemaking addressing the specific regulatory changes proposed in the petition, VA hereby denies the petition for rulemaking to repeal or amend 38 C.F.R. § 17.38(c)(4). While VA will continue to

Page 2.

Ilona Turner

consider how and when it might ultimately provide gender affirming surgery, this letter is the VA's final action on the petition for rulemaking.

Thank you for your attention to this matter and your advocacy on behalf of our Nation's transgender Veterans.

Sincerely yours,

Denis McDonough

PETITION FOR RULEMAKING TO

PROMULGATE REGULATIONS GOVERNING PROVISION OF SEX REASSIGNMENT

SURGERY TO TRANSGENDER VETERANS


SUBMITTED TO

THE UNITED STATES DEPARTMENT OF VETERANS AFFAIRS

MAY 9, 2016


Dee Fulcher, Giuliano Silva, and Transgender American Veterans Association

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................... 1

II.   LEGAL AUTHORITY .............................................................................. 4

III.  PETITIONERS ......................................................................................... 4

IV.   BACKGROUND:  THE CURRENT REGULATORY FRAMEWORK, GENDER
      DYSPHORIA, AND SEX REASSIGNMENT SURGERY ............................... 7

      A.    The VA's Provision of Medical Care ....................................... 7

      B.    Gender Dysphoria and Sex Reassignment Surgery ................. 8

      C.    The VA's Current Provision of Surgeries Constituting Sex Reassignment Surgery
            To Treat Other Conditions ....................................................... 13

      D.    The Critical Need for Sex Reassignment Surgery in the Transgender Veteran
            Population ............................................................................... 16

      E.    Developments in Health Care Coverage for Transgender Individuals ................. 17

V.    THE VA SHOULD AMEND THE REGULATION TO COVER SEX
      REASSIGNMENT SURGERY .................................................................. 20

VI.   THE EXISTING REGULATION IS ARBITRARY AND CAPRICIOUS ..................... 23

VII.  THE EXISTING REGULATION VIOLATES THE EQUAL PROTECTION
      COMPONENT OF THE FIFTH AMENDMENT .............................................. 28

      A.    Discrimination Against Transgender People Receives Heightened Scrutiny ........ 28

            1.    Discrimination Against Transgender People Is Sex Discrimination ......... 28

            2.    Discrimination Based on Transgender Status Also Receives Heightened
                  Scrutiny ........................................................................... 31

      B.    The Regulation Cannot Survive Any Level of Review ......................... 33

VIII. CONCLUSION ...................................................................................... 35

Dee Fulcher, Giuliano Silva, and the Transgender American Veterans Association ("TAVA") (together, "Petitioners") hereby petition the Secretary of Veterans Affairs (the "Secretary") to amend or repeal the rules and regulations, including 38 C.F.R. § 17.38(c)(4) and any implementing directives, that exclude medically necessary sex reassignment surgery for transgender veterans from the medical benefits package provided to veterans under the health care system of the Department of Veterans Affairs ("Department" or "VA"), and to promulgate regulations expressly including medically necessary sex reassignment surgery for transgender veterans in that medical benefits package.

## I.      INTRODUCTION

When Congress enacted the Veterans Health Care Eligibility Reform Act of 1996 (Pub. L. 104-262), establishing the current framework for veteran eligibility for medical benefits under the VA health care system, the United States sought to ensure that the medical needs of all American veterans would be met through the provision of quality health care. To implement that directive, the Department has promulgated a series of regulations establishing robust coverage for the panoply of medical needs that veterans of our armed services might confront. But in contravention of that directive, the Department also has promulgated a discriminatory regulation that singles out transgender veterans and bars the provision of medically necessary sex reassignment surgery to treat gender dysphoria. *See* 38 C.F.R. § 17.38(c)(4) (prohibiting coverage for "gender alterations") (the "Regulation").

That bar has remained in place notwithstanding the existence of a broad medical consensus about the need for sex reassignment surgery for many transgender people, and notwithstanding the United States' own evolving policies on the ability of transgender people to serve openly in the military. The Department's exclusion for sex reassignment surgery was not supported by medical evidence when it was implemented in 1999, and it is even more

- 1 -

indefensible today. The Department should eliminate the categorical exclusion of sex reassignment surgery as a treatment for gender dysphoria, and expressly include sex reassignment surgery in the medical benefits package available to veterans, either as an exercise of the Secretary's discretion or in recognition of the fact that the exclusion is both arbitrary and capricious and unconstitutional.

Providing sex reassignment surgery to transgender veterans for whom it is medically indicated is required by the Department's stated policy of providing medically necessary care to all veterans. That sex reassignment surgery is a medically necessary treatment for gender dysphoria is not in dispute within the medical community; all major medical associations recognize this treatment as such. Providing sex reassignment surgery to transgender veterans is essential to relieving the serious distress caused by gender dysphoria. Our Nation owes transgender veterans this treatment in the same way it owes all other veterans medically necessary care for their serious medical conditions. Finally, although the Department has never justified the exclusion for sex reassignment surgery on cost grounds, it bears emphasis here that any marginal increase in the Department's total expenditures on medical care—which should be negligible—should be offset in whole or in part by the reduced costs of long-term health care that would otherwise be necessary for some transgender veterans denied surgical treatment.

Including sex reassignment surgery in the medical benefits package is legally required, and the refusal to do so would constitute arbitrary and capricious agency action, subject to reversal by the federal courts. The established medical consensus plainly requires the inclusion of sex reassignment surgery in the medical benefits package, on equal footing with medical treatments that address other similarly serious and treatable medical conditions. Indeed, the Department recognizes the seriousness of gender dysphoria as a medical condition: It offers

- 2 -

other treatments that may be necessary (but not sufficient) to ameliorate that condition, such as

hormone therapy, and it offers ancillary treatments supporting sex reassignment surgery, such as

pre- and post-surgical care, for the few who can pay for the surgery on their own. Nor does the

Department appear to have any rational objection to the forms of surgery involved in sex

reassignment surgery: The Department's regulations and directives offer surgeries identical or

substantially similar to those constituting sex reassignment surgery to veterans with other

medical conditions. And, finally, the VA excluded sex reassignment surgery without examining

any relevant data and without giving any public explanation for the exclusion. All of this lays

bare the arbitrariness of the exclusion at issue here.

The Fifth Amendment to the Constitution likewise bars the exclusion. To offer certain

medically necessary surgeries to veterans for some conditions, yet to deny the same or

substantially similar surgeries to transgender veterans to treat gender dysphoria, constitutes

unconstitutional discrimination on the basis of sex and transgender status, and the regulations

implementing this discrimination fail to survive any level of scrutiny that may be applied. These

regulations—lacking any connection to medical consensus or any other rational justification—

are also unconstitutional under a long line of Supreme Court cases forbidding discriminatory

treatment that appears to be based on "'a bare … desire to harm a politically unpopular

group'[.]" *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013) (quoting *Department of

Agriculture v. Moreno*, 413 U.S. 528, 534-35 (1973)).

The amendments this petition seeks are not only good policy and legally required—they

also are urgent. The suicide rate for individuals with untreated gender dysphoria is significantly

higher than that of the general population, as is the prevalence of depression, self-harm, and drug

and alcohol addiction. Appropriate treatment is necessary to prevent such suffering and long-

- 3 -

**AR6**
Appx007

term harm.  Petitioners respectfully request that the Secretary attend to the urgency of the need of some transgender veterans for sex reassignment surgery in his consideration of this petition.

## II.    LEGAL AUTHORITY

Congress granted the Secretary of Veterans Affairs the "authority to prescribe all rules and regulations which are necessary or appropriate to carry out the laws administered by the Department," which include laws governing veterans' benefits.  38 U.S.C. § 501(a).  The Secretary thus has the authority to amend or repeal the rules and regulations that are the focus of this petition, including 38 C.F.R. § 17.38(c)(4), and to issue appropriate rules and regulations in their place.

## III.    PETITIONERS

Petitioners each have the statutory right to petition the Department for rulemaking pursuant to 5 U.S.C. § 553(e), which requires "[e]ach agency [to] give an interested person the right to petition for the issuance, amendment, or repeal of a rule."  Petitioners also satisfy the standing requirements of Article III of the United States Constitution.

TAVA is a 501(c)(3) organization dedicated to ensuring that transgender veterans receive appropriate and necessary medical care.  TAVA was founded in 2003 to advocate on behalf of transgender veterans within the VA health care system.  Its mission is to work with the VA, Congress, veterans, active-duty military personnel, and LGBT groups to influence the VA and military policy, regulations, and procedures regarding the provision of medical and psychological care to veterans with gender dysphoria.  While TAVA primarily focuses on ensuring the fair and equal treatment of transgender individuals, it is committed to improving the health care of all American veterans.

TAVA is a membership organization, and many of its members are transgender veterans currently enrolled in the VA health care system.  Affidavit of Evan Young ("Young Aff.") ¶ 11.

- 4 -

Some of those individuals have been diagnosed with gender dysphoria by the VA and have been

provided some medical care related to their diagnosis. *Id.* However, members who have sought

sex reassignment surgery through the VA, or coverage of such surgery by the VA, have been

denied such surgery or coverage because of the existing regulatory exclusion of "gender

alterations" from covered benefits. *Id.* Many of those veterans rely on the VA for provision of

their mental and physical health care, and they satisfy all the medical prerequisites for sex

reassignment surgery: They have been diagnosed with gender dysphoria (often by VA

clinicians), they have spent multiple years living in a gender role consistent with their gender

identity and are currently undergoing hormone therapy to assist in their transition, and they have

been prescribed sex reassignment surgery by qualified mental health providers as medically

necessary treatment for their condition. *Id.* Nevertheless, these veterans have been unable to

obtain medically necessary sex reassignment surgery due to the VA's categorical bar on "gender

alterations." *Id.* These veterans are currently, concretely, and directly harmed by the VA's bar

on sex reassignment surgery; granting the petition and repealing or amending the Regulation as

requested herein would provide them with redress.

TAVA's purpose in submitting this petition is to advocate on behalf of its members who

have been denied medically necessary treatment as a result of the VA's regulations. Young Aff.

¶ 12. This petition directly advances one of TAVA's central organizational goals—to achieve

reform of the VA's policies regarding coverage of sex reassignment surgery and other medical

procedures related to gender dysphoria. *Id.* If the VA were to amend its regulations to include

coverage of sex reassignment surgery, such an amendment would significantly improve the

physical and mental health of TAVA members and of other transgender veterans with gender

dysphoria. *Id.*

- 5 -

**AR8**
Appx009

Although the relief requested by TAVA in this petition does not require the participation of TAVA's individual members, *see, e.g.*, *Biotechnology Industry Organization v. District of Columbia*, 496 F.3d 1362, 1369 (Fed. Cir. 2007), TAVA is joined in this petition by Dee Fulcher and Giuliano Silva, individual transgender veterans whose interests are directly affected by the VA's exclusion of sex reassignment surgery.

Dee Fulcher is a veteran of the U.S. Marine Corps and a member of TAVA. Affidavit of Dee Fulcher ("Fulcher Aff.") ¶ 2. Dee is a transgender woman. *Id.* She was first diagnosed with gender dysphoria by a physician outside of the VA health care system. *Id.* ¶ 6. Ms. Fulcher's diagnosis of gender dysphoria has been confirmed by a clinical mental health social worker and a board certified physician in internal medicine, both at the Southeast Louisiana Veterans Healthcare System (part of the VA health care network). *Id.* ¶¶ 6-7. Ms. Fulcher's VA clinicians have both recommended that she receive sex reassignment surgery as the next step in her treatment for gender dysphoria. *Id.* If that were covered by the VA, Ms. Fulcher would pursue such surgery, including penectomy, vaginoplasty, facial feminization, breast augmentation, and electrolysis. *Id.* ¶ 8. Yet due to the VA's exclusion of sex reassignment surgery, Ms. Fulcher cannot receive this medically necessary treatment that her physician and mental health provider have prescribed for her.

Giuliano Silva is a veteran of the U.S. Army and a member of TAVA. Affidavit of Giuliano Silva ("Silva Aff.") ¶ 2. Mr. Silva is a transgender man and has been diagnosed with gender dysphoria by medical providers at the Miami VA Healthcare System. *Id.* ¶ 10. While Mr. Silva would seek sex reassignment surgery (in particular, a mastectomy) if that surgery were covered, Mr. Silva also has suffered, and continues to suffer, from additional effects of the VA's exclusion of sex reassignment surgery on the medical practices of VA healthcare providers.

- 6 -

**AR9**
Appx010

*Id.* ¶ 15. The VA's exclusion of sex reassignment surgery has had the effect of preventing Mr.

Silva from receiving a mastectomy, which a VA physician has recommended to Mr. Silva to

treat his severe back pain and related problems. *Id.* ¶ 11. The surgeon to whom this physician

referred Mr. Silva appears to have determined that Mr. Silva is seeking the mastectomy primarily

as transition-related surgery, rather than as a surgery to address his severe back problems, and

has consequently determined that the surgery is not covered. *Id.* In Mr. Silva's experience, the

VA's exclusion of sex reassignment surgery has left VA doctors skeptical of the medical needs

of transgender veterans and outwardly hostile to treating them. *Id.* ¶ 12.

## IV.     BACKGROUND: THE CURRENT REGULATORY FRAMEWORK, GENDER DYSPHORIA, AND SEX REASSIGNMENT SURGERY

### A.     The VA's Provision of Medical Care

Under 38 U.S.C. § 1710, the Secretary "shall furnish" "medical services" that the

Secretary determines to be "needed" by several classes of veterans, including those with a

service-connected disability, former prisoners of war, veterans of World War I, and all veterans

who are unable "to defray the expenses of necessary care," which include all veterans who

qualify for Medicaid, receive a qualifying pension, or meet specified income thresholds.

38 U.S.C. §§ 1710(a)(1)-(2), 1722 (a)(1)-(3). In addition, under § 1710, the Secretary is

authorized to provide "needed" "medical services" to all veterans "to the extent resources and

facilities are available." 38 U.S.C. § 1710(a)(3). Thus, all veterans are eligible to receive

medically necessary health care, as determined by the Secretary, as long as the VA has the

resources to provide or pay for such care. As President Clinton explained in signing the current

enabling statute into law, it "authorizes the Department of Veterans Affairs to furnish

comprehensive medical services to all veterans." Presidential Statement on Signing Veterans

Legislation, 32 Weekly Comp. Pres. Doc. 2018 (Oct. 9, 1996).

Veterans who enroll in the VA health care system (as well as certain other veterans

meeting other criteria[1]) are entitled to a "medical benefits package" as defined by regulation (the

"Medical Benefits Package"). 38 C.F.R. § 17.36. The regulation sets forth a broad and

overarching directive for the provision of veterans' health care: Veterans are meant to receive a

given medical treatment "if it is determined by appropriate healthcare professionals that the care

is needed to promote, preserve, or restore the health of the individual and is in accord with

generally accepted standards of medical practice." 38 C.F.R. § 17.38(b). Care is deemed "to

promote health" if "the care will enhance the quality of life or daily functional level of the

veteran." *Id.* at 17.38(b)(1). To that end, the regulation broadly covers inpatient and outpatient

medical, surgical, and mental health care. *See* 38 C.F.R. § 17.38(a).

## B.    Gender Dysphoria and Sex Reassignment Surgery

At issue in this petition is the VA's coverage of medically necessary health care for

veterans with gender dysphoria. By way of background, "gender identity" is an established

medical concept, referring to one's intrinsic understanding of oneself as being a particular

gender. Declaration of Dr. Randi C. Ettner ("Ettner Decl.") ¶ 11. Gender identity is an innate

aspect of personality that is firmly established, generally by the age of four, although individuals

vary in the age at which they come to understand and express that identity. *Id.* Typically, people

who are designated female at birth based on the appearance of their genitalia identify as girls or

women, and people who are designated male at birth identify as boys or men. *Id.* ¶ 12. For

transgender individuals, however, the person's gender identity differs from the sex assigned to

---

[1]    Under 38 C.F.R. § 17.37, even veterans who are not enrolled in the VA health care system may receive the care in the Medical Benefits Package, or some subset thereof, if they fall within one of certain specified classes. For example, veterans with service-connected disabilities that meet specified severity criteria are entitled to all the care in the Medical Benefits Package (§ 17.37(a)), and a veteran with a compelling medical need to complete a course of VA treatment started when the veteran was enrolled in the VA health care system may continue to receive that treatment regardless of the veteran's continuing enrollment status (§ 17.37(d)).

- 8 -

**AR11**
Appx012

that person at birth.[2]  The medical diagnosis for that feeling of incongruence is gender dysphoria, which can cause severe distress if untreated.  *Id.* ¶ 13.

The major medical associations and diagnostic manuals uniformly recognize gender dysphoria as a serious medical condition.  For example, the *Diagnostic and Statistical Manual of Mental Disorders*, Fifth Edition—on which the VA regulations governing ratings for disability relating to mental disorder rely, *see* 38 C.F.R. § 4.130—dedicates an entire chapter to the diagnosis of gender dysphoria.[3]  Other manuals too, such as the *International Classification of Diseases*, provide for a diagnosis of gender dysphoria (albeit using different terminology).[4]  Major medical organizations—including the American Psychiatric Association, the American Medical Association, the Endocrine Society, and the American Psychological Association—likewise recognize gender dysphoria, and provide for its diagnosis and full treatment, including through sex reassignment surgery where necessary.  Declaration of Dr. Marci L. Bowers ("Bowers Decl.") ¶ 36; Ettner Decl. ¶¶ 11, 13-14, 18, 24, 35.

In May 2012, the American Psychiatric Association ("APA") issued an official Position Statement on Access to Care for Transgender and Gender Variant Individuals, which: (1) recognizes that appropriately evaluated transgender and gender variant individuals can benefit greatly from medical and surgical gender transition treatments; (2) advocates for removal

---

[2]      A transgender man is a person who was assigned the sex of female at birth but whose gender identity is male.  A transgender woman is a person who was assigned the sex of male at birth but whose gender identity is female.

[3]      The *Diagnostic and Statistical Manual of Mental Disorders*, Fifth Edition ("DSM" or "DSM-5"), is used throughout the world as the authoritative guide to the diagnosis of mental disorders and includes gender dysphoria.  The DSM "provides a common language for clinicians to communicate about their patients and establishes consistent and reliable diagnoses that can be used in the research of mental disorders."  American Psychiatric Association, DSM Development, *available at* http://www.dsm5.org/about/Pages/faq.aspx.

[4]      World Health Organization, "Gender Identity Disorders," International Statistical Classification of Diseases and Related Health Problems, 10th Revision (2016), at F64, *available at* http://apps.who.int/classifications/icd10/browse/2016/en#/F64.0.

- 9 -

AR12
Appx013

of barriers to care and supports both public and private health insurance coverage for gender

transition treatment; and (3) opposes categorical exclusions of coverage for such medically

necessary treatment when prescribed by a physician.[5]

The protocol for diagnosing and treating gender dysphoria is well established and

generally accepted by the medical community. The Standards of Care for the Health of

Transsexual, Transgender, and Gender Nonconforming People promulgated by the World

Professional Association for Transgender Health ("WPATH Standards" or "Standards of Care")

set forth the accepted protocol for the diagnosis and treatment of gender dysphoria, and are

recognized as authoritative standards of care by the American Psychiatric Association, the

Endocrine Society, and the American Psychological Association. Ettner Decl. ¶ 18.

The Standards of Care identify the following treatment protocols for treating individuals

with gender dysphoria:

- Changes in gender expression and role (which may involve living part-time or

  full-time in another gender role, consistent with one's gender identity);

- Psychotherapy (individual, couple, family, or group) for purposes such as

  exploring gender identity, role, and expression; addressing the negative

  impact of gender dysphoria and stigma on mental health; alleviating

  internalized transphobia; enhancing social and peer support; improving body

  image; or promoting resilience;

- Hormone therapy to feminize or masculinize the body; and

---

[5]     American Psychiatric Association, Position Statement on Access to Care for Transgender and Gender
Variant Individuals (2012), *available at* http://www.psychiatry.org/File%20Library/Learn/Archives/Position-2012-
Transgender-Gender-Variant-Access-Care.pdf.

- 10 -

- Surgery to change primary and/or secondary sex characteristics (*e.g.*,

  breasts/chest, external and/or internal genitalia, facial features, body

  contouring).

Sex reassignment surgery is a well-established, effective, and often critical treatment for

gender dysphoria. Bowers Decl. ¶¶ 31-38; Ettner Decl. ¶¶ 15, 19-34. While not all individuals

with gender dysphoria require sex reassignment surgery, the WPATH Standards recognize that

hormone therapy and psychotherapy may be inadequate to treat severe cases of gender

dysphoria, and in those cases, failure fully to treat gender dysphoria through sex reassignment

surgery may cause serious mental and physical health issues for the patient. Bowers Decl. ¶¶ 34,

37; Ettner Decl. ¶¶ 19-20. Without treatment, individuals with severe gender dysphoria

experience anxiety, depression, suicidality, and other attendant mental health issues. Bowers

Decl. ¶ 37; Ettner Decl. ¶ 15. Many such individuals carry a burden of shame and low self-

esteem, attributable to a feeling of being inherently "defective," and as a result become socially

isolated. Ettner Decl. ¶ 15. This isolation in turn leads to the stigmatization of such individuals,

which over time proves ravaging to healthy personality development and interpersonal

relationships. *Id.* As a result, without treatment, many such individuals are unable to function

effectively in occupational, social, or other important areas of daily living. *Id.* A recent survey

shows a 41% rate of suicide attempts among transgender people, far above the baseline rates for

North America. *Id.* As with the diagnosis of gender dysphoria, there is a consensus within the

medical community that sex reassignment surgery may be the only adequate treatment for some

cases of gender dysphoria. *Id.* ¶¶ 21, 23; Bowers Decl. ¶ 34.

Courts too have recognized that gender dysphoria is a serious medical condition and that

sex reassignment surgery may be medically necessary to treat certain individuals with gender

- 11 -

**AR14**
Appx015

dysphoria.  In *Soneeya v. Spencer*, for example, the court held that a prisoner's gender dysphoria constituted a "serious medical need" that the Massachusetts Department of Correction ("MDOC") was required under the Eighth Amendment to address adequately.[6]  Moreover, although the MDOC had provided the prisoner with psychotherapy and hormone treatment, offering such treatment alone was inadequate, as the MDOC also was required to "consider whether sex reassignment surgery … [was] medically indicated."[7]  Likewise, in *Fields v. Smith*, the court found that gender dysphoria was a "serious medical need" within the meaning of the Eighth Amendment, and held that a statutory prohibition on hormone therapy and sex reassignment surgery for inmates was unconstitutional on its face because it deprived inmates of access to "medically necessary" treatment.[8]

In a recent Tax Court case, *O'Donnabhain v. Commissioner*, the court conducted a trial and an in-depth review of the medical evidence regarding treatment of gender dysphoria.[9]  The court noted the broad acceptance of the WPATH Standards throughout the psychiatric profession, as evidenced by multiple psychiatric and medical reference texts and court opinions, all concluding that sex reassignment surgery is medically necessary to ensure the health of some patients suffering from gender dysphoria.[10]  Other courts to consider the necessity of surgery to treat gender dysphoria have reached similar conclusions.[11]

---

[6]     851 F. Supp. 2d 228, 231-232, 252 (D. Mass. 2012).

[7]     *Id.* at 252.

[8]     712 F. Supp. 2d 830, 844 (E.D. Wis. 2010).

[9]     *See O'Donnabhain v. Commissioner*, 134 T.C. 34, 65-70 (2010).

[10]    *Id.*

[11]    *See, e.g., De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) (noting that sex reassignment surgery is an "accepted, effective, medically indicated treatment for GID").

- 12 -

Sex reassignment surgery often may be the only adequate treatment for gender dysphoria. In certain cases, sex reassignment surgery—which can include, depending upon the circumstances, removal or construction of the breasts, penectomy, vaginoplasty, phalloplasty, and penile and testicular implants—is medically necessary to treat the symptoms of gender dysphoria, and indeed may be the only medically adequate treatment.[12]

The VA's categorical ban on sex reassignment surgery in all instances, no matter how necessary it may be for an individual, flies in the face of the medical consensus on this subject. This categorical exclusion is all the more irrational because the VA recognizes that gender dysphoria is a serious medical condition that requires treatment. For example, the VA will provide, where medically necessary, hormone treatment to address gender dysphoria. The VA also will provide pre- and post-operative care for veterans who have undergone sex reassignment surgery outside the VA system. Thus, the VA appears to have no *medical* objection to sex reassignment surgery. Yet the VA irrationally continues to exclude coverage for sex reassignment surgery—no matter how medically necessary.

C.    **The VA's Current Provision of Surgeries Constituting Sex Reassignment Surgery To Treat Other Conditions**

The VA already provides each of the surgeries that constitute sex reassignment surgery. The VA provides these surgeries for a variety of reasons, including to address certain intersex conditions, to repair traumatic injuries, and to treat cancer, but the VA denies those same procedures to transgender veterans for the treatment of gender dysphoria. For example, VA policy covers surgery for intersex veterans "in need of surgery to correct inborn conditions related to reproductive or sexual anatomy." VHA Directive 2013-003 (Feb. 8, 2013) ("VHA

---

[12]    *See id.* (noting, in the Eighth Amendment context, that providing some treatment consistent with the WPATH Standards does not mean that constitutionally adequate treatment has been provided); *see also Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1188 (N.D. Cal. 2015) (granting preliminary injunction where plaintiff was likely to succeed in establishing that surgery was "the only way to treat her persistent symptoms of gender dysphoria").

- 13 -

Directive 2013-003" or "Directive 2013-003"), at 2.  Under 38 C.F.R. § 17.38(a)(1)(x), the VA

offers veterans "[r]econstructive (plastic) surgery required as a result of disease or trauma,"

which under VHA Directive 1091 (Feb. 21, 2014) ("Directive 1091") includes "those surgical

procedures performed for the revision of external bodily structures which deviate from normal

either from congenital or acquired causes."

Under 38 C.F.R. § 17.38(a)(1)(x) and Directive 1091, the VA offers breast reconstruction

to cisgender[13] women who have had a mastectomy, and penile and testicular implants to

cisgender males whose penises or testes have been damaged.[14]  Hysterectomy and mastectomy

are offered to cisgender females for, among other reasons, reduction of cancer risk.[15]  The VA

also offers cisgender males orchiectomies, scrotectomies, and penectomies for various medical

reasons.[16]  Moreover, under the clear language of Directive 2013-003, the VA offers various

procedures, including vaginoplasty and phalloplasty, for certain intersex individuals born with

ambiguous genitalia.

---

[13]    "Cisgender" is a term used to describe a person whose self-identity conforms to the sex he or she was assigned at birth—*i.e.*, someone who is not transgender. *See Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1120 n.9 (N.D. Cal. 2015).

[14]    *See* Leong *et al.*, *Effective Breast Reconstruction in Female Veterans*, 198(5) Am. J. Surg. 658-63 (Nov. 2009) (addressing outcomes of breast reconstruction performed at VA hospitals); *Shimansky v. West*, 17 Vet. App. 90, 90 (1999) (patient received a penile prosthesis at the Wilmington, Delaware VA Medical Center); *Brewer v. Nicholson*, 21 Vet. App. 420, 420 (2006) (patient received a penile prosthesis at the Jackson, Mississippi VA Medical Center); Board of Veteran's Appeals, Docket No. 96-07-121 (Sept. 26, 1997) (stating patient received a "testicular prosthetic implantation" at a VA hospital).

[15]    *See* Gardella *et al.*, *Prevalence of Hysterectomy and Associated Factors in Women Veterans Affairs Patients*, 50(3) J. Reprod. Med. 166, 166-72 (Mar. 2005) (estimating the prevalence of hysterectomies provided by the VA Puget Sound Health Care System); Hynes *et al.*, *Breast Cancer Surgery Trends and Outcomes:  Results from a National Department of Veterans Affairs Study*, 198(5) J. of the Am. College of Surgeons 707-16 (Mar. 2004) (examining trends in breast cancer surgery performed at VA hospitals).

[16]    *See Norvell v. Peake*, 22 Vet. App. 194, 195 (2008) (noting that the patient underwent a bilateral orchiectomy at Lexington, Kentucky, VA Medical Center), *aff'd sub nom. Norvell v. Shinseki*, 333 F. App'x 571 (Fed. Cir. 2009); Corman *et al.*, *Fournier's Gangrene in a Modern Surgical Setting:  Improved Survival with Aggressive Management*, BJU International, 84: 85-88 (July 1999) (noting that all patients covered in the survey had received scrotectomies for Fournier's Gangrene and that some of the patients had been treated at West Los Angeles Veterans Administration Hospital); Board of Veterans Appeals, Docket No. 05-31 519 (Oct. 25, 2007) (noting that the patient had undergone a total penectomy at a VA hospital due to cancer).

- 14 -

These procedures are excluded from coverage, however, if they are necessary to treat a transgender veteran's gender dysphoria. The regulation at issue here, *i.e.*, 38 C.F.R. § 17.38(c)(4), expressly excludes "[g]ender alterations" from the Medical Benefits Package. VHA Directive 2013-003 clarifies that this exclusion constitutes an absolute bar to coverage for "sex reassignment surgery," which the Directive defines to include "any of a variety of surgical procedures (including vaginoplasty and breast augmentation in MtF transsexuals and mastectomy and phalloplasty in FtM transsexuals) done simultaneously or sequentially with the explicit goal of transitioning from one sex to another." VHA Directive 2013-003 at 2. Heedless of the current medical consensus regarding the medical necessity of sex reassignment surgery for some individuals suffering from gender dysphoria, the Directive puts such surgery on equal footing with "plastic reconstructive surgery for strictly cosmetic purposes." It does this even though, as noted above, substantively identical procedures are available to intersex veterans under the clear language of the Directive, and to other veterans for various reasons, including to repair traumatic injuries and to treat cancer.

The illogic of the exclusion on sex reassignment surgery is underscored not only by the fact that the VA provides its constituent procedures to other veterans to treat other conditions, but also by the fact that the VA covers *other* aspects of transgender health, including hormone therapy and post-sex-reassignment-surgery health care. Specifically, the VA provides mental health care, hormone therapy, and preoperative evaluation for transgender veterans, as well as continuing hormone replacement therapy and post-operative care to veterans who have received sex reassignment surgery outside the VA health care system. VHA Directive 2013-003 at 2. The VA clearly views those treatments as medically necessary, but irrationally excludes only surgical treatments needed to treat gender dysphoria.

- 15 -

D. **The Critical Need for Sex Reassignment Surgery in the Transgender Veteran Population**

Recent empirical studies show that the estimated prevalence of transgender individuals in the Nation's military is five times greater than the estimated prevalence in the civilian population.[17] As of May 2014, there are an estimated 129,700 transgender veterans of the U.S. Military, as well as 4,600 retired transgender members of the U.S. Reserves and National Guard. Approximately 15,500 transgender individuals currently serve as members of the U.S. Armed Forces, Reserves, and Guard.[18] The population of transgender veterans is so significant that since 2015, clinics have opened in Cleveland, Ohio and Tucson, Arizona to specialize in providing medical care to these veterans.[19] Similarly, the VA Boston Healthcare System has formed the Interdisciplinary Transgender Treatment Team, which provides medical care tailored to the needs of transgender veterans.[20]

Moreover, recent progress in policies affecting transgender military personnel suggests that the population of transgender active-duty military and veterans is likely only to increase. In July 2015, United States Secretary of Defense Ashton B. Carter issued a directive to devise new rules to allow transgender individuals to serve openly in the military.[21] These rules are expected to reverse the military's longstanding policy of preventing transgender individuals from serving

---

[17]    Blosnich *et al.*, *Prevalence of Gender Identity Disorder and Suicide Risk Among Transgender Veterans Utilizing Veterans Health Administration Care*, 103(10) Am. J. of Public Health e27 (2001).

[18]    Gates & Herman, *Transgender Military Service*, Williams Institute (May 2014).

[19]    Albrecht, *VA's First Transgender Clinic Opens in Cleveland*, Cleveland.com (Nov. 2015); Jenkins, *New VA Clinic Opens for Transgender Vets*, National Public Radio (Dec. 29, 2015).

[20]    Dep't of Veterans Affairs, VA Boston Healthcare Sys. (Mar. 3, 2016).

[21]    Somashekhar & Whitlock, *Military To Allow Transgender Members To Serve Openly*, Wash. Post, July 13, 2015.

and reflect a growing recognition on the part of the federal government as a whole that transgender individuals deserve fair and equal treatment under the law.[22]

While the percentage of veterans who are transgender is very significant compared to the percentage of transgender individuals in the general population, the transgender veteran population nevertheless constitutes only a small percentage of the total veteran population. Based on the best available data, only 0.6% of the national population of veterans and retirees of the U.S. Armed Forces, Army Reserves, and National Guard is transgender.[23]

**E.    Developments in Health Care Coverage for Transgender Individuals**

The VA's categorical exclusion of sex reassignment surgery from the package of medical benefits available to transgender veterans has become increasingly divorced from the practices of other federal agencies and States, which have recognized that sex reassignment surgery may be a medical necessity to treat gender dysphoria. Several federal agencies and state governments have adopted laws and policies to prohibit discrimination against transgender individuals in access to health care. In particular, these agencies and governments have prohibited categorical bars on sex reassignment surgery in coverage determinations made by insurers and health care programs receiving federal and state financial assistance.

At the federal level, the Department of Health and Human Services ("HHS") recently issued a proposed rule under Section 1557 of the Affordable Care Act ("ACA") that would prohibit sex discrimination (including on the basis of gender identity) in any health program or activity receiving federal financial assistance. 42 U.S.C. § 18116; *see* Nondiscrimination in

---

[22]    On January 14, 2016, Matthew Allen, a Pentagon spokesperson, stated that he anticipates that the Secretary's final approval of the rules will be issued in spring 2016. Johnson, *Pentagon Expects Decision on Trans Military Ban in Spring*, Wash. Blade, January 14, 2016, *available at* http://www.washingtonblade.com/2016/01/14/pentagon-expects-determination-on-trans-military-ban-in-spring.

[23]    Gates & Herman, *supra* note 18 at 4.

- 17 -

Health Programs and Activities, 80 Fed. Reg. 54,172 (Sept. 8, 2015). That prohibition applies to

all covered entities under the ACA that provide or administer health-related insurance or other

health-related coverage. Although the prohibition does not apply to the VA, it is nonetheless

instructive for the VA as it formulates its own nondiscriminatory practices. The proposed rule

clarifies that the statutory bar on sex discrimination includes discrimination on the basis of

gender identity, and voids any explicit categorical exclusion for coverage of health services

related to gender transition, such as the one at issue here. The rule also would prohibit denial of

any specific health services related to gender transition "where such a denial or limitation results

in discrimination against a transgender individual." 80 Fed. Reg. at 54,190. For example, a

health care plan may be discriminatory if it generally provides coverage of hysterectomies but

denies coverage of a hysterectomy needed to treat gender dysphoria. *See id.*

Additionally, the HHS Departmental Appeals Board recently overturned a thirty-year-old

National Coverage Determination ("NCD") denying Medicare coverage of all sex reassignment

surgery as a treatment for gender dysphoria.[24] An NCD is "a determination by the Secretary [of

Health and Human Services] with respect to whether or not a particular item or service is

covered nationally under [title XVIII (Medicare)]." Social Security Act §§ 1862(l)(6)(A),

1869(f)(1)(B); *see also* 42 C.F.R. § 400.202 (NCD "means a decision that [the Centers for

Medicare & Medicaid Services] makes regarding whether to cover a particular service nationally

under title XVIII of the Social Security Act."). NCDs "describe the clinical circumstances and

settings under which particular [Medicare items and] services are reasonable and necessary (or

are not reasonable and necessary)." 67 Fed. Reg. 54,534, 54,535 (Aug. 22, 2002). The Appeals

Board found that the exclusion of coverage of sex reassignment surgery was unreasonable in

---

[24]     *See* Decision No. 2576, Department of Health and Human Services, Departmental Appeals Board (May 30,
2014), *available at* http://www.hhs.gov/dab/decisions/dabdecisions/dab2576.pdf.

- 18 -

light of significant and unchallenged empirical evidence supporting the safety, effectiveness, and

necessity of that treatment for certain individuals with severe gender dysphoria.[25]

Other federal agencies and multiple States have acknowledged the need to establish clear

policies that recognize the medical consensus that sex reassignment surgery may be medically

necessary for a number of transgender individuals.  For example, the Office of Personnel

Management ("OPM") recently issued a letter to health insurance carriers participating in the

Federal Employees Health Benefits Program stating that no carrier "may have a general

exclusion of services, drugs or supplies related to gender transition or 'sex transformations.'"[26]

The guidance from OPM recognizes "the evolving professional consensus that treatment may be

medically necessary to address a diagnosis of gender dysphoria."[27]  And an increasing number of

States, including California, Colorado, Connecticut, Illinois, Maryland, Massachusetts,

Minnesota, Nevada, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington,

as well as the District of Columbia, have adopted laws and policies that recognize the

discriminatory nature of health care programs that deny necessary coverage for the treatment of

gender dysphoria.[28]  These recent policy revisions and clarifications focus on the

inappropriateness of blanket exclusions of sex reassignment surgery and other treatments for

---

[25]     *Id.*

[26]     U.S. Office of Personnel Management, FEHB Program Carrier Letter, Letter No. 2015-12 (June 23, 2015), *available at* https://www.opm.gov/healthcare-insurance/healthcare/carriers/2015/2015-12.pdf.

[27]     *Id.*

[28]     *See* Pennsylvania Ins. Dep't, Notice Regarding Nondiscrimination, Pa.B. Doc. No. 16-762, 46 Pa.B. 2251 (Apr. 30, 2016), *available at* http://www.pabulletin.com/secure/data/vol46/46-18/762.html; 80 Fed. Reg. at 54,189; Rhode Island Office of the Health Ins. Comm'r, Bulletin No. 2015-3 (Nov. 23, 2015), *available at* http://www.ohic.ri.gov/documents/Bulletin-2015-3-Guidance-Regarding-Prohibited-Discrimination.pdf; Minnesota Dep't of Commerce, Administrative Bulletin 2015-5 (Nov. 24, 2015), *available at* http://mn.gov/commerce-stat/pdfs/bulletin-insurance-2015-5.pdf; Maryland Ins. Admin., Bulletin 14-02 (Jan. 27, 2014), *available at* http://insurance.maryland.gov/Insurer/Documents/bulletins/bulletin-1402-transgender.pdf.

- 19 -

gender dysphoria while still preserving providers' ability to make medical necessity
determinations on an individual basis.

The VA is quickly becoming an outlier among health care providers in its failure to
provide full coverage of the treatment necessary for patients with gender dysphoria.

## V.    THE VA SHOULD AMEND THE REGULATION TO COVER SEX REASSIGNMENT SURGERY

The VA should offer sex reassignment surgery to transgender veterans, first and
foremost, because doing so is good policy.  The VA may adopt a new policy if it "is permissible
under the statute, [] there are good reasons for it, and [] the agency *believes* it to be better, which
the conscious change adequately indicates." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S.
502, 515 (2009).  Offering sex reassignment surgery is clearly permissible under 38 U.S.C.
§ 1710, which broadly authorizes the Secretary to provide "needed" medical care to veterans,
and there are good reasons for this policy change:  providing this surgery is consistent with, and
mandated by, the VA's mission, would impose at most only a relatively minor burden on the VA
health care system, and would provide medically necessary care to alleviate the physical
suffering, depression, and suicidal ideation of transgender veterans who, in the absence of such
care, are likely to be gravely afflicted with such conditions.

Providing sex reassignment surgery is required by the VA's mission to promote the
health of veterans through coverage of medically accepted treatments that enhance the quality of
life or daily functional level of veterans.  The Secretary is charged with providing hospital care
and medical services to veterans.  *See* 38 U.S.C. § 1710.  The VA has determined that this
mandate includes care that is "needed to promote, preserve, or restore the health of the individual
and is consistent with generally accepted standards of medical practice." 38 C.F.R. § 17.38(b).
Care is deemed "to promote health" if "the care will enhance the quality of life or daily

- 20 -

functional level of the veteran," *id.* § 17.38(b)(1), and care is deemed to "preserve health" if the care will maintain the current quality of life or daily functional level of the veteran," including by "extend[ing] lifespan," *id.* § 17.38(b)(2). Notwithstanding its categorical exclusion for some of the most essential medical care for transgender veterans, VHA Directive 2013-003 states that "[i]t is the VHA policy that medically necessary care is provided to enrolled or otherwise eligible intersex and transgender veterans." VHA Directive 2013-003 at 2.[29]

As discussed above, there is no genuine dispute within the medical community that sex reassignment surgery is a medically necessary component of treatment for some individuals with gender dysphoria. Indeed, the VA implicitly acknowledges the necessity of sex reassignment surgery by providing preoperative assessment and post-operative care to veterans who may undergo, or who have already undergone, such surgery. Not all individuals suffering from gender dysphoria require surgery, yet those who do may be some of the most vulnerable to related complications from lack of access to care—namely, depression and suicide. Transgender individuals who need but do not receive sex reassignment surgery are significantly more susceptible than the general population to depression and suicide.[30]

Relative to the extraordinarily salubrious effect of providing medically necessary sex reassignment surgery to those in need of it, a change in VA policy would impose an immaterial cost burden on the VA health care system. Only a small absolute number of veterans are

---

[29]     Notably, in addition to preventing transgender veterans from receiving medically necessary care, the VA's exclusion of sex reassignment surgery from coverage appears to be having other unfortunate effects, evidently causing some providers to be skeptical of the medical needs of transgender veterans that are unrelated to gender transition, and outwardly hostile to treating them. *See* Silva Aff. ¶¶ 11-12.

[30]     *See* Ettner Decl. ¶ 15 ("A recent survey shows a 41% rate of suicide attempts among transgender people, far above the baseline rates for North America. (Haas et al., 2014)."); Blosnich *et al.*, Prevalence of Gender Identity Disorder and Suicide Risk Among Transgender Veterans Utilizing Veterans Health Administration Care," 103 Am. J. Pub. Health e27 (Oct. 2013), *available at* http://ajph.aphapublications.org/doi/abs/10.2105/AJPH.2013.301507 (the "rate of suicide-related events among GID-diagnosed VHA veterans was more than 20 times higher than were rates for the general VHA population.").

- 21 -

transgender, and likely only a fraction of them will require sex reassignment surgery.[31]  And sex

reassignment surgery is no more expensive than substantially identical surgeries included in the

Medical Benefits Package for cisgender veterans. *See, e.g.*, Bowers Decl. ¶ 20.  Moreover, the

VA's failure to treat gender dysphoria fully in a given patient leads to collateral consequences,

both for the individual veteran who experiences continued mental and physical impairment from

his or her partially treated condition, and for the VA health care system itself, which must

continue to pay for such veterans' mental health care, sometimes indefinitely.  In fact, a recent

study shows that the upfront costs of sex reassignment surgery are negligible when compared

with the ongoing costs associated with treatment of long-term depression in individuals with

cases of gender dysphoria for which surgery is appropriate.[32]

The California Department of Insurance likewise recently conducted an assessment of the

economic impact of covering transition-related health care and determined that "transgender

insureds who have access to treatment see rates of depression drop and anxiety decrease," and

that "[t]his overall improvement in mental health and reduction in utilization of mental health

---

[31]     *See supra* note 18 and accompanying text.  The WPATH Standards of Care reference available studies of individuals who "present for gender-transition-related care at specialist gender clinics," and notes that these studies estimate the prevalence of such individuals in the general population at between "1:11,900 to 1:45,000 for male-to-female individuals … and 1:30,400 to 1:200,000 for female-to-male … individuals."  Some researchers have suggested that, given the sources of the study participants, the figures in these studies approximate the prevalence of individuals who undergo sex reassignment surgery. *See* Olyslager & Conway, "On the Calculation of the Prevalence of Transsexualism" (Sept. 2007), at 1 (paper presented at the WPATH 20th International Symposium), *available at* http://www.changelingaspects.com/ PDF/2007-09-06-Prevalence of Transsexualism.pdf.

The New York Times has reported that a recent yet currently unreleased study commissioned by the Department of Defense and conducted by the RAND Corporation predicted that between 29 and 129 active service members would seek transition-related medical care annually.  The study also found that given these low numbers, the cost of providing transition-related care to active duty service members would be negligible.  Editorial Board, *The Military's Transgender Policy, Stalled*, N.Y. Times, Apr. 6, 2016.

[32]     Padula *et al.*, *Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis*, J. of General Internal Medicine (Oct. 19, 2015).

- 22 -

services could be a source of cost savings for employers, insurers, and insureds."[33] Citing the

California assessment, HHS agreed in its proposed rule on Section 1557 of the Affordable Care

Act that "providing transgender individuals non-discriminatory insurance coverage and treatment

... will have minimal impact on the overall cost of care and on health insurance premiums."[34]

Finally, offering sex reassignment surgery to transgender veterans is the right thing to do.

Offering sex reassignment surgery to transgender veterans can be a life-saving treatment to treat

the serious distress associated with gender dysphoria. Bowers Decl. ¶¶ 34-35, 37; Ettner

Decl. ¶¶ 15-16, 21. The VA implicitly acknowledges what the broader medical community does

not question—that sex reassignment surgery is medically necessary for some patients—yet the

VA refuses to provide this medically necessary care to those patients. Our Nation owes

transgender veterans this life-changing treatment in the same way it owes all other veterans

medically necessary care for their most significant medical conditions. It is time for the VA to

take the next step and provide complete treatment to transgender veterans.

## VI.     THE EXISTING REGULATION IS ARBITRARY AND CAPRICIOUS

Under the Administrative Procedure Act, a court may hold unlawful and set aside final

agency action, such as a regulation or a denial of a petition for rulemaking or to amend existing

rules, that it finds to be, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law." 5 U.S.C. § 706. To comply with the requirements of the Act, the

agency "must examine the relevant data and articulate a satisfactory explanation for its action."

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 552, (2009) (quoting *Motor Vehicles Mfrs.*

---

[33]     California Department of Insurance, "Economic Impact Assessment of Gender Nondiscrimination in Health Insurance," Reg. File No. REG-2011-00023 (Apr. 13, 2012), *available at* http://transgenderlawcenter.org/wp-content/uploads/2013/04/Economic-Impact-Assessment-Gender-Nondiscrimination-In-Health-Insurance.pdf.

[34]     Notice of Proposed Rulemaking Nondiscrimination in Health Programs and Activities, Medicare & Medicaid Guide 220954, 80 Fed. Reg. 54,171, 54,206 (Sept. 8, 2015).

- 23 -

*Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983)). That explanation must

"includ[e] a rational connection between the facts found and the choice made." *State Farm*, 463

U.S. at 42-43. "Normally, an agency rule would be arbitrary and capricious if the agency has

relied on factors which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the

evidence before the agency, or is so implausible that it could not be ascribed to a difference in

view or the product of agency expertise[.]" *Fox Television*, 556 U.S. at 552 (quoting *State Farm*,

463 U.S. at 42-43). Moreover, "it is well-established that 'an agency action is arbitrary when the

agency offer[s] insufficient reasons for treating similar situations differently.'" *SKF USA Inc. v.

United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (quoting *Transactive Corp. v. United States*,

91 F.3d 232, 237 (D.C. Cir. 1996)).

A denial of this petition would be arbitrary and capricious for three reasons: (1) the VA

already recognizes that gender dysphoria is a treatable medical condition and currently provides

some treatments for it, yet arbitrarily excludes sex reassignment surgery from the covered

treatments; (2) the VA covers certain treatments for cisgender and intersex veterans yet

arbitrarily denies the same or analogous treatments for transgender veterans; and (3) the VA

excluded sex reassignment surgery without examining any relevant data and without giving any

public explanation for the exclusion, while the overwhelming medical consensus supports the

inclusion of sex reassignment surgery.

It is the height of arbitrary and capricious action to recognize gender dysphoria as a

treatable medical condition and provide some treatments for it, while denying other equally

necessary medical treatments. The VA's current policy with respect to the provision of medical

care to transgender veterans states:

- 24 -

> VHA policy [requires] that medically necessary care [be] provided to enrolled or
> otherwise eligible intersex and transgender Veterans, including hormonal therapy,
> mental health care, preoperative evaluation, and medically necessary post-
> operative and long-term care following sex reassignment surgery. Sex
> reassignment surgery cannot be performed or funded by VA.

VHA Directive 2013-003 at 2.[35] Thus, VA policy clearly recognizes that medically necessary

care must be provided to transgender veterans, and also recognizes that some level of care related

to sex reassignment surgery is medically necessary. For example, the VA currently provides

mental health care coverage and hormonal therapy—which, like surgery, is specifically designed

to assist transgender individuals in treating their dysphoria by making their bodies congruent

with their gender. VA policy likewise provides transgender individuals with therapies, namely

"preoperative evaluation, and medically necessary post-operative and long-term care following

sex-reassignment surgery," that are specifically tailored to assist individuals seeking sex

reassignment surgery with the pre- and post-surgical aspects of such surgery. And VA policy

recognizes as medically necessary evaluations of transgender individuals performed prior to their

obtaining sex reassignment surgery (namely, preoperative evaluation). Thus, the VA recognizes

the medical necessity of *every aspect of care* for transgender veterans undergoing sex

reassignment surgery, except surgery itself. That policy is incoherent because it is internally

inconsistent, and therefore arbitrary and capricious.

The arbitrary and capricious nature of the VA's policy is underscored by the fact that the

VA offers the same or substantially similar surgeries to cisgender and intersex veterans for other

medically necessary conditions. As explained above, sex reassignment surgery is an umbrella

term referring to a compliment of surgeries that may include, penectomy, vaginoplasty, chest

reconstruction, phalloplasty, hysterectomy, and/or mastectomy.

---

[35]     *See also*, Dep't of Veterans Affairs, Patient Care Services, (Mar. 3, 2016), *available at*
http://www.patientcare.va.gov/Lesbian_Gay_Bisexual_and_Transgender_LGBT_Veteran_Care.asp.

AR28
Appx029

Under the clear language of the VA regulations and directives, each of these surgeries is provided as a matter of VA policy to cisgender and intersex veterans for other conditions that the VA recognizes to be medically necessary. VA policy grants surgery to intersex individuals "to correct inborn conditions related to reproductive or sexual anatomy," and so provides penectomy and vaginoplasty to certain intersex individuals born with ambiguous genitalia. VHA Directive 2013-003 at 2. Hysterectomy and mastectomy are offered to cisgender females for, among other reasons, reduction of cancer risk, but the same surgeries are denied to transgender males. *See supra*, note 15. The VA offers, and so deems medically necessary, breast reconstruction to cisgender women who have had a mastectomy, but denies a substantially identical surgery, breast augmentation, to transgender women. *See supra*, note 14. The VA offers penile and testicular implants to cisgender males whose penises or testes have been damaged, but refuses very similar treatment to transgender men. *See id.*

In each of these comparisons, the VA offers certain surgeries to cisgender or intersex individuals for their conditions, but refuses to cover the same or substantially similar surgeries to transgender individuals for their conditions. The VA cannot justify this inconsistent treatment by claiming that these surgeries are medically necessary for treatment of some conditions, but not medically necessary for the treatment of gender dysphoria—as explained above, *see supra* Section IV.B, there is no genuine dispute within the medical community that sex reassignment surgery is medically necessary for certain patients. Accordingly, the VA's current policy amounts to offering certain surgeries when they are medically necessary, only not when those surgeries are medically necessary to treat gender dysphoria. This policy is incoherent and unjustifiable, and the VA's action in continuing it would be arbitrary and capricious. *See SKF USA Inc.*, 263 F.3d at 1382.

- 26 -

Finally, the VA has given no public explanation for excluding from coverage sex reassignment surgery for transgender veterans. Neither the proposed nor the final Regulation explained the exclusion or offered any evidence that the VA had "examine[d] the relevant data" in arriving at its decision to exclude this surgery from coverage. *State Farm*, 463 U.S. at 42-43; *see* 63 Fed. Reg. 37,299 (July 10, 1998) (proposed rule); 64 Fed. Reg. 54,207 (Oct. 6, 1999) (final regulation). The subsequent VHA directives that implemented the exclusion of sex reassignment surgery from the Medical Benefits Package likewise contained no explanation. *See* VHA Directive 2011-024 (June 9, 2011); VHA Directive 2013-003 (Feb. 8, 2013). The VA has therefore failed thus far even to attempt to "articulate a satisfactory explanation for its action" in excluding sex reassignment surgery from the Medical Benefits Package, or to offer a "rational connection between [] facts found and the choice made." *State Farm*, 463 U.S. at 42-43; *see also Michigan v. E.P.A.*, 135 S. Ct. 2699, 2706 (2015) ("Federal administrative agencies are required to engage in 'reasoned decisionmaking.'") (citation omitted).

As explained above, if the VA were to examine data relevant to its policy of excluding sex reassignment surgery from the Medical Benefits Package, the VA would find that such data clearly support reversing this exclusion. The medical community has reached consensus that sex reassignment surgery is a medically necessary treatment for a significant number of individuals with gender dysphoria—medically necessary in the same way as any other medical treatment that is required "to promote, preserve, or restore" the well-being of the patient. VHA Directive 1091 (Feb. 21, 2014), at 1; *see also* Bowers Decl. ¶¶ 34-37; Ettner Decl. ¶¶ 21, 23. No major medical association considers sex reassignment surgery to be a form of cosmetic surgery. Bowers Decl. ¶ 35; Ettner Decl. ¶ 23. As discussed above, the costs of providing sex reassignment surgery are negligible in context. *See supra* Section V at 21-22.

- 27 -

For these reasons, a denial of this petition to amend the Regulation to include sex reassignment surgery in the Medical Benefits Package would constitute unlawful, arbitrary and capricious agency action.

## VII.    THE EXISTING REGULATION VIOLATES THE EQUAL PROTECTION COMPONENT OF THE FIFTH AMENDMENT

A denial of this petition to amend the Regulation to include sex reassignment surgery in the Medical Benefits Package would also violate the Equal Protection component of the Fifth Amendment. The Federal Circuit is required to "hold unlawful and set aside" any VA regulation "contrary to constitutional right, power, privilege, or immunity." 38 U.S.C. § 7292(d)(1)(B). The Regulation violates those guarantees by discriminating against transgender veterans on the basis of their sex and their transgender status, without any compelling, or even arguably permissible, government interest.

### A.    Discrimination Against Transgender People Receives Heightened Scrutiny

### 1.    Discrimination Against Transgender People Is Sex Discrimination

It is "firmly established" that laws or policies that discriminate based on sex are evaluated under close scrutiny. *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 723 (1982). Discrimination against transgender people receives the same scrutiny. In fact, since *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), every court of appeals to consider the question has concluded that prohibitions against sex discrimination protect transgender people.

In *Price Waterhouse*, the Supreme Court held that discrimination on the basis of gender stereotypes is sex-based discrimination. In that case, a female employee with the Price Waterhouse firm had been denied partnership in the firm because she was considered too "macho" and was told she needed to "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." 490 U.S. at 235. Six

- 28 -

members of the Supreme Court agreed that that kind of discrimination due to failure to conform

to sex stereotypes constituted sex discrimination. *Id.* at 250-251 (plurality opinion); *id.* at 258-

261 (White, J., concurring); *id.* at 272-273 (O'Connor, J., concurring).

Since that decision, federal courts have been nearly unanimous in holding that

discrimination against transgender people is also a form of sex discrimination under *Price*

*Waterhouse. See, e.g., G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, No. 15-2056, __ F.3d

__, 2016 WL 1567467, at *4-8 (4th Cir. Apr. 19, 2016); *Glenn v. Brumby*, 663 F.3d 1312, 1316-

1320 (11th Cir. 2011); *Smith v. City of Salem*, 378 F.3d 566, 571-575 (6th Cir. 2004); *Rosa v.*

*Park West Bank & Trust Co.*, 214 F.3d 213, 215-216 (1st Cir. 2000); *Schwenk v. Hartford*, 204

F.3d 1187, 1201-1202 (9th Cir. 2000); *see also Schroer v. Billington*, 577 F. Supp. 2d 293, 303-

306 (D.D.C. 2008).

As the Eleventh Circuit observed in *Glenn*, "[a] person is defined as transgender precisely

because of the perception that his or her behavior transgresses gender stereotypes" and there is

therefore "a congruence between discriminating against transgender and transsexual individuals

and discrimination on the basis of gender-based behavioral norms." 663 F.3d at 1316.

*Schroer* offered another formulation of why discrimination against transgender people

must be understood as sex discrimination, posing a helpful analogy:

> Imagine that an employee is fired because she converts from Christianity to
> Judaism. Imagine too that her employer testifies that he harbors no bias toward
> either Christians or Jews but only "converts." That would be a clear case of
> discrimination "because of religion." No court would take seriously the notion
> that "converts" are not covered by the statute. Discrimination "because of
> religion" easily encompasses discrimination because of a *change* of religion.

577 F. Supp. 2d at 306. Applying that logic, the court held that the discrimination against a

transgender job applicant because she disclosed her intent to transition from male to female

"was *literally* discrimination 'because of ... sex.'" *Id.* at 308; *see also Fabian v. Hosp. of Cent.*

- 29 -

*Conn.*, No. 3:12-cv-1154, 2016 WL 1089178, at *28 (D. Conn. Mar. 18, 2016)

("[D]iscrimination on the basis of gender stereotypes, or on the basis of being transgender, or

intersex, or sexually indeterminate … is literally discrimination 'because of sex.'").

    Recognizing that no responsible argument to the contrary remains, the federal

government has adopted the position that discrimination against transgender people is sex

discrimination.  In *Macy v. Holder*, the Equal Employment Opportunity Commission ("EEOC")

held unanimously that discrimination against a transgender person is, "by definition," a form of

sex discrimination.[36]  E.E.O.C. Appeal No. 0120120821, 2012 WL 1435995, at *11 (Feb. 24,

2012); *see also* Memorandum from the Attorney General, Treatment of Transgender

Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964 (Dec. 15,

2014) (announcing that the Department of Justice will take the position that discrimination

against transgender people violates Title VII); U.S. Department of Labor, Office of Federal

Contract Compliance Programs, Directive 2014-02 (Aug. 19, 2014) (clarifying that sex

discrimination "under Executive Order 11246 … includes discrimination on the bas[is] of …

transgender status").[37]

---

[36]    *Macy* was decided under Title VII, but "the showing a plaintiff must make to recover on a disparate treatment claim under Title VII mirrors that which must be made to recover on an equal protection claim." *Smith*, 378 F.3d at 577; *see also Glenn*, 663 F.3d at 1316-1318 (reviewing Title VII precedent to conclude that the Fourteenth Amendment prohibits discrimination against transgender employees).

[37]    The U.S. Department of Education also has made clear that "Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity." Dep't of Educ., Office of Civil Rights, *Questions and Answers on Title IX and Sexual Violence* (Apr. 29, 2014), at 5, *available at* http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf. Numerous federal courts have agreed. *See, e.g., G.G.*, 2016 WL 1567467, at *7; *Pratt v. Indian River Cent. Sch. Dist.*, 803 F. Supp. 2d 135, 151-152 (N.D.N.Y. 2011); *Doe v. Brimfield Grade Sch.*, 552 F. Supp. 2d 816, 823 (C.D. Ill. 2008); *Montgomery v. Independent Sch. Dist. No. 709*, 109 F. Supp. 2d 1081, 1090 (D. Minn. 2000); *see also Rumble v. Fairview Health Servs.*, No. 14-cv-2037, 2015 WL 1197415, at *10 (D. Minn. Mar. 16, 2015) (holding that Section 1557 of the Affordable Care Act, which incorporates Title IX's prohibition on sex-based discrimination, "protects plaintiffs … who allege discrimination based on 'gender identity'").

- 30 -

### 2.    Discrimination Based on Transgender Status Also Receives Heightened Scrutiny

Even aside from its inextricable connection to sex discrimination, discrimination based on transgender status is separately entitled to heightened scrutiny. If a classification disadvantages certain groups, it may be considered "suspect" or "quasi-suspect," and therefore scrutinized with extra care. The Supreme Court consistently has applied heightened scrutiny where the classified group has suffered a history of discrimination, and the classification has no bearing on a person's ability to perform in society. *See, e.g., Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (heightened scrutiny is warranted where a classified group has "experienced a 'history of purposeful unequal treatment' or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities"). In addition, the Supreme Court has sometimes considered whether the group is a minority or relatively politically powerless, and whether the characteristic is defining or "immutable" in the sense of being beyond the group member's control or not one the government has a right to insist an individual try to change. *See, e.g., Lyng v. Castillo*, 477 U.S. 635, 638 (1986); *see also Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407, 425-28 (Conn. 2008) (analyzing federal equal protection law to conclude that history of discrimination and ability to contribute to society are the two central considerations, and collecting authorities). While not all considerations need point toward heightened scrutiny, *Plyler v. Doe*, 457 U.S. 202, 216 n.14, (1982); *Golinski v. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 983 (N.D. Cal. 2012), here all demonstrate that laws that discriminate based on transgender status should be subjected to heightened review.

Under any faithful application of that standard, discrimination against transgender people must receive heightened review. In recent decisions, federal courts have recognized that discrimination against transgender people—beyond its connection to discrimination based on

- 31 -

sex—must be evaluated under heightened scrutiny. *See, e.g., Adkins v. City of New York*, __ F.

Supp. 3d __, No. 14 Civ. 7519, 2015 WL 7076956, at *3-4 (S.D.N.Y. Nov. 16, 2015);

*Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015). In *Adkins*, the court found

that all four of the hallmarks of heightened scrutiny were present with respect to the transgender

community. It found that "transgender people have [inarguably] suffered a history of

persecution and discrimination," 2015 WL 7076956, at *3;[38] that "transgender status bears no

relation to ability to contribute to society," *id.*; that "transgender status is a sufficiently

discernible characteristic to define a discrete minority class," *id.*; and that "transgender people

are a politically powerless minority," noting that "there have [n]ever been any transgender

members of the United States Congress or the federal judiciary," *id.*at *4. The court therefore

concluded that transgender people constituted a "quasi-suspect class" entitled to intermediate

scrutiny. *Id.* at *4.

Another federal court examined the same question in a case challenging a health care

policy—like the VA's here—that denied transgender people access to sex reassignment surgery.

*Norsworthy*, 87 F. Supp. 3d at 1119. That court noted the recent federal decisions indicating that

discrimination based on sexual orientation must be evaluated with heightened scrutiny, holding

that such conclusion "applies with at least equal force to discrimination against transgender

people, whose identity is equally immutable and irrelevant to their ability to contribute to

society, and who have experienced even greater levels of societal discrimination and

marginalization." *Id.* at 1119 n.8. As a result, the court held squarely that "discrimination based

---

[38]        *See also* Sears *et al., Documenting Discrimination on the Basis of Sexual Orientation and Gender Identity in State Employment,* Williams Institute (2009), *available at* http://williamsinstitute.law.ucla.edu/research/workplace/documenting-discrimination-on-the-basis-of-sexual-orientation-and-gender-identity-in-state-employment; Grant *et al., Injustice at Every Turn:  A Report of the National Transgender Discrimination Survey* (2011), *available at* http://www.thetaskforce.org/downloads/reports/reports/ntds_full.pdf.

- 32 -

on transgender status … qualifies as a suspect classification under the Equal Protection Clause." *Id.* at 1119.

### B.     The Regulation Cannot Survive Any Level of Review

The Regulation is plainly discriminatory: It denies transgender veterans treatments critical for their health, while providing the same treatments for other veterans. To state the obvious, an exclusion of coverage for surgeries related to "gender alteration," which the VA applies *only* to transgender veterans, targets transgender veterans for differential treatment. 38 C.F.R. § 17.38(c)(4); VHA Directive 2013-003 at 2 (defining the prohibited surgery to apply to transgender, but not intersex, veterans). That is facial discrimination based on sex and transgender status. Because there is no permissible justification for that exclusion, the Regulation is unconstitutional.

Under the heightened scrutiny standard applicable to claims of discrimination based on sex or transgender status, the challenged action must "serve important governmental objectives" and be "substantially related to the achievement of those objectives." *Craig v. Boren*, 429 U.S. 190, 197 (1976); *see also United States v. Virginia*, 518 U.S. 515, 531, 533 (1996) (under intermediate scrutiny, government "must demonstrate an exceedingly persuasive justification for that action," the burden for which "is demanding and … rests entirely on the state") (internal quotation marks and citations omitted).

No such "important" objective can be advanced by denying transgender veterans the same medically necessary treatments that are provided to other veterans. For example, the facts of this case are nearly identical to those in *Norsworthy*. That case challenged the policy of a state prison that sex reassignment surgery could never be provided to transgender people in prison, although the prison did provide the same treatments for non-transgender individuals, and it did provide mental health and hormone treatments to transgender individuals. The state was

- 33 -

unable to identify any "important governmental interest, much less describe how their gender

classification—which makes it more difficult for a transgender person to receive vaginoplasty

than it is for a cisgender woman—[could be] substantially related to that interest." 87 F. Supp.

3d at 1120. The court therefore concluded that a state policy of "treat[ing a transgender woman]

differently from a similarly situated non-transgender woman in need of [the same] medically

necessary surgery" would violate her right to equal protection. *Id.*

　　Even under the most deferential standard of review, however, the policy cannot stand.

Governmental action that "neither burdens a fundamental right nor targets a suspect class" will

be upheld only "so long as it bears a rational relation to some legitimate end." *Romer v. Evans*,

517 U.S. 620, 631 (1996). That test is not "toothless." *Mathews v. Lucas*, 427 U.S. 495, 510

(1976). In particular, the review must be meaningful when the policy at issue targets a

vulnerable group. *See Romer*, 517 U.S. at 634-635 (invalidating law that burdened the

"politically unpopular group" of lesbian, gay, and bisexual people); *Lawrence v. Texas*, 539 U.S.

558, 580 (2003) (O'Connor, J., concurring) ("When a law exhibits such a desire to harm a

politically unpopular group, we have applied a more searching form of rational basis review to

strike down such laws under the Equal Protection Clause."); *Kelo v. City of New London*, 545

U.S. 469, 490-491 (2005) (Kennedy, J., concurring) (distinguishing between the rational basis

test applied to "economic regulation" versus classifications discriminating against a particular

group of people).

　　As discussed above, because the VA already provides the same or similar treatments to

non-transgender and intersex veterans, there is no conceivable non-discriminatory basis for

excluding coverage for transgender veterans alone. The Regulation and its implementing

directives do not deny transgender veterans surgical treatments for gender dysphoria because of

- 34 -

concerns about medical necessity, or because it is expensive (which it is not),[39] or because it is impractical or difficult to provide—if any of those were the case, the VA would bar provision of those treatments for *any* veteran, not just transgender veterans. And the reason cannot be that the VA disagrees with the necessity of medical treatments for gender dysphoria generally—because if that were the case, the VA would not provide the many other medical treatments it *does* provide for transgender veterans, such as hormone therapy and pre- and post-operative care.

Accordingly, the only conceivable explanation for the transgender-specific surgery exclusion appears to be the fear of potential political controversy that could result from extending care to this vulnerable minority, which is not a permissible consideration under any standard of review. *See U.S. Dep't of Ag. v. Moreno*, 413 U.S. 528, 534 (1973) (intention to exclude a "politically unpopular group" from receiving benefits "cannot constitute a legitimate governmental interest"); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) ("mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable ... are not permissible bases" for differential treatment of a vulnerable group).

## VIII.   CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Secretary of Veterans Affairs amend or repeal the rules and regulations, including 38 C.F.R. § 17.38(c)(4), that exclude sex reassignment surgery for transgender veterans from the Medical Benefits Package provided to veterans under the Veterans Affairs health system, and promulgate regulations expressly

---

[39]     Because the population of transgender veterans affected by the Regulation is small compared to the overall population, cost concerns have no basis in reality. But regardless, the Fifth Amendment does not safeguard equality only when it is costless. Seeking to justify the Regulation as a budgetary matter would do what the Supreme Court has condemned: attempt to "protect the public fisc by drawing an invidious distinction between classes of its citizens." *Memorial Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 263 (1974); *see also Graham v. Richardson*, 403 U.S. 365, 374-375 (1971).

including sex reassignment surgery for transgender veterans within that Medical Benefits

Package.

Dated: May 9, 2016                 Respectfully submitted,

By: _Alan Schoenfeld / APV_          By: _____
Alan Schoenfeld                   M. Dru Levasseur
Austin Van                       LAMBDA LEGAL DEFENSE AND
WILMER CUTLER PICKERING        EDUCATION FUND, INC.
    HALE AND DORR LLP             120 Wall Street, 19th Floor
7 World Trade Center                New York, NY 1005
250 Greenwich Street              Telephone: (212) 809-8585
New York, NY 10007              Facsimile: (212) 809-0055
Telephone: (212) 937-7294
Facsimile: (212) 230-8888           Tara L. Borelli
                              LAMBDA LEGAL DEFENSE AND
Paul R.Q. Wolfson               EDUCATION FUND, INC.
Andrew Jaco                    730 Peachtree Street NE, Suite 1070
WILMER CUTLER PICKERING        Atlanta, GA 30308-1210
    HALE AND DORR LLP             Telephone: (404) 897-1880
1875 Pennsylvania Avenue         Facsimile: (404) 897-1884
Washington, DC 20006
Telephone: (202) 663-6390          By: _____
Facsimile: (202) 663-6363           Ilona Turner
                              Sasha Buchert
                              TRANSGENDER LAW CENTER
                              1629 Telegraph Avenue, Suite 400
                              Oakland, CA 94612
                              Telephone: (415) 865-0176
                              Facsimile: (877) 847-1278

*Attorneys for Petitioners*

## EXPERT DECLARATION OF DR. MARCI L. BOWERS

1.    I, Marci L. Bowers, MD have been asked to provide my expert medical opinion regarding the efficacy and appropriateness of sex reassignment surgery ("SRS") as a medically necessary treatment for gender dysphoria.  I have actual knowledge of the matters stated herein and could and would so testify if called as a witness.

## QUALIFICATIONS AND BACKGROUND

2.    I am a pelvic and gynecologic surgeon with over 25 years' experience.  I was the former Department Chairperson at Swedish Medical Center (Providence) in Seattle, where I practiced as an Obstetrician/Gynecologist for 20 years, delivering more than 2,200 babies.  I currently practice general gynecology and surgery and am the first North American gynecologic surgeon trained to functionally reverse female genital cutting.

3.    I am board certified by the American Board of Obstetrics & Gynecology.

4.    I am licensed to practice medicine in the states of Washington and California.

5.    I have completed over 3,000 sex reassignment surgeries and perform approximately 220 other surgeries related to gender transition annually.  Around 90% of the surgeries have been for people transitioning from male to female.

6.    I received my bachelor's degree in Medical Microbiology (1980) from the University of Wisconsin, Madison, WI, and my medical degree (1986) from the University of Minnesota, Minneapolis, MN.  I completed my residency (1986-1990) in Obstetrics/Gynecology at the University of Washington, Seattle, WA.

7.    I am a current member of the European Academy of Sciences.  I was honored as one of the Best Doctors in America (2002-2004), awarded the Chief Resident Award for Teaching Excellence (1986-1990), and was President of the University of Minnesota Medical Student Council (1985-1986).

8.    I frequently speak at medical schools across the United States and with media on the subject of SRS.  I have demonstrated SRS surgical techniques for plastic surgeons and urologists in Australia, Belgium, Brazil, China, Israel, Mexico, Serbia and other countries.

9.    I have published three chapters in books related to sex reassignment surgery:

•    "Complications of Male-to-Female Vaginoplasty" in MANAGEMENT OF GENDER DYSPHORIA:  A MULTIDISCIPLINARY APPROACH.  Trombetta et al. (Eds.), 2015.

•    "Transgender Surgery" in TRANS BODIES, TRANS SELVES:  A RESOURCE FOR THE TRANSGENDER COMMUNITY.  Erickson-Schroth (Ed.), 2014.

•    "Male-to-female Vaginoplasty" in AESTHETIC GYNECOLOGY.  Goodman, Alsinrod, et al. (Eds.), 2016.

10.    I have not provided deposition or trial testimony as an expert witness in the past four years.

11.    I am providing my expert consulting services in this case pro bono.

12.    A copy of my curriculum vitae is attached as Exhibit A.

## OPINIONS

13.    In forming my opinions, I have relied on my scientific education and training, my knowledge of the scientific literature in the pertinent fields, and my extensive clinical experience in treating patients with sex reassignment surgery.  Based on my review of the foregoing, and for reasons set forth in more detail below, my opinions are the following:

## I.    Sex Reassignment Surgery

14.    For transgender female patients, sex reassignment surgery commonly includes orchiectomy (removal of the testes) and vaginoplasty, and may also include breast augmentation, tracheal shaving (chondrolaryngoplasty), and facial feminization surgery.

15.    Vaginoplasty is often seen as the definitive male-to-female sex reassignment surgery.  It involves a variety of procedures including an orchiectomy, removal of the penis, creation of a vaginal cavity, a procedure to line the cavity, the shortening of the urethra, and the construction of the labia and a clitoris.  The vagina should have a hairless epithelium (the tissue lining the inside of the vagina) and should have an adequate depth and diameter in order to function properly.

16.    The procedure was first developed in 1933, and has evolved in the years since.  In the 1950s, Dr. Georges Burou, a gynecologist, pioneered the modern vaginoplasty technique known as "penile inversion."  Other leading surgeons performing the procedure included Dr. Stanley Biber, who provided over 4,000 sex reassignment surgeries from 1969 until the mid-2000s, and Drs. Yvan Menard and Pierre Brassard.

17.    I worked closely with Drs. Biber and Brassard during 2003-2005.  Under their tutelage, I developed a "one-stage procedure" for vaginoplasty with the basic principles of embryology in mind.  As everyone has female genitalia early in gestation, the goal of the procedure is to reverse the current anatomy to its earlier configuration and to create a vagina as feminine in function and appearance as possible.  The procedure is a version of the original "penile inversion technique," modified to include the use of scrotal skin grafting to line the vagina, and other advances.  The two-stage procedure included one stage for function and a second stage designed to improve appearance and define the labia and clitoral hood.  Utilizing the mucosa of the urethra, the one-stage procedure utilizes tissue that is sensory and secretory, pink and non-hair bearing to line the inner labia.  The procedure is the most compatible with the normal developmental process the patient would have undergone had the patient been born with female genitals.

18.    I typically see patients twice after a surgery:  first to instruct them on dilation, and then again shortly before they return home.  I also see patients at any other time, if needed.  Patients usually return home within two weeks of surgery and are shifted to the care of a primary care physician.  All patients are given detailed instructions on what to expect and a guide to

DECLARATION OF DR. MARCI BOWERS

possible complications.  I encourage patients to see their primary care physician one month following the surgery or sooner if needed.  I also urge patients to implement a long-term follow up plan that will include a Pap smear at a frequency similar to that of a natal woman who has had a hysterectomy and a speculum examination once yearly at minimum.

19.    For transgender male patients, sex reassignment surgeries may include chest reconstruction (mastectomy and reconstruction), metoidioplasty, phalloplasty, scrotoplasty, hysterectomy, and vaginectomy, among other surgical treatments.  Of those, I regularly provide hysterectomies, vaginectomies, metoidioplasties, and scrotoplasties.  I have performed over 2000 hysterectomies and over 350 metoidioplasties.

20.    A hysterectomy usually includes removal of both ovaries and fallopian tubes (salingo-oophrectomy).  The procedure can be performed from below (vaginal) or through the abdomen.  The hysterectomy procedures I have performed on transgender men do not differ significantly from the hysterectomy procedures I have performed on women.  When I have performed hysterectomy procedures on transgender men, the primary diagnosis is to treat gender dysphoria, rather than a gynecological diagnosis.  When I have performed hysterectomy procedures on women, the medical necessity arises from pathology.  Although many transgender men do not have a gynecological diagnosis, I have found in my practice that 15-20% will find incidental pathology at the time of the hysterectomy, meaning the post-surgical pathology report indicates pathology that was undetected prior to surgery, such as endometriosis, fibroids, pre-cancerous conditions of the uterus or cervix such as dysplasia or ovarian cysts, tumors, or adhesive disease.  The procedure for transgender men does not differ in price from hysterectomies performed on women.  In fact, it may be cheaper since there is generally less pathology and therefore, the procedure is generally less complicated and less time-consuming.

21.    The simple metoidioplasty ("SM") is a release of the testosterone-enlarged clitoris/phallus from the labia minora.  The released hood is sewn along the midline undersurface to fashion a male penis.  The penis is bulked by use of the labial subcutaneous tissue and levator musculature.  A final length of 3-8 centimeters in length for the penis can be expected although without the ability to urinate through the phallus.  The procedure is reasonably free of complications and inexpensive.  It is performed as an outpatient procedure and can be combined with scrotoplasty in the same surgery.

22.    Vaginectomy is the removal or obliteration of the vaginal walls, which allows full surgical closure of the vagina.  It may be provided either alone or in combination with hysterectomy or metoidioplasty.  One advantage of vaginal closure is to allow positioning of the testicles to a more masculine scrotal shape.

23.    Scrotoplasty is the construction of a testicle implant laden scrotal sac, also known as testicle implants.  The procedure can be combined with SM or done as a separate procedure.  If done in combination with SM, the original incisions allow the implants to be placed through a single incision hidden in the midline between the testicles.

24.    Most of the procedures that constitute SRS also are performed to treat conditions other than gender dysphoria, and most of these procedures are substantially similar when

DECLARATION OF DR. MARCI BOWERS

performed as part of SRS and when performed for other medical reasons. For example, a vaginoplasty performed as part of SRS does not differ substantially from a vaginoplasty performed to address certain intersex conditions. Penectomies, orchiectomies, mastectomies, vaginectomies and hysterectomies performed as part of SRS do not differ substantially when these procedures are performed to address tissue pathology. Likewise, scrotoplasties and breast enlargement procedures performed as part of SRS are similar when performed for reconstructive purposes.

## II.    Requirements for Genital Sex Reassignment Surgery

25.    Before performing SRS, I conduct an extensive consultation to review all of the inclusion criteria and to make certain that patients are aware of each aspect of the procedure. In making this assessment, I adhere to the guidelines established by the internationally recognized standards of care for transgender health care promulgated by the World Professional Association of Transgender Health ("WPATH").

26.    For genital SRS, in accordance with the WPATH standards of care, I require that the patient have two referrals from qualified mental health professionals who have independently assessed the patient.

27.    Certain medical concerns may delay surgery, such as serious cardiac issues, significant obesity, or a smoking habit. The risk of surgical complications for smokers is much higher, and tissue healing following surgery is much slower. I treat patients who have been diagnosed as HIV-positive or with Hepatitis C unless they are not receiving the appropriate treatment protocol for those co-existing conditions.

28.    Psychiatric diagnoses generally do not preclude treatment and, in fact, those conditions generally improve after SRS.

29.    The age of the patient by itself is not a determining factor, although the patient must be the legal age of majority in the jurisdiction.

30.    Other requirements include that the patient demonstrate an understanding of the surgery, its potential complications and post-surgical complications and the required length of stay in the hospital.

## III.    Efficacy of Sex Reassignment Surgery

31.    The vast majority of studies have shown that sex reassignment surgery is clinically effective. In my professional experience, the success rate of SRS is extremely high. A useful measure of the success rate of SRS is the rate of regret expressed by patients after receiving SRS. It is exceedingly rare for a patient to express regret following the treatment, and when they do it generally relates to issues of societal discrimination and relationship difficulties. Indeed, in my professional experience, patients who have had sex reassignment surgery have less regret than any other surgery of which I am aware.

32.    Sex reassignment surgery has a very low rate of complications, and the complications that may result from sex reassignment surgery are mainly minor in nature.

- 4 -

DECLARATION OF DR. MARCI BOWERS

33.     My clinic contacts patients one year after their surgery to determine the impact on their life, and an overwhelming majority of patients report less self-loathing and significantly more confidence and well-being.  Many patients report a dramatic improvement in mental health following surgery, and patients have been able to become productive members of society, no longer disabled with severe depression and gender dysphoria.

**VI.    Sex Reassignment Surgery Is Medically Necessary Treatment**

34.     Although some transgender people are able to treat their gender dysphoria effectively through other treatments, sex reassignment surgery for many is medically necessary to treat the individual's gender dysphoria and establish congruence between the individual's physical features and gender identity.

35.     Sex reassignment surgery is not an "experimental" or "cosmetic" procedure.  Many thousands of gender corrective surgeries have been performed worldwide for decades, and the treatment is in no way "experimental."  Rather, sex reassignment surgery has been shown to be a life-saving procedure and is unequivocally medically necessary.

36.     The American Medical Association ("AMA"), the preeminent health care organization in the United States, and the American Psychiatric Association and other health care organizations have issued resolutions supporting coverage of sex reassignment surgery as a medically necessary treatment for gender dysphoria.

37.     It is vital that patients with severe gender dysphoria have access to sex-reassignment surgery in a timely manner.  Gender dysphoria, if left untreated, can result in clinically significant psychological distress, dysfunction, debilitating depression and, for some people without access to appropriate medical care and treatment, suicidality and death.  As stated in the AMA resolution, "delays in access to appropriate medical care for gender identity disorder can result in significant psychological distress including debilitating depression, suicidality and death."

38.     MediCal is California's version of the federal Medicaid program, which provides health coverage for low-income people and people with disabilities.  MediCal covers sex reassignment surgery as a medically necessary treatment.  I have a contract with the San Francisco Health Plan and also contract with other county MediCal administrators in California to provide SRS and other transition-related surgeries.  We have performed operations on approximately two dozen MediCal contracted patients to date, all with relatively positive outcomes.

DECLARATION OF DR. MARCI BOWERS

\*\*\*

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _____May    7_____, 2016          _____
                                          Marci L. Bowers, MD

DECLARATION OF DR. MARCI BOWERS

# EXHIBIT A

**Marci L. Bowers, MD**
345 Lorton Avenue, Suite 101
Burlingame, CA  94010
Phone: 650-570-2270
Fax:  650-570-2283
marcibdoc@gmail.com

## EDUCATION

1980
Bachelor of Sciences in Medical Microbiology
University of Wisconsin
Madison, WI

1986
Medical Degree
University of Minnesota, Minneapolis, MN

## RESIDENCY

1986 – 1990
Obstetrics/Gynecology Residency
University of Washington
Seattle, WA

## BOARD CERTIFICATION

Board Certified, American Board of Obstetrics & Gynecology 1992, 2004-present

## LICENSURE

Washington, California

## PROFESSIONAL EXPERIENCE

1990 – 2002
The Polyclinic
Obstetrics and Gynecology
1145 Broadway
Seattle, WA 98122-4299

2002 – Present
Seattle Reproductive Healthcare
Obstetrics and Gynecology
1229 Madison Street Suite #840
Seattle, WA 98104

2003 – 2010
Trinidad Reproductive Healthcare
328 Bonaventure Street, Suite #2
Trinidad, CO 81082

2010 – present
Bay Area Reproductive Healthcare and Surgery
345 Lorton Ave Suite #101, Burlingame, CA 94010

**HOSPITAL AFFILIATIONS**

1990 – 2003
Swedish Hospital Medical Center/Seattle, WA

2003 – 2011
Mount San Rafael Hospital, Trinidad, CO

2010 – present
Mills-Peninsula Medical Center (Sutter Health),
Burlingame, CA

**PROFESSIONAL MEMBERSHIPS**

Fellow,
American College of Obstetrics & Gynecology

Member,
San Mateo Medical Association

Member,
World Professional Association for Transgender Health

**COMMITTEES**

1983 – 1984
Representative, Medical School Educational Policy Committee
University of Minnesota, MN

1993 – 1995
Chairperson, Quality Assurance Committee (CQI)
Department of Obstetrics/Gynecology
Swedish Medical Center (Providence), Seattle, WA

**AR48**
Appx049

1996-1998
Chairperson, Department of OB/GYN
Swedish (Providence) Medical Center

2002 – 2008
Advisory Board
Midwives' Association of Washington State

2007 – 2009
Chief of Surgery
Mt. San Rafael Hospital

2011 – present
National Board of Directors
GLAAD

2011 – present
National Board of Directors
Transgender Law Center (TLC)

**HONORS AND AWARDS**

1984 – 1985
President
University of Minnesota Medical School
Minneapolis, MN

1985 – 1986
President, Medical Student Council
University of Minnesota
Minneapolis, MN

1986 – 1990
Chief Resident Award for Teaching Excellence
University of Washington, Obstetrics & Gynecology
Seattle, WA

1990 – 1998
Family Practice Teaching Awards
Providence Medical Center, Seattle, WA
Swedish Medical Center, Seattle, WA

2002 – 2004
Best Doctors in America
American Research Council

2003 – present
Member-Elect
European Academy of Sciences

**PUBLICATIONS**

Management of Gender Dysphoria: A Multidisciplinary Approach; "Complications of Male-to-Female Vaginoplasty", 2014.

Trans Bodies Trans Selves; "Transgender Surgery", 2014.

**MEDIA APPEARANCES**

2004 CSI: Las Vegas 100th episode

2007 The Oprah Winfrey Show

2008 CBS Sunday Morning

2009 CNN

2008-2011 The Tyra Banks Show (5 appearances)

2012 The Doctors Show

2014 BBC

## EXPERT DECLARATION OF DR. RANDI C. ETTNER

1.      I, Randi C. Ettner, have been retained by counsel for the Transgender American

Veterans Association ("TAVA") in connection with its petition to the Secretary of the

Department of Veterans Affairs for rulemaking to promulgate regulations governing provision of

sex reassignment surgery to transgender veterans.  TAVA's counsel have asked me to provide

my expert opinion regarding whether there is any basis in medicine or science for the Veterans

Health Administration's policy of excluding sex reassignment surgery from the medical benefits

package offered to veterans.  This exclusion is embodied in regulation 38 C.F.R. § 17.38(c)

("Section 17.38") and in the current implementing directive for that regulation, VHA Directive

2013-003 (Feb. 8, 2013).[1]  My conclusion is that this exclusion for sex reassignment surgery has

no medical or scientific basis.  I base this conclusion on:  (i) scientific research on gender

dysphoria and its impact on the health and well-being of individuals with that diagnosis; and (ii)

information regarding best practices and the generally accepted standards of care for individuals

with gender dysphoria, including the efficacy of sex reassignment surgery as a treatment for

gender dysphoria.  I have actual knowledge of the matters stated herein, except where otherwise

stated, and could and would so testify if called as a witness.

## I.      QUALIFICATIONS

2.      I received my doctorate in psychology from Northwestern University in 1979.  I

have been the chief psychologist at the Chicago Gender Center since 2005, which specializes in

the treatment of individuals with gender dysphoria.  I have been involved in treating patients

---

[1]      Section 17.38 reads, in relevant part, "In addition to the care specifically excluded from
the "medical benefits package" under paragraphs (a) and (b) of this section, the "medical benefits
package" does not include the following: … (4) Gender alterations."

with gender dysphoria[2] since 1977, when I was an intern at the Cook County Hospital in Chicago, Illinois.

3.      During the course of my career, I have evaluated and/or treated between 2,500 and 3,000 individuals with gender dysphoria and mental health issues related to gender variance.

4.      I have published four books related to the treatment of individuals with gender dysphoria, including the medical text entitled *Principles of Transgender Medicine and Surgery.* (Ettner, Monstrey & Eyler, 2007) and the second edition (Ettner, Monstrey & Coleman, 2016). In addition, I have authored numerous articles in peer-reviewed journals regarding the provision of health care to this population. I have served as a member of the University of Chicago Gender Board, and am a member of the editorial boards for the *International Journal of Transgenderism* and *Transgender Health*.

5.      I am a member of the Board of Directors of the World Professional Association for Transgender Health (WPATH) (formerly the Harry Benjamin International Gender Dysphoria Association) and an author of the WPATH Standards of Care for the Health of Transsexual, Transgender and Gender-nonconforming People, 7th version, published in 2012. The WPATH-promulgated Standards of Care ("Standards of Care") are the internationally recognized guidelines for the treatment of persons with gender dysphoria and serve to inform medical treatment in the United States and throughout the world.

6.      I have lectured throughout North America, Europe and Asia on topics related to gender dysphoria. On numerous occasions, I have given grand rounds presentations on gender dysphoria at medical hospitals.

---

[2]      The American Psychiatric Association published a revised version of its Diagnostic and Statistical Manual of Mental Disorders in 2013, which replaced the "gender identity disorder" diagnosis with "gender dysphoria." For consistency, I will refer to the condition as "gender dysphoria" throughout my report, even when making reference to the condition prior to 2013.

7.    I have been retained as an expert regarding gender dysphoria and the treatment of gender dysphoria in multiple court cases and administrative proceedings.  I was deposed as an expert in three cases over the past ten years:  *Fields v. Smith*, No. 06-C-112 (E.D. Wis. 2006), *Doe v. Clenchy*, No. CV-09-2011 (Me. Super. Ct. Nov. 20, 2012), and *Kothmann v. Rosario*, 558 F. App'x 907 (11th Cir. 2014).

8.    My fees in this case are as follows:  $265 USD per hour for consulting; $395 USD per hour for deposition and trial testimony; and $900 USD per day for travel time spent out of the office.  My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I provide.

9.    A true and correct copy of my Curriculum Vitae, which provides a complete overview of my education, training, and work experience, and a full list of my publications, is attached hereto as Exhibit A.

## II.    MATERIALS CONSIDERED

10.    I have considered information from various sources in forming my opinions expressed herein, in addition to drawing on my extensive experience and review of the literature related to gender dysphoria over the past three decades.  A complete bibliography of the materials referenced in this report is attached hereto as Exhibit B.  The materials I have relied upon in preparing this declaration are the same types of materials that experts in my field of study regularly rely upon when forming opinions on the subject.

## III.    BACKGROUND INFORMATION ON GENDER DYSPHORIA

11.    Scientific and clinical evidence of gender dysphoria and current medical standards of care for the treatment of gender dysphoria make clear that Section 17.38(c) and its 2013 implementing directive lack any basis in medicine or science.  The concept of "gender identity"

3

is well-established in medicine and refers to every person's deeply held understanding of the person's own gender. Gender identity is an innate aspect of personality that is firmly established, generally by the age of four, although individuals vary in the age at which they come to understand and express that identity.

12.    Typically, people who are designated female at birth based on the appearance of their genitalia identify as girls or women, and people who are designated male at birth identify as boys or men. For transgender individuals, however, the person's gender identity differs from the sex assigned to that person at birth, and this incongruence gives rise to a sense of being "wrongly embodied."

13.    The medical diagnosis for this feeling of incongruence is Gender Dysphoria, formerly known as Gender Identity Disorder. Gender dysphoria is a serious medical condition codified in the International Classification of Diseases, 10th revision (World Health Organization, 2010) and the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 5th edition (American Psychiatric Association, 2013) ("DSM-5"). The condition is manifested by symptoms such as preoccupation with ridding oneself of primary and secondary sex characteristics. Untreated gender dysphoria can result in significant clinical distress, debilitating depression, and often suicidality. Gender dysphoria is also the psychiatric term used to describe the severe and unremitting emotional pain associated with the condition.

14.    The diagnostic criteria for establishing a diagnosis of Gender Dysphoria in adults are set forth in the DSM-V (302.85):

> A.    A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:

4

**AR54**

1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics.

2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender.

3. A strong desire for the primary and/or secondary sex characteristics of the other gender.

4. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).

5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

B. The condition is associated with clinically significant distress or impairment in social, occupational or other important areas of functioning.

15. Adults who manifest a severe degree of such dysphoria are commonly referred to as "transsexual individuals" or "transgender individuals." Without treatment, individuals with gender dysphoria experience anxiety, depression, suicidality and other attendant mental health issues. (*See, e.g.*, Fraser, 2009; Schaefer & Wheeler, 2004; Ettner, 1999; Brown, 2000, DSM-5 (2013).) Many such individuals carry a burden of shame and low self-esteem, attributable to a feeling of being inherently "defective," and as a result become socially isolated. This isolation in turn leads to the stigmatization of such individuals, which over time proves ravaging to healthy personality development and interpersonal relationships. As a result, without treatment, many such individuals are unable to function effectively in occupational, social, or other important

5

**AR55**

areas of daily living.  A recent survey shows a 41% rate of suicide attempts among transgender

people, far above the baseline rates for North America.  (Haas *et al.*, 2014.)

16.    Transsexuals without access to appropriate care are often desperate for relief, and

in some instances resort to self-surgery, such as life-threatening attempts at auto-castration (*i.e.*,

the removal of one's testicles).  (Brown, 2010; Brown & McDuffie, 2009.)

17.    Gender dysphoria intensifies with age.  Middle-aged and elderly gender dysphoric

adults experience an exacerbation of symptoms.  (Ettner, 2013; Ettner & Wiley, 2013.)

**IV.    TREATMENT OF GENDER DYSPHORIA**

    **A.    WPATH Standards of Care**

18.    The World Professional Association for Transgender Health ("WPATH") has

established internationally accepted Standards of Care for treating gender dysphoria.  The

WPATH Standards of Care are recognized as authoritative by the American Medical

Association, the Endocrine Society, and the American Psychological Association.  (*See* Br. of

Amici Curiae Medical and Mental Health Professionals at 6, Nos. 10-2339 and 10-2446 (7th Cir.

Nov. 29, 2010), *available at* www.lambdalegal.org/sites/default/files/fields_v__smith_-

_brief_of_amici_curiae_medical_and_mental_health_professionals.pdf; American Psychological

Association Policy Statement on Transgender, Gender Identity, and Gender Expression Non-

discrimination (2009).)[3]

19.    The Standards of Care identify the following treatment protocols for treating

individuals with gender dysphoria:

---

[3]    *See also* Wylie C. Hembree, *Endocrine Treatment of Transsexual Persons:  An
Endocrine Society Clinical Practice Guideline*, J. of Clinical Endocrinology & Metabolism,
94:9, 3132-3154 (2009), *available at* http://press.endocrine.org/doi/full/10.1210/jc.2009-
0345#sthash.ffOiZnIN.dpuf.

**AR56**

- Changes in gender expression and role (which may involve living part-time or full-time in another gender role, consistent with one's gender identity);

- Psychotherapy (individual, couple, family, or group) for purposes such as exploring gender identity, role, and expression; addressing the negative impact of gender dysphoria and stigma on mental health; alleviating internalized transphobia; enhancing social and peer support; improving body image; or promoting resilience;

- Hormone therapy to feminize or masculinize the body; and

- Surgery to change primary and/or secondary sex characteristics (*e.g.*, breasts/chest, external and/or internal genitalia, facial features, body contouring).

20.    Once a diagnosis of gender dysphoria is made, a treatment plan should be developed based on an individualized assessment of the medical needs of the particular patient. Treatment short of sex reassignment surgery, such as psychotherapy or counseling, and hormone therapy, can provide support and help with many of the issues that arise in tandem with gender dysphoria. Counseling and hormone therapy alone are not substitutes for surgical intervention where surgical intervention is needed. By analogy, for breast cancer, counseling might provide psychoeducation about treatment and prognosis, and information about nutrition, but it does not obviate the need for medically necessary surgical treatment.

**B.    Sex Reassignment Surgery**

21.    For many individuals with severe gender dysphoria, relief from their dysphoria cannot be achieved without surgical intervention to modify primary and/or secondary sex characteristics.

22.    Genital reconstructive surgery, for example, has two therapeutic purposes. *First*, removal of the gonads (*i.e.*, testes or ovaries, which are hormone-producing organs) eliminates

7

the major source of hormone production in the body. *Second*, the patient attains body congruence by gaining normal appearing and functioning uro-genital structures that conform to the patient's gender. Achieving both purposes is critical to alleviating or eliminating gender dysphoria in many patients.

23. Contrary to some outdated speculation, sex reassignment surgery is neither experimental nor cosmetic—no major medical association considers sex reassignment surgery to be either. Decades of careful and methodologically sound scientific research have demonstrated that sex reassignment surgery is a safe and effective treatment for severe gender dysphoria, and indeed, for many people, it is the only effective treatment. (*See, e.g.*, Pfafflin & Junge, 1998; Smith *et al.*, 2005; Jarolim *et al.*, 2009.)

24. WPATH, the American Medical Association, the Endocrine Society, the American Psychiatric Association, and the American Psychological Association all support surgery in accordance with the WPATH Standards of Care as medically necessary treatment for individuals with severe gender dysphoria. *See* American Medical Association (2008), Resolution 122 (A-08) ("public and private health insurance coverage for treatment of gender identity disorder as recommended by the patient's physician"); Endocrine Society (Hembree, W. *et al.*, 2009), Endocrine Treatment of Transsexual Persons:  An Endocrine Society Clinical Practice Guideline ("For many transsexual adults, genital sex reassignment surgery may be the necessary step towards achieving their ultimate goal of living successfully in their desired gender role."); American Psychiatric Association (2012), Position Statement on Access to Care for Transgender and Gender Variant Individuals (the American Psychiatric Association "[r]ecognizes that appropriately evaluated transgender and gender variant individuals can benefit greatly from medical and surgical gender transition treatments"); American Psychological

Association (2009), Policy Statement on Transgender, Gender Identity and Gender Expression Nondiscrimination (recognizing "the efficacy, benefit and medical necessity of gender transition treatments" and referencing studies demonstrating the effectiveness of sex-reassignment surgeries).

25.    Surgeries are considered "effective" from a medical perspective if they "have a therapeutic effect." (Monstrey *et al.*, 2007.)

26.    More than three decades of research confirms that sex reassignment surgery is therapeutic and therefore an effective treatment for gender dysphoria.  In a 1998 meta-analysis, Pfafflin and Junge reviewed data from 80 studies, spanning 30 years, from 12 countries.  They concluded that "reassignment procedures were effective in relieving gender dysphoria.  There were few negative consequences and all aspects of the reassignment process contributed to overwhelmingly positive outcomes." *Id.*

27.    Numerous subsequent studies confirm this conclusion.  Researchers reporting on a large-scale prospective study of 325 individuals in the Netherlands concluded that after surgery there was "a virtual absence of gender dysphoria" in the cohort and "results substantiate previous conclusions that sex reassignment is effective."  (Smith *et al.*, 2005.)  Indeed, the authors of the study concluded that the surgery "appeared therapeutic and beneficial" across a wide spectrum of factors, and "[t]he main symptom for which the patients had requested treatment, gender dysphoria, had decreased to such a degree that it had disappeared."  (*Id.*)

28.    In 2007, Gijs and Brewayes analyzed 18 studies published between 1990 and 2007, encompassing 807 patients.  The researchers concluded:  "Summarizing the results from the 18 outcome studies of the last two decades, the conclusion that [sex reassignment surgery] is the most appropriate treatment to alleviate the suffering of extremely gender dysphoric

9

individuals still stands:  Ninety-six percent of the persons who underwent [surgery] were satisfied and regret was rare."  (*Id.*)

29.    Studies conducted in countries throughout the world conclude that surgery is an extremely effective treatment for gender dysphoria.  For example, a 2001 study published in Sweden states:  "The vast majority of studies addressing outcome have provided convincing evidence for the benefit of sex reassignment surgery in carefully selected cases."  (Landen, 2001.)  Similarly, urologists at the University Hospital in Prague, Czech Republic, in a Journal of Sexual Medicine article concluded, "Surgical conversion of the genitalia is a safe and important phase of the treatment of male-to-female transsexuals."  (Jarolim, 2009.)

30.    Patient satisfaction is an important measure of effective treatment.  Achieving functional and normal physical appearance consistent with gender identity alleviates the suffering of gender dysphoria and enables the patient to function in everyday life.  Studies have shown that by alleviating the suffering and dysfunction caused by severe gender dysphoria, sex reassignment surgery improves virtually every facet of a patient's life.  This includes satisfaction with interpersonal relationships and improved social functioning (Rehman *et al.*, 1999; Johansson *et al.*, 2010; Hepp *et al.*, 2002; Ainsworth & Spiegel, 2010; Smith *et al.*, 2005); improvement in self-image and satisfaction with body and physical appearance (Lawrence, 2003; Smith *et al.*, 2005; Weyers *et al.*, 2009); and greater acceptance and integration into the family (Lobato *et al.*, 2006).

31.    Studies have also shown that surgery improves patients' abilities to initiate and maintain intimate relationships (Lobato *et al.*, 2006; Lawrence, 2005; Lawrence, 2006; Imbimbo *et al.*, 2009; Klein & Gorzalka, 2009; Jarolim *et al.*, 2009; Smith *et al.*, 2005; Rehman *et al.*, 1999; DeCuypere *et al.*, 2005).

32.    Multiple long-term studies have confirmed these results.  *See, e.g.*,
"Transsexualism in Serbia:  A Twenty-Year Follow-up Study" (Vujovic *et al.*, 2009); "Long-
term Assessment of the Physical, Mental, and Sexual Health Among Transsexual Women"
(Weyers, 2009); "Treatment Follow-up of Transsexual Patients" (Hepp *et al.*, 2002); "A Five-
year Follow-up Study of Swedish Adults with Gender Identity Disorder" (Johansson *et al.*,
2010); "A Report from a Single Institute's 14-Year Experience in Treatment of Male-to-Female
Transsexuals" (Imbimbo *et al.*, 2009); 'Followup of Sex Reassignment Surgery in Transsexuals:
A Brazilian Cohort" (Lobato *et al.*, 2006).

33.    Recognizing this consensus in the literature, in 2008, WPATH issued a "Medical
Necessity Statement" stating:  "These medical procedures and treatment protocols are not
experimental:  decades of both clinical and medical research show they are essential to achieving
well-being for the transsexual patient."  (World Professional Association for Transgender Health,
2008).

34.    On May 30, 2014, the Appellate Division of the Departmental Appeals Board of
the United States Department of Health and Human Services issued decision number 2576, in
which the Board determined that a Medicare regulation denying coverage of "all transsexual
surgery as a treatment for transsexualism" was not valid under the "reasonableness standard."
(U.S. Dept. of Health and Human Services, 2014).  The Board specifically concluded that
"transsexual surgery is an effective treatment option for transsexualism in appropriate cases." *Id.*

35.    Because of the overwhelming scientific evidence that transition-related care,
including sex reassignment surgery, is medically necessary for the treatment of gender dysphoria
in some patients, many of the leading medical and professional organizations have stated their
opposition to exclusions of insurance coverage for that care, including the American Medical

Association, American Academy of Family Physicians, American College of Obstetricians and

Gynecologists, the American Psychiatric Association, and WPATH.[4]

36.    Moreover, I understand that the Department of Veterans Affairs provides non-

surgical medical care in connection with gender transition, including hormone therapy, and pre-

and post-surgical care.  In light of that, the surgical exclusion is particularly arbitrary.  As

described above, hormone therapy and other forms of non-surgical treatments are not substitutes

for surgical intervention where such intervention is needed.  I am aware of no support in the

medical or scientific literature for policies that provide access to non-surgical care, while

simultaneously maintaining a blanket exclusion of surgical care regardless of an individual's

medical needs.

---

[4]    *See* (a) The American Medical Association, Resolution 122 (2008), attached as Exhibit C
at 489 ("RESOLVED, That our American Medical Association support public and private health
insurance coverage for treatment of gender identity disorder as recommended by the patient's
physician."); (b) The American Academy of Family Physicians ("AAFP"), Summary of Actions:
2012 National Conference of Special Constituencies, Action on Resolution No. 1004, attached
hereto in excerpted form as Exhibit D ("RESOLVED, [AAFP] supports efforts to require
insurers to provide coverage for comprehensive care of transgendered individuals including …
when medically necessary, gender reassignment surgery."); (c) The American College of
Obstetricians and Gynecologists, Committee Opinion of the Committee on Healthcare for
Underserved Women, No. 512 (Dec. 2011), attached hereto as Exhibit E at 1 ("The American
College of Obstetricians and Gynecologists opposes discrimination on the basis of gender
identity and urges public and private health insurance plans to cover the treatment of gender
identity disorder."); (d) The American Psychiatric Association, "Position Statement on Access to
Care for Transgender and Gender Variant Individuals" (2012), attached hereto as Exhibit F
(stating that the American Psychiatric Association "[a]dvocates for removal of barriers to care
and supports both public and private health insurance coverage for gender transition treatment"
and "[o]pposes categorical exclusions of coverage for such medically necessary treatment when
prescribed by a physician"); (e) The American Psychological Association, "Transgender, Gender
Identity & Gender Expression Non-Discrimination" Policy Statement (Aug. 2008), attached
hereto as Exhibit G at 26 ("BE IT FURTHER RESOLVED that APA recognizes the efficacy,
benefit, and necessity of gender transition treatments for appropriately evaluated individuals and
calls upon public and private insurers to cover these medically necessary treatments"); and (f)
WPATH SOC, attached hereto as Exhibit H at 186 ("WPATH urges health insurance companies
and other third-party payers to cover the medically necessary treatments to alleviate gender
dysphoria").

## V.   CONCLUSION

37.   Given the extensive scientific research, spanning decades, that supports the efficacy and necessity of sex reassignment surgery, it is clear that sex reassignment surgery is neither experimental nor cosmetic, but rather is a medically necessary treatment for gender dysphoria in patients prescribed this treatment.   Accordingly, I am aware of no medical or scientific basis for the Department of Veterans Affairs' policy of excluding sex reassignment surgery from the medical benefits package offered to veterans.   The exclusion embodied in Section 17.38 and its 2013 implementing directive has no basis in the scientific literature and is contrary to the medical consensus recognizing the efficacy and necessity of access to sex reassignment surgery.

***

I declare under penalty of perjury that the foregoing is true and correct.

Dated:   5.5.16   , 2016                Ranh C. Ethr PhD.
                                        Randi C. Ettner, Ph.D.

# EXHIBIT A

# RANDI ETTNER, PHD
**1214 Lake Street**
**Evanston, Illinois 60201**
**Tel 847-328-3433   Fax 847-328-5890**
**rettner@aol.com**

## POSITIONS HELD

Clinical Psychologist
Forensic Psychologist
Fellow and Diplomate in Clinical Evaluation, American Board of Psychological
Specialties
Fellow and Diplomate in Trauma/PTSD
President, New Health Foundation Worldwide
Board of Directors, World Professional Association of Transgender Health
(WPATH)
Chair, Committee for Incarcerated Persons, WPATH
University of Minnesota Medical Foundation: Leadership Council
Psychologist, Chicago Gender Center
Adjunct Faculty, Prescott College
Editorial Board, *International Journal of Transgenderism*
Editorial Board, *Transgender Health*
Television and radio guest (more than 100 national and international
appearances)
Internationally syndicated columnist
Private practitioner
Medical staff privileges attending psychologist; Advocate Lutheran General
Hospital

## EDUCATION

PhD, 1979     Northwestern University (with honors)
              Evanston, Illinois

MA, 1976      Roosevelt University (with honors)
              Chicago, Illinois
              Major:  Clinical Psychology

BA, 1969-72   Indiana University (cum laude)
              Bloomington, Indiana
              Major: psychology, Minor: sociology

1972          Moray College of Education
              Edinburgh, Scotland

1

International Education Program

1970            Harvard University
                Cambridge, Massachusetts
                Social relation undergraduate summer program in
                group dynamics and processes

## CLINICAL AND PROFESSIONAL EXPERIENCE

2016            Psychologist: Chicago Gender Center
                Consultant: Walgreens; Tawani Enterprises
                Private practitioner

2011            Instructor, Prescott College: Gender - A multidimensional
                    approach

2000            Instructor, Illinois Professional School of Psychology

1995-present    Supervision of clinicians in counseling gender non-conforming
                    clients

1993            Post-doctoral continuing education with Dr. James Butcher in
                    MMPI-2 interpretation University of Minnesota

1992            Continuing advanced tutorial with Dr. Leah Schaefer in
                    psychotherapy

1983-1984       Staff psychologist, Women's Health Center, St. Francis
                    Hospital, Evanston, Illinois

1981-1984       Instructor, Roosevelt University, Department of Psychology:
                    Psychology of Women, Tests and Measurements, Clinical
                    Psychology, Personal Growth, Personality Theories,
                    Abnormal Psychology

1976-1978       Research Associate, Cook County Hospital, Chicago, Illinois
                    Department of Psychiatry

1975-1977       Clinical Internship, Cook County Hospital, Chicago, Illinois,
                    Department of Psychiatry

1971            Research Associate, Department of Psychology, Indiana
                    University

1970-1972       Teaching Assistant in Experimental and Introductory
                    Psychology Department of Psychology, Indiana University

1969-1971       Experimental Psychology Laboratory Assistant, Department of

2

Psychology, Indiana University

## LECTURES AND HOSPITAL GRAND ROUNDS PRESENTATIONS

*Foundations in mental health; role of the mental health professional in legal and policy issues,* WPATH global education initiative, Chicago, 2015; Atlanta, 2016; *The transitioning client*, Springfield, MO, 2016

*Pre-operative evaluation in gender-affirming surgery*-American Society of Plastic Surgeons, 2015

*Gender affirming psychotherapy; Assessment and referrals for surgery-Standards of Care-* Fenway Health Clinic, Boston, 2015

*Gender reassignment surgery-* Midwestern Association of Plastic Surgeons, 2015

*Adult development and quality of life in transgender healthcare-* Eunice Kennedy Shriver National Institute of Child Health and Human Development, 2015

*Healthcare for transgender inmates-* American Academy of Psychiatry and the Law, 2014

*Supporting transgender students: best school practices for success-* American Civil Liberties Union of Illinois and Illinois Safe School Alliance, 2014

*Addressing the needs of transgender students on campus-* Prescott College, 2014

*The role of the behavioral psychologist in transgender healthcare –* Gay and Lesbian Medical Association, 2013

*Understanding transgender-* Nielsen Corporation, Chicago, Illinois, 2013;

*Role of the forensic psychologist in transgender care*; *Care of the aging transgender patient-* University of California San Francisco, Center for Excellence, 2013

*Evidence-based care of transgendered patients-* North Shore University Health Systems, University of Chicago, Illinois, 2011; Roosevelt-St. Vincent Hospital, New York; Columbia Presbyterian Hospital, Columbia University, New York, 2011

*Children of Transsexuals*-International Association of Sex Researchers, Ottawa, Canada, 2005; Chicago School of Professional Psychology, 2005

*Gender and the Law-* DePaul University College of Law, Chicago, Illinois, 2003; American Bar Association annual meeting, New York, 2000

3

*Gender Identity and Clinical Issues* –WPATH Symposium, Bangkok, Thailand, 2014; Argosy College, Chicago, Illinois, 2010; Cultural Impact Conference, Chicago, Illinois, 2005; Weiss Hospital, Department of Surgery, Chicago, Illinois, 2005; Resurrection Hospital Ethics Committee, Evanston, Illinois, 2005; Wisconsin Public Schools, Sheboygan, Wisconsin, 2004, 2006, 2009; Rush North Shore Hospital, Skokie, Illinois, 2004; Nine Circles Community Health Centre, University of Winnipeg, Winnipeg, Canada, 2003; James H. Quillen VA Medical Center, East Tennessee State University, Johnson City, Tennessee, 2002; Sixth European Federation of Sexology, Cyprus, 2002; Fifteenth World Congress of Sexology, Paris, France, 2001; Illinois School of Professional Psychology, Chicago, Illinois 2001; Lesbian Community Cancer Project, Chicago, Illinois 2000; Emory University Student Residence Hall, Atlanta, Georgia, 1999; Parents, Families and Friends of Lesbians and Gays National Convention, Chicago, Illinois, 1998; In the Family Psychotherapy Network National Convention, San Francisco, California, 1998; Evanston City Council, Evanston, Illinois 1997; Howard Brown Community Center, Chicago, Illinois, 1995; YWCA Women's Shelter, Evanston, Illinois, 1995; Center for Addictive Problems, Chicago, 1994

*Psychosocial Assessment of Risk and Intervention Strategies in Prenatal Patients*- St. Francis Hospital, Center for Women's Health, Evanston, Illinois, 1984; Purdue University School of Nursing, West Layette, Indiana, 1980

*Psychonueroimmunology and Cancer Treatment*- St. Francis Hospital, Evanston, Illinois, 1984

*Psychosexual Factors in Women's Health*- St. Francis Hospital, Center for Women's Health, Evanston, Illinois, 1984

*Sexual Dysfunction in Medical Practice*- St. Francis Hospital, Dept. of OB/GYN, Evanston, Illinois, 1980

*Sleep Apnea* - St. Francis Hospital, Evanston, Illinois, 1996; Lincolnwood Public Library, Lincolnwood, Illinois, 1996

*The Role of Denial in Dialysis Patients* - Cook County Hospital, Department of Psychiatry, Chicago, Illinois, 1977

## PUBLICATIONS

Ettner, R. & Guillamon, A. Theories of the etiology of transgenderism. In Principles of Transgender Medicine and Surgery. Ettner, Monstrey & Coleman (Eds.), 2nd edition; Routledge, June, 2016.

Ettner, R., Monstrey, S, & Coleman, E. (Eds.) Principles of Transgender Medicine and Surgery, 2nd edition; Routledge, June, 2016.

4

Bockting, W, Coleman, E., Deutsch, M., Guillamon, A., Meyer, I., Meyer, W., Reisner, S., Sevelius, J. & Ettner, R. Adult development and quality of life of transgender and gender nonconforming people. *Current Opinion in Endocrinology and Diabetes*, 2016.

Ettner, R. Children with transgender parents in <u>Sage Encyclopedia of Psychology and Gender</u>. Nadal (Ed.) Sage Publications, in press.

Ettner, R. Surgical treatments for the transgender population in <u>Lesbian, Gay, Bisexual, Transgender, and Intersex Healthcare: A Clinical Guide to Preventative, Primary, and Specialist Care</u>. Ehrenfeld & Eckstrand, (Eds.) Springer: MA, 2016.

Ettner, R. Etiopathogenetic hypothesis on transsexualism in <u>Management of Gender Identity Dysphoria: A Multidisciplinary Approach to Transsexualism.</u> Trombetta, Liguori, Bertolotto, (Eds.) Springer: Italy, 2015.

Ettner, R. Care of the elderly transgender patient. *Current Opinion in Endocrinology and Diabetes, 2013, V*ol. 20(6), 580-584.

Ettner, R., and Wylie, K. Psychological and social adjustment in older transsexual people. *Maturitas,* March, 2013, Vol. 74, (3), 226-229.

Ettner, R., Ettner, F. and White, T. Secrecy and the pathophysiology of hypertension. *International Journal of Family Medicine* 2012, Vol. 2012.

Ettner, R. Psychotherapy in <u>Voice and Communication Therapy for the Transgender/Transsexual Client: A Comprehensive Clinical Guide</u>. Adler, Hirsch, Mordaunt, (Eds.) Plural Press, 2012.

Coleman, E., Bockting, W., Botzer, M., Cohen-Kettenis, P., DeCuypere, G., Feldman, J., Fraser, L., Green, J., Knudson, G., Meyer, W., Monstrey, S., Adler, R., Brown, G., Devor, A., Ehrbar, R., Ettner, R., et.al. Standards of Care for the health of transsexual, transgender, and gender-nonconforming people. World Professional Association for Transgender Health (WPATH). 2012.

Ettner, R., White, T., and Brown, G. Family and systems aggression towards therapists. *International Journal of Transgenderism,* Vol. 12, 2010.

Ettner, R. The etiology of transsexualism in <u>Principles of Transgenger Medicine and Surgery</u>, Ettner, R., Monstrey, S., and Eyler, E. (Eds.). Routledge Press, 2007.

Ettner, R., Monstrey, S., and Eyler, E. (Eds.) <u>Principles of Transgender Medicine and Surgery</u>. Routledge Press, 2007.

Monstrey, S. De Cuypere, G. and Ettner, R. Surgery: General principles in <u>Principles of Transgender Medicine and Surgery</u>, Ettner, R., Monstrey, S., and Eyler, E. (Eds.) Routledge Press, 2007.

5

Schechter, L., Boffa, J., Ettner, R., and Ettner, F. Revision vaginoplasty with sigmoid interposition: A reliable solution for a difficult problem. The World Professional Association for Transgender Health (WPATH), 2007, *XX Biennial Symposium,* 31-32.

Ettner, R. Transsexual Couples: A qualitative evaluation of atypical partner preferences. *International Journal of Transgenderism,* Vol. 10, 2007.

White, T. and Ettner, R. Adaptation and adjustment in children of transsexual parents. *European Journal of Child and Adolescent Psychiatry,* 2007: 16(4)215-221.

Ettner, R. Sexual and gender identity disorders in <u>Diseases and Disorders</u>, Vol. 3, Brown Reference, London, 2006.

Ettner, R., White, T., Brown, G., and Shah, B. Client aggression towards therapists: Is it more or less likely with transgendered clients? *International Journal of Transgenderism,* Vol. 9(2), 2006.

Ettner, R. and White, T. in <u>Transgender Subjectives: A Clinician's Guide</u> Haworth Medical Press, Leli (Ed.) 2004.

White, T. and Ettner, R. Disclosure, risks, and protective factors for children whose parents are undergoing a gender transition. *Journal of Gay and Lesbian Psychotherapy,* Vol. 8, 2004.

Witten, T., Benestad, L., Berger, L., Ekins, R., Ettner, R., Harima, K. Transgender and Transsexuality. <u>Encyclopeida of Sex and Gender</u>. Springer, Ember, & Ember (Eds.) Stonewall, Scotland, 2004.

Ettner, R. Book reviews. *Archives of Sexual Behavior,* April, 2002.

Ettner, R. <u>Gender Loving Care: A Guide to Counseling Gender Variant Clients</u>. WW Norton, 2000.

"Social and Psychological Issues of Aging in Transsexuals," proceedings, Harry Benjamin International Gender Dysphoria Association, Bologna, Italy, 2005.

"The Role of Psychological Tests in Forensic Settings," *Chicago Daily Law Bulletin,* 1997.

<u>Confessions of a Gender Defender: A Psychologist's Reflections on Life amongst the Transgendered</u>. Chicago Spectrum Press. 1996.

"Post-traumatic Stress Disorder," *Chicago Daily Law Bulletin*, 1995.

"Compensation for Mental Injury," *Chicago Daily Law Bulletin*, 1994.

"Workshop Model for the Inclusion and Treatment of the Families of Transsexuals," Proceedings of the Harry Benjamin International Gender Dysphoria Symposium; Bavaria, Germany, 1995.

"Transsexualism- The Phenotypic Variable," Proceedings of the XV Harry Benjamin International Gender Dysphoria Association Symposium; Vancouver, Canada, 1997.

"The Work of Worrying: Emotional Preparation for Labor," <u>Pregnancy as Healing. A Holistic Philosophy for Prenatal Care</u>, Peterson, G. and Mehl, L. Vol. II. Chapter 13, Mindbody Press, 1985.


## PROFESSIONAL AFFILIATIONS

University of Minnesota Medical School –Leadership Council
American College of Forensic Psychologists
World Professional Association for Transgender Health
World Health Organization (WHO) Global Access Practice Network
TransNet national network for transgender research
American Psychological Association
American College of Forensic Examiners
Society for the Scientific Study of Sexuality
Screenwriters and Actors Guild
Phi Beta Kappa

## AWARDS AND HONORS

*The Randi and Fred Ettner Transgender Health Fellowship*-Program in Human Sexuality, University of Minnesota, 2016

Phi Beta Kappa, 1971
Indiana University Women's Honor Society, 1969-1972
Indiana University Honors Program, 9-1972
Merit Scholarship Recipient, 1970-1972
Indiana University Department of Psychology Outstanding Undergraduate Award
        Recipient, 1970-1972
Representative, Student Governing Commission, Indiana University, 1970

## LICENSE

Clinical Psychologist, State of Illinois, 1980

7

**EXHIBIT B**

## Bibliography of Sources Cited

Ainsworth, T. & Spiegel, J. (2010).  Quality of life of individuals with and without facial feminization surgery or gender reassignment surgery.  *Quality of Life Research*, 19(7):1019-24.

American Academy of Family Physicians (2012), Summary of Actions:  2012 National Conference of Special Constituencies, Action on Resolution 1004.

American College of Obstetricians and Gynecologists (2011), Committee Opinion of the Committee on Healthcare for Underserved Women, No. 512.

American Medical Association (2008).  Resolution 122 (A-08).  Retrieved from http://www.tgender.net/taw/ama_resolutions.pdf.

American Psychiatric Association (2012), Position Statement on Access to Care for Transgender and Gender Variant Individuals.  Retrieved from file:///C:/Users/28817/Downloads/position-2012-transgender-gender-variant-access-care.pdf

American Psychiatric Association (2013).  *Diagnostic & Statistical Manual of Mental Disorders*, 5th ed.

American Psychological Association (2009).  Policy Statement on Transgender, Gender Identity, and Gender Expression Non-Discrimination.  Retrieved from http://www.apa.org/about/policy/transgender.aspx.

Brown, G. (2000).  Transvestism and Gender Identity Disorder in Adults.  *Diagnostic & Statistical Manual of Mental Disorders-Text Revision, 4th ed.*

Brown, G. (2010).  Autocastration in autopenectomy as surgical self-treatment in incarcerated persons with gender identity disorder.  *International Journal of Transgenderism*, 12:31-39.

Brown, G. & McDuffie, E. (2009).  Health care policies addressing transgender inmates in prison systems in the United States.  *Journal of Correctional Health Care*, 15.

De Cuypere, G., et al. (2005).  Sexual and physical health after sex reassignment surgery.  *Archives of Sexual Behavior*, 34(6):679-90.

Ettner, R. (1999).  *Gender Loving Care:  A Guide to Counseling Gender-Viariant Clients* (W.W. Norton).

Ettner, R. (2013).  Care of the elderly transgender patient.  *Current Opinion in Endocrine and Diabetes*, 20(6):580-584.

Ettner, R. & Wiley, K. (2013).  Psychological and social adjustment in older transsexual people.  *Maturitas*, 74(3):226-229.

Fraser, L. (2009). Depth psychotherapy with transgender people. *Sexual and relationship therapy*, 24(2).

Gijs, L. & Brewayes, A. (2007). Surgical treatment of gender dysphoria in adults and adolescents: Recent developments, effectiveness, and challenges. *Annual Review of Sex Research*, 18:178-224.

Haas, A., et al. (2014). Suicide Attempts among Transgender and Gender Non-Conforming Adults. Retrieved from http://williamsinstitute.law.ucla.edu/wp-content/uploads/AFSP-Williams-Suicide-Report-Final.pdf.

Hembree, W., et al. (2009). Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guide. Retrieved from https://www.endocrine.org/~/media/endosociety/Files/Publications/Clinical%20Practice%20Guidelines/Endocrine-Treatment-of-Transsexual-Persons.pdf

Hepp, U., et al (2002). Treatment follow-up of transsexual patients: A catamnestic study. *Nervenarzt*, 73:283-288.

Imbimbo, C. (2009). A report from a single institute's 14-year experience in treatment of male-to-female transsexuals. *Journal of Sexual Medicine*, 6(10):2736-45.

Jarolim, L., et al. (2009). Gender reassignment surgery in male-to-female transsexualism: A retrospective 3-month follow-up study with anatomical remarks. *Journal of Sexual Medicine*, 6(6):1635-44.

Johansson, A., Sundbom, E., Hojerback, T., & Bodlund, O. (2010). A five-year follow up study of Swedish adults with gender identity disorder. *Archives of Sexual Behavior*, 39(6): 1429-1437. doi:10.1007/s10508-009-9551-1.

Klein, C. & Gorzalka, B.B. (2009). Sexual functioning in transsexuals following hormone therapy and genital surgery: A review (CME). *The Journal of Sexual Medicine*, 6(11):2922-2939. doi:10.1111/j.1743-6109.2009.01370.x.

Landen, M., et al. (2001). Done is done – and gone is gone: sex reassignment surgery is presently the best cure for transsexuals. *Lakartidningen*, 98(30-31):3322-6.

Lawrence, A. A. (2003). Factors associated with satisfaction or regret following male-to-female reassignment surgery. *Archives of Sexual Behavior*, 32(4):299-315, doi:10.1023/A:1024086814364.

Lawrence, A. A. (2005). Sexuality before and after male-to-female sex reassignment surgery. *Archives of Sexual Behavior*, 34:147-166.

Lawrence, A. A. (2006). Patient-reported complications and functional outcomes of male-to-female reassignment surgery. *Archives of Sexual Behavior*, 35(6):717-727. doi:10.1007/s10508-006-9104-9.

2

Lobato, M., et al. (2006). Follow-up of Sex Reassignment Surgery in Transsexuals: a Brazilian Cohort. *Archives of Sexual Behavior*, 33:711-715.

Medical and Mental Health Professionals, Br. of Amici Curiae, at 6, Nos. 10-2339 and 10-2446 (7th Cir. Nov. 29, 2010), *available at* www.lambdalegal.org/sites/default/files/fields_v__smith_-_brief_of_amici_curiae_medic al_and_mental_health_professionals.pdf

Ettner, R. Monstrey S., & Eyler, A. (Eds.), *Principles of Transgender Medicine and Surgery*, Haworth Press (2007), New York, NY.

Ettner, R. Monstrey S., & Coleman, E. (Eds.), *Principles of Transgender Medicine and Surgery*, Haworth Press (2016), New York, NY.

Pfafflin, F. & Junge, A. (1998). Sex reassignment: Thirty years of international follow-up studies after sex reassignment surgery, a comprehensive review, 1961-1991 (Jacobson, R., & Meier, A., Trans.). Retrieved from http://web.archive.org/web/20070503090247/http://www.symposion.com/ijt/pfaefflin/10 00.htm (Original work published 1992).

Rehman, J., Lazer, S., Benet, A.E., Schaefer, L.C., & Melman, A. (1999). The reported sex and surgery satisfactions of 28 postoperative male-to-female transsexual patients. *Archives of Sexual Behavior*, 28(1):71-89. doi:10.1023/A:1018745706354.

Schaefer, L. & Wheeler, C. (2004). Guilt in cross gender identity conditions: presentations and treatment. In Leli & Drescher (eds.) *Transgender Subjectivities: A Clinician's Guide*, Haworth.

Smith, Y.L.S., Van Goozen, S. H. M., Kuiper, A.J., & Cohen-Kettenis, P.T. (2005). Sex reassignment: Outcomes and predictors of treatment for adolescent and adult transsexuals. *Psychological Medicine*, 35(1):89-99.

U.S. Dept. of Health and Human Services, Department Appeals Board, Decision No. 2576 (May 30, 2014).

Vujovic, S. et al., (2009). Transsexualism in Serbia: a twenty year follow-up study. *Journal of Sexual Medicine*, 6(4):1018-23.

Weyers, S., et al. (2009). Long-term assessments of the physical, mental and sexual health among transsexual women. *Journal of Sexual Medicine*, 6(3):752-60.

World Health Organization (1992). *International Classification of Diseases* (10th ed.).

World Professional Association for Transgender Health (2008). WPATH Clairification on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the U.S.A. Retrieved from http://www.wpath.org/uploaded_files/140/files/Med%20Nec%20on%202008%20Letterh ead.pdf

World Professional Association for Transgender Health (2012). *Standards of Care for the Health of Transsexual, Transgender and Gender-nonconforming People* (7th version).  Retrieved from http://www.wpath.org/uploaded_files/140/files/IJT%20SOC,%20V7.pdf.

DEPARTMENT OF VETERANS AFFAIRS                                    8320-01

38 CFR Part 17

RIN 2900-AP69

Removing Exclusion of Gender Alterations from the Medical Benefits Package

AGENCY:  Department of Veterans Affairs

ACTION:  Proposed Rule

SUMMARY:  This rulemaking proposes to remove the exclusion of medical services that are considered "gender alterations" from the Department of Veterans Affairs (VA) medical benefits package regulation.  In the past, gender transition surgeries were considered treatment for gender dysphoria, previously referred to as transsexualism or gender identity disorder, but they required further research to assure their safety and reliability.  Increased understanding of both gender dysphoria and surgical techniques in this area have improved significantly, and surgical procedures are now widely accepted in the medical community as medically necessary treatment for gender dysphoria.  Additionally, recent medical research shows that the failure to provide transition surgeries to certain patients suffering from gender dysphoria can have severe medical consequences.  In light of these medical advances and the evolving standard of care, VA would revise its medical benefits package regulation to remove this exclusion.  VA would instead make medical decisions about what surgical procedures are medically necessary to treat a Veteran's gender dysphoria on a case-by-case basis consistent with the requirements of 38 CFR 17.38(b) (which apply to all care provided under the medical benefits package).

DATES:  Comment Date: Comments must be received on or before [Insert date 60 days after date of publication in the FEDERAL REGISTER].

ADDRESSES:  Written comments may be submitted through www.Regulations.gov; by mail or hand-delivery to Director, Regulation Policy and Management (02REG), Department of Veterans Affairs, 810 Vermont Avenue, NW, Room 1068, Washington, DC 20420; or by fax to (202) 273-9026.  Comments should indicate that they are submitted in response to ["RIN 2900-AP69– Removing Exclusion of Gender Alterations from the Medical Benefits Package."]  Copies of comments received will be available for public inspection in the Office of Regulation Policy and Management, Room 1068, between the hours of 8:00 a.m. and 4:30 p.m., Monday through Friday (except holidays).  Please call (202) 461-4902 for an appointment.  (This is not a toll-free number.)  In addition, during the comment period, comments may be viewed online through the Federal Docket Management System (FDMS) at www.Regulations.gov.

FOR FURTHER INFORMATION CONTACT:  Dr. Jillian Shipherd or Dr. Michael Kauth Directors of the LGBT Program for Patient Care Services, Department of Veterans Affairs, LGBTProgram@va.gov or 857-364-4660, 150 South Huntington Ave. Boston, MA 02130.  (This is not a toll-free number.)

SUPPLEMENTARY INFORMATION:  Section 1710 of title 38 United States Code (U.S.C.) requires VA to "furnish hospital care and medical services which the Secretary

determines to be needed" for eligible veterans.  In 1999, VA promulgated 38 CFR §

17.38, establishing the Department's medical benefits package for veterans enrolled in

VA's health care system.  64 FR 54207 (Oct. 6, 1999).  The regulation described the

types of medically needed care and services available for such veterans, as well as

certain exclusions.  The regulation specifically excluded medical services considered to

be "gender alterations."  38 CFR § 17.38(c)(4).  Although not specifically explained in

the preambles to the original proposed and final rules, the rationale for all exclusions in

§ 17.38(c) was generally that such services were not considered medically needed.  As

VA explained in proposing the medical benefits package, "medically needed" care is

"care that . . . appropriate healthcare professionals [determine] to be needed to

promote, preserve, or restore the health of the individual and to be in accord with

generally accepted standards of medical practice."  63 FR 37299, 37300 (July 10,

1998).  All care included in the package is intended to meet these criteria.  In addition,

the proposed rule defined the terms "promote," "preserve," and "restore" in

§§17.38(b)(1)-(3), respectively.  While other provisions of this regulation have been

modified over the years, this exclusion has to date remained unchanged.


VA has generally interpreted § 17.38(c)(4) as barring only gender transition

surgeries and gender alterations in the form of plastic reconstructive surgeries

performed for strictly cosmetic purposes.  See e.g. VHA Directive 2013-003, Providing

Health Care for Transgender and Intersex Veterans (February 8, 2013).

Medical science and surgical techniques supporting gender transitioning have, however, steadily improved since then.  Based on the medical literature, we now believe that surgical procedures currently available to aid individuals in gender transitioning may be reasonably determined by a treating VA healthcare provider to be care that is in accord with generally accepted standards of medical practice and medically necessary to promote, preserve, or restore a particular Veteran's health.  In other words, we would permit the treating VA healthcare provider to determine, in the exercise of his or her clinical judgment, that such services are medically necessary in a particular clinical case and so offer them to the patient.  Before VA permits this, however, we first must remove the current exclusion of gender alterations from the medical benefits package.  38 CFR § 17.38(c)(4).  We will also renumber the paragraphs in subsection (c) accordingly.

The rationale for this substantive change is two-fold.  First, based on the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM 5) , we now know that gender dysphoria is a clinical condition of gender incongruence associated with a strong desire to be treated as another gender, to be rid of one's birth sex characteristics, or a strong conviction that one has feelings and reactions typical of another gender, "which can have "clinically significant distress or impairment in social occupational, or other important areas of functioning."  DSM 5 452-53 (2013).  According to the American Medical Association House of Delegates, Resolution 122:A-08, gender dysphoria is a serious condition that, left untreated, can lead to serious medical problems, including "clinically significant psychological distress, dysfunction, debilitating depression and, for some people without access to appropriate

medical care and treatment, suicidality and death." American Medical Association (2008); see also Whittle, et al., WPATH Clarification on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage for Transgender and Transsexual People Worldwide (2008),

http://www.wpath.org/site_page.cfm?pk_association_webpage_menu=1352&pk_association_webpage=3947 (last visited Apr. 21, 2016). Second, related to gender transition surgery specifically, multiple medical professional organizations, including the American Psychological Association, the American Psychiatric Association, the American Academy of Family Physicians, the American Congress of Obstetricians and Gynecologists, and the World Professional Association for Transgender Health have all issued statements affirming that transition surgery is medically necessary care for some patients. See Proceedings of the American Psychological Association, American Psychologist 64:372–453 (2009), https://www.apa.org/about/policy/transgender.pdf (last visited Apr. 21, 2016); Drescher et al., APA official actions: Position Statement on Access to Care for Transgender and Gender Variant Individuals (2012), https://www.psychiatry.org/file%20library/about-apa/organization-documents-policies/policies/position-2012-transgender-gender-variant-access-care.pdf (last visited Apr. 21, 2016); American Academy of Family Physicians, Resolution 64:22 (2007); American College of Obstetricians and Gynecologists, Committee Opinion 118:1454-8 (2011) http://www.acog.org/Resources-And-Publications/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/Health-Care-for-Transgender-Individuals (last visited Apr. 21, 2016).

Additionally, a 2014 U.S. Department of Health and Human Services Departmental Appeals Board ("Appeals Board") decision reviewed the medical data on gender transition surgeries and stated that the "surgery relieves, and very often completely eliminates, gender dysphoria." Department of Health and Human Services Departmental Appeals Board Decision No. 2576 ("NCD Decision") at 16 (May 30, 2014). Other studies cited by the Appeals Board noted that providing sex reassignment surgical interventions alleviated suffering and dysfunction, significantly reduced suicidality, and improved virtually every part of a patient's life. Id. at 17.

Having deliberated on all the information above, we propose to remove "gender alterations" from the list of exclusions under § 17.38(c). As discussed above, a VA healthcare provider's decision to offer and provide surgical gender alteration services (as VA defines such services) to a particular patient would still need to meet all of the requirements for care in § 17.38(b). In other words, they would only be available if clinically determined to be medically necessary by the VA treating provider.

To effectuate this change, we propose to remove § 17.38(c)(4) in its entirety, to renumber current § 17.38(c)(5) as § 17.38(c)(4), and to renumber current § 17.38(c)(6) as § 17.38(c)(5).

Effect of Rulemaking

The Code of Federal Regulations, as proposed to be revised by this proposed rulemaking, represents the exclusive legal authority on this subject. No contrary rules or procedures would be authorized. All existing or subsequent VA guidance, including

VHA Directive 2013-003, would be read to conform with this rulemaking if possible or, if not possible, such guidance would be superseded by this rulemaking.

Paperwork Reduction Act

This proposed rule contains no provisions constituting a collection of information under the provisions of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501-3521).

Regulatory Flexibility Act

The Secretary hereby certifies that this proposed rule will not have a significant economic impact on a substantial number of small entities as they are defined in the Regulatory Flexibility Act, 5 U.S.C. 601-612.  This proposed rule will directly affect only individuals and will not directly affect small entities.  Therefore, pursuant to 5 U.S.C. 605(b), this rulemaking would be exempt from the initial and final regulatory flexibility analysis requirements of 5 U.S.C. 603 and 604.

Executive Orders 12866 and 13563

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, when regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, and other advantages; distributive impacts; and equity).  Executive Order 13563 (Improving Regulation and Regulatory Review) emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.  Executive Order 12866 (Regulatory

Planning and Review) defines  a "significant regulatory action," requiring review by the

Office of Management and Budget (OMB), unless OMB waives such review, as "any

regulatory action that is likely to result in a rule that may:  (1) Have an annual effect on

the economy of $100 million or more or adversely affect in a material way the economy,

a sector of the economy, productivity, competition, jobs, the environment, public health

or safety, or State, local, or tribal governments or communities; (2) Create a serious

inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impact of entitlements, grants, user fees, or loan

programs or the rights and obligations of recipients thereof; or (4) Raise novel legal or

policy issues arising out of legal mandates, the President's priorities, or the principles

set forth in this Executive Order."


The economic, interagency, budgetary, legal, and policy implications of this

proposed rule have been examined, and it has been determined not to be a significant

regulatory action under Executive Order 12866.  VA's impact analysis can be found as a

supporting document at http://www.regulations.gov, usually within 48 hours after the

rulemaking document is published.  Additionally, a copy of the rulemaking and its impact

analysis are available on VA's Web site at http://www.va.gov/orpm/, by following the link

for "VA Regulations Published From FY 2004 Through FY to Date."


Unfunded Mandates

The Unfunded Mandates Reform Act of 1995 requires, at 2 U.S.C. 1532, that

agencies prepare an assessment of anticipated costs and benefits before issuing any

rule that may result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more (adjusted annually for inflation) in any one year. This proposed rule would have no such effect on State, local, and tribal governments, or on the private sector.

Catalog of Federal Domestic Assistance

The Catalog of Federal Domestic Assistance numbers and titles for the programs affected by this document are 64.009, Veterans Medical Care Benefits; 64.042, VHA Inpatient Surgery.

Signing Authority

The Secretary of Veterans Affairs, or designee, approved this document and authorized the undersigned to sign and submit the document to the Office of the Federal Register for publication electronically as an official document of the Department of Veterans Affairs. [NAME AND TITLE OF APPROVING OFFICIAL] approved this document on [DATE] for publication.

List of Subjects in 38 CFR Part 17

Medical benefits package.


Approved:


_____

For the reasons described in the preamble, Department of Veterans Affairs proposes to amend 38 CFR part 17 as follows:

PART 17 – MEDICAL

1.  The authority citation for part 17 continues to read as follows:

AUTHORITY: 38 U.S.C. 501, and as noted in specific sections.

2.  Amend § 17.38 to remove paragraph (c)(4) and redesignate paragraphs (c)(5) and (c)(6) as paragraphs (c)(4) and (c)(5), respectively.



**U.S. Department
of Veterans Affairs**

Office of the Secretary                                          In Reply Refer To: **00REG**
Washington DC 20420

Date:  July 29, 2016

Subj:  Economic Impact Analysis for RIN 2900- AP69, Removing Gender Alterations
       Restriction from the Medical Benefits Package

       I have reviewed this rulemaking package and determined the following.

1.  This rulemaking will not have an annual effect on the economy of $100 million or
more, as set forth in Executive Order 12866.

2.  This rulemaking will not have a significant economic impact on a substantial number
of small entities under the Regulatory Flexibility Act, 5 U.S.C. 601-612.

3.  This rulemaking will not result in the expenditure of $100 million or more by State,
local, and tribal governments, in the aggregate, or by the private sector, under the
Unfunded Mandates Reform Act of 1995, 2 U.S.C. 1532.

4.  Attached please find the relevant cost impact documents.

**(Attachment 1):**  Agency's Impact Analysis, dated June 22, 2016
**(Attachment 2):** CFO Concurrence memo, dated July 24, 2016


**Approved by:**
Michael P. Shores, MSRC
Acting, Director Regulation Policy & Management (00REG)
Office of the Secretary

**(Attachment 1)**

**Impact Analysis for RIN 2900 AP69/WP2015-003**

**Title of Regulation:** Removing Gender Alterations Restriction from the Medical Benefits Package

**Purpose:** To determine the economic impact of this rulemaking. This impact analysis describes a cost allocation pilot for the additional services that will be provided by the rule change. This costing pilot will allow for data acquisition to improve projections of ongoing costs by utilizing actual costs for services associated with this rule change.

**The Need for the Regulatory Action:** Section 1710 of title 38 United States Code (U.S.C.) requires VA to "furnish hospital care and medical services which the Secretary determines to be needed" for eligible veterans. VA has established a "medical benefits package" in 38 CFR 17.38, which describes the types of medically needed care and services available for such eligible veterans, as well as certain exclusions. Services that are considered "gender alterations" are specifically excluded from being provided as part of the medical benefits package under 38 CFR 17.38(c)(4).

This rulemaking proposes to remove a restriction in Department of Veterans Affairs (VA) regulation that prohibits VA from providing medical services that are considered "gender alterations." In the past, gender dysphoria, previously referred to as transsexualism or gender identity disorder, was a disorder for which transition-related surgeries and procedures were considered treatment, but such surgeries and procedures required further research to assure their safety and reliability. Due to the prior limited knowledge about both gender dysphoria and effective transition-related procedures, surgical procedures in particular were not deemed to be medically necessary. However, increased understanding of both gender dysphoria and surgical techniques in this area have improved significantly, and surgical procedures are now widely accepted in the medical community as medically necessary treatment for gender dysphoria (e.g., American Medical Association, the American Psychological Association, the American Psychiatric Association, the American Academy of Family Physicians). Additionally, recent medical research shows that gender dysphoria is a serious condition that has had severe medical consequences for certain patients if transition-related surgeries and procedures are not provided[1]. In 2014, the U.S. Department of Health and Human Services (HHS) lifted its ban on transition-related care for Medicare patients.[2] In 2015, the Office of Personnel Management (OPM) required that insurance plans for the Federal Employees Health Benefits Program include coverage for all transition-related care.[3] A new HHS rule (effective July 18, 2016) requires health care plans under the Affordable Care Act (ACA) to be inclusive of comprehensive transgender care.[4] This

---

[1] See Padula, W.V. Heru, S., & Campbell, J.D. Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A cost-effectiveness Analyses (2015) J. of Gen. Intern. Medicine DOI 10.1007/s11606-015-3529-6

[2] See Decision No. 2576, Department of Health and Human Services, Departmental Appeals Board (May 30, 2014), available at http://www.hhs.gov/dab/decisions/dabdecisions/dab2576.pdf.

[3] U.S. Office of Personnel Management, FEHB Program Carrier Letter, Letter No. 2015-12 (June 23, 2015), *available at* https://www.opm.gov/healthcare-insurance/healthcare/carriers/2015/2015-12.pdf.

[4] See Section 1557 of the Patient Protections and Affordable Care Act (May 13. 2016) available at https://s3.amazonaws.com/public-inspection.federalregister.gov/2016-11458.pdf

rule change prohibits denial of health services based on gender identity, such as denying gender alteration procedures. In light of medical advances, recent research, and the standard in insurance coverage at the federal level, VA would revise its regulation to remove the prohibition on medical services that are considered "gender alterations." In this way, medical decisions would be made on a case-by-case basis; determining which procedures are medically necessary to treat gender dysphoria for the individual being treated.

**VHA already provides transgender care under Directive 2013-003:** Currently, VHA provides most services for transgender veterans including cross-sex hormones, psychotherapy, pre and post-operative care, including evaluations of readiness for surgical procedures and care associated with post-surgery complications.

**Added benefits if "gender alteration" exclusion is removed from the Medical Benefits Package:** Treatment decisions would be made by the medical team working with each unique Veteran. If this change is made, when transition-related procedures are indicated and deemed medically necessary by the treatment team, services would be provided and/or paid for by the VHA. This could include a variety of procedures that are currently disallowed (e.g., hysterectomy, penectomy, phalloplasty or metoidioplasty with urethral extension, vaginectomy, vaginoplasty, scrotoplasty, breast augmentation or reduction and reconstruction, electrolysis, facial feminization/masculinization, tracheal shave/ chondrolaryngoplasty). For ease of communication, these are described below as feminizing procedures and masculinizing procedures.

**Utilization of transition-related procedures outside VHA:** Very little published data exists on transgender healthcare utilization and/or costs. However, some recent research suggests that for large, civilian employers whose insurance plans offer transition-related care (including surgeries listed above), an average of .044 per thousand employees file claims for transition care annually.[5] This means that on average, one out of every 22,727 employees file claims for transition-related care each year.[6] This care can include any type of transition-related care, including hormones, gender counseling, surgeries, etc.

However, transgender people are over-represented in the veteran population by a factor of at least two.[7] The over-representation of transgender people in the veteran

---

[5] *See Jody L. Herman (2013), Costs and Benefits of Providing Transition-Related Health Care Coverage in Employee Health Benefits Plans: Findings from a Survey of Employers (Los Angeles: Williams Institute). The .044 figure cited above was derived from data from a subset of the largest employers.*

[6] *For additional research on utilization rates of transition-related care, see City and County of San Francisco and San Francisco Human Rights Commission (2007), San Francisco City and County Transgender Health Benefit; Department of Insurance, State of California (2012), Economic Impact Assessment: Gender Nondiscrimination in Health Insurance; Human Rights Campaign, (no date), Transgender-Inclusive Benefits: Medical Treatment Cost and Utilization; Jamison Green & Associates (2012), Transgender-Inclusive Health Benefits: Data for Cost Calculation. Presented by Andre Wilson of Jamison Green & Associates to the Department of Insurance, State of California, February 2012.*

[7] *According to a recent report, there are an estimated 134,300 veterans who self-identify as transgender out of a total veteran population of 21,999,108. Thus, individuals who self-identify as transgender make up 0.61% of the overall veteran population, as compared to 0.3% of the nation's civilian adult population. The percent of veterans who self-identify as transgender may be .0061/.003 = 2x greater than the percent of non-veterans who self-identify as transgender. See Gary J. Gates and Jody L. Herman (2014), Transgender Military Service in the United States (Los Angeles: Williams Institute). The total population of veterans is from Table 1L: VETPOP2014 Living Veterans by Age Group, Gender, 2013-2014, available at http://www.va.gov/vetdata/Veteran_Population.asp (last accessed November 28, 2014). For the percent*

population can be explained by developmental theories that argue the appeal of structured environments (such as the military) during periods of identity confusion or denial. By extension, transgender individuals are twice as likely to be enrolled in the VHA as to work for civilian organizations such as the large employers from which the .044 figure was derived. Thus, the average VHA utilization rate is expected to be at least twice as high as in the civilian study.

It is not known exactly how many transgender veterans use VHA services. However, using data from 2013 and the .044 figure from above, VHA can estimate that 687 unique VHA-utilizing veterans will require transition-related care.[8] Given that transition-related care is highly individualized, it is not possible to know what aspects of care will be required for each unique veteran. Again, it is important to note that the majority of this care is already covered by VHA including hormones and gender identity counseling. Fortunately, the addition of medically necessary transition-related procedures is viewed as an event-based expense per unique veteran, rather than ongoing medical expense to the system, especially since post-operative complications and care are already covered benefits. The proposed change would add transition-related procedures deemed medically necessary by the unique veteran's VHA treatment team to the existing benefits.

We have predicted that 687 unique VHA utilizing veterans will require transition-related care each year. As a check on the validity of the estimate, consider that researchers determined recently that the number of new transgender diagnoses in the VHA system increased from 226 in 2006 to 522 in 2013.[9] Once VHA removes its surgery exclusion, and after a period of adjustment during which VHA will meet the surgical needs of veterans who already have transgender diagnoses and who are already enrolled in the system, the annual number of VHA enrollees seeking transition-related surgery should not, in general, exceed the number of new transgender diagnoses each year.

**Unadjusted annual costs of providing transition-related procedures to each unique transgender Veteran:** When estimating the costs of added benefits, the figure of 687 unique veterans per year was used. In addition, while many of these veterans will not have any surgical interventions, these unadjusted projections assume that everyone will access all the services newly available to them. In this way, we offer the most conservative (highest) cost projection possible.

As with many healthcare services, determining actual costs of procedures is difficult. To generate these figures we relied on two sources: 1) For procedures not currently conducted within VHA (facial feminization procedures and electrolysis), we used recently (2013) published data on average costs of each intervention[10]. For these

---

*of adult Americans who self-identify as transgender, See Gary J. Gates (2011), How Many People Are Lesbian, Gay, Bisexual and Transgender (Los Angeles: Williams Institute).*

[8] *The 2013 VHA population was 7,809,269. The 687 figure was derived as follows: 2013 VHA Population/1000 \* (average utilization rate per thousand civilians \* transgender veteran prevalence factor), or 7,809,269/1000 \* (.044\*2) = 687.*

[9] Michael R. Kauth, Jillian C. Shipherd, Jan Lindsay, John R. Blosnich, George R. Brown, and Kenneth T. Jones (2014), Access to Care for Transgender Veterans in the Veterans Health Administration: 2006-2013, American Journal of Public Health 104, S4, 533.

[10] From Meier SC & Lubuski CM. (2013). The demographics of the transgender population (pp. 289-327). In AK Baumle (ed), The International Handbook on the Demography of Sexuality. Springer. Because there were no VHA data on electrolysis or facial feminization, the average figures reported for these two procedures were included despite these costs being from procedures conducted in civilian clinics.

procedures we utilized the average of costs reported for each procedure in civilian clinics. 2) Actual VHA cost data was used for procedures that are currently being performed by VHA staff for reasons other than gender transition (e.g., genital reconstruction due to blast injuries, mastectomies and breast reconstruction following a cancer diagnosis)[11]. Data were gathered from FY2008 through Q2 of FY2015 and averaged across years. For any breast-related procedures, costs were doubled with the assumption that both breasts would be modified for transition purposes.

For these cost estimates, it was assumed that two-thirds of the 687 transgender veterans would seek feminizing procedures and one-third would seek masculinizing procedures. This assumption is based on the statistically higher number of veterans with a male birth sex (relative to female sex at birth). Thus, in these estimates we anticipate that 458 unique VHA using Veterans would receive all feminizing procedures and 229 veterans would receive all masculinizing procedures. The figures described below do not include travel that may be associated with the listed procedures.

**Feminizing Procedures**

| Procedure | Cost per person | Unique Veterans | Unadjusted Cost to VHA |
|---|---|---|---|
| Breast augmentation[11] | $10,199 | 458 | $4,671,142 |
| Genital reconstruction[11] | $56,019 | 458 | $25,656,702 |
| Facial feminization[10] | $52,500 | 458 | $24,045,000 |
| Electrolysis[10] | $2,900 | 458 | $1,328,200 |
|  | **Per person** |  | **Unadjusted Cost Overall** |
| **Totals** | **$121,618** |  | $55,701,044 |

**Masculinizing Procedures**

| Procedure | Cost per person | Unique Veterans | Unadjusted Cost to VHA |
|---|---|---|---|
| Breast reduction/chest reconstruction[11] | $15,286 | 229 | $3,500,494 |
| Hysterectomy/ Genital reconstruction[11] | $80,731 | 229 | $18,487,399 |
|  |  |  |  |

---

[11] Data was derived from the following CPT Coded procedures performed within VHA FY2008 through April FY2015. All breast procedure costs were doubled, with the assumption that the procedure would be done on both sides to facilitate transition. Costs were averaged across all procedures/years. The number of procedures included in the calculation of costs are listed below for each included code:

| | Per person | | Unadjusted Cost Overall |
|---|---|---|---|
| Totals | $96,017 | | $21,987,893 |

Feminization procedures: Code 19325 Enlarge breast with implant (data from 147 procedures); Code 54125 Removal of penis (data from 88 procedures); Code 54520 Removal of testis (data from 1979 procedures); Code 54660 Revision of testis (data from 85 procedures); Code 54690 Laparoscopy orchiectomy (data from 15 procedures); Code 55180 Revision of scrotum (data from 24 procedures); Code 57291 Construction of vagina (data from 1 procedure); Code 57292 Construction of vagina with graft (data from 1 procedure); Code 57295 Revision of vaginal graft via vagina (data from 57 procedures); Code 57296 Revision of vaginal graft open abdomen (data from 2 procedures); Code 57426 Revision of vaginal graft laparoscopic (data from 2 procedures).

Masculinization procedures: Code 58150 Total hysterectomy (data from 2918 procedures); Code 58552 Laparoscopic vaginal hysterectomy incl T/O (data from 362 procedures); Code 58554 Laparoscopic vaginal hysterectomy incl W/T/O complete (data from 26 procedures); Code 58571 TLH W/T/O uterus 250 G or less (data from 238 procedures); Code 58573 TLH W/T/O uterus over 250 G (data from 33 procedures); Code 56625 Complete removal of vulva (data from 9 procedures); Code 56800 Repair of vagina (data from 5 procedures); Code 56805 Repair of clitoris (data from 1 procedure); Code 57110 Remove vagina wall complete (data from 2 procedures); Code 19350 Breast reconstruction (data from 5 procedures); Code 19371 Removal of breast capsule (data from 22 procedures).

There is no way to know how many unique VHA-utilizing veterans will seek and be medically cleared for these transition-related procedures. There are many personal and medical reasons why veterans may not seek or receive any or all of these procedures. However, to be conservative these unadjusted estimates assume that all of the unique 687 VHA utilizing veterans will receive all of these interventions. Using this approach, the maximum estimated per person costs range between $96,017 and $121,618 per veteran. If each unique veteran sought and attained every service available to them in VHA, the range of total unadjusted costs to VHA would be potentially as high as $77,690,998 each year to include both feminizing ($55,700,128) and masculinizing (21,990,870) procedures to 687 veterans. However, this figure assumes that every veteran would receive every possible procedure, an assumption that is highly unlikely due to the various personal and medical reasons why a veteran might not seek or receive any given procedure.

**Adjusted costs of providing transition-related surgery:** Using similar methodology as described above, the City and County of San Francisco estimated that offering transition-related care to its employees would cost $1.75 million per year, but the actual cost over five years averaged $77,283 per year. In other words, San Francisco's estimate was more than 22x too high.[12] Therefore, in our adjusted projected costs, we have divided these figures by a factor of 22 in order to have real-world, data-driven estimates of adjusted projected costs.

## Feminizing Procedures

| Procedure | Potential Cost to VHA | Adjusted Costs* |
|---|---|---|
| Breast augmentation | $4,675,264 | $212,512 |
| Genital reconstruction | $25,653,496 | $1,166,068 |
| Facial feminization | $24,041,336 | $1,092,788 |
| Electrolysis | $1,330,032 | $60,456 |
| | | |

[12] *Jody L. Herman (2013), Costs and Benefits of Providing Transition-Related Health Care Coverage in Employee Health Benefits Plans: Findings from a Survey of Employers (Los Angeles: Williams Institute), 11.*

**AR100**

|  | Overall | Adjusted Cost Overall |
|---|---|---|
| Totals | $55,700,128 | $2,531,824 |

*Adjusted costs are divided by 22

**Masculinizing Procedures**

| Procedure | Potential Cost to VHA | Adjusted Costs* |
|---|---|---|
| Breast reduction/chest reconstruction | $3,501,410 | $159,155 |
| Hysterectomy/Genital reconstruction | $18,489,460 | $840,430 |
|  |  |  |
|  | Overall | Adjusted Cost Overall |
| Totals | $21,990,870 | $999,585 |

*Adjusted costs are divided by 22

Summary of Projected Costs using Unadjusted and Adjusted Projections:

| FY | Cost per person | Unadjusted Annual Costs | Adjusted Annual Costs |
|---|---|---|---|
| 2018 | $96,017- $121,618 | $77,690,998 | $3,531,409 |

Thus, based on available data, the projected cost impact of adding these services to the Medical Benefits Package varies widely from a low of just over $3.5 million dollars annually ($2,531,824 Feminizing; $999,585 Masculinizing) a high of nearly $78 million per year. The wide variability in adjusted and unadjusted costs makes it difficult to project annual costs appropriately. As such, this proposal includes a three year cost allocation pilot to gather data on actual costs associated with this care. In this way, it will be possible to determine accurate cost allocations for care beyond the costing pilot.

**Limitations of this cost projection:** As with many healthcare related costs, determining the costs of associated procedures can be difficult. There were several data-driven assumptions that underlie the cost projections regarding the number of unique VHA utilizing veterans who may attain transition-related procedures. There are very few published reports or publically available data on transition-related costs. Moreover, the costs per procedure in this report were based on published data from the private sector, but are not necessarily the most current or applicable. In addition, where VHA data was used it is important to realize that the procedures were not for the purposes of gender transition but for other medical causes. Thus, even though these are the most relevant figures to generate cost estimates, it is not known how or if costs will differ for similar procedures conducted for gender transition purposes. In addition, in some cases there were only a few procedures conducted, and sometimes only one, which contributes to higher costs due to the infrequency of the procedure. These estimates were generated from the best available published data and from VHA data sources to assure the most accurate projections.

**AR101**

Importantly, VHA currently must pay for post-operative care and complications from transition surgeries performed outside the system. By ensuring that the entire transition process is handled within the VHA system, we have better continuity of care and better control of pricing. Many Veterans are enduring post-operative complications related to international travel from surgical centers and poor surgical care; by increasing access through VHA processes for this care these types of complications can be reduced and continuity of care will be enhanced.  On more than one occasion we have learned of veterans who sought transition-related surgeries outside of the U.S. and then returned home, sitting on the surgical site for an extended airline trip. These veterans then presented to VHA emergency rooms seeking assistance. Outcomes are poorer than when there has been planned post-surgical care.

Finally, transition-related surgery has been proven effective at mitigating serious health conditions including suicidality, substance abuse and dysphoria that, left untreated, impose treatment costs on the VHA.[13],[14]

**Cost allocation pilot:** Given the limitations of the data as described above, and the resulting wide variability in cost estimates, a three year costing pilot is being proposed with this rule change. Annual review of actual incurred costs of these added benefits will improve each successive year's budget projections.  By the end of the pilot it will be possible to provide data-driven cost projections to inform future budget planning.

In the initial months of access to these procedures, techniques that are more commonly performed at many VA facilities (e.g., removal of testes or uterus) for other medical purposes (e.g., cancer treatment) will be newly available for the purposes of transition-related care, but likely accessed by only a small number of veterans for minimal costs. In FY 2018, it is anticipated that systems of referral for more complex transition-related procedures will become widely available and costs will begin to increase as veterans are referred for this care. In FY2018 we anticipate meeting the lower projected cost estimates of 3.5 million, in FY 2019 and 2020, we predict a greater demand for services from previously identified veterans and also new veterans seeking services, potentially resulting in a doubling of demand and costs.

### Feminizing Procedures

| Procedure | Cost per person | Adjusted cost | Unique Veterans | Adjusted Cost to VHA |
|---|---|---|---|---|
| Breast augmentation | $10,199 | $464 | 458 | $212,512 |
| Genital reconstruction | $56,019 | $2,546 | 458 | $1,166,068 |
| Facial feminization | $52,500 | $2,386 | 458 | $1,092,788 |

---

[13] *For a review of the evidence of the efficacy of transition-related surgery, see Department of Health and Human Services Departmental Appeals Board Decision No. 2576 (May 30, 2014). For an analysis of cost savings that would be accrued by offering transition-related surgery, see Department of Insurance, State of California (2012), Economic Impact Assessment: Gender Nondiscrimination in Health Insurance, 9-12.*

[14] For a review of the cost-effectiveness analysis where provider both cost per quality-adjusted life year (QUALY) for successful transition reducing negative outcomes (e.g., HIV, depression, suicidality, drug abuse, mortality) with an incremental cost-effectiveness ratio of $9314/QUALY. Estimations are that costs of adding comprehensive transgender care (over no benefits) is $0.016 per member per month.

| Electrolysis | $2,900 | $132 | 458 | $60,456 |
|---|---|---|---|---|
| **Totals** | | | | **$2,532,824** |

**Masculinizing Procedures**

| Procedure | Cost per person | Adjusted cost | Unique Veterans | Adjusted Cost to VHA |
|---|---|---|---|---|
| Breast reduction/chest reconstruction | $15,286 | $695 | 229 | $159,155 |
| Hysterectomy/Genital reconstruction | $80,371 | $3,670 | 229 | $840,430 |
| **Totals** | | | | **$999,585** |

**Total of All Procedures FY 2018** | **$3,531,409**

\* adjusted costs divided by 22 per published results from San Francisco example

**Feminizing Procedures**

| Procedure | Cost per person | Adjusted cost | Unique Veterans | Adjusted Cost to VHA |
|---|---|---|---|---|
| Breast augmentation | $10,199 | $928 | 458 | $425,024 |
| Genital reconstruction | $56,019 | $5,092 | 458 | $2,332,136 |
| Facial feminization | $52,500 | $4,772 | 458 | $2,185,576 |
| Electrolysis | $2,900 | $264 | 458 | $120,912 |
| **Totals** | | | | **$5,063,648** |

**Masculinizing Procedures**

| Procedure | Cost per person | Adjusted cost | Unique Veterans | Adjusted Cost to VHA |
|---|---|---|---|---|
| Breast reduction/chest reconstruction | $15,286 | $1,390 | 229 | $318,310 |
| Hysterectomy/Genital reconstruction | $80,371 | $7,340 | 229 | $1,680,860 |
| **Totals** | | | | **$1,999,170** |

**Total of All Procedures FY 2019** | **$7,062,818**

**Total for All Procedures FY 2020 (FY 2019*3.9%)** | **$7,338,268**

**\* adjusted costs for FY 2018-FY 2019 multiplied by 2 to account for potential doubling of demand**

| FY | Projected Costs |
|---|---|
| 2018 | $3,531,409 |
| 2019 | $7,062,818 |
| 2020 | $7,338,268 |
| **Projected  Costs** | **$17,932,495** |

**Estimated Impact:**  VA has determined that there are costs associated with this rulemaking.  The costs estimated during the budget pilot from the publication of the rule through the first 3 years to be just over $17.9 million.  Annual review of actual incurred costs of these added benefits will improve each successive year's budget projections. Should demand for the services outstrip the cost allocations per year, the Under Secretary for Health has the authority to adjust budget allocations to assure access to care. This analysis sets forth the basic assumptions, methods, and data underlying the analysis and discusses the uncertainties associated with the estimates.

**Submitted by:**
Jillian C. Shipherd, Ph.D. and
Michael R. Kauth, Ph.D.
Directors, LGBT Program (10P4Y)
Patient Care Service
Department of Veterans Affairs
June 22, 2016

# Congress of the United States
## Washington, DC 20515

September 12, 2016

Secretary Robert A. McDonald
U.S. Department of Veterans Affairs
810 Vermont Avenue, NW
Washington D.C., 20420

Dear Secretary McDonald:

We write today as members of the Congressional LGBT Equality Caucus Transgender Equality Task Force to urge the Department of Veterans Affairs (VA) to move swiftly to ensure access to medically necessary surgical care for transgender veterans.

We commend the Department for considering a repeal of the current blanket exclusion in its Spring 2016 Regulatory Agenda (RIN: 2900-AP69). We urge you to move forward with publishing a proposed rule to remove the arbitrary and outdated restriction that prohibits VA from providing medical services to treat gender dysphoria. Your attention to this issue is especially urgent given the Obama Administration's forward thinking policy changes to lift policies that discriminate against LGBT people across the federal government.

It is our understanding that under current VA regulations (38 C.F.R. § 17.38(c)(4)), VHA is prohibited from covering transition-related surgeries for transgender veterans, without regard to medical necessity. We also understand that this rule runs counter to steps being taken by OPM, HHS/OCR, CMS, and DOD to eliminate blanket exclusions for surgical care for the treatment of gender dysphoria. The experience of states and employers,[1] and a significant body of research, demonstrates that providing surgical care for gender dysphoria based on individual medical necessity has extremely little to no net cost, and potentially provides long-term savings to government as a result of preventing future medical and mental health care costs (such as treatment of suicide attempts).[2] Both HHS[3] and Department of Labor (DOL)[4] echoed these findings in final regulations, finding a de minimis cost impact.

---

[1] See, e.g., Or. Health Review Comm'n, Value-based Benefits Subcommittee, http://www.oregon.gov/oha/herc/CommitteeMeetingMaterials/VbBS%20Materials%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.pdf (June 12, 2014) (estimating a 0.003% increase in non-administrative costs for Oregon Medicaid, before accounting for cost savings); Jody L. Herman, Costs and Benefits of Providing Transition-Related Health Care Coverage in Employee Health Benefit Plans: Findings from a Survey of Employers (2013) (finding "zero or very low costs [and] low utilization by employees," with employers reporting costs were "negligible," "minimal," or 0.004% of health care expenditures, and reviewing similar findings on municipal and university employee coverage), http://williamsinstitute.law.ucla.edu/wp-content/uploads/Herman-Cost-Benefit-of-Trans-Health-Benefits-Sept-2013.pdf; Cal. Dep't of Ins., Economic Impact Assessment: Gender Nondiscrimination in Health Insurance (2012) (concluding cost impacts for California health plans are "very insignificant" and likely to offset by savings).
[2] William V. Padula et al., Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis, 31 JOURNAL OF GENERAL INTERNAL MEDICINE 394 (2015) (finding that the cost of covering transition-related procedures is about $0.016 per plan member per month).

As you know, the existing regulation was adopted in 1999 and is not required by any statute. This exclusion denies transgender veterans critically important medical care currently available to VA employees, Medicare beneficiaries and, most recently, active duty military service members. This blanket exclusion, without regard to medical necessity, discriminates against transgender veterans in violation of Section 1557 of the Affordable Care Act, which applies to "any program or activity that is administered by an Executive Agency."[5]

This past year has proved historic for transgender equality and visibility. At no other time in our nation's history has the transgender community better or more publicly advocated for full inclusion throughout all parts of society and equal protection under the law. We've made significant gains, yet more work remains to be done and call on you to continue moving towards VA adoption of the proposed rule to permit surgical care for transgender veterans.

Our veterans earn the benefits provided to them through dedicated service to the protection of our country. It is our collective responsibility to ensure that *all* of our veterans are able to access the healthcare they have dutifully earned. We look forward to and eagerly await your response.

Sincerely,

Mike Quigley
Member of Congress

Michael M. Honda
Member of Congress

Jackie Speier
Member of Congress

Raúl M. Grijalva
Member of Congress

Bonnie Watson Coleman
Member of Congress

Eleanor Holmes Norton
Member of Congress

---

[3] In the preamble to its final regulation on Section 1557 of the ACA, HHS stated: "Based on the [existing research], we estimate that providing transgender individuals nondiscriminatory insurance coverage and treatment will impact a very small segment of the population due to the fact that the number of transgender individuals (and particularly those who seek surgical procedures in connection with their gender transition) in the general population is small, and consequently will have de minimis impact on the overall cost of care and on health insurance premiums." *Nondiscrimination in Health Programs and Activities; Final Rule, 81 Fed. Reg. 31375, 31457 (May 18, 2016).*

[4] In the preamble to its final regulation on sex discrimination by federal contractors, DOL OFFCP also said that the rule required the elimination of trans gender exclusions. Both DOL and HHS consulted the same body of research, and concluded: "OFFCP determines that the cost of adding nondiscriminatory health-care benefits is most likely to be de minimis." *81 Fed. Reg. 39107, 39148 (June 15, 2016).*

[5] 42 U.S. Code § 18116.

CC: Dr. Michael Kauth
Dr. Jillian Shipherd

# United States Senate
WASHINGTON, DC 20510

September 22, 2016

Secretary Robert A. McDonald
U.S. Department of Veterans Affairs
810 Vermont Avenue, NW
Washington D.C., 20420

Dear Secretary McDonald:

We write today to urge the Department of Veterans Affairs (VA) to move swiftly to ensure that all those who have served our nation so bravely have access to medically necessary care, including surgical treatment for gender dysphoria. Numerous federal agencies have taken steps to remove barriers to healthcare access for transgender people and it is critical that the Department do so as well.

We applaud the Department for its efforts to date to review this issue and explore a regulatory change to the current blanket exclusion for such care.[1] However, as we swiftly approach the end of the calendar year, it is crucial that the VA move forward with publishing a proposed rule to remove the arbitrary and outdated restriction that prohibits the VA from providing medical services to treat gender dysphoria.

Under current VA regulations (38 C.F.R. § 17.38(c)(4)), the Veterans Health Administration is prohibited from covering transition-related surgeries for transgender veterans, without regard to medical necessity. However, the understanding of the medical community regarding the healthcare needs of transgender people has advanced significantly since this regulation was adopted more than fifteen years ago, and today it is inconsistent with basic standards of medical care. Furthermore, it is out of step with efforts undertaken by the Office of Personnel Management, the Department of Health and Human Services (HHS), the Centers for Medicare and Medicaid Services and the Department of Defense to eliminate blanket exclusions for surgical care for the treatment of gender dysphoria. In addition, an increasing number of state and local governments and private sector employers have taken steps to ensure this care is available and their experience demonstrates that there is little to no net cost in doing so. Both HHS and the Department of Labor have recognized this de minimis fiscal impact in findings in final regulations prohibiting such exclusions for Marketplace health plans and for employee plans of federal contractors.[2]

---

[1] Department of Veteran's Affairs Spring 2016 Regulatory Agenda (RIN: 2900-AP69).
[2] *Nondiscrimination in Health Programs and Activities; Final Rule, 81 Fed. Reg. 31375, 31457 (May 18, 2016); Discrimination on the Basis of Sex; Final Rule, 81 Fed. Reg. 39107, 39148 (June 15, 2016).*

This exclusion denies transgender veterans critically important medical care currently available to VA civilian employees, Medicare beneficiaries and active duty service members. It is also in contravention of the requirements of Section 1557 of the Affordable Care Act, which bars discrimination based on sex in healthcare programs and applies to programs administered by Executive Branch agencies.

Our veterans, through proud service and sacrifice for their country, have earned our respect, admiration and every one of the benefits provided to them through the Department. They all deserve access to medically necessary care through the VA and it is imperative that you act swiftly to remove the outdated and unjustified exclusion that denies many transgender veterans the treatment that they need. We look forward to your response.

Sincerely,


Tammy Baldwin
United States Senator

Sherrod Brown
United States Senator

Jeffrey A. Merkley
United States Senator

Al Franken
United States Senator

Bernard Sanders
United States Senator

Patty Murray
United States Senator

Barbara Boxer
United States Senator

Edward J. Markey
United States Senator

Richard J. Durbin
United States Senator

Ron Wyden
United States Senator

Elizabeth Warren
United States Senator

CC: Drs. Michael Kauth and Jillian Shipherd, Co-Directors, Lesbian, Gay, Bisexual, and Transgender (LGBT) Program, Office of Patient Care Services, Veterans Health Administration



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Brian Babin
U.S. House of Representatives
Washington, DC 20515

Dear Congressman Babin:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Warren Davidson
U.S. House of Representatives
Washington, DC  20515

Dear Congressman Davidson:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.

**AR115**
Appx106



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Mike Kelly
U.S. House of Representatives
Washington, DC  20515

Dear Congressman Kelly:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Joe Pitts
U.S. House of Representatives
Washington, DC  20515

Dear Congressman Pitts:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Walter B. Jones
U.S. House of Representatives
Washington, DC 20515

Dear Congressman Jones:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable John Fleming, M.D.
U.S. House of Representatives
Washington, DC 20515

Dear Congressman Fleming:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Duncan Hunter
U.S. House of Representatives
Washington, DC  20515

Dear Congressman Hunter:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.

**AR120**
Appx111



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Tim Huelskamp
U.S. House of Representatives
Washington, DC 20515

Dear Congressman Huelskamp:

     This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

     VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

     VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

     Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

     Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Trent Kelly
U.S. House of Representatives
Washington, DC  20515

Dear Congressman Kelly:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable David Brat
U.S. House of Representatives
Washington, DC  20515

Dear Congressman Brat:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Vicky Hartzler
U.S. House of Representatives
Washington, DC  20515

Dear Congresswoman Hartzler:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Chuck Fleischmann
U.S. House of Representatives
Washington, DC  20515

Dear Congressman Fleischmann:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

*David J. Shulkin, MD*

David J. Shulkin, M.D.

**AR125**



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Diane Black
U.S. House of Representatives
Washington, DC  20515

Dear Congresswoman Black:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.

**AR126**
Appx117



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Doug LaMalfa
U.S. House of Representatives
Washington, DC  20515

Dear Congressman LaMalfa:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Doug Lamborn
U.S. House of Representatives
Washington, DC 20515

Dear Congressman Lamborn:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.

**AR128**
Appx119



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Steve King
U.S. House of Representatives
Washington, DC  20515

Dear Congressman King:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans.  Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care.  We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery.  Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment.  VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda.  While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Kevin Cramer
U.S. House of Representatives
Washington, DC  20515

Dear Congressman Cramer:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Peter J. Roskam
U.S. House of Representatives
Washington, DC  20515

Dear Congressman Roskam:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

*David J. Shulkin MD*

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Marsha Blackburn
U.S. House of Representatives
Washington, DC  20515

Dear Congresswoman Blackburn:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Jeff Duncan
U.S. House of Representatives
Washington, DC 20515

Dear Congressman Duncan:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable John J. Duncan, Jr.
U.S. House of Representatives
Washington, DC  20515

Dear Congressman Duncan:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans.  Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care.  We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery.  Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment.  VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available.  Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda.  While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Jason Smith
U.S. House of Representatives
Washington, DC  20515

Dear Congressman Smith:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Tom Rice
U.S. House of Representatives
Washington, DC  20515

Dear Congressman Rice:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Steven M. Palazzo
U.S. House of Representatives
Washington, DC  20515

Dear Congressman Palazzo:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Bill Flores
U.S. House of Representatives
Washington, DC  20515

Dear Congressman Flores:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Stephen Fincher
U.S. House of Representatives
Washington, DC 20515

Dear Congressman Fincher:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Thomas Massie
U.S. House of Representatives
Washington, DC  20515

Dear Congressman Massie:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.

**AR140**
Appx131



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Andy Harris, M.D.
U.S. House of Representatives
Washington, DC  20515

Dear Congressman Harris:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Todd Rokita
U.S. House of Representatives
Washington, DC 20515

Dear Congressman Rokita:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Charles W. Boustany, Jr., M.D.
U.S. House of Representatives
Washington, DC 20515

Dear Congressman Boustany:

This is in response to your June 22, 2016, letter to the Department of Veterans Affairs (VA) requesting that VA withdraw a Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Elizabeth Warren
United States Senate
Washington, DC 20510

Dear Senator Warren:

This is in response to your September 22, 2016, letter to the Department of Veterans Affairs (VA) asking for an update on the Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Ron Wyden
United States Senate
Washington, DC  20510

Dear Senator Wyden:

This is in response to your September 22, 2016, letter to the Department of Veterans Affairs (VA) asking for an update on the Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package.  I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans.  Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care.  We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery.  Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment.  VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda.  While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

*David J Shulkin MD*

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Richard Durbin
United States Senate
Washington, DC 20510

Dear Senator Durbin:

This is in response to your September 22, 2016, letter to the Department of Veterans Affairs (VA) asking for an update on the Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

*David J. Shulkin, MD*

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Edward J. Markey
United States Senate
Washington, DC  20510

Dear Senator Markey:

This is in response to your September 22, 2016, letter to the Department of Veterans Affairs (VA) asking for an update on the Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package.  I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans.  Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care.  We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery.  Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment.  VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Barbara Boxer
United States Senate
Washington, DC  20510

Dear Senator Boxer:

This is in response to your September 22, 2016, letter to the Department of Veterans Affairs (VA) asking for an update on the Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Patty Murray
United States Senate
Washington, DC  20510

Dear Senator Murray:

This is in response to your September 22, 2016, letter to the Department of Veterans Affairs (VA) asking for an update on the Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package.  I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care.  We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery.  Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment.  VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda.  While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Bernard Sanders
United States Senate
Washington, DC 20510

Dear Senator Sanders:

This is in response to your September 22, 2016, letter to the Department of Veterans Affairs (VA) asking for an update on the Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Al Franken
United States Senate
Washington, DC  20510

Dear Senator Franken:

This is in response to your September 22, 2016, letter to the Department of Veterans Affairs (VA) asking for an update on the Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package.  I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans.  Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care.  We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery.  Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment.  VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda.  While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
Under Secretary for Health
Washington DC 20420

November 10, 2016

The Honorable Jeffrey A. Merkley
United States Senate
Washington, DC  20510

Dear Senator Merkley:

This is in response to your September 22, 2016, letter to the Department of Veterans Affairs (VA) asking for an update on the Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Sherrod Brown
United States Senate
Washington, DC  20510

Dear Senator Brown:

This is in response to your September 22, 2016, letter to the Department of Veterans Affairs (VA) asking for an update on the Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package.  I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans.  Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care.  We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery.  Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment.  VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda.  While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Tammy Baldwin
United States Senate
Washington, DC 20510

Dear Senator Baldwin:

This is in response to your September 22, 2016, letter to the Department of Veterans Affairs (VA) asking for an update on the Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Mike Quigley
U.S. House of Representatives
Washington, DC  20515

Dear Congressman Quigley:

This is in response to your September 12, 2016, letter to the Department of Veterans Affairs (VA) asking for an update on the Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package.  I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans.  Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care.  We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery.  Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment.  VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available.  Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda.  While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

*David J. Shulkin MD*

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Michael M. Honda
U.S. House of Representatives
Washington, DC  20515

Dear Congressman Honda:

This is in response to your September 12, 2016, letter to the Department of Veterans Affairs (VA) asking for an update on the Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package.  I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans.  Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care.  We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery.  Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment.  VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available.  Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda.  While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Raúl M. Grijalva
U.S. House of Representatives
Washington, DC  20515

Dear Congressman Grijalva:

This is in response to your September 12, 2016, letter to the Department of Veterans Affairs (VA) asking for an update on the Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package.  I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans.  Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care.  We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery.  Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment.  VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda.  While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

*Did J Shlln MD*

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Bonnie Watson Coleman
U.S. House of Representatives
Washington, DC  20515

Dear Congresswoman Watson Coleman:

This is in response to your September 12, 2016, letter to the Department of Veterans Affairs (VA) asking for an update on the Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package.  I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans.  Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care.  We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery.  Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment.  VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Eleanor Holmes Norton
U.S. House of Representatives
Washington, DC  20515

Dear Congresswoman Norton:

This is in response to your September 12, 2016, letter to the Department of Veterans Affairs (VA) asking for an update on the Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package. I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans. Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care. We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery. Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment. VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available. Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda. While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

November 10, 2016

The Honorable Jackie Speier
U.S. House of Representatives
Washington, DC  20515

Dear Congresswoman Speier:

This is in response to your September 12, 2016, letter to the Department of Veterans Affairs (VA) asking for an update on the Notice of Proposed Rulemaking (NPRM) regarding the removal of gender alteration restrictions from VA's medical benefits package.  I am responding on behalf of the Department.

VA regularly reviews regulations across the full spectrum of medical services to provide the highest quality health care to our Nation's Veterans.  Where there is new data, research, or changes to health care policies across Federal agencies that suggest a need for review, VA makes every effort to examine the circumstances and openly discuss actions that could improve Veteran health care.  We note that VA has not published a NPRM to remove the exclusion of gender alterations from VA's medical benefits package, but rather announced it was considering issuance of such a NPRM in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the Federal Government.

VA currently provides many services for transgender Veterans to include hormone therapy, mental health care, preoperative evaluation, and long-term care following sex reassignment surgery.  Increased understanding of both gender dysphoria and surgical techniques in this area has improved significantly and is now widely accepted as medically necessary treatment.  VA has been and will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding is available.  Therefore, this regulation will be withdrawn from the Fall 2016 Unified Agenda.  While VA has begun considering factors impacting this rulemaking process, it is not imminent.

Should you have further questions, please have a member of your staff contact Ms. Angela Prudhomme, Congressional Relations Officer, at (202) 461-6471 or by email at Angela.Prudhomme@va.gov.

Thank you for your continued support of our Nation's Veterans.

Sincerely,

David J. Shulkin, M.D.



**Advocacy and Health Policy**  |  May 28, 2019

## America's Frontline Physicians Urge Trump Administration to Protect Transgender Patients and Women's Reproductive Health

### Proposed changes to Section 1557 of the Affordable Care Act would jeopardize care for patients who need it the most

***Washington, DC*** — Last week, the U.S. Department of Health and Human Services issued a proposed rule that would weaken nondiscrimination protections for lesbian, gay, bisexual, transgender, and questioning (LGBTQ) individuals under Section 1557 of the Affordable Care Act. The rule also allows for religious exemptions that could restrict women's access to reproductive health care, and weakens requirements that have enabled millions of patients with disabilities and limited English proficiency to access services.

Section 1557 prohibits discrimination in health coverage and care on the basis of race, color, national origin, sex, age, and disability in health programs and activities that receive federal funding. This includes most health care facilities, including hospitals and physicians' offices, and most health insurance companies.

In response, the American Academy of Family Physicians, American Academy of Pediatrics, American College of Obstetricians and Gynecologists, American College of Physicians, American Osteopathic Association and American Psychiatric Association, issued the following statement:

"Our organizations, which represent nearly 600,000 physicians and medical students, oppose efforts by the Administration to weaken critical protections for any of our patients, including those who are transgender, those with limited English proficiency, those with disabilities, and those who are seeking access to reproductive health care.

"Rolling back gender discrimination protections as the rule proposes would impede access to care

and sanction discrimination against already vulnerable patient populations. Transgender patients often cite stigma and discrimination as the primary barriers in accessing treatment, which leads to higher health care costs and poorer outcomes.

"In addition, permitting health care entities that receive federal funding to refuse care to patients who have had a pregnancy termination will have a dangerous effect on access to care. Allowing religious exemptions as the rule proposes will discriminate against women seeking necessary reproductive health care services. Any such exemption would be contrary to Congressional intent and the express purpose of Section 1557, and has the potential to cause great harm to our patients.

"We oppose any laws and regulations that discriminate against transgender and gender diverse individuals. We oppose any medically unnecessary restrictions placed on women's access to reproductive health care. Instead, we urge the Administration to eliminate this policy change and work with us to ensure patients have access to the quality care they need."

---

**About the American Academy of Family Physicians**

*Founded in 1947, the AAFP represents 134,600 physicians and medical students nationwide. It is the only medical society devoted solely to primary care. Family physicians conduct approximately one in five office visits -- that's 192 million visits annually or 48 percent more than the next most visited medical specialty. Today, family physicians provide more care for America's underserved and rural populations than any other medical specialty. Family medicine's cornerstone is an ongoing, personal patient-physician relationship focused on integrated care. To learn more about the specialty of family medicine, the AAFP's positions on issues and clinical care, and for downloadable multi-media highlighting family medicine, visit www.aafp.org/media. For information about health care, health conditions and wellness, please visit the AAFP's award-winning consumer website, www.familydoctor.org.*

**About the American Academy of Pediatrics**

*The American Academy of Pediatrics is an organization of 67,000 primary care pediatricians, pediatric medical subspecialists and pediatric surgical specialists dedicated to the health, safety and well-being of infants, children, adolescents and young adults. For more information, visit*

**About the American College of Physicians**

The American College of Physicians is the largest medical specialty organization in the United States with members in more than 145 countries worldwide. ACP membership includes 154,000 internal medicine physicians (internists), related subspecialists, and medical students. Internal medicine physicians are specialists who apply scientific knowledge and clinical expertise to the diagnosis, treatment, and compassionate care of adults across the spectrum from health to complex illness. Follow ACP on Twitter, Facebook, and Instagram.

**About the American College of Obstetricians and Gynecologists**

The American College of Obstetricians and Gynecologists (ACOG) is the nation's leading group of physicians providing health care for women. As a private, voluntary, nonprofit membership organization of more than 58,000 members, ACOG strongly advocates for quality health care for women, maintains the highest standards of clinical practice and continuing education of its members, promotes patient education, and increases awareness among its members and the public of the changing issues facing women's health care. www.acog.org

**About the American Osteopathic Association**

The American Osteopathic Association (AOA) represents more than 145,000 osteopathic physicians (DOs) and osteopathic medical students; promotes public health; encourages scientific research; serves as the primary certifying body for DOs; and is the accrediting agency for osteopathic medical schools. To learn more about DOs and the osteopathic philosophy of medicine, visit www.DoctorsThatDO.org.

**About the American Psychiatric Association**

The American Psychiatric Association, founded in 1844, is the oldest medical association in the country. The APA is also the largest psychiatric association in the world with more than 38,500 physician members specializing in the diagnosis, treatment, prevention and research of mental illnesses. APA's vision is to ensure access to quality psychiatric diagnosis and treatment. For more information please visit www.psychiatry.org.

**PLEASE PRODUCE LOCALLY FOR ALL THOSE WHO DO NOT ROUTINELY ACCESS EMAIL DUE TO THEIR SPECIALTIES.**

Denis McDonough



## MESSAGE FROM THE SECRETARY

The Department of Veterans Affairs (VA) welcomes all Veteran, family, caregiver and survivor beneficiaries and employees, inclusive of diverse gender identities and sexual orientation. VA is committed to providing a safe, welcoming and equitable environment for all the Veterans we serve and the workforce that makes it possible for us to accomplish our mission.

Pursuant to President Biden's recently signed Executive Orders (*Enabling All Qualified Americans to Serve Their Country in Uniform*, signed on January 25, 2021, and *Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation*, signed on January 20, 2021), I will be issuing a memo to all Administrations and Staff Offices to:

- Conduct a policy review to determine whether any regulations, directives, policies and procedures require revision to promote equity for and inclusion of lesbian, gay, bisexual or transgender (LGBT) Veterans, families, caregivers, survivors or employees. Design and implement a remediation plan if the review identifies discriminatory policies towards LGBT beneficiaries and employees.

- Perform an assessment of the necessary steps to eliminate the exclusion of "gender alteration" (gender affirmation surgery) in the medical benefits package to include assessment of statutory and regulatory requirements as well as funding, staffing, technology and other resources required to provide all medically necessary services.

- Develop means to measure the experience of LGBT beneficiaries and employees and to include their perspectives in the development of future guidance, and identify and address any barriers that LGBT beneficiaries and employees may face in accessing the full range of VA care, benefits and services.

- Develop a plan to ensure that employees are trained on inclusive, respectful and welcoming interaction with LGBT beneficiaries, and implement an enterprise plan to enhance data and information systems with respect to sexual orientation and gender identity, such that beneficiaries and employees may independently and securely self-identify and be addressed by their preferred name and pronouns.

Every person at VA, whether a customer or member of our workforce team, should be treated with respect and dignity. Our success as a team—our ability to deliver world-class care for our Veterans—depends on our respect for our fellow VA employees and the Veterans we serve is critical to everything we do.

Information regarding LGBT specific care that VA currently provides can be found at the following link: https://www.patientcare.va.gov/LGBT/#:~:text=Veterans%20may%20have%20other%20ways%20of%20describing%20themselves,who%20identify%20as%20sexual%20or%20gender%20minority.

**Department of
Veterans Affairs**

# Memorandum

Date:    February 23, 2021

From:    Secretary (00)

Subj:    Services for LGBT Beneficiaries and Employees (VIEWS 4486526)

To:    Under Secretaries, Assistant Secretaries and Other Key Officials

1. The Department of Veterans Affairs (VA) welcomes all Veteran, family, caregiver and survivor beneficiaries and employees, inclusive of diverse gender identities and sexual orientation. We must review all regulations, directives, policies and procedures in order to determine if beneficiaries and employees with lesbian, gay, bisexual or transgender (LGBT) and related identities can access all VA care, benefits and services in a welcoming and respectful environment. This review is underscored in importance by President Biden's Executive Order (EO) on *Enabling All Qualified Americans to Serve Their Country in Uniform,* signed on January 25, 2021, and the *EO on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation,* signed on January 20, 2021.

2. Administrations and Staff Offices need to conduct this review and collaboratively determine whether all regulations, directives, policies and procedures promote equity and inclusion and do not discriminate against LGBT Veterans, families, caregivers, survivors or employees; and that any discriminatory items or procedures identified are eliminated or amended, with the changes documented and managed through appropriate employee training and management metrics. In addition, the experience of LGBT beneficiaries and employees must be measured and their perspectives included in the development of future guidance and any barriers that LGBT beneficiaries and employees may face in accessing the full range of VA care, benefits and services are identified and addressed. The Office of Human Resources and Administration/Operations, Security and Preparedness (HRA/OSP) will provide you with a template and instructions for completing your review, including key due dates.

3. The policy review will also include an assessment of the steps necessary to eliminate the exclusion of "gender alteration" (gender affirmation surgery) in the medical benefits package. This will include an assessment of statutory and regulatory requirements, funding, staffing, technology and other resources required to provide all medically necessary services. In addition, appropriate management, oversight and development of an enterprise plan to enhance data and information systems with respect to sexual orientation and gender identity, such that Veterans may independently and securely self-identify and be addressed by their preferred name and pronouns when interacting with VA; and ensure that employees are trained on inclusive, respectful and welcoming interaction with LGBT Veterans, families, caregivers, survivors and colleagues.

Page 2.

Subj: Services for LGBT Beneficiaries and Employees (VIEWS 4486526)

4. In addition to organizational-specific policies, HRA/OSP must ensure no enterprise-wide human resources directives and handbooks, policies, procedures or regulations exist that discriminate against LGBT employees. If such discriminatory items are identified, HRA/OSP must develop and implement remediation plans.

5. All Administrations and Staff Offices must provide the name of their lead for this review to Dr. Jennifer MacDonald, Senior Advisor to the Acting Deputy Secretary, by March 5, 2021. Updates on progress will be provided through the enterprise governance structure. Should you have any further questions, please contact Dr. Jennifer MacDonald at Jennifer.MacDonald8@va.gov.

Denis McDonough

**DEPARTMENT OF
VETERANS AFFAIRS**

# Memorandum

Date: May 21, 2021

From: Acting Under Secretary for Health (10)

Subj: Decision Memorandum: Removal of Gender Alterations Exclusion from VA Medical Benefits Package (VIEWS 05176337)

To: Secretary of Veterans Affairs (00)

1. **Purpose:**  The Veterans Health Administration (VHA) recommends that the Department of Veterans Affairs (VA) grant the Petition for Rulemaking (PFR) to eliminate the exclusion of "gender alterations" from the medical benefits package (38 CFR §17.38). This would commence the rulemaking process, which once complete, would enable VA to provide a full continuum of care for transgender Veterans, including medically necessary surgical procedures.

2. **Background:**  A January 20, 2021, Executive Order outlines this Administration's commitment to "combat discrimination on the basis of gender identity or sexual orientation." Your February 23, 2021, VA-wide email also requested that VA "perform an assessment of the necessary steps to eliminate the exclusion of 'gender alteration' (gender affirmation surgery) in the medical benefits package to include assessment of statutory and regulatory requirements as well as funding, staffing, technology and other resources required to provide all medically necessary services."

VHA currently does not offer gender affirming surgeries because the term "gender alterations" is listed as an exclusion in the medical benefits package (38 CFR §17.38). The term "gender alterations" has been interpreted by VA to mean surgical interventions for gender transition. In 2016, VA received a PFR to remove the "gender alterations" exclusion from the medical benefits package. VA solicited public comment on the PFR and convened a work group to review such feedback, with 61% of the comments in favor of this rule change.

To provide gender affirming surgeries, VA would need to engage in rulemaking to update the medical benefits package by removing the "gender alterations" exclusion from 38 CFR §17.38. This would require publishing a proposed rule in the Federal Register for public comment and responding to those comments in a final rule. Once the final rule is published and effective, VA would be able to provide surgical interventions for gender transition when a Veteran wants surgery and it is determined to be medically necessary by a Veteran's treatment team. Consistent with international standards of care and VHA care generally, VHA medical teams will make decisions on a case-by-case basis on those procedures that are medically necessary to promote, preserve or restore the health of a Veteran.

Page 2.

Subj: Decision Memorandum: Removal of Gender Alterations Exclusion from VA Medical Benefits Package (VIEWS 05176337)

The provision of gender affirming surgical procedures would align with best medical practice, research, health insurers and professional health organizations, as well as current Administration priorities.

In the absence of rulemaking, VHA will continue to provide or pay for the services it currently offers, including corrective procedures after gender affirming surgeries a Veteran obtains outside VHA, hormone therapy and other gender affirming care.

3. **Options:** Via an Executive Decision Memorandum, two options were presented to the following VHA governing bodies: Resource Council, Healthcare Operations Council, Healthcare Delivery Council, and Governance Board. These councils and Governance Board unanimously selected Option 1. The two options are now presented for your consideration.

   a. Option 1 (recommended): Grant the PFR and begin the rulemaking process to remove the "gender alterations" exclusion from the medical benefits package.
   b. Option 2: Deny the PFR and maintain status quo (do not revise the medical benefits package).

4. **Recommended Decision:** To enable a safe, inclusive continuum of care for transgender Veterans, the recommended option is to grant the PFR and commence the rulemaking process to remove the "gender alterations" exclusion from the medical benefits package.


Richard A. Stone, M.D.

Approve/Disapprove:

Comments:

Denis McDonough
Secretary of Veterans Affairs

6/11/21
Date

Attachments:
   Signed VHA Executive Decision Memorandum
   White Paper

**MENU**

VA (http://www.va.gov/) » Office of Public and Intergovernmental Affairs (/OPA/index.asp) »

# Office of Public and Intergovernmental Affairs

## Remarks by Secretary Denis R. McDonough

Orlando VA Healthcare System's 11th Annual Pride Month Celebration
Orlando, FL
June 19, 2021

Thank you, Keri. Good afternoon everyone, and welcome.

There are many people to thank for making this event happen and for all of their years of tireless advocacy for LGBTQ+ rights and care both here at VA and beyond.

First, my thanks to Keri Griffin, who has done an amazing job here in Orlando serving as both the LGBTQ+ Veteran Care Coordinator and also the LGBTQ+ Special Emphasis Program Manager for employees. Keri's often done this work for free, in her spare hours, hosting the first ever PRIDE event here 11 years ago—back when it was just a few folks in a basketball gym—and bringing us all the way to today. Thank you, Keri, for all you've done.

I would be remiss if I didn't also recognize Elizabeth Jackson, our Orlando Vet Center Outreach Specialist, who works with Keri and the Vet Center to offer life-changing support services for eligible Veterans, service members, and their families.

Thanks as well to Dr. Jillian Shipherd and Dr. Michael Kauth, our fantastic national **LGBTQ+** Health Program Directors.

And thanks to all of you who have joined us today.

This day and this month are a celebration. A celebration of the one million lesbian, gay, and bisexual Veterans in the United States. A celebration of the nearly eight percent of VA employees who identify as lesbian, gay or bisexual, and the thousands of our employees who identify as transgender. A celebration of a country and VA that have come a long way toward equity and equality.

I am proud to stand here, on behalf of President Biden, to say to all LGBTQ+ Vets, servicemembers, allies, and family members that at VA you will be treated with respect, compassion, and care. You deserve our very best, and I promise that we will give you nothing less;

But even as I say those words, I cannot help but think of the shadow they cast. The fact that they need to be said is a reminder that for far too long—and for far too many—acceptance, respect, and care were not the norm for LGBTQ+ Veterans. Far from it.

For generations, service members who identify as lesbian, gay, bisexual, transgender, or related identities faced brazen discrimination or even worse—not just in our Armed Forces, but in so many aspects of their lives. They lived in fear—of shunning, of violence, of having their lives turned upside down. And when it came to putting on the uniform and serving our country, they feared being denied that higher calling, too, simply because of who they were and who they loved.

📣 **Learn what the PACT Act means for your VA benefits >> (https://www.va.gov/resources/the-pact-act-and-your-VA-benefits)**

AR181
Appx160

and-your-va-benefits)

When I think of those injustices, I think of Leonard Matlovich. Leonard Matlovich was a Vietnam War Veteran, a recipient of the Purple Heart and the Bronze Star, and a gay man who came out to the military and the world by appearing on the cover of TIME magazine in 1975.

He quickly became a symbol of defiance and freedom for so many LGBTQ+ people in America. He was also quickly issued an Other Than Honorable discharge from the Armed Forces, despite twelve years of decorated service.

Years later, after Matlovich passed, his grave became a rallying site for LGBTQ+ servicemembers everywhere. Instead of his name, he chose to inscribe his gravestone with a short phrase: "When I was in the military, they gave me a medal for killing two men and a discharge for loving one."

That is the dark history we must overcome, at VA and in America. And it echoes to this day in horrific incidents like the Pulse Night Club shooting that devastated this community five years ago, and in the statistics that show that 80 percent of LGBTQ+ Vets have encountered a hurtful or rejecting experience in the military.

But Matlovich's dream, and the dream of those who came before and after him, has in so many ways come true. "Don't ask, Don't Tell" was repealed in 2010 and formally ended the next year. Marriage equality became the law of the land five years later. And the transgender ban on military service was repealed by President Biden on his fifth day in office.

Today, I am so proud to say that Americans of all gender and sexual identities now have the freedom to serve. And although there is still much work to be done, and the vestiges of bigotry remain, I am encouraged by the progress that's been made. And here at VA, we are determined to continue down that path of progress.

That is why I am announcing today that we are taking the first necessary steps to expand VA's care to include gender confirmation surgery, thus allowing transgender Vets to go through the full gender confirmation process with VA by their side.

Now, this process will require changing VA's regulations and establishing policy that will ensure the equitable treatment and safety of transgender Veterans. There are several steps to take, which will take time. But we are moving ahead, methodically, because we want this important change in policy to be implemented in a manner that has been thoroughly considered to ensure that the services made available to Veterans meet VA's rigorous standards for quality health care. This time will allow VA to develop capacity to meet the surgical needs that transgender Veterans have called for and deserved for a long time, and I am proud to begin the process of delivering it.

Additionally, we are changing the name of VHA's LGBT health program to the LGBTQ+ Health Program, language that proudly reflects new community standards of inclusiveness and anticipates future changes in terms.

We're making these changes not only because they are the right thing to do, but because they can save lives. Due in part to minority stress, LGBTQ+ Veterans experience mental illness and suicidal thoughts at far higher rates than those outside their community, but they are significantly less likely to seek routine care, largely because they fear discrimination. This perpetuates a cycle in which LGBTQ+ individuals have lower rates of access to preventive care services, utilize health care services less frequently, and have more negative experiences with health care.

That's unacceptable. And at VA, we're doing everything in our power to show Veterans of all sexual orientations and gender identities that they can talk openly, honestly, and comfortably with their health care providers about any issues they may be experiencing.

To that end, we're making a concerted effort to create a safe and caring environment for LGBTQ+ Veterans in all of our hospitals. In fact, one of my first actions as VA Secretary was ordering a top-down review of all of our policies to determine how we can make VA a more welcoming place.

◀ **Learn what the PACT Act means for your VA benefits »** (https://www.va.gov/resources/the-pact-act-and-your-va-benefits)

AR182

Appx161

We've found that even something as simple as displaying VA-specific rainbow magnets has proven to make our hospitals more welcoming, signaling to LGTBQ+ Vets that we are here for them. We offer both group and individual counseling services, as well as "Pride in All Who Served," a 10-week health education group that significantly reduces suicidal ideation and anxiety among LGBTQ+ Veterans. And every VA medical facility now has an LGBTQ+ Veteran care coordinator, a VCC, who can help Vets find the care they need.

Now, we recognize that some folks might be wary of sharing or talking about sexual orientation or gender identity with their health care provider. And we understand that, completely. But to those folks, I want to assure you that that VA health care providers keep all information confidential. Each and every one of them has undergone rigorous training to ensure that nothing you tell us goes beyond the walls of VA. And if providers violate this trust, they're violating the law, and they will face serious consequences.

All of which is to say that you can trust your provider to keep your conversations and records private. Rest assured that even if the way you identify is not known by your family and friends, your provider will never reveal it to them. By discussing all aspects of your identity with your health care provider, you can help them give you the best possible care for your personal needs.

The Orlando Medical Center is proof that these policies are already saving lives. A few years ago, a transgender woman Veteran was struggling. Her depression had worsened as a result of feeling caged in a body that wasn't hers, and she began to consider taking her own life. Then she called the Orlando VAMC and did something she never expected to do: she said aloud, for the first time ever, the words "I am transgender."

That is the trust that this health care system has developed: after 39 years of silence, a transgender woman Veteran was willing to tell us her secret. And we were ready to help. Today, she's not suicidal, and she wakes up each day as her authentic self. And she thanks Orlando VA Health Care System and Keri Griffin for all their efforts, saying, "I don't know what I would do without [them]." That's a job well done, and it's what we aspire to at every VA across America.

You know, when President Biden nominated me to lead VA, he told me to fight like hell for our Vets. And when he said that, he meant all Veterans. Because, as he says, our most sacred obligation is to prepare and equip the troops we send into harm's way, and to care for them and their families when they return home.

That sacred obligation means that when the brave young people who signed up to serve our country transition to civilian life, we owe them. We owe them a debt of gratitude. We owe them care and benefits. And, perhaps most of all, we owe them a chance to experience all the freedoms that they joined the military to uphold.

For LGBTQ+ Veterans, we have long failed to keep those most sacred promises. But, under the leadership of President Biden and this administration—and the care of the amazing providers at VA—we're going to do better.

No matter who you are or who you love, there is care, compassion, and respect for you at VA. We will serve LGBTQ+ Veterans just like they served our country. Our commitment to them, and to all Veterans, has never been stronger.

Happy Pride to all of you. May God bless you, our troops, our Veterans, their families, caregivers, and survivors. And may we always give you our very best.

Thank you.

📣 **Learn what the PACT Act means for your VA benefits » (https://www.va.gov/resources/the-pact-act-and-your-va-benefits)**

 An official website of the United States government

Search: ○ Agenda ● Reg Review ○ ICR

Go

| Home | Unified Agenda | Regulatory Review | Information Collection Review | FAQs / Resources | Contact Us |

### OIRA Conclusion of EO 12866 Regulatory Review

**RIN:** 2900-AR34    **View EO 12866 Meetings**
**Title:** Removal of Exclusion of Gender Alterations from the Medical Benefits Package
**Agency/Subagency:** VA
**Concluded Action:** Consistent with Change

**Legal Deadline:** None
**Publication Date:**
**Major:** Yes
**Regulatory Flexibility Analysis Required:** No
**Federalism Implications:** No

**International Impacts:** No

**Pandemic Response:** No

**Received Date:** 04/13/2022

**Stage:** Proposed Rule
**Concluded Date:** 09/07/2022
**Section 3(f)(1) Significant \*:** No
**Economically Significant \*\*:** No
**Unfunded Mandates:** No
**Related To Homeland Security:** No
**Small Entities Affected:** No
**Affordable Care Act [Pub. L. 111-148 & 111-152]:** No
**Dodd-Frank Wall Street Reform and Consumer Protection Act, [Pub. L. 111-203]:** No

**Note**:
\* Following the issuance of E.O. 14094 on April 6, 2023, which amended Section 3(f)(1) of E.O. 12866, OIRA has designated regulatory actions as "Section 3(f)(1) Significant" if under that newly amended section of E.O. 12866 they are likely to result in a rule that may have an annual effect on the economy of $200 million or more (adjusted every 3 years by the Administrator of OIRA for changes in gross domestic product); or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, territorial, or tribal governments or communities. After April 6, 2023, OIRA no longer designated regulatory actions as "Economically Significant."

\*\* Between September 30, 1993, when E.O. 12866 was issued, and April 6, 2023, when E.O. 14094 was issued, OIRA designated regulatory actions as "Economically Significant" if under Section 3(f)(1) of E.O. 12866 they were likely to result in a rule that may have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities.

 

  Reginfo.gov
**An official website of the** U.S. General Services Administration **and the** Office of Management and Budget

About Us        About GSA        About OIRA        Related Resources        Disclosure        Accessibility        FOIA        Privacy Policy        Contact Us

Looking for U.S. government information and services?
Visit USA.gov

Search: ● Agenda ○ Reg Review ○ ICR

Go

Home | Unified Agenda | Regulatory Review | Information Collection Review | FAQs / Resources | Contact Us

## View Rule

<u>View EO 12866 Meetings</u>                                    <u>Printer-Friendly Version</u>   <u>Download RIN Data in XML</u>

**VA**                              **RIN:** 2900-AR34                              **Publication ID:** Fall 2022

**Title:** Removal of Exclusion of Gender Alterations From the Medical Benefits Package
**Abstract:**

The Department of Veterans Affairs (VA) is proposing to revise its medical regulations by removing the exclusion on gender alterations from the medical benefits package. VA is proposing these changes so that transgender and gender diverse veterans may receive medically necessary health care, including surgical interventions for gender transition. This proposed change would be consistent with medical industry standards and would ensure that VA provides a full continuum of care to transgender and gender diverse veterans.

**Agency:** Department of Veterans Affairs(VA)                     **Priority:** Other Significant
**RIN Status:** Previously published in the Unified Agenda            **Agenda Stage of Rulemaking:** Proposed Rule Stage
**Major:** Yes                                                   **Unfunded Mandates:** No
**CFR Citation:** <u>38 CFR 17.38</u>
**Legal Authority:** <u>38 U.S.C. 1710</u>
**Legal Deadline:** None
**Timetable:**

| Action | Date | FR Cite |
|---|---|---|
| NPRM | 12/00/2022 | |

**Regulatory Flexibility Analysis Required:** No                  **Government Levels Affected:** None
**Small Entities Affected:** No                                   **Federalism:** No
**Included in the Regulatory Plan:** No
**RIN Information URL:** <u>www.regulations.gov</u>
**RIN Data Printed in the FR:** No
**Agency Contact:**
Veterans Health Administration VHA
Department of Veterans Affairs
810 Vermont Avenue NW,
Washington, DC 20420
Phone:202 461-5049

   

 Reginfo.gov
**An official website of the** <u>U.S. General Services Administration</u> **and the** <u>Office of Management and Budget</u>

<u>About Us</u>      <u>About GSA</u>      <u>About OIRA</u>      <u>Related Resources</u>      <u>Disclosure</u>      <u>Accessibility</u>      <u>FOIA</u>      <u>Privacy Policy</u>      <u>Contact Us</u>

Looking for U.S. government information and services?
<u>Visit USA.gov</u>

An official website of the United States government  Here's how you know

Talk to the Veterans Crisis Line now

VA.gov    Locations    Business    VA Careers

Contact Us

VA | News

News ⌄    Resources ⌄    VA Podcast Network

VA Press Room    Q

Home  / Press Room

# Disabled American Veterans

FOR IMMEDIATE RELEASE

February 26, 2023  1:29 pm

Denis McDonough  Washington, DC

Joe Parsetich, thanks for that kind introduction. It is great to be among this great company. I want to highlight a couple folks who really make this partnership what it is: Randy Reese, Marc Burgess, Darlene Spence, Burl Jimmerson, and Joy Ilem, whose status as a Minnesotan is only outshone by her relentlessness and unrivaled reach on Capitol Hill. You are the glue that makes this great organization run,

**AR238**
Appx165

and that brings our partnership to life. Thank you, for everything.

I'll begin by just saying, thank you for your service, your devotion to Vets, and for our partnership in serving them, as well as they have served this country. These past two years, we have delivered more care and more benefits to more Vets than at any other time in our nation's history; thanks to many people, including each and every one of you. We're going to keep fighting like hell for Vets, together and for all Vets, to give them the best outcomes. And we're looking forward to collaborating even more effectively, to build on what's working, and to fix what's not.

I want to focus on our partnership — because we have no more important partner than you. I see that every day, but earlier this year I saw the real impact of your work. This past summer, Rich Batcho — an incredible DAV volunteer from Nevis, Minnesota, about an hour from where I went to college — was on his way to drive a rural Veteran to his VA appointment. There had been bad storms in the area over the previous weeks, and trees had fallen all over the property — including onto the Veteran's house and garage. So, the driver picked up the Veteran and started asking about the storm damage. He quickly learned that the Veteran had been without electricity — for almost a week — and that he was having a hard time getting an electrician to come out.

A week without electricity, in the middle of the summer. So Rich immediately sprang into action. On the road to the clinic, he called another DAV volunteer in the area — Darius Simon — who immediately called the local DAV commander, Jason Bristlin. Darius

**AR239**
Appx166

already had his saws in his truck, so he and Jason got right to work cutting down the fallen trees. Within four hours — four hours — the electricity was back on in the Veteran's house, just as Rich's car was pulling back up the driveway to return the Veteran from his appointment. In just four hours, three DAV volunteers — three Veterans — had worked together to get this disabled Veteran running power and water.

The impact that you make on behalf of Veterans every single day is inspiring. This is what our work is all about — getting the job done for Veterans, together, whether that means providing the best care in the world, benefits they've earned, or a dignified last resting place that honors their service and sacrifice. So, when you hear from a Vet who needs something — just like those three incredible Veterans in Minnesota — I want your first call to be to us. Together, we can solve problems with full transparency, holding nothing back, continuing to build trust by telling the whole story. We are proud of our accomplishments. But we are going to be candid about our failings — candid with ourselves, with you, with Vets, and with the American people. We still can, and still must, be better — and do better — for the Veterans we serve. So, let me touch on our goals for this year: more care, more benefits, for more Vets.

Let's start with more care. Over the last two years, we've delivered more care to more Vets than at any other time in our nation's history. In just the past year, Vets had over 73 million outpatient appointments at VA and 37 million more outpatient appointments with community care providers in your states. Meanwhile, we've seen a staggering 3000% increase in virtual

home visits since 2020 — over 23 million total in that time span.

And in the midst of such revolutionary change in how we deliver care, Vets are continuing to tell us they trust VA. On average, for outpatient care, trust is hovering around 90% — including among historically marginalized Vet populations. All of you in this room help us earn and maintain that trust, every single day. But we need to build more trust with women Vets, whose trust score is down at 87%, and significantly improve trust with our younger, post-9/11 Vets. Across the board, the younger the Veterans, the less they trust us.

And to build that trust, we need to make their care experience better and more effective, no matter if it is in the direct care system, or in the community. And we need your help, our strong partnership, strengthening effective networks, and making sure network members help us coordinate care for Veterans. Because VA doesn't always get community care records back in a timely manner. Sometimes, we don't get those records back at all. It means we can't coordinate the Vet's care. It means we can't manage the cost of their care. It means that the care gets less effective, and more expensive. The trend should be just the opposite — more effective, less expensive.

Now, one reason community care is sometimes slow is because we need more staff to do the work. I'll hit hiring in a minute. But I want to ask you to sit down with community providers in our network and in your states and let's get their help. We need them to sign up for our Health-Share Referral Manager system; the technology we have that will improve communications, coordination, and medical

AR241
Appx168

documentation sharing between VA and community providers. And if not Health-Share, there's the Joint Legacy Viewer, E-fax, and the Postal Service. We need them to use VA's Request for Services process to meet any additional needs of Vets they're seeing. And we need them to talk to us so we can all do better, for Vets.

Another place we have to deepen our partnership is on our number one clinical priority — mental health and suicide prevention. We all have to be there for Vets when it matters most, especially in times of crisis. Two years ago, we failed a Veteran — Major Ian Fishback — because we didn't carefully coordinate our response to his needs across federal, state, and county systems. I can update you today that we spent the last year — among VA Office of Mental Health and Suicide Prevention, VISN 10, and Michigan state authorities — so we're better positioned to ensure that a Vet isn't responsible for managing complex governmental bureaucracies. We're responsible. We have to do that, for all Veterans.

And this is the charge President Biden gave us in this year's State of the Union. Vets need and deserve suicide prevention solutions that meet them where they are, rather than taking a one-size-fits-all approach. So, I want to quickly run through five of the solutions we're continuing to implement this year:

First, we just announced a final round of prizes through our Mission Daybreak challenge — totaling nearly $20 million across 40 teams — to build out proven new solutions developed by Americans in communities across the country. These investments will help develop innovations that will save Veterans' lives.

**AR242**
Appx169

Second, the Staff Sergeant Parker Gordon Fox Suicide Prevention Grants are getting resources to local suicide prevention services where Vets are, funding local innovations among people who know their Vets best.

Third, we launched Suicide Prevention 2.0, designed to recruit, hire and train more than 100 licensed mental health providers serving Veterans at high risk of suicide. At VA — as in every health care system in the country — we are badly in need of additional trained mental health professionals.

Fourth, we're significantly expanding VA coverage through the COMPACT Act, opening doors of emergency care when Vets need it most — access to any health care facility, VA or not — for free emergency mental health care. Now, the COMPACT Act is connecting us to Veterans who may have never worked with us in the past, so it is critical that we continue listening and seeking feedback from Veterans, our VA employees, our community partners, and all of you. In the weeks since this benefit has been implemented, we have already received very valuable feedback. For example, we have heard that additional communication and education to Veterans about who qualifies for this important benefit would be helpful. Additionally, we have heard how important it is for our community partners to hear from VA quickly when seeking approvals for care payment. We are using this feedback to get better. And you have my commitment that we ensure that Veterans receive the suicide crisis care they need when and where they need it without ever having to worry about receiving a bill.

Finally, we've brought on over 1,300 peer support specialists. These peer support specialists are all

Vets, trained to use their personal experiences with their own recovery to help struggling fellow-Vets reconnect, find a sense of belonging, and access resources at VA and in their communities. Look, here's what we know after decades of success with twelve step programs. Recovery takes work every day. Every day. It takes recognition of a higher power. And we also know that nothing helps one's recovery quite like helping out someone else who is fighting through recovery, through everyday challenge. Vets helping Vets, long after they take off the uniform. There's nothing better than that. There's no one who does that better than DAV.

Now, I know, that's a lot. But suicide prevention takes all of us … pulling together in the same direction to save lives. And with all this work, and more, saving lives is exactly what we're going to do. And, together, we will do it.

Now, let me touch on how we're partnering–VA and DAV–to get more benefits to more Veterans. Right now, we're delivering more benefits, more quickly, to more Veterans than ever before, and the Board of Veterans' Appeals is a big part of that. But we can do better, and your benefits advocates are helping us get there.

Volunteers like Wanda Daniels in Georgia. Wanda is a 25-year Air Force Veteran who currently serves as the Adjutant for DAV's Georgia office. Not only that, she serves as her chapter's benefits advocate — Chapter 92 in Jefferson, Georgia. Every week, she travels two hours to the department's headquarters to handle her duties as adjutant. And she's always on the move, meeting Veterans wherever is most convenient for them to help process their VA claims. She is especially

proud of the work she's done to reach underserved women Veterans, ensuring they receive the benefits they've earned from their service to this country.

This past year, she was awarded the President's Lifetime Achievement Volunteer Service Award in recognition of the thousands of hours she has volunteered on behalf of her fellow Veterans. President Biden's letter read, "We are living in a moment that calls for hope and light and love. Hope for our futures, light to see our way forward, and love for one another. Through your service, you are providing all three." Hope, light, and love. There are few people who embody these traits more than DAV volunteers like Wanda.

So we at VA have to do our part to ensure the best possible outcomes for Veterans. We have to keep working to shorten Vets' waits by ensuring they're in the right line with files ready for a final decision. And we at VA have a lot of work to do communicating better with Vets about why claims were denied, what they can do to challenge denials, and how to close information gaps in their claims long before their hearing. The first time Vets know what's missing from their files cannot be when the judge tells them. So, we have to work together to maximize Vets' chances of getting that claimed benefits on appeal.

Now, I tell you this because we set an all-time record last year getting Vets over 1.7 million decisions on their claims. And we're on pace to break that record this year. Just since the PACT Act was signed last August, Veterans and survivors have filed more than a million claims — over 24% more than the same period last year. To date, we've awarded 103,000 toxic exposure claims out of 128,000 we've reviewed. Again,

that's thanks to your help ... in part because you made such a strong presence across the country at the PACT Act Week of Action events in December. And we have to make sure every Vet knows about these new toxic benefits and how to file a claim.

Here's why. A Vet exposed to herbicides while serving in Thailand in the early '70s had been trying to get service-connection for Parkinson's disease, diabetes mellitus type II, and peripheral neuropathy the last seven years. All his previous claims and appeals had been denied.  Well, on the first day of this year — the first day we granted PACT Act benefits — that Vet was granted service connection for 13 disabilities. That's because the PACT Act added a presumptive for his service in Thailand. For him, that's a retroactive and monthly benefit that will go a long way supporting his well-being for the rest of his life. So, help us tell your Vets:

First, apply for toxic exposure benefits and care right now. Applying before August 10th this year means benefits will be backdated to August 10 of last year, the day President Biden signed the bill into law.

Second, enrolled Vets should get a toxic exposure screening at their VA medical center. Nearly 2 million [1.8M] Vets already have. And if they're not enrolled, let's get them enrolled.

Third, some Vets worry that applying for toxic exposure benefits will impact their current benefits. The truth is that with the PACT Act, they're 32 times more likely to have their benefits increase — or stay the same — than to see a decrease.

Fourth, there are people who'll try to convince Vets they need to pay somebody or use a lawyer to apply for their VA benefits. Not true. Working with VA or a VSO, it's free and easy to apply.

And fifth, everybody can learn more about the PACT Act and apply anytime by visiting VA.gov/PACT or calling 1-800-MY-VA-411 … 1-800-698-2411.

So, we've talked about more care and more benefits. Now, let's talk about reaching more Vets, and how our partnership can ensure we reach more Vets. First, we're investing in modern facilities to expand access. We opened 17 new CBOCs last year providing better access for 2.8 million Vets. This year we're awarding and completing significant major construction projects that will serve millions more. And, thanks again to the PACT Act, we have new authorizations and funding for 31 major leases to improve access for over 4.5 million Vets.

Let's continue to ensure we work together to ease the exercise of these leases and share data on how we position them correctly, so that we bring care to Veterans rather than expecting them to bring themselves to the care. And we still need more people to ensure we're processing claims quickly and providing timely access to world class care.

That's why we're aggressively hiring for positions across VA. VBA has hired 2,500 people so far this year and anticipates needing about 4,500 more. So far this year, VHA has hired over 18,500 people. But we need over 33,000 more. So, we need your help finding and hiring the best of the best. Send us Vets to hire. Send us people who believe in our mission and want to serve Vets. Send us people like Serena, who we hired

in Michigan. Her grandfather's a World War II Vet, and she said, "I just want to give back because Vets have given their whole lives for our freedom."

And reaching more Vets — that means all Vets. All Vets. After World War II, our country failed a million Black Vets … failed them — men and women both, at every level. After they finished fighting in Europe and the Pacific, Black Veterans had to fight something back home as insidious as any enemy. Racism. Unfortunately, that fight's still raging, and VA isn't immune. There have been unacceptable disparities in benefits decisions because of racial bias, and discrimination based on sexual orientation and gender identity.

We're committed to right these wrongs, to ensure we're combating institutional racism and discrimination rather than perpetuating it. So, we'll continue to take steps to ensure Black Vets and all minority and historically underserved Vets get what they have earned and so richly deserve. We'll be taking a series of steps this coming year — building on steps we've taken over the last two years — to ensure that our fastest growing cohort of Veterans, women Vets, feel welcomed at VA.

And we will be taking the next steps to make sure we are providing the full spectrum of care to transgender Vets. I'm not naïve about the environment we're operating in, and the pressure we can all feel around politics. But some things are beyond politics. All Veterans deserve timely access to world-class health care and earned benefits. Not some Veterans. All Veterans.

Because when you and all our Veterans signed up to serve, we made a promise to you, to them. If you fight for us, we will fight for you. If you serve us, we will serve you. If you take care of us, we will take care of you when you come home. Our country, as a whole, makes that promise. But it's our job at VA to keep that promise, to each of you and to every Veteran. Every Veteran.

And here's my commitment to you. We will never settle for anything less. That's the lens through which I have seen my work to date, and I'll stand by that approach this year. And in the spirit of the partnership I have spoken with you about today — and I've intended to conduct myself with over these last two years together — I'll always be candid with you about those decisions, and always open to you, to your feedback, and to your advice. Even if, if not especially when, we disagree. Oftentimes, that's when it matters most.

I look forward to working with you in the year ahead, and I look forward to your questions. And may God bless all of you, our servicemembers protecting our country today, and our Veterans, their families, caregivers, and survivors.

### 

Reporters and media outlets with questions or comments should contact the Office of Media Relations at vapublicaffairs@va.gov



Veterans with questions about their health care and benefits (including GI Bill). Questions, updates and documents can be submitted online.

[Contact us online through Ask VA](#)



Veterans can also use our chatbot to get information about VA benefits and services. The chatbot won't connect you with a person, but it can show you where to go on VA.gov to find answers to some common questions.

[Learn about our chatbot and ask a question](#)

[Subscribe today](#) to receive these news releases in your inbox.

**Topics**

Caregivers    Secretary McDonough

Veteran Families

Veteran Service Organizations (VSO)

## LET OTHERS KNOW ABOUT THIS



# More from the Press Room

SPEECHES
NOVEMBER 11, 2023

## Veterans Day Commemoration at Arlington National Cemetery

It is fitting that we gather today at Arlington National Cemetery, on these hallowed, rolling hills overlooking our nation's capital. With one sweep of the eye, we see the cost of freedom in the rows of marble headstones

SPEECHES
NOVEMBER 3, 2023

## Medal of Honor Society Annual Convention

Britt, thanks for that kind introduction, and for your advice and counsel. And Leroy, thanks so much for the invitation to join you today, and for your leadership as President of the Congressional

SPEECHES
NOVEMBER 1, 2023

## VHA Innovation Experience

You once told an audience that our most valuable asset at VA is our people — a force of caring, compassionate, innovative professionals deeply committed to the Veterans we serve. Truer words were never said, and you are one of our most valued

5/30/24, 9 31 AM　　　　　　　　　　　Disabled American Veterans　VA News

stretching into the distance, the final resting places of our nation's heroes, and in the precision of the sentinels guarding the Tomb of the Unknown Soldier.

Medal of Honor Society.

professionals. Thank you for your leadership.

Last updated March 8, 2023



**U.S. Department of Veterans Affairs**
**810 Vermont Ave., NW**
**Washington, DC 20420**
**1-800-698-2411**

**VA** News

An official website of the U.S. Department of Veterans Affairs

VA.gov
ChooseVA
DiscoverVA

VA Forms
VA Publications
About VA

VA mobile apps
Accessibility at VA
No FEAR Act data

**AR252**
Appx179

Disabled American Veterans  VA News

Whistleblower
Protection

Office of the Inspector
General

VA plans, budget,
finances, and

performance

Agency Financial Report

Privacy policy

FOIA requests

Disclaimers

Open data

Vulnerability disclosure
policy

Copyright policy

Looking for U.S. government information and services?  Visit USA.gov



**DEPARTMENT OF VETERANS AFFAIRS**
**WASHINGTON**

March 6, 2023

Rebekka Eshler
President, Board of Directors
Transgender American Veterans Association
2020 Pennsylvania Ave. Suite 465
Washington D.C., DC 20006

Dear Ms. Eshler:

This is in response to the email of January 12, 2023, sent by the former Executive Director of the Transgender American Veterans Association, regarding the removal of the gender affirming exclusion in the medical benefits package. I am responding on behalf of the Department of Veterans Affairs (VA) and want to assure you that VA remains committed to removing this discriminatory exclusion of treatment services for transgender and gender diverse Veterans.

When Secretary McDonough announced that VA would pursue a rule change to remove the gender affirming surgery exclusion, he noted that this process can take at least 2 years. In fact, in some instances the rulemaking process can take longer. We are close to finalizing the review and publishing the proposed rule in the Federal Register.

Secretary McDonough understands how frustrating the rule change process is for transgender and gender diverse Veterans who have long waited for these treatment services. During this rule change process, non-surgical treatments remain available to transgender and gender diverse Veterans.

Again, thank you for your letter and for your service to the country. Please know that VA is committed to treating all Veterans equitably with respect and compassion.

Should you have any questions, you may contact Dr. Michael Kauth, Executive Director, Lesbian, Gay, Bisexual, Transgender, Queer + Health Program at Michael.Kauth@va.gov.

Sincerely,

Kimberly M. Mitchell
Director, Veterans Service
Organization Liaison

By Email and U.S. Priority Mail                                    Friday, March 31, 2023

The Honorable Joseph R. Biden              The Honorable Denis R. McDonough
President of the United States              Secretary of the
The White House                             Department of Veterans Affairs
1600 Pennsylvania Avenue N.W.               810 Vermont Avenue N.W.
Washington, D.C. 20003                      Washington, D.C. 20420

**Re: Honor Transgender Day of Visibility by removing Department of Veterans Affairs'
categorical regulatory exclusions on gender affirming surgery**

Dear President Biden and Secretary McDonough:

On behalf of the 157 undersigned national military and veteran advocacy groups,
veteran serving organizations, and civil-rights and LGBTQIA+ advocacy organizations, and 229
veterans, service members, dependents, and their allies and supporters, we write to urge you
to honor Transgender Day of Visibility[1] by removing the categorical regulatory exclusion on
gender-affirming surgery from the Department of Veterans Affairs Medical Benefits package.

Transgender, nonbinary, and gender-diverse veterans have never been able to access
gender-affirming surgery from the Veterans Health Administration, a ban Secretary
McDonough promised to lift in statements on June 19, 2021.[2] This announcement was made at
the height of Pride month and earned justifiable praise from the community. Nearly two years
later, though, we are still waiting for that commitment to be fulfilled.

The ban on gender-affirming surgery is not just an equity issue, it is also a safety issue –
a reality that the Secretary himself has acknowledged.[3] In his own words, the Department is
taking steps to remove the ban "not only because [it is] the right thing to do, but because [it]
can save lives."

Saving lives is even more critical today than it was when the Secretary made his
remarks in 2021, as the health and safety of trans people are threatened across the nation. In
2022, lawmakers in 33 states introduced nearly 175 bills attacking trans people's healthcare
access, legal recognition, and basic right to exist.[4] In 2023, that number more than doubled:
Already since January 1, 2023, nearly 400 anti-LGBTQ+ bills have been introduced in state
legislatures across the country,[5] many of them targeting gender-affirming care for minors *and*

---

[1] Trans Day of Visibility is an annual awareness day celebrated around the world. The day is dedicated to celebrating
the accomplishments of transgender and gender nonconforming people while raising awareness of the work that
still needs to be done to achieve trans justice.
[2] Office of Public and Intergovernmental Affairs. (2021, June 19). *Remarks by Secretary Denis R. McDonough*. Office of
Public and Intergovernmental Affairs. https://www.va.gov/opa/speeches/2021/06_19_2021.asp
[3] Ibid.
[4] https://translegislation.com/bills/2022
[5] https://translegislation.com/; *see also* Factora, J. (2023, February 9). *Over 300 anti-LGBTQ+ bills have already been
filed in 2023*. Them. https://www.them.us/story/anti-lgbtq-bills-over-300-2023

adults, including restricting insurance coverage for these procedures.[6] Transgender, nonbinary, and gender-diverse veterans are counting on the Department to provide this care and for Secretary McDonough and the Biden-Harris Administration to hold true to their promises of serving gender-diverse veterans more equitably, including in the delivery of and access to VA's own benefits and services.

Secretary McDonough has indicated that this process would take time and include several steps.[7] Since 2021, the Department has made headway internally on the proposed regulatory changes, and its own regulatory agenda projected that the Notice of Proposed Rulemaking (NPRM) would be issued last Fall.[8] To date, the Department still has not taken that step. After years of patience and anticipation, we issue this letter to demand action from the Biden Administration and Secretary McDonough. Every day that passes, members of the transgender community continue to suffer mental health crises and lose their lives to suicide.[9] Studies indicate that transgender veterans are twice as likely as their cisgender veteran counterparts and 5.85 times more likely than the general population to die by suicide. This is not an inevitable outcome; for transgender veterans seeking this life-saving health care, it is an outcome that this Administration has the power to change.

We urge you to issue the NPRM immediately so that the regulatory process can get underway and gender-diverse veterans can finally receive the care they deserve and were promised without further delay.

Respectfully,

---

[6] Examples include Texas S.B. 1029, which would prohibit most insurance coverage of all "gender modification procedures and treatments."; Tennessee H.B. 1215, which would ban its state Medicaid program from contracting with providers who cover transition-related care; and South Carolina H.B. 3730 and Oklahoma S.B. 129, both of which would bar medical professionals from providing transition related care to people up to 26 years of age.
[7] Office of Public and Intergovernmental Affairs. (2021, June 19). *Remarks by Secretary Denis R. McDonough*. Office of Public and Intergovernmental Affairs. https://www.va.gov/opa/speeches/2021/06_19_2021.asp
[8] https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202210&RIN=2900-AR34
[9] Tucker R. P. (2019). Suicide in Transgender Veterans: Prevalence, Prevention, and Implications of Current Policy. *Perspectives on psychological science : a journal of the Association for Psychological Science, 14*(3), 452–468. https://doi.org/10.1177/1745691618812680

# Organizational Signers

1. Academy LGBTQ
2. Ace and Aro Alliance of Central Ohio
3. ACCESS REPRODUCTIVE JUSTICE
4. American Atheists
5. American Humanist Association
6. API Chaya
7. Athlete Ally
8. **Black Veterans Project**
9. Bridgercare
10. Cal Poly Pomona Pride Center
11. Center for Reproductive Rights
12. CenterLink: The Community of LGBT Centers
13. Charlotte Transgender Healthcare Group
14. Chattanooga Trans Liberation Collective
15. Chicago House and Social Service Agency
16. Citizens Project
17. Code Whatever
18. Colors+
19. Compass LGBTQ Community Center
20. Connecticut TransAdvocacy Coalition
21. Create the Pause
22. Democrats Abroad
23. Diversity Center of Oklahoma Inc.
24. Eastern PA Trans Equity Project
25. EqualityMaine
26. Equality Federation
27. Equality Nevada
28. Equality Texas
29. Equitas Health
30. Fenway Health
31. First City Pride Center
32. FORGE, Inc.
33. Four Corners Rainbow Youth Center
34. GenderNexus
35. Gender Justice

36. Gender Justice League

37. GLAAD

38. GLMA: Health Professionals Advancing LGBTQ+ Equality

39. GLSEN RVA

40. GO Magazine

41. Grand Rapid Trans Foundation

42. Henderson Equality Center

43. Human Rights Campaign

44. Human Rights First

45. inclusion tennessee

46. Inside Out Youth Services

47. Institute for LGBT Health and Wellbeing

48. Interior AIDS Association

**49. Iraq and Afghanistan Veterans of America**

50. Jackson Pride Center, Jackson, MI

**51. Jewish War Veterans**

52. Joseph Pope Counseling

**53. Journal of Veterans Studies**

54. Justice in Aging

55. Kentucky Health Justice Network

56. Lambda Legal

57. Lancaster LGBTQ+ Coalition

58. Latino Equality Alliance

59. Lexington Pride Center

60. LGBTQ Center of the Cape Fear Coast

61. LGBT Center of Greater Reading

62. LGBTQ Center OC

63. LGBT Center of Raleigh

64. LGBTQ Allyship

65. LGBTQ+ Community Center of Southern Nevada

66. Los Angeles LGBT Center

67. Louisiana Trans Advocates

68. Louisville Youth Group

69. Lyon-Martin Community Health Services

70. Maine Transgender Network

71. Massachusetts Transgender Political Coalition

**72. Minority Veterans of America**

**73. Modern Military Association of America**

74. Montgomery Pride United/ Bayard Rustin Community Center

75. Muncie OUTreach LGBTQ+ Center

76. National Center for Transgender Equality

77. National Women's Law Center

78. NEW Pride Agenda

79. North Las Vegas Equality Center

80. Oklahomans for Equality

81. one-n-ten

82. One Colorado

83. One Iowa

84. OutCenter Southwest Michigan

85. OutNebraska

**86. Out in National Security**

87. Pacific Pride Foundation

88. PFLAG National

89. Physicians for Reproductive Health

**90. The Pink Berets**

91. Pittsburgh Equality Center

92. Planned Parenthood Federation of America

93. Point of Pride

94. The Pride Center for Sexual Orientation  & Gender Diversity At Lehigh University

95. Pride Center of Staten Island

96. Pride Center of Terre Haute Inc.

97. Pride Community Center of North Central Florida

98. Princess Janae Place Inc.

99. PRISM

100.     PROMO Missouri

**101.     Protect Our Defenders**

102.     Rainbow Connections, LLC

103.     Rainbow Health Minnesota

104.     Rainbow Rose Center

105.     The Rep Room

106.     Rockland County Pride Center

107.     SAGE

108.    The San Diego LGBT Community Center

109.     San Diego Black LGBTQ Coalition

110.    San Diego Pride

**111.    San Diego Pride Military Department**

112.    San José State University PRIDE Center

113.    Serotiny Counseling

**114.    Service Women's Action Network**

115.    Sexuality and Gender Alliance at UNC-Chapel Hill

116.    Solano Pride Center

**117.    SPARTA**

118.    Spectrum: The Other Clinic

119.    Spectrum of Rockford LGBTQ+ Counseling Center

120.    St. Louis Queer+ Support Helpline

**121.    Student Veterans of America**

122.    Sussex Pride

123.    SweeneyPsych

124.    T-time Transgender Support

125.    Trans Advocacy Pennsylvania

126.    Trans Formations Project

127.    TransFamily Support Services

**128.    Transgender American Veterans Association**

129.    Transgender Assistance Program Virginia

130.    Transgender People in Florida Prison Project

**131.    Transgender Veterans Support Group**

132.    Transinclusive Group

133.    TransOhio

134.    TransPonder

135.    Transpositive PDX

136.    TransSOCIAL, Inc.

**137.    TransVeteran Action Group**

138.    Trans Maryland

139.    Trans Pride Initiative

140.    Trans Youth Equality Foundation

141.    United Territories of Pacific Islanders Alliance- Portland (UTOPIA PDX)

142.    Uniting Pride of Champaign County

143.    Uptown Gay and Lesbian Alliance (UGLA)

144.    US Professional Association for Transgender Health (USPATH)

**145.    Vet Voice Foundation**

**146.    VETSxHBCU**

147.  **Veterans and Military Families Caucus of Democrats Abroad**

148.  **Veterans for American Ideals**

149.  Virginia Council on LGBTQ+

150.  **VoteVets**

151.  Washington County Gay Straight Alliance, Inc.

152.  Waves Ahead Corp Puerto Rico

153.  We Are Family

154.  William Way LGBT Community Center

155.  World Professional Association for Transgender Health (WPATH)

156.  Youth Pride, Inc

157.  4Ever Caring Evonné

**\*Bold** - Military and/or veteran serving organization

# Individual Signers

## Military Affiliated

*Prior Service, Retirees, and Actively Serving Signing as Private Citizen*

1.  Camden Ador, Tennessee, Veteran or prior service member, Navy
2.  Robyn Allen, Oklahoma, Retiree, Air Force
3.  Philip Baitinger Virginia, Actively serving (Signing as private citizen), Veteran or prior service member
4.  Eric Ballentine, Washington, Veteran or prior service member, Army
5.  William Barker, Virginia, Actively serving (Signing as private citizen)
6.  Karyn Board, Washington, Veteran or prior service member, Navy
7.  Christy Book, Indiana, Veteran or prior service member, Army
8.  Caron Bryant, Florida, Veteran or prior service member, Navy
9.  Axios Burrows, Pennsylvania, Retiree, Army
10. Cassie Byard, Ohio, Veteran or prior service member, Navy
11. Josie Caballero, Maryland, Veteran or prior service member, Navy
12. Daniel Caffarel, Arizona, Actively serving (Signing as private citizen), Army
13. Anonymous, Alaska, Retiree, Army
14. Lauren Carson, Colorado, Veteran or prior service member, Army
15. Joseph Cavazzini, Washington, Veteran or prior service member, Air Force
16. Lindsay Church, Virginia, Retiree, Veteran or prior service member, Navy
17. Kate Church, Washington, Veteran or prior service member, Navy
18. Charlotte Clymer, Washington, D.C., Veteran or prior service member, Army

**AR295**

19. Marriane Connors, Florida, Veteran or prior service member, Air Force

20. Arlie Cooper, Oregon, Veteran or prior service member, Navy

21. Hope de Vega, Washington, Veteran or prior service member, Navy

22. Cathal DeJoseph, New York, Veteran or prior service member, Army, Marine Corps

23. Lucy Del Gaudio, New Jersey, Veteran or prior service member, Army

24. Matthew Dingeldein, Ohio, Veteran or prior service member, Army

25. Kiersten Downs, Florida, Veteran or prior service member, Air Force

26. Micki Duran, Virginia, Veteran or prior service member, Marine Corps

27. Ian Finkenbinder, Washington, Veteran or prior service member, Army

28. Rebecca Forteau, Florida, Veteran or prior service member, Air Force

29. Qwynn Galloway-Salazar, Georgia, Veteran or prior service member, Army

30. Stephanie Gattas, Texas, Veteran or prior service member, Navy

31. Janessa Goldbeck, California, Veteran or prior service member, Marine Corps

32. Donna Graphman, Michigan, Retiree, Marine Corps

33. Alisha Guffey, Washington, DC, Actively serving (Signing as private citizen)

34. Miyo Hall-Kennedy, Hawaii, Veteran or prior service member, Navy

35. Candace Hardnett, Georgia, Veteran or prior service member, Marine Corps

36. Heather Hardy, California, Veteran or prior service member, Air Force

37. Jon Hegwood, Washington, Veteran or prior service member, Army

38. David Herring, Washington, Actively serving (Signing as private citizen)

39. Kody Horton, California, Veteran or prior service member, Navy

40. Tom Hove, Washington, Veteran or prior service member, Navy

41. Julie Howeel, California, Veteran or prior service member, Army

42. Kaitlynn Jensvold, Texas, Actively serving (Signing as private citizen)

43. Natalie Kastner, Texas, Veteran or prior service member, Army

44. Zander Keig, Florida, Veteran or prior service member, Coast Guard

45. Nathan Kempthorne, New York, Veteran or prior service member, Air Force

46. Christopher Kim , Maryland, Veteran or prior service member, Air Force

47. Aiden Kirchner, Virginia, Veteran or prior service member, Army

48. Sarah Klimm, Colorado, Retiree, Marine Corps

49. Jason Kresge, Washington, Veteran or prior service member, Army, Marine Corps

50. Joanna Kresge, Washington, Veteran or prior service member, Air Force

51. Emery Kurtzweil, Nebraska, Veteran or prior service member, Air Force

52. Emily Laha, Virginia, Retiree, Marine Corps

53. Kirsten Laha-Walsh, Virginia, Veteran or prior service member, Navy

54. Esti Lamonica, New York, Veteran or prior service member, Army

55. Nichole Landers, Nevada, Actively serving (Signing as private citizen)

56. Amelia Lawrence, Virginia, Actively serving (Signing as private citizen)

57. Kevyn Lenagh, North Dakota, Veteran or prior service member, Navy

58. Michael Lewis, Arizona, Veteran or prior service member, Navy

59. Nicholas Literski, Oregon, Veteran or prior service member, Army

60. Sarah Alice Luffman, Florida, Veteran or prior service member, Navy

61. Tatiana Mason, Maryland, Veteran or prior service member, Navy

62. Zachary McDonald, Nevada, Actively serving (Signing as private citizen)

63. Stephanie Merlo, Virginia, Veteran or prior service member, Army

64. Jack Merrill, Indiana, Veteran or prior service member, Air Force

65. Rowan Mooney, Illinois, Retiree, Army

66. Monique Munroe, Massachusetts, Veteran or prior service member, Army

67. Kristen Murdock, Texas, Veteran or prior service member, Navy

68. Thomas Murphy, Maine, Veteran or prior service member, Navy

69. Bailey Nace, Pennsylvania, Veteran or prior service member, Army

70. Jason Nunez, North Carolina, Veteran or prior service member, Air Force

71. Jeralyn O'Brien, Oregon, Retiree, Army, Coast Guard

72. Heather O'Malley, Illinois, Veteran or prior service member, Army

73. Andrew Ohemueller, Washington, Veteran or prior service member, Navy

74. Bee Page, Maryland,  Actively serving (Signing as private citizen)

75. Sophia Pena, Texas, Retiree, Veteran or prior service member, Marine Corps

76. Terrell Pruitt, New York, Veteran or prior service member, Army

77. Renee Purdue, Tennessee, Retiree, Army, Marine Corps

78. Steven Pugh, Kansas, Actively serving (Signing as private citizen)

79. Sarah Purcell, Colorado, Veteran or prior service member, Navy

80. Charlene Raman-Preston, South Carolina, Veteran or prior service member, Air Force

81. Riley Reddinger, California, Veteran or prior service member, Navy

82. Mia Renna, Illinois, Veteran or prior service member, Army

83. Vivian Richards, Maryland, Retiree, Army

84. Rolando Rodriguez, Colorado, Veteran or prior service member, Navy

85. Kegan Ross, Washington, Veteran or prior service member, Air Force

86. Angela Schmitt, Pennsylvania, Actively serving (Signing as private citizen)

87. Frances Schonleber, New Jersey, Veteran or prior service member, Army

88. Analeigh Smith, Washington, Veteran or prior service member, Army

89. Sybastian Smith, Georgia, Veteran or prior service member, Army

90. Joshua Souder, Florida, Veteran or prior service member, Army

91. Alleria Stanley, South Carolina, Retiree, Army

92. Becky Stefanik, Washington, Veteran or prior service member, Army

93. Rhiannon Storie, Pennsylvania, Veteran or prior service member, Marine Corps

94. Amy Tiemeyer, Washington, Veteran or prior service member, Dependent or survivor, Army

95. Kate Tillotson, Washington, Veteran or prior service member, Marine Corps

96. Hanna Tripp, Massachusetts, Veteran or prior service member, Air Force

97. Michael Turner, Florida, Veteran or prior service member, Marine Corps

98. Samantha Turner, New York, Actively serving (Signing as private citizen)

99. Liam Waller, North Carolina, Veteran or prior service member, Air Force

100. Ash Wallis, Colorado, Veteran or prior service member, Dependent or survivor, Army

101. Toni Williams, Washington, DC, Veteran or prior service member , Marine Corps

102. Cassandra Williamson, Alabama, Veteran or prior service member, Marine Corps, Navy

103. Maria Woodall, North Carolina, Veteran or prior service member, Marine Corps, Air Force

## Allies and Supporters

*Prior Service, Retirees, and Actively Serving Signing as Civilian*

1. Lindsay Allan, Washington
2. Iana Amiscaray, Illinois
3. Jonathan Amos, Michigan
4. Tai Atteberry, Illinois
5. Karsen Bailey, Ohio
6. Chelsey Baker-Hauck, Colorado
7. Kaylen Barker, West Virginia
8. Ruth Beauchamp, Colorado
9. Miriam Bennett, Maryland
10. Antonion Berryman, New Jersey
11. Lake Best, Tennessee
12. Ashleigh "Bing" Bingham, Virginia
13. David Booth, Minnesota
14. Katherine Bowers, Washington
15. Meghan Brooks, Connecticut
16. Colton Brown, North Carolina
17. Amanda Brush, California
18. Jacqueline Calvache, California
19. Chelsea Clark, Oregon
20. Patricia Colapietro, Ohio
21. Darcy Connors, New York
22. Annaliese Cothron, Texas

23. Michelle Crane-Bolton, New Jersey

24. Jordan Downing, Massachusetts

25. Melanie Dwiggins, Tennessee

26. Laura Eagle, Connecticut

27. Briyan Ellicott, New York

28. Keith Elston, Kentucky

29. Michael Farmer, North Carolina

30. Amanda Fisher, Minnesota

31. Joshua Gavel, Illinois

32. Michelle Giordano, New Jersey

33. Nathaniel Glanzman, Virginia

34. Jessica Gottsleben, Florida

35. Noah Granade, North Carolina

36. Mariana Grohowski, Michigan

37. Kiera Hansen, Oregon

38. Sasha Harrison, New York

39. Dee Hayward, California

40. Jan Hayward, California

41. Pamela Hemphill, Pennsylvania

42. Meredith Higgins, Texas

43. Jessica Hill, Texas

44. Charlotte Hoffman, Maryland

45. Nasreen Hosein, Massachusetts

46. Annada Hypes, North Carolina

47. Lucica Ion, Texas

48. JM Jaffe, California

49. Katheryn Jenifer, North Carolina

50. Tina Jones, Maryland

51. Morgan Kelleher, Georgia

52. Adam Kellogg, Kansas

53. Esther Alicia Kempthorne, New York

54. Kiara Kempthorne-Curiel, New York

55. Natalia Kempthorne-Curiel, New York

56. Kelly Kipgen, Oklahoma

57. Jerrica Kirkley, MD, Colorado

58. Robyn Koeppen, North Carolina

59. Wilfred Labiosa, Puerto Rico

60. Tiffany Lange, Virginia
61. Heather Leanox, North Carolina
62. Sheila Lee, Washington
63. Deborah Levine, Illinois
64. Micque Li
65. Joannah Lillian, Florida
66. Maggie Lindrooth, Pennsylvania
67. Ana Machado, Florida
68. Jevon Martin, Texas
69. Tanika Santos MacSwain, Virginia
70. Laura MacWaters, Colorado
71. Quinnehtukqut McLamore, Missouri
72. Miles Migliara, Virginia
73. Ed Miller, Pennsylvania
74. Johann Moore, Florida
75. Brande Morrow, Virginia
76. Grace Most, Texas
77. Anthony Munger, Kentucky
78. Hilary Murmers, Michigan
79. Hayden Nielsen, North Carolina
80. Jessica Norman , Virginia
81. Amanda Nowoczynski, New Mexico
82. Devon Ojeda, Washington, DC
83. Adriana Orozco, Florida
84. Anika Orrock, Tennessee
85. Lindsay Ortman, Ohio
86. Beaei Pardo, Illinois
87. Peter Perkowski California
88. Iva Peters, Alaska
89. Gail Peterson, Minnesota
90. Oliver Peterson, Minnesota
91. Joan Potter, California
92. Joules Provenzano, Massachusetts
93. Amber Pugh, Kansas
94. Kirtly Raether, Virginia
95. Diana Ramirez, Texas
96. Dylan Reeves-Thacker, Tennessee

97. Oliver Reilly, Pennsylvania

98. Anthony Rickard, Alaska

99. Brad Ridgeway, Washington

100.    Ruth Riley, California

101.    Eve Rogerson, North Carolina

102.    Aliya Saulson, North Carolina

103.    Holly Savoy, North Carolina

104.    Donna SC, Florida

105.    Nemo Siqueiros, Minnesota

106.    Joe Smith, Florida

107.    Sharen Sonntag, Maryland

108.    Katie Sonntag, Maryland

109.    Jessica Stephens, California

110.    Genevieve Stone, Alaska

111.    H.G. Stovall, Tennessee

112.    Florence Sum, Washington

113.    Hannah Sung, Washington

114.    Jaeun Tang, Washington

115.    Alexander Thornton, Alaska

116.    Ann Tobin, Minnesota

117.    Tiffany Towns, Alaska

118.    Leslie Townsend, Colorado

119.    Shawn Trader, Vermont

120.    Jamie Trager, Colorado

121.    Kristen Vierregger, MD, California

122.    Chelsea Ward, Washington

123.    Claire Wilensky, Colorado

124.    Michael Wishnie, Connecticut

125.    Nadia Yeracaris, Washington

126.    Sherry Yetter, Missouri

Search: ● Agenda ○ Reg Review ○ ICR

Go

Home | Unified Agenda | Regulatory Review | Information Collection Review | FAQs / Resources | Contact Us

## View Rule

<u>View EO 12866 Meetings</u>                                                <u>Printer-Friendly Version</u>   <u>Download RIN Data in XML</u>

**VA**                                  **RIN:** 2900-AR34                    **Publication ID:** Spring 2023

**Title:** Removal of Exclusion of Gender Alterations From the Medical Benefits Package
**Abstract:**

The Department of Veterans Affairs (VA) is proposing to revise its medical regulations by removing the exclusion on gender alterations from the medical benefits package. VA is proposing these changes so that transgender and gender diverse veterans may receive medically necessary health care, including surgical interventions for gender transition. This proposed change would be consistent with medical industry standards and would ensure that VA provides a full continuum of care to transgender and gender diverse veterans. These amendments are in accordance with the President's priorities that advance equity and support underserved, vulnerable, and marginalized communities.

**Agency:** Department of Veterans Affairs(VA)                    **Priority:** Other Significant
**RIN Status:** Previously published in the Unified Agenda         **Agenda Stage of Rulemaking:** Proposed Rule Stage
**Major:** No                                                    **Unfunded Mandates:** No
**CFR Citation:** <u>38 CFR 17.38</u>
**Legal Authority:** <u>38 U.S.C. 1710</u>
**Legal Deadline:** None
**Timetable:**

| Action | Date | FR Cite |
|---|---|---|
| NPRM | 10/00/2023 | |

**Regulatory Flexibility Analysis Required:** No                **Government Levels Affected:** None
**Small Entities Affected:** No                                **Federalism:** No
**Included in the Regulatory Plan:** No
**RIN Information URL:** <u>www.regulations.gov</u>
**RIN Data Printed in the FR:** No
**Agency Contact:**
Veterans Health Administration VHA
Department of Veterans Affairs
810 Vermont Avenue NW,
Washington, DC 20420
Phone:202 461-5049

  

  GSA  Reginfo.gov
**An official website of the** <u>U.S. General Services Administration</u>  **and the** <u>Office of Management and Budget</u>

<u>About Us</u>      <u>About GSA</u>      <u>About OIRA</u>      <u>Related Resources</u>      <u>Disclosure</u>      <u>Accessibility</u>      <u>FOIA</u>      <u>Privacy Policy</u>      <u>Contact Us</u>

Looking for U.S. government information and services?
<u>Visit USA.gov</u>

# Congress of the United States
## Washington, D.C. 20515

March 31, 2023

The Honorable Dennis McDonough
Secretary
U.S. Department of Veterans Affairs
810 Vermont Avenue NW
Washington, DC 20420

Dear Secretary McDonough,

We write today to urge you to move forward expeditiously with issuing rulemaking to remove the categorical regulatory exclusion of certain gender affirming care for transgender veterans. As you know, under current Department of Veterans Affairs (VA) regulations, the Veterans Health Administration is prohibited from providing certain gender affirming health care to transgender veterans, even in cases of medical necessity.[1]

As you have publicly acknowledged, this regulation deprives transgender veterans access to certain lifesaving medical care. Active-duty transgender military service members have access to a range of gender affirming health care, but upon separation from the military they are suddenly stripped of their care by this regulation.

Interrupting a successful care plan determined by veterans and their doctors is unfair and dangerous. You acknowledged this reality when you stated VA would undertake rulemaking to reverse this regulation "not only because [it is] the right thing to do, but because [it] can save lives."

We agree that gender affirming surgery saves lives. Studies indicate that transgender veterans are twice as likely as their cisgender veteran counterparts and 5.85 times more likely than the general population to die by suicide.[2] Research also unambiguously shows that gender affirming surgery reduces the risk of suicide and mental distress for trans people.[3] We believe this rationale even more critical today than it was when you made these remarks in 2021, as the health and safety of trans people are threatened across the nation. In 2022, lawmakers in 33 states introduced nearly 175 bills attacking trans people's health care access, legal recognition, and basic right to exist.[4]

---

[1] 38 CFR. § l7.38(c)(4) (blanket exclusion of care in the medical benefits package for care related to "gender alterations").

[2] Tucker R. P. (2019). Suicide in Transgender Veterans: Prevalence, Prevention, and Implications of Current Policy. Perspectives on psychological science : a journal of the Association for Psychological Science, 14(3), 452–468. https://doi.org/10.1177/1745691618812680

[3] Almazan AN, Keuroghlian AS. Association Between Gender-Affirming Surgeries and Mental Health Outcomes. JAMA Surg. 2021;156(7):611–618. doi:10.1001/jamasurg.2021.0952

[4] Trans Legislation Tracker. Retrieved from https://translegislation.com/bills/2022

In 2023, that number more than doubled: Already since January 1, 2023, nearly 400 anti-LGBTQ+ bills have been introduced in state legislatures across the country, many of them targeting gender-affirming care for minors *and* adults, including restricting insurance coverage for these procedures.

Further, there are no similar blanket exclusions relating to gender affirming care in the Federal Employees Health Benefits Program or the Medicaid program and they should be eliminated here. Transgender veterans, like all veterans, have selflessly served our country with honor and distinction, and they deserve access to medically necessary health care, including surgical care. The current regulation runs counter to federal law, including Section 1557 of the Affordable Care Act, which prohibits discrimination on the basis of gender stereotyping in health care programs administered by Executive agencies.

It has been a year and a half since the Fall 2021 Unified Agenda of Regulatory and Deregulatory Actions announced that these proposed regulations were expected to be published in July 2022. It has also been more than six years since VA first announced its intention to repeal this blanket exclusion.[5] Despite the urgency of need for this care, VA is yet to make official notice of rulemaking that would undo this dangerous and discriminatory rule.

We urge you to issue the Notice of Proposed Rulemaking immediately so that the regulatory process can get underway and gender-diverse veterans can finally receive the care they deserve and were promised without further delay.

Sincerely,

Julia Brownley
Ranking Member
House Veterans' Affairs
Committee
Subcommittee on Health

---

[5] RIN 2900-AP69, Removing Gender Alterations Restriction From the Medical Benefits Package (Published Spring 2016), https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201604&RIN=2900-AP69

Lauren Underwood
Member of Congress

Eleanor Holmes Norton
Member of Congress

Pramila Jayapal
Member of Congress

Grace Meng
Member of Congress

Mark Pocan
Member of Congress

Dan Goldman
Member of Congress

Suzanne Bonamici
Member of Congress

James P. McGovern
Member of Congress

Adam B. Schiff
Member of Congress

Ted W. Lieu
Member of Congress

Stephen F. Lynch
Member of Congress

Jan Schakowsky
Member of Congress

Robert Garcia
Member of Congress

Sara Jacobs
Member of Congress

Jerrold Nadler
Member of Congress

Rick Larsen
Member of Congress

Rashida Tlaib
Member of Congress

David N. Cicilline
Member of Congress

Sydney Kamlager-Dove
Member of Congress

Andrea Salinas
Member of Congress

Judy Chu
Member of Congress

Chellie Pingree
Member of Congress

Adriano Espaillat
Member of Congress

Morgan McGarvey
Member of Congress

Chris Pappas
Member of Congress

Brittany Pettersen
Member of Congress

Teresa Leger Fernández
Member of Congress

Greg Landsman
Member of Congress

Chris Deluzio
Member of Congress

Nikki Budzinski
Member of Congress

Delia C. Ramirez
Member of Congress

Jason Crow
Member of Congress

Becca Balint
Member of Congress

Adam Smith
Member of Congress



**DEPARTMENT OF VETERANS AFFAIRS**
**WASHINGTON**

May 02, 2023

Minority Veterans of America
P.O. Box 25272
Richmond, VA 23260

Dear Minority Veterans of America:

Thank you for your March 31, 2023, co-signed letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion. I am responding on behalf of the Department.

Secretary McDonough appreciates how frustrating the rule change process is for transgender and gender diverse Veterans who have waited for these treatment services. During this rule change process, non-surgical treatments remain available to transgender and gender diverse Veterans. VA is actively working on the gender affirming surgery regulatory action, and we are committed to delivering timely access to world-class health care and earned benefits to all Veterans, family members, survivors and caregivers.

Should you have any questions, please contact Dr. Michael Kauth, Executive Director, Lesbian, Gay, Bisexual, Transgender, Queer (LGBTQ+) Health Program at Michael.Kauth@va.gov. Please share this response with the other signatories of your letter.

Sincerely,

Kimberly M. Mitchell
Veterans Service Organization Liaison



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Teresa Leger Fernández
U.S. House of Representatives
Washington, DC 20515

Dear Representative Leger Fernández:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Becca Balint
U.S. House of Representatives
Washington, DC 20515

Dear Representative Balint:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Suzanne Bonamici
U.S. House of Representatives
Washington, DC 20515

Dear Representative Bonamici:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Nikki Budzinski
U.S. House of Representatives
Washington, DC 20515

Dear Representative Budzinski:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Judy Chu
U.S. House of Representatives
Washington, DC 20515

Dear Representative Chu:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable David N. Cicilline
U.S. House of Representatives
Washington, DC 20515

Dear Representative Cicilline:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Jason Crow
U.S. House of Representatives
Washington, DC 20515

Dear Representative Crow:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Chris Deluzio
U.S. House of Representatives
Washington, DC 20515

Dear Representative Deluzio:

   Thank you for your March 31, 2023, cosigned letter to the Department of
Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender
affirming care for transgender Veterans. Specifically, you requested that VA quickly
publish its proposed regulations to remove such exclusion.

   This proposed rule is continuing through VA's concurrence process and is being
considered carefully and thoroughly with the understanding of its importance.

   VA is committed to delivering timely access to world-class health care and
earned benefits for all Veterans, family members, survivors and caregivers. This
response has been sent to the other signatories of your letter.

   Thank you for your continued support of our mission.

                    Sincerely,

                    Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Andriano Espaillat
U.S. House of Representatives
Washington, DC 20515

Dear Representative Espaillat:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Robert Garcia
U.S. House of Representatives
Washington, DC 20515

Dear Representative Garcia:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Dan Goldman
U.S. House of Representatives
Washington, DC 20515

Dear Representative Goldman:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Sara Jacobs
U.S. House of Representatives
Washington, DC 20515

Dear Representative Jacobs:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Pramila Jayapal
U.S. House of Representatives
Washington, DC 20515

Dear Representative Jayapal:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Sydney Kamlager-Dove
U.S. House of Representatives
Washington, DC 20515

Dear Representative Kamlager-Dove:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Greg Landsman
U.S. House of Representatives
Washington, DC 20515

Dear Representative Landsman:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Rick Larsen
U.S. House of Representatives
Washington, DC 20515

Dear Representative Larsen:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Ted W. Lieu
U.S. House of Representatives
Washington, DC 20515

Dear Representative Lieu:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Stephen F. Lynch
U.S. House of Representatives
Washington, DC 20515

Dear Representative Lynch:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Morgan McGarvey
U.S. House of Representatives
Washington, DC 20515

Dear Representative McGarvey:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable James P. McGovern
U.S. House of Representatives
Washington, DC 20515

Dear Representative McGovern:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Grace Meng
U.S. House of Representatives
Washington, DC 20515

Dear Representative Meng:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Jerrold Nadler
U.S. House of Representatives
Washington, DC 20515

Dear Representative Nadler:

Thank you for your March 31, 2023, cosigned letter to the Department of
Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender
affirming care for transgender Veterans. Specifically, you requested that VA quickly
publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being
considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and
earned benefits for all Veterans, family members, survivors and caregivers. This
response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Eleanor Holmes Norton
U.S. House of Representatives
Washington, DC 20515

Dear Representative Norton:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Chris Pappas
U.S. House of Representatives
Washington, DC 20515

Dear Representative Pappas:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Brittany Pettersen
U.S. House of Representatives
Washington, DC 20515

Dear Representative Pettersen:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Chellie Pingree
U.S. House of Representatives
Washington, DC 20515

Dear Representative Pingree:

Thank you for your March 31, 2023, cosigned letter to the Department of
Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender
affirming care for transgender Veterans. Specifically, you requested that VA quickly
publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being
considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and
earned benefits for all Veterans, family members, survivors and caregivers. This
response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Mark Pocan
U.S. House of Representatives
Washington, DC 20515

Dear Representative Pocan:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Delia C. Ramirez
U.S. House of Representatives
Washington, DC 20515

Dear Representative Ramirez:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Andrea Salinas
U.S. House of Representatives
Washington, DC 20515

Dear Representative Salinas:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Jan Schakowsky
U.S. House of Representatives
Washington, DC 20515

Dear Representative Schakowsky:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Adam B. Schiff
U.S. House of Representatives
Washington, DC 20515

Dear Representative Schiff:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Adam Smith
U.S. House of Representatives
Washington, DC 20515

Dear Representative Smith:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Rashida Tlaib
U.S. House of Representatives
Washington, DC 20515

Dear Representative Tlaib:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Lauren Underwood
U.S. House of Representatives
Washington, DC 20515

Dear Representative Underwood:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 9, 2023

The Honorable Julia Brownley
Ranking Member
Subcommittee on Health
Committee on Veterans' Affairs
U.S. House of Representatives
Washington, DC 20515

Dear Representative Brownley:

Thank you for your March 31, 2023, cosigned letter to the Department of Veterans Affairs (VA) regarding removal of the regulatory exclusion of certain gender affirming care for transgender Veterans. Specifically, you requested that VA quickly publish its proposed regulations to remove such exclusion.

This proposed rule is continuing through VA's concurrence process and is being considered carefully and thoroughly with the understanding of its importance.

VA is committed to delivering timely access to world-class health care and earned benefits for all Veterans, family members, survivors and caregivers. This response has been sent to the other signatories of your letter.

Thank you for your continued support of our mission.

Sincerely,

Denis McDonough

Search: ⦿ Agenda  ○ Reg Review  ○ ICR

Go

Home | Unified Agenda | Regulatory Review | Information Collection Review | FAQs / Resources | Contact Us

# View Rule

<u>View EO 12866 Meetings</u>                                                    <u>Printer-Friendly Version</u>    <u>Download RIN Data in XML</u>

**VA**                                          **RIN:** 2900-AR34                          **Publication ID:** Fall 2023

**Title:** Removal of Exclusion of Gender Alterations From the Medical Benefits Package
**Abstract:**

The Department of Veterans Affairs (VA) is proposing to revise its medical regulations by removing the exclusion on gender alterations from the medical benefits package. VA is proposing these changes so that transgender and gender diverse veterans may receive medically necessary health care, including surgical interventions for gender transition. This proposed change would be consistent with medical industry standards and would ensure that VA provides a full continuum of care to transgender and gender diverse veterans.

**Agency:** Department of Veterans Affairs(VA)                        **Priority:** Other Significant
**RIN Status:** Previously published in the Unified Agenda           **Agenda Stage of Rulemaking:** Proposed Rule Stage
**Major:** No                                                        **Unfunded Mandates:** No
**CFR Citation:** <u>38 CFR 17.38</u>
**Legal Authority:** <u>38 U.S.C. 1710</u>
**Legal Deadline:** None
**Timetable:**

| Action | Date | FR Cite |
|--------|------|---------|
| NPRM | 11/00/2023 | |

**Regulatory Flexibility Analysis Required:** No                     **Government Levels Affected:** None
**Small Entities Affected:** No                                      **Federalism:** No
**Included in the Regulatory Plan:** No
**RIN Information URL:** <u>www.regulations.gov</u>
**RIN Data Printed in the FR:** No
**Agency Contact:**
Veterans Health Administration VHA
Department of Veterans Affairs
810 Vermont Avenue NW,
Washington, DC 20420
Phone:202 461-5049

    

  Reginfo.gov
**An official website of the** <u>U.S. General Services Administration</u>  **and the** <u>Office of Management and Budget</u>

<u>About Us</u>      <u>About GSA</u>      <u>About OIRA</u>      <u>Related Resources</u>      <u>Disclosure</u>      <u>Accessibility</u>      <u>FOIA</u>      <u>Privacy Policy</u>      <u>Contact Us</u>

Looking for U.S. government information and services?
<u>Visit USA.gov</u>

# The Jerome N. Frank Legal Services Organization

YALE LAW SCHOOL

*Via Email*

November 20, 2023

Richard J. Hipolit
Acting General Counsel
U.S. Department of Veterans Affairs
810 Vermont Avenue NW
Washington, DC 20420
richard.hipolit@va.gov

Re:     *Forthcoming lawsuit regarding VA delay in responding to rulemaking petition*

Dear Acting General Counsel Hipolit,

We represent the Transgender American Veterans Association ("TAVA"), which is prepared to file suit on behalf of itself and its members challenging the unlawful failure of the Secretary of the Department of Veterans Affairs ("VA") to respond to its 2016 petition for rulemaking ("PFR"). TAVA intends to file a petition for mandamus under the All Writs Act, 28 U.S.C. § 1651(a), to compel a formal response from VA. We write you in your capacity as Acting VA General Counsel to raise the prospect of pre-litigation resolution of TAVA's claims.

VA currently excludes gender-confirmation surgery ("GCS") from the medical benefits package it provides to veterans. 38 C.F.R. § 17.38(c)(4); *see also* VHA Directive 2013-003; VHA Directive 2018-1341(3). On May 9, 2016, TAVA and two individual veterans submitted a formal rulemaking petition requesting that VA amend its medical benefits package to provide GCS (attached as Exhibit 1). The petition requested that VA amend or repeal the rules and regulations, including 38 C.F.R. § 17.38(c)(4), that exclude medically necessary GCS for transgender veterans from the medical benefits package, and that VA instead promulgate regulations expressly including GCS for transgender veterans in that medical benefits package.

Since assuming office in 2021, Secretary McDonough has made multiple public promises that he intends to grant TAVA's petition and initiate the rulemaking it requested.[1] After earlier litigation regarding this PFR in 2016, VA sought and received public comment on the petition in 2018.[2] VA also submitted four notices of proposed rulemaking ("NPRM") to the Office of Information & Regulatory Affairs ("OIRA") for publication in the Unified Agenda, including as

---

[1] *See, e.g.*, Leo Shane III, *VA to Offer Gender Surgery to Transgender Veterans for the First Time*, MIL. TIMES (June 19, 2021), https://www.militarytimes.com/veterans/2021/06/19/va-to-offer-gender-surgery-to-transgender-vets-for-the-first-time; Rebecca Kheel, *No Timeline for Trans Vet Surgeries, VA Says 2 Years After Announcing Coverage*, MILITARY.COM (June 9, 2023), https://www.military.com/daily-news/2023/06/09/va-said-it-would-cover-trans-surgery-two-years-later-it-still-doesnt.html; *Town Hall with VA Secretary Denis McDonough*, VA NEWS (Nov. 8, 2023), https://news.va.gov/125963/town-hall-with-va-secretary-denis-mcdonough-2.

[2] 83 Fed. Reg. 31711 (July 9, 2018).

P O BOX 209090, NEW HAVEN, CONNECTICUT 06520 -9090 • PHONE 203 432 -4800 • FASCIMILE 203 432 -1426

COURIER ADDRESS 127 WALL STREET, NEW HAVEN, CONNECTICUT 06511

recently as spring 2023,[3] one of which has gone through full OIRA cost-benefit analysis.[4] In all of its submissions to OIRA's Unified Agenda, VA indicated an intended publication date for the NPRM in the Federal Register—yet failed to adhere to any of them.

Indeed, despite the public assurances and internal preparation that have recurred over the past several years, VA has not yet published a NPRM or a proposed rule in the Federal Register. It has been over seven years since TAVA first submitted the petition and over two years since Secretary McDonough first promised to take action on this matter. This inaction violates VA's statutory duties under the Administrative Procedure Act ("APA") to refrain from engaging in unreasonable delay, 5 U.S.C. § 706(1), and to conclude matters presented to it within a reasonable time, 5 U.S.C. § 555(b). TAVA is entitled to a writ of mandamus under the All Writs Act, 28 U.S.C. § 1651(a), compelling VA to formally respond to its rulemaking petition on this basis.

## I.  Members of TAVA are directly harmed by VA's exclusion of gender-confirmation surgery from the medical benefits package and its delay in addressing the exclusion.

VA's failure to respond to TAVA's petition harms both TAVA and its members. By failing to act on the petition for more than seven years, VA has undermined TAVA's mission of ensuring that all transgender veterans receive full services and dignified treatment at the hands of the VA, *see* Ex. 1 at 4, and has forced TAVA to divert its scarce resources to address the failure of VA to live up to the public pledge of its Secretary. Additionally, TAVA's members have been denied medically necessary care—which has been recommended by VA doctors, even though VA refuses to provide this treatment—as a result of VA's exclusion of "gender alterations" from the medical benefits package. *See* Ex. 1 at 6-7.

VA's failure to provide GCS subjects transgender veterans, including TAVA members, to increased risk of physical harm, psychological distress, and suicide. *See* Ex. 1 at 11-12, 21. GCS is effective and often essential treatment for gender dysphoria, which is the medical diagnosis for the distress caused by the incongruence between one's gender identity and one's sex assigned at birth.[5] As major medical associations have long recognized, *see* Ex. 1 at 9,[6] GCS is associated with significantly lower levels of psychological distress and suicidal ideation among transgender people. *See also* Ex. 1 at 11-12.[7] This treatment is particularly important for the veteran

---

[3] *See RIN 2900-AR34*, Off. Info. & Regul. Affs. (Fall 2021), https://rb.gy/ldslfb, *RIN 2900-AR34*, Off. Info. & Regul. Affs. (Spring 2022), https://rb.gy/kpldjc, *RIN 2900-AR34*, Off. Info. & Regul. Affs. (Fall 2022), https://rb.gy/6a0ozs, *RIN 2900-AR34*, Off. Info. & Regul. Affs. (Spring 2023), https://rb.gy/eai51e.

[4] *See OIRA Conclusion of EO 12866 Regulatory Review – RIN: 2900-AR34*, Off. Info. & Regul. Affs. (Sept. 7, 2022), https://rb.gy/74ug6z [hereinafter "OIRA Review"].

[5] *See* Am. Psychiatric Ass'n, *Gender Dysphoria*, in Diagnostic and Statistical Manual of Mental Disorders 451 (5th ed. 2013).

[6] *See also, e.g.*, Am. Med. Ass'n, Resolution 122 (A-08) (2008); William Byne et al., *Report of the APA Task Force on Treatment of Gender Identity Disorder*, 169 Am. J. Psychiatry 1, 9 (2012); Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869, 3875 (2017); *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Psychol. Ass'n 832, 846 (2015).

[7] *See also, e.g.*, Anthony N. Almazan & Alex S. Keuroghlian, *Association Between Gender-Affirming Surgeries and Mental Health Outcomes*, 156 J. Am. Med. Ass'n 611, 617 (2021).

community, which is already at disproportionately high risk of depression and suicide.[8] Moreover, forcing veterans to seek GCS outside of VA facilities disrupts their continuity of care, resulting in financial, physical, and emotional harm. Transgender veterans are more likely than cisgender veterans to rely on VA healthcare, since they are more likely to be uninsured and to face cost barriers to care even when they have insurance.[9] Disruptions in the continuity of care, especially transition-related care otherwise received through VA, can have a multitude of negative effects on transgender patients. For instance, one transgender veteran who could not afford privately provided GCS in the United States had to travel out of the country to receive a cheaper operation—which was so mishandled that she has had to spend two years receiving additional procedures to correct for the harm done.[10]

In addition to the harms perpetrated by VA's outright exclusion, VA's delay itself has also harmed TAVA and its members. VA has placed TAVA and its members in an unstable state of limbo, wherein they are repeatedly assured by the Secretary that VA-provided GCS will be available, but are given no indication of when nor which procedures will be covered. Transgender veterans have delayed medically necessary GCS, in reliance on the Secretary's public statements and in the expectation that they could use VA healthcare instead of expensive private treatments. But absent action from the Secretary, this waiting period may only exacerbate the mental health risks detailed above. TAVA and its members deserve an answer from VA as to when and how it plans to provide GCS to transgender veterans. At the very least, after 7.5 years, they deserve an answer from VA to their petition on the question of whether VA will provide GCS at all.

## II.    TAVA will challenge VA's unreasonable delay as unlawful in the Federal Circuit.

Unless prompt action is taken by VA to formally grant or deny TAVA's PFR, TAVA will file a petition for mandamus under the All Writs Act, 28 U.S.C. § 1651(a), in the United States Court of Appeals for the Federal Circuit to require VA to issue a response.

VA's nearly eight-year delay is a violation of both § 706(1) and § 555(b) of the APA, which respectively mandate that VA must not engage in unreasonable delay and that VA must resolve matters presented to it within a reasonable time. Based on application of multi-factor test set out in *Telecomms. Rsch. & Action Ctr. v. F.C.C.*, 750 F.2d 70, 80 (D.C. Cir. 1984), which governs analysis of mandamus claims based on unreasonable delay, TAVA is entitled to a writ of mandamus compelling a response from VA. First, no "rule of reason" governs VA's nearly eight-year delay on this matter. VA prepared all necessary materials, including multiple NPRMs for OIRA's Unified

---

[8] *See, e.g.*, VA OFF. MENTAL HEALTH & SUICIDE PREVENTION, NATI'L VETERAN SUICIDE PREVENTION ANNUAL REPORT 7 (2022), https://www.mentalhealth.va.gov/docs/data-sheets/2022/2022-National-Veteran-Suicide-Prevention-Annual-Report-FINAL-508.pdf (finding suicide rate for veterans is 57.3% higher than for non-veterans); *Depression*, U.S. DEP'T VETERANS AFFS., https://www.research.va.gov/topics/depression.cfm (reporting that 33.3% of veterans have some symptoms of depression, 20% have serious symptoms, and between 12.5% to 10% have major depression, while only 6.7% of all US adults have ever had at least one major depressive episode).

[9] *See* Matthew Rae et al., *Demographics, Insurance Coverage, and Access to Individuals Among Transgender Adults*, KFF (Oct. 21, 2020), https://www.kff.org/health-reform/issue-brief/demographics-insurance-coverage-and-access-to-care-among-transgender-adults.

[10] *See, e.g.,* Nicole Comstock, *California Veteran Shares Story of Gender Transition*, FOX40 (May 11, 2015), http://fox40.com/2015/05/11/california-veteran-shares-story-of-gender-transition.

Agenda, as early as spring 2016[11] (shortly after TAVA filed its petition) and as recently as spring 2023.[12] VA's delay is plainly unreasonable. Second, VA's failure to respond has directly impacted human health and welfare by subjecting transgender veterans, including TAVA members, to increased risks of depression, suicide, and financial harm while denying them essential medical care. *See supra* Part I. VA's delay prejudices important interests of transgender veterans in access to the medically necessary care to which they are entitled by virtue of their service. VA provides these surgeries to cisgender veterans seeking treatment for conditions other than gender dysphoria, *see* Ex. 1 at 14, but not to transgender veterans with gender dysphoria for whom the procedures in question may be the difference between life and death. Third, responding to TAVA's petition would not delay VA actions of a higher or competing priority. The cost of publishing an already-drafted NPRM is negligible, in terms of both financial and administrative resources. And—by VA's own admission in its submissions to OIRA's Unified Agenda—the costs of the actual rule requested by TAVA are not economically significant,[13] meaning it does not represent a tangible tradeoff with other agency priorities. That VA has publicly indicated its support for providing GCS is immaterial to this analysis, as no bad-faith finding is required for mandamus to issue.

Absent a judicially reviewable decision by VA on TAVA's petition, mandamus is the only form of relief available to TAVA. The unreasonableness of VA's delay has only sharpened the clarity and indisputability of TAVA's right to an issuance of mandamus, which is appropriate given the high stakes of these circumstances. TAVA is entitled to a writ of mandamus from the Federal Circuit compelling VA to respond to its PFR.

**III.    VA must respond to TAVA's petition.**

VA's failure to respond for more than seven years constitutes an unreasonable delay prohibited by the APA. This silence consigns transgender veterans who rely on VA healthcare for transition care to a liminal state wherein VA's official actions are entirely discordant with its public statements and internal preparations. VA's refusal to make these statements and preparations official is an insult to the transgender veterans who have made enormous sacrifices to serve their country and who are entitled to medically necessary healthcare, including GCS, as a result. We urge VA to issue a publication in the Federal Register constituting a formal grant or denial of TAVA's PFR. Specifically, we urge VA to grant TAVA's PFR by issuing a NPRM or proposed rule that will repeal 38 C.F.R. § 17.38(c)(4) and any implementing directives and include GCS for transgender veterans in the medical benefits package.

Please confirm your receipt of this correspondence and provide a response within 30 days, or our client will have no choice but to proceed with an enforcement action. If this matter proceeds

---

[11] *See RIN 2900-A69*, OFF. REGUL. & INFO. AFFS. (Fall 2016), https://rb.gy/7n9vxr; *RIN 2900-A69*, OFF. REGUL. & INFO. AFFS. (Spring 2016), https://rb.gy/cgmlvz.

[12] *See* sources cited *supra* note 3.

[13] The fall 2022, spring 2022, and spring 2023 OIRA Unified Agenda submissions are classified as "Other Significant" priority, which means the rulemaking is not 'economically significant' but is considered significant by the agency." Similarly, the fall 2021, spring 2022, and spring 2023 OIRA Unified Agenda submissions are all classified as non-major, which means they are unlikely to have an economic effect of $100 million or more. *See* sources cited *supra* note 3; *Unified Agenda: How Are The Terms on the Unified Agenda Tab Defined?*, REGULATIONS.GOV, https://www.regulations.gov/faq; *see also* OIRA Review, *supra* note 4 (clarifying that the rule is not economically significant under the definitions provided).

this litigation, TAVA reserves the right to seek additional relief and to recover attorneys' fees and costs.

  We look forward to hearing from you and working towards a resolution.


Sincerely,


By: /s/ Michael Wishnie
John Baisley, Law Student Intern
Alexandra Johnson, Law Student Intern
K.N. McCleary, Law Student Intern
Sonora Taffa, Law Student Intern,
Michael J. Wishnie, Supervising Attorney
Veterans Legal Services Clinic
Yale Law School
P.O. Box 209090
New Haven, CT 06520-9090
(203) 432-4800
michael.wishnie@ylsclinics.org


*cc*:    Richard Revesz, richard.l.revesz@omb.eop.gov;
         Dr. Shereef M. Elnahal, shereef.elnahal@va.gov;
         Brian Boynton, brian.m.boynton@usdoj.gov.



**U.S. Department of Veterans Affairs**
Office of General Counsel

810 Vermont Avenue NW
Washington DC 20420
www.va.gov/ogc

In Reply Refer To: 022

December 22, 2023

Ilona Turner
Sasha Buchert
Transgender Law Center
1629 Telegraph Avenue, Suite 400
Oakland, CA 94612

Dear Counsellors,

I am writing on behalf of the U.S. Department of Veteran Affairs (VA) and Secretary Denis McDonough.

On, May 9, 2016, Dee Fulcher, Giuliano Silva and Transgender American Veterans Association submitted a petition for rulemaking to repeal or amend 38 C.F.R. § 17.38(c)(4).

VA believes that Gender Affirming Care should be available to any Veteran who needs it, and VA plans to take necessary steps to expand the availability of that care to Veterans. VA announced its intentions on this matter in Summer 2021 based on the uniform recommendation of its Veterans Health Administration Governing Board and the recognized need for this care. As VA has already decided it should offer these services, VA has reviewed the 2016 petition and believes action is appropriate. Any change in VA policies or services like those that are the subject of the 2016 petition must be implemented in a manner that has been thoroughly considered to ensure that the services made available to Veterans meet VA's rigorous standards for quality health care. VA plans to act as soon as practicable to address these issues and will do so by initiating rulemaking proceedings to address issues raised in the petition.

Thank you for your attention to this matter and your advocacy on behalf of our Nation's Servicemembers and Veterans. We have sent a similar letter to each of the attorneys for the petitioners.

Sincerely yours,

Richard J. Hipolit
Deputy General Counsel for Veterans
Programs Performing the Delegable Duties of
the General Counsel

2.

Ilona Turner

cc:

Paul R.Q. Wolfson
Andrew Jaco
Wilmer, Cutler, Pickering, Hale and Dorr, LLP
1875 Pennsylvania Avenue
Washington DC 20006

Alan Schoenfeld
Austin Van
Wilmer, Cutler, Pickering, Hale and Dorr, LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

M. Dru Levasseur
Lambda Legal Defense and Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY 10005

Tara L. Borelli
Lambda Legal Defense and Education Fund, Inc.
730 Peachtree Street, NE, Suite 1070
Atlanta, GA, 30308-1210



**U.S. Department of Veterans Affairs**
**Office of General Counsel**

810 Vermont Avenue NW
Washington DC 20420
www.va.gov/ogc

In Reply Refer To: 022

December 22, 2023

Paul R.Q. Wolfson
Andrew Jaco
Wilmer, Cutler, Pickering, Hale and Dorr, LLP
1875 Pennsylvania Avenue
Washington DC 20006

Dear Counsellors,

I am writing on behalf of the U.S. Department of Veteran Affairs (VA) and Secretary Denis McDonough.

On, May 9, 2016, Dee Fulcher, Giuliano Silva and Transgender American Veterans Association submitted a petition for rulemaking to repeal or amend 38 C.F.R. § 17.38(c)(4).

VA believes that Gender Affirming Care should be available to any Veteran who needs it, and VA plans to take necessary steps to expand the availability of that care to Veterans. VA announced its intentions on this matter in Summer 2021 based on the uniform recommendation of its Veterans Health Administration Governing Board and the recognized need for this care. As VA has already decided it should offer these services, VA has reviewed the 2016 petition and believes action is appropriate. Any change in VA policies or services like those that are the subject of the 2016 petition must be implemented in a manner that has been thoroughly considered to ensure that the services made available to Veterans meet VA's rigorous standards for quality health care. VA plans to act as soon as practicable to address these issues and will do so by initiating rulemaking proceedings to address issues raised in the petition.

Thank you for your attention to this matter and your advocacy on behalf of our Nation's Servicemembers and Veterans. We have sent a similar letter to each of the attorneys for the petitioners.

Sincerely yours,

*Richard J. Hipolit*

Richard J. Hipolit
Deputy General Counsel for Veterans
Programs Performing the Delegable Duties of
the General Counsel

2.

Paul R.Q. Wolfson

cc:

M. Dru Levasseur
Lambda Legal Defense and Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY 10005

Tara L. Borelli
Lambda Legal Defense and Education Fund, Inc.
730 Peachtree Street, NE, Suite 1070
Atlanta, GA, 30308-1210

Ilona Turner
Sasha Buchert
Transgender Law Center
1629 Telegraph Avenue, Suite 400
Oakland, CA 94612

Alan Schoenfeld
Austin Van
Wilmer, Cutler, Pickering, Hale and Dorr, LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007



**U.S. Department of Veterans Affairs**
**Office of General Counsel**

810 Vermont Avenue NW
Washington DC 20420
www.va.gov/ogc

In Reply Refer To: 022

December 22, 2023

Alan Schoenfeld
Austin Van
Wilmer, Cutler, Pickering, Hale and Dorr, LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

Dear Counsellors,

I am writing on behalf of the U.S. Department of Veteran Affairs (VA) and Secretary Denis McDonough.

On, May 9, 2016, Dee Fulcher, Giuliano Silva and Transgender American Veterans Association submitted a petition for rulemaking to repeal or amend 38 C.F.R. § 17.38(c)(4).

VA believes that Gender Affirming Care should be available to any Veteran who needs it, and VA plans to take necessary steps to expand the availability of that care to Veterans. VA announced its intentions on this matter in Summer 2021 based on the uniform recommendation of its Veterans Health Administration Governing Board and the recognized need for this care. As VA has already decided it should offer these services, VA has reviewed the 2016 petition and believes action is appropriate. Any change in VA policies or services like those that are the subject of the 2016 petition must be implemented in a manner that has been thoroughly considered to ensure that the services made available to Veterans meet VA's rigorous standards for quality health care. VA plans to act as soon as practicable to address these issues and will do so by initiating rulemaking proceedings to address issues raised in the petition.

Thank you for your attention to this matter and your advocacy on behalf of our Nation's Servicemembers and Veterans. We have sent a similar letter to each of the attorneys for the petitioners.

Sincerely yours,

*Richard J. Hipolit*

Richard J. Hipolit
Deputy General Counsel for Veterans
Programs Performing the Delegable Duties of
the General Counsel

2.

Alan Schoenfeld

cc:

M. Dru Levasseur
Lambda Legal Defense and Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY 10005

Tara L. Borelli
Lambda Legal Defense and Education Fund, Inc.
730 Peachtree Street, NE, Suite 1070
Atlanta, GA, 30308-1210

Ilona Turner
Sasha Buchert
Transgender Law Center
1629 Telegraph Avenue, Suite 400
Oakland, CA 94612

Paul R.Q. Wolfson
Andrew Jaco
Wilmer, Cutler, Pickering, Hale and Dorr, LLP
1875 Pennsylvania Avenue
Washington DC 20006



**U.S. Department of Veterans Affairs**
Office of General Counsel

810 Vermont Avenue NW
Washington DC 20420
www.va.gov/ogc

In Reply Refer To: 022

December 22, 2023

Tara L. Borelli
Lambda Legal Defense and Education Fund, Inc.
730 Peachtree Street, NE, Suite 1070
Atlanta, GA, 30308-1210

Dear Counsellors,

I am writing on behalf of the U.S. Department of Veteran Affairs (VA) and Secretary Denis McDonough.

On, May 9, 2016, Dee Fulcher, Giuliano Silva and Transgender American Veterans Association submitted a petition for rulemaking to repeal or amend 38 C.F.R. § 17.38(c)(4).

VA believes that Gender Affirming Care should be available to any Veteran who needs it, and VA plans to take necessary steps to expand the availability of that care to Veterans. VA announced its intentions on this matter in Summer 2021 based on the uniform recommendation of its Veterans Health Administration Governing Board and the recognized need for this care. As VA has already decided it should offer these services, VA has reviewed the 2016 petition and believes action is appropriate. Any change in VA policies or services like those that are the subject of the 2016 petition must be implemented in a manner that has been thoroughly considered to ensure that the services made available to Veterans meet VA's rigorous standards for quality health care. VA plans to act as soon as practicable to address these issues and will do so by initiating rulemaking proceedings to address issues raised in the petition.

Thank you for your attention to this matter and your advocacy on behalf of our Nation's Servicemembers and Veterans. We have sent a similar letter to each of the attorneys for the petitioners.

Sincerely yours,

Richard J. Hipolit
Deputy General Counsel for Veterans
Programs Performing the Delegable Duties of
the General Counsel

2.

Tara L. Borelli

cc:

Paul R.Q. Wolfson
Andrew Jaco
Wilmer, Cutler, Pickering, Hale and Dorr, LLP
1875 Pennsylvania Avenue
Washington DC 20006

Alan Schoenfeld
Austin Van
Wilmer, Cutler, Pickering, Hale and Dorr, LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

M. Dru Levasseur
Lambda Legal Defense and Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY 10005

Ilona Turner
Sasha Buchert
Transgender Law Center
1629 Telegraph Avenue, Suite 400
Oakland, CA 94612



**VA** | **U.S. Department of Veterans Affairs**
Office of General Counsel

810 Vermont Avenue NW
Washington DC 20420
www.va.gov/ogc

In Reply Refer To: 022

December 22, 2023

M. Dru Levasseur
Lambda Legal Defense and Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY 10005

Dear Counsellors,

I am writing on behalf of the U.S. Department of Veteran Affairs (VA) and Secretary Denis McDonough.

On, May 9, 2016, Dee Fulcher, Giuliano Silva and Transgender American Veterans Association submitted a petition for rulemaking to repeal or amend 38 C.F.R. § 17.38(c)(4).

VA believes that Gender Affirming Care should be available to any Veteran who needs it, and VA plans to take necessary steps to expand the availability of that care to Veterans. VA announced its intentions on this matter in Summer 2021 based on the uniform recommendation of its Veterans Health Administration Governing Board and the recognized need for this care. As VA has already decided it should offer these services, VA has reviewed the 2016 petition and believes action is appropriate. Any change in VA policies or services like those that are the subject of the 2016 petition must be implemented in a manner that has been thoroughly considered to ensure that the services made available to Veterans meet VA's rigorous standards for quality health care. VA plans to act as soon as practicable to address these issues and will do so by initiating rulemaking proceedings to address issues raised in the petition.

Thank you for your attention to this matter and your advocacy on behalf of our Nation's Servicemembers and Veterans. We have sent a similar letter to each of the attorneys for the petitioners.

Sincerely yours,

Richard J. Hipolit
Deputy General Counsel for Veterans
Programs Performing the Delegable Duties of
the General Counsel

2.

M. Dru Levasseur

cc:

Ilona Turner
Sasha Buchert
Transgender Law Center
1629 Telegraph Avenue, Suite 400
Oakland, CA 94612

Paul R.Q. Wolfson
Andrew Jaco
Wilmer, Cutler, Pickering, Hale and Dorr, LLP
1875 Pennsylvania Avenue
Washington DC 20006

Alan Schoenfeld
Austin Van
Wilmer, Cutler, Pickering, Hale and Dorr, LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

Tara L. Borelli
Lambda Legal Defense and Education Fund, Inc.
730 Peachtree Street, NE, Suite 1070
Atlanta, GA, 30308-1210

# The Jerome N. Frank Legal Services Organization
### YALE LAW SCHOOL

*Via FedEx*

January 16, 2024

The Honorable Denis R. McDonough
U.S. Secretary of Veterans Affairs
Department of Veterans Affairs
810 Vermont Avenue NW
Washington, DC 20420

> *Re:    Supplement to May 9, 2016 rulemaking petition*

Dear Secretary McDonough,

We represent the Transgender American Veterans Association ("TAVA"). On May 9, 2016, TAVA filed a petition for rulemaking requesting that the Department of Veterans Affairs ("VA") amend or repeal the rules and regulations, including 38 C.F.R. § 17.38(c)(4) and any implementing directives, that exclude medically necessary gender-confirmation surgery ("GCS") for transgender veterans from the medical benefits package, and that VA promulgate regulations expressly including GCS for transgender veterans in that medical benefits package. VA has not yet formally granted nor denied TAVA's rulemaking petition.

We write to supplement TAVA's original rulemaking petition with the following five additional sources that have been published since TAVA filed the petition in 2016:

1. Anthony N. Almazan & Alex S. Keuroghlian, *Association Between Gender-Affirming Surgeries and Mental Health Outcomes*, 156 J. AM. MED. ASS'N 611 (2021). In this study, the authors found that GCS specifically reduces the risk of suicide and self-harm.
2. Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. CLINICAL ENDOCRINOLOGY & METABOLISM 3869 (2017). These guidelines demonstrate the Endocrine Society's continued belief in the importance of GCS to the health, including mental health, of transgender people.
3. Matthew Rae et al., *Demographics, Insurance Coverage, and Access to Individuals Among Transgender Adults*, KFF (Oct. 21, 2020), https://www.kff.org/health-reform/issue-brief/demographics-insurance-coverage-and-access-to-care-among-transgender-adults. This article reveals the insurance gaps between transgender people and their cisgender peers.
4. VA OFFICE OF MENTAL HEALTH AND SUICIDE PREVENTION, NATIONAL VETERAN SUICIDE PREVENTION ANNUAL REPORT (2022), https://www.mentalhealth.va.gov/docs/data-sheets/2022/2022-National-Veteran-Suicide-Prevention-Annual-Report-FINAL-508.pdf. This source, which comes from VA itself, demonstrates the distressing prevalence of suicide in the veteran population.
5. AM. PSYCHIATRIC ASS'N, *Gender Dysphoria*, *in* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, TEXT REVISIONS 164.0 (5th ed. 2022).

We hope these materials are helpful in VA's deliberations.

Sincerely,

/s/ Michael Wishnie
John Baisley, Law Student Intern
Alexandra Johnson, Law Student Intern
K.N. McCleary, Law Student Intern
Sonora Taffa, Law Student Intern,
Michael J. Wishnie, Supervising Attorney
Veterans Legal Services Clinic
Yale Law School
P.O. Box 209090
New Haven, CT 06520-9090
(203) 432-4800
michael.wishnie@ylsclinics.org

*cc*:          Adam S. Farina
              Deputy Assistant Secretary for Public Affairs
              Office of Public and Intergovernmental Affairs
              Department of Veterans Affairs
              810 Vermont Avenue NW
              Washington, DC 20420
              adam.farina@va.gov

              Zaneta Inez Adams
              Deputy Assistant Secretary for Intergovernmental Affairs
              Office of Public and Intergovernmental Affairs
              Department of Veterans Affairs
              810 Vermont Avenue NW
              Washington, DC 20420
              zaneta.adams@va.gov

              Acting General Counsel Richard J. Hipolit, JD
              Office of General Counsel
              Department of Veterans Affairs
              810 Vermont Avenue NW
              Washington, DC 20420
              richard.hipolit@va.gov

              Eric Laufgraben
              Senior Trial Counsel, Civil Division, Commercial Litigation Branch
              Department of Justice
              950 Pennsylvania Avenue NW
              Washington, DC 20530
              eric.e.laufgraben@usdoj.gov

Research

JAMA Surgery | Original Investigation

# Association Between Gender-Affirming Surgeries and Mental Health Outcomes

Anthony N. Almazan, BA; Alex S. Keuroghlian, MD, MPH

**IMPORTANCE** Requests for gender-affirming surgeries are rapidly increasing among transgender and gender diverse (TGD) people. However, there is limited evidence regarding the mental health benefits of these surgeries.

**OBJECTIVE** To evaluate associations between gender-affirming surgeries and mental health outcomes, including psychological distress, substance use, and suicide risk.

**DESIGN, SETTING, AND PARTICIPANTS** In this study, we performed a secondary analysis of data from the 2015 US Transgender Survey, the largest existing data set containing comprehensive information on the surgical and mental health experiences of TGD people. The survey was conducted across 50 states, Washington, DC, US territories, and US military bases abroad. A total of 27 715 TGD adults took the US Transgender Survey, which was disseminated by community-based outreach from August 19, 2015, to September 21, 2015. Data were analyzed between November 1, 2020, and January 3, 2021.

**EXPOSURES** The exposure group included respondents who endorsed undergoing 1 or more types of gender-affirming surgery at least 2 years prior to submitting survey responses. The comparison group included respondents who endorsed a desire for 1 or more types of gender-affirming surgery but denied undergoing any gender-affirming surgeries.

**MAIN OUTCOMES AND MEASURES** Endorsement of past-month severe psychological distress (score of ≥13 on Kessler Psychological Distress Scale), past-month binge alcohol use, past-year tobacco smoking, and past-year suicidal ideation or suicide attempt.

**RESULTS** Of the 27 715 respondents, 3559 (12.8%) endorsed undergoing 1 or more types of gender-affirming surgery at least 2 years prior to submitting survey responses, while 16 401 (59.2%) endorsed a desire to undergo 1 or more types of gender-affirming surgery but denied undergoing any of these. Of the respondents in this study sample, 16 182 (81.1%) were between the ages of 18 and 44 years, 16 386 (82.1%) identified as White, 7751 (38.8%) identified as transgender women, 6489 (32.5%) identified as transgender men, and 5300 (26.6%) identified as nonbinary. After adjustment for sociodemographic factors and exposure to other types of gender-affirming care, undergoing 1 or more types of gender-affirming surgery was associated with lower past-month psychological distress (adjusted odds ratio [aOR], 0.58; 95% CI, 0.50-0.67; *P* < .001), past-year smoking (aOR, 0.65; 95% CI, 0.57-0.75; *P* < .001), and past-year suicidal ideation (aOR, 0.56; 95% CI, 0.50-0.64; *P* < .001).

**CONCLUSIONS AND RELEVANCE** This study demonstrates an association between gender-affirming surgery and improved mental health outcomes. These results contribute new evidence to support the provision of gender-affirming surgical care for TGD people.

← Invited Commentary page 618

➕ CME Quiz at jamacmelookup.com

**Author Affiliations:** Harvard Medical School, Boston, Massachusetts (Almazan, Keuroghlian); Harvard T. H. Chan School of Public Health, Boston, Massachusetts (Almazan); The Fenway Institute, Fenway Health, Boston, Massachusetts (Keuroghlian); Department of Psychiatry, Massachusetts General Hospital, Boston (Keuroghlian).

**Corresponding Author:** Anthony N. Almazan, BA, Harvard Medical School, 25 Shattuck St, Boston, MA 02215 (anthony_almazan@hms.harvard.edu).

*JAMA Surg.* 2021;156(7):611-618. doi:10.1001/jamasurg.2021.0952
Published online April 28, 2021.

611

© 2021 American Medical Association. All rights reserved.

AR-618

Downloaded from jamanetwork.com by Yale University user on 12/04/2023

Appx256

Transgender and gender diverse (TGD) people experience a disproportionate burden of mental health problems compared with the general population.[1,2] Prior studies of mental health among TGD people have demonstrated a 41% lifetime prevalence of suicide attempts,[2] 7% to 61% lifetime prevalence of binge drinking,[3] and a 33% prevalence of tobacco use.[4] Increased adverse mental health outcomes among TGD people are likely attributable to stigma, discrimination, pathologization, economic marginalization, violence, and dysphoria associated with an incongruence between gender identity and societal expectations based on one's sex assigned at birth.[5]

According to *Standards of Care* published by the World Professional Association for Transgender Health, gender-affirming surgery is a medically necessary treatment to alleviate psychological distress for many TGD people.[6] The term *gender-affirming surgery* refers to any surgical procedures offered to affirm the gender identities of TGD people. The process of surgical gender affirmation is individually tailored because not all TGD people desire or access these procedures.[7] In the largest survey of the TGD community to our knowledge to date, 25% of respondents reported undergoing some type of gender-affirming surgery.[8]

As a result of professional recommendations, insurance nondiscrimination laws, and expansion of dedicated transgender health practices, demand for gender-affirming surgery is steadily rising.[9] In the United States, incidence of gender-affirming surgeries has increased annually since 2000.[10] Despite growing demand for and access to gender-affirming surgery, there is a paucity of high-quality evidence regarding its effects on mental health outcomes among TGD people.

Existing evidence on the association between gender-affirming surgeries and mental health outcomes is largely derived from small-sample, cross-sectional, and uncontrolled studies.[1,11,12] A seminal 1998 review of the experiences of more than 2000 TGD people from 79 predominantly uncontrolled follow-up studies demonstrated qualitative improvement in psychosocial outcomes following gender-affirming surgery.[11] Attempts since then to empirically demonstrate mental health benefits from gender-affirming surgery have generated mixed results. A meta-analysis of 1833 TGD people across 28 studies concluded that studies offered "low-quality evidence" for positive mental health benefits from surgical gender affirmation.[12] The largest existing study on this subject to our knowledge,[13] a total population study including 2679 people diagnosed as having gender incongruence in Sweden, demonstrated a longitudinal association between gender-affirming surgery and reduced mental health treatment utilization.[13] However, a 2020 published correction of this study[14] demonstrated no mental health benefit from gender-affirming surgery after comparison with a control group of TGD people who had not yet undergone surgery. Mental health effects of gender-affirming surgery thus remain controversial.

Given the increasing incidence of surgical gender affirmation among TGD people, there is a significant need for clarification of the mental health benefits of gender-affirming surgery. In this article, we present the largest study to our knowledge to date on the association between gender-

**Key Points**

**Question** Are gender-affirming surgeries associated with better mental health outcomes among transgender and gender diverse (TGD) people?

**Findings** In this secondary analysis of the 2015 US Transgender Survey (n = 27 715), TGD people with a history of gender-affirming surgery had significantly lower odds of past-month psychological distress, past-year tobacco smoking, and past-year suicidal ideation compared with TGD people with no history of gender-affirming surgery.

**Meaning** These findings support the provision of gender-affirming surgeries for TGD people who seek them.

affirming surgeries and mental health outcomes. Using the 2015 US Transgender Survey, the largest existing data set on surgical and mental health experiences of TGD people, we investigate the hypothesis that gender-affirming surgeries are associated with improved mental health outcomes, including psychological distress, substance use, and suicidality.

## Methods

### Study Design
In this study, we performed a secondary analysis of the 2015 US Transgender Survey (USTS).[8] This investigation is reported using Strengthening the Reporting of Observational Studies in Epidemiology (STROBE) reporting guidelines.

### Study Population and Data Source
The 2015 USTS was a cross-sectional, nonprobability sample of responses from 27 715 TGD adults from 50 US states, Washington, DC, US territories, and US military bases abroad. The survey was developed by researchers, advocates, people with lived experience, and subject experts over the course of a year. The final survey contained 324 possible questions with 32 domains addressing subjects including health and health care access. It was disseminated by community-based outreach and administered online from August 19, 2015, to September 21, 2015. The USTS protocol was approved by the University of California, Los Angeles institutional review board.[8] The protocol for the present study was reviewed by the Fenway Institute institutional review board and did not meet criteria for human subjects research. For this reason, consent was not obtained.

### Outcomes
Five binary mental health outcomes were examined, including endorsement or denial of the following: (1) past-month severe psychological distress (score on the Kessler Psychological Distress Scale meeting the previously validated threshold of ≥13),[15] (2) past-month binge alcohol use (≥5 alcoholic drinks on one occasion), (3) past-year tobacco smoking, (4) past-year suicidal ideation, and (5) past-year suicide attempt.

### Exposure Group
The exposure group included respondents who endorsed a history of gender-affirming surgery, defined as undergoing 1 or

© 2021 American Medical Association. All rights reserved.

Downloaded from jamanetwork.com by Yale University user on 12/04/2023

AR419

Appx257

more types of gender-affirming surgery at least 2 years prior to submitting responses to the USTS. Respondents were asked about their experiences with gender-affirming surgeries through the question, "Have you had or do you want any of the health care listed below for gender transition?" Respondents were presented with 1 of 2 lists of gender-affirming surgeries based on their self-reported sex assigned at birth. For each surgery, respondents were able to indicate one of the following answers: "Have had it," "Want it some day," "Not sure if I want this," or "Do not want this." Respondents were included in the exposure group if they answered "Have had it" to 1 or more of the following types of gender-affirming procedures: breast augmentation, orchiectomy, vaginoplasty/labiaplasty, trachea shave, facial feminization surgery, or voice surgery. Respondents were also included in the exposure group if they answered "Have had it" to one or more of the following types of gender-affirming procedures: chest surgery, hysterectomy, clitoral release/metoidioplasty/centurion procedure, or phalloplasty.

In this study, outcomes of interest included mental health symptoms in the year prior to taking the USTS. To ensure that exposure to gender-affirming surgeries temporally preceded all outcomes of interest, respondents were included in the exposure group if they had received their first gender-affirming surgery at least 2 years prior to submitting responses to the USTS. For each respondent with a history of gender-affirming surgery, the number of years since their first surgery was calculated by subtracting age at first surgery from current age.

### Control Group
The control group included respondents who desired gender-affirming surgeries but had not yet received any. Respondents were included in this group if they answered "Want it some day" for at least 1 of the aforementioned gender-affirming procedures but did not answer "Have had it" for any of them. We excluded participants who did not report desire for any gender-affirming surgeries.

### Covariates
The following sociodemographic covariates were examined: age (18-44 years, 45-64 years, and ≥65 years), education level (less than high school or high school graduate up to associate degree, bachelor degree, or higher), employment status (employed, unemployed, or out of labor force), gender identity (transgender woman, transgender man, nonbinary, or cross-dresser), health insurance status (uninsured or insured), household income (<$25 000, $25 000-$99 999, or ≥$100 000), race (Alaska Native/American Indian, Asian/Pacific Islander, Black/African American, Latinx/Hispanic, other/biracial/multiracial, or White), sex assigned at birth (female or male), and sexual orientation (asexual, lesbian/gay/bisexual, or heterosexual).

Family rejection was included as a covariate and was defined by the USTS as history of any of the following experiences with a family member owing to the respondent's gender identity: ending the relationship, physical violence, being forced out of their home, being prevented from wearing desired gender-concordant clothing, and exposure to gender identity conversion efforts. Lifetime exposures to other types of

gender-affirming care were also examined, including gender-affirming counseling, pubertal suppression, and hormone therapy. Given the possibility that any of these covariates could confound the relationship between gender-affirming surgeries and mental health outcomes, all covariates were included in the final multivariable models.

### Statistical Analysis
All analyses were conducted using Stata, version 16.1 (StataCorp). Unweighted descriptive statistics for exposure and control groups were calculated and are presented as frequencies and percentages.

Multivariable logistic regression models adjusted for all covariates were generated to examine whether undergoing gender-affirming surgery is associated with each of the examined mental health outcomes.[16,17] To account for the survey's nonprobability sampling, all models incorporated survey weights to correct sampling biases related to age and race/ethnicity. Adjusted odds ratios (aORs), 95% CIs, and 2-sided $P$ values are reported.

We performed a post hoc analysis to determine whether associations between gender-affirming surgeries and mental health outcomes differ based on the degree of surgical affirmation. The exposure variable was recoded as 3 categories: those who received all desired surgeries, some desired surgeries, and no desired surgeries. Because the USTS did not collect information on timing of each respondent's last surgery, respondents for this post hoc analysis could not be excluded to ensure that all exposures temporally preceded mental health outcomes. The recoded 3-category exposure variable was substituted into 5 additional multivariable logistic regression models, adjusted for all aforementioned covariates.

Owing to concerns that baseline mental health status may confound associations between gender-affirming surgery and mental health outcomes, we conducted an additional post hoc analysis to determine whether lifetime mental health measures were associated with exposure to gender-affirming surgeries. We did not incorporate these measures into the primary models due to collinearity. Four separate post hoc models, adjusted for all aforementioned covariates, regressed exposure to gender-affirming surgeries against lifetime suicidal ideation, lifetime suicide attempts, lifetime alcohol use, and lifetime smoking.

To account for multiple hypothesis testing, a Bonferroni correction was applied to adjust for 19 total tests. A $P$ value of less than .002 was used as the corrected threshold for statistical significance.

Less than 2% of the study sample had missing data for exposure and outcome variables, and less than 9% of the study sample had missing data for any covariates. Given that these are acceptably low levels of missingness,[18] respondents with missing data were excluded without compensatory methods.

## Results
Of the 27 715 respondents, 3559 (12.8%) endorsed undergoing 1 or more types of gender-affirming surgery at least 2 years

© 2021 American Medical Association. All rights reserved.

Downloaded from jamanetwork.com by Yale University user on 12/04/2023

AR420

Appx258

**Table 1. Sample Sociodemographics[a]**

| Characteristic | No. (%) | | Difference, % (95% CI) |
|---|---|---|---|
| | No history of surgery (n = 16 401) | History of surgery (n = 3559) | |
| **Age, y** | | | |
| 18-44 | 14 170 (86.4) | 2012 (56.5) | 29.9 (28.2 to 31.6) |
| 45-64 | 1922 (11.7) | 1261 (35.4) | −23.7 (−25.4 to −22.1) |
| ≥65 | 309 (1.9) | 285 (8.0) | −6.1 (−7.0 to −5.2) |
| **Education** | | | |
| Less than high school | 682 (4.2) | 37 (1.0) | 3.1 (2.7 to 3.6) |
| High school graduate up to associate degree | 10 918 (66.6) | 1243 (34.9) | 31.6 (29.9 to 33.3) |
| Bachelor degree or higher | 4801 (29.3) | 2279 (64.0) | −34.8 (−36.5 to −33.0) |
| **Employment** | | | |
| Employed | 10 306 (62.8) | 2585 (72.6) | −9.8 (−11.4 to −8.2) |
| Unemployed | 2474 (15.1) | 202 (5.7) | 9.4 (8.5 to 10.3) |
| Out of labor force | 3537 (21.6) | 755 (21.2) | 0.4 (−1.1 to 1.8) |
| **Family rejection** | | | |
| Yes | 7466 (45.5) | 2328 (65.4) | −19.9 (−21.6 to −18.2) |
| No | 7360 (44.9) | 1173 (33.0) | 11.9 (10.2 to 13.6) |
| **Gender identity** | | | |
| Transgender woman | 6277 (38.3) | 1474 (41.4) | −3.1 (−4.9 to −1.4) |
| Transgender man | 4764 (29.1) | 1725 (48.5) | −19.4 (−21.2 to −17.6) |
| Nonbinary | 4958 (30.2) | 342 (9.6) | 20.6 (19.4 to 21.8) |
| Cross-dresser | 402 (2.5) | 18 (0.5) | 2.0 (1.6 to 2.3) |
| **Health insurance** | | | |
| Uninsured | 2397 (14.6) | 304 (8.5) | 6.1 (5.0 to 7.1) |
| Insured | 13 959 (85.1) | 3253 (91.4) | −6.3 (−7.4 to −5.2) |
| **Household income** | | | |
| <$25 000 | 5960 (36.3) | 768 (21.6) | 14.7 (13.2 to 16.3) |
| $25 000-$99 999 | 6829 (41.6) | 1804 (50.7) | −9.1 (−10.9 to −7.2) |
| ≥$100 000 | 2073 (12.6) | 840 (23.6) | −11.0 (−12.4 to −9.5) |
| **Race/ethnicity** | | | |
| Alaska Native/American Indian | 206 (1.3) | 39 (1.1) | 0.2 (−0.2 to 0.5) |
| Asian/Pacific Islander | 436 (2.7) | 64 (1.8) | 0.9 (0.4 to 1.4) |
| Black/African American | 459 (2.8) | 124 (3.5) | −0.7 (−1.3 to −0.03) |
| Latinx/Hispanic | 929 (5.7) | 154 (4.3) | 1.3 (0.6 to 2.1) |
| Other/biracial/multiracial | 963 (5.9) | 200 (5.6) | 0.3 (−0.6 to 1.1) |
| White | 13 408 (81.8) | 2978 (83.7) | −1.9 (−3.3 to −0.6) |
| **Sex assigned at birth** | | | |
| Female | 9032 (55.1) | 2029 (57.0) | −1.9 (−3.7 to −0.1) |
| Male | 7369 (44.9) | 1530 (43.0) | 1.9 (0.1 to 3.7) |
| **Sexual orientation** | | | |
| Asexual | 2002 (12.2) | 228 (6.4) | 5.8 (4.9 to 6.7) |
| Lesbian, gay, bisexual | 11 433 (69.7) | 2393 (67.2) | 2.5 (0.8 to 4.2) |
| Heterosexual | 1729 (10.5) | 782 (22.0) | −11.4 (−12.9 to −10.0) |
| **Other gender-affirming care** | | | |
| Counseling | 9016 (55.0) | 3099 (87.1) | −32.1 (−33.4 to −30.8) |
| Pubertal suppression | 197 (1.2) | 94 (2.6) | −1.4 (−2.0 to −0.9) |
| Hormone therapy | 7104 (43.3) | 3213 (90.3) | −47.0 (−48.2 to −45.7) |

[a] Column percentages may not add up to 100% because missing data are not displayed.

prior to submitting survey responses, while 16 401 respondents (59.2%) endorsed a desire to undergo 1 or more types of gender-affirming surgery but denied undergoing any of these.

Compared with the control group, the exposure group had higher percentages of respondents who were older, employed, more educated, endorsed family rejection, reported having health insurance, and reported higher household income. Respondents in the exposure group were more likely to endorse a history of gender-affirming counseling, pubertal suppression, and hormone therapy (**Table 1**).

© 2021 American Medical Association. All rights reserved.

Downloaded from jamanetwork.com by Yale University user on 12/04/2023

AR-421

Appx259

Association Between Gender-Affirming Surgeries and Mental Health Outcomes

<span style="color:maroon">Original Investigation</span> Research

---

**Figure 1. Desire for and History of Gender-Affirming Surgical Procedures in Study Sample**



**A** Gender-affirming surgical experiences of respondents assigned male sex at birth (n = 8899)



**B** Gender-affirming surgical experiences of respondents assigned female sex at birth (n = 11 061)

Includes 2015 US Transgender Survey respondents who indicated they desired and either had or had not undergone at least 1 type of gender-affirming surgery. Respondents were presented with 1 of 2 lists of gender-affirming surgeries based on their self-reported sex assigned at birth.

**Figure 2. Comparison of Mental Health Outcomes Among Respondents Who Did and Did Not Undergo Gender-Affirming Surgery**



---

**Table 2. Association Between History of Gender-Affirming Surgery and Mental Health Outcomes[a]**

| Variable | aOR (95% CI)[b] | P value |
|---|---|---|
| Severe psychological distress (past month)[c] | 0.58 (0.50-0.67) | <.001 |
| Substance use | | |
|   Binge alcohol use (past month)[d] | 0.83 (0.72-0.96) | .01 |
|   Smoking (past year) | 0.65 (0.57-0.75) | <.001 |
| Suicidality (past year) | | |
|   Ideation | 0.56 (0.50-0.64) | <.001 |
|   Attempt | 0.65 (0.47-0.90) | .009 |

Abbreviation: aOR, adjusted odds ratio.

[a] Adjusted for age, education, employment status, family rejection, gender identity, health insurance, household income, race/ethnicity, sex assigned at birth, sexual orientation, history of gender-affirming counseling, pubertal suppression, and history of gender-affirming hormone therapy.

[b] Reference/control group (n = 16 401) is composed of individuals who desired at least 1 type of gender-affirming surgery but had not received any surgeries. Exposure group (n = 3559) is limited to respondents who had their first surgery at least 2 years prior to submitting survey responses.

[c] Defined as a score of at least 13 on the Kessler Psychological Distress Scale.

[d] Defined as consuming at least 5 alcoholic drinks on the same occasion.

---

For each surgical procedure, the percentage of people who desired it was higher than the percentage of people who endorsed undergoing it (Figure 1). For every adverse mental health outcome, the percentage of respondents who endorsed it was lower in the exposure group than in the control group (Figure 2).

After adjustment for sociodemographic factors and exposure to other types of gender-affirming care, undergoing 1 or more types of gender-affirming surgery was associated with lower past-month psychological distress (aOR, 0.58; 95% CI, 0.50-0.67; *P* < .001), past-year smoking (aOR, 0.65; 95% CI, 0.57-0.75; *P* < .001), and past-year suicidal ideation (aOR, 0.56; 95% CI, 0.50-0.64; *P* < .001). After Bonferroni correction, there was no statistically significant association between gender-affirming surgeries and past-month binge alcohol use or past-year suicide attempts (Table 2).

In the post hoc analysis stratifying by degree of surgical affirmation, 16 401 respondents were in the reference group who received no desired surgeries. Respondents who had undergone all desired surgeries (n = 2448) had significant reductions in the odds of each adverse mental health outcome, and these reductions were more profound than those among respondents who had received only some desired surgeries (n = 3311) (Table 3).

Measures of lifetime mental health were not associated with exposure to gender-affirming surgeries. After adjustment for all aforementioned covariates, undergoing gender-affirming surgery was not associated with lifetime suicidal ideation (aOR, 1.00; 95% CI, 0.85-1.20; *P* = .92), lifetime suicide attempts (aOR, 1.16; 95% CI, 1.01-1.34; *P* = .04), lifetime alcohol use (aOR, 1.00; 95% CI, 0.99-1.01; *P* = .96), or lifetime smoking (aOR, 1.00; 95% CI, 1.00-1.01; *P* = .34).

## Discussion

To our knowledge, this is the first large-scale, controlled study to demonstrate an association between gender-affirming surgery and improved mental health outcomes. In this study, we demonstrate that undergoing gender-affirming surgery is associated with decreased odds of past-month severe psychological distress, past-year smoking, and past-year suicidal ideation. The post hoc analysis stratifying by degree of surgical affirmation demonstrates that TGD people who underwent all desired surgeries had significantly lower odds of all adverse mental health outcomes, and these benefits were stronger than

---

© 2021 American Medical Association. All rights reserved.

Downloaded from jamanetwork.com by Yale University user on 12/04/2023

AR-422

Appx260

**Table 3. Association Between Degree of Surgical Gender Affirmation and Mental Health Outcomes[a]**

| Variable | Received some desired surgeries (n = 3311)[b] | | Received all desired surgeries (n = 2448)[b] | |
|---|---|---|---|---|
| | aOR (95% CI) | P value | aOR (95% CI) | P value |
| Severe psychological distress (past month)[c] | 0.70 (0.60-0.81) | <.001 | 0.47 (0.39-0.56) | <.001 |
| Substance use | | | | |
| Binge alcohol use (past month)[d] | 0.97 (0.84-1.11) | .63 | 0.75 (0.64-0.87) | <.001 |
| Smoking (past year) | 0.75 (0.66-0.86) | <.001 | 0.58 (0.49-0.68) | <.001 |
| Suicidality (past year) | | | | |
| Ideation | 0.72 (0.63-0.81) | <.001 | 0.44 (0.38-0.51) | <.001 |
| Attempt | 0.70 (0.53-0.93) | .01 | 0.44 (0.28-0.70) | <.001 |

Abbreviation: aOR, adjusted odds ratio.

[a] Adjusted for age, education, employment status, family rejection, gender identity, health insurance, household income, race/ethnicity, sex assigned at birth, sexual orientation, history of gender-affirming counseling, pubertal suppression, and history of gender-affirming hormone therapy.

[b] Reference group is individuals who received none of their desired surgeries (n = 16 401).

[c] Defined as a score of at least 13 on the Kessler Psychological Distress Scale.

[d] Defined as consuming at least 5 alcoholic drinks on the same occasion.

among TGD people who only received some desired surgeries.

The observed associations between gender-affirming surgery, psychological distress, and suicide risk reinforce previous small-sample studies suggesting that gender-affirming surgery improves mental health and quality of life among TGD people.[1,12] Our findings also reflect evidence from qualitative studies indicating perceived mental health benefits of gender-affirming surgeries among TGD people.[19-21] In our primary analysis, although gender-affirming surgery was associated with lower odds of past-year suicidal ideation, there was no statistically significant association between gender-affirming surgeries and past-year suicide attempts. However, in a post hoc analysis respondents who underwent all desired gender-affirming surgeries had significantly lower odds of past-year suicide attempts.

The association observed between gender-affirming surgeries and reduction in substance use behaviors is consistent with previous studies involving small community samples that demonstrated associations between gender-affirming medical care and lower odds of high-risk substance use.[22,23] In the primary analysis, undergoing gender-affirming surgery was not significantly associated with past-month binge alcohol use. This may be consistent with evidence that after adjustment for sociodemographic factors, gender minority identity itself does not predict high-risk alcohol use.[24] However, in a post hoc analysis, respondents who underwent all desired gender-affirming surgeries had significantly lower odds of past-month binge alcohol use.

This investigation offers evidence to support the clinical practice of gender-affirming surgery. Guidelines for provision of gender-affirming medical and surgical care have historically been challenged based on a limited evidence base. The American Psychiatric Association has previously concluded that the quality of evidence for treatment of gender dysphoria is low, and consequently, recommendations regarding gender-affirming care have been driven by clinical consensus where empirical evidence is lacking.[25] This study offers new data that substantiate the current clinical consensus by expanding the evidence base in support of gender-affirming surgical care.

The observed mental health benefits of gender-affirming surgeries in this study highlight the importance of policies that facilitate access to surgical gender affirmation. In the present study, the percentages of people who had undergone each gender-affirming surgical procedure were substantially lower than the percentages of people who desired them, suggesting significant barriers to accessing gender-affirming surgeries. State-level prohibitions against insurance exclusions for gender-affirming care have been associated with more extensive coverage of gender-affirming surgical procedures.[26] In light of this study's results, such policies may be of even greater public health interest. US federal policies related to gender-affirming care have included a recent reversal of Affordable Care Act insurance protections for gender affirmation and the continued prohibition of Veterans Affairs funding allocation for gender-affirming surgeries.[27,28] Formulation of evidence-based policies for the financing of gender-affirming surgery will be crucial for advancing the health and well-being of TGD communities.

### Strengths and Limitations

This study's strengths include aspects of its design that address prior limitations in the existing literature on this subject. Multiple meta-analyses of studies examining the association between gender-affirming surgeries and mental health outcomes have demonstrated that much of the existing literature consists of evidence derived with small sample sizes, lack of control groups, and lack of adjustment for other kinds of gender-affirming care.[12,29] Our study is responsive to these methodologic concerns.

First, we used the largest existing data set containing information on the surgical and mental health experiences of TGD people. Second, this is, to our knowledge, the first large-scale study on this subject to use the ideal control group to examine associations between gender-affirming surgeries and mental health outcomes: individuals who desire gender-affirming surgery but have not yet received it. Experts have cautioned against using comparison groups that conflate TGD people who did not undergo gender-affirming surgery because they were waiting for it with TGD people not seeking it in the first place. Inability to differentiate these 2 groups likely

© 2021 American Medical Association. All rights reserved.

Downloaded from jamanetwork.com by Yale University user on 12/04/2023

AR-423

Appx261

contributed to the lack of significant mental health benefit observed in the 2019 large-scale study on this subject.[13,30]

Third, although this survey-based investigation uses a cross-sectional study design, we constructed an exposure group that includes only individuals exposed to their first gender-affirming surgery prior to the window of assessment for any adverse mental health outcomes. Thus, we ensured that our exposure temporally preceded our outcomes, allowing us to better understand the direction of observed associations. These exclusions could not be performed in our post hoc analysis stratifying by degree of surgical affirmation, and that analysis should therefore be interpreted with caution.

Fourth, our data set allowed us to control for previous experiences of gender-affirming counseling, pubertal suppression, and hormone therapy. Consequently, this study is, to our knowledge, the first large-scale investigation to ascertain the mental health benefits of gender-affirming surgery independent of other common forms of gender-affirming health care.

Our study has several limitations. The nonprobability sampling of the USTS may limit generalizability. All measures are self-reported and may be subject to response bias. Furthermore, the USTS only offers data on experiences with 10 specific types of gender-affirming surgeries and does not capture the full range of procedures that constitute gender-affirming surgery. Lastly, because this is an observational study, it may be subject to unmeasured confounding. Much of the literature on mental health benefits of gender-affirming surgery has been complicated by inability to adjust for a key con-

founder: baseline mental health status. Our post hoc analysis demonstrates that lifetime suicidality and substance use behaviors are not associated with the exposure variable in this sample. Therefore, prior mental health factors do not appear to confound associations between gender-affirming surgery and subsequent mental health outcomes in our study. There may nevertheless be other types of mental health problems not captured in the USTS that confound these associations. These limitations highlight the need for larger probability-based surveys with TGD communities, more consistent gender identity data collection across health care systems, and more comprehensive baseline health data collection with TGD populations.

## Conclusions

In this article, we present the largest study to our knowledge to date on associations between gender-affirming surgeries and mental health outcomes. Our results demonstrate that undergoing gender-affirming surgery is associated with improved past-month severe psychological distress, past-year smoking, and past-year suicidal ideation. Our findings offer empirical evidence to support provision of gender-affirming surgical care for TGD people who seek it. Furthermore, this study provides evidence to support policies that expand and protect access to gender-affirming surgical care for TGD communities.

## ARTICLE INFORMATION

**Accepted for Publication:** February 5, 2021.

**Published Online:** April 28, 2021.
doi:10.1001/jamasurg.2021.0952

**Author Contributions:** Mr Almazan had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.
*Concept and design:* All authors.
*Acquisition, analysis, or interpretation of data:* All authors.
*Drafting of the manuscript:* All authors.
*Critical revision of the manuscript for important intellectual content:* All authors.
*Statistical analysis:* Almazan.
*Obtained funding:* Keuroghlian.
*Administrative, technical, or material support:* Keuroghlian.
*Supervision:* Keuroghlian.

**Conflict of Interest Disclosures:** Dr Keuroghlian reported grants from Patient-Centered Outcomes Research Institute contract AD-2017C1-6569 (PI: Sari L. Reisner) during the conduct of the study; in addition, Dr Keuroghlian stands to receive future royalties as editor of a forthcoming McGraw-Hill Education textbook on transgender and gender diverse care. No other disclosures were reported.

**Funding/Support:** This work was supported by contract AD-2017C1-6569 from the Patient-Centered Outcomes Research Institute (PI: Dr Sari L. Reisner).

**Role of the Funder/Sponsor:** The funding source had no role in the design and conduct of the study; collection, management, analysis, and

interpretation of the data; preparation, review, or approval of the manuscript; and decision to submit the manuscript for publication.

**Additional Contributions:** We thank the National Center for Transgender Equality for granting us access to the data from the 2015 US Transgender Survey.

## REFERENCES

1. Dhejne C, Van Vlerken R, Heylens G, Arcelus J. Mental health and gender dysphoria: a review of the literature. *Int Rev Psychiatry*. 2016;28(1):44-57. doi:10.3109/09540261.2015.1115753

2. Grant J, Mottet L, Tanis J. Injustice at every turn: a report of the National Transgender Discrimination Survey. 2011. Accessed October 11, 2020. https://www.transequality.org/sites/default/files/docs/resources/NTDS_Report.pdf

3. Gilbert PA, Pass LE, Keuroghlian AS, Greenfield TK, Reisner SL. Alcohol research with transgender populations: a systematic review and recommendations to strengthen future studies. *Drug Alcohol Depend*. 2018;186:138-146. doi:10.1016/j.drugalcdep.2018.01.016

4. Wheldon CW, Wiseman KP. Tobacco use among transgender and gender non-conforming adults in the United States. *Tob Use Insights*. 2019;12: X19849419. doi:10.1177/1179173X19849419

5. Reisner SL, Poteat T, Keatley J, et al. Global health burden and needs of transgender populations: a review. *Lancet*. 2016;388(10042): 412-436. doi:10.1016/S0140-6736(16)00684-X

6. Coleman E, Bockting W, Botzer M, et al. Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. *Int J Transgenderism*. 2012;13(4):165-232. doi:10.1080/15532739.2011.700873

7. Berli JU, Knudson G, Fraser L, et al. What surgeons need to know about gender confirmation surgery when providing care for transgender individuals: a review. *JAMA Surg*. 2017;152(4):394-400. doi:10.1001/jamasurg.2016.5549

8. James S, Herman J, Rankin S, Keisling M, Mottet L, Anafi M. The Report of the 2015 U.S. Transgender Survey. National Center for Transgender Equality; 2016. Accessed April 2, 2020. https://ncvc.dspacedirect.org/handle/20.500.11990/1299

9. Weissler JM, Chang BL, Carney MJ, et al. Gender-affirming surgery in persons with gender dysphoria. *Plast Reconstr Surg*. 2018;141(3):388-396e. doi:10.1097/PRS.0000000000004123

10. Canner JK, Harfouch O, Kodadek LM, et al. Temporal trends in gender-affirming surgery among transgender patients in the United States. *JAMA Surg*. 2018;153(7):609-616. doi:10.1001/jamasurg.2017.6231

11. Pfäfflin F, Junge A. Sex reassignment thirty years of international follow-up studies SRS: a comprehensive review, 1961-1991. *International Journal of Transgenderism*. Published online 1998.

12. Murad MH, Elamin MB, Garcia MZ, et al. Hormonal therapy and sex reassignment: a systematic review and meta-analysis of quality of life and psychosocial outcomes. *Clin Endocrinol (Oxf)*. 2010;72(2):214-231. doi:10.1111/j.1365-2265.2009.03625.x

© 2021 American Medical Association. All rights reserved.

Downloaded from jamanetwork.com by Yale University user on 12/04/2023

AR424

Appx262

**Department of Veterans Affairs**
**Veterans Health Administration**
**Washington, DC 20420**

**VHA DIRECTIVE 1341(3)**
**Transmittal Sheet**
**May 23, 2018**

### PROVIDING HEALTH CARE FOR TRANSGENDER AND INTERSEX VETERANS

**1. REASON FOR ISSUE:** This Veterans Health Administration (VHA) directive revises VHA policy for the respectful delivery of health care to transgender and intersex Veterans who are enrolled in the Department of Veterans Affairs (VA) health care system or are otherwise eligible for VA care.

**2. SUMMARY OF MAJOR CHANGES:**

**Amendment dated, June 1, 2023:**

a. Includes updates in language to be more inclusive, such as the addition of queer and other identities reflected by "Q+". ***NOTE:*** *The '+' symbol captures identities beyond LGBTQ, including pansexual and asexual and those who are questioning their sexual orientation identity. The '+' symbol is used throughout the directive but is not in the directive title due to assistive technology accessibility needs. See paragraph 5 for additional information regarding terminology.*

b. Paragraph 5.e.: Specifies a minimum number of working hours for Lesbian, Gay, Bisexual, Transgender and Queer (LGBTQ+) Veterans Integrated Services Network (VISN) Leads based on current VISN Lead activities.

c. Paragraph 5.f.(1): Increases the recommended minimum number of hours for VA medical facility LGBTQ+ Veteran Care Coordinators (VCCs) and clarifies current duties, which have expanded since the inception of the program.

d. Paragraphs 5.f.(7) and 5.g.(2): Strengthens the recommendation to collect Veteran gender identity information during clinical encounters to improve individual Veteran care and aid analyses of LGBTQ+ Veteran population needs.

e. Paragraph 3: Replaces definition for gender non-conforming with definition for gender diverse.

f. Appendix A: Adds qualifications for LGBTQ+ VISN Leads and VA medical facility VCCs.

g. Appendix B: Adds additional information for LGBTQ+ VCCs.

**Amendment dated, June 26, 2020,** incorporates Appendix B which includes additional guidance for LGBTQ+ Veteran Care Coordinators (VCCs).

**Amendment dated May 24, 2019,** updates language to Appendix A in paragraph 22.

**Major changes as published on May 23, 2018 included:**

**T-1**

**May 23, 2018**                                        **VHA DIRECTIVE 1341(3)**

   a. Updates to language and definitions to reflect current nomenclature.

   b. Removal of content which conflicts with changes to the Computerized Patient Record System (CPRS).

   c. Additional oversight responsibilities for the Under Secretary for Health and the Deputy Under Secretary for Health for Operations and Management.

   d. Delineated responsibilities for the Veterans Integrated Service Network (VISN) Lesbian, Gay, Bisexual, and Transgender, Queer, and associated identities (LGBTQ+) Lead and LGBTQ+ Veteran Care Coordinator.

   e. Updates to the Frequently Asked Questions.

   f. Inclusion of sections on Training and Records Management, in accordance with VHA Directive 6330(3), Controlled National Policy/Directives Management System, dated June 24, 2016. ***NOTE:*** *VHA Directive 0999, VHA Policy Management, dated March 29, 2022 rescinded VHA Directive 6330.*

**3. RELATED ISSUES:**  None.

**4. REPONSIBLE OFFICE:**  The LGBTQ+ Health Program, Office of Patient Care Services (12PCS), is responsible for the content of this VHA directive.  Questions may be referred to LGBTQ+ Health Program at [VHALGBTQ+HEALTH@va.gov](mailto:VHALGBTQ+HEALTH@va.gov).

**5. RESCISSIONS:**  VHA Directive 2013-003, Providing Health Care for Transgender and Intersex Veterans, dated February 8, 2013, is rescinded.

**6. RECERTIFICATION:**  This VHA directive is scheduled for recertification on or before the last working day of May 2023.  This VHA directive will continue to serve as national VHA policy until it is recertified or rescinded.


                              /s/ Carolyn M. Clancy, M.D.
                              Executive in Charge


***NOTE:***  *All references herein to VA and VHA documents incorporate by reference subsequent VA and VHA documents on the same or similar subject matter.*

**DISTRIBUTION:**  Emailed to the VHA Publication Distribution List on 6/1/2018.  **Substantive amendment** dated, June 1, 2023 was emailed to the VHA Publications Distribution List on June 6, 2023.

                                                                          **T-2**

**May 23, 2018**                                    **VHA DIRECTIVE 1341(3)**

## CONTENTS

## PROVIDING HEALTH CARE FOR TRANSGENDER AND INTERSEX VETERANS

1. PURPOSE.................................................................................................. 1

2. BACKGROUND........................................................................................ 1

3. DEFINITIONS ......................................................................................... 1

4. POLICY .................................................................................................. 3

5. RESPONSIBILITIES ............................................................................... 3

6. TRAINING ............................................................................................. 10

7. RECORDS MANAGEMENT .................................................................. 11

8. REFERENCES...................................................................................... 11

APPENDIX A

FREQUENTLY ASKED QUESTIONS (FAQ) REGARDING THE PROVISION OF
HEALTH CARE FOR TRANSGENDER AND INTERSEX VETERANS.......................A-1

APPENDIX B

ADDITIONAL GUIDANCE FOR LGBTQ+ VETERAN CARE COORDINATORS .........B-1

May 23, 2018                                             VHA DIRECTIVE 1341(3)

## PROVIDING HEALTH CARE FOR TRANSGENDER AND INTERSEX VETERANS

## 1. PURPOSE

   This Veterans Health Administration (VHA) directive states policy regarding the respectful delivery of health care to transgender and intersex Veterans who are enrolled in the Department of Veterans Affairs (VA) health care system or are otherwise eligible for VHA care.  In accordance with the medical benefits package, VA provides care and treatment to Veterans that is compatible with generally accepted standards of medical practice and determined by appropriate health care professionals to promote, preserve, or restore the health of the individual. **AUTHORITY:**  38 U.S.C. § 7301(b); 38 C.F.R. § 17.38.

## 2. BACKGROUND

   a. VA is committed to addressing health disparities, including disparities among our transgender and intersex Veterans.

   b. VHA provides health care for transgender and intersex Veterans, no matter how they present.  Not all Veterans who identify as transgender or intersex undergo a transition process.  For those who do, they may present to VHA at various points in their gender transition.  VHA does not discriminate based on state of gender transition.  This applies to all Veterans who are enrolled in VHA's health care system or are otherwise eligible for VHA care.

   c. VHA will provide care to all transgender and intersex Veterans in a manner that is consistent with their self-identified gender identity.

   d. VA does not provide gender confirming/affirming surgeries because VA regulation excludes them from the medical benefits package.

   e. VA does not provide plastic reconstructive surgery for strictly cosmetic purposes.

## 3. DEFINITIONS

   a. **Birth Sex.**  Birth sex refers to the classification of individuals as female or male, most often on the basis of their external genitalia at birth.  In VA records, this information is the sex recorded on the Veteran's original birth certificate.

   b. **Gender.**  Gender refers to the behavioral, cultural, or psychological traits that a society associates with birth sex or gender expression.  Common gender categories are man and woman.

   (1) **Gender Expression.**  Gender expression is the external display of one's gender, through a combination of dress, social behavior, and other factors.  Gender expression is sometimes (but not always) consistent with gender identity.

                                                                                        **1**

**May 23, 2018**                                    **VHA DIRECTIVE 1341(3)**

(2) **Gender Identity.**  Gender identity refers to how an individual identifies the self as belonging to the male (that is, boy or man), female (that is, girl or woman), or some other gender category (for example, gender non-conforming – *see definition below*).  In VA, administrative staff record this information as self-identified gender identity (SIGI).

c. **Gender Confirming/Affirming Surgeries.**  Gender confirming/affirming surgeries (also referred to as sex reassignment surgeries) include any of a variety of surgical procedures (including but not limited to vaginoplasty and breast augmentation in transgender women and mastectomy and phalloplasty in transgender men) done simultaneously or sequentially with the explicit goal of gender transitioning.  Not all transgender or intersex individuals want gender confirming/affirming surgeries.

d. **Gender Dysphoria.**  Gender Dysphoria is the diagnosis in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5) for persons who experience distress related to an incongruence between the gender with which the person identifies and their birth sex.  Not all transgender people meet full criteria for this diagnosis.

e. **Intersex.**  Intersex individuals are born with reproductive or sexual anatomy and/or chromosome pattern that does not fit typical definitions of male or female birth sex.  People with intersex conditions are often assigned male or female birth sex by others (for example, by parents or doctors).  The individual's gender identity may or may not be consistent with the sex assigned at birth.

f. **Self-Identified Gender Identity.**  Self-Identified Gender Identity (SIGI) is a field in the VA records which refers to how Veterans think about their gender.  Veterans may choose from a set of responses which include male, female, transman, transwoman, other, or the individual chooses not to answer.  For more information, see https://dvagov.sharepoint.com/sites/vhava-lgbt-resources/HealthCareTopics/SitePages/SIGI.aspx.  ***NOTE:***  *This is a VA internal Web site that is not available to the public.*

g. **Transgender.**  A transgender person is someone whose gender identity differs from their birth sex.

(1) **Transgender Woman.**  Transgender women are a subset of transgender individuals who are assigned male sex at birth but self-identify as female and often take steps to socially or medically transition to live as women.  This may include feminizing hormone therapy, electrolysis, and surgeries (for example, vaginoplasty, facial feminization, or breast augmentation).  Generally, the pronouns these individuals use are "she," "her," or "hers," unless the Veteran requests different pronouns.

(2) **Transgender Man**.  Transgender men are a subset of transgender individuals who are assigned female sex at birth but self-identify as male and often take steps to socially or medically transition to live as men.  This may include masculinizing hormone therapy and surgeries (for example, phalloplasty, metoidioplasty, or mastectomy with

**May 23, 2018**                                    **VHA DIRECTIVE 1341(3)**

chest reconstruction).  Generally, the pronouns these individuals use are "he," "him," or "his," unless the Veteran requests different pronouns.

(3) **Gender Diverse.** Individuals whose gender identity falls outside of the gender binary structure (e.g., non-binary, genderqueer, agender).

## 4. POLICY

It is VHA policy that staff provide clinically appropriate, comprehensive, Veteran-centered care with respect and dignity to enrolled or otherwise eligible transgender and intersex Veterans, including but not limited to hormonal therapy, mental health care, preoperative evaluation, and medically necessary post-operative and long-term care following gender confirming/affirming surgery.  It is VHA policy that Veterans must be addressed based upon their self-identified gender identity; the use of Veteran's preferred name and pronoun is required.  *NOTE:  VA does not provide or fund gender confirming/affirming surgeries because VA regulation excludes them from the medical benefits package.  In addition, VA does not provide plastic reconstructive surgery, in accordance with the medical benefits package and VHA Directive 1091, Plastic Reconstructive Surgery, dated February 28, 2020.*

## 5. RESPONSIBILITIES

a. <u>**Under Secretary for Health.**</u> The Under Secretary for Health is responsible for ensuring overall VHA compliance with this directive.

b. <u>**Assistant Under Secretary for Health for Patient Care Service/Chief Nursing Officer.**</u> The Assistant Under Secretary for Health for Patient Care Services/Chief Nursing Officer is responsible for supporting the LGBTQ+ Health Program with implementation and oversight of this directive.

c. <u>**Assistant Under Secretary for Health for Operations.**</u> The Assistant Under Secretary for Health for Operations is responsible for:

(1) Communicating the contents of this directive to each of the Veterans Integrated Services Networks (VISNs).

(2) Assisting VISN Directors to resolve implementation and compliance challenges in all VA medical facilities within that VISN.

(3) Providing oversight of VISNs to ensure compliance with this directive and its effectiveness.

d. <u>**Executive Director, LGBTQ+ Health Program.**</u> The Executive Director, LGBTQ+ Health Program, is responsible for:

(1) Providing oversight for VISN and VA medical facility compliance with this directive by communicating with LGBTQ+ VISN Leads about continuous quality improvement activities, reviewing VA medical facility reports and surveys regarding

3

LGBTQ+ populations, raising awareness about complaints or problems from VISNs and VA medical facilities and ensuring corrective action is taken when non-compliance is identified, including sharing challenges and needs with Clinical Informatics, Office of Information and Technology, and other offices as appropriate.

(2) Disseminating this directive to VISNs and VA medical facilities and responding to staff questions, concerns and educational needs regarding its implementation.

(3) Facilitating connections between VA medical facility and VISN stakeholders as needed.

(4) Conducting national LGBTQ+-specific monitoring and reporting on prevalence of LGBTQ+ Veterans, health services utilization and health care needs.

(5) Communicating with the LGBTQ+ VISN Leads, on a minimum quarterly basis.

e. **Veterans Integrated Service Network Director.**  Each VISN Director is responsible for:

(1) Ensuring that all VA medical facilities within the VISN comply with this directive and informing leadership when barriers to compliance are identified.

(2) Ensuring that necessary and appropriate health care is provided at all VA medical facilities within the VISN to all enrolled or otherwise eligible Veterans based on the Veteran's self-identified gender, regardless of birth sex, status of medical/surgical interventions, or appearance.

(3) Appointing a LGBTQ+ VISN Lead, ensuring sufficient allocated time to meet their responsibilities, meeting at least quarterly, and supporting the LGBTQ+ VISN Lead in their work with the VA medical facility LGBTQ+ Veteran Care Coordinators (VCCs) in their region.

(4) Ensuring a minimum of quarterly attendance by the LGBTQ+ VISN Lead at VISN staff meetings.

(5) Monitoring vacancies in the VA medical facility LGBTQ+ VCC role and facilitating an appointment if the position is vacant for more than 2 months. ***NOTE:*** *Vacancies for more than 2 months are considered deficiencies.*

(6) Communicating with the LGBTQ+ VISN Lead on a minimum quarterly basis about the LGBTQ+ activities at the VA medical facilities.

f. **LGBTQ+ Veterans Integrated Service Network Lead.**  *NOTE: The LGBTQ+ VISN Lead is appointed by and reports to the VISN Director. The role of the LGBTQ+ VISN Lead requires a minimum of 8-12 hours per week. The number of hours allocated for the LGBTQ+ VISN Lead will vary by number of VA medical facilities in the VISN, size of VA medical facilities, number of VA medical facility LGBTQ+ VCCs in the VISN and support needs of the VA medical facility LGBTQ+ VCCs. This can be a collateral*

**May 23, 2018**                                    **VHA DIRECTIVE 1341(3)**

*position. VISN Directors may determine that the LGBTQ+ VISN Lead work be assigned as part of regular duties (i.e., full or part time).* The LGBTQ+ VISN Lead is responsible for:

(1) Assisting VA medical facility Directors in their VISN with identifying and appointing VA medical facility LGBTQ+ VCCs and allocating sufficient time for their responsibilities, as well as working collaboratively on any remediation needed with VA medical facility LGBTQ+ VCC performance or time allocation.

(2) Serving as a reliable source of information regarding the appropriate amount of time a VA medical facility LGBTQ+ VCC may need to perform their duties above the suggested minimum, as well as the need for local resources to support their work.

(3) Supporting the LGBTQ+ Health VCC program by orienting newly appointed VA medical facility LGBTQ+ VCCs to their roles and responsibilities.

(4) Attending the VISN staff meetings at least quarterly.

(5) Assisting VA medical facility LGBTQ+ VCCs across the VISN with development and coordination of strategic plans and program activities, local problem solving and engagement of VA medical facility leadership when necessary.

(6) Communicating with the Executive Director, LGBTQ+ Health Program, on a minimum quarterly basis, about activities in their VISN to ensure ongoing quality improvement with measurable gains and to monitor compliance with this directive.

(7) Communicating with the VISN Director on a minimum quarterly basis about the LGBTQ+ VISN Lead's activities and activities at the VA medical facilities, including sharing results of VA medical facility LGBTQ+ VCC activities (e.g., training and education initiatives, outreach efforts, LGBTQ+ awareness campaigns, Pride events).

(8) Communicating on a minimum of monthly basis with VA medical facility LGBTQ+ VCCs in the VISN to ensure quality improvement within VA medical facilities, including but not limited to conducting an annual survey of VA medical facility LGBTQ+ VCCs to gather information about VA medical facility initiatives.

(9) Conducting an annual meeting with each VA medical facility Director and VA medical facility LGBTQ+ VCCs to review the strategic plan progress, as well as review VA medical facility data collection progress for Veteran's sexual orientation identity and self-identified gender identity in the electronic health record (EHR).

g. **VA Medical Facility Director.** The VA medical facility Director, is responsible for:

(1) Appointing at least one designated VA medical facility LGBTQ+ VCC who dedicates non-clinical time (that is, dedicated administrative time and labor mapped appropriately) to fulfill the responsibilities of the role. ***NOTE: The VA medical facility LGBTQ+ VCC reports to the VA medical facility Director.***

**5**

**May 23, 2018**                                                VHA DIRECTIVE 1341(3)

(a) VA medical facility LGBTQ+ VCC positions can be ancillary duty assignments, but increasingly are full-time positions in combination with delivery of LGBTQ+ Veteran direct care or serving as a LGBTQ+ Special Emphasis Program Manager for Equal Employment Opportunity. (See Distinctions Between the Roles and Responsibilities of the VA medical facility LGBTQ+ Veteran Care Coordinators and LGBTQ+ Special Emphasis Program Managers in VA Handbook 5975.5, Special Emphasis Program Management, dated December 28, 2017.) LGBTQ+ Veteran needs may vary across settings for multiple reasons. Based on data from currently serving VA medical facility LGBTQ+ VCCs, it is recommended to allocate the following minimum number of hours for the LGBTQ+ VCC role relative to VA medical facility complexity and enrollment:

<u>1.</u> For VA medical facilities with less than 25,000 Veterans enrolled, a minimum of 12 hours per week (or.30 full-time employee equivalent (FTEE)).

<u>2.</u> For VA medical facilities with 25,000 to 75,000 Veterans enrolled, a minimum of 16 hours per week (or.40 FTEE).

<u>3.</u> For VA medical facilities with over 75,000 Veterans enrolled, a minimum of 20 hours per week (or.50 FTEE).

(b) Determining, based on VA medical facility needs, whether to assign more than one VA medical facility LGBTQ+ VCC or to increase the minimum number of hours necessary for this role at the VA medical facility. Need for more than one VA medical facility LGBTQ+ VCC or creation of a full-time LGBTQ+ VCC position may be due to:

<u>1.</u> The size of the VA medical facility.

<u>2.</u> A high number of community-based outpatient clinics (CBOCs) or multiple campuses.

<u>3.</u> A high number of anticipated LGBTQ+ Veterans receiving care in the health care system.

<u>4.</u> A great distance between sites.

<u>5.</u> Minimal existing services for LGBTQ+ Veterans.

(2) Meeting with the VA medical facility LGBTQ+ VCCs at least twice annually to ensure that responsibilities are being fulfilled, ensure sufficient time is allocated to meet their responsibilities, and develop improvement plans as needed.

(3) Overseeing the VA medical facility LGBTQ+ VCCs and supporting staff, education and training to promote an affirming clinical environment.

(4) Maintaining an environment free from harassment of any kind. The LGBTQ+ Veteran Care Coordinator (VCC) is a resource for the medical facility Director in implementing corrective actions and training. ***NOTE:*** *For more information, see LGBT VCC section below.*

**6**

**May 23, 2018**                                            **VHA DIRECTIVE 1341(3)**

(5) Meeting with the LGBTQ+ VISN Lead and VA medical facility LGBTQ+ VCC at least once a year to review the strategic plan progress, as well as reviewing VA medical facility data collection progress for Veteran's sexual orientation identity and self-identified gender identity in the EHR.

(6) Ensuring the VA medical facility has the mechanisms available for staff and Veterans to bring concerns about interactions that are disrespectful, biased or discriminatory (e.g., Patient Advocate, staff member's supervisor, EEO Office, Disruptive Behavior Committee).

(7) Ensuring transgender and intersex individuals are provided all care in VA's medical benefits package, including but not limited to:  hormonal therapy, mental health care, preoperative evaluation, and medically necessary post-operative and long-term care following gender confirming surgeries to the extent that the appropriate health care professional determines that the care is needed to promote, preserve, or restore the health of the individual and is in accord with generally accepted standards of medical practice.  ***NOTE:  VA will not provide or fund gender confirming/affirming surgeries because VA regulation excludes them from the medical benefits package.  In addition, VA does not provide plastic reconstructive surgery, in accordance with the medical benefits package and VHA Directive 1091, Plastic Reconstructive Surgery, dated February 18, 2020.***

(8) Adhering to VA's values of diversity, inclusion, and commitment to increasing awareness about the health care needs of Veterans by assuring transgender and intersex Veterans receive culturally appropriate, confidential care in a welcoming environment.

(9) Addressing and referring to Veterans (even when they are not present) based on the Veteran's self-identified gender identity and preferred name, including in conversation and clinical notes, even when this is not their legal name.  Pronouns used must be consistent with the Veteran's preferences.

(10) Offering patients appropriate clinical health screens.  Birth sex, gender identity, hormone therapy, surgical status, and current treatments determine which clinical health screens are appropriate.  For example, a transgender man should receive breast and cervical cancer screening, if that anatomy is present, and a transgender woman should receive prostate cancer screening.

(11) Modifying administrative data (including name and birth sex) in the electronic health record, as specified in VHA IdM Directives 1907.09, Identity Authentication for Health Care Services, dated June 6, 2019, and VHA Directive 1906, Data Quality Requirements for Identity Management and Master Patient Index Functions, dated April 10, 2020.  Additional guidance is offered in the Identity Management Fact Sheet.  For more information see the HC IdM website: http://vaww.vhadataportal.med.va.gov/PolicyAdmin/HealthcareIdentityManagement.aspx.  ***NOTE:  This is an internal VA website that is not available to the public.***

**7**

**May 23, 2018**                                    **VHA DIRECTIVE 1341(3)**

(12) Informing Veterans about how birth sex and gender identity will be included in the patient's health record and the procedure to request a change to the record (VHA Directive 1907.01, Health Information Management and Health Records, dated April 5, 2021).  The Veteran has a right to not be identified as "transgender" or any other label, unless omitting this information would compromise medically necessary care.

(13) Room assignments and access to facilities for which gender is a consideration (for example, restrooms) in a manner which gives preference to self-identified gender, irrespective of appearance and/or surgical status.  Where there are questions related to room assignments or other concerns or conflicts about values, an ethics consultation may be requested.  ***NOTE:***  *Federal policy and law supersedes state law on Federal grounds property or in federally leased space.*

(14) Providing all health services to transgender and intersex Veterans without discrimination in a manner consistent with care and management of all Veterans.

(15) Requiring all staff, including medical and administrative staff, to treat as confidential any information about a Veteran's transgender or intersex identity or any treatment related to a Veteran's gender transition, unless relevant to medical care, consistent with VHA Directive 1605.01, Privacy and Release of Information, dated August 31, 2016.  For example, casual conversation about a Veteran's identity is inappropriate.

h. **VA Medical Facility Chief of Staff or Associate Director for Patient Care Services.** The VA medical facility CoS or Associate Director for Patient Care Services (ADPCS) is responsible for:

(1) Ensuring clinically appropriate, comprehensive, Veteran-centered care is provided with respect and dignity to all Veterans in an affirming environment, regardless of their gender identity or gender expression.

(2) Monitoring completion rates of the sexual orientation and gender identity data fields in the EHR by staff and clinicians to ensure that this information is available on all Veterans.

(3) Ensuring all staff members, including medical and administrative staff, treat as confidential any information about a Veteran's gender identity.

(4) Ensuring VA health care providers ask Veterans about their gender identity, discuss with the Veteran how information about gender identity will be included in the Veteran's EHR and populate the gender identity field. ***NOTE:*** *VA will comply with the Veteran's decision not to be identified as "transgender" or another label as long as the omission of this information does not compromise medically necessary care.*

(5) Educating Veterans about the need for open communication with VA health care providers about gender identity as part of routine care that is delivered with respect and without judgment or bias.

**8**

**May 23, 2018**                                    **VHA DIRECTIVE 1341(3)**

   i. **VA Medical Facility LGBTQ+ Veteran Care Coordinator.** *NOTE: The VA medical facility LGBTQ+ VCC coordinator is appointed by and reports to the VA medical facility Director and coordinates activities with the LGBTQ+ VISN Lead. The VA medical facility LGBTQ+ VCC plays a critical role in ensuring culturally competent, Veteran-centered and effective care for LGBTQ+ Veterans because LGBTQ+ Veterans are seen at every VA medical facility. See Appendix B for additional guidance for LGBTQ+ VCCs. NOTE: See Appendix B for additional guidance for LGBTQ+ VCCs.* The LGBTQ+ VCC is responsible for:

   (1) Supporting the implementation of national policies related to LGBTQ+ Veteran health at the VA medical facility to ensure consistent access to culturally competent care for LGBTQ+ Veterans.

   (2) Investigating and recommending corrective action upon awareness of an issue and, as appropriate, offering recommendations to the VA medical facility Director for further action to assist the VA medical facility in educating staff and creating an affirming environment (for example, providing education to staff about treatment of Veterans based upon their self-identified gender identity and assuring facilities are inclusive and welcoming).

   (3) Communicating with individual facility services (for example, prosthetics, endocrinology, social work, etc.) to provide tailored guidance and education as needed. This includes working with the clerical staff who may need training in asking about birth sex and self-identified gender identity in a respectful manner, and/or working with local Master Veteran Index coordinators (typically the Privacy Officer) for Veterans making changes to name and/or birth sex fields in the record system.

   (4) Serving as a point-person, source of information, Veteran advocate and problem-solver for LGBTQ+ Veteran-related health care issues at the VA medical facility.

   (5) Identifying the needs of LGBTQ+ Veterans within the VA medical facility (e.g., town hall meetings, needs assessment) and assisting the VA medical facility in developing needed care.

   (6) Serving as a liaison with external LGBTQ+ community organizations.

   (7) Developing relationships with internal VA medical facility stakeholders, such as primary care, mental health, women's health, police, eligibility and enrollment.

   (8) Ensuring coverage of VA medical facility LGBTQ+ VCC duties during absences and coordinating with the VA medical facility Director to determine a backfill when needed.

   (9) Communicating to the public via outreach measures, for example, sustainment of a dedicated website for the VA medical facility's LGBTQ+ Veteran care resources.

   (10) Participating in community events such as Veteran outreach activities, Transgender Day of Remembrance and LGBTQ+ Pride events.

**9**

**May 23, 2018**                                    **VHA DIRECTIVE 1341(3)**

(11) Promoting an affirming environment for LGBTQ+ Veterans (e.g., VA medical facility LGBTQ+ resource webpage, advisory council, LGBTQ+ awareness posters, Pride events) that directly counteracts any potential expectations of discrimination. These activities occur in coordination with the VA medical facility's Public Affairs Office.

(12) Conducting LGBTQ+-specific monitoring and reporting in their VA medical facility and related CBOCs, including strategic planning.

(13) Serving as the primary designee of the VA medical facility Director for monitoring and reporting on LGBTQ+ Veterans in the catchment area.

(14) Participating in strategic planning processes and responding to the annual national survey of VA medical facility LGBTQ+ VCC activities.

(15) Ensuring LGBTQ+ VCC contact information on the VA medical facility LGBTQ+ website is accurate and current.

(16) Creating local educational materials (e.g., fliers and brochures) and confirming the accuracy of information on the national LGBTQ+ VCC directory.

(17) Meeting with the VA medical facility Director at least twice a year to ensure that responsibilities are being fulfilled and developing improvement plans as needed.

(18) Meeting with the LGBTQ+ VISN Lead and VA medical facility Director once a year to review the strategic plan progress, as well as review VA medical facility data collection progress for Veteran's sexual orientation identity and gender identity in the EHR.

(19) Communicating at least once a month with the LGBTQ+ VISN Lead to ensure quality improvement within the VA medical facility through existing formal quality improvement projects or through informal changes in VA medical facility processes, including but not limited to the annual survey of LGBTQ+ VCCs.

(20) Communicating to the VA medical facility Director if insufficient time has been allocated to ensure the responsibilities of the VA medical facility LGBTQ+ VCC are fulfilled. ***NOTE:** For more information on time allocation, see paragraph 2.f.(1)(a) and (b).*

## 6. TRAINING

Recommended staff training on transgender and intersex health and other educational and clinical resources may be accessed through the LGBTQ+ Health Resources SharePoint https://dvagov.sharepoint.com/sites/vhava-lgbt-resources, which includes direct links to the Talent Management System (TMS) trainings. ***NOTE:** This is an internal VA website that is not available to the public.* These trainings cover general information for non-clinical staff and brief, topic-focused modules for clinicians.

**May 23, 2018**                                                    **VHA DIRECTIVE 1341(3)**

## 7. RECORDS MANAGEMENT

All records regardless of medium (paper, electronic, electronic systems) created by this directive shall be managed as required by the National Archives and Records Administration (NARA) approved records schedules found in VHA Records Control Schedule 10-1. Questions regarding any aspect of records management should be addressed to the appropriate Records Officer.

## 8. REFERENCES

a. 38 U.S.C. § 7301(b).

b. 38 C.F.R. § 17.38.

c. VHA Directive 0999, VHA Policy Management, dated March 21, 2022.

d. VHA Directive 1906, Data Quality Requirements for Identity Management and Master Veteran Index Functions, dated April 10, 2020.

e. VHA Directive 1907.09, Identity Authentication for Health Care Services, dated June 6, 2019.

f. VHA Directive 1605.01, Privacy and Release of Information, dated August 31, 2016.

g. VHA Directive1310, Medical Management of Enrolled Veterans Receiving Self-Directed Care from External Health Care Providers, dated October 4, 2021.

h. VHA Directive 1907.01, Health Information Management and Health Records, dated April 5, 2021.

i. VHA Handbook 1004.01, Informed Consent for Clinical Treatments and Procedures, dated August 14, 2009.

j. Identity Management Fact Sheet, VHA Office of Informatics and Information Governance Data Quality, Healthcare Identity Management (HC IdM), available at: http://vaww.vhadataportal.med.va.gov/PolicyAdmin/HealthcareIdentityManagement.aspx.

k. Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5), American Psychiatric Association (2013).

**11**

**May 23, 2018**                                            **VHA DIRECTIVE 1341(3)**
                                                              **APPENDIX A**

## FREQUENTLY ASKED QUESTIONS (FAQ) REGARDING THE PROVISION OF HEALTH CARE FOR TRANSGENDER AND INTERSEX VETERANS

**1. How can a Department of Veterans Affairs (VA) employee know a Veteran's gender identity?**

VA record systems now have both a "birth sex" field and a "self-identified gender identity" (SIGI) field.  Birth sex is used for determining sex-based medical health screenings, and SIGI is used for addressing the Veteran based upon the Veteran's self-identified gender identity.  For information about how to ask about birth sex and SIGI, see:  https://dvagov.sharepoint.com/sites/vhava-lgbt-resources/HealthCareTopics/SitePages/SIGI.aspx.  **NOTE:** *This is an internal VA website that is not available to the public.*

**2. Is being transgender the same as being "gay", "lesbian", or "bisexual"?**

No.  Being transgender is not the same as being gay, lesbian, or bisexual.  The term "transgender" refers to gender identity or the sense of oneself as a man, woman, or something else (for example, gender non-conforming).  Gay, lesbian, and bisexual refer to sexual orientation identities.  Sexual orientation identities are the terms one uses to describe sexual and romantic attractions.  Transgender people, like all people, can identify with any sexual or romantic identity.  A transgender Veteran may identify as heterosexual ("straight"), gay, lesbian, bisexual, queer, pansexual, asexual, etc.  Knowing someone's gender identity gives you no information about their sexual orientation.  The best practice is to ask Veterans how they identify and use those terms.  For more information about sexual orientation terms and uses, see the Glossary on the LGB SharePoint:  http://vaww.infoshare.va.gov/sites/LGBEducation/GLOSSARY(sharepoint.com)sitefiles/LGBT%20Veteran%20Health%20glossary.pdf.  **NOTE:** *This is an internal VA Web site that is not available to the public.*

**3. Do all intersex individuals identify as transgender?**

No.  For example, an individual may be assigned a "female" birth sex and identify as female throughout her lifetime, with or without knowing about her intersex condition.  Some intersex persons with male chromosomes, who have been assigned "female" sex at birth, may experience gender dysphoria even without knowing that they were "reassigned" at, or near, birth.  Knowing someone has an intersex condition gives you no information about their gender identity or sexual orientation.

**4. I have heard the term transsexual - what does that term mean?**

Transsexual is an older term that refers to a subset of transgender individuals who often take steps to socially or medically transition to their preferred gender.  Transgender women are sometimes referred to as male-to-female transsexuals.  Transgender men are sometimes referred to as female-to-male transsexuals.  In

**A-1**

**May 23, 2018**                                            **VHA DIRECTIVE 1341(3)**
**APPENDIX A**

general, it is best practice to use the term that the Veteran uses to refer to themselves as a way to be respectful.

**5. Where can we refer transgender Veterans?**

It is always the preference for Veterans to be treated at their nearest VA facility when they are eligible for care, since that is less expensive and more culturally appropriate. Transgender and intersex Veterans are no different. Since 2011, all VA facilities are required to either provide care or pay for care in the local community for enrolled Veterans who identify as transgender. Treatment plans are individualized and based upon the Veteran's unique treatment goals and circumstances. The local LGBTQ+ Veteran Care Coordinator can assist in identifying training resources for providers to treat transgender or intersex Veterans.

**6. What is the correct pronoun to use when speaking with a transgender Veteran or documenting the clinical encounter in a progress note?**

You should always address and refer to a transgender Veteran by the Veteran's preferred name and self-identified gender. This is true in conversation and in documentation in the medical record, irrespective of the Veteran's appearance. Official documents are not needed (for example, legal name change or changed birth certificate) nor are surgical or medical interventions required for Veterans to be identified by their preferred gender or name. For more information about how to ask about birth sex and self-identified gender identity (SIGI), see: https://dvagov.sharepoint.com/sites/vhava-lgbt-resources/HealthCareTopics/SitePages/SIGI.aspx. **NOTE:** *This is an internal VA website that is not available to the public.*

**7. Are transgender Veterans allowed to use public accommodations of their choice?**

Yes. VA policies on access to facilities (for example, bathrooms, locker rooms, or room assignments) apply to all VA facilities across the country, regardless of local or state laws or regulations regarding use of facilities based on birth sex. To ensure the safety and respect of Veterans in cities and states with policies restricting access to bathrooms, locker rooms, etc., extra education, signage, and safety precautions could be needed to guarantee the safety of transgender people using the facilities of their choosing.

**8. Are transgender Veterans allowed to use the bathroom of their choice?**

Yes. Transgender Veterans who self-identify as women are allowed to use bathrooms for women. Likewise, those who self-identify as men are allowed to use bathrooms for men. This is irrespective of the Veteran's appearance or whether the Veteran has had surgical interventions. Some transgender people may prefer to use single stall bathrooms, typically labeled "unisex," or something similar. If a transgender person requests a single stall bathroom, they should be directed accordingly, though

**A-2**

**May 23, 2018**                                    **VHA DIRECTIVE 1341(3)**
                                                              **APPENDIX A**

they remain welcome to use any and all facilities that correspond to their self-identified gender identity.

**9. What about room assignments, including shared rooms?**

Room assignments are made in accordance with the Veteran's self-identified gender, irrespective of the Veteran's appearance or whether the Veteran has had surgical interventions, and in consideration of the needs of other Veterans. Privacy and confidentiality dictate that staff may not share any information about one Veteran with another Veteran without express permission. If a room assignment leads to distress for either Veteran, then efforts need to be made to move the distressed Veteran to a different semi-private room. If both Veterans are distressed, staff should use current policies about resolving roommate disputes to determine if/when and how a room change should happen. ***NOTE:*** *Ethics consultations are encouraged when concerns arise related to the provision of respectful care for transgender and intersex Veterans and other Veterans.*

**10. What is sex reassignment surgery?**

Sex reassignment surgery is an older term for gender confirming/affirming surgeries or procedures.

**11. Will VA provide gender confirming/affirming surgeries or plastic reconstructive surgery if needed?**

VA does not provide gender confirming/affirming surgeries in VA facilities or through non-VA care. In addition, VA does not provide plastic reconstructive surgery for strictly cosmetic purposes in VA facilities or through non-VA care. However, transgender Veterans cannot be denied access to surgical interventions that are medically indicated for other medical conditions simply because the procedure is also consistent with transition goals. ***NOTE:*** *Some transgender Veterans may elect to have one or more medical or surgical procedures over their lifetime to bring their bodies into a closer alignment with their experienced gender. Only a minority of transgender Veterans will undergo gender confirming/affirming surgeries outside VA. Some Veterans receiving care at a VA medical facility may have had gender confirming/affirming surgeries somewhere else. VA does provide health care to pre- and post-operative transgender Veterans, including treatment of surgical complications.*

**12. How do pre-operative medical and mental health evaluations differ for transgender Veterans?**

VA provides pre-operative medical and mental health evaluations for Veterans who receive surgeries outside VA. Medical evaluation prior to any surgery includes pre-operative cardiac risk assessment and careful evaluation of current medications, including hormone dosing. Providers may recommend that Veterans on hormone therapy taper off prior to surgery to reduce risks and reinitiate hormone treatment post-surgery.

**A-3**

**13. Will VA provide feminizing or masculinizing hormone therapy?**

Yes, if it is consistent with the Veteran's wishes, the treatment team's clinical recommendations, and VA treatment guidance.

**14. What guidance is available to clinicians regarding hormone therapy?**

VA Pharmacy Benefits Management Services has developed guidance for the use of hormone therapy in transgender and intersex Veterans in VA.  This guidance is located at:  https://dvagov.sharepoint.com/sites/vhava-lgbt-resources/HealthCareTopics/Transgender%20Care/Forms/AllItems.aspx?id=%2Fsites%2Fvhava%2Dlgbt%2Dresources%2FHealthCareTopics%2FTransgender%20Care%2FCFU%20PBM%20Guidelines%2FCFU%20Masculinizing%20Hormone%20Therapy%20%28Testosterone%29%20Transgender%20%26%20Gender%20Diverse%20Patients%20%20%28Rev%20Apr%202021%29%5F508%2Epdf&parent=%2Fsites%2Fvhava%2Dlgbt%2Dresources%2FHealthCareTopics%2FTransgender%20Care%2FCFU%20PBM%20Guidelines and https://dvagov.sharepoint.com/sites/vhava-lgbt-resources/HealthCareTopics/Transgender%20Care/Forms/AllItems.aspx?id=%2Fsites%2Fvhava%2Dlgbt%2Dresources%2FHealthCareTopics%2FTransgender%20Care%2FCFU%20PBM%20Guidelines%2FCFU%20Feminizing%20Hormone%20Therapy%20%28Estrogens%29%20for%20Transgender%20%26%20Gender%20Diverse%20Patients%20%28Rev%20Apr%202021%29%5F508%2Epdf&parent=%2Fsites%2Fvhava%2Dlgbt%2Dresources%2FHealthCareTopics%2FTransgender%20Care%2FCFU%20PBM%20Guidelines.  ***NOTE:***  *This is an internal Web site and is not available to the public.*  Training in prescribing hormone therapy is available TMS courses:  VA 39646, 39647, 39648, 39649, and 39644.  ***NOTE:***  *This is an internal Web site and is not available to the public.*  This training is also available on an external Web site at*:*  https://www.train.org/vha/welcome, TRAIN course:  1066855.

**15. What is the process for informed consent for hormone therapy?**

a. For treatment plans that include hormone therapy or surgical interventions, VA clinicians should follow the requirements for informed consent as outlined in VHA Handbook 1004.01(5), Informed Consent for Clinical Treatments and Procedures, dated August 14, 2009.  This includes discussing the indication for the treatment, the risks, benefits, and limitations of the therapy with the Veteran, as well as the risks and benefits of the alternative treatments, including no treatment.  Signature consent is not required for hormone therapy; oral informed consent is sufficient.  ***NOTE:***  *Policy regarding informed consent can be found in VHA Handbook 1004.01(5).*

b. Obtaining the patient's consent for treatments and procedures promotes the Veteran's involvement in decisions about their care.  Shared decision-making combines the provider's medical knowledge and expertise with the Veteran's preferences about care.  Using shared decision-making for decisions about hormone therapy will help identify a medically appropriate treatment option that promotes the Veteran's preferences about treatment (for example, desired feminizing or masculinizing

**May 23, 2018**                                    **VHA DIRECTIVE 1341(3)**
                                                    **APPENDIX A**

outcomes) and incorporate the provider's knowledge and experience about the risks and benefits of the treatment.

**16. What are the goals of hormone therapy?  What effects and risks are associated with hormone therapy?**

   a. Hormone therapy is used to reduce or eliminate gender dysphoria and other symptoms related to the discordance between a transgender or intersex individual's gender identity and their sex assigned at birth.  The treatment produces changes in hormonally-sensitive sex characteristics (that is, reducing characteristics of the birth sex and inducing those of the opposite sex).  VA clinicians need to provide transgender and intersex Veterans with a careful evaluation prior to providing prescriptions for hormone therapy.  Not all transgender or intersex Veterans will want hormone treatment.
   b. The goal of feminizing hormone therapy is to suppress testosterone levels and introduce estrogen to achieve a pre-menopausal female hormonal range.  The effects are decreased facial and body hair, redistribution of fat, breast development, and prostate and testicular atrophy.  Risks include infertility, venous thromboembolism, liver dysfunction, hypertension, and cardiovascular disease.  As with any medical therapy, benefits and harms of treatment need individualization using principles of shared decision-making, with an emphasis upon the lowest (safest) dose to achieve benefits.  VA does not encourage the imposition of "menopausal" state in elder transgender women.  Hormone treatments should be consistent with the Veteran's treatment goals and can include feminizing hormone therapy in older transgender women.

   c. In cases when anti-androgens and/or doses of estrogens cannot be tolerated by the patient, are ineffective, or if the Veteran would be at increased risk for adverse effects, such as cardiovascular or other thrombotic events, and when an appropriate medical provider has determined that there are no other standard medical options for hormone management, surgical orchiectomy is an acceptable treatment recommendation.  In these select Veterans, orchiectomy can be considered medically necessary as part of their hormone management, and not gender confirming/affirming surgery.  Decisions about the appropriate use of orchiectomy should be made on a case-by-case basis as determined by the treatment team, and should include a medical provider who has expertise in the management of hormone therapy.  ***NOTE:*** *Transgender E-consultations and/or ethics consultations are available for case-specific consultation.*

   d. The goal of masculinizing hormone therapy is to maintain testosterone and estrogen levels in the typical male range, generally through testosterone supplementation and sometimes in combination with a Gonadotropin Releasing Hormone (GnRH) agonist or progestins to suppress menses.  The effects are increased facial and body hair and muscle, acne, permanent deepening of the voice, cessation of the menses, redistribution of fat mass, and clitoral enlargement.  Risks include hypertension, erythrocytosis, liver dysfunction, lipid changes, weight gain, and sodium retention.

**17. Can hormone therapy cause infertility?**

**A-5**

**May 23, 2018**                                           **VHA DIRECTIVE 1341(3)**
                                                                        **APPENDIX A**

Yes.  This should be discussed with the prescribing provider as a part of medical decision making.  Transgender and intersex Veterans are eligible for the same fertility preservation services as other Veterans about to undergo treatment that can alter fertility.  For more information about VA's coverage of fertility services, please see: https://vaww.infoshare.va.gov/sites/LGBEducation/Pages/FAQ.aspx.  *NOTE:  This is an internal Web site and is not available to the public.*

**18. Are there specific diagnostic criteria to consider in prescribing hormone therapy?**

A diagnosis is required to prescribe medications.  A DSM-5 diagnosis of Gender Dysphoria or other gender dysphoria condition should be the basis for prescription for hormone therapy for transgender Veterans.  There may be clinical exceptions to the diagnosis for prescribing hormone therapy (for example, transgender individuals diagnosed as having "Other Specified Gender Dysphoria" who are post-transition and still require medications).  *NOTE:  Gender Identity Disorder (GID) is an outdated diagnosis from DSM-IV that described a conflict between a person's birth sex and the gender with which the person identifies.  With regard to encounter codes, the term GID may be listed if Gender Dysphoria is not available.*

**19. Transgender and intersex Veterans are presenting to VA providers with prescriptions for hormones from outside sources, such as from another provider, the Internet, or illicit sources.  Should we stop these medications while we do a full evaluation or should a VA provider rewrite the prescriptions so they can be filled in a VA pharmacy and continued?**

Under VHA Directive 1310(1), Medical Management of Enrolled Veterans Receiving Self-Directed Care form External Health Care Providers, October 4, 2021, VA providers are not permitted to simply rewrite prescriptions from an outside provider, unless the VA provider has first made a professional assessment that the prescribed medication is medically appropriate.  *NOTE:  It may be appropriate for a VA provider to provide temporary prescriptions based on each Veteran's unique situation and a weighing of risks/benefits in order to avoid negative physical and psychiatric consequences while a VA evaluation is in progress.*

**20. What evaluation is necessary prior to initiation of hormone therapy?**

Because the provision of hormone therapy in transgender Veterans is designed to treat the gender incongruence and dysphoria, a diagnosis must be established before hormone therapy can begin.  A mental health professional generally establishes a Gender Dysphoria diagnosis prior to provision of hormone therapy.  Additionally, the provider who prescribes the hormone therapy must obtain informed consent for that treatment, as described in FAQ #15.  The presence of other psychiatric and physical conditions is not necessarily a barrier to initiating treatment.  Treatment for comorbid conditions can be recommended in the evaluation, but cannot create a barrier to access for hormone treatment, except where medically contraindicated.  For Veterans who enter VA with well documented hormone therapy from outside clinicians, the diagnosis

**A-6**

**May 23, 2018**                                    **VHA DIRECTIVE 1341(3)**
                                                    **APPENDIX A**

of Gender Dysphoria is still required, and should be confirmed.  In such cases, a mental health evaluation may help to both confirm the diagnosis and address other potential mental health needs of the Veteran.

### 21. How do we handle preventive screening requirements?

In addition to treatments related to their new gender identity, transgender Veterans need appropriate medical screening and/or treatment specific to their birth sex.  Clinical reminders are cued to birth sex.  Important screening reminders include prostate exams and mammograms for transgender women and vaginal exams and mammograms for transgender men, as indicated.  Some transgender Veterans will change the birth sex in their records.  For these Veterans, their clinical reminders will not be cued to their natal sex but to the sex listed in the birth sex field.  Providers and Veterans will need to remember to do preventive screens as needed.

### 22.  Is hair removal (electrolysis/laser hair removal) covered by the VA for transgender Veterans?

Permanent hair removal can be medically necessary, such as for pre-surgical hair removal for genital surgery. VA provides pre-operative and long term post-operative care for gender affirming surgeries.  For non-cosmetic medically necessary hair removal, laser hair removal is appropriate to prevent major complications following genital surgery. For Veterans who are not candidates for laser hair removal due to hair color (white/gray/ blonde), electrolysis may be provided.  Currently, each VA decides if hair removal is indicated on a case-by-case basis after an evaluation of medical necessity. Some VA facilities have the equipment to perform laser hair removal and/or electrolysis, while others will need to access community care when this procedure is medically indicated.

### 23. Will VA provide medically necessary prosthetics (e.g., wigs, chest binders, dilators, etc.) to eligible transgender and intersex Veterans?

Yes.  For more information on prosthetics, see the Prosthetic & Sensory Aids Service Policy SharePoint at https://vaww.infoshare.va.gov/sites/prosthetics/Policy%20Questions/Forms/Answer.aspx.  *NOTE:  This is a VA internal Web site that is not available to the public.*

### 24. Will VA provide medically necessary vocal coaching to transgender and intersex Veterans?

Yes. VA speech pathologists can offer this care, or if this service is not available at your facility, it can be offered through non-VA community-based care.

**A-7**

**May 23, 2018**                                                    **VHA DIRECTIVE 1341(3)**
                                                                    **APPENDIX A**

### 25. Can a transgender Veteran request a change of birth sex in Computerized Patient Record System (CPRS) before having gender confirming/affirming surgery?

Yes.  Surgery is not a prerequisite for amendment of birth sex in the Veteran's record.  Amending the birth sex of the Veteran in CPRS is based on the Veteran making a written amendment request to the facility's Master Veteran Index Coordinator (often the Privacy Officer).  The request must be accompanied by official documentation as described in the Identity Management Fact Sheet, dated November 2016.  However, self-identified gender identity can be changed without documentation by the Veteran or by any VA staff who routinely update demographic data.  Changing birth sex will result in loss of information for preventive health screenings, and may complicate medication dosing and medical reports.

### 26. Do I need to become an expert in treating transgender Veterans?

No, but all clinicians and staff who provide clinical services to transgender Veterans need to be knowledgeable about transgender health issues.  Providers are encouraged to consult with specialists on any aspect of care for which they need advice or for ongoing management, as they would for any other Veteran.  Everyone needs to be aware that transgender Veterans deserve to receive health care at VA and need to be treated with dignity and respect.

### 27. What education is available to VA staff?

Cultural awareness and sensitivity education, as well as clinical trainings, are available and can be found on the Transgender SharePoint: http://go.va.gov/Transgender.  ***NOTE:*** *This is an internal VA website that is not available to the public.*  For local trainings, the LGBTQ+ Veteran Care Coordinator will have access to the most current information.

### 28. What do I do if I become aware of possible discrimination or harassment of a transgender Veteran?

VA is founded on respect of Veterans and does not tolerate discrimination or harassment.  To report concerns, you may work with the LGBTQ+ Veteran Care Coordinator, your supervisor, and/or the patient advocates.  The VA Medical Facility Director is responsible for implementing corrective actions and training.

### 29. As a VA staff member, where can I find good resources on transgender care?

There are VA and non-VA resources that can be helpful.  A good repository for this information is https://dvagov.sharepoint.com/sites/vhava-lgbt-resources/HealthCareTopics/SitePages/Transgender-%26-Gender-Diverse-Resources.aspx.  You may also wish to consult with your local LGBTQ+ Veteran Care Coordinator about training.  ***NOTE:*** *This is an internal VA website that is not available to the public.*

**A-8**

**30. Who typically serves as LGBTQ+ VISN Leads and Veteran Care Coordinators?**

a. VA employees who serve in LGBTQ+ VISN Lead positions are familiar with LGBTQ+ Veteran health issues, best clinical practices, VA medical facility clinical operations and VHA policies and are motivated to improve care for LGBTQ+ Veterans in the VISN. LGBTQ+ VISN Leads are most effective when they meet regularly with VISN Leadership and VA medical facility LGBTQ+ VCCs as detailed in this directive. A clinical background can be an advantage to advise VA medical facility LGBTQ+ VCCs and resolve issues involving gaps or conflicts in clinical processes.

b. VA employees who serve as VA medical facility LGBTQ+ VCCs are knowledgeable about their local community and the availability of LGBTQ+ services there. Effective VA medical facility LGBTQ+ VCCs are excellent advocates for Veterans and teachers who are able to tailor educational or training content for different clinical and non-clinical learners.

**31. How have VA medical facilities staffed LGBTQ+ VCC positions to provide appropriate coverage?**

This directive offers guidance for the minimum allocated time for VA medical facility LGBTQ+ VCCs based on the size of the VA medical facility. Other factors, such as the number of campuses, community-based outpatient clinics (CBOCs) and size of the LGBTQ+ Veteran population also influence the amount of time provided for this role. See paragraphs 5.g. in the body of the directive. Many VA medical facilities have provided larger amounts of allocated time to their LGBTQ+ VCC. Some VA medical facilities have established a full-time LGBTQ+ VCC position or multiple part-time LGBTQ+ VCCs. Having more than one LGBTQ+ VCC and having VCCs located in CBOCs may be especially advantageous for coverage of very large VA medical facilities or VA medical facilities with multiple campuses. Multiple VCCs can be helpful for engaging CBOCs, as well as providing coverage during leave.

**May 23, 2018**                                    **VHA DIRECTIVE 1341(3)**
                                                              **APPENDIX B**

### ADDITIONAL GUIDANCE FOR LGBTQ+ VETERAN CARE COORDINATORS

**1.** The Lesbian, Gay, Bisexual, Transgender and Queer (LGBTQ+) Veteran Care Coordinator (VCC) program was established in 2016 to ensure that culturally competent LGBTQ+ clinical services are provided at Department of Veterans Affairs (VA) medical facilities consistent with Veterans Health Administration (VHA) policies and priorities. Research shows that LGBTQ+ Veterans expect to experience discrimination in VA medical facilities which may impair their engagement in care. Research also shows that LGBTQ+ Veterans as a group experience higher rates of several health conditions compared to non-LGBTQ+ Veterans including suicidal ideation and attempts. The elevated risk for health inequities is attributed to the psychosocial stressors inherent in belonging to a minority group. Therefore, additional efforts to reduce minority stress and engage this vulnerable population are necessary to provide equitable health care for LGBTQ+ Veterans. See https://doi.apa.org/doiLanding?doi=10.1037%2Fa0034826 for additional information. ***NOTE: This website is outside VA control and may not conform to Section 508 of the Rehabilitation Act of 1973.***

**2.** The LGBTQ+ Health Program in collaboration with LGBTQ+ Veterans Integrated Service Network (VISN) Leads, LGBTQ+ Veteran Care Coordinators (VCC), and Network leadership strongly recommend that LGBTQ+ VCCs follow guidance under four priority areas listed below.  LGBTQ+ VCCs are encouraged to complete at least three activities listed for each priority area. Furthermore, LGBTQ+ VCCs are encouraged to participate in additional activities specific to the needs of the VA medical facility.

   a. **Create a safe and affirming environment throughout the VA medical facility.**

   (1) Place LGBTQ+ VCC program materials throughout the facility (e.g., LGBTQ+ posters, handouts, fact sheets), including main campuses and community clinics.

   (2) Make outreach information available at VA medical facilities to inform LGBTQ+ Veterans of LGBTQ+ specific services, role, and contact information of the LGBTQ+ VCC.

   (3) Display or distribute LGBTQ+ safety signals (e.g., pins, lanyards) to raise awareness and denote spaces where staff are trained in affirming practices. Decisions to display safety signals, and which signals, are made by VA medical facility leadership.

   (4) Connect Veterans to LGBTQ+-focused programing.

   (5) Collaborate with the Patient Experience Officer, Patient Advocate, Equal Employment Office (including Inclusion, Diversity, Equity, and Access (I-DEA) initiatives), and VA medical facility leadership in responding to compliments, complaints, inquiries, and recommendations from various stakeholders, including staff, patients, caregivers, congressional inquiries, White House Hotline, and others about LGBTQ+ care at the VA medical facility.

**B-1**

(6) Promote collection of preferred name, pronouns, sexual orientation and gender identity patient data in the electronic health record (EHR).

(7) Support the VA medical facility's completion of the Healthcare Equality Index survey.

b. **Build a network of stakeholders, including building allies and partners within the VA medical facility, the community, and the Veterans Integrated Services Network.**

(1) Maintain current contact information for LGBTQ+ VCCs on the VA medical facility website and LGBTQ+ Resource SharePoint, https://dvagov.sharepoint.com/sites/vhava-lgbt-resources. ***NOTE:*** *This is an internal VA website that is not available to the public.*

(2) During the VA medical facility LGBTQ+ VCC's regular tour of duty, hold at least one joint event annually (e.g., training, outreach events, town halls) with the Equal Employment Office or other VHA programs (e.g., Mental Health, Women Veterans Health, Suicide Prevention, Intimate Partner Violence Assistance Program, Healthcare for Homeless Veterans, M2VA Post 9/11 Military to VA Care Management).

(3) During the VA medical facility LGBTQ+ VCC's regular tour of duty, attend at least one external LGBTQ+ community event annually to foster collaborative relationships.

(4) Meet at least annually with VA medical facility leadership to review the VA medical facility's LGBTQ+ VCC Program strategic plan and facilitate communication about achievements and ongoing needs for LGBTQ+ Veterans at the VA medical facility.

(5) Participate in national LGBTQ+ Health Program and LGBTQ+ VISN calls to maintain awareness of program updates and resources.

c. **Knowledge of LGBTQ+ services and identification of VA medical facility gaps in care.**

(1) Know what LGBTQ+ Veteran services are provided by VHA and what services are available at the VA medical facility. VA medical facility LGBTQ+ VCCs will participate in orientation to develop this foundational knowledge.

(2) Identify gaps in local services and take steps to resolve as appropriate with VA medical facility leadership and relevant stakeholders.

(3) Establish a process to address LGBTQ+ Veteran concerns about services, VHA policies, and processes.

d. **Educate and train staff to reduce barriers to LGBTQ+ Veteran care to improve access to and quality of care at the VA medical facility.**

**July 6, 2017**                                            **VHA DIRECTIVE 1341(3)**
                                                                    **APPENDIX B**

   (1) Provide LGBTQ+ trainings to staff and VA health care providers at least annually. Develop a plan with VA medical facility leadership regarding when and where trainings are needed (e.g., new employee orientation, clinic meetings, in response to complaints). Examples of training content include the need for and how to collect preferred name, pronouns, sexual orientation and gender identity data in the EHR and ways to provide affirming health care and service to LGBTQ+ Veterans. Trainings can be accessed through the LGBTQ+ Health Resource SharePoint: https://dvagov.sharepoint.com/sites/vhava-lgbt-resources. ***NOTE:*** *This is an internal VA website that is not available to the public.*

   (2) Disseminate information (e.g., emails, VA medical facility newsletters, posters, brochures, announcements in meetings) to staff and VA health care providers about LGBTQ+ Veteran health trainings, resources, services, and events.

**B-3**

**Department of Veterans Affairs**
**Veterans Health Administration**
**Washington, DC  20420**

<div style="border:1px solid red; color:red">Revised
January 19, 2017</div>

**VHA DIRECTIVE 2013-003**

**February 8, 2013**

## PROVIDING HEALTH CARE FOR TRANSGENDER AND INTERSEX VETERANS

**1. PURPOSE:**  This Veterans Health Administration (VHA) Directive establishes policy regarding the respectful delivery of health care to transgender and intersex Veterans who are enrolled in the Department of Veterans Affairs (VA) health care system or are otherwise eligible for VA care.

**2. BACKGROUND:**  In accordance with the medical benefits package (title 38 Code of Federal Regulations (CFR) section 17.38), VA provides care and treatment to Veterans that is compatible with generally accepted standards of medical practice and determined by appropriate health care professionals to promote, preserve, or restore the health of the individual.

   a.  VA provides health care for transgender patients, including those who present at various points on their transition from one gender to the next.  This applies to all Veterans who are enrolled in VA's health care system or are otherwise eligible for VA care, including those who have had sex reassignment surgery outside of VHA, those who might be considering such surgical intervention, and those who do not wish to undergo sex reassignment surgery but self-identify as transgender.  Intersex individuals may or may not have interest in changing gender or in acting in ways that are discordant with their assigned gender.

   b.  VA does not provide sex reassignment surgery or plastic reconstructive surgery for strictly cosmetic purposes.

   c.  **<u>Definitions</u>**

   (1)  **Sex.**  Sex refers to the classification of individuals as female or male on the basis of their reproductive organs and functions.

   (2)  **Gender.**  Gender refers to the behavioral, cultural, or psychological traits that a society associates with male and female sex.

   (3)  **Transgender.**  Transgender is a term used to describe people whose gender identity (sense of themselves as male or female) or gender expression differs from that usually associated with their sex assigned at birth.

   (a)  <u>Transsexual (Male-to-Female).</u>  Male-to-female (MtF) transsexuals are a subset of transgender individuals who are male sex at birth but self-identify as female and often take steps to socially or medically transition to female, including feminizing hormone therapy, electrolysis, and surgeries  (e.g., vaginoplasty, breast augmentation).

**THIS VHA DIRECTIVE EXPIRES FEBRUARY 28, 2018**



(b) <u>Transsexual (Female-to-Male).</u>  Female-to-male (FtM) transsexuals are a subset of transgender individuals who are female sex at birth but self-identify as male and often take steps to socially or medically transition to male, including masculinizing hormone therapy and surgeries (e.g., phalloplasty, mastectomy).

(4) **Sex reassignment surgery.**  Sex reassignment surgery includes any of a variety of surgical procedures (including vaginoplasty and breast augmentation in MtF transsexuals and mastectomy and phalloplasty in FtM transsexuals) done simultaneously or sequentially with the explicit goal of transitioning from one sex to another.  This term includes surgical revision of a previous sex reassignment surgery for cosmetic purposes.  *NOTE: This term does not apply to non-surgical therapy (e.g., hormone therapy, mental health care, etc.) or intersex Veterans in need of surgery to correct inborn conditions related to reproductive or sexual anatomy or to correct a functional defect.*

(5) **Gender Identity Disorder (GID).**  GID is a conflict between a person's physical sex and the gender with which the person identifies.

(6) **Intersex.**  Intersex individuals are born with reproductive or sexual anatomy and/or chromosome pattern that do not seem to fit typical definitions of male or female.  People with intersex conditions are often assigned male or female gender by others at birth (e.g., parents), although the individual may or may not later identify with the assigned gender.

**3.  POLICY:**  It is VHA policy that medically necessary care is provided to enrolled or otherwise eligible intersex and transgender Veterans, including hormonal therapy, mental health care, preoperative evaluation, and medically necessary post-operative and long-term care following sex reassignment surgery.  Sex reassignment surgery cannot be performed or funded by VA.

**4.  ACTION**

a.  <u>**Veterans Integrated Service Network (VISN) Director.**</u>  Each VISN Director must ensure that necessary and appropriate health care is provided to all enrolled or otherwise eligible Veterans based on the Veteran's self-identified gender, regardless of sex or sex reassignment status.

b.  <u>**Medical Facility Director, Chief of Staff,  and Associate Director for Patient Care Services or Nurse Executive.**</u>  The medical facility Director, Chief of Staff, and Associate Director for Patient Care Services or Nurse Executive are responsible for ensuring:

(1)  Transgender patients and intersex individuals are provided all care included in VA's medical benefits package including but not limited to:  hormonal therapy, mental health care, preoperative evaluation, and medically necessary post-operative and long-term care following sex reassignment surgery to the extent that the appropriate health care professional determines that the care is needed to promote, preserve or restore the health of the individual and is in accord with generally-accepted standards of medical practice.

(a)  Patients will be addressed and referred to based on their self-identified gender.  Room assignments and access to any facilities for which gender is normally a consideration (e.g., restrooms) will give preference to the self-identified gender, irrespective of appearance and/or surgical history, in a manner that respects the privacy needs of transgender and non-transgender patients alike.  Where there are questions or concerns related to room assignments, an ethics consultation may be requested.

(b)  The documented sex in the Computerized Patient Record System (CPRS) needs to be consistent with the patient's self-identified gender.  In order to modify administrative data (e.g., name and sex) in CPRS, patients must provide official documentation as per VHA guidance and policy on <u>Identity Authentication for Health Care Services</u> and <u>Data Quality Requirements for Identity Management and Master Patient Index Functions</u>.

(c)  Sex reassignment surgery as defined in subparagraph 2c(4), will not be provided or funded.

(d)  Non-surgical, supportive care for complications of sex-reassignment surgery must be provided.  For example, a MtF patient over the age of 50 may be offered breast cancer screening and may wish to discuss the benefits and harms of prostate cancer screening with her provider. A FtM transsexual patient may be offered screening for breast and cervical cancer.

(e) A diagnosis of GID, or other gender dysphoria diagnoses, is not a pre-condition for receiving care consistent with the Veteran's self-identified gender.

(2)  All other health services are provided to transgender Veterans without discrimination in a manner consistent with care and management of all Veteran patients.

(3)  All staff, including medical and administrative staff, are required to treat as confidential any information about a patient's transgender status or any treatment related to a patient's gender transition, unless the patient has given permission to share this information.

(4)  VA Mandates diversity awareness and maintains a zero-tolerance standard for harassment of any kind.

**5.  REFERENCES**

Title 38 CFR § 17.38 (c).

**6.  FOLLOW-UP RESPONSIBILITY:**  The Office of Patient Care Services (10P4) is responsible for the contents of this Directive.  Questions related to medical care may be referred to the Lesbian, Gay, Bisexual and Transgender (LGBT) Program (10P4Y) by Email at VALGBTPROGRAM@VA.gov.  Questions related to mental health care may be referred to the Office of Mental Health Services (10P4M) at (202) 461-7310.

**7.  RESCISSIONS:**  VHA Directive 2011-024, Providing Health Care for Transgender and Intersex Veterans, is rescinded.  This VHA Directive expires February 28, 2018.

Robert A. Petzel, M.D.
Under Secretary for Health

Attachment

DISTRIBUTION:    E-mailed to the VHA Publications Distribution List  2/11/2013

Revised
January 19, 2017

**Attachment A**

### FREQUENTLY ASKED QUESTIONS (FAQ) REGARDING THE

### PROVISION OF HEALTH CARE FOR TRANSGENDER AND INTERSEX VETERANS

**1. What is the prevalence of transgender individuals? Is there a difference between transgender and transsexual individuals?**

a. The prevalence of transgender individuals is not known in general or in the Veteran population. This is because of challenges in defining gender identity, the reluctance of individuals to identify themselves to others as transgender, and measures that are narrowly focused on subsets of individuals who either have been diagnosed with gender identity disorder (GID) or have had sex reassignment surgery. It is for these reasons that the Institute of Medicine issued their report "The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding" (March 31, 2011) and called on Health and Human Services (HHS) and other Federal agencies to "implement a research agenda designed to advance knowledge and understanding of Lesbian, Gay, Bisexual, and Transgender (LGBT) health. This agenda includes appropriate data gathering on sexual orientation and gender identity in public health research tools and electronic health records.

b. Current estimates of the prevalence of transsexual individuals with GID are approximately 1:11,000 natal males and 1:30,000 natal females. The prevalence of all transgender individuals is much higher since "transgender" is an umbrella term that includes individuals who do not have GID.

c. Based on these data, the estimated prevalence of Male-to-Female (MtF) to Female-to-Male (FtM) transsexual individuals is approximately 3:1 in the general population. This prevalence ratio is likely to be higher in the predominantly male Veteran population. It is important to note that FtM transsexual individuals are also part of the Veteran population.

d. Intersex Veterans, that is, individuals who are born with reproductive or sexual anatomy and/or chromosome pattern that do not seem to fit typical definitions of male or female, may or may not identify as transgender.

**2. Is transgender the same as being "gay" or "lesbian"?**

No. The term "transgender" refers to gender identity or the sense of oneself as male, female, or other, (e.g., androgynous, eunuch, etc.). The terms "gay" (in the case of men) and "lesbian" (in the case of women) refer to sexual orientation. The sexual orientation of gay and lesbian persons is attraction to the same gender whereas heterosexual persons are attracted to the opposite gender. A transgender Veteran may identify as heterosexual ("straight"), gay, lesbian, bisexual (i.e., attracted to both genders), queer, pansexual, asexual, etc. Knowing someone's gender identity gives you no information about their sexual orientation.

**3. What is intersex?**

Intersex individuals are born with reproductive or sexual anatomy and/or chromosome pattern that do not seem to fit typical definitions of male or female. People with intersex conditions are often assigned male or female gender by others at birth (e.g., parents), although the individual may or may not later identify with the assigned gender.

**4. Do all intersex individuals identify as transgender?**

No. For example, an individual may be assigned the physical status of "female" at birth and identify as female throughout her lifetime, with or without knowledge of an intersex condition. Some intersex persons with male chromosomes who have been assigned female become gender dysphoric even without knowing that they were "reassigned" at, or near, birth. Knowing someone has an intersex condition gives you no information about their gender identity or sexual orientation.

**5. What is sex reassignment surgery?**

Sex reassignment surgery includes any of a variety of surgical procedures done simultaneously or sequentially with the explicit goal of transitioning from one gender to another. This term includes surgical revision of a previous sex reassignment surgery for cosmetic purposes. This term does not apply to non-surgical therapy (e.g., hormone therapy, mental health care, etc.) or to intersex Veterans in need of surgery to correct inborn conditions related to reproductive or sexual anatomy or to correct a functional defect.

**6. Will VA provide sex reassignment surgery and plastic reconstructive surgery if needed?**

VA does not provide sex reassignment surgery in VA facilities or through non-VA care. In addition, VA does not provide plastic reconstructive surgery for strictly cosmetic purposes in VA facilities or through non-VA care. However, patients with GID or other gender dysphoria conditions may elect to have one or more medical or surgical procedures over their lifetime to bring their bodies into a closer alignment with their perceived gender. ***NOTE:*** *Only a minority of transgender Veterans will undergo sex reassignment surgery, as their symptoms may often be adequately treated with other therapeutic interventions.* Some Veterans receiving care at the VA may have had sex reassignment surgery somewhere else. The VA does provide health care to pre- and post-operative transsexual Veterans, including treatment of surgical complications.

**7. Will the VA provide for electrolysis through non-VA care for male-to-female transsexual (MtF) Veterans?**

No. VA will not provide electrolysis as this is considered by VHA to be cosmetic rather than medically necessary to promote, preserve, or restore health of the Veteran.

**8. What are the guidelines for clinical care and the informed consent process?**

a. Effective clinical care for transgender and intersex patients ideally involves an interdisciplinary, coordinated treatment approach with special attention to the needs of the individual patient and collaboration among multiple specialties, notably: gynecology, mental health, primary and specialty care, women's health, pharmacy, and urology. For all treatments and procedures, informed consent and shared decision-making needs to be the basis for individualized care that weighs the possible benefits and harms, with an emphasis on the lowest (safest) dose to achieve benefits. ***NOTE:*** *Procedures regarding informed consent can be found in VHA Handbook 1004.01, Informed Consent for Clinical Treatments and Procedures at:* http://www1.va.gov/vhapublications/ViewPublication.asp?pub_ID=2055.

b. For treatment plans that include cross-sex hormone therapy, VA clinicians must, consistent with requirements of informed consent (VHA Handbook 1004.01), discuss the risks, benefits, and limitations of cross-sex hormone therapy with the patient. Signature consent is <u>not</u> required for cross-sex hormone therapy. Ongoing monitoring of treatment is required.

**9. Will VA provide feminizing or masculinizing hormone therapy?**

Yes, if it is consistent with the patient's wishes, the treatment team's clinical recommendations, and VA treatment guidance.

**10. What guidance is available to clinicians regarding hormone therapy?**

VA Pharmacy Benefits Management Services has developed guidance for the use of hormone therapy in transgender and intersex patients in VA. This guidance is located at: http://vaww.national.cmop.va.gov/PBM/default.aspx. ***NOTE:*** *This is an internal Web site and is not available to the public.*

**11. What are the goals of cross-sex hormonal treatment? What effects and risks are associated with hormonal treatment?**

a. Cross-sex hormonal treatment is used to reduce or eliminate gender dysphoria and other symptoms related to the discordance between a transgender or intersex individual's gender identity and their biological sex at birth or the gender they were assigned at birth. The treatment produces changes in hormonally-sensitive sex characteristics (i.e., reducing characteristics of the original sex and inducing those of the opposite sex). VA clinicians need to provide transgender and intersex patients with a careful evaluation prior to providing a prescription for cross-sex hormonal therapy.

b. The goal of cross-sex hormone therapy in treatment of MtF transgender patients is to suppress testosterone levels and introduce estrogen to achieve a pre-menopausal female hormonal range. The effects are decreased facial and body hair, redistribution of fat, breast development and prostate and testicular atrophy. Risks include venous thromboembolism, liver dysfunction, hypertension, and cardiovascular disease. As with any medical therapy, benefits

and harms of treatment need individualization using principles of shared decision-making, with an emphasis upon the lowest (safest) dose to achieve benefits.

c.  The goal of cross-sex hormone therapy in treatment of FtM transgender patients is to maintain testosterone and estrogen levels in the normal male range, generally through testosterone supplementation and sometimes in combination with a Gonadotropin Releasing Hormone (GnRH) agonist or progestins to suppress menses.  The effects are increased facial and body hair and muscle, acne, permanent deepening of the voice, cessation of menses, redistribution of fat mass, and clitoral enlargement.  Risks include hypertension, erythrocytosis, liver dysfunction, lipid changes, weight gain, and sodium retention.

**12.  Are there specific diagnostic criteria to consider in prescribing cross-sex hormone therapy?**

a.  A diagnosis of GID or other dysphoria condition should be the basis for prescription for cross-sex hormonal therapy for transgender patients.  There may be clinical exceptions to the diagnosis for prescribing cross-sex hormone therapy (e.g., transgender individuals with "GID not otherwise specified").

b.  Intersex patients are excluded from the GID diagnosis by DSM IV criteria.  Transgender patients with intersex conditions who are seeking hormonal treatment need to fulfill DSM IV criteria for "GID not otherwise specified."  Intersex and transgender individuals may have different mental health considerations.

**13.  Transgender and intersex Veterans are presenting to VA providers with prescriptions for hormones from outside sources, such as from another provider, the internet, or illicit sources.  Should we stop these medications while we do a full evaluation or should a VA provider rewrite the prescriptions so they can be filled in a VA pharmacy and continued?**

Under current VHA National Dual Care Policy, VA providers are not permitted to simply re-write prescriptions from an outside provider, unless the VA provider has first made a professional assessment that the prescribed medication is medically appropriate.  However, cross sex hormones cannot generally be stopped abruptly without negative physical and psychiatric consequences.  If the patient has records that support a thorough evaluation and psychotherapy prior to initiation of hormones, then it may be appropriate for a VA provider to rewrite the prescriptions so they can be filled in a VA pharmacy and continued while the evaluation is in progress and to monitor hormone levels.  A mental health exam in this situation is not required and is based on the clinical situation.  Very high doses of cross-sex hormones are associated with a greater likelihood of side effects, and a reduction in dose may be required.  Additionally, the benefits and harms of hormonal therapy differ based upon the presence or absence of risk factors for, or occurrence of, serious complications (cardiovascular, thrombotic-embolic) and thus dosage needs to be individualized.

**14. What if a transgender or intersex Veteran presents to VA and self-reports that they have been taking cross sex hormones that they would like to continue but can provide no supportive documentation from a physician?**

Consistent with the VHA National Dual Care Policy, VA clinicians need to provide transgender patients with a careful medical and mental health evaluation <u>prior</u> to providing a prescription for cross-sex hormonal therapy.

**15. Is a mental health evaluation necessary or required?**

A thorough and careful mental health evaluation needs to be completed prior to provision of hormone therapy and needs to include evaluation and treatment for psychiatric comorbidities that may have overlapping presentations, such as depression, anxiety, Post Traumatic Stress Disorder (PTSD) or substance use disorders. The presence of other psychiatric and physical conditions is not necessarily a barrier to initiating treatment. For patients who enter VA with well-documented cross-sex hormone therapy from outside clinicians, mental health evaluations are optional based on the clinical presentation.

**16. I understand that VA does not provide sex reassignment surgery, but are there any special considerations regarding a mental health evaluation prior to sex reassignment surgery?**

Mental health evaluation prior to surgery includes specialized exams by knowledgeable doctoral level clinicians. Some professional associations with expertise on transgender issues (see resources in paragraph 28 of this Attachment) recommend that individuals contemplating genital surgery need to participate in a minimum of a 1-year "real life experience" i.e., living full time in the preferred gender role, prior to any genital surgical intervention.

**17. In what ways would a pre-operative medical evaluation differ for these Veterans?**

Medical evaluation prior to surgery includes pre-operative cardiac risk assessment and careful evaluation of current medications including hormone dosing.

**18. What types of surgeries might transgender Veterans consider?**

a. As part of their transition, FtM patients might consider undergoing several types of surgery including mastectomy, hysterectomy or oopherectomy, and neophallus construction. The common complications of neophallus construction include flap or graft necrosis, fistulae, urinary tract infection, donor site scarring, and infections. Mastectomy and hysterectomy have far fewer complications. Clinicians need to be aware that VA does not provide sex reassignment surgery or plastic reconstructive surgery for strictly cosmetic purposes in VA facilities or through non-VA care.

b. As part of their transition, MtF patients might consider undergoing several types of surgery including orchiectomy, penectomy, vaginoplasty, breast implants, laryngeal shave, and facial feminization procedures. Common complications of genital surgeries include strictures,

infections, fistulae, urinary tract complications and loss of genital sensation. Clinicians need to be aware that VA does not provide sex reassignment surgery or plastic reconstructive surgery for strictly cosmetic purposes in VA facilities or through non-VA care. MtF patients may consider undergoing electrolysis for hair removal. Clinicians need to be aware that VA does not provide electrolysis as this is considered a cosmetic rather than a medically necessary procedure.

**19. If a patient has had sex reassignment surgery, how do we handle preventive screening requirements?**

In addition to treatments related to their new gender identity, transgender patients need appropriate medical screening and/or treatment specific to their birth sex. This includes prostate exams and mammograms for MtF patients and vaginal exams and mammograms for FtM patients, as indicated.

**20. Can a transgender Veteran request a change of gender or sex in Computerized Patient Record System (CPRS) before having sex reassignment surgery?**

Amending the gender or sex of the Veteran in CPRS is based on the Veteran making a request to the facility Privacy Officer and providing the official documentation as required by VHA policies. Sex reassignment surgery is not a prerequisite for amendment of gender or sex in the Veteran's record.

**21. What constitutes "official documentation" in order for gender or sex to be changed in CPRS?**

A Veteran's request for amendment to gender or sex in the record is considered a Privacy Act "amendment request."

a. One of the following is required as supporting documentation: Legal documentation (i.e., amended birth certificate or court order), passport or a signed original statement on office letterhead, from a licensed physician. Sex reassignment surgery is not a prerequisite for amendment of gender/sex in the Veteran's record.

b. The licensed physician's statement must include <u>all</u> of the following information:

(1) Physician's full name;

(2) Medical license or certificate number;

(3) Issuing state of medical license or certificate;

(4) Drug Enforcement Administration (DEA) registration number assigned to the physician or comparable foreign designation, if applicable;

(5) Address and telephone number of the physician;

(6)  Language stating that the physician has treated the patient or reviewed and evaluated the medical history of the applicant.  The physician also has a doctor patient relationship with the applicant, which is evident in having one or more clinical encounters between doctor and patient;

(7)  Language stating that the patient has had appropriate clinical treatment for gender transition to the new gender (specifying male or female); and

(8)  Language stating, "I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct."

## 22.  Do I need to become an expert in treating transgender Veterans?

a.  All clinicians and staff who provide clinical services to transgender Veterans need to become more knowledgeable about transgender health issues.  Everyone needs to be aware that transgender Veterans deserve to receive health care at VA and need to be treated with dignity and respect.  Primary Care and Mental Health providers need to be encouraged to consult with specialty physicians on any aspect of management for which they need advice or for ongoing management, as they would for any other complex patient.  The initial VA prescription for cross-sex hormone therapy need to be restricted to facility-designated providers experienced with the use of cross-sex hormone therapy (e.g., women's health specialist, endocrinologist, psychiatrist, or other local designee).

b.  The potential lack of clinical expertise in specialties such as endocrinology, mental health, and surgery regarding clinical care of transgender and intersex Veterans, may necessitate establishing a mechanism for timely expert consultation on complicated cases within Veterans Integrated Service Networks (VISN) or facilities.

## 23.  What education will be provided to VA staff?

Cultural awareness and sensitivity education for field staff was developed and implemented in fiscal year 2012.  The VA standard of zero tolerance for discrimination, harassment, or abuse of Veterans applies to VHA treatment of transgender and intersex Veterans.

## 24.  What is the correct pronoun to use when speaking with a transgender Veteran and in documentation of the clinical encounter in a progress note?

Transgender Veterans should always be addressed and referred to based on their self-identified gender, in conversation and in documentation in the patient record, irrespective of the Veteran's appearance.  Neither sex reassignment surgery nor official documentation of change in sex is required for Veterans to be identified by their preferred gender or for documentation of preferred gender in the patient record.

## 25.  Are transgender Veterans allowed to use the bathroom of their choice?

Transgender Veterans who presently self-identify as female are allowed to use bathrooms for women.  Likewise, those who presently self-identify as males are allowed to use bathrooms for

men. This is irrespective of the Veteran's appearance or whether the Veteran has had sex reassignment surgery. The privacy needs of other patients must also be considered; availability of "unisex" bathrooms (for men and women) throughout facilities is a practical approach to this issue and is common practice in some facilities.

**26. What about room assignments?**

Patient room assignments are made in accordance with the patient's self-identified gender irrespective of the Veteran's appearance or whether the Veteran has had sex reassignment surgery, and in consideration of the needs of other patients. ***NOTE:*** *Ethics consultations are encouraged when concerns arise related to the provision of respectful care for transgender and intersex Veterans and other patients.*

**27. In situations where shared inpatient rooms are common, might assignments be made such that a MtF transsexual patient and a biologic female would be assigned to share a room or a FtM transsexual patient and a biologic male would be assigned to share a room?**

Yes. According to current VHA policy, "*room assignments will give preference to the self-identified gender, irrespective of appearance and/or surgical history, in a manner that respects the privacy needs of transgender and non-transgender patients alike.*" Privacy and confidentiality dictate that staff may not share any information about one patient with another without express permission. If a room assignment leads to distress for either patient, then efforts need to be made to assign one of them to a private room. When this cannot be accommodated or when there are questions or concerns related to room assignments, an ethics consultation needs to be requested.

**28. Are there any recommended resources for further information?**

VA does not currently have clinical practice guidelines for the care of transgender and intersex Veterans. While VA does not endorse the following private sector guidelines, they may serve to provide information and education about the complexities of caring for this patient population.

a. World Professional Association for Transgender Health's Standards of Care for Gender Identity Disorders, Version 7, 2011. Available from www.WPATH.org

b. Endocrine Society Guidelines http://www.endo-society.org/guidelines/final/upload/Endocrine-Treatment-of-Transsexual-Persons.pdf

c. Clinical Protocol Guidelines for Transgender Care http://www.vch.ca/transhealth or http://transhealth.vch.ca/resources/careguidelines.html

d. The Joint Commission: *Advancing Effective Communication, Cultural Competence and Patient-and-Family Centered Care for the Lesbian, Gay, Bisexual and Transgender (LGBT) Community: A Field Guide.* Oak Brook, IL, Oct. 2011. http://www.jointcommission.org/lgbt/

## 29. **REFERENCES**

a.  Brown, G. R. (2010). Autocastration and autopenectomy as surgical self-treatment in incarcerated persons with gender identity disorder. *International Journal of Transgenderism, 12*(1), 31-39 doi:10.1080/15532731003688970.

b.  Institute of Medicine. (2011). *The health of lesbian, gay, bisexual, and transgender people: Building a foundation for better understanding.* Washington, DC:  The National Academies Press:  http://www.iom.edu/Reports/2011/The-Health-of-Lesbian-Gay-Bisexual-and-Transgender-People.aspx.

c.  Murad, M. H., Elamin, M. B., Garcia, M. Z., Mullan, R. J., Murad, A., Erwin, P. J., &Montori, V. M. (2010).  Hormonal therapy and sex reassignment:  A systematic review and meta-analysis of quality of life and psychosocial outcomes. *Clinical Endocrinology, 72*(2), 214-231. doi:10.1111/j.1365-2265.2009.03625.x.

Research

JAMA Surgery | Original Investigation

# Association Between Gender-Affirming Surgeries and Mental Health Outcomes

Anthony N. Almazan, BA; Alex S. Keuroghlian, MD, MPH

◄ Invited Commentary page 618

✚ CME Quiz at
jamacmelookup.com

**IMPORTANCE** Requests for gender-affirming surgeries are rapidly increasing among transgender and gender diverse (TGD) people. However, there is limited evidence regarding the mental health benefits of these surgeries.

**OBJECTIVE** To evaluate associations between gender-affirming surgeries and mental health outcomes, including psychological distress, substance use, and suicide risk.

**DESIGN, SETTING, AND PARTICIPANTS** In this study, we performed a secondary analysis of data from the 2015 US Transgender Survey, the largest existing data set containing comprehensive information on the surgical and mental health experiences of TGD people. The survey was conducted across 50 states, Washington, DC, US territories, and US military bases abroad. A total of 27 715 TGD adults took the US Transgender Survey, which was disseminated by community-based outreach from August 19, 2015, to September 21, 2015. Data were analyzed between November 1, 2020, and January 3, 2021.

**EXPOSURES** The exposure group included respondents who endorsed undergoing 1 or more types of gender-affirming surgery at least 2 years prior to submitting survey responses. The comparison group included respondents who endorsed a desire for 1 or more types of gender-affirming surgery but denied undergoing any gender-affirming surgeries.

**MAIN OUTCOMES AND MEASURES** Endorsement of past-month severe psychological distress (score of ≥13 on Kessler Psychological Distress Scale), past-month binge alcohol use, past-year tobacco smoking, and past-year suicidal ideation or suicide attempt.

**RESULTS** Of the 27 715 respondents, 3559 (12.8%) endorsed undergoing 1 or more types of gender-affirming surgery at least 2 years prior to submitting survey responses, while 16 401 (59.2%) endorsed a desire to undergo 1 or more types of gender-affirming surgery but denied undergoing any of these. Of the respondents in this study sample, 16 182 (81.1%) were between the ages of 18 and 44 years, 16 386 (82.1%) identified as White, 7751 (38.8%) identified as transgender women, 6489 (32.5%) identified as transgender men, and 5300 (26.6%) identified as nonbinary. After adjustment for sociodemographic factors and exposure to other types of gender-affirming care, undergoing 1 or more types of gender-affirming surgery was associated with lower past-month psychological distress (adjusted odds ratio [aOR], 0.58; 95% CI, 0.50-0.67; $P < .001$), past-year smoking (aOR, 0.65; 95% CI, 0.57-0.75; $P < .001$), and past-year suicidal ideation (aOR, 0.56; 95% CI, 0.50-0.64; $P < .001$).

**CONCLUSIONS AND RELEVANCE** This study demonstrates an association between gender-affirming surgery and improved mental health outcomes. These results contribute new evidence to support the provision of gender-affirming surgical care for TGD people.

**Author Affiliations:** Harvard Medical School, Boston, Massachusetts (Almazan, Keuroghlian); Harvard T. H. Chan School of Public Health, Boston, Massachusetts (Almazan); The Fenway Institute, Fenway Health, Boston, Massachusetts (Keuroghlian); Department of Psychiatry, Massachusetts General Hospital, Boston (Keuroghlian).

**Corresponding Author:** Anthony N. Almazan, BA, Harvard Medical School, 25 Shattuck St, Boston, MA 02115 (anthony_almazan@hms.harvard.edu).

*JAMA Surg.* 2021;156(7):611-618. doi:10.1001/jamasurg.2021.0952
Published online April 28, 2021.

Appx302

© 2021 American Medical Association. All rights reserved.

Downloaded from jamanetwork.com by Yale University user on 12/04/2023

AR676

Appx 108

611

**Research** Original Investigation

Association Between Gender-Affirming Surgeries and Mental Health Outcomes

Transgender and gender diverse (TGD) people experience a disproportionate burden of mental health problems compared with the general population.[1,2] Prior studies of mental health among TGD people have demonstrated a 41% lifetime prevalence of suicide attempts,[2] 7% to 61% lifetime prevalence of binge drinking,[3] and a 33% prevalence of tobacco use.[4] Increased adverse mental health outcomes among TGD people are likely attributable to stigma, discrimination, pathologization, economic marginalization, violence, and dysphoria associated with an incongruence between gender identity and societal expectations based on one's sex assigned at birth.[5]

According to *Standards of Care* published by the World Professional Association for Transgender Health, gender-affirming surgery is a medically necessary treatment to alleviate psychological distress for many TGD people.[6] The term *gender-affirming surgery* refers to any surgical procedures offered to affirm the gender identities of TGD people. The process of surgical gender affirmation is individually tailored because not all TGD people desire or access these procedures.[7] In the largest survey of the TGD community to our knowledge to date, 25% of respondents reported undergoing some type of gender-affirming surgery.[8]

As a result of professional recommendations, insurance nondiscrimination laws, and expansion of dedicated transgender health practices, demand for gender-affirming surgery is steadily rising.[9] In the United States, incidence of gender-affirming surgeries has increased annually since 2000.[10] Despite growing demand for and access to gender-affirming surgery, there is a paucity of high-quality evidence regarding its effects on mental health outcomes among TGD people.

Existing evidence on the association between gender-affirming surgeries and mental health outcomes is largely derived from small-sample, cross-sectional, and uncontrolled studies.[1,11,12] A seminal 1998 review of the experiences of more than 2000 TGD people from 79 predominantly uncontrolled follow-up studies demonstrated qualitative improvement in psychosocial outcomes following gender-affirming surgery.[11] Attempts since then to empirically demonstrate mental health benefits from gender-affirming surgery have generated mixed results. A meta-analysis of 1833 TGD people across 28 studies concluded that studies offered "low-quality evidence" for positive mental health benefits from surgical gender affirmation.[12] The largest existing study on this subject to our knowledge,[13] a total population study including 2679 people diagnosed as having gender incongruence in Sweden, demonstrated a longitudinal association between gender-affirming surgery and reduced mental health treatment utilization.[13] However, a 2020 published correction of this study[14] demonstrated no mental health benefit from gender-affirming surgery after comparison with a control group of TGD people who had not yet undergone surgery. Mental health effects of gender-affirming surgery thus remain controversial.

Given the increasing incidence of surgical gender affirmation among TGD people, there is a significant need for clarification of the mental health benefits of gender-affirming surgery. In this article, we present the largest study to our knowledge to date on the association between gender-affirming surgeries and mental health outcomes. Using the 2015 US Transgender Survey, the largest existing data set on surgical and mental health experiences of TGD people, we investigate the hypothesis that gender-affirming surgeries are associated with improved mental health outcomes, including psychological distress, substance use, and suicidality.

**Key Points**

**Question** Are gender-affirming surgeries associated with better mental health outcomes among transgender and gender diverse (TGD) people?

**Findings** In this secondary analysis of the 2015 US Transgender Survey (n = 27 715), TGD people with a history of gender-affirming surgery had significantly lower odds of past-month psychological distress, past-year tobacco smoking, and past-year suicidal ideation compared with TGD people with no history of gender-affirming surgery.

**Meaning** These findings support the provision of gender-affirming surgeries for TGD people who seek them.

## Methods

### Study Design

In this study, we performed a secondary analysis of the 2015 US Transgender Survey (USTS).[8] This investigation is reported using Strengthening the Reporting of Observational Studies in Epidemiology (STROBE) reporting guidelines.

### Study Population and Data Source

The 2015 USTS was a cross-sectional, nonprobability sample of responses from 27 715 TGD adults from 50 US states, Washington, DC, US territories, and US military bases abroad. The survey was developed by researchers, advocates, people with lived experience, and subject experts over the course of a year. The final survey contained 324 possible questions with 32 domains addressing subjects including health and health care access. It was disseminated by community-based outreach and administered online from August 19, 2015, to September 21, 2015. The USTS protocol was approved by the University of California, Los Angeles institutional review board.[8] The protocol for the present study was reviewed by the Fenway Institute institutional review board and did not meet criteria for human subjects research. For this reason, consent was not obtained.

### Outcomes

Five binary mental health outcomes were examined, including endorsement or denial of the following: (1) past-month severe psychological distress (score on the Kessler Psychological Distress Scale meeting the previously validated threshold of ≥13),[15] (2) past-month binge alcohol use (≥5 alcoholic drinks on one occasion), (3) past-year tobacco smoking, (4) past-year suicidal ideation, and (5) past-year suicide attempt.

### Exposure Group

The exposure group included respondents who endorsed a history of gender-affirming surgery, defined as undergoing 1 or

© 2021 American Medical Association. All rights reserved.

Downloaded from jamanetwork.com by Yale University user on 12/04/2023

AR677

Appx303

Association Between Gender-Affirming Surgeries and Mental Health Outcomes

Original Investigation   Research

more types of gender-affirming surgery at least 2 years prior to submitting responses to the USTS. Respondents were asked about their experiences with gender-affirming surgeries through the question, "Have you had or do you want any of the health care listed below for gender transition?" Respondents were presented with 1 of 2 lists of gender-affirming surgeries based on their self-reported sex assigned at birth. For each surgery, respondents were able to indicate one of the following answers: "Have had it," "Want it some day," "Not sure if I want this," or "Do not want this." Respondents were included in the exposure group if they answered "Have had it" to 1 or more of the following types of gender-affirming procedures: breast augmentation, orchiectomy, vaginoplasty/labiaplasty, trachea shave, facial feminization surgery, or voice surgery. Respondents were also included in the exposure group if they answered "Have had it" to one or more of the following types of gender-affirming procedures: chest surgery, hysterectomy, clitoral release/metoidioplasty/centurion procedure, or phalloplasty.

In this study, outcomes of interest included mental health symptoms in the year prior to taking the USTS. To ensure that exposure to gender-affirming surgeries temporally preceded all outcomes of interest, respondents were included in the exposure group if they had received their first gender-affirming surgery at least 2 years prior to submitting responses to the USTS. For each respondent with a history of gender-affirming surgery, the number of years since their first surgery was calculated by subtracting age at first surgery from current age.

### Control Group

The control group included respondents who desired gender-affirming surgeries but had not yet received any. Respondents were included in this group if they answered "Want it some day" for at least 1 of the aforementioned gender-affirming procedures but did not answer "Have had it" for any of them. We excluded participants who did not report desire for any gender-affirming surgeries.

### Covariates

The following sociodemographic covariates were examined: age (18-44 years, 45-64 years, and ≥65 years), education level (less than high school or high school graduate up to associate degree, bachelor degree, or higher), employment status (employed, unemployed, or out of labor force), gender identity (transgender woman, transgender man, nonbinary, or cross-dresser), health insurance status (uninsured or insured), household income (<$25 000, $25 000-$99 999, or ≥$100 000), race (Alaska Native/American Indian, Asian/Pacific Islander, Black/African American, Latinx/Hispanic, other/biracial/multiracial, or White), sex assigned at birth (female or male), and sexual orientation (asexual, lesbian/gay/bisexual, or heterosexual).

Family rejection was included as a covariate and was defined by the USTS as history of any of the following experiences with a family member owing to the respondent's gender identity: ending the relationship, physical violence, being forced out of their home, being prevented from wearing desired gender-concordant clothing, and exposure to gender identity conversion efforts. Lifetime exposures to other types of

gender-affirming care were also examined, including gender-affirming counseling, pubertal suppression, and hormone therapy. Given the possibility that any of these covariates could confound the relationship between gender-affirming surgeries and mental health outcomes, all covariates were included in the final multivariable models.

### Statistical Analysis

All analyses were conducted using Stata, version 16.1 (StataCorp). Unweighted descriptive statistics for exposure and control groups were calculated and are presented as frequencies and percentages.

Multivariable logistic regression models adjusted for all covariates were generated to examine whether undergoing gender-affirming surgery is associated with each of the examined mental health outcomes.[16,17] To account for the survey's nonprobability sampling, all models incorporated survey weights to correct sampling biases related to age and race/ethnicity. Adjusted odds ratios (aORs), 95% CIs, and 2-sided $P$ values are reported.

We performed a post hoc analysis to determine whether associations between gender-affirming surgeries and mental health outcomes differ based on the degree of surgical affirmation. The exposure variable was recoded as 3 categories: those who received all desired surgeries, some desired surgeries, and no desired surgeries. Because the USTS did not collect information on timing of each respondent's last surgery, respondents for this post hoc analysis could not be excluded to ensure that all exposures temporally preceded mental health outcomes. The recoded 3-category exposure variable was substituted into 5 additional multivariable logistic regression models, adjusted for all aforementioned covariates.

Owing to concerns that baseline mental health status may confound associations between gender-affirming surgery and mental health outcomes, we conducted an additional post hoc analysis to determine whether lifetime mental health measures were associated with exposure to gender-affirming surgeries. We did not incorporate these measures into the primary models due to collinearity. Four separate post hoc models, adjusted for all aforementioned covariates, regressed exposure to gender-affirming surgeries against lifetime suicidal ideation, lifetime suicide attempts, lifetime alcohol use, and lifetime smoking.

To account for multiple hypothesis testing, a Bonferroni correction was applied to adjust for 19 total tests. A $P$ value of less than .002 was used as the corrected threshold for statistical significance.

Less than 2% of the study sample had missing data for exposure and outcome variables, and less than 9% of the study sample had missing data for any covariates. Given that these are acceptably low levels of missingness,[18] respondents with missing data were excluded without compensatory methods.

## Results

Of the 27 715 respondents, 3559 (12.8%) endorsed undergoing 1 or more types of gender-affirming surgery at least 2 years

© 2021 American Medical Association. All rights reserved.

Downloaded from jamanetwork.com by Yale University user on 12/04/2023

AR678

Appx304

Research **Original Investigation**                    Association Between Gender-Affirming Surgeries and Mental Health Outcomes

**Table 1. Sample Sociodemographics[a]**

| Characteristic | No. (%) | | Difference, % (95% CI) |
|---|---|---|---|
| | No history of surgery (n = 16 401) | History of surgery (n = 3559) | |
| **Age, y** | | | |
| 18-44 | 14 170 (86.4) | 2012 (56.5) | 29.9 (28.2 to 31.6) |
| 45-64 | 1922 (11.7) | 1261 (35.4) | −23.7 (−25.4 to −22.1) |
| ≥65 | 309 (1.9) | 285 (8.0) | −6.1 (−7.0 to −5.2) |
| **Education** | | | |
| Less than high school | 682 (4.2) | 37 (1.0) | 3.1 (2.7 to 3.6) |
| High school graduate up to associate degree | 10 918 (66.6) | 1243 (34.9) | 31.6 (29.9 to 33.3) |
| Bachelor degree or higher | 4801 (29.3) | 2279 (64.0) | −34.8 (−36.5 to −33.0) |
| **Employment** | | | |
| Employed | 10 306 (62.8) | 2585 (72.6) | −9.8 (−11.4 to −8.2) |
| Unemployed | 2474 (15.1) | 202 (5.7) | 9.4 (8.5 to 10.3) |
| Out of labor force | 3537 (21.6) | 755 (21.2) | 0.4 (−1.1 to 1.8) |
| **Family rejection** | | | |
| Yes | 7466 (45.5) | 2328 (65.4) | −19.9 (−21.6 to −18.2) |
| No | 7360 (44.9) | 1173 (33.0) | 11.9 (10.2 to 13.6) |
| **Gender identity** | | | |
| Transgender woman | 6277 (38.3) | 1474 (41.4) | −3.1 (−4.9 to −1.4) |
| Transgender man | 4764 (29.1) | 1725 (48.5) | −19.4 (−21.2 to −17.6) |
| Nonbinary | 4958 (30.2) | 342 (9.6) | 20.6 (19.4 to 21.8) |
| Cross-dresser | 402 (2.5) | 18 (0.5) | 2.0 (1.6 to 2.3) |
| **Health insurance** | | | |
| Uninsured | 2397 (14.6) | 304 (8.5) | 6.1 (5.0 to 7.1) |
| Insured | 13 959 (85.1) | 3253 (91.4) | −6.3 (−7.4 to −5.2) |
| **Household income** | | | |
| <$25 000 | 5960 (36.3) | 768 (21.6) | 14.7 (13.2 to 16.3) |
| $25 000-$99 999 | 6829 (41.6) | 1804 (50.7) | −9.1 (−10.9 to −7.2) |
| ≥$100 000 | 2073 (12.6) | 840 (23.6) | −11.0 (−12.4 to −9.5) |
| **Race/ethnicity** | | | |
| Alaska Native/American Indian | 206 (1.3) | 39 (1.1) | 0.2 (−0.2 to 0.5) |
| Asian/Pacific Islander | 436 (2.7) | 64 (1.8) | 0.9 (0.4 to 1.4) |
| Black/African American | 459 (2.8) | 124 (3.5) | −0.7 (−1.3 to −0.03) |
| Latinx/Hispanic | 929 (5.7) | 154 (4.3) | 1.3 (0.6 to 2.1) |
| Other/biracial/multiracial | 963 (5.9) | 200 (5.6) | 0.3 (−0.6 to 1.1) |
| White | 13 408 (81.8) | 2978 (83.7) | −1.9 (−3.3 to −0.6) |
| **Sex assigned at birth** | | | |
| Female | 9032 (55.1) | 2029 (57.0) | −1.9 (−3.7 to −0.1) |
| Male | 7369 (44.9) | 1530 (43.0) | 1.9 (0.1 to 3.7) |
| **Sexual orientation** | | | |
| Asexual | 2002 (12.2) | 228 (6.4) | 5.8 (4.9 to 6.7) |
| Lesbian, gay, bisexual | 11 433 (69.7) | 2393 (67.2) | 2.5 (0.8 to 4.2) |
| Heterosexual | 1729 (10.5) | 782 (22.0) | −11.4 (−12.9 to −10.0) |
| **Other gender-affirming care** | | | |
| Counseling | 9016 (55.0) | 3099 (87.1) | −32.1 (−33.4 to −30.8) |
| Pubertal suppression | 197 (1.2) | 94 (2.6) | −1.4 (−2.0 to −0.9) |
| Hormone therapy | 7104 (43.3) | 3213 (90.3) | −47.0 (−48.2 to −45.7) |

[a] Column percentages may not add up to 100% because missing data are not displayed.

prior to submitting survey responses, while 16 401 respondents (59.2%) endorsed a desire to undergo 1 or more types of gender-affirming surgery but denied undergoing any of these.

Compared with the control group, the exposure group had higher percentages of respondents who were older, employed, more educated, endorsed family rejection, reported having health insurance, and reported higher household income. Respondents in the exposure group were more likely to endorse a history of gender-affirming counseling, pubertal suppression, and hormone therapy (Table 1).

© 2021 American Medical Association. All rights reserved.

Downloaded from jamanetwork.com by Yale University user on 12/04/2023

AR679

Appx305

Association Between Gender-Affirming Surgeries and Mental Health Outcomes

Original Investigation Research

Figure 1. Desire for and History of Gender-Affirming Surgical Procedures in Study Sample



**A** Gender-affirming surgical experiences of respondents assigned male sex at birth (n = 8899)

Vaginoplasty/labiaplasty
Orchiectomy
Facial feminization surgery
Breast augmentation
Trachea shave
Voice surgery

Desired procedure
Underwent procedure

Respondents endorsing, %



**B** Gender-affirming surgical experiences of respondents assigned female sex at birth (n = 11 061)

Top/chest surgery
Hysterectomy
Metoidioplasty
Phalloplasty

Respondents endorsing, %

Includes 2015 US Transgender Survey respondents who indicated they desired and either had or had not undergone at least 1 type of gender-affirming surgery. Respondents were presented with 1 of 2 lists of gender-affirming surgeries based on their self-reported sex assigned at birth.

Figure 2. Comparison of Mental Health Outcomes Among Respondents Who Did and Did Not Undergo Gender-Affirming Surgery



History of gender-affirming surgery
No history of gender-affirming surgery

Past-month severe psychological distress
Past-month binge alcohol use
Past-year smoking
Past-year suicidal ideation
Past-year suicide attempt

Respondents with outcome, %

Table 2. Association Between History of Gender-Affirming Surgery and Mental Health Outcomes[a]

| Variable | aOR (95% CI)[b] | P value |
|---|---|---|
| Severe psychological distress (past month)[c] | 0.58 (0.50-0.67) | <.001 |
| Substance use | | |
| Binge alcohol use (past month)[d] | 0.83 (0.72-0.96) | .01 |
| Smoking (past year) | 0.65 (0.57-0.75) | <.001 |
| Suicidality (past year) | | |
| Ideation | 0.56 (0.50-0.64) | <.001 |
| Attempt | 0.65 (0.47-0.90) | .009 |

Abbreviation: aOR, adjusted odds ratio.

[a] Adjusted for age, education, employment status, family rejection, gender identity, health insurance, household income, race/ethnicity, sex assigned at birth, sexual orientation, history of gender-affirming counseling, pubertal suppression, and history of gender-affirming hormone therapy.

[b] Reference/control group (n = 16 401) is composed of individuals who desired at least 1 type of gender-affirming surgery but had not received any surgeries. Exposure group (n = 3559) is limited to respondents who had their first surgery at least 2 years prior to submitting survey responses.

[c] Defined as a score of at least 13 on the Kessler Psychological Distress Scale.

[d] Defined as consuming at least 5 alcoholic drinks on the same occasion.

For each surgical procedure, the percentage of people who desired it was higher than the percentage of people who endorsed undergoing it (Figure 1). For every adverse mental health outcome, the percentage of respondents who endorsed it was lower in the exposure group than in the control group (Figure 2).

After adjustment for sociodemographic factors and exposure to other types of gender-affirming care, undergoing 1 or more types of gender-affirming surgery was associated with lower past-month psychological distress (aOR, 0.58; 95% CI, 0.50-0.67; P < .001), past-year smoking (aOR, 0.65; 95% CI, 0.57-0.75; P < .001), and past-year suicidal ideation (aOR, 0.56; 95% CI, 0.50-0.64; P < .001). After Bonferroni correction, there was no statistically significant association between gender-affirming surgeries and past-month binge alcohol use or past-year suicide attempts (Table 2).

In the post hoc analysis stratifying by degree of surgical affirmation, 16 401 respondents were in the reference group who received no desired surgeries. Respondents who had undergone all desired surgeries (n = 2448) had significant reductions in the odds of each adverse mental health outcome, and these reductions were more profound than those among respondents who had received only some desired surgeries (n = 3311) (Table 3).

Measures of lifetime mental health were not associated with exposure to gender-affirming surgeries. After adjustment for all aforementioned covariates, undergoing gender-affirming surgery was not associated with lifetime suicidal ideation (aOR, 1.00; 95% CI, 0.85-1.20; P = .92), lifetime suicide attempts (aOR, 1.16; 95% CI, 1.01-1.34; P = .04), lifetime alcohol use (aOR, 1.00; 95% CI, 0.99-1.01; P = .96), or lifetime smoking (aOR, 1.00; 95% CI, 1.00-1.01; P = .34).

## Discussion

To our knowledge, this is the first large-scale, controlled study to demonstrate an association between gender-affirming surgery and improved mental health outcomes. In this study, we demonstrate that undergoing gender-affirming surgery is associated with decreased odds of past-month severe psychological distress, past-year smoking, and past-year suicidal ideation. The post hoc analysis stratifying by degree of surgical affirmation demonstrates that TGD people who underwent all desired surgeries had significantly lower odds of all adverse mental health outcomes, and these benefits were stronger than

© 2021 American Medical Association. All rights reserved.

Downloaded from jamanetwork.com by Yale University user on 12/04/2023

AR 680

Appx 112     Appx306

Association Between Gender-Affirming Surgeries and Mental Health Outcomes

**Table 3. Association Between Degree of Surgical Gender Affirmation and Mental Health Outcomes[a]**

| Variable | Received some desired surgeries (n = 3311)[b] | | Received all desired surgeries (n = 2448)[b] | |
|---|---|---|---|---|
| | aOR (95% CI) | P value | aOR (95% CI) | P value |
| Severe psychological distress (past month)[c] | 0.70 (0.60-0.81) | <.001 | 0.47 (0.39-0.56) | <.001 |
| Substance use | | | | |
|   Binge alcohol use (past month)[d] | 0.97 (0.84-1.11) | .63 | 0.75 (0.64-0.87) | <.001 |
|   Smoking (past year) | 0.75 (0.66-0.86) | <.001 | 0.58 (0.49-0.68) | <.001 |
| Suicidality (past year) | | | | |
|   Ideation | 0.72 (0.63-0.81) | <.001 | 0.44 (0.38-0.51) | <.001 |
|   Attempt | 0.70 (0.53-0.93) | .01 | 0.44 (0.28-0.70) | <.001 |

Abbreviation: aOR, adjusted odds ratio.

[a] Adjusted for age, education, employment status, family rejection, gender identity, health insurance, household income, race/ethnicity, sex assigned at birth, sexual orientation, history of gender-affirming counseling, pubertal suppression, and history of gender-affirming hormone therapy.

[b] Reference group is individuals who received none of their desired surgeries (n = 16 401).

[c] Defined as a score of at least 13 on the Kessler Psychological Distress Scale.

[d] Defined as consuming at least 5 alcoholic drinks on the same occasion.

among TGD people who only received some desired surgeries.

The observed associations between gender-affirming surgery, psychological distress, and suicide risk reinforce previous small-sample studies suggesting that gender-affirming surgery improves mental health and quality of life among TGD people.[1,12] Our findings also reflect evidence from qualitative studies indicating perceived mental health benefits of gender-affirming surgeries among TGD people.[19-21] In our primary analysis, although gender-affirming surgery was associated with lower odds of past-year suicidal ideation, there was no statistically significant association between gender-affirming surgeries and past-year suicide attempts. However, in a post hoc analysis respondents who underwent all desired gender-affirming surgeries had significantly lower odds of past-year suicide attempts.

The association observed between gender-affirming surgeries and reduction in substance use behaviors is consistent with previous studies involving small community samples that demonstrated associations between gender-affirming medical care and lower odds of high-risk substance use.[22,23] In the primary analysis, undergoing gender-affirming surgery was not significantly associated with past-month binge alcohol use. This may be consistent with evidence that after adjustment for sociodemographic factors, gender minority identity itself does not predict high-risk alcohol use.[24] However, in a post hoc analysis, respondents who underwent all desired gender-affirming surgeries had significantly lower odds of past-month binge alcohol use.

This investigation offers evidence to support the clinical practice of gender-affirming surgery. Guidelines for provision of gender-affirming medical and surgical care have historically been challenged based on a limited evidence base. The American Psychiatric Association has previously concluded that the quality of evidence for treatment of gender dysphoria is low, and consequently, recommendations regarding gender-affirming care have been driven by clinical consensus where empirical evidence is lacking.[25] This study offers new data that substantiate the current clinical consensus by expanding the evidence base in support of gender-affirming surgical care.

The observed mental health benefits of gender-affirming surgeries in this study highlight the importance of policies that facilitate access to surgical gender affirmation. In the present study, the percentages of people who had undergone each gender-affirming surgical procedure were substantially lower than the percentages of people who desired them, suggesting significant barriers to accessing gender-affirming surgeries. State-level prohibitions against insurance exclusions for gender-affirming care have been associated with more extensive coverage of gender-affirming surgical procedures.[26] In light of this study's results, such policies may be of even greater public health interest. US federal policies related to gender-affirming care have included a recent reversal of Affordable Care Act insurance protections for gender affirmation and the continued prohibition of Veterans Affairs funding allocation for gender-affirming surgeries.[27,28] Formulation of evidence-based policies for the financing of gender-affirming surgery will be crucial for advancing the health and well-being of TGD communities.

### Strengths and Limitations

This study's strengths include aspects of its design that address prior limitations in the existing literature on this subject. Multiple meta-analyses of studies examining the association between gender-affirming surgeries and mental health outcomes have demonstrated that much of the existing literature consists of evidence derived with small sample sizes, lack of control groups, and lack of adjustment for other kinds of gender-affirming care.[12,29] Our study is responsive to these methodologic concerns.

First, we used the largest existing data set containing information on the surgical and mental health experiences of TGD people. Second, this is, to our knowledge, the first large-scale study on this subject to use the ideal control group to examine associations between gender-affirming surgeries and mental health outcomes: individuals who desire gender-affirming surgery but have not yet received it. Experts have cautioned against using comparison groups that conflate TGD people who did not undergo gender-affirming surgery because they were waiting for it with TGD people not seeking it in the first place. Inability to differentiate these 2 groups likely

© 2021 American Medical Association. All rights reserved.

AR681

Downloaded from jamanetwork.com by Yale University user on 12/04/2023

Appx307

contributed to the lack of significant mental health benefit observed in the 2019 large-scale study on this subject.[13,30]

Third, although this survey-based investigation uses a cross-sectional study design, we constructed an exposure group that includes only individuals exposed to their first gender-affirming surgery prior to the window of assessment for any adverse mental health outcomes. Thus, we ensured that our exposure temporally preceded our outcomes, allowing us to better understand the direction of observed associations. These exclusions could not be performed in our post hoc analysis stratifying by degree of surgical affirmation, and that analysis should therefore be interpreted with caution.

Fourth, our data set allowed us to control for previous experiences of gender-affirming counseling, pubertal suppression, and hormone therapy. Consequently, this study is, to our knowledge, the first large-scale investigation to ascertain the mental health benefits of gender-affirming surgeries independent of other common forms of gender-affirming health care.

Our study has several limitations. The nonprobability sampling of the USTS may limit generalizability. All measures are self-reported and may be subject to response bias. Furthermore, the USTS only offers data on experiences with 10 specific types of gender-affirming surgeries and does not capture the full range of procedures that constitute gender-affirming surgery. Lastly, because this is an observational study, it may be subject to unmeasured confounding. Much of the literature on mental health benefits of gender-affirming surgery has been complicated by inability to adjust for a key confounder: baseline mental health status. Our post hoc analysis demonstrates that lifetime suicidality and substance use behaviors are not associated with the exposure variable in this sample. Therefore, prior mental health factors do not appear to confound associations between gender-affirming surgery and subsequent mental health outcomes in our study. There may nevertheless be other types of mental health problems not captured in the USTS that confound these associations. These limitations highlight the need for larger probability-based surveys with TGD communities, more consistent gender identity data collection across health care systems, and more comprehensive baseline health data collection with TGD populations.

## Conclusions

In this article, we present the largest study to our knowledge to date on associations between gender-affirming surgeries and mental health outcomes. Our results demonstrate that undergoing gender-affirming surgery is associated with improved past-month severe psychological distress, past-year smoking, and past-year suicidal ideation. Our findings offer empirical evidence to support provision of gender-affirming surgical care for TGD people who seek it. Furthermore, this study provides evidence to support policies that expand and protect access to gender-affirming surgical care for TGD communities.

ARTICLE INFORMATION

Accepted for Publication: February 5, 2021.

Published Online: April 28, 2021.
doi:10.1001/jamasurg.2021.0952

Author Contributions: Mr Almazan had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.
Concept and design: All authors.
Acquisition, analysis, or interpretation of data: All authors.
Drafting of the manuscript: All authors.
Critical revision of the manuscript for important intellectual content: All authors.
Statistical analysis: Almazan.
Obtained funding: Keuroghlian.
Administrative, technical, or material support: Keuroghlian.
Supervision: Keuroghlian.

Conflict of Interest Disclosures: Dr Keuroghlian reported grants from Patient-Centered Outcomes Research Institute contract AD-2017C1-6569 (PI: Sari L. Reisner) during the conduct of the study; in addition, Dr Keuroghlian stands to receive future royalties as editor of a forthcoming McGraw-Hill Education textbook on transgender and gender diverse care. No other disclosures were reported.

Funding/Support: This work was supported by contract AD-2017C1-6569 from the Patient-Centered Outcomes Research Institute (PI: Dr Sari L. Reisner).

Role of the Funder/Sponsor: The funding source had no role in the design and conduct of the study; collection, management, analysis, and interpretation of the data; preparation, review, or approval of the manuscript; and decision to submit the manuscript for publication.

Additional Contributions: We thank the National Center for Transgender Equality for granting us access to the data from the 2015 US Transgender Survey.

REFERENCES

1. Dhejne C, Van Vlerken R, Heylens G, Arcelus J. Mental health and gender dysphoria: a review of the literature. Int Rev Psychiatry. 2016;28(1):44-57. doi:10.3109/09540261.2015.1115753

2. Grant J, Motter L, Tanis J. Injustice at every turn: a report of the National Transgender Discrimination Survey. 2011. Accessed October 11, 2020. https://www.transequality.org/sites/default/files/docs/resources/NTDS_Report.pdf

3. Gilbert PA, Pass LE, Keuroghlian AS, Greenfield TK, Reisner SL. Alcohol research with transgender populations: a systematic review and recommendations to strengthen future studies. Drug Alcohol Depend. 2018;186:138-146. doi:10.1016/j.drugalcdep.2018.01.016

4. Wheldon CW, Wiseman KP. Tobacco use among transgender and gender non-conforming adults in the United States. Tob Use Insights. 2019;12: X19849419. doi:10.1177/1179173X19849419

5. Reisner SL, Poteat T, Keatley J, et al. Global health burden and needs of transgender populations: a review. Lancet. 2016;388(10042): 412-436. doi:10.1016/S0140-6736(16)00684-X

6. Coleman E, Bockting W, Botzer M, et al Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. Int J Transgenderism. 2012;13(4):165-232. doi:10.1080/15532739.2011.700873

7. Berli JU, Knudson G, Fraser L, et al. What surgeons need to know about gender confirmation surgery when providing care for transgender individuals: a review. JAMA Surg. 2017;152(4):394-400. doi:10.1001/jamasurg.2016.5549

8. James S, Herman J, Rankin S, Keisling M, Mottet L, Anafi M. The Report of the 2015 U.S. Transgender Survey. National Center for Transgender Equality; 2016. Accessed April 2, 2020. https://ncvc.dspacedirect.org/handle/20.500.11990/1299

9. Weissler JM, Chang BL, Carney MJ, et al. Gender-affirming surgery in persons with gender dysphoria. Plast Reconstr Surg. 2018;141(3):388e-396e. doi:10.1097/PRS.0000000000004123

10. Canner JK, Harfouch O, Kodadek LM, et al. Temporal trends in gender-affirming surgery among transgender patients in the United States. JAMA Surg. 2018;153(7):609-616. doi:10.1001/jamasurg.2017.6231

11. Pfäfflin F, Junge A. Sex reassignment thirty years of international follow-up studies SRS: a comprehensive review, 1961-1991. International Journal of Transgenderism. Published online 1998.

12. Murad MH, Elamin MB, Garcia MZ, et al. Hormonal therapy and sex reassignment: a systematic review and meta-analysis of quality of life and psychosocial outcomes. Clin Endocrinol (Oxf). 2010;72(2):214-231. doi:10.1111/j.1365-2265.2009. 03625.x

© 2021 American Medical Association. All rights reserved.

AR682

Appx308

Downloaded from jamanetwork.com by Yale University user on 12/04/2023

13. Brånström R, Pachankis JE. Reduction in mental health treatment utilization among transgender individuals after gender-affirming surgeries: a total population study. *Am J Psychiatry*. doi:10.1176/appi.ajp.2019.19010080

14. Correction to Brånström and Pachankis. Correction to Brånström and Pachankis. *Am J Psychiatry*. 2020;177(8):734-734. doi:10.1176/appi.ajp.2020.1778correction

15. Kessler RC, Green JG, Gruber MJ, et al. Screening for serious mental illness in the general population with the K6 screening scale: results from the WHO World Mental Health (WMH) survey initiative. *Int J Methods Psychiatr Res*. 2010;19(S1) (suppl 1):4-22. doi:10.1002/mpr.310

16. Tolles J, Meurer WJ. Logistic regression: relating patient characteristics to outcomes. *JAMA*. 2016; 316(5):533-534. doi:10.1001/jama.2016.7653

17. Stoltzfus JC. Logistic regression: a brief primer. *Acad Emerg Med*. 2011;18(10):1099-1104. doi:10.1111/j.1553-2712.2011.01185.x

18. Bennett DA. How can I deal with missing data in my study? *Aust N Z J Public Health*. 2001;25(5): 464-469. doi:10.1111/j.1467-842X.2001.tb00294.x

19. Schneiders M. *Values and Preferences of Transgender People: A Qualitative Study*. World Health Organization; 2014:65.

20. Jokić-Begić N, Lauri Korajlija A, Jurin T. Psychosocial adjustment to sex reassignment surgery: a qualitative examination and personal experiences of six transsexual persons in croatia. *ScientificWorldJournal*. 2014;2014:960745. doi:10.1155/2014/960745

21. McGuire JK, Doty JL, Catalpa JM, Ola C. Body image in transgender young people: Findings from a qualitative, community based study. *Body Image*. 2016;18:96-107. doi:10.1016/j.bodyim.2016.06.004

22. Keuroghlian AS, Reisner SL, White JM, Weiss RD. Substance use and treatment of substance use disorders in a community sample of transgender adults. *Drug Alcohol Depend*. 2015;152:139-146. doi:10.1016/j.drugalcdep.2015.04.008

23. Wilson EC, Chen Y-H, Arayasirikul S, Wenzel C, Raymond HF. Connecting the dots: examining transgender women's utilization of transition-related medical care and associations with mental health, substance use, and HIV. *J Urban Health*. 2015;92(1):182-192. doi:10.1007/s11524-014-9921-4

24. Blosnich JR, Lehavot K, Glass JE, Williams EC. Differences in alcohol use and alcohol-related health care among transgender and nontransgender adults: findings from the 2014 behavioral risk factor surveillance system. *J Stud Alcohol Drugs*. 2017;78(6):861-866. doi:10.15288/jsad.2017.78.861

25. Byne W, Bradley SJ, Coleman E, et al; American Psychiatric Association Task Force on Treatment of Gender Identity Disorder. Report of the American Psychiatric Association task force on treatment of gender identity disorder. *Arch Sex Behav*. 2012;41 (4):759-796. doi:10.1007/s10508-012-9975-x

26. Almazan AN, Benson TA, Boskey ER, Ganor O. Associations between transgender exclusion prohibitions and insurance coverage of gender-affirming surgery. *LGBT Health*. 2020;7(5): 254-263. doi:10.1089/lgbt.2019.0212

27. Arnold JD, Nelson AE, Loubier EM. Trends in insurance coverage for gender-affirming surgeries. *JAMA Surg*. 2018;153(10):972. doi:10.1001/jamasurg.2018.2120

28. Kuzon WM Jr, Sluiter E, Gast KM. Exclusion of medically necessary gender-affirming surgery for America's armed services veterans. *AMA J Ethics*. 2018;20(4):403-413. doi:10.1001/journalofethics.2018.20.4.sect1-1804

29. Nobili A, Glazebrook C, Arcelus J. Quality of life of treatment-seeking transgender adults: a systematic review and meta-analysis. *Rev Endocr Metab Disord*. 2018;19(3):199-220. doi:10.1007/s11154-018-9459-y

30. Brånström R, Pachankis JE. Toward rigorous methodologies for strengthening causal inference in the association between gender-affirming care and transgender individuals' mental health: response to letters. *Am J Psychiatry*. 2020;177(8): 769-772. doi:10.1176/appi.ajp.2020.20050599

---

**Invited Commentary**

# Gender-Affirming Surgeries and Improved Psychosocial Health Outcomes

Andrew A. Marano, MD; Matthew R. Louis, MD; Devin Coon, MD, MSE

**There is a growing body of literature** supporting the positive outcomes of gender-affirming surgery (GAS) on transgender and gender diverse individuals. Mental health outcomes are among the most vital end points to study, given the fundamental intent of GAS to provide patients with relief from gender dysphoria and improvement of psychosocial distress. Much of the data on this topic come from observational studies that lack either control groups or adequate sample size.[1,2] In this issue of *JAMA Surgery*, Almazan and Keuroghlian[3] contribute an analysis of the US Transgender Survey (USTS), examining the topic of mental health outcomes following GAS.

This study[3] compared individuals who desired but had not undergone GAS with those who had, finding significantly lower rates of psychosocial distress, smoking, and suicidal ideation in the surgery group. When the analysis was broadened to include lifetime rather than recent symptoms (ie, the temporal association between surgery and symptoms was removed), the association became insignificant. The authors[3] concluded the significant associations were not because of prior mental health status but rather a result of surgical intervention.

We commend the authors[3] on their thorough exploration of the USTS, the largest collection of data on the experience of transgender and gender diverse individuals to our knowl-



Related article page 611

edge to date. They provide a controlled, well-powered study, and their findings align with prior studies demonstrating the efficacy of GAS. However, the largest challenge in interpreting this association lies in the mental health screening typically necessary to be a candidate for GAS, which may convolute the specific connection between these 2 variables. The authors have fashioned a surrogate temporal association from cross-sectional data, but it is one that inevitably depends on certain key assumptions to hold true.

The second challenge is the use of USTS survey questions to quantify psychosocial distress, rather than a validated outcome instrument targeted toward psychosocial assessment in the transgender and gender diverse population. This is not as much a critique of the method as an acknowledgment of the scarcity of prospective longitudinal data sets measuring robust outcomes. Prospective cohort-level analyses (rather than population-level analyses) with well-validated outcome instruments are widely recognized as the area requiring greater progress. In the interim, though, this report[3] contributes additional evidence to support the efficacy of GAS in alleviating dysphoria.

The availability of data on this community is a major impediment to addressing its needs and 1 reason the USTS was conducted in the first place, since nearly all governmental surveys continue to omit gender identity as a survey item. This issue has been recognized by numerous key public health

© 2021 American Medical Association. All rights reserved.

Downloaded from jamanetwork.com by Yale University user on 12/04/2023

AR683

Appx309

| RESEARCH AND PRACTICE |

# Prevalence of Gender Identity Disorder and Suicide Risk Among Transgender Veterans Utilizing Veterans Health Administration Care

John R. Blosnich, PhD, George R. Brown, MD, Jillian C. Shipherd, PhD, Michael Kauth, PhD, Rebecca I. Piegari, MS, and Robert M. Bossarte, PhD

The *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* (*DSM-IV*) defines gender identity disorder (GID) as having deeply rooted feelings of persistent discomfort with one's current biological gender and having the desire to be of the opposite gender to the extent that "the disturbance causes clinically significant distress or impairment in . . . important areas of functioning."[1(p260)]

Although the diagnosis is relatively rare, persons diagnosed with GID constitute a subpopulation of people who experience numerous disparities in physical and mental health as well as health care access.[2] Although a precise estimate of GID occurrence among the general population is unknown, one theoretical framework (i.e., flight into hypermasculinity) posits that GID may be overrepresented in the military and among veterans,[3] and there is support for this hypothesis in community-based samples of transgender persons in which high prevalence of military service is observed.[4] Furthermore, there is evidence of elevated risk for suicidal behavior among transgender populations.[5–10] However, prevalence of GID and suicide-related events (e.g., suicide planning, suicide attempt) have yet to be examined among veterans who have received Veterans Health Administration (VHA) services. We have addressed this unmet need.

## GENDER IDENTITY DISORDER TERMINOLOGY

Although there are multiple ways that a person diagnosed with GID may self-identify, the 2 common terms used in the literature for this self-identification are transgender and transsexual. Transgender is a term with broader scope; it typically encompasses individuals who self-identify as being or living outside socially constructed gender roles of masculinity and femininity. Transsexual is often used to conceptualize a subset of transgender persons who usually desire to undergo physical changes to their bodies, potentially including cross-gender hormone treatments and gender reassignment surgery.[11]

Because the data for our analysis did not permit an assessment of self-identified transgender or transsexual status, we have used the terms GID, transgender, and transsexual interchangeably, and our review of the literature includes findings of studies with GID, transgender, and transsexual samples. Although these populations share many qualities, we duly note that persons with GID constitute only a portion of transgender and transsexual communities. Thus, our focus on persons diagnosed with GID (i.e., a clinical subpopulation) should not be misinterpreted to represent either transgender or transsexual populations at large.

Currently, the most common treatments for GID are combinations of psychotherapy, cross-gender hormone therapy, living full time in the cross-gender role, electrolysis, voice therapy, and surgical procedures.[12–14]

## PREVALENCE OF GENDER IDENTITY DISORDER

Precise estimates of the number of persons with GID are difficult to make, as not every person with GID is able to access care from a health care provider who is knowledgeable in this diagnosis.[5,15,16] Moreover, many studies of GID use records of gender reassignment surgeries as a proxy census (i.e., counting only transsexuals with severe forms of GID),[17] which likely produces underestimates of GID prevalence, as only a small fraction of GID-diagnosed individuals undergoes gender reassignment surgeries.[18]

The *DSM-IV* estimates that 1 in 30 000 natal males and 1 in 100 000 natal females have GID among the US population; however, these figures are based on older, limited data.[1] More recent research, from other countries,

*Objectives.* We estimated the prevalence and incidence of gender identity disorder (GID) diagnoses among veterans in the Veterans Health Administration (VHA) health care system and examined suicide risk among veterans with a GID diagnosis.

*Methods.* We examined VHA electronic medical records from 2000 through 2011 for 2 official ICD-9 diagnosis codes that indicate transgender status. We generated annual period prevalence estimates and calculated incidence using the prevalence of GID at 2000 as the baseline year. We cross-referenced GID cases with available data (2009–2011) of suicide-related events among all VHA users to examine suicide risk.

*Results.* GID prevalence in the VHA is higher (22.9/100 000 persons) than are previous estimates of GID in the general US population (4.3/100 000 persons). The rate of suicide-related events among GID-diagnosed VHA veterans was more than 20 times higher than were rates for the general VHA population.

*Conclusions.* The prevalence of GID diagnosis nearly doubled over 10 years among VHA veterans. Research is needed to examine suicide risk among transgender veterans and how their VHA utilization may be enhanced by new VA initiatives on transgender care. (*Am J Public Health.* 2013;103:e27–e32. doi: 10.2105/AJPH.2013.301507)

reports that GID may be more common,[19] ranging from approximately 1 in 13 000 natal males and 1 in 34 000 females in Belgium[20] to 1 in 11 000 natal males and 1 in 20 000 natal females in the Netherlands.[21] Although more precise estimates of population prevalence are unavailable, trends across studies suggest that GID is more common among natal males than among natal females,[19] with a prevalence ratio of 3 natal males with GID to every 1 natal female with GID.[17]

## SUICIDE RISK DISPARITIES

Research on GID-diagnosed, transgender, and transsexual populations is sparse, and no national-level health surveillance survey currently collects information that can be used to reliably identify these populations. The literature suggests that people diagnosed with GID may experience a significantly elevated risk for suicide. For example, a study of more than 300 transgender persons in Virginia documented that 65% had lifetime suicidal ideation.[6] Similarly, a study of 70 US military veterans, most self-referred for a gender evaluation, found that 61% reported lifetime suicidal ideation.[7] These estimates are much higher than the estimated 8.4% prevalence of lifetime suicidal ideation among the general adult US population.[22] Elevated suicidal ideation has similarly been found among other samples of transgender persons in the United States.[5,8,10]

Research also suggests that attempted suicide is disproportionately higher among transgender populations. In a needs assessment of nearly 200 transgender persons in Philadelphia, Pennsylvania, nearly one third (30.1%) reported at least 1 lifetime suicide attempt.[5] Clements-Nolle et al. also noted that roughly a third (32.2%) in their sample of more than 500 transgender respondents reported a lifetime suicide attempt.[23] Other studies report a lifetime suicide attempt prevalence ranging from 18% to 41%.[6,24–27] By comparison, less than 3% of the general US population report a lifetime suicide attempt.[22]

Relative to data about suicide ideation and attempt, information about suicide among persons with GID is perhaps the most limited, with the only known estimates derived from surveillance in the Netherlands. In a retrospective study of more than 1400 transsexual

outpatients from that country's largest clinic providing transsexual health care, van Kesteren et al. noted substantially higher death by suicide among transsexual patients than among the age- and gender-corresponding general Dutch population rates (standardized mortality ratio [SMR] = 9.29; 95% CI = 4.94, 15.88).[28] In a recent follow-up study of outpatients from the same clinic in July 1997, the authors still found elevated rates of death from suicide, although they were not as pronounced as in their earlier findings (SMR = 5.70; 95% CI = 4.93, 6.54).[29] More recent studies among transsexual persons in Sweden report a similar elevated risk of suicide.[30] To our knowledge, no empirical investigation has examined similar rates of suicide mortality among US populations of persons with GID or who identify as either transgender or transsexual.

## GENDER IDENTITY DISORDER AND VETERANS

There is a theoretical basis, informed by clinical case analysis, for the suggestion that the prevalence of GID may be disproportionately higher among persons with military service histories than among the general population. Based on a case series, Brown developed a flight into hypermasculinity theory, asserting that young men with GID may enlist in the military at critical periods in their psychosocial development to "become real men" or to purge their inner gender conflict through the strict rigor and focus on overtly masculine activities (e.g., weaponry training, physical training, combat).[3]

Supplementing Brown's theoretical framework is the fact that more than 95% of the VHA system's patients are male[31]; GID is suspected to occur with more frequency among natal males.[1] In a community-based sample of 141 transgender individuals, Shipherd et al. found that veteran status was endorsed at 3 times what is observed in the general population, and VHA use was elevated among transgender veterans (16.3% in the past 6 months) relative to general rates of VHA use (annual 6.2%–15.8%).[4] Furthermore, in June 2011, the VHA issued a new directive outlining health care for transgender and intersex veterans, which may have

increased the willingness of transgender veterans to seek VHA care.

Thus, we first sought to document the prevalence of official diagnoses of GID within the VHA health care system. Second, because of evidence of greater risk for suicide attempt among transgender populations, we also examined suicide-related events among VHA-utilizing veterans with a diagnosis of GID.

## METHODS

The VHA is the single largest integrated system for health care in the United States, annually serving more than 8 million veterans.[32] Because the VHA has a national system of standardized electronic medical records,[33] we employed a review of both inpatient and outpatient electronic patient treatment files from fiscal year (FY)2000 through FY2011. We specified inclusion criteria for a GID case as being a patient with an ICD-9 diagnosis code of either 302.85 (gender identity disorder in adolescents or adults; i.e., GID) or 302.6 (gender identity disorder not otherwise specified; i.e., GID-NOS) recorded during any inpatient stay or outpatient encounter or visit. We counted a patient with a GID diagnosis only once, and the first notation of the GID diagnosis in the patient treatment files indicated the FY in which said patient would be counted. We generated period prevalence estimates for each FY by dividing the number of unique GID diagnoses in that FY by the total number of patients seen in that calendar year. FYs start October 1 and end September 30. For example, FY2011 started October 1, 2010, and ended September 30, 2011.

Although there is prevalence of GID diagnoses beginning in FY2000, the VHA patient data were not obtainable for FY2000 or FY2001; thus, we could not calculate any period prevalence or incidence proportions of GID diagnoses for those years. Beginning in FY2002, we calculated incidence estimates using the prevalence of GID at FY2000 as the baseline for assessing new, unique cases of GID. An additional conservative assumption in annual incidence calculations was omitting the cumulative extant cases of GID from the population at risk (i.e., the denominator) for

| RESEARCH AND PRACTICE |

each year, which assumes that a patient diagnosed with GID stayed in VHA care throughout the observed period and thus needed to be removed from the denominator of people at risk. For example, we subtracted the total new GID cases documented in both FY2000 and FY2001 from the FY2002 denominator for calculation of the most conservative FY2002 incidence.

It is important to note that although the vast majority of VHA users are veterans, the cohort of VHA users also includes some nonveterans (i.e., veterans' family members). We reviewed inpatient and outpatient files for the unique cases of GID for variables specifically identifying that person as a nonveteran. Overall, the numbers of nonveteran VHA users with GID was extremely small in each year, ranging from a low of zero in FY2005 through FY2007 to a high of 5 in FY2000. Because of the small number of nonveteran cases, we kept all identified cases.

We examined past year suicide-related event prevalence by cross-referencing all GID cases with the VHA's Suicide Prevention Application Network (SPAN) database. SPAN is a database of information about suicide-related behaviors reported by the national network of suicide prevention coordinators situated in every VHA medical center and large outpatient facility. We did not include suicide deaths among the outcomes. Suicide-related events include suicide-related behaviors recorded by the suicide prevention coordinators (e.g., interrupted suicide attempts, gestures with a firearm, suicide plans). Because the suicide prevention coordinators focus on behaviors, suicidal ideation is not a recorded outcome in SPAN. Furthermore, although SPAN does contain data on suicide deaths, the local reporting of deaths (i.e., from coroners or medical examiners) is not mandatory and is not considered complete. Thus all outcomes from SPAN used only nonfatal events.

We cross-referenced GID cases from available years of data from SPAN (i.e., FY2009–2011) for at least 1 suicide-related event noted in each year; we counted persons with multiple events in 1 year only once. To generate prevalence of suicide events, we divided the number of GID cases with at least 1 report of a suicide-related event for each year by the

cumulative data of GID diagnoses in that particular year.

## RESULTS

Across the analytic period of FY2000–FY2011, 3177 unique persons had at least 1 diagnosis of GID in their files. Prevalence calculations suggest an increasing trend of GID in the VHA (Figure 1). Although we could not calculate estimates for FY2000–FY2001 because of a lack of data on the VHA cohort of patients, beginning with FY2002 data, we noted a baseline prevalence of 12.52 per 100 000.

The prevalence of GID among VHA users has nearly doubled over the 10-year period we examined, whereas the incidence has been relatively stable (Table 1). Beginning in FY2000, new cases have been identified in the VHA at an average rate of 246 cases per year, whereas some previously identified veterans with GID continue to use VHA care, resulting in a near doubling of the prevalence of GID diagnoses in the VHA. All 3 past year prevalence estimates of suicide-related events, ranging from 4000 per 100 000 to 5000 per 100 000, were much higher than are any currently

available general population metric of past year suicidal behavior (Table 2).

## DISCUSSION

To our knowledge this is the largest study of a transgender population to date in the United States, and our findings indicate a much higher prevalence of GID among VHA veterans than what has been reported previously in the literature,[19] lending support to Brown's flight into hypermasculinity theory within military populations. Specifically, in FY2011, 22.9 per 100 000 VHA users had a diagnosis of GID, which is more than 5 times the *DSM-IV* prevalence estimate of GID in the general US population (4.3/100 000 persons). The results showed a relatively stable annual incident rate of 246 new diagnoses of GID, contributing to an increasing prevalence of VHA veterans with GID.

Why the prevalence of GID among this veteran population is higher than is that in the general population is beyond the scope of our study; several areas of future research are needed to better qualify these results. For instance, the estimate of GID from the *DSM* is based on older studies and may not accurately reflect the current prevalence of GID.



*Note.* GID = gender identity disorder.

**FIGURE 1—Prevalence of GID diagnoses by fiscal year: United States, 2000–2011.**

**TABLE 1—Prevalence and Incidence of GID Diagnoses by Fiscal Year: United States, 2000–2011**

| Fiscal Year | Total New GID Diagnoses, No. | Total GID Diagnoses, No. | Total VHA Patients, No. | Period Prevalence[a] | Incidence[a] |
|---|---|---|---|---|---|
| 2000 | 472[b] | 472 | . . . | . . . | . . . |
| 2001 | 261 | 475 | . . . | . . . | . . . |
| 2002 | 283 | 569 | 4 544 353 | 12.52 | 6.23 |
| 2003 | 228 | 590 | 4 805 421 | 12.28 | 4.74 |
| 2004 | 235 | 673 | 4 977 772 | 13.52 | 4.72 |
| 2005 | 214 | 747 | 5 094 425 | 14.66 | 4.20 |
| 2006 | 196 | 801 | 5 188 825 | 15.44 | 3.78 |
| 2007 | 209 | 889 | 5 230 122 | 17.00 | 4.00 |
| 2008 | 203 | 930 | 5 299 645 | 17.55 | 3.83 |
| 2009 | 230 | 979 | 5 448 058 | 17.96 | 4.22 |
| 2010 | 285 | 1162 | 5 638 263 | 20.61 | 5.06 |
| 2011 | 361 | 1326 | 5 795 165 | 22.88 | 6.23 |

*Note.* GID = gender identity disorder; VHA = Veterans Health Administration. Prevalence = total GID diagnoses/total VHA patients; incidence = total new GID diagnoses/total VHA patients in previous years' diagnoses.
[a]Per 100 000 patients.
[b]Used as baseline although formal diagnosis may have occurred before fiscal year 2000.

Furthermore, because GID is more prevalent among natal males than among natal females, the VHA may see a disproportionately high prevalence because the majority of its patients are males. Reports of GID diagnoses from other large health systems in the United States would aid in examining how results from patients enrolled in different health systems (e.g., 1 not solely composed of those eligible for VHA benefits) compare with our findings and thus help to better understand the current prevalence of GID.

On the basis of simple de-identified counts, it is unclear whether these veterans continued to seek care over time in the VHA once diagnosed. The existence of transgender veterans poses many additional questions, such as what types of care are most utilized among this population. Preliminary studies suggest that transgender veterans are likely to seek both medical and mental health care at VHA facilities.[4] Utilization and quality of care are particularly salient questions since the VHA announced its first ever directive outlining health care provision to transgender and intersex veterans in June 2011, and there have been documented problems in accessing care for transgender persons.[34] Consequently, there may be historical shifts in the trends of GID diagnoses in the time before and after the issuance of the directive. In addition to utilization, future research is needed to examine other facets of health, including comorbidities and sources of mortality.

Suicide is a particular concern for this population. Results show that suicide-related events occur at significantly elevated rates among this population, which corroborates results from other transgender samples.[8,10,26,27] Estimates for each year—ranging from 4000 per 100 000 to 5000 per 100 000—were well above any general population metric related to suicidal behavior. For example, general population data available from the Centers for Disease Control and Prevention Web-based Injury Statistics Query and Reporting System indicate a past year crude rate of self-harm injuries of 150.61 per 100 000 in the year 2010.[35] Among VHA veterans in general, the rate of suicide-related events in FY2010 was approximately 202 per 100 000 patients,[36] which makes the FY2010 rate among veterans with GID more than 20 times higher.

A recent World Health Organization multinational report of past-year suicidal behavior noted that approximately 2.0% of adults reported suicidal ideation, 0.6% reported suicide planning, and 0.3% reported a suicide attempt.[37] By contrast, estimates of unique suicide-related events among veterans with GID using VHA care ranged from 4.1% to 5.1%. Although comparisons are illustrative and studies strive to measure similar overarching constructs of suicide risk, exact definitions and measures of suicidal behavior differ, making direct comparison impossible. Moreover, it is unclear whether transgender veterans may have higher or lower burden of suicide risk compared with their transgender nonveteran peers, as veterans may carry unique experiences that are associated with suicide risk, such as combat exposure and traumatic brain injury.[38,40] Nor is it clear how this population of veterans with GID diagnoses compares with the larger population of transgender veterans who do not meet criteria for GID or GID-NOS.

The burden of suicide risk among this population clearly warrants more attention regarding etiology, prevention, and intervention. For example, high rates of early life trauma among transgender persons (e.g., childhood maltreatment, peer victimization)[24,34,41,42] may contribute to the risk of suicide, but it is unclear how and whether trauma from military service interacts with previous trauma. In terms of prevention and because of the extremely high prevalence of suicide-related behavior among this sample of transgender veterans, more research is needed to examine whether suicide

**TABLE 2—Suicide-Related Event Prevalence Among GID-Diagnosed Veterans by Fiscal Year: United States, 2000–2011**

| Fiscal Year | GID Patients With ≥ 1 Suicide Related Events | Total GID Patients | Period Prevalence of Suicide Related Events[a] |
|---|---|---|---|
| 2009 | 40 | 979 | 4085.80 |
| 2010 | 49 | 1162 | 4216.87 |
| 2011 | 68 | 1326 | 5128.21 |

*Note.* GID = gender identity disorder.
[a]Per 100 000 patients.

e30 | Research and Practice | Peer Reviewed | *Blosnich et al.*    American Journal of Public Health | October 2013, Vol 103, No. 10

AR741
Appx313

| RESEARCH AND PRACTICE |

prevention campaigns and services are reaching or being utilized by this population.[43][45]

## Limitations

Several limitations of this study must be noted. First, although we have reported a census sample of all GID diagnoses in VHA medical records from FY2000 through FY2011, the specialized nature of this subpopulation (i.e., clinically diagnosed veterans) limits generalizability.

Second, the study period was before the VHA's June 2011 directive outlining health care for transgender veterans. Thus, the census of GID diagnoses may be an underestimate because transgender veterans may have felt uncomfortable seeking care from the VHA before the issuance of the directive. For instance, before the national directive a few localized VHA policies prevented access to specific types of care (i.e., cross-gender hormones) for veterans with GID, which may have resulted in veterans seeking care elsewhere.

Third, we were unable to assess for misclassification bias through potential mistaken diagnosis codes in the patient treatment files.

Fourth, we employed a definition of transgender status limited to clinical diagnoses, which may have missed persons without clinical diagnoses of GID who self-identify as transgender but may have included persons with GID who do not self-identify as transgender. Finally, although SPAN is currently the largest registry of suicide-related events in the United States, it may not capture all events and has operated only since 2008; thus, it is likely an underestimate of suicide risk for this population.

## Conclusions

As research continues to develop, the VHA has taken steps to improve health care outcomes for transgender veterans since issuing the transgender health care directive.[46] Activities included system-wide communications and development of resources about transgender health care and a series of national virtual meetings for VHA clinical staff on conducting evaluations for hormone therapy, prescribing cross-gender hormones, and providing an integrated care approach for transgender veterans. Plans are underway to produce a web-based continuing education program on transgender health care for new clinical staff and to establish formal clinical consultation services on culturally appropriate transgender care. These efforts are supported by recent joint commission guidelines that require accredited facilities to eliminate discriminatory policies and procedures and provide staff training on culturally and clinically appropriate care for lesbian, gay, bisexual, and transgender individuals.[47]

This report contributes to a small but growing body of literature about transgender health and is a first step in exploring the unique health needs of GID-diagnosed veterans within the VHA. Transgender persons experience many barriers in seeking and access to health care,[4,5,34] but these issues have not been explored fully among transgender persons within the VHA, which is the nation's largest integrated health care system.

Several questions remain about the transgender veteran population, the most pressing of which includes addressing the unusually high burden of suicidal behavior and finding ways of identifying transgender populations beyond the sole use of diagnosis codes. More nuanced future examinations could also contribute to a better understanding about subgroups within the transgender veteran population. The VHA has made recent progress by issuing a directive outlining clinical care guidelines for transgender veterans and providing training to staff, but there is still much to learn about this veteran population's health care utilization and epidemiology of health issues. ∎

## About the Authors

John R. Blosnich is with the Department of Psychiatry, University of Rochester, Rochester, NY. George R. Brown is with the VA Office of Health Equity (10A6), Washington, DC. Jillian C. Shipherd is with VA Boston Healthcare System, Boston, MA. Michael Kauth is with VA South Central Mental Illness Research, Education, & Clinical Center, Michael E. DeBakey VA Medical Center, Houston, TX. At the time of this study, Rebecca I. Piegari was with Department of Veteran Affairs VISN-2 Center of Excellence for Suicide Prevention, Canandaigua, NY. Robert M. Bossarte is with the Department of Veteran Affairs VISN-2 Center of Excellence for Suicide Prevention.

Correspondence should be sent to John R. Blosnich, Department of Veterans Affairs VISN-2 Center of Excellence for Suicide Prevention, 400 Fort Hill Ave, Canandaigua, NY 14424 (e-mail: john_blosnich@urmc.rochester.edu). Reprints can be ordered at http://www.ajph.org by clicking the "Reprints" link.

This article was accepted June 7, 2013.

## Contributors

J. R Blosnich analyzed the data. R. I. Piegari directed data analysis and management. R. M. Bossarte conceptualized the study. All authors contributed to the writing of the article.

## Acknowledgments

This work was partially supported by the Department of Veterans Affairs VISN-2 Center of Excellence for Suicide Prevention and by a postdoctoral fellowship in an Institutional National Research Service Award from the National Institute of Mental Health (award 5T32MH02006112 to J. R B.).

Note. The opinions expressed in this work are the authors' and do not reflect those of the funding institutions, the US Department of Veterans Affairs, or the US Government.

## Human Participant Protection

This project was approved by the institutional review board of the Veterans Affairs Medical Center-Syracuse, NY.

## References

1. American Psychiatric Association. Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition. Washington, DC; 2000.

2. Clements-Nolle K, Marx R, Guzman R, Katz M. HIV prevalence, risk behaviors, health care use, and mental health status of transgender persons: implications for public health intervention. Am J Public Health. 2001; 91(6):915–921.

3. Brown G. Transsexuals in the military: flight to hypermasculinity. Arch Sex Behav. 1988;17(6):527–537.

4. Shipherd JC, Mizock L, Maguen S, Green K. Male-to-female transgender veterans and VA health care utilization. Int J Sex Health. 2012;24(1):78–87.

5. Kenagy GP. Transgender health: findings from two needs assessment studies in Philadelphia. Health Soc Work. 2005;30(1):19–26.

6. Xavier J, Honnold JA, Bradford J. The Health, Health-Related Needs, and Lifecourse Experiences of Transgender Virginians. Richmond, VA: Virginia Department of Health; 2007.

7. McDuffie E, Brown G. 70 US veterans with gender identity disturbances: a descriptive study. Int J Transgenderism. 2010;12:1, 21–30.

8. Mathy R. Transgender identity and suicidality in a nonclinical sample: sexual orientation, psychiatric history, and compulsive behaviors. J Psychol Human Sex. 2002;14(4):47–65.

9. Xavier J, Bobbin M, Singer B, Budd E. A needs assessment of transgendered people of color living in Washington, DC. Int J Transgenderism. 2005;8(2–3): 31–47.

10. Kenagy G, Bostwick W. Health and social service needs of transgender people in Chicago. Int J Transgenderism. 2005;8(2–3):57–66.

11. Lombardi EL. Enhancing transgender health care. Am J Public Health. 2001;91(6):869–872.

12. Levine SB, Brown GR, Coleman E, et al. The standards of care for gender identity disorders. J Psychol Human Sex. 1999;11(2):1–34.

13. Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, Version 7.

Minneapolis, MN: World Professional Association for Transgender Health; 2011.

14. King RS, Brown GR, McCrea CR. Voice parameters that result in identification or misidentification of biological gender in male-to-female transgender veterans. *Int J Transgenderism.* 2012;13(3):117–130.

15. Sanchez NF, Sanchez JP, Danoff A. Health care utilization, barriers to care, and hormone usage among male-to-female transgender persons in New York City. *Am J Public Health.* 2009;99(4):713–719.

16. Sperber J, Landers S, Lawrence S. Access to health care for transgendered persons: results of a needs assessment in Boston. *Int J Transgenderism.* 2005;8(2–3):75–91.

17. Landén M, Wålinder J, Lundström B. Prevalence, incidence and sex ratio of transsexualism. *Acta Psychiatr Scand.* 1996;93(4):221–223.

18. Cohen-Kettenis PT, Gooren L. Transsexualism: a review of etiology, diagnosis and treatment. *J Psychosom Res.* 1999;46(4):315–333.

19. Zucker K, Lawrence A. Epidemiology of gender identity disorder: recommendations for the Standards of Care of the World Professional Association for Transgender Health. *Int J Transgenderism.* 2009;11(1):8–18.

20. De Cuypere G, van Hemelrijck M, Michel A, et al. Prevalence and demography of transsexualism in Belgium. *Eur Psychiatry.* 2007;22(3):137–141.

21. Bakker A, van Kesteren PJM, Gooren L, Bezemer P. The prevalence of transsexualism in the Netherlands. *Acta Psychiatr Scand.* 1993;87(4):237–238.

22. Baca-Garcia E, Perez-Rodriguez MM, Keyes KM, et al. Suicidal ideation and suicide attempts in the United States: 1991–1992 and 2001–2002. *Mol Psychiatry.* 2010;15(3):250–259.

23. Clements-Nolle K, Marx R, Katz M. Attempted suicide among transgender persons: the influence of gender-based discrimination and victimization. *J Homosex.* 2006;51(3):53–69.

24. Grossman AH, D'Augelli AR. Transgender youth and life-threatening behaviors. *Suicide Life Threat Behav.* 2007;37(5):527–537.

25. Maguen S, Shipherd JC. Suicide risk among transgender individuals. *Psychol Sex.* 2010;1(1):34–43.

26. Grant JM, Mottet LA, Tanis J, Herman JL, Harrison J, Keisling M. *National Transgender Discrimination Survey Report on Health and Health Care.* Washington, DC: National Center for Transgender Equality and the National Gay and Lesbian Task Force; 2010.

27. Terada S, Matsumoto Y, Sato T, Okabe N, Kishimoto Y, Uchitomi Y. Suicidal ideation among patients with gender identity disorder. *Psychiatry Res.* 2011;190 (1):159–162.

28. van Kesteren PJM, Asscheman H, Megens JAJ, Gooren L. Mortality and morbidity in transsexual subjects treated with cross-sex hormones. *Clin Endocrinol (Oxf).* 1997;47(3):337–342.

29. Asscheman H, Giltay EJ, Megens JA, de Ronde W, van Trotsenburg MA, Gooren LJ. A long-term follow-up study of mortality in transsexuals receiving treatment with cross-sex hormones. *Eur J Endocrinol.* 2011;164 (4):635–642.

30. Dhejne C, Lichtenstein P, Boman M, Johansson ALV, Långström N, Landén M. Long-term follow-up of transsexual persons undergoing sex reassignment surgery: cohort study in Sweden. *PLoS ONE.* 2011;6(2):e16885.

31. Frayne SM, Yano EM, Nguyen VQ, et al. Gender disparities in Veterans Health Administration care. *Med Care.* 2008;46(5):549–553.

32. US Department of Veterans Affairs. About VHA. 2011. Available at: http://www.va.gov/health/aboutVHA.asp#datasource. Accessed January 26, 2012.

33. Jha AK, DesRoches CM, Campbell EG, et al. Use of electronic health records in US Hospitals. *N Engl J Med.* 2009;360(16):1628–1638.

34. Shipherd JC, Green K, Abramovitz SM. Transgender clients: identifying and minimizing barriers to mental health treatment. *J Gay Lesbian Ment Health.* 2010;14 (2):94–108.

35. Centers for Disease Control and Prevention. Injury prevention & control: data & statistics (WISQARS). 2011. Available at: http://www.cdc.gov/injury/wisqars/index.html. Accessed January 11, 2012.

36. US Department of Veterans Affairs. *Fact Sheet: VA Suicide Prevention Program Facts About Veteran Suicide.* Washington, DC: Office of Patient Care Services; Office of Mental Health Services; 2011.

37. Borges G, Nock MK, Haro Abad JM, et al. Twelve-month prevalence of and risk factors for suicide attempts in the World Health Organization World Mental Health Surveys. *J Clin Psychiatry.* 2010;71(12):1617–1628.

38. Kemp JE, Bossarte R. *Suicide Data Report, 2012.* Washington, DC: Department of Veterans Affairs; 2013.

39. Prigerson HG, Maciejewski PK, Rosenheck RA. Population attributable fractions of psychiatric disorders and behavioral outcomes associated with combat exposure among U.S. men. *Am J Public Health.* 2002;92 (1):59–63.

40. Maguen S, Luxton DD, Skopp NA, et al. Killing in combat, mental health symptoms, and suicidal ideation in Iraq war veterans. *J Anxiety Disord.* 2011;25(4):563–567.

41. Shipherd JC, Maguen S, Skidmore WC, Abramovitz SM. Potentially traumatic events in a transgender sample. *Traumatology.* 2011;17(2):56–67.

42. Drescher J, Byne W. Gender dysphoric/gender variant (GD/GV) children and adolescents: summarizing what we know and what we have yet to learn. *J Homosex.* 2012;59(3):501–510.

43. Katz IR, Kemp JE, Blow FC, McCarthy JF, Bossarte R. Changes in suicide rates and in mental health staffing in the Veterans Health Administration, 2005. *Psychiatr Serv.* 2013;64(7):620–625.

44. Kemp JE, Bossarte R. Surveillance of suicide and suicide attempts among veterans: address a national imperative. *Am J Public Health.* 2012;102(suppl 1):e4–e5.

45. Katz I. Lessons learned from mental health enhancement and suicide prevention activities in the Veterans Health Administration. *Am J Public Health.* 2012;102(suppl 1):S14–S16.

46. Blosnich JR, Bossarte RM, Silenzio VM. Suicidal ideation among sexual minority veterans: results from the 2005–2010 Massachusetts Behavioral Risk Factor Surveillance Survey. *Am J Public Health.* 2012;102(suppl 1):S44–S47.

47. *Advancing Effective Communication, Cultural Competence, and Patient- and Family-Centered Care for the Lesbian, Gay, Bisexual, and Transgender (LGBT) Community: A Field Guide.* Oak Brook, IL: The Joint Commission; 2011.

e32 | Research and Practice | Peer Reviewed | *Blosnich et al.*    American Journal of Public Health | October 2013, Vol 103, No. 10

AR743
Appx315

<div align="center">

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

</div>

|  |  |  |
|---|---|---|
| DEE FULCHER, GIULIANO SILVA, and TRANSGENDER AMERICAN VETERANS ASSOCIATION, | ) ) ) ) | |
| Petitioners, | ) ) ) | **PETITION FOR REVIEW** |
| v. | ) ) ) | **PURSUANT TO 38 U.S.C. § 502** |
| SECRETARY OF VETERANS AFFAIRS, | ) ) ) | |
| Respondent. | ) ) | |

Pursuant to 38 U.S.C. § 502 and Federal Circuit Rule 47.12, Dee Fulcher ("Ms. Fulcher"), Giuliano Silva ("Mr. Silva"), and the Transgender American Veterans Association ("TAVA") (collectively "Petitioners") hereby petition this Court for review of the denial of their petition for rulemaking by the U.S. Department of Veterans Affairs (the "Department" or "VA"). The petition for rulemaking, *see* Exhibit 1 ("Pet."), requested that the Department initiate rulemaking to amend or repeal rules and regulations excluding sex reassignment surgery as a covered medical benefit for transgender veterans and, in particular, to amend or repeal 38 C.F.R. § 17.38(c)(4) (the "Regulation"), which categorically excludes coverage for "gender alterations."

<div align="center">

1

</div>

## STATEMENT OF THE CASE

On May 9, 2016, Petitioners filed a petition for rulemaking pursuant to 5 U.S.C. § 553(e), requesting that the VA "amend or repeal the rules and regulations, including 38 C.F.R. § 17.38(c)(4) and any implementing directives, that exclude medically necessary sex reassignment surgery for transgender veterans from the medical benefits package provided to veterans under the health care system of the [Department], and to promulgate regulations expressly including medically necessary sex reassignment surgery for transgender veterans in that medical benefits package." Pet. 1. The Department acknowledged receipt of the petition.

Later in the spring of 2016, the Department announced in the Unified Agenda of Federal Regulatory and Deregulatory Actions, a semiannual compilation of regulatory actions under development in the federal government, that it was considering issuance of a notice of proposed rulemaking to remove the regulation that prohibits the VA from providing medical services that are considered gender alterations.

On November 10, 2016, the Department informed members of Congress that it was withdrawing consideration of that possible rulemaking from its regulatory agenda. *See* Exhibit 2. Although the Department stated that it "will continue to explore a regulatory change that would allow VA to perform gender alteration surgery and a change in the medical benefits package, when appropriated funding

2

is available," it made clear that any rulemaking that would allow the VA to perform or pay for such treatment is "not imminent." *Id.* The VA's letter amounts to a denial of the petition. *See Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior*, 794 F. Supp. 2d 39, 46 (D.D.C. 2011) (holding in part that an agency's letter response, which stated that the agency may engage in future rulemaking but would not initiate rulemaking at that time, constituted a denial of the plaintiffs' petition for rulemaking).

This petition for review is timely because it is filed within 60 days of the VA's letter as required by Federal Circuit Rule 47.12. This Court has jurisdiction pursuant to 38 U.S.C. § 502 to review the VA's denial of the petition for rulemaking. *See Preminger v. Sec'y of Veterans Affairs*, 632 F.3d 1345, 1352 (Fed. Cir. 2011).

## PETITIONERS

Pursuant to Federal Circuit Rule 47.12, Petitioners state that each has been adversely affected by the VA's denial of the petition for rulemaking.

Ms. Fulcher is a transgender veteran of the U.S. Marine Corps who has been diagnosed with gender dysphoria and whose VA clinicians have recommended sex reassignment surgery as treatment. Pet. 6. Because of the Regulation, Ms. Fulcher cannot obtain medically necessary procedures that her clinicians have prescribed. Pet. 6.

3

Mr. Silva is a transgender man who has also been diagnosed with gender dysphoria.  He is a veteran of the U.S. Army.  Pet. 6.  Mr. Silva would undergo both a mastectomy and reconstructive surgery but cannot obtain both because of the Regulation.  Pet. 6.

Both Ms. Fulcher and Mr. Silva are members of TAVA, which is a 501(c)(3) organization dedicated "to ensuring that transgender veterans receive appropriate and necessary medical care."  Pet. 4.  Members of TAVA have been denied access to sex reassignment surgery by the Regulation.  TAVA has independent standing to bring this petition because its members are directly harmed by the Regulation, the petition is germane to TAVA's purpose, and the participation of individual members is not required for the relief sought.  *See Disabled Am. Veterans v. Gober*, 234 F.3d 682, 689 (Fed. Cir. 2000) (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).  Specifically, at least one veteran is a member of TAVA, Pet. 6; advocacy relating to healthcare for transgender veterans is consistent with TAVA's mission, Pet. 5; and, although individual TAVA members are participating in this appeal, their participation is not necessary to obtain the desired relief—namely, an order requiring the VA to engage in the requested rulemaking.

## RELIEF SOUGHT

For the foregoing reasons, Petitioners request that this Court review the

Department's denial of the petition for rulemaking and direct the VA to undertake

a rulemaking to amend or repeal the Regulation.

Dated:  January 6, 2017                  Respectfully submitted,

M. Dru Levasseur                         /s/ Paul R.Q. Wolfson
LAMBDA LEGAL DEFENSE AND                 Paul R.Q. Wolfson
EDUCATION FUND, INC.                     WILMER CUTLER PICKERING
120 Wall Street, 19th Floor                  HALE AND DORR LLP
New York, NY 10005                       1875 Pennsylvania Avenue
Telephone:  (212) 809-8585               Washington, DC 20006
Facsimile:  (212) 809-0055               Telephone:  (202) 663-6390
                                         Facsimile:  (202) 663-6363
Tara L. Borelli
LAMBDA LEGAL DEFENSE AND                 Alan Schoenfeld
EDUCATION FUND, INC.                     WILMER CUTLER PICKERING
730 Peachtree Street NE, Suite 1070          HALE AND DORR LLP
Atlanta, GA 30308-1210                   7 World Trade Center
Telephone:  (404) 897-1880               250 Greenwich Street
Facsimile:  (404) 897-1884               New York, NY 10007
                                         Telephone:  (212) 937-7294
                                         Facsimile:  (212) 230-8888


*Attorneys for Petitioners*

5

NOTE: This order is nonprecedential.

# United States Court of Appeals for the Federal Circuit

———————————

**DEE FULCHER, GIULIANO SILVA, TRANSGENDER AMERICAN VETERANS ASSOCIATION,**

*Petitioners*

v.

**SECRETARY OF VETERANS AFFAIRS,**

*Respondent*

———————————

2017-1460

———————————

Petition for review pursuant to 38 U.S.C. Section 502.

———————————

PER CURIAM.

## <u>O R D E R</u>

The parties having so agreed, it is

ORDERED that the proceeding is DISMISSED under Fed. R. App. P. 42 (b). Each party shall bear its own costs.

FOR THE COURT

2                    FULCHER v. SECRETARY OF VETERANS AFFAIRS

August 1, 2018                    /s/ Peter R. Marksteiner
                                  Peter R. Marksteiner
                                  Clerk of Court


**ISSUED AS A MANDATE:** August 1, 2018

12/4/23, 2:30 PM    VA to offer gender surgery to transgender vets for the first time

Pentagon & Congress

# VA to offer gender surgery to transgender vets for the first time

By **Leo Shane III**



Sections    **Military** Times    News   Pay & Benefits   Flashpoints

Nick Rondoletto, left, and Doug Thorogood, wave a rainbow flag and a sign during a July 26, 2017, protest in San Francisco. (Olga R. Rodriguez/AP)

Veterans Affairs officials for the first time will offer surgeries for transgender veterans seeking to alter their physical attributes, Secretary Denis McDonough will announce on

AR941

Appx 373 Appx323

12/4/23, 2:30 PM

Case: 24-1714     Document: 78-1     Page: 330     Filed: 10/31/2024
Case: 24-108     Document: 2-2   VA to offer gender surgery to transgender vets for the first time     Filed: 04/25/2024

Saturday.

The move follows repeated promises by VA officials to make the department "more welcoming" to all veterans and was accompanied by an announcement that the Veterans Health Administration will rename its LGBT health program to the LGBTQ+ program to "reflect new community standards of inclusiveness and anticipate future changes in terms."

"[This is ] allowing transgender vets to go through the full gender confirmation process with VA by their side," McDonough said prepared remarks for an event at the Orlando VA Healthcare System in Florida. "We're making these changes not only because they are the right thing to do, but because they can save lives."

The National Center for Transgender Equality estimates there are more than 134,000 transgender veterans in America today, and another 15,000 transgender individuals serving in the armed forces.

**RELATED**



Reversing Trump, Pentagon releases new transgender policies

The new department regulations allow transgender people who meet military standards to enlist and serve openly in their self-identified gender, and they will be able to get medically...

By **Lolita C. Baldor, The Associated Press**

VA officials estimate that around 4,000 veterans nationwide will be interested in the surgeries. Total cost of the program is not yet known. The department also could not say when surgeries will be available, since officials must first go through a formal rule change process.

McDonough said making the change "will require changing VA's regulations and establishing policy that will ensure the equitable treatment and safety" of transgender veterans.

"There are several steps to take, which will take time. But we are moving ahead, methodically, because we want this important change in policy to be implemented in a manner that has been thoroughly considered to ensure that the services made available to veterans meet VA's rigorous standards for quality health care."

The announcement on gender confirmation surgeries, also known as gender reassignment surgeries, is a dramatic shift from the previous White House and President Donald Trump's moves to ban transgender individuals from joining the military and limit surgery options for those already in the ranks. Trump cited cost and morale concerns for that opposition.

McDonough, in his remarks, called it a matter of finding the best ways to serve veterans' needs.

"LGBTQ+ veterans experience mental illness and suicidal thoughts at far higher rates than those outside their community," he said. "But they are significantly less likely to seek routine care, largely because they fear discrimination.

"At VA, we're doing everything in our power to show veterans of all sexual orientations and gender identities that they can talk openly, honestly and comfortably with their health care providers about any issues they may be experiencing."

**RELATED**



Retired surgeons general say Trump's transgender ban damaged military readiness
A Palm Center study found that the policy negative affected recruiting, retention and morale.
By **Meghann Myers**

Since 2016, all VA facilities have had a local LGBT Veteran Care Coordinator responsible for helping those veterans connect to available services.

**AR943**

In a statement, House Veterans' Affairs Committee Chairman Mark Takano, D-Calif. and the first openly gay minority individual elected to Congress, hailed the move.

"Veterans in need of gender confirmation surgery should not have to seek healthcare outside of the VA health system or navigate complicated processes to get the care they need," he said. "VA must be inclusive of all veterans who have served, regardless of their identity."

Senate Veterans' Affairs Committee Chairman Jon Tester, D-Mont., similarly praised the expansion of health care offerings for transgender veterans.

"Every service member and veteran deserves equal access to quality care from VA, and this includes our LGBTQ+ veterans," he said in a statement. "We must reaffirm our commitment to making VA a more welcoming place for everyone who fought to protect our freedoms."

But House Veterans' Affairs Committee ranking member Mike Bost, R-Ill., blasted the announcement as the White House trying to win "the culture wars."

"This announcement clearly has more to do with advancing a radical liberal agenda than serving veterans," he said. "It is a disgrace. This administration should rethink their priorities immediately."

In a statement, GLAAD President Sarah Kate Ellis praised the news as "not only an overdue victory for transgender veterans, but the latest move from Secretary McDonough and the VA in affirming LGBTQ veterans."

---

About **Leo Shane III**

Leo covers Congress, Veterans Affairs and the White House for Military Times. He has covered Washington, D.C. since 2004, focusing on military personnel and veterans policies. His work has earned numerous honors, including a 2009 Polk award, a 2010 National Headliner Award, the IAVA Leadership in Journalism award and the VFW News Media award.

**Transgender Care Coordination**
External Frequently Asked Questions (FAQs)

## External FAQs: Removing "Gender Alterations" Exclusion from the VA Medical Benefits Package

### 1. What is VA's policy regarding health care for transgender Veterans?

VA is committed to ensuring that we, as an integrated service and benefits delivery system, are welcoming to all Veterans, including those with minority gender identities and expressions. As part of this commitment, VA provides all medically necessary gender affirming care to transgender Veterans with the exception of gender affirming surgical interventions due to an exclusion in the VA medical benefits package.

### 2. Is VA planning to remove this exclusion from its benefits package?

Yes. VA wants all eligible Veterans to have access to clinically appropriate, inclusive health care services. In 2016, VA received a Petition for Rulemaking (PFR) to remove this "gender alterations" exclusion that prevented and continues to prevent VA from performing medically necessary gender-affirming surgeries. This petition argued that the exclusion was discriminatory. Revising the medical benefits package would enable a safe, coordinated continuum of care that is Veteran-centric.

### 3. What is VA doing to ensure transgender Veterans are not facing discrimination?

VA is currently reviewing its policies to ensure that transgender Veterans do not face discrimination based on their gender identity and expression. This review includes an evaluation of statutory and regulatory requirements to build out a continuum of care that provides all medically necessary services for our transgender and gender diverse Veterans.

### 4. What are the steps involved to permanently remove the exclusion?

VA would formally grant the PFR and initiate rulemaking to remove the exclusion. The entire rulemaking process, itself, can take two years and includes a period of public comment.

Rulemaking is the term used when a federal government agency creates, modifies, or removes rules published in the Code of Federal Regulations (also known as the CFR). Rulemaking to remove this exclusion is recommended to align VA with current Administration priorities, best medical practice, research, and professional health organizations. Revising the medical benefits package would enable a safe, coordinated continuum of care that is Veteran-centric.

### 5. What about transgender Veteran care during the rulemaking process?

During the rulemaking process, VA will continue to provide or pay for the services it currently offers, including corrective procedures after gender affirming surgeries a Veteran obtains outside VA, hormone therapy, and other gender affirming care.

VA will also have the opportunity to develop processes to meet the surgical and care coordination needs so that Veterans have clear and consistent access nationwide. Delivery of the care will likely happen in a combination of venues including both within VA and through academic partners and other community-based experts in transition-related surgical care.

**6. What are the benefits of removing this exclusion?**

Removing this exclusion would enable VA to provide transgender and gender diverse Veterans with coordinated, medically necessary, transition-related surgical procedures. Gender affirming procedures have been proven effective at mitigating serious health conditions, including suicidality, substance abuse, and dysphoria.

Sections      News  Pay & Benefits  Flashpoints

Veterans

# After two years, still no timeline for transgender surgeries at VA

By **Leo Shane III**

📅 Tuesday, Jun 20

     



Lindsay Church, executive director of Minority Veterans of America (center), speaks at a Capitol Hill rally on LGBTQ veterans rights on March 29. (Leo Shane III/Staff)

Two years after Veterans Affairs leaders announced they would make "life saving" surgery options for transgender veterans available through department medical centers for the first time, no such operations have been performed, and VA officials admit there is no timeline for when they might begin.

The delay comes as a national debate has erupted over both the surgeries and transgender rights. Instead of alleviating some of the stress associated with that, Veterans Affairs officials are adding to the anxiety by failing to follow through with its promise, advocates say.

"The frustration level is extremely high," said Cassandra Williamson, executive director of Transgender and Diverse Veterans of America. "This is impacting veterans' mental health and well-being, and postponing some medically necessary procedures. We're losing faith in VA in a big way."

On June 19, 2021, Veterans Affairs Secretary Denis McDonough publicly vowed to start offering gender confirmation procedures through department facilities for the first time. Officials at the time drew praise from LGBTQ activists for the move, even as department officials warned that the rulemaking process could drag on for months.

**RELATED**



VA to offer gender surgery to transgender vets for the first time

Officials do not know how long the rule making process will take or when surgeries will begin to be scheduled.

By **Leo Shane III**

Now, those months have turned into years. In the meantime, at least 20 states have placed limits on gender confirmation surgeries, largely aimed at minors. Florida Governor and Republican presidential candidate Ron DeSantis recently compared the operations to "mutilation."

In a statement, VA press secretary Terrence Hayes said department leaders are still committed to providing the surgery options to transgender veterans, and insisted that the larger political

debate over transgender rights has not slowed down the rulemaking work.

But he also said there is no timeline for when the first surgeries may be scheduled. Officials are "moving ahead methodically because we want this important change in policy to be implemented in a manner that has been thoroughly considered" and "meets VA's rigorous standards for quality health care."

Past estimates from the National Center for Transgender Equality and other advocacy groups put the number of transgender veterans in America today between 130,000 and 150,000. VA officials have estimated that around 4,000 veterans nationwide may be interested in gender confirmation surgeries, also known as gender reassignment surgeries.

Conservative groups have disputed both the estimates of transgender veterans and the need for VA to provide the surgery options, especially in states where it may run afoul of local laws.

Although gender confirmation surgeries are not yet available through VA, the department does offer hormone therapies and other transgender-specific medical options.

But advocates say that isn't enough, and question the reasons behind the delay.

**RELATED**



Transgender vets call for more protections from Congress, VA

Advocates want VA to move ahead with plans to provide gender-affirming surgery to transgender veterans, a policy change first promised in summer 2021.

By **Leo Shane III**

In late March, 157 outside groups — including Minority Veterans of America, Student Veterans of America and Iraq and Afghanistan Veterans of America — sent a letter to McDonough calling the continued delay over transgender surgery availability "not just an equity issue, but also a safety issue." They said that offering the operations could help cut down on depression and suicide rates among transgender veterans.

Lindsay Church, executive director and founder of Minority Veterans of America, called the lack of progress on the issue disheartening.

"When they announced this plan, they said it would save lives," Church said. "So where is the action now that trans people's lives are on the line?"

Church, who identifies as non-binary, was given breast implants years ago as part of reconstructive surgery from medical complications that arose during their time in the Navy. Earlier this year, during a medical appointment with VA, Church found out those implants had ruptured, causing a series of new health problems.

"I couldn't take them out earlier, because that falls under the transgender surgery options," Church said. "So the government can give you breast implants to affirm the gender they think you are, but they won't help you with other options unless it's a medical emergency."

Williamson, a Navy and Marine Corps veteran, said she has heard similar stories from other transgender veterans. "We're hearing that having these surgery options would have helped greatly, but for now, these veterans are still waiting."

House Veterans' Affairs Committee ranking member Mark Takano, D-Calif., said he is "concerned about the two-year delay" regarding the surgeries and hopes for resolution on the issue soon.

However, he said he still has faith that McDonough and his administration is committed to "providing much-needed healthcare to transgender veterans" in the near future.

Veterans Affairs health care websites promise that transgender veterans who reach out to the department will "receive affirming care and services to achieve optimal health and well-being." But for now, the list of services still excludes gender confirming surgeries.

"I just keep telling our folks to keep fighting, to stay on this," Williamson said. "We understand the regulatory process does take time. But we didn't expect it to be this long."

About **Leo Shane III**

Leo covers Congress, Veterans Affairs and the White House for Military Times. He has covered Washington, D.C. since 2004, focusing on military personnel and veterans policies. His work has earned numerous honors, including a 2009 Polk award, a 2010 National Headliner Award, the IAVA Leadership in Journalism award and the VFW News Media award.

Share:     

## In Other News ›

### Air Force expanding review of cancers in nuclear missile community

The expanded Air Force study will consider a broader range of career fields as well as an additional base.



### Navy raises crashed P-8A Poseidon aircraft from Hawaii's Kaneohe Bay

The plane overshot a runway on Nov. 20 and landed in the environmentally sensitive bay. No injuries were reported.



### Military-themed brewery sparks fight in Virginia military city

The controversy over Armed Forces Brewing mirrors increasingly divisive national battles about free speech.



### Divers find sunken Osprey, remains of 5 airmen, Air Force says

American and Japanese crews continue to search for two people who are still missing.



### SEAL to Storyteller: Remi Adeleke hosts new military podcast

The Down Range podcast features veterans' tales of combat.

VA | News

Contact Us

Home  / #VetResources, Secretary's Blog, Top Stories, Vets Experience  /
Town hall with VA Secretary Denis McDonough



# Town hall with VA Secretary Denis McDonough

November 8, 2023

**Share this story**

f  Facebook

X  Twitter

in  LinkedIn

reddit  Reddit

telegram  Telegram



AR952

Appx 384  Appx334

**VA** | News

from Veterans and their families, caregivers and survivors.

**Appears In**

#VetResources

Secretary's Blog

Top Stories

Vets Experience

The one-hour town hall was streamed live on YouTube. If you missed it, you can watch it online .

If you have questions, please go to 2023 Veterans Town Hall on RallyPoint to submit a question where a VA expert will address your question by Nov. 17.

You can also read the town hall Q&A with answers to some of the most asked questions:

# Why is it so difficult and take so long to increase a disability rating?

VA is determined to provide Veterans efficient, quality service and recognizes that timeliness is an important aspect of that service, which is why VA uses timeliness as an indicator to monitor the general effectiveness of the claims process. This past year, VA decided claims almost 20 days faster than the year before.

VA | News

800-698-2411). Veterans can also meet in-person with a public contact representative at a local VA regional office.

# Why is it so hard for us to get community care referrals when care is not available at VA?

Community care is a force-multiplier for VA care — it's an essential part of our portfolio of care options for Veterans. That includes in-person, telehealth, or being seen at one of our clinical contact centers, such as VA Health Connect. In fiscal year 2023, over 2.4 million Veterans received community care, and over the past several years we've continued to make improvements to the overall community care experience. As of May 2023, our overall satisfaction score for community care was 85.3%, the highest ever.

To get a community care referral, of course, you have to be eligible based on your specific health care needs and circumstances. If you meet a least one of the six criteria, our staff are required to

**VA | News**

important because they have to meet our standards and requirements; this is how we make sure Veterans are getting high-quality care that's properly coordinated with VA.

# I'm a Veteran who lives too far from a VA national cemetery. I want my family to be able to visit me if they choose. What options do I have?

In addition to VA's National Cemeteries, VA also works with State Cemetery partners who run their cemeteries in accordance with the very high standards the National Cemetery Administration (NCA) sets. We encourage you to look at the State and Tribal Cemeteries in your area that offer burials for Veterans and their spouse. Also, there are even smaller municipalities, such as counties, that have Veterans cemeteries as well.

**VA | News**

bronze marker absolutely free (there may be an installation fee that a private cemetery charges). Finally, if you go with a private cemetery and a private headstone, you still can have a medallion from VA affixed to your headstone that annotates your branch of military service.

# When will VA propose a rule to allow for gender confirmation surgery?

VA is committed to delivering timely access to world-class health care and earned benefits to all Veterans, family members, survivors and caregivers. VA is actively working on a gender affirming surgery regulatory action.

# Why does it take so long to get an answer on a Veterans appeal? As a surviving spouse I need the help of that

VA | News

# with costs rising; it is very hard on one paycheck.

The Board of Veterans Appeals understands that many Veterans and appellants have been waiting a long time for a decision. We acknowledge that this wait can be very frustrating, and we want to explain why getting a Board decision can take a long time and what options are available to Veterans and appellants that may reduce the time they have to wait for a decision.

The Veterans Benefits Administration usually takes 12 to 18 months to review appeals and decide whether to grant some or all of the appeal. The good news is that the line is now moving faster because of increased resources and improved processes under the newer AMA system. I can report to you that in the last 5 years, the Board of Veterans' Appeals (Board) has issued a total of 496,012 appeals decisions, 103,245 during fiscal year 2023 alone, a new historical record. However, we are also aware that despite the high numbers of decisions each year, there are still over 200,000 pending appeals waiting in line for a decision.

VA | News

significant considering the increasing number of Veterans who have filed an appeal at the Board in recent years. We have Congress to thank for providing enough resources for the Board to hire more Veterans Law Judges, supporting counsel and staff to help resolve and process these appeals.

# Is it possible to have a rating increase posthumously? My husband passed in 2019. Why aren't benefits retroactive to 2012 when he first filed?

Accrued benefits may exist:

- if the decision was made within the past 12-months, which can still be appealed, or
- based on evidence in the file on the date of death, or
- if an eligible claimant continues a claim that was pending on the date of the Veteran's death

VA | News

death, including a claim in which the period to file an appeal has not yet expired. Claimants who wish to apply for accrued benefits should use VA Form 21P-601, "Application for Accrued Amounts Due a Deceased Beneficiary."

The retroactive amount due and date of entitlement is dependent on many factors. Generally, decisions are considered final one year after the date of a decision notice, unless an appeal was filed. Claims filed after the one-year period expires establish a new entitlement date. This includes claims for increased rating evaluation. The ability to provide retroactive benefits once a claim is closed is limited to either authorization from Congress to provide an earlier effective date or for cases in which it is determined that VA made a clear and unmistakable error.

# Are you aware that travel benefits does not work for everyone?

One of VA's highest priorities is reducing barriers to VA health care and services. It is

**VA** | News

VA travel pay reimburses eligible Veterans and VA caregivers for mileage and other travel expenses to and from approved health care appointments. The Beneficiary Travel program is predominantly a reimbursement mechanism for mileage-based transport in privately-owned vehicles for Veterans who are 30 percent or more service connected, traveling for a service-connected condition, in receipt of VA pension or fall below VA income guidelines. In addition, these Veterans may be aided with Special Mode Transportation (e.g., ambulance, ground, or air), or common carrier such as taxi, or rideshares such as Uber, Lyft, bus or airfare.

Additionally, all Veterans may be provided cost-free transportation assistance through Veterans Transportation Services, available at over 125 VA medical centers. VA does an extensive amount of collaboration to connect Veterans to services provided by local state Veterans service agencies such as Disabled American Veterans (DAV) and other Veterans Service Organizations.

For more information on these programs, see www.va.gov/healthbenefits/vtp.

AMERICAN MEDICAL ASSOCIATION HOUSE OF DELEGATES

Resolution: 122
(A-08)

Introduced by:    Resident and Fellow Section, Massachusettes Medical Society, California
Medical Association, Medical Society of the State of New York

Subject:    Removing Financial Barriers to Care for Transgender Patients

Referred to:    Reference Committee A

---

1  Whereas, The American Medical Association opposes discrimination on the basis of
2  gender identity[1] and
3
4  Whereas, Gender Identity Disorder (GID) is a serious medical condition recognized as
5  such in both the Diagnostic and Statistical Manual of Mental Disorders (4th Ed., Text
6  Revision) (DSM-IV-TR) and the International Classification of Diseases (10th Revision),[2]
7  and is characterized in the DSM-IV-TR as a persistent discomfort with one's assigned
8  sex and with one's primary and secondary sex characteristics, which causes intense
9  emotional pain and suffering;[3] and
10
11  Whereas, GID, if left untreated, can result in clinically significant psychological distress,
12  dysfunction, debilitating depression and, for some people without access to appropriate
13  medical care and treatment, suicidality and death;[4] and
14
15  Whereas, The World Professional Association For Transgender Health, Inc. ("WPATH")
16  is the leading international, interdisciplinary professional organization devoted to the
17  understanding and treatment of gender identity disorders,[5] and has established
18  internationally accepted Standards of Care [6] for providing medical treatment for people
19  with GID, including mental health care, hormone therapy and sex reassignment surgery,
20  which are designed to promote the health and welfare of persons with GID and are
21  recognized within the medical community to be the standard of care for treating people
22  with GID; and
23
24  Whereas, An established body of medical research demonstrates the effectiveness and
25  medical necessity of mental health care, hormone therapy and sex reassignment
26  surgery as forms of therapeutic treatment for many people diagnosed with GID; [7] and
27
28  Whereas, Health experts in GID, including WPATH, have rejected the myth that such
29  treatments are "cosmetic" or "experimental" and have recognized that these treatments
30  can provide safe and effective treatment for a serious health condition;[7] and
31
32  Whereas, Physicians treating persons with GID must be able to provide the correct
33  treatment necessary for a patient in order to achieve genuine and lasting comfort with
34  his or her gender, based on the person's individual needs and medical history;[8] and
35
36  Whereas, The AMA opposes limitations placed on patient care by third-party payers
37  when such care is based upon sound scientific evidence and sound medical opinion;[9, 10]
38  and



1 Whereas, Many health insurance plans categorically exclude coverage of mental health,
2 medical, and surgical treatments for GID, even though many of these same treatments,
3 such as psychotherapy, hormone therapy, breast augmentation and removal,
4 hysterectomy, oophorectomy, orchiectomy, and salpingectomy, are often covered for
5 other medical conditions; and
6
7 Whereas, The denial of these otherwise covered benefits for patients suffering from GID
8 represents discrimination based solely on a patient's gender identity; and
9
10 Whereas, Delaying treatment for GID can cause and/or aggravate additional serious and
11 expensive health problems, such as stress-related physical illnesses, depression, and
12 substance abuse problems, which further endanger patients' health and strain the health
13 care system; therefore be it
14
15 RESOLVED, That the AMA support public and private health insurance coverage for
16 treatment of gender identity disorder (Directive to Take Action); and be it further
17
18 RESOLVED, That the AMA oppose categorical exclusions of coverage for treatment of
19 gender identity disorder when prescribed by a physician (Directive to Take Action).

Fiscal Note: No significant fiscal impact.


**<u>References</u>**

1.   AMA Policy H-65.983, H-65.992, and H-180.980
2.   Diagnostic and Statistical Manual of Mental Disorders (4th ed.. Text revision)
     (2000) ("DSM-IV-TR"), 576-82, American Psychiatric Association; International
     Classification of Diseases (10th Revision) ("ICD-10"), F64, World Health
     Organization.  The ICD further defines transsexualism as "[a] desire to live and be
     accepted as a member of the opposite sex, usually accompanied by a sense of
     discomfort with, or inappropriateness of, one's anatomic sex, and a wish to have
     surgery and hormonal treatment to make one's body as congruent as possible with
     one's preferred sex."  ICD-10, F64.0.
3.   DSM-IV-TR, 575-79
4.   Id. at 578-79.
5.   World Professional Association for Transgender Health: http://www.wpath.org.
     Formerly known as The Harry Benjamin International Gender Dysphoria
     Association.
6.   The Harry Benjamin International Gender Dysphoria Association's Standards of
     Care for Gender Identity Disorders, Sixth Version (February, 2001).  Available at
     http://wpath.org/Documents2/socv6.pdf.
7.   Brown G R: A review of clinical approaches to gender dysphoria. J Clin Psychiatry.
     51(2):57-64, 1990. Newfield E, Hart S, Dibble S, Kohler L. Female-to-male
     transgender quality of life. Qual Life Res. 15(9):1447-57, 2006. Best L, and Stein K.
     (1998) "Surgical gender reassignment for male to female transsexual people."
     Wessex Institute DEC report 88; Blanchard R, et al. "Gender dysphoria, gender
     reorientation, and the clinical management of transsexualism."J Consulting and
     Clinical Psychology. 53(3):295-304. 1985; Cole C, et al. "Treatment of gender



dysphoria (transsexualism)." Texas Medicine. 90(5):68-72. 1994; Gordon E. "Transsexual healing: Medicaid funding of sex reassignment surgery." Archives of Sexual Behavior. 20(1):61-74. 1991; Hunt D, and Hampton J. "Follow-up of 17 biologic male transsexuals after sex-reassignment surgery." Am J Psychiatry. 137(4):432-428. 1980; Kockett G, and Fahrner E. "Transsexuals who have not undergone surgery: A follow-up study." Arch of Sexual Behav. 16(6):511-522. 1987; Pfafflin F and Junge A. "Sex Reassignment. Thirty Years of International Follow-Up Studies after Sex Reassignment Surgery: A Comprehensive Review, 1961-1991." IJT Electronic Books, available at http://www.symposion.com/ijt/pfaefflin/1000.htm; Selvaggi G, et al. "Gender Identity Disorder: General Overview and Surgical Treatment for Vaginoplasty in Male-to-Female Transsexuals." Plast Reconstr Surg. 2005 Nov;116(6):135e-145e; Smith Y, et al. "Sex reassignment: outcomes and predictors of treatment for adolescent and adult transsexuals." Psychol Med. 2005 Jan; 35(1):89-99; Tangpricha V, et al. "Endocrinologic treatment of gender identity disorders. " Endocr Pract. 9(1):12-21. 2003; Tsoi W. "Follow-up study of transsexuals after sex reassignment surgery." Singapore Med J. 34:515-517. 1993; van Kesteren P, et al. "Mortality and morbidity in transsexual subjects treated with cross-sex hormones." Clin Endocrinol (Oxf). 1997 Sep;47(3):337-42; World Professionals Association for Transgender Health Standards of Care for the Treatment of Gender Identity Disorders v.6 (2001).

8. The Harry Benjamin International Gender Dysphoria Association's Standards of Care for Gender Identity Disorders, at 18.

9. Id.

10. AMA Policy H-120.988


**Relevant AMA policy**

**H-65.983 Nondiscrimination Policy**
The AMA opposes the use of the practice of medicine to suppress political dissent wherever it may occur. (Res. 127, A-83; Reaffirmed: CLRPD Rep. 1, I-93; Reaffirmed: CEJA Rep. 2, A-05)

**H-65.992 Continued Support of Human Rights and Freedom**
Our AMA continues (1) to support the dignity of the individual, human rights and the sanctity of human life, and (2) to oppose any discrimination based on an individual's sex, sexual orientation, race, religion, disability, ethnic origin, national origin or age and any other such reprehensible policies. (Sub. Res. 107, A-85; Modified by CLRPD Rep. 2, I-95; Reaffirmation A-00; Reaffirmation A-05)

**H-180.980 Sexual Orientation as Health Insurance Criteria**
The AMA opposes the denial of health insurance on the basis of sexual orientation. (Res. 178, A-88; Reaffirmed: Sub. Res. 101, I-97)

**H-120.988 Patient Access to Treatments Prescribed by Their Physicians**
The AMA confirms its strong support for the autonomous clinical decision-making authority of a physician and that a physician may lawfully use an FDA approved drug product or medical device for an unlabeled indication when such use is based upon



sound scientific evidence and sound medical opinion; and affirms the position that, when the prescription of a drug or use of a device represents safe and effective therapy, third party payers, including Medicare, should consider the intervention as reasonable and necessary medical care, irrespective of labeling, should fulfill their obligation to their beneficiaries by covering such therapy, and be required to cover appropriate "off-label" uses of drugs on their formulary. (Res. 30, A-88; Reaffirmed: BOT Rep. 53, A-94; Reaffirmed and Modified by CSA Rep. 3, A-97; Reaffirmed and Modified by Res. 528, A-99; Reaffirmed: CMS Rep. 8, A-02; Reaffirmed: CMS Rep. 6, A-03; Modified: Res. 517, A-04)

APA Official Actions

# Report of the APA Task Force on Treatment of Gender Identity Disorder

Approved by the Joint Reference Committee, July 2011
Approved by the Board of Trustees, September 2011

The findings, opinions, and conclusions of this report do not necessarily represent the views of the officers, trustees, or all members of the American Psychiatric Association. Views expressed are those of the authors." -- *APA Operations Manual*.

William Byne M.D., Ph.D. (Chair)*

Susan Bradley, M.D.

Eli Coleman, Ph.D.

A. Evan Eyler, M.D., M.P.H.

Richard Green, M.D., JD.

Edgardo J. Menvielle, M.D., M.S.H.S.

Heino F. L. Meyer-Bahlburg, Dr. rer. nat.

Richard R. Pleak, M.D.

D. Andrew Tompkins, M.D.

## Table of Contents

Preface ........................................................................... 1
Executive Summary and Recommendations
  Evaluation of Levels of Evidence ............................. 3
  Terminology ............................................................. 3
  Synopses of Literature Reviews and Opinions with
  Respect to Recommendations ................................. 4
  Why APA Recommendations Are Needed for the
  Treatment of GID .................................................... 8
  Recommendations for the APA ............................... 9
Literature Reviews ....................................................... 10
  Gender Variance in Childhood ................................ 10
  Gender Variance in Adolescence............................ 13
  Gender Identity Concerns in Adulthood .................. 17
  Gender Variance in Persons with Somatic Disorders
  of Sex Development (aka Intersexuality) ............... 26
Appendix I: Other APA Concerns Regarding Gender Variance 30
Appendix II: Other APA Concerns Regarding DSD ................. 30
References................................................................. 31

*(Am J Psychiatry 2012; Suppl., 1-35)*

## Preface

After the announcement of the DSM-5 Work Group membership in May 2008, the American Psychiatric Association (APA) received many inquiries regarding the workgroup named to address the entities included under Gender Identity Disorder (GID) in versions III through IV-TR of the *Diagnostic and Statistical Manual of Mental Disorders™* (*DSM*). These inquiries most often dealt with treatment controversies regarding GID, especially in children, rather than issues related specifically to the *DSM* text and diagnostic criteria. In addition, the APA Committee on Gay, Lesbian, and Bisexual Issues had previously raised concerns about the lack of evidence-based guidelines for GID, and questions about whether such guidelines could and should be developed.

While the diagnosis and treatment of mental disorders are inextricably linked, they are separate issues and the evaluation of treatments is not addressed by the DSM Work Groups. The APA Board of Trustees, therefore, formed a task force on the treatment of GID under the oversight of the Council on Research. Members of the GID Task Force were appointed by the APA President,  Dr. Nada Stotland,

and charged by the Board of Trustees "to perform a critical review of the literature on the treatment of Gender Identity Disorder at different ages and to present a report to the Board of Trustees." The report "would include an opinion as to whether or not there is sufficient credible literature to take the next step and develop treatment recommendations."

The Task Force commenced its work as the *DSM-5™* workgroups were deliberating. Questions, therefore, arose regarding the impact of potential differences between the forthcoming *DSM-5* and previous iterations of the *DSM* on the utility of the Task Force Report. Of particular concern was the question of whether or not the diagnostic entity designated as GID would be carried forward into the *DSM-5*. The Task Force concluded that most of the issues pertaining to gender variance (GV) that lead individuals (or their parents in the case of minors) to seek mental health services would remain the same regardless of any changes in *DSM* nomenclature or diagnostic criteria. Any such changes to the *DSM* should, therefore, have minimal impact on the utility of the Task Force Report. Since the *DSM-5* would be published only  after completion of work

* The authors comprise the Task Force on Treatment of Gender Identity Disorder, APA Council on Research. We would like to thank the following for reading and providing comments on the initial draft of the report: Peggy T. Cohen-Kettenis, Ph.D., Jack Drescher, M.D., Sharon Preves, Ph.D., and Nada Stotland, M.D., as well as William Narrow, M.D., M.P.H., and Erin Dalder for APA staff support.  DISCLOSURES: Dr. Coleman chairs the Sexual Health Advisory Committees for Church & Dwight and the Sinclair Institute. The other authors report no financial relationships with commercial interests. [Note added in print: Since the completion of this report, Version 7 of the WPATH SOC has been published and is available at www.wpath.org.]

GENDER IDENTITY DISORDER

by the Task Force, the evidence base available for consideration by the Task Force was necessarily based on prior diagnostic formulations. The Task Force chose to conduct its deliberations primarily in terms of the *DSM-IV-TR™* formulations with reference to other formulations as necessary.

Although the charge to the Task Force was to comment on the feasibility of making treatment recommendations, questions arose in the initial conference calls regarding the nature of the evidence base required by the APA for development of recommendations in the specific form of APA practice guidelines. APA practice guidelines are defined as systematically developed documents in a standardized format that present patient care strategies to assist psychiatrists in clinical decision making. The APA's Steering Committee on Practice Guidelines (SCPG) both selects topics for guideline development and oversees their development. According to the APA's website (http://www.psychiatryonline.com/content.aspx?aID=58560) at the time the Task Force commenced it work in 2008 and concluded it in May 2011, two of the criteria for topic selection by the SCPG are quality of the relevant data base and prevalence of the disorder. The randomized double blind control trial is the study design that affords the highest quality evidence regarding the comparative efficacy of various treatment modalities; however, no such trials have been conducted to address any aspect of the treatment of GID. Given the very nature of GID, such trials, or even unblinded trials with random assignment to treatment groups, are not likely to be forthcoming due to a lack of feasibility and/or ethical concerns. In addition to the lack of evidence of the highest quality relevant to the treatment of GID, GID is widely believed to be a rare phenolmenon (1)[1] and likely to fall short of the SCPG's criterion for prevalence. The Task Force, therefore, decided to consider whether available evidence, together with clinical consensus, constitutes a sufficient basis to support the development of treatment recommendations, broadly defined, in addition to assessing the quality of evidence relevant to the potential development of APA practice guidelines, as defined above.

In order to address its charge, the Task Force divided itself into subgroups to address GID and related issues in four populations. Three of these populations are defined by age: children, adolescents and adults. The fourth population comprises individuals with the desire to change their assigned gender who have a somatic disorder of sex development (DSD). The makeup of the subgroups was as follows: **child** (Drs. Pleak and Menvielle); **adolescent** (Drs. Bradley and Green); **adult** (Drs. Eyler, Coleman and Tompkins), and **DSD** (Drs. Meyer-Bahlburg and Byne).

Each subgroup conducted database searches and produced a document addressing the Task Force's charge pertaining to its assigned subpopulation. These documents were circulated to all members of the Task Force, discussed

during conference calls and revised until approved by group consensus. Because the consensus process involves compromise, all members of the Task Force do not necessarily agree with all views expressed within the report. The Task Force could not reach a consensus regarding the question of whether or not persistent cross-gender identification sufficient to motivate an individual to seek sex reassignment, per se, is a form of psychopathology in the absence of clinically significant distress or impairment due to a self-perceived discrepancy between anatomical signifiers of sex and gender identity. Since this question falls within the purview of the *DSM* Committee and is not central to the Task Force's charge of evaluating treatment, text suggesting a stand on this issue was deleted from the report. Similarly, a consensus could not be reached regarding the legitimacy of particular goals of therapy with children diagnosed with GID (e.g., prevention of transgenderism or homosexuality) even when consistent with the religious beliefs or sociocultural values of the parents or primary caregivers.

# EXECUTIVE SUMMARY AND RECOMMENDATIONS

This Task Force report assesses the current status of evidence bearing on treatment, by mental health professionals, of the entities included under GID in the *DSM* (versions III through IV-TR) as well as gender dysphoria in individuals with somatic DSDs (designated as GID Not Otherwise Specified (GID NOS)) in *DSM-IV-TR*. The primary aim of the report is to answer the question posed by the APA Board of Trustees as to whether or not there is sufficient credible literature to support development by the APA of treatment recommendations for GID. Separate sections of the report are addressed to GID in children, adolescents, and adults as well as to GID NOS in individuals with somatic DSDs. The Executive Summary provides a synopsis of each of those sections (readers are referred to each primary section for full citations), together with an opinion from the Task Force regarding support for treatment recommendations in the literature. The Task Force concludes that the current credible literature is adequate for the development of consensus-based treatment recommendations for all subgroups reviewed. Moreover, with subjective improvement as the primary outcome measure, it is concluded that for adults sufficient evidence exists for the development of recommendations in the form of an APA practice guideline, with gaps in the research database filled in by clinical consensus.

The case is also made that treatment recommendations from the APA are needed, even in areas where criteria are not met for selection by the SCPG for APA practice guideline development, and that the APA should proceed with their preparation. The Task Force recommends that additional steps be taken by the APA pertaining to issues relating to GV (Appendix I) and to DSDs, whether or not GV is an issue (Appendix II). These include issuing a position

---

[1] Epidemiological studies are lacking so that no strong conclusions about the prevalence of GID can be drawn (1). The prevalence estimates cited in DSM-IV for adults of 1:30,000 for natal males and 1:100,000 in natal females are likely to be under estimates (1).

© Copyright, American Psychiatric Association, all rights reserved.    **2**

statement to clarify the APA's position regarding the medical necessity of treatments for GID, the ethical bounds of treatments for minors with GID, and the rights of persons of any age who are gender variant or transgender.

### Evaluation of Levels of Evidence

Where possible, the Task Force Report comments on the level of evidence from research studies bearing on treatment issues. Unless otherwise specified, the levels of evidence refer to the APA evidence coding system which was in use at the time the Task Force was commissioned (http://www.psychiatryonline.com/content.aspx?aID=58560) and is specified below:

[A]   *Randomized, double-blind clinical trial. A study of an intervention in which subjects are prospectively followed over time; there are treatment and control groups; subjects are randomly assigned to the two groups; and both the subjects and the investigators are "blind" to the assignments.*

[A-]   *Randomized clinical trial. Same as above but not double blind.*

[B]   *Clinical trial. A prospective study in which an intervention is made and the results of that intervention are tracked longitudinally. Does not meet standards for a randomized clinical trial.*

[C]   *Cohort or longitudinal study. A study in which subjects are prospectively followed over time without any specific intervention.*

[D]   *Control study. A study in which a group of patients and a group of control subjects are identified in the present and information about them is pursued retrospectively or backward in time.*

[E]   *Review with secondary data analysis. A structured analytic review of existing data, e.g., a meta-analysis or a decision analysis.*

[F]   *Review. A qualitative review and discussion of previously published literature without a quantitative synthesis of the data.*

[G]   *Other. Opinion-like essays, case reports, and other reports not categorized above.*

### Terminology

The diagnostic category, GID, was introduced by *DSM-III* and included the diagnoses of GID of Childhood and Transsexualism. In *DSM-III-R*, GID of Childhood, and Transsexualism were retained; GID of Adolescence and Adulthood, Nontranssexual Type (GIDAANT), was added; and "disorders in gender identity" not otherwise classified, were designated as GID, Not Otherwise Specified (GID NOS). Note that under GID of Childhood, physical disorders of the sex organs, when present, were noted on Axis III. This stipulation was not made explicit for transsexualism and GIDAANT, but intersex is not noted under GID NOS in *DSM-III-R*. Thus, if a person with a DSD met GID criteria, s/he would be given the GID diagnosis, with the intersex syndrome listed on Axis III. In *DSM-IV* and *IV-TR*, GID of Childhood and GID NOS (in addition to some other conditions) were retained; however, the designation GID of Adolescence and Adulthood subsumed both Transsexualism and the Nontranssexual Types.

*DSM-IV-TR* excludes individuals with a disorder of sex development (DSD) from the diagnosis of GID. Individuals with gender dysphoria and a DSD are placed under the category GID NOS, rather than under the more specifically defined term, GID. GID NOS is commonly used also for individuals without a DSD who meet some but not all required GID criteria (often referred to as "subthreshold cases"). Thus, the *DSM-IV-TR* applies the term, GID NOS (apart from other examples), to three groups of individuals with gender dysphoria: 1) those without a DSD who do not meet full criteria for GID, 2) those who would meet full criteria for GID if not for the DSD exclusion, and 3) those with a DSD who do not meet the full inclusion criteria.

The criteria for the GID diagnoses, as well as the nomenclature itself, are under revision at the time of this writing. Documentation regarding the development of the *DSM-5*, and potential changes in nomenclature and diagnostic criteria are available through the American Psychiatric Association's website (http://www.psych.org) and are not addressed here.

### Abbreviations

| | |
|---|---|
| AACAP | American Academy of Child and Adolescent Psychiatry |
| APA | American Psychiatric Association |
| CAH | congenital adrenal hyperplasia |
| DSD | disorder of sex development |
| *DSM* | *Diagnostic and Statistical Manual* |
| FTM | female to male |
| GID | Gender Identity Disorder |
| GIDAANT | Gender Identity Disorder of Adolescence and Adulthood, Nontranssexual Type |
| GID NOS | Gender Identity Disorder, Not Otherwise Specified |
| GLBT | gay, lesbian, bisexual transgender/transsexual |
| GnRH | gonadotropin releasing hormone |
| GRADE | Grading of Recommendations, Assessment, Development, and Evaluation |
| GV | gender variance |
| HBIGDA | Harry Benjamin International Gender Dysphoria Association |
| ICTLEP | International Conference on Transgender Law and Employment Policy, Inc. |
| MTF | male to female |
| WPATH | World Professional Association for Transgender Health (formerly the Harry Benjamin International Gender Dysphoria Association [HBIGDA]) |
| RCT | randomized controlled trial |
| SCPG | Steering Committee on Practice Guidelines |
| SOC | Standards of Care |
| SRS | sex reassignment surgery |

In the present report, the abbreviations, GID and GID NOS, are used to refer to Gender Identity Disorders as defined in the *DSM-IV-TR*. The entities designated as Gender Identity Disorders by the *DSM-IV-TR* include only a subset of individuals for whom clinical concerns related to GV may be raised (whether by the individual or the individual's primary caregivers, educators, or healthcare providers). *Gender Variance* (GV) is used to refer to any degree of cross-gender identification or nonconformity in gender role behavior regardless of whether or not criteria are met for either GID or GID NOS. The terms, *transsexual* and *transsexualism*, are used to refer to adults who meet diagnostic criteria for GID and have employed hormonal and/or surgical treatments in the process of transitioning gender or who plan to do so. *Transgender* denotes individuals with cross-gender identification whether or not hormonal or surgical treatments have been, or are planned to be, employed in transitioning gender. *Natal sex* is used to refer to the sex at birth of individuals who subsequently desire or undergo any degree of sex reassignment or

© Copyright, American Psychiatric Association, all rights reserved.   3

**GENDER IDENTITY DISORDER**

gender transition, provided that they do not have a *disorder of sex development* (DSD). DSD as employed here, refers to congenital conditions (formerly referred to as intersex disorders, hermaphroditism, and pseudo-hermaphroditism) which entail atypical development of chromosomal, gonadal and/or genital sex.

## Synopses of Literature Reviews and Opinions with Respect to Recommendations

### Children

*Synopsis*: Children have limited capacity to participate in decision making regarding their own treatment, and no legal ability to provide informed consent. They must rely on caregivers to make treatment decisions on their behalf, including those that will influence the course of their lives in the long term. The optimal approach to treating pre-pubertal children with GV including *DSM*-defined GID, is, therefore, more controversial than treating these phenomena in adults and adolescents. An additional obstacle to consensus regarding treatment is the lack of randomized controlled treatment outcome studies of children with GID or with any presentation of GV (2). In the absence of such studies, the highest level of evidence available for treatment recommendations for these children can best be characterized as expert opinion. Opinions vary widely among experts, and are influenced by theoretical orientation, as well as assumptions and beliefs (including religious) regarding the origins, meanings and perceived fixity or malleability of gender identity. Primary caregivers may, therefore, seek out providers for their children who mirror their own world views, believing that goals consistent with their views are in the best interest of their children.

The outcome of childhood GID without treatment is that only a minority will identify as transsexual or transgender in adulthood (a phenomenon termed *persistence*), while the majority will become comfortable with their natal gender over time (a phenomenon termed *desistence*) (3-6). GID that persists into adolescence is more likely to persist into adulthood (2). Compared to the general population, the rate of homosexual orientation is increased in adulthood whether or not GID was treated (2, 4). It is currently not possible to differentiate between preadolescent children in whom GID will persist and those in whom it will not. To date, no long-term follow-up data have demonstrated that any modality of treatment has a statistically significant effect on later gender identity.

The overarching goal of psychotherapeutic treatment for childhood GID is to optimize the psychological adjustment and wellbeing of the child. What is viewed as essential for promoting the wellbeing of the child, however, differs among clinicians, as does the selection and prioritization of goals of treatment. In particular, opinions differ regarding the questions of whether or not minimization of gender atypical behaviors, and prevention of adult transsexualism, are acceptable goals of therapy.

Several approaches to working with children with GID were identified in the professional literature. The first of these focuses on working with the child and caregivers to lessen gender dysphoria and to decrease cross-gender behaviors and identification. The assumption is that this approach decreases the likelihood that GID will persist into adolescence and culminate in adult transsexualism (7). For various reasons (e.g., social stigma, likelihood of hormonal and surgical procedures with their associated risks and costs), persistence is considered to be an undesirable outcome by some (4, 7, 8) but not all (9-11) clinicians who work in this area of practice.

A second approach makes no direct effort to lessen gender dysphoria or gender atypical behaviors. This approach is premised on the evidence that GID diagnosed in childhood usually does not persist into adolescence and beyond (4, 5), and on the lack of reliable markers to predict in whom it will or will not persist. A variation of this second approach is to remain neutral with respect to gender identity and to have no therapeutic target with respect to gender identity outcome. The goal is to allow the developmental trajectory of gender identity to unfold naturally without pursuing or encouraging a specific outcome (12-14). Such an approach entails combined child, parent and community-based interventions to support the child in navigating the potential social risks (12, 13, 15, 16). Support for this approach is centered on the assumption that self-esteem may be damaged by conveying to the child that his or her likes and dislikes, behaviors and mannerisms, are somehow intrinsically wrong (17). A counter argument proposes that self-esteem can be best served by improved social integration including positive relationships with same-sex peers (18). Alternatively, proponents of this second approach suggest that the child's self-recognition of a gender variant and stigmatized status may be actively encouraged, with the goal of mastery, e.g., developing cognitive, emotional and behavioral coping tools for living as a gender variant person (12, 19). A third approach may entail affirmation of the child's cross-gender identification by mental health professionals and family members (7). Thus, the child is supported in transitioning to a cross-gendered role, with the option of endocrine treatment to suspend puberty in order to suppress the development of unwanted secondary sex characteristics if the cross-gendered identification persists into puberty (12). The rationale for supporting transition before puberty is the belief that a transgender outcome is to be expected in some children, and that these children can be identified so that primary caregivers and clinicians may opt to support early social transition. A supporting argument is that children who transition this way can revert to their originally assigned gender if necessary since the transition is done solely at a social level and without medical intervention (9). The primary counterargument to this approach is based on the evidence that GID in children usually does not persist into adolescence and adulthood. Thus, supporting gender transition in childhood might increase the likelihood of persistence (20). Furthermore, the peer-reviewed literature does not support the view that desisters and persisters can currently be reliably distinguished as children (5, 21-23).

Moreover, after transitioning gender in childhood, reverting to the natal gender may entail complications (24).

Primary modes of therapy utilized in working with children with GID include individual insight-oriented psychoanalytic or psychodynamic psychotherapy (25); protocol-driven psychotherapy such as behavior modification (26); parent and peer relations focused therapy (18); and parent and child therapeutic groups (12, 13, 15). Additional interventions include support groups for primary caregivers, community education through websites and conferences, school-based curricula, and specialized youth summer camps. The primary focus of intervention is sometimes the primary caregivers. Depending on the treatment approach chosen, work may include parenting support and psychoeducation, guidance in reinforcing behavior modification, and instruction in techniques for building self-acceptance and resilience in the child. Some interventions are multifaceted and involve the school and community as well as the child and family. These include diversity education and steps to prevent bullying.

The Task Force identified the following as the major tasks for mental health professionals working with children referred for gender concerns: 1) to accurately evaluate the gender concerns that precipitated the referral; 2) to accurately diagnose any gender identity related disorder in the child according to the criteria of the most current *DSM*; 3) to accurately diagnose any coexisting psychiatric conditions in the child, as well as problems in the parent-child relationship, and to recommend their appropriate treatment; 4) to provide psychoeducation and counseling to the caregivers about the range of treatment options and their implications; 5) to provide psychoeducation and counseling to the child appropriate to his or her level of cognitive development; 6) when indicated, to engage in psychotherapy with the appropriate persons, such as the child and/or primary caregivers, or to make appropriate referrals for these services; 7) to educate family members and institutions (e.g., day care and preschools, kindergartens, schools, churches) about GV and GID; and 8) to assess the safety of the family, school and community environments in terms of bullying and stigmatization related to gender atypicality, and to address suitable protective measures.

With respect to comparing alternative approaches to accomplishing the above tasks, the Task Force found no randomized (APA level A) or adequately controlled nonrandomized longitudinal (APA level A-) studies, and very few follow-up studies without a control group either with (APA level B) or without (APA level C) an intervention. The majority of available evidence is derived from qualitative reviews (APA level F) and experimental systematic single case studies that do not fit into the APA evidence grading system.

*Opinion Regarding Treatment Recommendations for Children*: Despite deficiencies in the evidence base and the lack of consensus regarding treatment goals, the present literature review suggests consensus on a number of points. Areas where existing literature supports development of consensus recommendations include, but are not limited to, the following: 1) assessment, and accurate *DSM* diagnosis of the child referred for gender concerns, including the use of validated questionnaires and other validated assessment instruments to assess gender identity, gender role behavior and gender dysphoria; 2) diagnosis of any coexisting psychiatric conditions in the child and seeing to their appropriate treatment or referral; 3) identification of mental health concerns in the caregivers, and difficulties in their relationship with the child; ensuring that these are adequately addressed, 4) provision of adequate psychoeducation and counseling to caregivers to allow them to choose a course of action and to give fully informed consent to any treatment chosen. This entails disclosing the full range of treatment options available (including those that might conflict with the clinician's beliefs and values), the limitations of the evidence base that informs treatment decisions, the range of possible outcomes, and the currently incomplete knowledge regarding the influence of childhood treatment on outcome; 5) provision of age appropriate information to the child; and 6) assessment of the safety of the family, school and community environments in terms of bullying and stigmatization related to gender atypicality, and addressing suitable protective measures.

### Adolescents

*Synopsis*: For purposes of this Task Force report, adolescence is defined as the developmental period from 12 to 18 years of age. Adolescents with GID comprise two groups, those in whom GID began in childhood and has persisted, and those with the onset of GID in adolescence. Only two clinics (one in Canada and one in The Netherlands) have systematically gathered data on sufficient numbers of subjects to provide an empirical "experience base" on the main issues in adolescence. Both of these teams concur that management of those in whom GID has persisted from childhood is more straightforward than management of those in whom GID is of more recent onset. In particular, the latter group is more likely to manifest significant psychopathology in addition to GID. This group should be screened carefully to detect the emergence of the desire for sex reassignment in the context of trauma as well as for any disorders such as schizophrenia, mania or psychotic depression that may produce gender confusion. When present, such psychopathology must be addressed and taken into account prior to assisting the adolescent's decision as to whether or not to pursue sex reassignment or actually assisting the adolescent with the gender transition. Both the Canadian and Dutch groups are guided by the World Professional Association for Transgender Health (WPATH) Standards of Care (SOC) which endorse a program of staged gender transition including a period of living as the other gender prior to any somatic treatment.

With the beginning of puberty, development of the secondary sex characteristics of the natal gender often triggers or exacerbates the anatomical dysphoria of adolescents with GID (11, 27). Recently, the option has become available for pubertal patients with severe gender dysphoria and minimal, if any, additional psychopathology

© Copyright, American Psychiatric Association, all rights reserved.  **5**

**GENDER IDENTITY DISORDER**

to have puberty suspended medically in order to prevent or to minimize development of unwanted secondary sex characteristics, some of which are not fully reversible with subsequent hormonal or surgical sex reassignment therapies (28). A practice guideline developed by the Endocrine Society (29) suggests that pubertal suspension can be done for a period of up to several years during which time the patient, with the clinicians, can decide whether it is preferable for the adolescent to revert to living in the birth sex or to continue gender transition with cross-sex hormone therapy. There are currently little data regarding the timing of cross-sex hormone treatment in adolescents and no studies comparing outcomes when such treatment is initiated in adolescence as opposed to adulthood, with or without prior suspension of puberty. We know, however, that many adult transsexuals express regret over the body changes that occurred during puberty, some of which are irreversible. In the absence of a DSD (addressed in a separate section), at present, sex reassignment surgery (SRS) is not performed prior to the age of 18 in the United States. It is noted, however, that one study on carefully selected individuals in the Netherlands suggests that, as assessed by satisfaction with surgery and lack of regrets, outcome was generally better in individuals who initiated sex reassignment as adolescents compared to those who initiated reassignment as adults (30, 31). Even in these studies, however, SRS was not initiated prior to the age of 18.

The major tasks identified by the Task Force to be germane to provision of mental health services to adolescents with the desire to transition in gender, or who are in the process of transitioning, are: 1) psychiatric and psychological assessment to both assure that any psychopathology is adequately diagnosed and addressed, and to determine whether the clinicians' approach will be neutral or supportive with respect to the desire to transition in gender; 2) provision of psychotherapy as indicated by the initial assessment and as indicated by changes over time. This includes providing psychological support during the real-life experience and suspension of puberty and/or the administration of cross-sex hormones; and 3) assessment of eligibility and readiness for each step of treatment.

Database searches failed to reveal any RCTs related to any of these issues. The quality of the evidence is primarily individual case reports (APA level G); follow-up studies with control groups of limited utility and without random assignment, or longitudinal follow-up studies after an intervention without control groups (APA level B); and reviews of the above (APA level F). Between 2001 and 2009, over 80 adolescents selected based on conservative criteria have been treated with pubertal suspension with overall positive results in the most detailed follow-up study published to date (APA evidence level B) (28, 32). In a consecutive series of 109 adolescents (55 females, 54 males) with GID, the Toronto group identified demographic variables correlated with clinical decisions to recommend, or not recommend, gonadal hormone blocking therapy (33). Follow-up data, to date, however, are not adequate for statistical analyses of outcome variables.

*Opinion Regarding Treatment Recommendations for Adolescents*: Existing literature is insufficient to support development of an APA practice guideline for treatment of GID in adolescence but is sufficient for consensus recommendations in the following areas: 1) psychological and psychiatric assessment and diagnosis of adolescents presenting with a wish for sex reassignment, including assessment and diagnosis of co-occurring conditions and facilitation of appropriate management; 2) psychotherapy (including counseling and supportive therapy as indicated) with these adolescents, including enumeration of the issues that psychotherapy should address. These would include issues that arise with adolescents who are transitioning gender, including the real life experience; 3) assessment of indications and readiness for suspension of puberty and/or cross-sex hormones as well as provision of documentation to specialists in other disciplines involved in caring for the adolescent; 4) psychoeducation of family members and institutions regarding GV and GID; and 5) assessment of the safety of the family/school/community environment in terms of gender-atypicality-related bullying and stigmatization, and to address suitable protective measures.

### Adults

*Synopsis*: The adult section addresses individuals 18 years of age and older, and thus picks up where the adolescent section leaves off in considering individuals who seek mental health services for reasons related to GV, some of whom meet diagnostic criteria for GID. For some adults, GID/GV has clearly persisted from childhood and adolescence, but for others it has arisen (or at least come to clinical attention) for the first time in adulthood. Among natal males, there tend to be a number of differences between those with an early (childhood) as opposed to late (adulthood) onset. In particular, those with late onset are more likely to have had unremarkable histories of gender nonconformity as children, and are less likely to be primarily sexually attracted to individuals of their natal gender, at least prior to gender transition (34). Age of onset may have some, albeit limited, value in predicting satisfaction versus regret following sex reassignment surgery (35-38).

The WPATH SOC and the recent Endocrine Society guideline (29) endorse psychological evaluation and a staged transition in which fully reversible steps (e.g., presenting as the desired gender) precede partially reversible procedures (administration of gonadal hormones to bring about the desired secondary sex characteristics), which precede the irreversible procedures (e.g., gonadectomy, vaginoplasty in natal males, mastectomy and surgical construction of male-typical chest and phalloplasty in natal females). Adults who have capacity to give informed consent may receive the gender transition treatments for which they satisfy the qualifying criteria of the providers. These criteria vary among providers and clinics. A recent review graded the quality of evidence relating particular components of the WPATH SOC to outcomes and concluded that psychotherapy prior to initiating hormonal or surgical treatments, and staged

    © Copyright, American Psychiatric Association, all rights reserved.   **6**

transition (including a period of real-life experience) were associated with good outcome (39). Most of the studies reviewed were case series and case reports or reviews (APA level D or lower), although some included sufficient longitudinal follow-up and standardization to meet APA level B or C.

Prior to adulthood, some individuals will have already transitioned without medical intervention, while others may have had puberty medically suspended in order to prevent the emergence of undesired secondary sex characteristics, and others may have initiated cross-sex hormone treatments. Some of these individuals may have previously formulated a plan, together with their healthcare providers, to move to the next stage of medical/surgical gender transition as soon as they reach the legal age of majority and can legally assume responsibility for themselves and give informed consent. Such individuals may seek the services of mental health professionals at this point only for the assessment of their eligibility and readiness for the desired procedures as required by the WPATH SOC or their particular provider's policy.

As is the case with GID in childhood and adolescence, and for similar reasons, there are no RCTs pertaining to any treatment intervention in adults. Nor is there universal agreement regarding treatment goals other than improving the sense of wellbeing and overall functioning of the individual. Recently, the greatest emphasis has been placed on subjective patient reports, particularly those of satisfaction, and self-perceived improvement or regrets. Several correlates of regret have been identified including major co-existing psychiatric issues such as psychosis or alcohol dependency; an absence of, or a disappointing, real-life experience; and disappointing cosmetic or functional surgical results (39-48). Regrets are somewhat more frequent for patients with late as opposed to early onset of GID. For both early and late onset groups, a favorable outcome is more likely among individuals who were high functioning prior to transition, and who received care, including surgeries, from experienced providers, and who were satisfied with the quality of their surgical results.

As was the case for GID in children and adolescents, database searches failed to reveal any RCTs related to addressing the mental health issues raised by GID in adults. Most of the literature addressing psychotherapy with gender variant adults would be categorized as APA level G and consists of case reports and review articles without additional data analysis. This body of work nevertheless, identifies the major issues that should be addressed in psychotherapy with these individuals. There are some level B studies examining satisfaction/regret following sex reassignment (longitudinal follow up after an intervention, without a control group); however, many of these studies obtained data retrospectively and without a control group (APA level G). Overall, the evidence suggests that sex reassignment is associated with an improved sense of wellbeing in the majority of cases, and also indicates correlates of satisfaction and regret. No studies have directly compared various levels of mental health screening prior to hormonal and surgical treatments on outcome variables; however, existing studies suggest that comprehensive mental health screening may be successful in identifying those individuals most likely to experience regrets (39-48).

*Opinion Regarding Treatment Recommendations for Adults*: The Task Force concludes that, with subjective improvement as the primary outcome measure, the existing evidence base combined with clinical consensus is sufficient for developing recommendations in the form of an APA practice guideline. Areas where recommendations can be made include the following: 1) assessing and diagnosing patients' gender concerns according to *DSM* criteria and assuring that these are appropriately addressed; 2) assessing and correctly diagnosing any co-existing psychopathology and assuring that it is addressed adequately. This may entail modification of the plans/schedule for gender transitioning; 3) distinguishing between GID with concurrent psychiatric illness and gender manifestations that are not part of GID but epiphenomena of psychopathology; 4) engaging in psychotherapy with gender variant individuals as indicated. This includes identifying the elements that should be addressed in therapy including the impact of discrimination and stereotyping; 5) ensuring that individuals who are in the process of transitioning, or who are considering or planning to do so, receive counseling from a qualified professional about the full range of treatment options and their physical, psychological and social implications including both their potential benefits and the full range of potential limitations (e.g., loss of reproductive potential), risks and complications; 6) ascertaining eligibility and readiness for hormone and surgical therapy, or locating professionals capable of making these ascertainments to whom the patient may be referred; 7) educating family members, employers and institutions about GV including GID; and 8) ensuring that documentation, including preparation of letters to endocrineologists and surgeons, employs terminology that facilitates accurate communication, minimizes pejorative or potentially stigmatizing language, and conforms (when applicable) to standards for third party reimbursement and tax deductible medical expense.

### Individuals with Disorders of Sex Development

*Overview and Synopsis*: As employed here, the term, *disorders of sex development* (DSD) refers to congenital conditions (formerly referred to as intersex disorders, hermaphroditism and pseudohermaphroditism) which entail atypical development of chromosomal, gonadal and/or genital sex. The gender that should be assigned may not be obvious at birth, and in many cases the process of decision making with respect to gender assignment is complex and fraught with uncertainties. Genitoplasty is often employed to bring the appearance of the external genitalia in line with the gender assigned. Additionally, gonadectomy must be considered in a variety of DSD syndromes due to increased risk of malignancy. The multiple medical (e.g., malignancy risk) and psychological (cross-gender puberty) factors that bear on such decisions were acknowledged by the Task Force as were the current debates regarding the timing of gonadectomy and the lack of consensus regarding the multiple issues relating to genital surgeries

© Copyright, American Psychiatric Association, all rights reserved.   7

**GENDER IDENTITY DISORDER**

performed on minors. Readers are referred elsewhere for various viewpoints on these controversial interdisciplinary issues, e.g., (49-55).

Some individuals with DSDs, in a proportion that varies greatly with syndrome and assigned gender, become dysphoric in the assigned gender and may reject it. A variety of issues in the clinical care of individuals with DSDs require the expertise of mental health professionals (49, 56). This Task Force report addresses only those issues related to gender dysphoria and gender transition in these individuals. The clinical options and decision-making processes that bear on gender transition and reassignment overlap to some extent regardless of the presence or absence of a DSD. When a DSD is present, however, there are fewer barriers to legal gender reassignment, and the barriers to hormonal and surgical treatments in conjunction with gender reassignment are lower.

Major areas of involvement of mental health professionals in the care of individuals with DSDs and gender dysphoria include: 1) the evaluation of gender identity and the assessment of incongruences, if present, between gender identity and assigned gender; 2) decision making regarding gender reassignment; 3) psychotherapy to address significant gender dysphoria in individuals with a DSD who do not transition gender; 4) selected psychological/psychiatric aspects of the endocrine management of puberty in the context of gender reassignment; and 5) selected psychological/psychiatric aspects of genital surgery in the context of gender reassignment.

The literature bearing on the above issues includes numerous long-term follow-up studies (APA levels B and C) of gender outcome in individuals with DSDs, including some with gender dysphoria and reassignment. These often have significant methodological weaknesses related to sample size and heterogeneity as well as inadequate control groups. There are also multiple reviews (APA level F), some of which integrate data from accessible case reports and small group studies [e.g., (57-61)].

*Opinion Regarding Treatment Recommendations for Individuals with DSDs*: The general absence of systematic studies linking particular interventions within the purview of psychiatry to mental health outcome variables largely limits the development of practice recommendations for DSDs to their derivation from clinical consensus. For individuals with gender dysphoria and a DSD, consensus recommendations could be developed for: 1) the evaluation of gender identity and assessment of incongruences between gender identity and assigned gender; 2) decisions/recommendations regarding gender reassignment based on assessment; and 3) psychotherapy to address dysphoria in the context of incongruences between gender identity and assigned gender in the absence of desire for gender transition. Although recent medical guidelines emphasize the desirability of, and need for, mental health service providers with expertise in this area of care [e.g., (29, 49, 51, 54)] it is premature to recommend detailed guidelines on their required qualifications. To do so might jeopardize existing providers rather than contribute to closing the gap in the availability of mental health service providers. Recommendations re-

garding the mental health needs of individuals with DSDs and their caregivers, whether or not gender dysphoria is present, are found in Appendix II and are not summarized here.

### Why APA Recommendations Are Needed for the Treatment of GID

APA recommendations are needed for the treatment of GID for a variety of reasons. First, the existing guidelines, standards of care and policy statements of other professional organizations, including the WPATH SOC, and recent reviews highlight the role of mental health professionals in a multidisciplinary team approach to providing medical services to individuals with GID (29, 49, 62-66); however, to date no professional organization of mental health practitioners provides such recommendations. Recognizing the current absence of guidelines by any professional organization of mental health professionals, the clinical practice guideline of the Endocrine Society (29) states that mental health professionals usually follow the guidelines set forth by WPATH. Although WPATH is not a professional organization of mental health professionals, it counts many mental health professionals among its members, including psychologists, psychiatrists and psychiatric social workers. A limitation of the Current WPATH SOC (version 6), which will be remedied in the forthcoming version 7, is that it does not cite its underlying evidence base, nor indicate the level of evidence upon which its standards are based. An appreciation of the quality of evidence upon which recommendations are based is critical for the practitioner who must judge whether or not implementation of a particular recommendation is likely to be in the patient's best interest. Version 7 of the WPATH SOC is now in preparation, and in that context numerous reviews of the supporting evidence have recently been published. In fact, all four issues of the 2009 volume of *International Journal of Transgenderism* are devoted to this topic. Additionally, the Task Force on Gender Identity and Gender Variance of the American Psychological Association has recently called for guideline development by its parent organization. Exactly when such guidelines will be available remains to be determined, however, their preparation is expected to get underway shortly. A call for nominations to a "Task Force on Guidelines for Psychological Practice with Transgender and Gender Nonconforming Clients" was issued by the American Psychological Association on April 8, 2011.

Second, although the practice of psychiatry overlaps with that of other medical specialties as well as with other mental health fields, including psychology, it is distinct in many respects. In particular, the diagnosis and treatment of major mental illnesses (e.g., psychotic disorders) in which gender identity concerns may arise as epiphenomena are primarily within the purview of psychiatrists, as are the pharmacological management of psychiatric disorders that may coexist with GID (e.g., mood and anxiety disorders and the assessment of undesired psychiatric manifestations of hormonal manipulations). It is, therefore, important that the available clinical evidence be

© *Copyright, American Psychiatric Association, all rights reserved.* **8**

evaluated from a psychiatric perspective for the benefit of practicing psychiatrists and their patients.

Third, it is likely that APA recommendations for the treatment of GID would positively impact the number of psychiatrists willing to provide services to individuals with GID as well as the development of opportunities to receive training in providing such care. Such opportunities could include continuing medical education activities as well as workshops and similar venues at national meetings such as the APA and AACAP.

Finally, recommendations from the APA would frame its position on what constitutes realistic and ethical treatment goals as well as what constitutes ethical and humane approaches to treatment. In addition to providing guidance to psychiatrists and other healthcare professionals, such a document would provide guidance to consumers of mental healthcare services, including the primary caregivers of minors with GID, in selecting among the various available approaches to treatment.

### Recommendations for the APA

1) The opinion of the Task Force is that the current credible literature is sufficient to support treatment recommendations, and that such recommendations are needed. The Task Force, therefore, recommends that the APA proceed with developing treatment recommendations. These recommendations should address, but not be limited to, those areas identified in this report for which recommendations are needed and substantial support is available from either research data or clinical consensus within the literature. With the possible exception of GID in adults, it is unlikely that GID/GID NOS will meet the criteria to be prioritized by the SCPG for APA practice guideline development. If not, the Task Force suggests that recommendations for each of the groups discussed in this report (children, adolescents, adults and individuals with DSDs) be prepared as APA resource documents.

2) There is a critical need for an APA position statement on the treatment of GID, and given the time it will take to develop treatment recommendations, a position statement should precede the development of recommendations. In recent years, the APA has received many requests from advocacy groups and the media inquiring about APA's position on the treatment of individuals with GID. As the APA has never had any specific component charged with directly addressing such inquiries, such questions were usually referred by default to the Committee on Gay, Lesbian and Bisexual Issues which was sunset during the restructuring of APA components in 2008. Examples of questions received include: How can primary caregivers best nurture a child with GID? Does any APA documentation define what is considered humane and ethical treatment of individuals, especially children, with GID? What constitutes medically necessary treatment for individuals of different age groups who meet criteria for GID? To what level of GID-related care are individuals entitled if their care is provided, or paid for, by govern-

mental bodies (e.g., adolescents in foster care, prisoners, military personnel and veterans)? Is SRS a standard treatment that should be routinely covered by insurance?

The APA first introduced GID as a category of diagnostic entities in 1980. Thirty years later, other than the *DSM* diagnoses, the APA has no official position statements pertaining to, or even mentioning, these diagnostic entities. In particular, the APA has not addressed the issue of what constitutes either ethical and humane or medically necessary treatment for the GID diagnoses. Requests for psychotherapeutic, hormonal and surgical treatments for GID, or their reimbursement, are not infrequently denied because they are perceived by private and public third party payers as cosmetic or unnecessary procedures rather than medically necessary or standard medical and mental health care (67). A document by the WPATH board of directors and executive officers discusses the term, *medically necessary*, as it is commonly used among health insurers in the United States and lists those aspects of GID treatment that meet the definition (68). While the existence of the diagnosis contributes to the stigma of affected individuals, the unintended result of the APA's silence is a failure to facilitate full access to care for those diagnosed with GID. The Task Force, therefore, recommends that the APA consider drafting a resolution, similar to Resolution 122 of the American Medical Association (62). This resolution concludes that medical research demonstrates the effectiveness and necessity of mental health care, hormone therapy and sex reassignment surgery for many individuals diagnosed with GID and resolves that the AMA supports public and private health insurance coverage for medically necessary treatments and opposes categorical exclusions of coverage for treatment of GID when prescribed by a physician.

3) This Task Force strongly endorses recent medical and psychological guidelines that emphasize the desirability of, and need for, mental health service providers with expertise in providing services to individuals with gender dysphoria, GID and DSDs (29, 49, 51, 54, 56). It is the opinion of this Task Force, however, that detailed restrictions on required qualifications of the mental health practitioners who provide these services are not desirable. Such restrictions might jeopardize existing providers rather than contribute to closing the gap in the availability of mental health service providers. Instead, the Task Force recommends that the APA create opportunities for educating mental healthcare providers in this area of care. Such opportunities could include continuing medical education activities as well as workshops and similar venues at national meetings such as the APA and AACAP.

4) The Task Force recommends that a structure, or structures, within the APA be either identified or newly created and charged to follow-up on the recommendations of this report, to periodically review and update resulting treatment recommendations, to identify areas where research is particularly needed to optimize treatment, and to identify means to facilitate such research.

**GENDER IDENTITY DISORDER**

## LITERATURE REVIEWS

### Gender Variance in Childhood

Edgardo J. Menvielle, M.D., M.S.H.S.
Richard R. Pleak, M.D.

The optimal approach to treating prepubertal children with GV including *DSM*-defined GID is much more controversial than treating these phenomena in adults and adolescents for several reasons. Intervention, or the lack thereof, in childhood as opposed to later may have a greater impact on long range outcome (219); however, consensus is lacking regarding the definition of desirable outcomes. Further, children have limited capacity to participate in decision making regarding their own treatment and must rely on caregivers to make treatment decisions on their behalf. An additional obstacle to consensus is the lack of randomized controlled treatment outcome studies of children with GID or with any degree of GV (2). In the absence of such studies, the highest level of evidence currently available for treatment recommendations for these children is expert opinion. Such opinions do not occur in a complete vacuum of relevant data, but are enlightened by a body of literature (mostly APA level C and lower) including systematic experimental single-case trials as well as both uncontrolled and inadequately controlled treatment studies, longitudinal studies without intervention and clinical case reports. Opinions vary widely among experts depending on a host of factors including their theoretical orientation as well as their assumptions and beliefs (including religious) relating to the origins, meanings and fixity/malleability of gender identity. For example, do gender variations represent natural variations, not assimilated into the social matrix, or pathological mental processes? Even among secular practitioners there is a lack of consensus regarding some of the most fundamental issues: What are indications for treatment? What outcomes with respect to gender identity, gender role behaviors and sexual orientation are desirable? Is the likelihood of a particular outcome altered by intervention? What constitutes ethical treatment aimed at bringing about the desired changes/outcomes? Adding to this complexity, service seekers as well as providers differ in their religious and cultural beliefs as well as in their world views regarding gender identity, appropriate gender role behaviors, and sexual orientation. Primary caregivers may, therefore, seek out providers for their children who mirror their own world views, believing that goals consistent with their views are in the best interest of their children.

We begin by examining the natural history of GID as defined by outcome without treatment. We then discuss the goals of interventions in treating these children and the factors that influence clinicians in goal selection. Next, we describe various interventions that have been proposed. The empirical data available to inform the selection of goals and interventions are then reviewed and an opinion is offered regarding the status of current credible evidence upon which treatment recommendations could be based.

### Outcome Without Treatment

The natural history or outcome of untreated children with GID is that a minority will identify as transsexual or transgender in adulthood (a phenomenon termed *persistence*), while the majority will become comfortable with their natal gender over time (a phenomenon termed *desistence*) (3-6). As reviewed by Wallien and Cohen-Kettenis (2008), the rate of persistence into adulthood was initially reported to be exceedingly low, but more recent studies suggest that it may be 20% or higher. In one recent study of gender dysphoric children (59 boys, 18 girls; mean age 8.4 years, age range 5-12 years), 27% (out of 54 who agreed to participate in the follow-up study) remained gender dysphoric at follow-up 10 years later (5). At follow-up, nearly all male and female participants in the persistence group reported having a homosexual or bisexual sexual orientation. In the desistance group, all of the girls and half of the boys reported having a heterosexual orientation. The other half of the boys in the desistance group had a homosexual or bisexual sexual orientation.

A more recent study (69) assessed 25 girls in childhood (mean age, 8.88 years; range, 3-12 years) and again as adolescents or adults (mean age, 23.24 years; range, 15-36 years). At the assessment in childhood, 60% of the girls met the DSM criteria for GID, and 40% were subthreshold for the diagnosis. At follow-up, 3 participants (12%) were judged to have GID or gender dysphoria. Regarding sexual orientation, 8 participants (32%) were classified as bisexual/homosexual in fantasy, and 6 (24%) were classified as bisexual/homosexual in behavior. The remaining participants were classified as either heterosexual or asexual. At follow-up, the rates of GID and bisexual/homosexual sexual orientation were substantially higher than base rates in the general female population derived from epidemiological or survey studies.

Desistence develops gradually over the preadolescent period (primarily between 8 and 12 years) for unknown reasons which have been postulated to include social ostracism, early pubertal hormonal changes, and cognitive development (5). It has also been noted that compared to "persisters," "desisters" may experience less gender dysphoria in childhood (5). The reliability of adult transsexuals' reports of childhood gender nonconformity has been discussed by Lawrence (34). A substantial proportion of adult transsexuals retrospectively report gender conformity as children and/or gender dysphoria that was kept private, never leading to clinical referral (70, 71). Some may also reinterpret childhood memories in light of later life events and recall greater degrees of gender nonconformity than were apparent in childhood, thereby making the decision to transition gender more easily explicable to self and others (72). Some patients report exaggerating the history of gender nonconformity in order to be regarded by mental health and other professionals as appropriate candidates for medical services related to gender transition (73).

In Green's longitudinal study of gender-referred boys, psychotherapy as children did not appear to have any effect on gender identity or sexual orientation in young

    © *Copyright, American Psychiatric Association, all rights reserved.*  **10**

adulthood, but the numbers of boys in various types of therapy were too small to draw strong conclusions (4). To date, no long-term follow-up data have demonstrated that any modality of treatment has a statistically significant effect on later gender identity or sexual orientation.

### Treatment Goals and Objectives

The overarching goal of psychotherapeutic treatment for childhood GID is to optimize the psychological adjustment and wellbeing of the child. The literature reflects a broad consensus regarding several other goals, including appropriate diagnosis and treatment of concomitant psychopathology as well as disorders or conflicts whose manifestations may be confused with GID, and building the child's self-esteem (7, 17, 18, 29, 74). Although the child is the designated patient, there is also consensus regarding the need for parental psychoeducation, assessment, and adequate attention to parental psychopathology and parent-child conflicts (7, 25).

What is viewed as essential for optimizing the wellbeing of the child differs among clinicians, as does the manner in which the various potential goals of treatment should be prioritized relative to one another. For example, should re-shaping the child's gender behaviors (e.g., increasing gender-conforming behaviors and/or decreasing gender nonconforming behaviors) be a primary therapeutic goal? Some have argued against directly targeting noncomforming behaviors (12-14), while recognizing that some forms of co-existing psychopathology in children with GID (e.g., depression) may be secondary to poor peer relations resulting from peer rejection due to the cross-gender identification. Modifying the child's cross-gender behaviors has been suggested by others to alleviate short term distress by improving peer relations and perhaps preventing the development of other psychopathological sequelae (75).

Opinions also differ regarding the question of whether or not prevention of adult transsexualism should be a goal of therapy. Zucker concludes that "there is little controversy in this rationale, given the emotional distress experienced by gender dysphoric adults and the physically and often socially painful measures required to align an adult's phenotypic sex with his or her subjective gender identity (75). Given the absence of any evidence that therapy is effective in preventing transsexualism in adulthood, together with concerns that therapy with that aim may be damaging to self-esteem, others challenge prevention as an acceptable goal. Among clinicians who share this second view, some endorse allowing the child to live in their preferred gender role to the extent that it is deemed safe to do so (12, 19). Some children may choose to present in the gender congruent with their biological sex in most social settings in order to avoid teasing and ridicule, but may present as their preferred gender at home and in other "safe" environments. Other children may become extremely depressed and even suicidal if not permitted to live in their preferred gender in all settings. Thus, some clinicians endorse childhood gender transition in at least some cases (12, 19).

The rationale for supporting transition before puberty is based on the belief that in some children a long term transgender outcome is to be expected and that these children can be identified so that primary caregivers and clinicians may opt for early social transition. An additional argument is that children who transition this way can always revert to their originally assigned gender if necessary, since the transition is only done at a social level and without medical intervention (9) although this may not be without complications (24). The main counter-arguments to this approach hinge on the finding that GID in children usually does not persist into adolescence and adulthood. Thus, supporting gender transition in childhood might hinder the child's development or perhaps increase the likelihood of persistence (20). Furthermore, the peer-reviewed literature does not support the view that desisters and persisters can currently be distinguished reliably as children (5, 21-23).

Yet another approach to working with children with GID is to remain neutral with respect to gender identity and to have no goal with respect to gender identity outcome. Instead, the goal is to allow the developmental trajectory of gender/sexuality to unfold naturally without pursuing or encouraging a specific outcome (12-14). The position in favor of supporting free gender expression is centered on the assumption that self-esteem may be damaged by conveying to the child that his/her likes and dislikes as well as mannerisms are somehow intrinsically wrong. The counter argument proposes that self-esteem can be best served by improved social integration, including the ability to make same-sex friendships. Here the assumption is that the derived psychological benefits brought about by conforming to social expectations outweigh the benefits of expressing the putative "true gender self" (12) freely when it deviates significantly from social gender norms. Alternatively, the child's self-recognition of a gender variant and stigmatized status may be actively encouraged with the goal of mastery, e.g., developing cognitive, emotional and behavioral coping tools (12).

As reviewed by Zucker, there is currently widespread recognition among mental health professionals that homosexuality is not inherently related to general psychopathology or mental disorders (75). Nevertheless, it has been suggested that treatment of gender variant children for the prevention of homosexuality can be justified on other grounds, including parental values (4) as well as religious values (8). Given the absence of evidence that any form of therapy has an effect on future sexual orientation, however, such efforts are presently controversial, and this point should be addressed in the psychoeducation of primary caregivers. Further, it has been argued that offering therapy aimed at preventing homosexuality could have the effect of labeling homosexuality as an inferior and undesirable condition, thereby increasing prejudice and discrimination towards lesbians and gay men (76). Parallel arguments could be made regarding attempts aimed at preventing transsexualism.

### Types of Interventions

A variety of intervention modalities has been proposed to achieve the above goals. Therapeutic approaches to

© Copyright, American Psychiatric Association, all rights reserved. **11**

**GENDER IDENTITY DISORDER**

work with children with GID include individual insight-oriented psychoanalytic or psychodynamic psychotherapy (25); protocol-driven psychotherapy such as behavior modification (26); parent and peer-relations focused therapy (18) and, parent and child therapeutic groups (12, 13, 15). Other proposed interventions are best characterized as self-advocacy and educational: support groups for primary caregivers, community education through websites and conferences, school-based curricula, and specialized youth summer camps. As in other disorders, the recommendation for a particular therapy often hinges on the therapist's preferences and training. This is especially true for GID, however, in light of the lack of consensus regarding either the goals for therapy or the malleability of gender identity, as well as the controversies surrounding the ethics of aiming to influence identity development.

Even though the child should be the ultimate beneficiary of treatment, the primary focus of intervention is sometimes the primary caregivers (e.g., via parenting support and psychoeducation as well as guidance in reinforcing behavior modification, and building self-acceptance and resilience in the child) and often multi-pronged interventions are necessary that involve not only the child and family, but the community (e.g., via bullying prevention and diversity education). Some approaches may center on the primary caregivers to minimize therapist contact with the child in order to avoid placing the child squarely in the clinical spotlight which can be stigmatizing (12, 18). This is particularly true of work with very young children in which the primary caregivers may be targeted with the aim of empowering them with the understanding and skills necessary for optimally parenting their child with GID (12). Additionally, psychodynamic theories have sometimes focused on the primary caregivers (77) or parent-child conflict (78) as possible causal factors in GID, providing a different rationale for primary caregivers as the target(s) of intervention. Problems in parent-child attachment interacting with temperamental dispositions in the child have been suggested to be causally implicated in GID and cited as a focus for psychodynamic therapy of the child (25).

Zucker and Bradley observed higher levels of psychopathology in clinical samples of primary caregivers and suggested that parental psychological abnormalities may contribute to GID (79). These observations, however, do not distinguish between cause and effect. Whatever the directionality of the cause and effect relationship, parental distress and psychopathology should be assessed and appropriately addressed as part of a comprehensive treatment approach.

### Outcome Research

Very few studies have systematically researched any given mode of intervention with respect to an outcome variable in GID, and no studies have systematically compared results of different interventions. Some of the earliest treatment studies of children with GID were done in the 1970s by Rekers and colleagues in individual and small case series using behavioral methods (80, 81). These authors tested behavior modification in boys through contingency management including punishment of feminine behaviors, with a stated goal being prevention of later homosexuality and transsexualism. Short-term treatment success was reported with a decrease in gender non-conforming behaviors. Long term follow-up studies, however, were not reported so there is no evidence that these effects were enduring or that intervention influenced either gender identity or sexual orientation. Although Rekers' reports were widely criticized for using punishment and religious persuasion with the goal of prevention of homosexuality (13, 82, 83), his general goals for interventions with children with GID have been shared by other clinicians, e.g., (84, 85) and endorsed by controversial mental health organizations such as the National Association for Research and Therapy of Homosexuality (www.narth.org).

A parent- and peer relations focused protocol for boys with GID was tested by Meyer-Bahlburg (18). The treatment focused on the interaction of the child with the primary caregivers and with the same gender peer group. The goals were developing a positive relationship with the father (or father figure), developing positive relationships with male peers, developing gender-typical skills and habits, fitting into the male peer group, and feeling good about being a boy. To minimize the child's stigmatization, only the primary caregivers attended treatment sessions which focused on such issues as parents' gender attitudes, changing family dynamics when the father increases positive interaction with the boy, selection of appropriate same-sex peers for play dates, selection of summer camp, supporting artistic interests and talents, etc. The therapy also involved ignoring rather than prohibiting or bluntly criticizing the boy's cross-gender behaviors and distracting him in contexts typically leading to cross-gender behaviors, while giving him positive attention when he engaged in gender-neutral or masculine activities.

The sample consisted of 11 boys. Age at evaluation ranged from 3 years, 11 months to 6 years with a median of 4 years, 9 months. Eight boys were diagnosed as having GID of childhood, and three as having GID NOS. Treatment was terminated in most cases when the goals stated above were judged to have been fully reached. Ten of the 11 cases showed such marked improvement; only one did not and was, therefore, judged to be unsuccessful. The total number of treatment visits per family ranged from 4–19 (with a median of 10). In some cases, treatment for other family problems, such as marital conflict or individual psychiatric problems of the primary caregivers, continued after treatment of the child's GID was completed. Follow-up was done mostly by telephone. The duration of follow-up was left to the primary caregivers and varied up to several years. There was no significant recurrence of GID or GID NOS in the 10 successful cases, although several primary caregivers reported occasional recurrence of some cross-gender activities, especially during the first winter following treatment when the children were homebound and peer contacts diminished.

Some therapists, including the present authors, modify Meyer-Bahlburg's parent- and peer-centered approach

© Copyright, American Psychiatric Association, all rights reserved.    **12**

(18). This entails working with the family in a psychoeducational and supportive approach, promoting the child's self-esteem and decreasing family dysfunction, while assisting the family with the child's positive adaptation regardless of gender identity. This approach involves much work with the primary caregivers and other family members, as well as with the school or other facilities, and can include support groups for the primary caregivers (13, 14, 86). The goals are to allow the child to have a variety of experiences and to promote positive adaptation to whatever gender identity and sexual orientation the child will have as an adolescent and adult, and to assist the family in accepting and supporting their child regardless of outcome. The present authors (unpublished) have observed improved self-esteem, decreased behavioral disturbance, improved family functioning, and generally less cross-gender behavior using this approach. One of the authors (Pleak, unpublished) has followed up 10 boys with GID who were in treatment between ages 3 to 12 years old. In young adulthood, 7 identify as gay men, one as bisexual, one has undergone sex reassignment and is now a woman, and one who has Asperger's disorder has no romantic or sexual relationships with other people, but identifies entirely as male and reports sexual fantasies about women. As adults, all acknowledge their previous GV in behavior and identity, and the 9 who did not become transsexual say they have not felt cross-gendered since adolescence.

### Conclusions and Opinion Regarding Treatment Recommendations

Web-based literature searches failed to reveal any randomized controlled studies related to any of the issues germane to treatment of children with GID. The majority of studies would be categorized as APA evidence category G such as individual case reports and APA evidence category C such as longitudinal follow-up studies without any specific intervention (4). A few reports might be categorized as APA level B (clinical trials), however, these lacked control groups (or an adequate control group) and/or the follow-up interval was brief (18, 26, 87).

In light of the limited empirical evidence and disagreements about treatment approaches and goals among experts in the field and other stakeholders, recommendations supported by the available literature are largely limited to the areas of consensus identified above and would be in the form of general suggestions and cautions. One such caution would be to inform primary caregivers and children (in an age-appropriate manner) of the realistic therapeutic goals, available treatment options and the lack of rigorous evidence favoring any particular treatment over another for attaining a particular goal. Families should be informed about potential outcomes including the possibility that the child's experience/perception of the gendered self may change as they mature. The range of possible long-term outcomes discussed should include homosexuality, heterosexuality, varying degrees of discomfort with sex of birth, and variance in gender expression in relation to stereotypes, including the pursuit of medical/surgical interventions for sex reassignment. Clinicians should be sensitive to the primary caregivers' values and wishes but also be alert to the possibility of parental decisions being driven by a wish to normalize the child through therapy intended to increase gender conformity (or heterosexuality) or through premature gender role transition. At the same time, clinicians should be cautioned against wholesale rejection of gender role transition when this may be in the best interest of the child, even if in a relatively small number of cases (88). Clearly, therapy cannot be offered with the promise of preventing either transsexualism or homosexuality. Even offering treatment with such aims raises ethical concerns, and these have been addressed elsewhere (13, 89).

## Gender Variance in Adolescence

Susan Bradley, M.D.
Richard Green, M.D., J.D.

For purposes of this Task Force report, adolescence is defined as the developmental period from 12 to 18 years of age. Problems of gender identity present as a spectrum with some adolescents having longstanding gender dysphoria and wishes to be the other sex (typically evident in childhood) while others present with a more recent onset of gender dysphoria, sometimes in the context of more broad identity confusion and less clear definition of their identity as the other sex. For example we have seen several adolescent females with recent onset of a wish for SRS following a sexual assault. Other adolescents may present with clear body dysmorphic disorder, psychosis, severe depression and Asperger's disorder, with the wish for SRS appearing almost as a secondary phenomenon. Those adolescents with GID whose GID symptoms were clearly present in childhood and have continued into adolescence are generally less complicated to manage. According to Cohen-Kettenis and van Goozen (90) this "persistent" group may have less overt psychopathology. Those whose GID symptoms emerge later, often with pubertal changes and/or in the context of a psychiatric disorder or following Transvestic Fetishism, present with a more complicated management picture. Although many of the same issues arise for both early and later onset groups, the timing at which particular issues arise and how they are managed clinically may vary between the two groups. The consensus among the clinicians with the most experience in this area is that it is important to address major co-occurring psychiatric issues prior to the gender issues in both early and later onset groups (23, 91). In the absence of other contributory issues, as is more common with the early onset group, supportive work towards transition may be appropriate (23, 91).

Searches of PubMed and PsychInfo databases failed to reveal any randomized controlled trials (RCTs) related to any of the issues germane to treatment of adolescents with GID. The majority of studies would be categorized as APA evidence category G such as individual case reports (92); APA evidence category C such as longitudinal follow-up studies without control groups [e.g., (31, 93, 94)]; APA evidence category B such as follow-up studies with control

© Copyright, American Psychiatric Association, all rights reserved.
**13**

**GENDER IDENTITY DISORDER**

groups of limited utility and without random assignment [e.g., (30, 88)], and APA evidence category F such as reviews of the above, some of which were exhaustive [e.g., (21, 23, 27, 95)]. There are two clinics (The Gender Clinic of Vrije University Medical Center, Amsterdam, The Netherlands, and The Child and Adolescent Gender Identity Service of The Centre for Addiction and Mental Health, Toronto, Canada) that have sufficient numbers of subjects and where there is systematic data collection to act as an "experience base" from which to guide both the inquiry and possibly expert opinion on the main issues in adolescence. Unfortunately, additional studies to either corroborate or challenge the findings of these clinics are not available.

This report will begin by considering the assessment of adolescents presenting with a wish for gender reassignment, and then consider the evidence for psychotherapy, the real-life experience, medical suspension of puberty, and cross-sex hormones. An assessment of the evidence base regarding each of these issues is given as well as an opinion regarding the development of treatment recommendations. SRS is not performed on adolescents in the United States and is, therefore, not addressed in detail.

### Assessment

Follow-up studies of adolescents and adults from the Dutch clinic emphasize the importance of good assessment with respect to comorbid psychopathology (30, 31, 96-98). Better outcomes from SRS were seen in female-to-male transsexuals (FTMs) and male-to-female transsexuals (MTFs) who were primarily erotically attracted to individuals of their natal sex than in MTFs who were not primarily attracted to individuals of their natal sex. MTF individuals in the latter category with more psychopathology and cross-gender symptoms in childhood, yet less gender dysphoria at initial consultation, were more likely to drop out from follow up prematurely. Such clients with considerable psychopathology and body dissatisfaction reported the worst post-operative outcomes. As described below, the most systematic information is available on the adults (N=162) while the adolescent samples were smaller (N=22 and N=20).

Although the studies from the Dutch clinic are suggestive, the predictors are hardly either well tested or strong enough alone to use in assessing prospective candidates for SRS. Generally, both clinics believe that those adolescents with higher levels of psychopathology, less gender dysphoria and/or more recent onset of their wish for sex reassignment should be followed over a period of time in order to treat the more obvious psychopathology (e.g., depression, psychosis, body dysmorphic disorder) and to see if treatment of the psychopathology will lead to a reduction in the wish to proceed to SRS (see case reports of change in wish for SRS with treatment of comorbid psychopathology (99-102)).

The position of the Toronto clinic has been to aim for neutrality with respect to the issue of gender transition in those situations in which the GID is of recent onset and accompanied by more obvious psychopathology. With those adolescents where there is longstanding GID and the adolescent is already engaged in the "real-life experience" or prepared to do so, the Toronto clinic tends to be more positive with respect to supporting transition. Both groups may, however, be offered pubertal suspension as a way of delaying puberty and/or the development of secondary sex characteristics in order to allow more time either for psychotherapy or for planning for the future. Future planning issues include how to present oneself socially as the other sex, how to change one's name, who to tell, and similar issues. Clearly, for the younger adolescent this means agreement of the primary caregivers. In some cases older, "emancipated" adolescents may proceed without parental agreement.

The Dutch group supports full gender transition, assisted by hormone administration for adolescents who are generally well adjusted and functioning socially in the preferred gender role, are older than 12 years of age and have reached Tanner stage 2-3. In a follow-up study of such individuals (N=20), they reported that with cross-sex hormone treatment in adolescence and SRS at age 18, or shortly thereafter, the outcomes were overall quite positive (as assessed by satisfaction with surgery and lack of regrets) and generally better compared to individuals who underwent SRS later in adulthood (30). They also followed a group of adolescents who were refused SRS or chose not to pursue it (N= 21). The reasons for refusal were elevated levels of psychopathology, lack of clarity or consistency regarding the nature and extent of the gender identity concerns resulting in diagnostic uncertainty, and gross psychological instability. Those who did not have SRS showed reductions in gender dysphoria but continued to have more social and emotional difficulties than the SRS group. The difficulty in interpreting this study is that the subjects who were refused or not encouraged to proceed generally had higher levels of psychopathology to begin with. Although there were reductions in psychopathology across all groups it is impossible to draw conclusions about the efficacy of SRS in reducing comorbid psychopathology because the groups were not matched for level of psychopathology at the outset. There are no controlled studies with matching of subjects at the outset and random assignment to SRS or supportive therapy. Overall, those who were refused did not regret not being able to pursue SRS. The investigators emphasize the importance of careful evaluation as the initial step in SRS and referral for comorbid psychopathology in those who do not meet careful criteria for gender dysphoria. Clearly, clinical judgment is involved with it being easier to assess and evaluate those with longstanding GID as opposed to the later onset group who tend to present not only with more psychopathology but more uncommon requests such as the desire for drugs to reduce testosterone levels with no overt desire to pursue SRS.

In the Toronto sample there is significant psychopathology in the adolescent sample, particularly in the late onset group (103). As indicated above, many of these adolescents also present with a shorter duration of cross-gender feelings and less clarity or consistency regarding the nature of their gender concerns as well as histories of trauma, psychosis, body dysmorphic disorder and severe

*Am J Psychiatry 169:8, August 2012, data supplement.*
© Copyright, American Psychiatric Association, all rights reserved.    **14**

depression that seem related to their cross-gender feelings. Despite these observations, often these adolescents are very certain that SRS is the "only" solution to their dilemmas and because of this may become very pressuring of doctors in their quest for SRS. Access to Internet sites that uncritically support their wishes appears to facilitate their intense desire for hormones and surgery. In order to deal with these issues, both the Dutch and the Toronto groups generally insist on some form of involvement in supportive psychotherapy with a focus on comorbid psychopathology and family issues as well as support around pursuing or not pursuing SRS. Some of these adolescents and their families, however, are reluctant to proceed with psychotherapy or family therapy.

Based on the above, it is important to do a thorough assessment of adolescents presenting with a wish for SRS. This should include an assessment for comorbid psychopathology, particularly any disorder that may have as a secondary phenomenon a tendency to produce gender confusion such as schizophrenia or psychotic depression, or emergence of the SRS wish in the context of trauma.

### Psychotherapy

As indicated above, psychotherapeutic involvement is used not only to explore issues related to the individual's commitment to living in the cross gender role but also to explore whether the individual has fully explored other options, such as living as a homosexual person without SRS. Attempts to engage the individual in more in-depth psychotherapy to "cure" them of their gender dysphoria are currently not considered fruitful by the mental health professionals with the most experience working in this area (79, 91). Instead of psychotherapy aimed at "curing" gender dysphoria, supportive therapy and psychoeducation seem justified on the basis of ensuring that the individual understands and is committed to a long and difficult process and has considered alternatives to SRS. Generally, some time is devoted to supporting the individual's efforts to live and present oneself as the other sex. There have been no systematic studies of the effects of this supportive psychotherapy.

A survey of Dutch psychiatrists who did not work in GID clinics found that 49 percent had treated at least one "cross-gender confused" patient. Of 584 patients reported on in the survey, GID was regarded as the primary diagnosis for 39 percent. In the other 61 percent of cases, cross-gender issues were comorbid with other psychiatric disorders and in the majority of those cases, the gender issues were interpreted as epiphenomena of the comorbid disorder (104). The most frequently reported disorders in which "cross-gender confusion" was reported were personality, mood, dissociative and psychotic disorders (104, 105), with gender confusion or cross-gender delusions occurring in up to 20 percent of individuals with schizophrenia over the course of the illness (106). Campo (2003) concluded that the survey emphasizes the need for articulated rules to assist mental health specialists in distinguishing GID with a comorbid psychiatric disorder from gender confusion that is an epiphenomenon of another disorder. Knowledgeable clinicians can make this distinction based on the patient's history, including collateral history from friends and family members, and longitudinal follow-up. Most experienced clinicians would agree that, when the adolescent is motivated, supportive psychotherapy is very helpful either to assist in the transition to the other gender or to assist in the individual's decision as to whether to pursue SRS or not.

### Expectations for Period of Living as the Other Sex (The Real-Life Experience)

Since the original guidelines drafted in 1979 (107) by the Harry Benjamin International Gender Dysphoria Association (HBIGDA), now WPATH, subjects wishing SRS have been expected by the mental health professionals assessing them for suitability, to live as the other gender for one to two years prior to being approved for surgery. These recommendations for living or presenting oneself as the other gender have been modified over time and there is no absolute agreement as to what length of time nor what aspects of real-life experience are critical either to acceptance for SRS or to later outcomes. Many adolescents who have longstanding gender dysphoria may be living as the other gender at the time of assessment, some of them quite convincingly. Others, often in the late onset group, do not appear to have considered how they would begin to present themselves as the other gender and often create a sense of dissonance in the examiners between their wish and their appearance. The extent to which an individual seems engaged in presenting as the other sex often reflects the extent of anatomical gender dysphoria and commitment to hormonal and/or surgical interventions.

Although there has been some loosening in the application of the real-life experience over the years and no consensus as to what is a required minimum length of time of such an experience, the majority of professionals working in this area believe that some period of real-life experience is important. Further research is needed before a guideline on this issue can be established.

### Issues Regarding Suspension of Puberty

Puberty is the critical developmental milestone in the continuation, or not, of GID. Associated body changes can have a negative short- and long-term impact. A person born male who is convinced that he should have the body of a female is distraught at experiencing the testosterone-mediated changes of male puberty. A person born female convinced that she should be male is distraught at the changes of female development. Assuming that the GID endures, the consequences of undesired pubertal changes are substantial. In the long term, they are typically more troublesome for the person born male. The stigmata of pubertal body development including height, bony configuration, hair and voice are a substantial handicap when later attempting to integrate socially as a woman. For the person born female there can be a height handicap as well as the need for surgery which could have been avoided by suppression of puberty. Clinicians experienced with GID in adult patients burdened by the pubertal changes of the "wrong sex" and clinicians attempting to help patients with GID who are entering adolescence recognize the need

© Copyright, American Psychiatric Association, all rights reserved.
**15**

**GENDER IDENTITY DISORDER**

for intervention to prevent both the short- and long-term consequences of the "wrong puberty."

The gonads secrete sex steroids in response to the gonadotropins from the pituitary. These are secreted in response to hypothalamic gonadotropin releasing hormones (GnRH). Synthetic GnRH agonists bind to the pituitary so that GnRH no longer acts. Gonadal sex steroid production ceases within 4-12 weeks, and upon discontinuance, hormonal puberty is resumed within 3 months (108). Thus, current endocrinological sophistication provides a therapeutic strategy. Puberty, as it begins, can be suspended (29). Administration of GnRH analogues can delay the sex steroid induced progression of body changes. During this period of "time out" the patient and clinician can explore the options available and decide on the optimal future direction of living as a man or as a woman.

The duration of pubertal suspension that can be safely implemented has been of concern. This has focused primarily on the effect of sex steroid deficiency on bone metabolism with its potential for deficient mineralization and possible osteoporosis. Research has demonstrated that a period of up to several years appears to be safe with the deficiency of progressive mineralization being remedied once sex steroids, either those expected by birth sex or those administered for cross-sex development, are available. Peak bone mass occurs at about 25 years of age and long term treatment data have yet to be reported (91, 109). Significant safety issues connected with the use of hormone suppressing agents have not emerged to date; however, long term follow-up data are lacking.

Adolescence is also a developmental period of substantial brain maturation and concerns have been expressed over possible cognitive deficits consequent to pubertal suspension. There is some evidence in hamsters of a detriment to development or changes in behavior (110); however, there has been no evidence clinically of any consequence of pubertal suspension on brain functioning in humans (109). Concerns about consequences of pubertal suspension may be tempered by the fact that there is substantial variation in the age of onset of normal puberty (e.g., between the ages of 11 and 16 years).

A critical treatment issue is the diagnostic challenge of selecting patients for whom GID is on a continuing developmental trajectory. The majority of prepubertal patients diagnosed with GID do not continue with GID into adolescence (111). Most ultimately manifest sexual attraction to persons of their birth sex but have no desire to modify their body to that of the other sex. However, most children whose anatomical gender dysphoria intensifies as pubertal development ensues will ultimately desire SRS. The fit is not perfect. Therefore, pubertal suspension for a year or two provides breathing space for the young person and clinician to experience and to explore the continuing evolution of gender identity.

Adolescent patient selection criteria have included an intense pattern of cross-gender identity and behavior from early childhood, and an increase in gender dysphoria with the onset of puberty in a patient otherwise psychologically stable and in a supportive family environment (91). Clinical experience with pubertal suspension demonstrates that with thorough clinical screening the large majority of patients whose puberty has been suspended continue to experience GID and do not want the body changes typical of their birth sex. They are then administered sex steroids to enable body changes consistent with their cross-sex identity (28). For the small number of patients who conclude that developing along the lines expected by birth sex is preferable, GnRH analogues can be discontinued, and pubertal development as typical of their natal sex resumes (29). On the other hand, if gender transition is desired, GnRH analogues are continued during cross-sex steroid treatment prior to gonadectomy.

In the most experienced treatment center in the Netherlands, GnRH analogues are prescribed shortly after the onset of puberty (Tanner stage 2-3). Triptorelin is administered in a dose of 3.75 mg every 4 weeks. At the introduction of treatment an extra dose is given at 2 weeks. Gonadotrophins are suppressed after a brief period of stimulation (109). Feminizing/masculinizing endocrine therapy in that center can begin at 16 years with recommendation of the mental health professional who has engaged with the adolescent for a minimum of 6 months. Sex reassignment surgery for continuing GID can be performed at 18 years and must be preceded by a 2 year real-life experience of full-time cross-gender living. As a 12 cm height difference is a typical sex difference, it is advantageous to retard the growth of natal males and enhance the growth of natal females. The Endocrine Society guideline addresses management of this important issue (29).

The most extensive series of cases with pubertal suspension is reported from the Netherlands (APA level B, longitudinal follow-up after an intervention). From 2001 to 2009, 118 adolescents were treated (50 natal males and 68 natal females). Mean age was 14.3 years in 2009. None had discontinued pubertal suspension. Behavioral and emotional problems (as measured by the Child Behavior Check List and Youth Self-Report) and depressive symptoms (as measured by the Beck depression inventory) decreased while general functioning (Global Assessment Scale) improved significantly during puberty suppression. Cross-sex hormone treatment had been started with 71, at a mean age of 16.6 years (28).

The experience of the Toronto group to date has been recently published (33). This group examined demographic, behavior problem, and psychosexual measures to see if any of them correlated with the clinical decision to recommend, or not recommend, pubertal suspension in a consecutive series of 109 adolescents (55 females, 54 males) with GID evaluated between 2000 and 2009. Of the 109 adolescents, 66 (60.6%) were recommended for pubertal suspension and 43 (39.4%) were not. A combination of five (of 15) demographic, behavior problem, and psychosexual measures were identified in a logistic regression analysis to significantly ($p<.10$) predict this clinical recommendation (Zucker et al. 2011). The quantitative data were complemented by clinical case descriptions; however, follow-up data were not adequate for statistical comparison of any outcome measures between those for whom pubertal suspension was recommended

    © Copyright, American Psychiatric Association, all rights reserved.  **16**

compared to those for whom it was not. Other centers in Los Angeles and Boston have similarly instituted programs of pubertal suspension but have not yet published systematic evaluations of their case series. Because of cost, GnRH analogues are not affordable for many in the U.S. Less expensive alternatives (e.g., spironolactone) may be used in natal males (29).

### Issues Regarding the Use of Cross-Sex Hormones

The major issue with respect to use of cross-sex hormones concerns the timing of administration. There are no established criteria for use of cross-sex hormones in adolescents. Generally, however, these are now used following suspension of puberty when it is increasingly clear that the adolescent meets readiness criteria to move towards SRS and is functioning reasonably well psychologically and socially. There are no studies addressing the issue of timing. The Dutch follow-up study (94) concluded that those adolescents who transitioned earlier presented a more convincing physical appearance than did those with a later age of transition. This follows logically as there was less development of secondary sex characteristics of the natal sex as indicated above. There are currently inadequate data for development of an evidence-based guideline regarding the timing of cross-sex hormone treatment.

### Issues Regarding the Timing of SRS

SRS is not generally an issue for adolescent populations in the United States as surgery is normally not performed before the age of 18. However, occasionally surgery has been done during adolescence in other countries. Given the irreversible nature of surgery, most clinicians advise waiting until the individual has attained the age of legal consent and a degree of independence. In some jurisdictions (e.g., UK), there is no fixed legal age of consent to medical procedures. Instead, a comprehensive understanding of the procedure, with options, risks, and benefits must be demonstrated by the patient (30). At present, there is inadequate evidence to develop a guideline regarding the timing of sex reassignment surgery although medical advice is important with respect to removal of ovaries within a reasonable time after use of cross-sex hormones (29).

## Gender Variance in Adults

A. Evan Eyler, M.D., M.P.H.
D. Andrew Tompkins, M.D.
Eli Coleman, Ph.D.

Here we address the care of transgender and other gender variant adults from the perspective of the practicing psychiatrist. First, the principal concerns of these individuals in a clinical context are described. Psychiatric assessment, treatment options and the processes employed in clinical decision making are discussed. The quality of evidence currently available to guide the selection of practice options and to support treatment recommendations is then evaluated using the American Psychiatric Association coding system. The professional literature regarding treatment of adults with GID/GV is more extensive than the literature regarding the treatment of children or adolescents. This section of the report is, therefore, correspondingly longer than those sections.

### Gender Identity Concerns in Adulthood

GV is sufficiently common that even adult psychiatrists whose practice does not focus on transgender care encounter patients who are transitioning gender, or contemplating gender transition. Gender variant persons choose different means to express the gendered self authentically or to attain relief of psychological distress due to lack of congruence between the psychological and socially-presented selves, or between physical characteristics and gender identity. Many seek both hormonal and surgical transition; however, some seek hormonal treatment but do not feel the need for any, or particular (e.g., genital) surgical procedures. Others may choose surgical but not hormonal treatments. Mental health services may be sought for many reasons, including a desire for professional assistance with exploring gender identity, or to gain comfort with the gendered self or preferred gender presentation. Some also seek counseling regarding the decision of whether or not to transition publicly, and, if so, to what extent. Additional concerns include preparing to initiate hormonal treatment; monitoring psychological functioning as the physical effects of the administered hormones become apparent; choosing whether or not to undergo various surgical procedures, such as breast, genital, or facial modifying surgeries; and adjusting to post-transition living in the preferred gender presentation. Psychiatrists who treat transgender adults may also be called upon to assist their patients with the legal and financial concerns associated with gender transition in the current social system. These include coding and payment of insurance claims for mental health and other medical services related to transgender care; management of identity documentation during and after transition; the treatment of transgender and transitioning persons in the military and in incarceration settings; discrimination based on gender identity or gender presentation, and many others.

Adults who conclude that transition is the best solution to the psychological discomfort they experience face different challenges than children and adolescents with strong cross-gender identification. Some individuals who publicly transition in adulthood have been aware of a sense of gender incongruence since childhood or adolescence, but have adopted a social presentation that is at least somewhat conforming to gender expectations. This may have occurred (consciously or unconsciously) in order to reduce the level of difficulty encountered in settings such as education, employment and partnered relationships (112). They may take the risks inherent in transitioning publicly when they are older and have more autonomy, or when they are naturally going through stages of individuation. Concerns regarding transgender awareness or transition may emerge during the course of treatment of some other presenting complaint. For example, some transgender adults initially seek treatment for depression, substance abuse, or other clinical problems that have

© Copyright, American Psychiatric Association, all rights reserved.   17

**GENDER IDENTITY DISORDER**

developed in the context of chronic suppression, or repression, of feelings related to GV. Initial disclosure, particularly in a clinical setting, is usually a time of high emotional vulnerability for the person sharing this confidence with the psychiatrist or other professional (112), and requires knowledgeable and empathic management.

Acknowledging the awareness of cross-gender identification to oneself and to others, and integrating this awareness into one's identity, is sometimes referred to as "coming out transgender" or "coming out trans." This has been described as a multi-stage process by mental health professionals with extensive clinical experience with transgender phenomena, as well as on the basis of observational or qualitative research (112-116). These observations suggest a process somewhat analogous to that proposed for identity development among gay men (117-120), lesbian women (121, 122) and bisexuals (123, 124). Though particular stages or milestones may be recognized in the process of coming out, they do not necessarily progress in the same sequence in all individuals (125). Persons who come out as transgender, or who transition during the adult years, are usually in the position of balancing the drive to live in a more authentic gender presentation with the needs created by years of living a more gender conforming public and private life.

### Transition Goals and Outcomes

The process of integration of transgender identity may also demonstrate substantial complexity due to the variation in outcome that individuals seek. For example, some never publicly transition gender, while some may delay openly transitioning for a variety of reasons, such as concern about the impact of disclosing the transgender identity on employment or child custody arrangements. These individuals may, nevertheless, utilize hormonal treatments to facilitate presentation in the psychological (trans)gender in private settings – sometimes for years prior to public transition. Others find that their best sense of psychological relief and self-comfort is obtained through adopting a combination of social gender signifiers, with or without reinforcing medical treatments, to facilitate private reinforcement, though not public recognition, of the transgender identity. For example, an older male whose gender identity is female, may spend his leisure time at a club frequented by transgendered individuals, dressed as a woman, but may continue to present as male in his retirement community. He may also take a small dose of estrogen for psychological relief, even if this does not result in full physical feminization.

The range of transition goals sought has also evolved over time. Among the male-to-female (MTF) transsexual adults in Lewin's qualitative work (1995), the final stage of transition was described as "invisibility," i.e., assimilation into the general female population. Such "invisibility," however, is not currently a desired outcome for many transgender individuals and other gender variant adults. As transgender people and groups have become more visible in society, and have gained a measure of relative acceptance, the possibility of a transgender identity as such, rather than as a transitional stage within a male-female divided social system, has become a more realistic option. The film *Transgender Stories* (126) provides some first-person accounts in that regard. Some individuals do hope to fully assimilate as women or as men; however, others find authenticity in presenting a blend of gendered characteristics, or of fully transitioning gender while continuing to value the earlier life experience in the other gender role, such as by maintaining interests and activities developed during the pre-transition years. The process of integration of the transgender identity can also continue after the completion of surgical transformation of the body.

The possibility of stopping the process of gender transition prior to completion, or of reversing some of the physical changes that have been attained, has gained more acceptance in recent years. Some individuals find that a measure of bodily change, without genital surgery, clarifies their understanding of their gender identity and desired gender presentation. For example, some adults who begin FTM transition discontinue androgen use after some physical masculinization has been achieved, finding that a masculine female (butch) identity is more authentically representative of the self than living as a man. Some adults who initially present with transgender concerns decide, during the process of psychotherapy, not to proceed with any form of public gender transition (31). This can be a reasonable outcome to an exploratory psychotherapy, but elimination or "correction" of transgender identity is no longer considered a reasonable therapeutic goal. Pfafflin and colleagues (48, 127), for example, describe the evolution in treatment of gender dysphoria from historic psychoanalytic approaches aimed at achieving gender congruence through resolution of presumed intrapsychic conflict, to a contemporary model of offering psychotherapy or mental health evaluations that are often followed by hormonal treatments and surgeries.

### Diagnostic and Mental Health Needs Assessment

Adults desiring hormonal or surgical treatments in the process of transitioning gender sometimes initially seek psychotherapy to clarify their gender identity and personal goals. Some individuals present directly to a surgeon, endocrinologist or other prescribing clinician, and are referred for mental health consultation prior to initiation of hormone therapy or preparation for surgery. Exploration of the gender identity, assessment of realistic understanding of transition treatments and outcomes, and detection and treatment of any concurrent psychiatric pathology are some of the usual goals of this process. At least brief (several months) participation in psychotherapy is recommended in many clinical settings, in order to allow sufficient time for this work to unfold prior to initiating physical treatments that produce effects that are not fully reversible. Mental health evaluation and treatment, and the medical transition treatments that may follow, are discussed in more detail below.

### Psychotherapy and Mental Health Support

The skills used by mental health professionals in caring for adults who are in the process of transgender coming out are similar to those used in other clinical situations in

© Copyright, American Psychiatric Association, all rights reserved. **18**

which concerns regarding personal identity, individuation versus conformity, or adaptation to minority identification within nonaffirming majority culture are involved. Decisions such as whether and when to transition publicly, whether hormonal and surgical treatments will be needed or whether some other accommodation can be reached; if, when and how to come out regarding the transgender identity or history; and how to manage the concerns associated with family, employment and education, etc. are best addressed in a supportive clinical environment, at the pace that is acceptable to the transgender individual, and in some cases, couple.

Most of the literature addressing psychotherapy with gender variant adults is descriptive in nature; case reports, review articles based on practice experience, theoretical schemas based on clinical observation or qualitative work. The vast majority would be categorized as APA levels F and G. The lack of more statistically robust forms of evidence, such as RCTs, is representative of the history of this aspect of clinical practice, and the fact that psychotherapy is often (though not always) followed by hormonal or surgical treatments. The relatively low, and apparently declining, rate of regret following gender reassignment surgery (as discussed below) in a number of studies is believed to reflect the overall effectiveness of current treatment of gender dysphoria, including psychotherapy aimed at clarifying the social and physical changes needed to achieve comfort with the gendered self. The available literature (48, 128, 129) suggests that adequate pre-surgical psychotherapy is predictive of good post-surgical outcomes.

Bockting, Knudson and Goldberg (130) offer fairly comprehensive recommendations for assessment and treatment of gender concerns, concurrent mental health difficulties, and elements of general counseling that are transgender specific. Their recommendations are based on a model of "transgender–affirmative approach, client-centered care, and harm reduction." Based on the available literature, it would not be possible to recommend one particular style of psychotherapy over another for working with patients who are transgender; however, it is possible to identify the issues that therapy should address. These include concerns related to gender identity, gender expression and sexuality; social functioning and support; personal goals for public and private life, and related matters. Reasonable understanding of the effects of contemplated medical treatments and ability to adhere to a therapeutic regimen also should be assessed (107, 130) consistent with usual principles of decision-making capacity and informed consent. Assessment of co-occurring mental illness, particularly psychopathology that may influence the transgender presentation or that may be mistaken for transgender (e.g., Skoptic syndrome, in which a person is preoccupied with or engages in genital self-mutilation such as castration, penectomy or clitoridectomy) and psychotic disorders, etc. is paramount (29, 131).

Adults with gender identity concerns have also often experienced stigmatization or victimization related to gender variant appearance or behavior, or on the basis of actual or presumed sexual orientation as documented in the *Report of the National Transgender Discrimination Survey* (132). In fact, some authors have concluded that such stigmatization largely accounts for mental illness among individuals with GID (133). The American Psychological Association's Task Force on Gender Identity and Gender Variance concludes that "…there is adequate research concerning discrimination and stereotyping to support the development of clinical guidelines addressing these areas specifically." As with clinical work with individuals who are lesbian, gay or bisexual identified, an open-minded and nonjudgmental psychotherapy approach that affirms the autonomy and lived experience of the individual is a fundamental part of psychiatric care of gender variant adults.

### Medical Aspects of Gender Transition and Their Mental Health Implications

Mental health professionals who work with individuals who plan to transition using hormonal or surgical treatments, or who are in the process of doing so, need to be knowledgeable about these procedures and their mental health implications. These are, therefore, briefly reviewed here. Some individuals who transition, either female-to-male (FTM) or male-to-female (MTF), do so without hormonal therapy. Some seek mental health services while clarifying the decision to do so, and others do not find this necessary or feasible.

FTM transition usually includes use of androgens, which produce (or enhance) male secondary sex characteristics, such as beard growth and male distribution of body hair, deepening of the voice, and often mild coarsening of the facial features and skin. Androgen supplementation also causes enlargement of the clitoris, often to the extent that metaoidoplasty (one form of masculinizing genital surgery, discussed below) becomes feasible. MTF transition often consists of both estrogen supplementation and reduction in circulating androgens through use of anti-androgen agents, such as spironolactone or cyproterone (29). Estrogen effects include breast development and mild feminizing changes to skin and hair, though for many who transition MTF after completion of male pubertal development, depilation will be needed. Many also need surgical reduction of the laryngeal cartilage or feminizing facial surgeries. Use of hormonal preparations is much more effective in "adding" physical characteristics than in "subtracting" those that have already developed with natural puberty. Body habitus, including both fat distribution and potential for muscular development, is altered by use of cross-sex hormones. Utilization of either androgens or estrogens carries with it potential for both added health risks and, in some cases, physiologic benefits. The technical aspects of transgender hormonal treatment are discussed elsewhere (29, 109, 134) as is the associated general medical and preventive care (135-137).

Emotional changes may occur with use of either androgen or estrogen supplementation, though these are often relatively subtle and consistent with the pre-transition personality (135). Increase in libido usually occurs with androgen use (29), though some individuals

© *Copyright, American Psychiatric Association, all rights reserved.*   **19**

**GENDER IDENTITY DISORDER**

transitioning as MTF also experience a stronger interest in sex, perhaps due to the affirming aspects of attaining the bodily changes that have been desired for years, such as development of female breasts (135). Individuals in transition often benefit from ongoing psychiatric care (138). In addition to the psychotherapeutic work involved when individuals choose major life-changing experiences fueled by ongoing distress, monitoring the psychiatric effects of hormone use, along with the prescribing internist, family physician, gynecologist or endocrinologist, is advisable. For example, if excessive lability is noted, such as moodiness, weepiness or aggression (similar to the "steroid rage" that can accompany use of anabolic steroids by competitive male athletes and body builders), checking serum levels of circulating hormones is indicated (135). Safer sex information, and instruction in self-protective negotiation in sexual settings, is often provided by the psychiatrist or other mental health professional if this has not been done by the prescribing clinician. It is important that this information be tailored to the needs and experiences of transgender persons (136, 139).

Surgeries for purposes of gender transition include breast and chest ("top") surgeries and genital ("bottom") procedures. It is believed that most adults who transition from FTM have chest reconstruction surgery, because the visible contours of female breasts are such a powerful social cue and aspect of gender presentation as a woman, whereas a flatter chest facilitates presentation as a man (140). Some individuals may not require breast surgery if the body habitus is more masculine. The goal of FTM top surgery is not mastectomy, as would be performed for treatment of carcinoma of the breast, but creation of a natural appearing male chest, such that some of the subcutaneous fat is retained, in proportion to the general body habitus of the individual. Some adults who transition MTF have breast augmentation surgery due to achieving minimal breast development with hormonal treatment alone, though others develop fully morphologically normal female breasts with estrogen, and sometimes progestin, use. Some also choose breast augmentation due to dissatisfaction with the level of breast development achieved, similar to some non-transsexual women.

Many adults undergoing MTF genital surgery receive penile inversion vaginoplasty with clitoroplasty, labiaplasty, and orchiectomy. FTM genial surgery can consist of either metaiodoplasty with limited scrotoplasty, or more extensive surgery, including phalloplasty with grafted tissue from another body site, urethral extension, scrotoplasty and vaginectomy. Hysterectomy and oophorectomy are performed in either case. Information regarding the rationale for surgery (141), as well as current information regarding specific techniques (141, 142), is readily available to patients and professionals in a variety of sources, including professional sources, the popular press and the Internet; however, comparative outcome data among the providers and techniques are not similarly available.

### Review of Literature with Respect to Support for Treatment Recommendations

Prior to considering whether current literature provides sufficient evidence to support treatment recommendations by the APA, it is necessary to define what constitutes successful treatment and to determine the quality of evidence that compares treatment options in terms of outcome. These issues will be discussed in turn.

### Outcome Criteria

The definition of treatment success is complex, because gender identity and gender dysphoria, as well as any perceived benefit of treatment of gender dysphoria, are subjective experiences. Individuals seeking gender transition may also experience psychiatric symptoms or disorders that are unrelated to the gender identity concern, or that may have developed as a response to the distress of the gender dysphoria (e.g., addictive disorders) and require specific treatment.

*DSM-IV-TR* criterion D for GID states that "[t]he disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning." From this perspective, treatment can be considered successful if it relieves this distress or facilitates improvement in function in some substantive way. Some early outcome studies emphasized functional indices such as "job, education, marital, and domiciliary stability" (143). However, many persons who present for medical services for transition are already functioning very well socially and occupationally. In these cases, relief of the gender dysphoria, satisfaction with treatment, and lack of regret regarding the decision to transition, represent the primary measureable outcomes. (Among patients who experience some level of functional impairment, these may still be most important). Some clinical situations are complex. For example, an individual with high levels of personality pathology and gender dysphoria may experience substantial emotional relief with transition, and yet remain disabled from employment by the co-existing psychiatric illness.

The importance of subjective satisfaction as opposed to regret on the part of the patient has gained emphasis in the literature during the last two decades (38, 128, 144-146). This may reflect a combination of factors, including a relaxation of prevailing biases regarding gender and sexual orientation, a greater commitment to patient autonomy in mental health and general medical services, and the emergence of transgender and gender variant persons as a recognizable political group with reasonable claims to civil rights and responsibilities, rather than a population regarded primarily as patients and clients. Cole and collaborators (70) note that treatment of gender dysphoria during the early and mid-twentieth century was based on prevailing gender stereotypes: "Transsexualism itself was considered a liminal state, a transitory phase, to be negotiated as rapidly as possible on one's way to becoming a 'normal' man or 'normal' woman." This viewpoint has

© Copyright, American Psychiatric Association, all rights reserved. **20**

gradually evolved to accommodate a greater variety of transgender experiences, and recognition of the importance of subjective outcomes as opposed to the ability to conform to majority cultural expectations. Kuiper and Cohen-Kettenis (1998) concluded, "…an evaluation of SRS can be made only on the basis of subjective data, because SRS is intended to solve a problem that cannot be determined objectively."

### Evidence Regarding Effectiveness of Treatment for Gender Dysphoria in Adults

*Satisfaction versus Regret.* Pfafflin and Junge (48) reviewed the 79 available follow-up studies regarding gender transition treatment conducted between 1961 and 1991, including a total of more than 1,000 MTF patients and more than 400 FTM patients. Although a variety of outcome criteria were used, when the key subjective criteria (such as general satisfaction and lack of regret) were examined, results were supportive of treatment as a means of relieving psychological distress. Most of the studies reviewed were case series, case reports or reviews (APA level D or lower) though some included sufficient longitudinal follow-up and standardization to meet APA level C or B. "Big" regrets (such as reversion to the original gender role, rather than some lesser degree of regret or ambivalence) were estimated to have occurred in only 1-1.5% of patients. Other sizeable reviews (of numerous smaller studies, APA level F) also suggested hormonal and surgical treatments as successful therapies for gender dysphoria (39, 147). Interpretation of these findings is limited by the analysis of nonrandom samples based on recruitment and/or response rate. One study avoided these problems by using German registry data to assess reversal of name changes following reassignment as a measure of regret (148). Only one person of 733 who applied for legal change of sex between 1981 and 1990 subsequently applied for reversal, suggesting profound regret; 57 of 1,422 (0.4%) of adults who obtained gendered changes of first name requested a second legal name change, suggesting at least some degree of regret. Though this indirect approach (APA level G) does not provide robust evidence, the results are consistent with other approaches. A recent systematic review and meta-analysis reported that 80% experienced subjective improvement in terms of gender dysphoria and other psychological symptoms and quality of life (149).

Some relatively long-term, follow-up data (APA level B) are available, though sample sizes are generally modest. Smith and collaborators evaluated 162 Dutch adolescent and adult patients who were eligible for gender transition services based on "gender dysphoria, psychological stability, and physical appearance" after completion of treatment. Approximately half of the original consecutive applicants for sex reassignment completed hormonal and surgical transition (98). Two patients had regrets; most others experienced relief of gender dysphoria and were found to be functioning well "psychologically, socially and sexually." Johansson and collaborators followed 42 MTF adults and 17 FTM adults, who met diagnostic criteria for GID and were accepted into treatment in a transgender treatment program, for 5 years or longer (150). At the time

of publication, 32 had received genital reassignment surgery, 5 were anticipating surgery, and 5 had decided not to proceed. No one regretted his or her decision; 95% of participants rated their global outcome as favorable, though only 62% of the clinician assessments concurred. There were no differences between subgroups. Conversely, Kuhn et al. (151) used the King's Health Questionnaire and Visual Analogue Scale to measure quality of life in 52 MTF adults and 3 FTMs recruited from a Swiss tertiary medical center gender program (151). All subjects were 15 or more years post-gender reassignment surgery. Overall quality of life and life satisfaction levels were lower than matched controls, particularly in the domains of general health, role limitation, physical limitation, and personal limitation. However, the control group was chosen from the "healthy female married or with at least one previous abdominal or pelvic operation," rather than from a more representative sample, such as transgender adults who did not receive surgery. The quality of life assessments are, therefore, likely to be valid in absolute terms, but the question of whether the participants' quality of life was improved by transition (relative to having not transitioned) remains unresolved. Similarly, a recent population-based matched cohort study (APA level D) compared 191 MTF subjects and 133 FTM subjects with random controls matched by birth year and natal sex, as well as by birth year and reassigned sex (152). The transsexual subjects had received sex reassignment surgery in Sweden between the years 1973-2003. Although higher risks for psychiatric morbidity, suicidal behavior, and mortality were found in the transsexual groups, relative to non-transsexual controls, no comparison was made to transsexual persons who did not receive treatment. As with the Kuhn study (151) questions regarding the magnitude of improvement in quality of life attributable to gender transition and SRS were not addressed, though the authors noted that the gender dysphoria had been alleviated.

*Correlates of Satisfaction and Regret.* Much of the research literature that employs an outcome perspective has focused on identifying correlates of treatment satisfaction and lack of regret among persons seeking transition with hormonal and surgical treatments, particularly those who transition MTF. In theory, these data could be used in the formulation of treatment recommendations, to assist clinicians in identifying individuals who are most likely to benefit from hormonal and surgical treatments as well as those most likely to have post-treatment regrets. Particularly controversial in this research, MTF psychological and social characteristics have often been dichotomized by the typology of "early onset/androphilic" versus "late onset/ gynephilic" transsexual adults. Lawrence (38) summarizes this distinction as follows:

> Many researchers have proposed that there are two types of MTF transsexuals. One category includes persons who typically transition at a younger age, report more sexual attraction to and sexual experience with males, are unlikely to have married or to have become biological parents, and recall more childhood femininity. The other category includes persons who typically transition at an older age, report more sexual attraction to and sexual

© Copyright, American Psychiatric Association, all rights reserved.   **21**

**GENDER IDENTITY DISORDER**

experience with females, are more likely to have married and to have become biologic parents, report more past or current sexual arousal to cross-dressing and cross-gender fantasy, and recall less childhood femininity [p.300].

Transgender MTF adults with early onset/androphilic characteristics have been more often found to have higher rates of satisfaction with gender transition and fewer regrets (35-37). However, Lawrence (38) notes that the population of persons applying for gender transition surgeries has undergone a demographic shift, particularly in the United States and Canada. For example, at the Clarke Institute of Psychiatry in Toronto, the percentage of MTF adults seeking SRS who were "nonhomosexual relative to biologic sex," increased from 25% (153) to 59% (154) in a single decade. In a related phenomenon, the average age of MTF transgender adults presenting for gender reassignment services in Sweden increased by 8 years during two decades (155). Younger age at the time of transition had previously been found to correlate with both androphilia and better outcome satisfaction. However, rates of regret following surgery have decreased during this time, as discussed below, suggesting the possibility that co-occurring social changes, or other factors, have eroded the strength of these previously somewhat predictive relationships.

Interviews with subjects who express substantial regret following genital reassignment surgery, and related case reviews, have identified several correlates of regret. These include: inadequate diagnosis of major pathology (e.g., psychosis, personality disorder, alcohol dependency), misdiagnosis, absence of or a disappointing real-life experience, and poor family support (39-48). Given the magnitude of the social changes associated with gender transition, these correlates are intuitively appealing, as strong family support and good emotional health are associated with positive adjustment to many other life changes. However, cases have been reported in which the individual was both suffering from severe co-occurring psychopathology, and was a "late-onset, gynephilic" MTF transgender adult, and yet experienced a long-term, positive outcome with hormonal and surgical gender transition (156). Several members of this Task Force have treated patients with severe co-existing psychiatric illness who successfully transitioned gender and experienced improved quality of life. Delaying therapy with hormones or surgery until serious mental health difficulties are addressed may promote adherence to needed psychiatric and other mental health treatment, such that the individual experiences benefit with regard to both the gender dysphoria and the concurrent psychiatric illness. The co-occurrence of serious psychiatric pathology is further discussed below.

The quality of the surgical result, including function and appearance, has also correlated positively with patient satisfaction or other positive outcome measures among both MTF adults (42, 45, 47, 48, 128) and FTM adults (157), though it remains difficult to achieve surgically excellent results with phalloplasty (158) relative to vulvovaginoplasty (38). In her anonymous mailed questionnaire study of 232

MTF transsexual adults operated on between 1994 and 2000 by one surgeon using a consistent technique, Lawrence (2003) found poor surgical outcome to be the strongest predictor of regret. Overall, no participants reported "consistent regret" and only 15 (6%) were "sometimes regretful" (p. 305). Kuiper and Cohen-Kettenis (1998) recommended the use of multidisciplinary teams in order to minimize poor outcomes through lack of complete information or individual clinician bias. Although few systematic studies of suicide among gender transitioning persons have been conducted, the case report literature suggests that this is a relatively rare outcome (39). Dhejne et al. (152) found an increased risk of death by suicide, and of suicide attempts, among subjects who had received SRS, relative to age-matched population controls, but also noted that the difference in suicide attempts did not reach statistical significance for the most recent cohort, those who had transitioned gender during 1989-2003.

The majority of the satisfaction/regret outcome studies described above suggests that most subjects experience subjective improvement following gender transition; however, most lacked a control group. Studies assessing correlates of satisfaction through interviews or case reviews would be categorized as APA level G. For some important aspects of transgender care, it would be impossible or unwise to engage in more robust study designs due to ethical concerns and lack of volunteer enrollment. For example, it would be extremely problematic to include a "long-term placebo treated control group" in an RCT of hormone therapy efficacy among gender variant adults desiring to use hormonal treatments.

Review of the available literature also documents a downward trend in rates of post-surgical regrets over the last three decades. Though satisfaction with transition outcome is believed to be the norm in recent years, earlier studies (143, 159) found rates of regret of 30% or higher, and even in 1997, one study found a 6% regret rate (47). Reasons for this trend are not completely clear, but it is temporally correlated with fairly widespread adoption of flexible but less idiosyncratic pre-surgical criteria (the WPATH SOC); improved surgical techniques and outcomes, particularly for vulvovaginoplasty; and an improved social climate for members of sexual and gender minorities. This has been suggested as indirect evidence of the utility of the WPATH SOC in pre-surgical evaluation and treatment of gender transitioning patients (39, 160).

### Options and Evidence for Psychiatric Evaluation and Mental Health Care

Adults who make use of conventional medical services for gender transition historically received mental health evaluation prior to beginning this process (161), unless they had already been living as a member of the psychological (post-transition) gender for a significant period of time (107). The principal area of current clinical controversy with regard to use of hormonal medications by persons in gender transition concerns the nature of and extent of preparation for beginning hormonal transition, particularly the mental health evaluation. Options currently in use include the following: extensive mental

health evaluation or real-life experience prior to beginning treatment with hormonal medications, brief evaluation by a mental health professional prior to hormonal prescripttion, mental health screening by the prescribing clinician, and prescription without specific evaluation. Additional possibilities, such as the creation of certified "gender specialists" who would assess readiness have been suggested (162). Evaluation prior to genital surgery is similar but usually more extensive. The basis for each of these approaches is discussed below. This discussion applies only to the treatment of patients who seek medical services through licensed health care facilities in the United States and Canada. Some individuals obtain hormonal preparations without any medical or mental health contact, such as via the Internet or veterinary supply. Some travel to other countries to obtain surgical treatments without specific pre-surgical requirements. Outcome data for treatment obtained through these routes are lacking.

### Mental Health Evaluation Options Prior to Hormonal Therapy

*Comprehensive Mental Health Evaluation.* Although some reasonable evidence supporting the clinical effect-tiveness of hormonal and surgical methods in the treatment of "gender dysphoria" (principally case series by Benjamin, Green, Money, and Stoller [e.g., (163-166), reviewed in (167)] had accumulated by the 1960s, the use of these physical modalities, rather than psychoanalysis or extended psychotherapy aimed at resolving the intra-psychic conflict believed to underlie the transsexualism, and its associated implicit homosexuality, remained controversial and politicized. For example, the first university-affiliated transgender program, at Johns Hopkins University was founded in the 1960s and then disbanded in an ideological sea change in 1979 (though gender identity concerns subsequently became part of the scope of practice of the Johns Hopkins Sexual Behaviors Consultation Unit). Psychiatrists and psychologists approached individuals seeking medical services for gender transition idiosyncratically, without consistency in regard to recommending, or attempting to dissuade the use of, hormonal and surgical treatments. Several recent reviews and policy papers (161, 162, 168, 169) have described the intertwined clinical and political difficulties that existed in that era.

The Harry Benjamin International Gender Dysphoria Association (HBIGDA) was founded in 1979, to address the need for professional guidance in treating individuals with GID. Standards of Care (SOC) were developed by an international consensus panel, initially for the purpose of providing some protection to patients and their treating physicians (107). These have been subsequently revised at intervals, with a 7th revision in process at the time of this writing. HBIGDA has been renamed, and is now the World Professional Association for Transgender Health (WPATH).

The current, sixth version (107) of the WPATH SOC recommends evaluation by a psychiatrist, psychologist, clinical social worker, or other master's or doctoral level mental health clinician, prior to beginning treatment with

hormonal medications. Areas of emphasis include identifying and beginning treatment of any pathology that may exist concurrent with the transition, and assessing readiness for hormonal treatment based on consolidation of the gender identity and demonstration of general psychiatric stability sufficient to withstand the social or medical complications that may ensue during the physical transition process. Adults seeking treatment with hormonal medications should also have either engaged in psychotherapy (usually for 3 months or longer) or have engaged in a documented period of having lived in the psychological gender (a "real-life experience") for at least 3 months. In addition, patients should experience further consolidation of the gender identity during this time and make progress with regard to any ongoing mental health problems, such as substance abuse. They should also be considered likely to "take hormones in a responsible manner [p.14]." In other words, the use of hormonal medications is regarded as part of an ongoing process of physical and psychosocial transition, undertaken with informed consent, in the context of mental health and general medical care.

The WPATH SOC recommend different levels of preparation for breast and genital surgeries. FTM breast surgery may be obtained at the time of beginning hormonal treatment, as the breast morphology will be minimally affected by use of testosterone, and because FTM chest reconstruction may be necessary for social presentation as a male. MTF individuals should defer breast augmentation surgery until after at least 18 months of treatment with feminizing hormones, in order to reduce the likelihood of unnecessary procedures. WPATH Standards for preparation for genital surgery are more comprehensive than those addressing hormonal treatment eligibility and readiness, and the time course is longer: twelve months of hormonal therapy unless this is medically contraindicated, and twelve months of real-life experience. The current WPATH SOC (version 6) require documentation of a GID diagnosis and recommendation for surgery by two mental health professionals, at least one of whom must be a psychiatrist or doctoral level psychologist.

The Oxford Centre for Evidence-Based Medicine Level of Evidence system has been used to evaluate the evidence regarding the key components of the WPATH SOC for sex reassignment surgery, described as eligibility and readiness criteria (e.g., pre-treatment psychotherapy, real-life experience, sequence of transition steps), as predictors of favorable post-surgical outcome (39). Overall evidence supported these components; however, the level of evidence was generally low, mostly corresponding to APA level D and lower. Some studies, however, [e.g, (31, 37, 170)], that tracked patients longitudinally after intervention could be categorized as APA level B. The evidence in support of gender reassignment surgery as an "effective and medically indicated" treatment in cases of "severe GID" was similarly evaluated (140). Results were not uniformly supportive of surgical transition, but reports of post-surgical regret have become much less common over time; studies published since the late 1990s have been more consistently positive. Due to the lack of RCTs or large,

**GENDER IDENTITY DISORDER**

well-designed follow-up studies most evidence is estimated to be at or below APA level C. Outcome measures varied across the studies reviewed, but were largely based on satisfaction and similar subjective measures.

In 2009, a consensus group of European and American endocrinological professional societies produced an evidence based practice guideline (29) based on extensive literature review using the Grading of Recommendations, Assessment, Development, and Evaluation (GRADE) system (171). Strong recommendations (based on GRADE criteria) were made regarding the involvement of mental health professionals in gender transition treatment, including that the diagnosis of GID be made by a mental health professional and that the endocrinologist and mental health professional agree on the advisability of surgical reassignment prior to surgery. The type of mental health professional was not specified. The endocrine guideline notes that mental health professionals usually adhere to the WPATH SOC (29).

Some other clinical guidelines, such as the Vancouver Transgender Health Program/Vancouver Coastal Health (172) also recommend full psychological and/or psychiatric mental health evaluation before genital surgery. Although many, and perhaps most, adults who seek transgender hormonal transition or surgical procedures may have sufficient mental and emotional well-being to manage the associated physical and experiential impacts, the smaller number who do not may be spared devastating outcomes through timely (especially presurgical) evaluation and treatment of co-existing psychiatric illness.

The mental health evaluation component of these guidelines is included in an effort to promote good transition outcomes through management of the psychological stress of the transition process and any accompanying axis I or II disorders, rather than simply through assuring accurate diagnosis of the GID as such. In some cases, gender concerns or preoccupations are a manifestation of other intrapsychic conflicts (e.g., a male sex offender who covertly desires castration) or epiphenomena of other illnesses (e.g., bipolar mania or psychosis with delusional beliefs about gender). A recent Dutch study found that mental health professionals most valued consultation that provided guidance in distinguishing between transgender with concurrent psychiatric illness and psychopathology manifesting features that could be confused with GID (104, 105). Similarly, a British psychiatrist was sanctioned by the General Medical Council for prescribing hormonal medications and recommending surgeries based on insufficient evaluation, in cases such as those described above, to the detriment of the patient; in effect, for failing to follow the WPATH SOC current at the time (173, 174).

Although clinical guidelines that restrict access to hormonal or surgical treatments may reflect a variety of implicit assumptions regarding the experience of persons who transition gender, one important basis for their development has been the finding that, although GV is not in itself evidence of medical or psychiatric pathology, neither is it protective from concurrent psychiatric illness

(175-178). Further, Meyer (160) notes that although some clinicians have observed that proceeding with transition planning can sometimes alleviate other axis I related symptoms (41, 43, 48, 155, 175), others have reported lower likelihood of good long-term outcome (e.g., poor adjustment or regret) when concurrent disorders are present. It is probable that both findings have validity. Gender transition can foster social adjustment, improve self-esteem, and relieve the anxiety and mood symptoms that can accompany gender dysphoria, but significant co-occurring mental illness can mitigate against positive outcomes of any medical treatment, whether or not it is related to gender identity. Bockting et al. (2006) provide an approach to consultation regarding gender transition, including a list of co-occurring factors that should be specifically evaluated, such as associated obsessive-compulsive features, delusions about sex or gender, dissociation, personality disorders, Asperger's disorder and internalized homophobia. Their approach has substantial face validity and is consistent with general principles of psychiatric diagnosis, although it is supported primarily by low levels of evidence (generally level D and below).

*Other Options Prior to Initiating Hormones.* Although the WPATH SOC have been utilized in clinical practice with gender transitioning persons in a variety of geographic areas and settings, their implementation presupposes significant resources on the part of the individual seeking transition. Many people who seek hormonal treatment have neither the funds to obtain a psychiatric evaluation and three months of psychotherapy nor insurance coverage of mental health services. However, both estrogens and androgens are available via the internet, over the counter in Mexico and other countries, without prescription in certain settings (e.g., testosterone preparations at some gyms), and through veterinary supply. Individuals who lack financial resources, or who do not wish to participate in usual medical and mental health care for other reasons, therefore, have the option of self-treatment with informally obtained hormone preparations. This entails significant medical risk. Potential problems include needle sharing (179) as well as administration of inappropriately high hormone dosages together with lack of monitoring for deleterious hormonal effects (180). Despite the apparent widespread use of nonprescribed hormonal preparations [reviewed by Lawrence (180)], there is currently little information available concerning complications of this practice given that it occurs outside of the medical setting. Some clinicians and practices have adopted a harm reduction model of hormonal care for gender transitioning persons, consisting of hormone prescription and basic laboratory services with few additional treatment requirements on the part of the patient.

The *Protocols for Hormonal Reassignment of Gender* of the Tom Waddell Health Center (TWHC) note that "[t]here exists a large group of individuals self-identified as transgenders who are at high risk for HIV transmission, are homeless or nearly homeless, and who are in need of general primary care services. This group has historically

© Copyright, American Psychiatric Association, all rights reserved.   **24**

been averse to accessing medical services for a number of reasons…" (181). The decision regarding hormone prescription is, therefore, left to the individual physician or nurse practitioner, based on psychosocial evaluation, physical examination, and informed consent. However, psychiatric evaluation is required for adolescents, with family participation unless the youth is legally emancipated. Although specific data regarding measurable aspects of treatment success from this approach have not been published, the authors of the TWHC protocol documenttation (2006) note that their center has treated nearly 1,200 patients, with over 400 in active medical care. Most practices that use similar treatment approaches are located in urban centers with substantial populations of high-risk transgender adults and youth. Evidence regarding the effectiveness of these approaches is currently lacking with regard to treatment of gender dysphoria, though the harm reduction basis is similar to other evidence-based public health programs aimed at reducing HIV risk.

In some settings, psychiatric or psychological evaluation is not required prior to initiation of hormonal therapies if the prescribing clinician is able to assume responsibility for the associated aspects of mental health care. For example, in the Transgender Health Program of Vancouver Coastal Health (172) primary care providers, including family physicians and nurse practitioners, may choose to have sole responsibility for evaluating eligibility and readiness for hormone therapy, and for initiating and monitoring this treatment, if their clinical expertise and practice structure support this level of involvement. (In this protocol, nurse practitioners may prescribe estrogens but not androgens.) However, the British Columbia Medical Services Plan will not approve applications for transgender surgical coverage unless this is recommended by two psychiatrists or one psychiatrist and one Ph.D. psychologist, both of whom must be registered with the Plan (182). Evidence regarding the efficacy of this approach is not available, though the pre-surgical criteria are similar to the WPATH SOC in some respects.

Some practices employ a modified treatment protocol, such as a medical evaluation with hormone prescription, followed by a later visit with a mental health provider, for at least some transgender patient groups. In New York City, the Callen-Lorde Community Health Center treatment protocol for hormone therapy for "men of transgender experience, hormone experienced" provides an example in that regard (227). Other physicians informally waive any requirement for mental health evaluation if the individual has already been using hormonal medications for a substantial length of time, even if they were obtained without prescription. Some clinicians place a very high emphasis on patient autonomy, and provide hormone prescriptions on patient request, unless a strong medical contraindication is present. This is consistent with the principles articulated by the International Conference on Transgender Law and Employment Policy, Inc. (ICTLEP) (183). No studies comparing treatment guided by these different policies have been carried out with respect to any outcome measure.

Fraser (184) has recommended expanded use of the internet for education and psychotherapy for transgender persons and for clinician training in transgender mental health care. The creation of "gender specialists" among masters- and doctoral-level clinicians has been suggested by Lev (162). Although the gender specialist was conceptualized as having a supportive/informed consent role rather than acting as a "gatekeeper," letters of recommendation would be required prior to the initiation of hormonal and surgical treatments. Thus, the distinction between this role and that of gatekeeper is subtle— evaluation by a mental health professional would still be required prior to receiving desired medical treatments. Although the informal use of the term "gender specialist" appears to be increasing among some mental health practitioners, formalization seems unlikely in the near future given the absence of consensus regarding formal training requirements, training institutions and licensing bodies. The Task Force does not support development of specific gender specialist criteria or certification as this might inadvertently create restrictions for mental health professionals already working with patients with GV/GID.

### Mental Health Evaluation Prior to Surgical Care

At the time of this writing, many surgeons performing genital gender reassignment surgery in the United States utilize the WPATH SOC (version 6) as part of the preoperative evaluation, though these are neither mandatory nor universally accepted, and some surgeons select patients through other means. In some other countries, surgical eligibility criteria are even more stringent than the WPATH SOC, such as the requirement by the British Columbia Medical Services Plan that both evaluating clinicians be of doctoral level and approved by the Plan, and at least one a psychiatrist. Waiver of the mental health evaluation has been recommended as a matter of policy (ICTLEP, 1997) or on ethical grounds (185) but it is not clear that either of these arguments has gained extensive support within the surgical community. No direct evidence is available to address the safety and efficacy of evaluation for suitability for surgery by the surgeon, without the assistance of mental health professionals, though Lawrence's (38) work is somewhat related.

Given the magnitude of bodily change involved, its profound social significance, and the irreversible nature of these procedures, it seems unlikely that many more surgeons in the United States and Europe will decide to perform genital reassignment surgeries without preoperative mental health consultation, prior hormonal transition and real life experience, or some other substantial evaluative process. However, it should be noted that the ultimate decision regarding whether or not to operate in a particular case rests with the surgeon, i.e., he/she can decline to perform surgery even if the patient has been recommended according to the WPATH SOC or other evaluative means. As Richard Green (167) has noted, "If gender patients can procure surgeons who do not require psychiatric or psychological referrals, research should address outcomes for those who are professionally referred versus the self-referred."

© Copyright, American Psychiatric Association, all rights reserved. **25**

GENDER IDENTITY DISORDER

## Gender Variance in Persons with Somatic Disorders of Sex Development (aka Intersexuality)

Heino F. L. Meyer-Bahlburg, Dr. rer. nat.
William Byne, M.D., Ph.D.

### Overview

The process of decisions on gender assignment at birth is strongly emphasized in the clinical management of individuals with somatic disorders of sex development (DSD; the term includes, but is not limited to, what was formerly called intersexuality). Patient-initiated gender reassignment at later ages, from late pre-school age through adulthood, varies with the specific DSD syndrome, from 0% to about two-thirds of persons (60). Among individuals who meet *DSM-IV-TR* criteria A and B for GID, those who have a DSD differ markedly in several respects from those who do not. These differences include variations in presentation, medical implications and clinical context (168). As a consequence, the *DSM-IV-TR* (187) placed individuals with gender dysphoria and a DSD under the category GID Not Otherwise Specified (GID NOS), rather than under the more specifically defined term GID. GID NOS is commonly used also for individuals without a DSD who meet some but not all required GID criteria (often referred to as "subthreshold cases"). Thus, GID NOS is often applied to both groups of individuals with a DSD and gender identity concerns, those who meet all required GID criteria A and B, and those who meet only some of them. As the *DSM-5* will be published in 2013 at the earliest, and the revision process is in progress at the time of this writing, the current discussion will use the *DSM-IV-TR* formulations. Given the very limited literature on DSD-related GID and the fact that sex reassignment in individuals with DSD-related GID can occur at any age, we will deviate from the strictly age-defined outline of the previous sections and will present the DSD-related issues in a more integrated fashion.

The present discussion will be limited to individuals with DSDs who present with clinically significant gender dysphoria or frank desire for gender reassignment. Clinical management of gender reassignment of such patients overlaps to some extent with that of persons with GID in the absence of a DSD. However, for individuals with a DSD, there are fewer barriers to legal gender reassignment, and the barriers to hormonal and surgical treatments in conjunction with gender reassignment are much lower. An example would be a 46,XY individual who was born with penile agenesis, assigned to the female gender and gonadectomized (although the testes were entirely normal and had provided for male-typical androgen exposure of the fetal brain), and who chooses to transition to the male gender in late adolescence (61). Another example would be a 46,XX legally female individual with congenital adrenal hyperplasia (CAH) and an associated history of marked fetal masculinization and marked postnatal virilization (due to insufficient cortisol replacement therapy) who in adulthood requests reassignment to the male gender (188).

As illustrated by the above examples, several factors contribute to the lowered threshold for gender reassignment in individuals with a DSD. One is the fact that many of the underlying medical conditions require hormone administration as part of routine care. Moreover, many DSD syndromes involve infertility, which may either be congenital or due to gonadectomy performed according to past or present management guidelines, e.g., because of cancer risk (51). In addition, genital surgery has often been performed in infancy so that genital anatomy more closely corresponds to the assigned gender and is suitable for penile-vaginal intercourse at a later age (51, 54). Legal and medical gender reassignment of individuals with a DSD may, therefore, take place at much younger ages than in persons with GID in the absence of a DSD. The evolution of clinical thinking and management guidelines concerning the indications for gonadectomy and genital surgery in infancy, and current controversies in these areas, are discussed in several recent reviews (50-52, 54, 55, 168, 189-191). Decisions regarding hormonal and surgical procedures are complicated by the highly variable somatic presentations of the many diverse DSD conditions. [*A review of these syndromes is beyond the scope of the present review; see Grumbach et al. (192).*] In addition, appropriate mental health care includes the often delicate task of disclosure of the medical history along with psycho-education about the underlying biological condition (56, 193, 194).

Several major clinical management concerns that arise with patients with a DSD who experience gender dysphoria can be expected to profit from mental health interventions and treatment guidelines. These include: 1) the evaluation of gender and the respective psychiatric diagnosis, if any, in cases with incongruence between gender identity and assigned gender. This issue will be addressed largely in *DSM-5* and only briefly touched upon in this report; 2) the process and validation of decisions regarding gender reassignment including the identification and validation of the criteria on which such decisions are based; 3) the management of clinically significant gender dysphoria in individuals with a DSD who do not transition to gender change; 4) selected psychological and psychiatric aspects of the endocrine management of puberty in the context of gender reassignment; 5) selected psychological and psychiatric aspects of care involving genital surgery in the context of gender reassignment; 6) psychological implications of gonadectomy and their management; 7) disclosure of the DSD and treatment history to the patient; 8) the impact of DSD support groups; and 9) the qualifications of professionals who provide mental health services to patients with DSDs and gender identity concerns.

Treatment of individuals with DSDs, in general, needs to address a variety of additional issues with mental health implications. Among these are the management of the gender assignment at birth and its implications for the risk of developing gender dysphoria later; the clinical and ethical issues involved in the disclosure of medical history and biological status to the patient; the patient's self-disclosure to others; evaluation and management of any associated psychiatric conditions, especially depression

*Am J Psychiatry 169:8, August 2012, data supplement.*
© Copyright, American Psychiatric Association, all rights reserved.   26

and suicide risk; the management of DSD-related stigma; assessment of adherence to hormone-replacement therapy and reasons for nonadherence; providing continuity of care from childhood and adolescence into adulthood; and many others (50, 55, 56).

### Gender Evaluation

The assessment of gender-related behavior and identity in individuals with DSDs has been greatly improved by the development of a number of psychometrically sound questionnaires and interview schedules, based on self-report or parent report [e.g., (195, 196)]. The evaluation procedures and related clinical considerations have been described in several publications (49, 56, 197, 198). The validation of such gender-assessment tools is based primarily on the demonstration of significant differences, preferably with large effect sizes: 1) between males and females in general; 2) between individuals with gender dysphoria who do not have a DSD versus control individuals without either gender dysphoria or a DSD (separately for males and females); and later, when available, 3) between individuals with both a DSD and gender dysphoria and controls.

Clinical experience has demonstrated that, in children and young adolescents, the evaluation of gender identity and related medical decisions regarding potential hormonal and surgical treatments requires cautious shielding of the young patient from family and peer pressures. Strong rapport building is also required by the clinician who must avoid unwittingly "leading" the child or adolescent. The process demands an extensive commitment of time. To date no systematic studies of related techniques and their outcomes are available.

### Decisions on Gender Reassignment

When an individual with a DSD meets GID criteria A and B of *DSM-IV-TR*, the clinician and the patient, or in the case of minors, the primary caregivers and the clinician (with the child's participation increasing with cognitive maturation), through discussion arrive at a consensus regarding a decision for or against gender reassignment. In this context, reassignment usually means reassignment to the "other gender" relative to the patient's natal or legal gender, although occasionally adult patients self-identify as "neither – nor," "third gender," "intersex," or some other category that implicitly rejects an exclusively binary system of gender classification. This decision is also influenced by a number of factors in addition to the A and B criteria. These include: 1) the known or assumed implications of the individual's particular DSD syndrome for genetic and hormonal effects on the sexual differentiation of the brain and behavior (199); 2) available knowledge regarding the long-term gender outcome of other individuals with this particular syndrome (e.g., likelihood of long-term satisfaction with the new gender identity and/or gender role versus regret and request for re-transition, degree of confidence in one's gender identity, etc.); and 3) the potential benefits and risks of gender-confirming surgical surgery.

Readiness criteria for the various steps of gender reassignment, for instance in terms of cognitive and

emotional development, especially in children and adolescents, have not been formulated for individuals with DSDs. Clinical experience and published case reports suggest that these factors should be considered along with the duration and consistency of gender incongruence and desire for gender change. In addition, different cultures and even subcultures within a given country may differ in the prevailing gender categories and the salience and weight of criteria used in decision making on gender assignment (200).

A stringent evaluation of gender reassignment decisions by RCT with long-term follow-up has never been attempted. Moreover, such a study is highly unlikely to be done for a variety of reasons. These include the distress likely to be involved when gender assignment is done randomly rather than based on what clinicians and parents decide on as best on the basis of existing information, the expected low participation rate, and the large costs of long-term follow up. A short-term, waiting list type study design might be acceptable to an institutional review board, but would be logistically difficult to implement and probably not even be very informative given the slow processes involved in gender development. A less stringent validation of gender reassignment decisions (without RCT) in terms of long-term gender outcome by systematic prospective follow-up studies into at least mid-adulthood has also not yet been made because of the obvious logistical and financial problems involved.

Long-term follow-up studies of gender outcome that are available at this time include individual case reports [e.g., (188, 201)]. There are also one time, cross-sectional studies, such as follow-up of all patients seen within a clinic starting at birth or any time later [e.g., (202-206)], or studies of patients recruited from support groups or from multiple sources, without analyzing systematically for patient-initiated gender reassignment [e.g., (207-209)]. These studies typically cover a wide range of ages. Moreover, the time intervals between assignment and follow up vary widely, and there are usually no attempts to do case-control comparisons of individuals with the same syn-drome and the same degree of syndrome severity in terms of genital atypicality. Missing altogether is a validation of the specific criteria upon which gender reassignment decisions in patients with DSDs have been based, e.g., which factors best predict a stable gender identity and/or quality of life.

The best available evidence is a combination of Levels [B] Clinical trial (with reassignment as the intervention for gender-dysphoric cases) and [C] Longitudinal follow-up, without any specific intervention for cases without gender dysphoria. These observational follow-up studies often have significant methodological weaknesses, including small sample sizes, syndrome heterogeneity, high attrition rates in long-term follow-ups, large variations in the follow-up intervals, and noncomparability of (reassignment) cases and (nonreassignment) controls in regard to reassignment-relevant medical characteristics and/or social contexts. A few summary reports integrate data from accessible existing case reports and small group studies and, thereby, fit the APA evidence category of [F] Review

© Copyright, American Psychiatric Association, all rights reserved.  27

**GENDER IDENTITY DISORDER**

[e.g., (57-61)]. The GRADE system of evidence categorization (210) is not applicable because a systematic analysis of the risk/benefit ratio has typically not been attempted in these reports.

### Gender Dysphoria Without Transition to Gender Change

As gender roles in industrialized societies have gained flexibility and the (non-DSD) transgender spectrum has diversified, the spectrum of gender outcomes in patients with DSDs has also expanded. Gender dysphoria does not always lead to gender reassignment and even if legal gender change is obtained, the individual may not necessarily seek to obtain all facets of available hormonal and surgical treatment. By way of self-reflection alone, or in conjunction with discussions in support groups or psychotherapy sessions, the patient may decide against a gender transition altogether or only for a partial transition. No systematic work has addressed the psychological processes underlying such decisions in patients with DSDs.

### Gender Reassignment and the Endocrine Management of Puberty

In young persons with gender dysphoria who do not have a DSD, the aversive reaction to endogenous puberty is considered an indicator of cross-gender identification and recent years have seen an increase in the use of pubertal suspension, mostly by the administration of GnRH analogs, to give the early adolescent more time to come to a conclusion regarding gender reassignment, to reduce the development of unwanted secondary sex characteristics before cross-sex hormone treatment is started, and to reduce the emotional distress associated with such developments (29).

Medical suspension of puberty is not relevant to the management of gender dysphoria in those patients with DSDs who do not have functional gonadal tissue (whether congenitally or due to gonadectomy). However, such an approach could in principle be considered for patients with functioning gonadal tissue and a DSD such as 46,XX CAH, where the excess androgen production of the adrenal is suppressed by glucocorticoid replacement therapy, but no such study has been published to date. It is noted, however, that some adult patients with 46,XX CAH have simply stopped taking glucocorticoids to self-induce somatic virilization (188).

In hypogonadal or agonadal persons with a DSD, puberty is usually induced by sex hormone treatment, and when the decision for gender reassignment has been made, the sex hormone treatment is done in line with the gender desired by the patient. The details of sex hormone administration (specific medication, dosing, and mode of administration) are decided by the endocrinologist. On psychological grounds, the age when the patient's peers begin noticeable pubertal development is usually recommended as the starting age for the initiation of puberty in patients with DSDs. The supporting evidence for this is clinical experience and some evidence from early observational follow-up reports of patients with Turner's syndrome or hypopituitarism and late initiated puberty [summarized in (211)], not based on systematic study.

However, such early timing might also be recommended on the basis of recent data on nonhuman mammals showing continued capacity of the brain for organizational effects of sex hormones which gradually diminishes from early puberty to adulthood (212).

A number of retrospective studies have reported past periods of gender uncertainty in patients with DSDs who at the time of later evaluation in adulthood were content with their originally assigned gender (209, 213, 214). Whether the resolution of such transient gender uncertainties of patients with DSDs is supported by sex-hormone treatment and its timing or other factors has not been studied. The question of postnatal hormone effects is raised in this context. For example, female-assigned 46,XX individuals with CAH who transition gender at later ages tend to be those with a history of high postnatal androgen exposure. Causes of such high exposure include delayed onset of glucocorticoid treatment or prolonged interruption of treatment (usually due to the unavailability of appropriate services or a lack of money), even if their prenatal androgen exposure and their genital masculinization at birth were not extreme (188). Available evidence is yet too limited for firm conclusions regarding the role of postnatal sex-hormone exposure in gender-identity development.

### Gender Reassignment and Gender-Confirming Genital Surgery

Detailed case reports [e.g., (201)], clinical observations [e.g., (215)], and the first systematic qualitative studies (186, 190, 202, 216) have documented the widespread social stigmatization in patients with DSDs, which is in part related to gender-atypical appearance, especially of the genitals. The "optimal gender policy" for the management of DSD introduced in the mid-1950s by John Money and colleagues at Johns Hopkins included recommendations for corrective genital surgery in early childhood. The aim was to bring the genital appearance in line with the assigned gender in order to facilitate the acceptance of the child as a member of the assigned gender in the social environment. This would, in turn, facilitate gender-appropriate rearing, and, thereby minimize the occurrence of later body image problems and gender doubts on the part of the patient. An additional aim was to provide the capacity for penile-vaginal intercourse in adulthood. Because it was easier to surgically construct a vagina than a penis, this policy entailed a bias towards female assignment in 46,XY patients with a DSD and a markedly undersized phallus (an extreme example is the syndrome of penile agenesis mentioned earlier). In the last 15 years, testimonials of individuals with DSDs whose care followed the "optimal gender policy," detailed case reports, and long-term, observational follow-up studies on gender outcome and sexual functioning have raised significant doubts about the policy (60). Many patients initiate gender change later despite early gender-confirming surgery, especially among 46,XY patients raised female (although the frequency varies considerably with the particular DSD syndrome). Furthermore, body-image problems and even stigmatization can occur despite early genital surgery, especially if the latter is not well done. Additionally, genital

© Copyright, American Psychiatric Association, all rights reserved.   **28**

surgery entails a significant risk of impaired sexual functioning, which has led to a rethinking of gender assignment decisions in newborns and increased conservatism regarding genital surgery (51, 194, 217), a process that is still ongoing.

In the course of this debate, numerous outcome studies of genital surgery in individuals with DSDs have been published, which increasingly evaluate not only cosmesis (i.e., quality of the anatomic outcome) but also functional outcome (216, 218-221). Yet, the surgical techniques utilized are highly variable; the existing cross-sectional follow-up studies usually involve only modest sample sizes of patients with DSDs, often with considerable variability in the particular DSD syndromes represented among the subjects as well as in the ages at evaluation; RCT approaches to compare surgical techniques, even for cosmetic outcome, have not been attempted; and the existing follow-up studies commonly do not even attempt to systematically compare different surgical techniques. It is, therefore, difficult to draw conclusions sufficient for evidence-based recommendations. This applies especially to the numerous functional outcome criteria that are of clinical relevance (222). The question of optimal timing of such genital surgery runs into similar difficulties and existing consensus recommendations are uncomfortably nonspecific (51, 54). While many aspects of the evaluation of surgical technique fall within the purview of surgery, the indications and patient readiness for surgery as well as the impact of surgery on sexual satisfaction and psychological wellbeing should ideally involve mental health professionals. Considerations of the implications of a patient's present or emerging sexual orientation are also typically missing in existing discussions regarding the indications for genital surgery. The capacity for penile-vaginal intercourse may be valued differently depending on the sexual orientation of the individual, especially relative to the difficulties that the required surgeries sometimes entail (223).

### Psychological Implications of Gonadectomy

Particularly in DSD syndromes involving Y chromosomes, various forms of gonadal dysgenesis, gonadal dysfunction, and/or the risk of malignant transformation, removal of the gonads may be recommended regardless of sex reassignment decisions (51, 53). Although there is a rich non-DSD literature on the consequences of infertility, gonadectomy, and iatrogenic and endogenous hypogonadism, there has been no systematic study of these issues in individuals with DSDs, except for the inclusion of related clinical observations in occasional case reports.

### Disclosure of the DSD History

Because of the potential for DSD-related social stigmatization and self-image problems, the "optimal gender policy" of the Johns Hopkins group recommended that provision of information on the biological status and medical information about the child with a DSD be limited to a few family members along with a carefully paced disclosure to the patient him/herself and detailed suggestions on disclosure procedures [e.g., (197, 224)]. Although Money recommended full disclosure by the time a child

completed high school unless there were significant cognitive limitations, our experience is that other clinicians frequently advised permanent withholding of disclosure from the patient and sometimes even from the parent. This approach has been challenged on ethical grounds, is clearly at variance with the patients' rights movement of recent decades, and may entail serious medical risks. This approach may also lead to a situation when an adult discovers his/her DSD status in a setting that does not include medical supervision (e.g., self-initiated review of medical records, self-diagnosis with the aid of web-based materials or Internet contacts). Moreover, many case reports and patient testimonials have documented the negative psychological outcomes of such secrecy—for example, shame, distress to the point of suicidality, and distrust of primary caregivers and doctors, the latter in some patients leads to avoidance of routine medical services altogether (190, 201, 205, 225). Yet, the questions of timing and techniques of disclosure as described by Money (197) and Meyer-Bahlburg (56), for instance, have never undergone systematic study, and formal clinical trials are highly unlikely given the difficult logistics of such trials with patients with rare disorders as well as the complexity of clinical considerations involved. For quite a few patients with DSDs and gender uncertainty or gender dysphoria, the disclosure of their medical information can be of help to their understanding of their behavioral gender atypicality and may add arguments to their initiation of gender change, but this has been documented only in occasional case reports, not by systematic studies.

### DSD Support Groups

Feelings of isolation are widespread among persons with DSDs, as in individuals with other uncommon medical conditions. Clinical experience and many patient testimonials have documented the tremendous beneficial effects many people experience when they are finally able to contact or meet face-to-face with others with the same or a similar condition through a DSD support group [e.g., (190, 225, 226)]. Such groups are usually organized by persons with DSDs or their families rather than by medical or mental health professionals. Despite the emotional relief that they can provide, support group contacts sometimes also may cause additional concerns (56). For instance, the composition of the group (e.g., the DSD syndromes represented within the group, the personalities of group members) may not meet the patient's expectations, and the information provided may not always be correct. Thus, patients who choose to participate in support groups should be encouraged to check back with their clinicians if they receive conflicting information or advice. Systematic research on the value of support groups in the clinical management of persons with DSDs has not yet been done.

### Qualifications of Providers of Mental Health Services

The selected topics above provide a cursory overview of the issues with which mental health professionals (psychiatrists, psychologists, social workers, etc.) ought to be familiar and be able to manage clinically. Although recent medical guidelines emphasize the need for mental

© Copyright, American Psychiatric Association, all rights reserved.   **29**

**GENDER IDENTITY DISORDER**

health service providers with expertise in this area of care (29, 51, 54), currently very few mental health professionals are knowledgeable about treatment of persons with GID, and even fewer have much clinical experience with individuals with DSDs who have gender identity concerns. Given the dearth of specialized mental health service providers in this area, the gender evaluation and preparation for management decisions, including hormone treatment and genital surgery, are primarily made by endocrinologists and surgeons. Currently there exist no formal programs for specialized training of mental health personnel in this area. This Task Force strongly endorses the involvement of psychiatrists and other mental health professionals in the care of persons with DSDs and gender dysphoria; however, we conclude that it is premature to recommend detailed guidelines on required qualifications. To do so might jeopardize existing providers rather than contribute to closing the gap in the availability of mental health professionals in this area of clinical service.

## APPENDIX I: OTHER APA CONCERNS REGARDING GENDER VARIANCE

In addition to the issue of treatment recommendations, several concerns regarding gender identity and the rights of persons who are gender variant are potential subjects for policy development within the American Psychiatric Association. These include:

(1) Support for treatment resources for gender variant and gender transitioning adults, and removal of barriers to care, including insurance coverage for accepted treatments, similar to AMA House of Delegates' *Resolutions 114 (A-08)* and *122*, and the American Psychological Association Council of Representatives' *Policy Statement regarding Gender Identity, Transgender and Gender Expression Non-discrimination.*

(2) Support for reasonable revision of identity documents for gender transitioning persons, including United States passports and birth certificates which currently are difficult to correct.

(3) Specific support for the marriage, adoption and parenting rights of transgender and gender transitioning persons, similar to existing American Psychiatric Association policies regarding same gender couples.

(4) Support for the rights of incarcerated persons who are gender variant or gender transitioning to personal safety and comprehensive healthcare, including transgender health services.

(5) Support for transgender health services for members of the uniformed services and veterans, and opposition to the use of transgender or GV as grounds for discharge or rejection from enlistment.

(6) Support for the most appropriate placement of persons who are transgender in gender-segregated treatment facilities, including inpatient psychiatric units, residential addiction treatment programs, and geriatric care centers.

(7) Support for the inclusion and fair, collegial treatment of gender variant persons in all aspects of professional life, including medical schools, residency programs and fellowships in psychiatry, and the American Psychiatric Association.

(8) Support for professional and public education regarding transgender and GV, including:
  (a) Scientifically sound, non-stigmatizing information about GV for patients and members of the general public.
  (b) The inclusion of affirming, nondiscriminatory information regarding GV and gender transition in the curricula of medical schools and psychiatric residencies and fellowships.
  (c) Sponsorship of continuing medical education (CME) activities regarding transgender, such as presentations at the APA annual meeting and written materials in CME publications, particularly those used for maintenance of certification (MOC).
  (d) Inclusion of questions about transgender on the ABPN certifying and MOC examinations.
  (e) Tasking a specific APA component or other group within the APA to monitor progress with regard to these activities.

## APPENDIX II: OTHER APA CONCERNS REGARDING DSD

Because of the multiplicity of DSDs, the complex differences among them and their implications for integrated interdisciplinary care that includes mental health services; because not all DSDs are associated with either gender ambiguity or gender dysphoria; and because the needs of individuals with DSDs and gender dysphoria overlap incompletely with the needs of individuals with gender dysphoria in the absence of a DSD, the Task Force recommends that the APA create a separate mechanism for assessing the mental health needs of individuals with DSDs, whether or not gender dysphoria is present, and work towards better integration of mental health professionals into the interdisciplinary teams that provide their care. This would include involvement with parents as soon as the DSD comes to attention, which increasingly occurs during pregnancy.

Areas identified to be addressed within this mechanism include 1) psychoeducation of parents or primary caregivers; 2) assessment of indications and readiness for gender confirming surgeries and procedures related to them; 3) age appropriate disclosure of DSD status and related medical/surgical history; 4) issues related to gonadectomy and infertility; 5) DSD-associated stigma including that related to genital anomalies and other body image issues as well as feelings of shame and guilt; 6) revealing DSD status to others; and 7) the impact of DSD status on relationship issues including sexual intimacy.

This recommendation to create a mechanism to address the mental health needs of individuals with DSDs, whether or not gender concerns are present, is not intended to exclude individuals with DSDs from APA recommendations pertaining to GID, GID NOS or other manifestations of GV.

BYNE, BRADLEY, COLEMAN, ET AL.

# References

1. Zucker KJ, Lawrence AA: Epidemiology of gender identity disorder: recommendations for the Standards of Care of the World Professional Association for Transgender Health. International Journal of Transgenderism 2009; 11:8-18

2. Zucker KJ: On the "natural history" of gender identity disorder in children. J Am Acad Child Adolesc Psychiatry 2008; 47:1361-1363

3. Davenport CW: A follow-up study of 10 feminine boys. Arch Sex Behav 1986; 15:511-517

4. Green R: The "Sissy Boy Syndrome" and the Development of Homosexuality. New Haven, CT, Yale University Press, 1987

5. Wallien MS, Cohen-Kettenis PT: Psychosexual outcome of gender-dysphoric children. J Am Acad Child Adolesc Psychiatry 2008; 47:1413-1423

6. Zuger B: Effeminate behavior present in boys from childhood: ten additional years of follow-up. Compr Psychiatry 1978; 19:363-369

7. Zucker KJ: Children with gender identity disorder: is there a best practice? Neuropsychiatrie de l'Enfance et de l'Adolescence 2008;358-364

8. Rekers GA: Growing Up Straight: What Families Should Know about Homosexuality. Chicago, IL, Moody Press, 1982

9. Brill S, Pepper R: The Transgendered Child. San Francisco, CA, Cleis Press, 2008

10. Ehrensaft D: Raising girly boys: a parent's perspective. Studies in Gender and Sexuality 2007; 8:269-302

11. Spack N: Transgenderism. Med Ethics (Burlington, MA) 2005; 12:1-2, 12

12. Ehrensaft D: From gender identity disorder to gender identity creativity: true gender self-child therapy. J Homosex 2011; 59:337-56

13. Pleak RR: Ethical issues in diagnosing and treating of gender-dysphoric children and adolescents, in Sissies and Tomboys: Gender Nonconformity and Homosexual Childhood. Edited by Rottnek M. New York, New York University Press, 1999, pp 34-51

14. Hill DB, Menvielle E, Sica KM, Johnson A: An affirmative intervention for families with gender variant children: parental ratings of child mental health and gender. J Sex Marital Ther 2010; 36:6-23

15. Menvielle EJ, Tuerk C: A support group for parents of gender-nonconforming boys. J Am Acad Child Adolesc Psychiatry 2002; 41:1010-1013

16. Hill DB, Menvielle EJ: You have to give them a place where they feel protected and safe and loved: the views of parents who have gender variant children and adolescents. Journal of LGBT Youth 2010; 6:243-271

17. Richardson J: Response: finding the disorder in gender identity. Harv Rev Psychiatry 1999; 7:43-50

18. Meyer-Bahlburg HFL: Gender identity disorder in young boys: a parent-and peer-based treatment protocol. Clin Child Psychol Psychiatry 2002; 7:360-376

19. Edwards-Leeper L, Spack NP: Psychological evaluation and medical treatment of transgender youth in an interdisciplinary "gender management service" (GEMS) in a major pediatric center. J Homosex 2011; 59:321-36

20. Pleak RR: Transgender persons, in Disparities in Psychiatric Care: Clinic and Cross-Cultural Perspectives. Edited by Ruiz P, Primm A. Philadelphia, Lippincott, William, & Wilkins, 2010, pp 107-116

21. Zucker KJ: Gender identity disorder in children, adolescents and adults, in Gabbard's Treatments of Psychiatric Disorders, Fourth Edition. Edited by Gabbard GO. Washington, D.C., APA Publishing, Inc., 2007, pp 2069-2096

22. Cohen-Kettenis P, Pfafflin F: The DSM diagnostic criteria for gender identity disorder in adolescents and adults. Arch Sex Behav 2010; 39:499-513

23. Zucker KJ, Cohen-Kettenis P: Gender Identity Disorder in Children and Adolescents, in Handbook of Sexual and Gender Identity Disorders. Edited by Rowland DL, Incrocci L. New York, John Wiley and Sons, Inc., 2008, pp 376-422

24. Steensma TD, Biemond R, Boer FD, Cohen-Kettenis PT: Desisting and persisting gender dysphoria after childhood: A qualitative follow-up study. Clin Child Psychol Psychiatry 2011; 16:499-516

25. Coates S, Friedman RD, Wolfe S: The etiology of gender identity disorder: A model for integrating temperament, development, and psychodynamics. Psychoanalytic Dialogues 1991; 1:481-523

26. Rekers GA: Sex-role behavior change: intrasubject studies of boyhood gender disturbance. J Psychol 1979; 103:255-269

27. Cohen-Kettenis P, Delemarre-van de Waal HA, Gooren LJ: The treatment of adolescent transsexuals: changing insights. J Sex Med 2008; 5:1892-1897

28. de Vries AL, Steensma TD, Doreleijers TA, Cohen-Kettenis PT: Puberty Suppression in Adolescents With Gender Identity Disorder: A Prospective Follow-Up Study. J Sex Med 2010; 8:2276-83

29. Hembree WC, Cohen-Kettenis P, Delemarre-van de Waal HA, Gooren LJ, Meyer WJ, III, Spack NP, Tangpricha V, Montori VM: Endocrine treatment of transsexual persons: An Endocrine Society clinical practice guideline. J Clin Endocrinol Metab 2009; 94:3132-3154

30. Smith YL, van Goozen SH, Cohen-Kettenis PT: Adolescents with gender identity disorder who were accepted or rejected for sex reassignment surgery: a prospective follow-up study. J Am Acad Child Adolesc Psychiatry 2001; 40:472-481

31. Smith YL, van Goozen SH, Kuiper AJ, Cohen-Kettenis PT: Sex reassignment: outcomes and predictors of treatment for adolescent and adult transsexuals. Psychol Med 2005; 35:89-99

32. de Vries AL, Kreukels BP, Steensma TD, Doreleijers TA, Cohen-Kettenis PT: Comparing adult and adolescent transsexuals: an MMPI-2 and MMPI-A study. Psychiatry Res. 2011; 186:414-418

33. Zucker KJ, Bradley SJ, Owen-Anderson A, Singh D, Blanchard R, Brain J: Puberty-blocking hormonal therapy for adolescents with gender identity disorder: a descriptive clinical study. J Gay Lesbian Ment Health 2011; 15:58-82

34. Lawrence AA: Sexual orientation versus age of onset as bases for typologies (subtypes) for gender identity disorder in adolescents and adults. Arch Sex Behav 2010; 39:514-545

35. Blanchard R, Steiner BW, Clemmensen LH, Dickey R: Prediction of regrets in postoperative transsexuals. Can J Psychiatry 1989; 34:43-45

36. Muirhead-Allwood SK, Royle MG, Young R. Sexuality and satisfaction with surgical results in male-to-female transsexuals. XVI Biennial Symposium of the Harry Benjamin International Gender Dysphoria Association. London, August 17-21, 1999

37. De Cuypere G, Elaut E, Heylens G, Van Maele G, Selvaggi G, T'Sjoen G, Rubens R, Hoebeke P, Monstrey S: Long-term follow-up: psychosocial outcome of Belgian transsexuals after sex reassignment surgery. Sexologies 2006; 15:126-133

38. Lawrence AA: Factors associated with satisfaction or regret following male-to-female sex reassignment surgery. Arch Sex Behav 2003; 32:299-315

39. De Cuypere G, Vercruysse H: Eligibility and Readiness Criteria for Sex Reassignment Surgery: Recommendations for Revision of the WPATH Standards of Care. International Journal of Transgenderism 2009; 11:194-205

40. Gijs L, Brewaeys A: Surgical treatment of gender dysphoria in adults and adolescents: recent developments, effectiveness, and challenges. Annu Rev Sex Res 2007; 18:224

41. Kuiper AJ, Cohen-Kettenis P: Gender role reversal among postoperative transsexuals. International Journal of Transgenderism 1998; http://www.wpath.org/journal/www.iiav.nl/ezines/web/IJT/97-03/numbers/symposion/ijtc0502.htm [Accessed on May 2, 2011]

42. Botzer, M. and Vehrs, B. Psychosocial and treatment factors contributing to favorable outcomes of gender reassignment. XIV Biennial Symposium of the Harry Benjamin International Gender Dysphoria Association. Kloster Irsee, Germany, September 7-10, 1995

43. Landen M, Walinder J, Hambert G, Lundstrom B: Factors predictive of regret in sex reassignment. Acta Psychiatr Scand 1998; 97:284-289

44. Bodlund O, Kullgren G: Transsexualism--general outcome and prognostic factors: a five-year follow-up study of nineteen trans-sexuals in the process of changing sex. Arch Sex Behav 1996; 25:303-316

45. Lundstrom B, Pauly I, Walinder J: Outcome of sex reassignment surgery. Acta Psychiatr Scand 1984; 70:289-294

46. Walinder J, Lundstrom B, Thuwe I: Prognostic factors in the assessment of male transsexuals for sex reassignment. Br J Psychiatry 1978; 132:16-20

47. Eldh J, Berg A, Gustafsson M: Long-term follow up after sex reassignment surgery. Scand J Plast Reconstr Surg Hand Surg 1997; 31:39-45

48. Pfafflin F, Junge A: Sex Reassignment. Thirty years of International Follow-up Studies after Sex Reassignment Surgery: A Comprehensive Review, 1961-1991. http://www.symposion.com/ijt/pfaefflin/1000.htm [Accessed on May 2, 2011]

49. Consortium on the management of disorders of sex development: Clinical Guidelines for Management of Disorders of Sex Development in Childhood. Rohnert Park, CA, Intersex Society of North America, 2006

50. Wiesemann C, Ude-Koeller S, Sinnecker GH, Thyen U: Ethical principles and recommendations for the medical management of differences of sex development (DSD)/intersex in children and adolescents. Eur J Pediatr 2010; 169:671-679

51. Hughes IA, Houk C, Ahmed SF, Lee PA: Consensus statement on management of intersex disorders. J Pediatr Urol 2006; 2:148-162

52. Frimberger D, Gearhart JP: Ambiguous genitalia and intersex. Urol Int 2005; 75:291-297

53. Brown J, Warne G: Practical management of the intersex infant. J Pediatr Endocrinol Metab 2005; 18:3-23

© Copyright, American Psychiatric Association, all rights reserved.
31

## GENDER IDENTITY DISORDER

54. Speiser PW, Azziz R, Baskin LS, Ghizzoni L, Hensle TW, Merke DP, Meyer-Bahlburg HFL, Miller WL, Montori VM, Oberfield SE, Ritzen M, White PC: Congenital adrenal hyperplasia due to steroid 21-hydroxylase deficiency: An Endocrine Society clinical practice guideline. J Clin Endocrinol Metab 2010; 95:4133-4160

55. Sytsma SE (ED): Ethics and Intersex. Dordrecht, The Netherlands, Springer, 2006

56. Meyer-Bahlburg HF: Treatment guidelines for children with disorders of sex development. Neuropsychiatrie del'Enfance et de l'Adolescence 2008; 56:345-349

57. Cohen-Kettenis P: Gender change in 46,XY persons with 5alpha-reductase-2 deficiency and 17beta-hydroxysteroid dehydrogenase-3 deficiency. Arch Sex Behav 2005; 34:399-410

58. Dessens AB, Slijper FM, Drop SL: Gender dysphoria and gender change in chromosomal females with congenital adrenal hyperplasia. Arch Sex Behav 2005; 34:389-397

59. Mazur T: Gender dysphoria and gender change in androgen insensitivity or micropenis. Arch Sex Behav 2005; 34:411-421

60. Meyer-Bahlburg HF: Introduction: Gender dysphoria and gender change in persons with intersexuality. Arch Sex Behav 2005; 34:371-373

61. Meyer-Bahlburg HF: Gender identity outcome in female-raised 46,XY persons with penile agenesis, cloacal exstrophy of the bladder, or penile ablation. Arch Sex Behav 2005; 34:423-438

62. American Medical Association House of Delegates: Resolution 122 (A-08). 2008.

63. American Medical Association House of Delegates: Resolution 114 (A-08). 2008.

64. Di Ceglie D, Sturge C, Sutton A: Gender identity disorders in children and adolescents: Guidance of management. London, Royal College of Psychiatrists, 1998, CR 63. <www.rcpsych.ac.uk/ files/pdfversion/cr63.pdf> [Accessed on May 3, 2011]

65. British Society for Paediatric Endocrinology and Diabetes Clinical Committee: Statement on the management of gender identity disorder (GID) in children and adolescents. 2009

66. Gooren LJ: Clinical practice. Care of transsexual persons. N Engl J Med 2011; 364:1251-1257

67. Minter S: Representing Transsexual Clients: Selected Legal Issues. 2003; http://www.transgenderlaw.org/resources/ translaw.htm#_ftnref49 [Accessed on May 2, 2011]

68. Whittle S, Bockting W, Monstrey S, Brown G, Brownstein M, DeCuypere G, Ettner R, Fraser L, Green J, Meriggiola C, Rachlin K, Robinson B: WPATH clarification on medical necessity of treatment, sex reassignment, and insurance coverage in the U.S.A. 2008; http://www.tgender.net/taw/WPATHMedNecofSRS.pdf [Accessed on May 2, 2011]

69. Drummond KD, Bradley SJ, Peterson-Badali M, Zucker KJ: A follow-up study of girls with gender identity disorder. Dev Psychol 2008; 44:34-45

70. Cole SS, Denny D, Eyler AE, Samons SS: Issues of transgender, in Psychological Perspectives on Human Sexuality. Edited by Szuchman LT, Muscarella F. New York, John Wiley & Sons, 2000; 149-195

71. Denny D: The politics of diagnosis and a diagnosis of politics: the university-affiliated gender clinics, and how they failed to meet the needs of transsexual people. Chrysalis Quarterly 1992; 9-20

72. Bancroft J: The relationship between gender identity and sexual behaviour: Some clinical aspects, in Gender Differences: Their Ontogeny and Significance. Edited by Ounsted C, Taylor DC. Edinburgh, Scotland, UK, Churchill-Livingstone, 1972; 123-157

73. Fisk N: Gender dysphoria syndrome (the how, what, and why of a disease), in Proceedings of the Second Interdisciplinary Symposium on Gender Dysphoria Syndrome. Edited by Laub DR, Gandy P. Stanford, CA, Stanford University Press, 1974; 7-14

74. Perrin E, Smith N, Davis C, Spack N, Stein MT: Gender variant and gender dysphoria in two young children. J Dev Behav Pediatr 2010; 31:161-164

75. Zucker KJ: Treatment of gender identity disorder in children, in Clinical Management of Gender Identity Disorders in Children and Adults. Edited by Blanchard R, Steiner MB. Washington, D.C., American Psychiatric Press, 1990; 25-47

76. Byne W, Stein E: Ethical implications of scientific research on the causes of sexual orientation. Health Care Anal 1997; 5:136-148

77. Stoller RJ: Presentations of Gender. New Haven, CT, Yale University Press, 1985

78. Haber CH: The psychoanalytic treatment of a preschool boy with a gender identity disorder. J Am Psychoanal Assoc 1991; 39:107-129

79. Zucker KJ, Bradley SJ: Gender Identity Disorder and Psychosexual Problems in Children and Adolescents. New York, Guilford Press, 1995

80. Rekers GA, Rosen AC, Lovaas OL, Bentler PM: Sex role stereotypy and professional intervention for childhood gender disturbance. Prof Psychol 1978; 9:127-136

81. Rekers GA: Assessment and treatment of childhood gender problems, in Advances in Clinical Child Psychology (Volume 1). Edited by Lahey BB, Kazdin AE. New York, Plenum, 1977; 267-306

82. Morin SF, Schultz SJ: The gay movement and the rights of children. J Soc Iss 1978; 34:137-148

83. Wolfe BE: Behavioral treatment of childhood sexual disorders: a conceptual and empirical critique. Behavior Modification 1979; 3:550-575

84. Socarides CW: Homosexuality: a freedom too far. Phoenix, AZ, Adam Margrave Books, 1995

85. Nicolosi J, Nicolosi LA: A Parent's Guide to Preventing Homosexuality. Downers Grove, IL, InterVarsity Press, 2002

86. Menvielle E, Perrin E, Tuerk C: The beat of a different drummer: children who do not follow gender-typical expectations. Contemp Pediatr 2005; 22:38-46

87. Rekers GA, Mead S: Early intervention for female sexual identity disturbance: self-monitoring of play behavior. J Abnorm Child Psychol 1979; 7:405-423

88. Steensma TD, Cohen-Kettenis PT: Gender Transitioning before Puberty? Arch Sex Behav 2011; 40:649-650

89. Dreger A: Gender identity disorder in childhood: inconclusive advice to parents. Hastings Cent Rep 2009; 39:26-29

90. Cohen-Kettenis P, van Goozen S: Adolescents who are eligible for sex reassignment surgery: parental reports of emotional and behavioral problems. Clin Child Psychol Psychiatry 2002; 7:412-422

91. De Vries A, Cohen-Kettenis P: Review of World Professional Association for Transgender Health's Standards of Care for children and adolescents with gender identity disorder: a need for change? International Journal of Transgenderism 2009;100-109

92. Babinski S, Reyes A: Identity formation in adolescence: case study of gender identity disorder and treatment through an intermediate-care day hospital. Psychiatric Quarterly 1994; 65:121-133

93. McCauley E, Erhardt AA: Follow-up of females with gender identity disorders. J Nerv Ment Dis 1984; 172:353-358

94. Cohen-Kettenis P, van Goozen SH: Sex reassignment of adolescent transsexuals: a follow-up study. J Am Acad Child Adolesc Psychiatry 1997; 36:263-271

95. Tugnet N, Goddard JC, Vickery RM, Khoosal D, Terry TR: Current management of male-to-female gender identity disorder in the UK. Postgrad Med J 2007; 83:638-642

96. Cohen L, de Ruiter C, Ringelberg H, Cohen-Kettenis PT: Psychological functioning of adolescent transsexuals: personality and psychopathology. J Clin Psychol 1997; 53:187-196

97. De Vries A, Steensma TD, Cohen-Kettenis P: Psychiatric comorbidity in gender dysphoric adolescents. J Child Psychol Psychiatry 2011; 52:1195-202

98. Smith YL, van Goozen SH, Kuiper AJ, Cohen-Kettenis PT: Transsexual subtypes: clinical and theoretical significance. Psychiatry Res 2005; 137:151-160

99. Caldwell C, Keshavan MS: Schizophrenia with secondary transsexualism. Can J Psychiatry 1991; 36:300-301

100. Coleman E, Cesnik J: Skoptic syndrome: the treatment of an obsessional gender dysphoria with lithium carbonate and psychotherapy. Am J Psychother 1990; 44:204-217

101. Puri BK, Singh I: The successful treatment of a gender dysphoric patient with pimozide. Aust NZ J Psychiatry 1996; 30:422-425

102. Marks IM, Mataix-Cols D: Four-year remission of transsexualism after comorbid obsessive-compulsive disorder improved with self-exposure therapy. Br J Psychiatry 1997; 171:389-390

103. Zucker, K. J., Bradley, S. J., Owen-Anderson, A., Kibblewhite, S. J., and Wood, H. Singh D. Choi K. Demographics, behavior problems, and psychosexual characteristics of adolescents with gender identity disorder or transvestic fetishism. J Sex Marital Ther 2011; 15:58-82

104. Campo J, Nijman H, Merckelbach H, Evers C: Psychiatric comorbidity of gender identity disorders: a survey among Dutch psychiatrists. Am J Psychiatry 2003; 160:1332-1336

105. Campo JM, Nijman H, Evers C, Merckelbach HL, Decker I: Gender identity disorders as a symptom of psychosis, schizophrenia in particular. Ned Tijdschr Geneeskd 2001; 145:1876-1880

106. Borras L, Huguelet P, Eytan A: Delusional "pseudotranssexualism" in schizophrenia. Psychiatry 2007; 70:175-179

107. Meyer, W., Bockting, W., Cohen-Kettenis P., et al. The Harry Benjamin International Gender Dysphoria Association's Standards of Care for Gender Identity

© Copyright, American Psychiatric Association, all rights reserved.    32

Disorders, 6th Version, 2001; www.wpath.org/documents2/socv6.pdf [Accessed on May 2, 2011]

108. De Vries A, Cohen-Kettenis P., Delemarre-van de Waal H.: Clinical management of gender dysphoria in adolescents. International Journal of Transgenderism 2006; 9:83-94

109. Delemarre-van de Waal H, Cohen-Kettenis P.: Clinical management of gender identity disorder in adolescents: A protocol on psychological and paediatric endocrinology aspects. Eur J Endocrinol 2006; 155:S131-S137

110. Schulz KM, Sisk CL: Pubertal hormones, the adolescent brain, and the maturation of social behaviors: Lessons from the Syrian hamster. Mol Cell Endocrinol 2006; 254-255:120-126

111. Green R, Roberts CW, Williams K, Goodman M, Mixon A: Specific cross-gender behaviour in boyhood and later homosexual orientation. Br J Psychiatry 1987; 151:84-88

112. Bockting WO, Coleman E: Developmental stages of the transgender coming out process: Toward an integrated identity, in Principles of Transgender Medicine and Surgery. Edited by Ettner R, Monstrey S, Eyler E. New York, The Haworth Press, 2007; 185-208

113. Lewins F: Transexualism in society: A Sociology of Male-to-Female Transsexuals. South Melbourne, Australia, MacMillan Education Australia, 1995

114. Lev AI: Transgender Emergence: Therapeutic Guidelines for Working with Gender-variant People and Their Families. Binghamton, NY, The Haworth Press, 2004

115. Gagne P, Tewksbury R, McGaughey D: Coming out and crossing over: identity formation and proclamation in a transgender community. Gender Society 1997; 11:478-508

116. Devor AH: Witnessing and mirroring: a fourteen stage model of transsexual identity formation. Journal of Gay & Lesbian Psychotherapy 2004; 8:41-67

117. Cass VC: Homosexual identity formation: a theoretical model. J Homosex 1979; 4:219-235

118. Coleman E: Developmental stages of the coming out process. J Homosex 1981; 7:31-43

119. Troiden RR: The formation of homosexual identities. J Homosex 1989; 17:43-73

120. Troiden RR: Homosexual identity development. J Adolesc Health Care 1988; 9:105-113

121. Diamond LM: Development of sexual orientation among adolescent and young adult women. Dev Psychol 1998; 34:1085-1095

122. Parks CA: Lesbian identity development: an examination of differences across generations. Am J Orthopsychiatry 1999; 69:347-361

123. Savin-Williams RC: Lesbian, gay male, and bisexual adolescents, in Lesbian, Gay, and Bisexual Identities Across the Lifespan: Psychological Perspectives. Edited by D?Augelli AR, Patterson CJ. Oxford, England, Oxford University Press, 1995; 165-189

124. Weinberg MS, Williams CJ, Pryor DW: Dual Attraction: Understanding Bisexuality. Oxford, England, Oxford University Press, 1994

125. Troiden RR: The formation of homosexual identities, in Psychological Perspectives on Lesbian and Gay Male Experiences. Edited by Garnets LD, Kimmel DC. New York, Columbia University Press, 1993; 191-217

126. Bockting, W.O. (Producer), Goldberg, E. (Editor), & Kimberly, S. (Director). (2008). Transgender stories [Motion Picture]. United States: Frameline.

127. Pfafflin F: Regrets After Sex Reassignment Surgery. J Psychol Hum Sex 1993; 5:69-85

128. Green R, Fleming D: Transsexual surgery follow-up: status in the 1990's. Ann Rev Sex Res 1990; 1:163-174

129. Michel A, Ansseau M, Legros JJ, Pitchot W, Mormont C: The transsexual: What about the future? Eur Psychiatry 2002; 17:353-362

130. Bockting WO, Knudson G, Goldberg,J.M.: Counseling and mental health care for transgender adults and loved ones. International Journal of Transgenderism 2006; 9:35-82

131. Roberts LF, Brett MA, Johnson TW, Wassersug RJ: A passion for castration: characterizing men who are fascinated with castration, but have not been castrated. J Sex Med 2008; 5:1669-1680

132. Grant JM, Mottet LA, Tanis J, Harrision J, Herman JL, Keisling M: Injustice at Every Turn: A Report of the National Transgender Dis-crimination Survey. 2011; <http://www.thetaskforce.org/downloads/ reports/reports/ntds_full.pdf> [Accessed on May 2, 2011]

133. Nuttbrock L, Hwahng S, Bockting W, Rosenblum A, Mason M, Macri M, Becker J: Psychiatric impact of gender-related abuse across the life course of male-to-female transgender persons. J Sex Res 2010; 47:12-23

134. Moore E, Wisniewski A, Dobs A: Endocrine treatment of transsexual people: a review of treatment regimens, outcomes, and adverse effects. J Clin Endocrinol Metab 2003; 88:3467-3473

135. Eyler E: Primary medical care of the gender-variant patient, in Principles of Transgender Medicine and Surgery. Edited by Ettner R, Monstrey S, Eyler E. Binghamton, NY, The Haworth Press, 2007; 15-32

136. Feldman J.: Preventative care of the transgendered patient: An evidence based approach, in Principles of Transgender Medicine and Surgery. Edited by Ettner R, Monstrey S, Eyler E. Binghamton, NY, The Haworth Press, 2007

137. Feldman JL: Medical management of the transgender patient: What the primary care clinician needs to know, in The Fenway Guide to Enhancing Healthcare in Lesbian, Gay, Bisexual, and Transgender Communities. Edited by Makadon H, Mayer K, Potter J, Goldhammer H. Philadelphia, PA, American College of Physicians, 2008; 365-392

138. Rehman J, Lazer S, Benet AE, Schaefer LC, Melman A: The reported sex and surgery satisfactions of 28 postoperative male-to-female transsexual patients. Arch Sex Behav 1999; 28:71-89

139. Eyler AE, Feldman J: The transsexual male, in Clinical Men's Health: Evidence in Practice. Edited by Heidelbaugh JJ. Philadelphia, PA, Elsevier, 2008; 561-584

140. Monstrey S, Vercruysse H, De Cuypere G: Is gender reassignment evidence based? Recommendation for the seventh version of WPATH standards of care. International Journal of Transgenderism 2009; 11:206-214

141. Monstrey S, De Cuypere G, Ettner R: Surgery: General principles, in Principles of Transgender Medicine and Surgery. Edited by Ettner R, Monstrey S, Eyler E. Binghamton, NY, The Haworth Press, 2007; 89-104

142. Monstrey S, Ceulemans P, Hoebeke P: Surgery: Female-to-male patient, in Principles of Transgender Medicine and Surgery. Edited by Ettner R, Monstrey S, Eyler E. Binghamton, NY, The Haworth Press, 2007; 135-168

143. Meyer JK, Reter DJ: Sex reassignment: Follow-up. Arch Gen Psychiatry 1979; 36:1010-1015

144. Carroll R: Outcomes of treatment for gender dysphoria. Journal of Sex Education and Therapy 1999; 24:128-136

145. Kuiper B, Cohen-Kettenis P: Sex reassignment surgery: A study of 141 Dutch transsexuals. Arch Sex Behav 1988; 17:439-457

146. Snaith P, Tarsh MJ, Reid R: Sex reassignment surgery: A study of 141 Dutch transsexuals. Br J Psychiatry 1993; 162:681-685

147. Cohen-Kettenis P, Gooren LJG: Transsexualism: A review of etiology, diagnosis, and treatment. J Psychosom Res 1999; 46:315-333

148. Weitze C, Osburg S: Transsexualism in Germany: empirical data on epidemiology and application of the German Transsexuals' Act during its first ten years. Arch Sex Behav 1996; 25:409-425

149. Murad MH, Elamin MB, Garcia MZ, Mullan RJ, Murad A, Erwin PJ, Montori VM: Hormonal therapy and sex reassignment: a systematic review and meta-analysis of quality of life and psychosocial outcomes. Clin Endocrinol (Oxf) 2010; 72:214-231

150. Johansson A, Sundbom E, Hojerback T, Bodlund O: A five-year follow-up study of Swedish adults with gender identity disorder. Arch Sex Behav 2010; 39:1429-1437

151. Kuhn A, Bodmer C, Stadlmayr W, Kuhn P, Mueller MD, Birkhauser M: Quality of life 15 years after sex reassignment surgery for transsexualism. Fertil Steril 2009; 92:1685-1689

152. Dhejne C, Lichtenstein P, Boman M, Johansson AL, Langstrom N, Landen M: Long-term follow-up of transsexual persons undergoing sex reassignment surgery: Cohort study in Sweden. PLoS One 2011; 6:e16885

153. Freund K, Steiner BW, Chan S: Two types of cross-gender identity. Arch Sex Behav 1982; 11:49-63

154. Blanchard R, Sheridan PM: Proportion of unmarried siblings of homosexual and nonhomosexual gender-dysphoric patients. Can J Psychiatry 1992; 37:163-167

155. Olsson SE, Moller R: On the incidence and sex ratio of transsexualism in Sweden, 1972-2002. Arch Sex Behav 2003; 32:381-386

156. Brown, G. Sex reassignment surgery in a patient with Gender Identity Disorder and Dissociative Identity Disorder: Report of a successful case. 2001. XVII Biennial Symposium of the Harry Benjamin International Gender Dysphoria Association, Galveston, TX, October 31-November 4, 2001

157. Garaffa G, Christopher NA, Ralph DJ: Total phallic reconstruction in female-to-male transsexuals. Eur Urol 2009; 57:715-722

158. Leriche A, Timsit MO, Morel-Journel N, Bouillot A, Dembele D, Ruffion A: Long-term outcome of forearm flee-flap phalloplasty in the treatment of transsexualism. BJU Int 2008; 101:1297-1300

159. Lindemalm G, Korlin D, Uddenberg N: Long-term follow-up of "sex change" in 13 male-to-female transsexuals. Arch Sex Behav 1986; 15:187-210

160. Meyer W: World Professional Association for Transgender Health's standards of care: Requirements of hormone therapy for adults with gender identity disorder. International Journal of Transgenderism 2009; 11:127-132

© Copyright, American Psychiatric Association, all rights reserved.   33

## GENDER IDENTITY DISORDER

161. Drescher J: Queer diagnoses: parallels and contrasts in the history of homosexuality, gender variance, and the diagnostic and statistical manual. Arch Sex Behav 2010; 39:427-460

162. Lev AI: The ten tasks of the mental health provider: Recommendations for revision of the World Professional Association for Transgender Health's standards of care. International Journal of Transgenderism 2009; 11:74-99

163. Green R, Newman LE, Stoller RJ: Treatment of boyhood "transsexualism." Arch Gen Psychiatry 1972; 26:213-217

164. Stoller RJ: Etiological factors in male transsexualism. Transactions of the New York Academy of Sciences 1967; 29:431-433

165. Stoller RJ: The male transsexual as 'experiment.' Int J Psychoanal 1973; 54:215-225

166. Benjamin H: The transsexual phenomenon. Transactions of the New York Academy of Sciences 1967; 29:428-430

167. Green, R. Reflections on "Transgenderism and Sex Reassignment" 1969-1999: Presidential address. XVI Biennial Symposium of the Harry Benjamin International Gender Dysphoria Association, August 17-21, 1999; <www.wpath.org/journal/www.iiav.nl/ezines/web/IJT/97-03/numbers/symposion/green00.htm> [Accessed on May 3, 2011]

168. Meyer-Bahlburg HFL: Variants of gender differentiation in somatic disorders of sex development: Recommendations for version 7 of the World Professional Association for Transgender Health's standards of care. International Journal of Transgenderism 2009; 11:226-237

169. Zucker KJ: The DSM diagnostic criteria for gender identity disorder in children. Arch Sex Behav 2010; 39:477-498

170. Pfäfflin F, Junge A: Nachuntersuchung von 85 operierten transexxuxuellen. Forsch 1990; 3:331-348

171. Atkins D, Best D, Briss PA, Eccles M, Falck-Ytter Y, Flottorp S, Guyatt GH, Harbour RT, Haugh MC, Henry D, Hill S, Jaeschke R, Leng G, Liberati A, Magrini N, Mason J, Middleton P, Mrukowicz J, O'Connell D, Oxman AD, Phillips B, Schunemann HJ, Edejer TT, Varonen H, Vist GE, Williams JW, Jr., Zaza S: Grading quality of evidence and strength of recommendations. BMJ 2004; 328:1490

172. Dahl, M., Feldman, J., Jaboero, A., Bockting, W., Knudson, G., and Goldberg, J. Endocrine therapy for transgender adults in British Columbia: Suggested Guidelines. 2006; http://transhealth.vch.ca/resources/careguidelines.html [Accessed May 2, 2011]

173. Dyer O: Gender disorder specialist is found guilty of serious professional misconduct. BMJ 2007; 334:1134

174. Dyer O: Sex change expert accused of rushing patients into surgery. BMJ 2006; 333:935

175. Cole CM, O'Boyle M, Emory LE, Meyer WJ: Comorbidity of gender dysphoria and other major psychiatric diagnoses. Arch Sex Behav 1997; 26:13-26

176. Hepp U, Kraemer B, Schnyder U, Miller N, Delsignore A: Psychiatric comorbidity in gender identity disorder. J Psychosom Res 2005; 58:259-261

177. Kersting A, Reutemann M, Gast U, Ohrmann P, Suslow T, Michael N, Arolt V: Dissociative disorders and traumatic childhood experiences in transsexuals. J Nerv Ment Dis 2003; 191:182-189

178. Wallien MS, Swaab H, Cohen-Kettenis PT: Psychiatric comorbidity among children with gender identity disorder. J Am Acad Child Adolesc Psychiatry 2007; 46:1307-1314

179. Sebastian C: Transgenderism and the AIDS epidemic. Posit Aware 1999; 10:57

180. Lawrence AA: Transgender health concerns, in The Health of Sexual Minorities: Public Health Perspectives on Lesbian, Gay, Bisexual and Transgender Populations. Edited by Meyer IH, Northridge ME. New York, Springer, 2007; 473-505

181. Tom Waddell Transgender Team. Tom Waddell Health Center protocols for hormonal reassignment of gender. 2006; www.sfdph.org/dph/comupg/oservices/medSvs/hlthCtrs/TransGendprotocols122006.pdf [Accessed on May 2, 2011]

182. Bockting WO, Knudson G, Goldberg JM: Counseling and mental health care for transgender adults and loved ones. International Journal of Transgenderism 2007; 9:35-82

183. International Conference on Transgender Law and Employment Policy, Inc.: Health law standards of care for transsexualism; 1993 http://www.transgendercare.com/guidance/resources/ictlep_soc.htm [Accessed on May 2, 2011]

184. Fraser L: Etherapy: ethical and clinical considerations for version 7 of the World Professional Association for Transgender Health's Standards of Care. International Journal of Transgenderism 2009; 11:247-263

185. Hale CJ: Ethical problems with the mental health evaluation standards of care for adult gender variant prospective patients. Perspect Biol Med 2007; 50:491-505

186. Meyer-Bahlburg HF, Khuri J, Baker SW, New MI: Genital body image and stigmatization by lovers in 46,Xx intersexuality. J Sex Med 2009; 6 (Suppl):368

187. American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, 4th edition, text revision. Washington, D.C., American Psychiatric Association, 2000

188. Meyer-Bahlburg HF, Gruen RS, New MI, Bell JJ, Morishima A, Shimshi M, Bueno Y, Vargas I, Baker SW: Gender change from female to male in classical congenital adrenal hyperplasia. Horm Behav 1996; 30:319-332

189. Reiner WG: Psychosexual development in genetic males assigned female: the cloacal exstrophy experience. Child Adolesc Psychiatr Clin N Am 2004; 13:657-74

190. Preves SE: Intersex and Identity: The Contested Self, Piscataway, NJ, Rutgers University Press, 2003

191. Diamond M, Beh HG: Changes in the management of children with intersex conditions. Nat Clin Pract Endocrinol Metab 2008; 4:4-5

192. Grumbach MM, Hughes IA, Conte FA: Disorders of sex differentiation, in Williams Textbook of Endocrinology. Edited by Larsen PR, Kronenberg HM, Melmed S, Polonsky KS. Philadelphia, W.B. Saunders, 2003

193. American Academy of Pediatrics: Timing of elective surgery on the genitalia of male children with particular reference to the risks, benefits, and psychological effects of surgery and anesthesia. Pediatrics 1996; 97:590-594

194. Meyer-Bahlburg HF: Gender assignment and reassignment in intersexuality: Controversies, data, and guidelines for research. Adv Exp Med Biol 2002; 511:199-223

195. Deogracias JJ, Johnson LL, Meyer-Bahlburg HF, Kessler SJ, Schober JM, Zucker KJ: The gender identity/gender dysphoria questionnaire for adolescents and adults. J Sex Res 2007; 44:370-379

196. Zucker KJ: Measurement of psychosexual differentiation. Arch Sex Behav 2005; 34:375-388

197. Money J: Sex Errors of the Body and Related Syndromes: A Guide to Counseling Children, Adolescents, and Their Families, 2nd Edition. Baltimore, MD, Paul H. Brookes 1994

198. Uslu R, Oztop D, Ozcan O, Yilmaz S, Berberoglu M, Adiyaman P, Cakmak M, Kerimoglu E, Ocal G: Factors contributing to sex assignment and reassignment decisions in Turkish children with 46,XY disorders of sex development. J Pediatr Endocrinol Metab 2007; 20:1001-1015

199. Hines M: Brain Gender. Oxford, Oxford University Press, 2004

200. Lang C, Kuhnle U: Intersexuality and alternative gender categories in non-Western cultures. Horm Res 2008; 69:240-250

201. Money J: Biographies of Gender and Hermaphroditism, in Paired Comparisons: Clinical Supplement to the Handbook of Sexology. Amsterdam, Elsevier, 1991

202. Frisen L, Nordenstrom A, Falhammar H, Filipsson H, Holmdahl G, Janson PO, Thoren M, Hagenfeldt K, Moller A, Nordenskjold A: Gender role behavior, sexuality, and psychosocial adaptation in women with congenital adrenal hyperplasia due to CYP21A2 deficiency. J Clin Endocrinol Metab 2009; 94:3432-3439

203. Meyer-Bahlburg HF, Dolezal C, Baker SW, Ehrhardt AA, New MI: Gender development in women with congenital adrenal hyperplasia as a function of disorder severity. Arch Sex Behav 2006; 35:667-684

204. Migeon CJ, Wisniewski AB, Gearhart JP, Meyer-Bahlburg HF, Rock JA, Brown TR, Casella SJ, Maret A, Ngai KM, Money J, Berkovitz GD: Ambiguous genitalia with perineoscrotal hypospadias in 46,XY individuals: long-term medical, surgical, and psychosexual outcome. Pediatrics 2002; 110:e31

205. Schutzmann K, Brinkmann L, Schacht M, Richter-Appelt H: Psychological distress, self-harming behavior, and suicidal tendencies in adults with disorders of sex development. Arch Sex Behav 2009; 38:16-33

206. Warne G, Grover S, Hutson J, Sinclair A, Metcalfe S, Northam E, Freeman J: A long-term outcome study of intersex conditions. J Pediatr Endocrinol Metab 2005; 18:555-567

207. Brinkmann L, Schweizer K, Richter-Appelt H: Geschlechtsidentitat und psychische Belastungen von erwachsenen personen mit intersexualitat. Z Sexualforsch 2007; 20:129-144

208. Jurgensen M, Hiort O, Holterhus PM, Thyen U: Gender role behavior in children with XY karyotype and disorders of sex development. Horm Behav 2007; 51:443-453

209. Richter-Appelt H, Discher C, Gedrose B: Gender identity and recalled gender related childhood play-behaviour in adult individuals with different forms of intersexuality. Anthropol Anz 2005; 63:241-256

210. Swiglo BA, Murad MH, Schunemann HJ, Kunz R, Vigersky RA, Guyatt GH, Montori VM: A case for clarity, consistency, and helpfulness: State-of-the-art clinical practice guidelines in endocrinology using the grading of

 © Copyright, American Psychiatric Association, all rights reserved. **34**

recommendations, assessment, development, and evaluation system. J Clin Endocrinol Metab 2008; 93:666-673

211. Meyer-Bahlburg HF: Sexuality in early adolescence, in Handbook of Human Sexuality. Edited by Wolman BB, Money J. Englewood Cliffs, NJ, Prentice-Hall, 1980; 61-82

212. Schulz KM, Molenda-Figueira HA, Sisk CL: Back to the future: The organizational-activational hypothesis adapted to puberty and adolescence. Horm Behav 2009; 55:597-604

213. Meyer-Bahlburg HF, Migeon CJ, Berkovitz GD, Gearhart JP, Dolezal C, Wisniewski AB: Attitudes of adult 46, XY intersex persons to clinical management policies. J Urol 2004; 171:1615-1619

214. Wisniewski AB, Migeon CJ, Malouf MA, Gearhart JP: Psychosexual outcome in women affected by congenital adrenal hyperplasia due to 21-hydroxylase deficiency. J Urol 2004; 171:2497-2501

215. Warne GL, Bhatia V: Intersex, East and West in Ethics and Intersex Edited by Sytsma SE. Berlin, Springer, 2006;

216. Karkazis K: Fixing Sex: Intersex, Medical  Authority, and Lived Experience, Durham, NC, Duke University Press, 2008

217. Preves SE: For the sake of the children: destigmatizing intersexuality. J Clin Ethics 1998; 9:411-420

218. Gastaud F, Bouvattier C, Duranteau L, Brauner R, Thibaud E, Kutten F, Bougneres P: Impaired sexual and reproductive outcomes in women with classical forms of congenital adrenal hyperplasia. J Clin Endocrinol Metab 2007; 92:1391-1396

219. Crouch NS, Liao LM, Woodhouse CR, Conway GS, Creighton SM: Sexual function and genital sensitivity following feminizing genitoplasty for congenital adrenal hyperplasia. J Urol 2008; 179:634-638

220. Minto CL, Liao LM, Woodhouse CR, Ransley PG, Creighton SM: The effect of clitoral surgery on sexual outcome in individuals who have intersex conditions with ambiguous genitalia: A cross-sectional study. Lancet 2003; 361:1252-1257

221. Sircili MH, de Mendonca BB, Denes FT, Madureira G, Bachega TA, Silva FA: Anatomical and functional outcomes of feminizing genitoplasty for ambiguous genitalia in patients with virilizing congenital adrenal hyperplasia. Clinics (Sao Paulo) 2006; 61:209-214

222. Meyer-Bahlburg HFL, Blizzard RM: Research on intersex - summary of planning workshop. The Endocrinologist 2004; 14:59-69

223. Consortium on the management of disorders of sex development: Handbook for Parents. Rohnert Park, CA, Intersex Society of North America, 2006

224. Carmichael P, Ransley PG: Telling children about a physical intersex condition. Dialogues in Pediatric Urology 2002; 25:7-8

225. Garrett CC, Kirkman M: Being an XY female: an analysis of accounts from the website of the androgen insensitivity syndrome support group. Health Care Women Int. 2009; 30:428-446

226. Dreger AD: Intersex in the Age of Ethics. Frederick, MD, University Publishing Group, 1999

227. Callen-Lorde Community Health Center: Transgender Health Program Protocols, unpublished, 2009

   *© Copyright, American Psychiatric Association, all rights reserved.*   **35**